IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC. | ) | Case No. 01-0706 (MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proc. No. 03-50003 (MFW) |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL

Plaintiff, EBC I, Inc., f/k/a EToys, Inc., appeals under 28 U.S.C. § 158(a) from the:

(1)    Findings of Fact and Conclusions of Law (Bankr. D.I. 111) (Exhibit A hereto);

(2)    Opinion Granting Judgment in Favor of America Online, Inc. (Bankr. D.I. 112) (Exhibit B hereto); and

(3)    Order Granting Judgment in Favor of America Online, Inc. (Bankr. D.I. 113) (Exhibit C hereto), entered in the case on January 10, 2008.

The names of the parties to the Opinion and Order appealed from, and the names, addresses and telephone numbers of their respective attorneys are as follows:

| PARTY | ATTORNEYS |
|---|---|
| EBC I, Inc. | Richard D. Allen, Esquire<br>Gregory W. Werkheiser, Esquire<br>Thomas W. Briggs, Jr., Esquire<br>Morris Nichols Arsht & Tunnell LLP<br>1201 N. Market Street, 18th Floor<br>P.O. Box 1347<br>Wilmington, DE  19899-1347<br>Telephone:  (302) 658-9200<br>Facsimile:  (302) 658-3989 |
| America Online, Inc. | Karen C. Bifferato, Esquire<br>Marc J. Phillips, Esquire<br>Christina M. Thompson, Esquire<br>Connolly Bove Lodge & Hutz LLP<br>The Nemours Building<br>1007 N. Orange Street<br>Wilmington, DE  19899<br>Telephone:  (302) 658-9141<br>Facsimile:  (302) 658-5614<br><br>Michael D. Snyder, Esquire<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20006<br>Telephone:  (202) 663-6000<br>Facsimile:  (202) 663-6363 |

MORRIS NICHOLS ARSHT & TUNNELL LLP

Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
   *Attorneys for Appellant/Plaintiff*
   *E-Toys, Inc.*

January 22, 2008

1395730

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT
AND CONCLUSIONS OF LAW[1]

I.    FINDINGS OF FACT

A.    Parties and Background

1.    From October 1997 through December 2000 eToys, Inc. ("eToys") was the leading online retailer focused on toys and children's products.  (Ex. D-1 at 1)[2]

2.    At all relevant times America Online, Inc. ("AOL") operated as an internet service provider.  AOL provided its subscribers

---

[1]  These, together with the accompanying Opinion, constitute the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2]  Citations to the Plaintiff's and Defendant's Exhibits are to "Ex. P- at [page]" and "Ex. D- at [page]," respectively. Citations to the transcript of the hearing held on June 26, 2007, are to "Tr. [page:line]" and to depositions are to "Dep. [name] [page:line]."  Citations to the Pretrial Stipulation and Order are to "PT Stip. [page]."  Citations to pleadings are to the docket as "D.I. [#]."

("AOL Members") with access to the internet at large and to news, entertainment, sports, and online shopping services provided through third party retailers.  (Tr. 22:17-23:24)

3.   In the late 1990s AOL had approximately 20 million AOL Members each of whom paid a subscription fee of approximately $20 per month.  (Tr. 23:17-25:2)

4.   In the shopping area of the AOL site, people could locate products, compare them to others, and buy them directly from AOL's shopping partners.  (Tr. 23:10-23:16)

5.   Third party retailers paid AOL for the opportunity to provide shopping services to AOL Members.  (Tr. 23:25-24:5)

6.   Shopping partners purchased advertisements ("impressions") showing the retailers' logo or promotion ad in AOL's online shopping mall and other areas that AOL Members were expected to browse.  (Tr. 26:24-27:22)

7.   AOL did not have direct control over how many impressions would result from its contracts with marketing partners, because it depended on how many AOL Members visited a particular site over a particular period.  (Tr. 30:4-30:12)

8.   For shopping partners, the goal of an impression was to generate a "click through," whereby the AOL Member would visit the retailer's own website to shop and hopefully purchase products.  (Tr. 28:3-28:11)

9.   As of the late 1990s, approximately 80% of AOL's revenues resulted from subscriber fees paid by AOL Members and approximately 20% resulted from payments by third parties, including shopping partners.  (Tr. 24:8-24:13)

   B.   1997 Interactive Marketing Services Agreement

10.  On October 1, 1997, the day that eToys launched its website, eToys and AOL entered into their first Interactive Marketing Services Agreement which was to last through December 31, 1999. (PT Stip. at 2; Ex. D-1 at 1; Ex. D-2 at AOL 00491)

11.  At the time of the 1997 Agreement, eToys was the only online toy retailer to provide a comprehensive selection of nationally advertised and specialty toy brands, and eToys' prices were as low as, or lower than, those of land-based toy retailers.  (Ex. D-1 at 1; Tr. 35:1-35:18)

2

12.   AOL provided a demographic profile that was particularly compatible with eToys' target customer profile.  (Dep. [Schoch] 65:9-65:18; Dep. [Lenk] 43:11-43:22)

13.   Under the 1997 Agreement, AOL was to provide eToys with approximately 17 million impressions plus a presence on the AOL Shopping Channel and Service Shopping Channel Toys Department. (Ex. D-2 at AOL 00488, 00492)

14.   If AOL failed to provide the required number of impressions in a year, AOL was required to "make good" by providing the impressions missed within four months.  (Ex. D-2 at AOL 00488-89)

15.   In the event that AOL failed to deliver more than 20% of the promised impressions, AOL would provide 1.5 times the missed impressions; if AOL failed to deliver more than 30% of the promised impressions, eToys had the right to terminate the 1997 Agreement.  (Ex. D-2 at AOL 00488-89)

      C.   <u>1999 Interactive Marketing Services Agreement</u>

16.   Before the end of the 1997 Agreement, eToys and AOL met to review the results achieved to date.  (Ex. D-4 at AOL 00374)

17.   eToys was eager to pursue additional promotional opportunities both online and offline and to increase its offers to AOL Members.  (Ex. D-4 at AOL 00374)

18.   eToys was interested in doing a large deal with AOL because it wanted to promote its brand and online store to become the dominant children's brand and compete effectively with established land-based toy retailers.  (Tr. 37:8-39:24; Ex. D-12 at AOL 00454)

19.   On August 10, 1999, eToys and AOL executed a new three-year Interactive Marketing Services Agreement (the "1999 Agreement"), whereby AOL made eToys' shopping services available to AOL Members and provided various forms of promotions for eToys in exchange for $18 million, payable in $1.5 million quarterly installments.  (PT Stip. at 2; Ex. P-1)

20.   eToys expressly agreed that its payments under the 1999 Agreement were "non-refundable."  (Ex. P-1 at AOL 00204; Dep. [Brine] 84:12-84:18)

21.   AOL had the right to terminate the 1999 Agreement if eToys became insolvent or ceased operations, which AOL felt was important to protect its Members and AOL's brand.  (Ex. P-1 at AOL 00207; Dep. [Burger] 21:3-25:6)

3

22.  The price paid by eToys under the 1999 Agreement was calculated by the sum of some (but not all) of the impressions to be delivered by AOL multiplied by a particular cost per thousand (CPM) reflected on AOL's rate card.  (Dep. [Burger] 40:1-41:6; Tr. 80:4-80:11)

23.  AOL's rate card represented an initial offer or starting point that AOL would use in negotiating an agreement with a retail partner like eToys.  (Dep. [Brine] 114:2-114:18; Tr. 33:6-33:9; Dep. [Burger] 57:2-57:7)

24.  Because eToys was negotiating a major agreement with AOL, the price reached was substantially below the rate card prices (averaging approximately 69% less).  (Dep. [Baig] 92:4-92:15)

25.  Based on the agreed prices, the 1999 Agreement provided that roughly $3.5 million in certain impressions would be provided by AOL in the first year, $5.8 million in the second year, and $8.7 million in the third year.  (Ex. P-21 at AOL 00704; Dep. [Baig] 88:1-90:4)

26.  Under the 1999 Agreement AOL agreed to provide in excess of 1 billion impressions with eToys' logo or ad.  In the event impressions were not provided, AOL agreed to provide make good impressions at a rate of 1.5 times the missed impressions.  (Ex. P-1 at AOL 00197-98, 00211-12, 00216-17; Dep. [Burger] 58:17-58:20; Dep. [Valle] 38:5-38:13)

27.  Although their value was not explicitly included in the price, eToys sought and received AOL's commitment to provide Welcome Screen impressions (impressions appearing on the AOL homepage) which eToys felt were valuable.  (Tr. 86:5-86:18; Dep. [Lenk] 118:6-119:23; Dep. [Valle] 83:20-84:14; Dep. [Brine] 22:4-22:18, 23:8-23:25, 24:1-24:23, 27:23-29:9; Dep. [Burger] 98:20-100:12; Dep. [Iannuccilli] 35:1-35:7, 65:1-65:7, 68:24-69:14; Ex. D-5 at AOL 01748; Ex. D-18 at AOL 01568)

28.  In later years AOL charged other parties for the type of Welcome Screen impressions that it gave eToys under the 1999 Agreement and Amendment.  (Tr. 86:16-86:18; Dep. [Burger] 99:6-100:4; Dep. [Baig] 77:6-77:11, 77:15-78:10)

29.  Under the Agreement, AOL also allowed eToys to use AOL's brand and made eToys a premier retailer with exclusivity on some AOL sites.  (Dep. [Baig] 86:16-87:2, 92:16-94:4, 137:1-137:11, 148:9-148:20, 149:6-149:12, 152:6-152:10)

30. Specifically, under Exhibit G of the 1999 Agreement, eToys received a license to market, distribute, display, transmit, promote, and use certain trade names, trademarks, and service marks of AOL, which it did use in its television advertising. (Ex. P-1 at AOL 00226; Tr. 53:11-54:4)

31. Under the 1999 Agreement, eToys was an "Anchor Tenant" in various AOL online shopping areas, including toys, educational toys, kid and infant gear, and electronic games. (Ex. P-1 at AOL 00200; Ex. D-82 at TR 001976; Dep. [Brine] 34:12-34:17)

32. The 1999 Agreement also gave eToys exclusivity in some areas which meant that AOL would not put a competitor's placements in those areas. (Ex. P-1 at AOL 00199-200; Tr. 33:23-34:4; Dep. [Lenk] 88:9-89:9; Dep. [Burger] 116:18-117:6)

33. eToys valued the preclusive effect that the 1999 Agreement had on potential agreements between its competitors and AOL. (Dep. [Lenk] 69:4-69:21)

34. Section 1.5 of the 1999 Agreement provided that impressions delivered under the Agreement would link only to the eToys website and were limited to the categories of products listed on Exhibit D. (Ex. P-1 at AOL 00199, 00219)

35. Section 2.1 of the 1999 Agreement required that at least 50% of the net sales of the products on eToys' website be derived from the sale of children's toys, hobbies, arts and crafts, video games, and software. (Ex. P-1 at AOL 00200; Tr. 49:22-50:6)

36. The 1999 Agreement permitted eToys to collect and use information from AOL Members (which it did), but required that eToys comply with applicable privacy and disclosure requirements to protect the privacy of AOL Members, including their names, addresses, and purchases. (Ex. P-1 at AOL 00221, 00228; Tr. 52:10-54:18)

37. The Operating Standards in Exhibit E required that eToys' website rank among the top three interactive websites in the toy industry in the categories of competitive pricing, scope and selection of products, customer service and fulfillment, and ease of use. (Ex. P-1 at AOL 00221; Tr. 50:22-51:10)

38. If eToys failed to comply with the Operating Standards, section 2.7 of the 1999 Agreement allowed AOL to decrease or suspend the impressions it provided to eToys until such non-compliance was corrected. (Ex. P-1 at AOL 00203, Tr. 51:11-51:16)

39.   Exhibit F of the 1999 Agreement required that eToys conform to AOL's Kids and Teens Policy, which was designed to protect children and teenagers from being misled by what they saw on AOL or the internet.  (Tr. 53:1-53:10; Ex. P-1 at AOL 00225)

40.   The parties agreed that, in the press release announcing the 1999 Agreement, eToys would be referred to as the premier retailer of children's products such as toys, children's videos, and children's books.  This was intended by eToys to generate increased brand recognition, which it valued.  (Tr. 88:1-88:10; Ex. D-17 at AOL 00844)

41.   The potential effect of the 1999 Agreement on the investor community was important to eToys.  (Tr. 87:9-87:12; Dep. [Iannuccilli] 99:19-99:24; Dep. [Schoch] 72:14-72:21; Dep. [Lenk] 51:4-51:15, 56:11-56:24, 69:4-69:21)

42.   Investors viewed eToys' association with AOL favorably. (Dep. [Schoch] 40:9-40:11, 71:16-72:23; Dep. [Lenk] 113:6-113:13)

43.   In the ten days following the execution of the 1999 Agreement, the price of eToys' common stock rose from $31.25 to $45.625, representing an increase in its market capitalization of $1.564 billion.  (Ex. D-80 at TR 001965)

   D.   Performance of the 1999 Agreement

44.   Almost immediately after signing the 1999 Agreement, eToys expressed dissatisfaction with the results eToys was realizing from the Agreement.  (Ex. D-26 at AOL 00397)

45.   During the 1999 holiday season, shortly after the Agreement was signed, AOL began to deliver far fewer impressions than it was obligated to deliver.   This was acknowledged by AOL in an internal e-mail dated December 16, 1999, which reported that: "We are VERY low on our impression delivery."  (Ex. P-22)

46.   The total shortfall in delivery of impressions during the 1999 holiday season was about 34 million.  (Ex. P-6 at AOL 00155; Ex. P-18 at AOL 00722)

47.   AOL tried to work with eToys to compensate for the under-delivery of impressions, including delivering more welcome screen impressions.  (Dep. [Baig] 55:2-56:2, 70:20-71:12; Dep. [Burger] 78:24-79:9, 79:21-81:9, 104:16-105:2, 105:13-106:11; Dep. [Valle] 85:8-85:17; Dep. [Iannuccilli] 34:12-34:19)

48.  The under-delivery of impressions was, in part, the result
of fewer AOL Members browsing the internet and seeing the areas
where eToys' ads were placed.  (Dep. [Valle] 43:10-43:17)

49.  eToys also complained that AOL's redesign of its website
caused eToys to lose business because it increased the options
for AOL Members, thereby reducing the number of viewers of the
eToys' impressions.  (Dep. [Baig] 116:14-116:22; Dep. [Lenk]
135:1-136:3; Dep.[Valle] 91:24-92:10)

50.  Because of AOL's inability to deliver impressions at the
rate specified in the 1999 Agreement, eToys asked to restructure
the Agreement beginning in February 2000.  (Ex. D-28 at AOL
00762; Dep. [Baig] 51:5-51:8)

51.  By late spring of 2000, AOL was aware that it would be
unable to provide eToys with the impressions (including "make
good" impressions) it was obligated to deliver in the first year
of the 1999 Agreement and projected that there would be massive
delivery shortfalls in the second and third years as well.  (Dep.
[Burger] 104:16-105:12, 107:3-108:7)

52.  Internally, AOL recognized that the actual and projected
shortfall in delivery of impressions "was material" and that
eToys could assert it had the right to terminate the 1999
Agreement as a result.  (Ex. P-23; Dep. [Baig] 66:21-67:17,
107:22-109:19; Dep. [Burger] 140:5-140:19)

53.  AOL delayed renegotiation of the 1999 Agreement, however,
because it felt it would have greater leverage over eToys closer
to the holiday season.  (Ex. P-18 at AOL 00725; Dep. [Baig]
62:16-63:8; Dep.[Burger] 82:19-83:8)

54.  Renegotiation of the 1999 Agreement began in earnest in
August and September 2000.  (Ex. D-45 at AOL 00629; Tr. 47:5-
47:7)

55.  In the course of negotiations about the Amendment, AOL
acknowledged that it had under-delivered impressions during the
first year of the 1999 Agreement by approximately 54 million.
(Dep. [Iannuccilli] 73:14-73:23)

    E.    November 15, 2000, Amendment

56.  On November 15, 2000, eToys and AOL executed the Amendment
to the 1999 Agreement. (PT Stip. at 2; Ex. P-3 at AOL 00535)

57.  Under the Amendment, eToys paid an additional $750,000 to
AOL and AOL agreed to provide impressions for the following two

7

years without any further payments by eToys.  (Ex. P-3 at AOL 00534, 00537)

58.  After the Amendment, therefore, the total price paid by eToys to AOL for the three-year period was reduced from $18 million to $8.25 million and was fully pre-paid.  (Ex. P-3 at AOL 00534, 00537; Dep. [Lenk] 154:11-155:1; Dep. [Baig] 166:18-166:21)

59.  An internal AOL summary stated that the total dollar figure paid under the Amendment was derived "for years 2 and 3 using current rate cards," which were significantly less than the rate card prices at the time the 1999 Agreement had been negotiated.  (Ex. P-3 at AOL 00534; Ex. P-10; Dep. [Brine] 114:2-115:11; Dep. [Valle] 90:23-91:14; Dep. [Baig] 130:8-131:4, 135:1-135:14)

60.  The Amendment deemed AOL to have satisfied all its obligations with respect to the delivery of impressions in the first year of the Agreement.  (Ex. P-3 at AOL 00534-35; Dep. [Burger] 171:3-171:14)

61.  The Amendment also reduced AOL's obligations to deliver priced impressions in the second and third years and eliminated eToys' exclusivity rights under the 1999 Agreement.  (Ex. P-3 at AOL 00534)

62.  However, under the Amendment, AOL agreed to provide eToys with one billion impressions in all categories, including 889 million Welcome Screen impressions, during the second and third years of the Agreement.  (Ex. P-3 at AOL 00541; Dep. [Iannuccilli] 120:14-120:21)

63.  In the event of a shortfall in AOL's delivery of impressions, AOL again agreed to deliver additional impressions but only at the rate of one times the missed impressions unless there was a shortfall of 50% or more of the combined number of promised impressions, in which case the make good impressions would equal 1.5 times the shortfall.  (Ex. P-3 at AOL 00536-37)

64.  Under the Amendment, AOL waived its right to collect $397,000 due from eToys' wholly owned subsidiary, BabyCenter, Inc.  (Ex. P-3 at 00537; Dep. [Lenk] 155:2-155:9)

65.  All terms of the 1999 Agreement not expressly modified by or in direct conflict with the Amendment remained in effect.  (Ex. P-3 at AOL 00538)

66.    In the negotiations that resulted in the Amendment, the
parties did not allocate any value to exclusivity or the Welcome
Screen impressions to be delivered. (Tr. 86:16-86:18; Dep.
[Burger] 116:18-117:13)

F.    Performance of the 2000 Amendment

67.    AOL produced schedules showing the impressions it delivered
(1) from the commencement of the 1999 Agreement through
termination, (2) from the Amendment through January 31, 2001, and
(3) from February 1 to 26, 2001.   (Ex. P-4; Ex. P-5; Ex. P-6)

68.    However, AOL has said that: "a perfect comparison between
the carriage plan contained in schedule A of the [A]mendment and
the impressions actually provided is not possible.  Both changes
in the nomenclature used by AOL and any changes agreed to by the
parties regarding what impressions would actually be delivered
make such a side-by-side comparison impossible.  There is thus no
'key' that ties the information in [the] exhibits . . . to
schedule A of the [A]mendment."   (Ex. P-8)

69.    Nonetheless, the Exhibits evidence that AOL did not deliver
any of the various impressions it committed to provide, including
(a) "Pop-up" impressions to be delivered by the end of 2000, (b)
Section 2 impressions, such as the "People.com" impressions, (c)
the 10.7 million "Winter Holiday-Shopping Package" impressions,
(d) the 1.6 million "Santa's Home Page" banners, and (e) the
600,000 "Baby Registries" banners.   (Ex. P-3 at AOL 00539-40; Ex.
P-4; Ex. P-5; Ex. P-6)

70.    The Exhibits also demonstrate that AOL delivered only a
small percentage of other impressions it was obligated to
deliver: (a) 20,524 of the 3 million "Birthday Club" banners, (b)
29,486 of the 3 million "Run Of Parenting Channel" impressions,
(c) 1,832,130 of the 7,533,334 "Movies: Gold" impressions, (d)
2,206,962 of the 10,777,778 "Books and Magazines: Gold"
impressions, (e) 132,096 of the 490,000 "Kids Wish List" banners,
(e) 432,643 of the 1,766,660 "Maternity: Gold" impressions, (f)
2,086,772 of the 9,252,000 "Home Page" impressions, (g) 1,507,342
of the 4,500,000 "Educational Toys: Anchor" impressions, and (h)
6,262,425 of the 15,750,000 "Toys & Games: Anchor" impressions.
(Ex. P-3 at AOL 00540; Ex. P-4; Ex. P-5; Ex. P-6)

71.    However, eToys received a substantial number of the Welcome
Screen impressions that it had sought in the Agreement and the
Amendment: approximately 231 million from August 1999 to August
2000 and 475 million from August 2000 to February 2001.   (Tr.
86:5-86:15; Dep. [Burger] 75:7-75:10, 162:4-162:14; Dep.

9

[Iannuccilli] 65:11-65:14; Ex. P-6 at AOL 00155; Ex. P-4 at AOL 01802)

72.   The Amendment obligated AOL to deliver only 862,400,000 Welcome Screen impressions (not the impressions listed in Exhibit A as referenced in section 1a and the impressions listed in section 1b).  (Ex. P-3 at AOL 00535)

   G.   2000 Holiday Season

73.   Quite surprisingly, the 2000 holiday season was terrible; internet businesses particularly suffered.

74.   It was clear by mid-December 2000, that the 2000 holiday season was a failure and that eToys would miss its projected sales.  (Ex. D-77 at TR 001868; Dep. [Brine] 57:14-57:19; Dep. [Schoch] 54:2-54:16)

75.  On December 15, 2000, eToys revised its projected sales for the quarter downward from $210-$240 million to $120-$130 million.  (Ex. D-77 at TR 001868)

76.  eToys' downward adjustment of its projected sales resulted in a downward revision in the estimate of cash the company would have on hand at the end of December from $100-$120 million to $50-$60 million.  (Ex. D-77 at TR 001868)

77.  To advise it on its options, eToys hired Goldman Sachs which quickly determined that financing was not available and began seeking strategic and financial buyers.  (Dep. [Lenk] 63:15-64:4)

78.  eToys and its management talked with numerous prospective buyers, none of whom presented an offer.  (Dep. [Lenk] 64:5-64:25; Dep. [Schoch] 55:24-57:11, 141:21-142:15)

79.  By January 3, 2001, eToys' management recognized that the company would not be able to proceed in its current configuration.  (Dep. [Schoch] 54:17-55:10, 132:10-133:2, 141:21-143:15; Dep. [Bousquette] 22:20-23:2)

80.  On January 4, 2001, eToys issued job elimination notices to approximately 700 of its 1,000 full-time employees.  (Ex. D-78 at TR 001963; Dep. [Brine] 18:5-18:8; Dep. [Schoch] 55:11-55:23)

81.  On January 10, 2001, eToys' unsecured creditors formed an informal committee which entered into a standstill agreement with eToys on January 16, 2001.  (Tr. 132:9-132:14)

82.  By the end of January 2001, eToys' search for a buyer was reaching the desperation stage.  (Dep. [Schoch] 145:5-145:11)

83.  On February 5, 2001, eToys issued job elimination notices to all its remaining employees.  (Tr. 132:15-132:19; Ex. D-78 at 001893)

84.  During the month of February, eToys tried to raise cash by selling large quantities of inventory on its website at discount prices in an informal liquidation.  (Dep. [Schoch] 99:21-100:7, 104:25-105:8; Dep. [Lenk] 169:6-169:15)

85.  During this period, eToys' management knew that paying all its bills would prevent it from continuing as a viable company and started to conserve cash.  (Dep. [Schoch] 50:7-52:16, 99:21-100:9; Dep. [Lenk] 165:14-165:19)

86.  While eToys was able to sell BabyCenter for $10 million, it was clear by February 26, 2001, that eToys would not be able to find a buyer for the company as a whole.  (Tr. 119:20-120:3; Dep. [Schoch] 148:15-148:22, 149:5-149:11, 184:11-184:23)

87.  By February 26, 2001, eToys had no alternative than to file for bankruptcy, and its Board of Directors authorized it to file a chapter 11 bankruptcy petition.  (Ex. P-16 at 6; Ex. D-59 at AOL 00349)

88.  On February 26, 2001, eToys began valuing its remaining assets on a piecemeal basis in preparation for selling them in a liquidation.  (Dep. [Schoch] 183:7-184:10)

89.  On that same day, eToys issued a press release announcing that it would cease operations, close its website, wind down its business and liquidate its assets because it had concluded that "under any scenario, its outstanding liabilities, which totaled approximately $274 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction."  (PT Stip. at 2; Ex. D-59 at AOL 00349; Dep. [Schoch] 183:7-184:23)

90.  AOL learned of eToys' intentions shortly after the press release was issued.  (Tr. 55:1-55:11)

H.    Notice of Termination

91.  On February 28, 2001, AOL sent eToys a notice of termination of the 1999 Agreement as authorized by section 5.6 of the 1999 Agreement.  (Tr. 57:3-57:5; PT Stip. at 2; Ex. P-1 at AOL 00207)

11

92.  If eToys' banner and promotions continued to appear on AOL's website after eToys' website had shut down, AOL Members clicking on that banner would have seen a static splash page saying that eToys was no longer open and would not have received any of the services that eToys was obligated to provide under the 1999 Agreement.  (Dep. [Lenk] 68:8-68:20; Tr. 55:18-56:14)

93.  AOL was concerned that if there were continuing transactions between AOL Members and eToys after its announcement that it was going out of business, eToys would not have had the product or the necessary personnel to complete the sales and to ensure compliance with AOL's applicable merchant certification requirements.  (Tr. 56:15-57:12; Dep. [Baig] 154:2-155:8, 163:15-164:15; Dep. [Lenk] 170:5-170:7)

94.  AOL feared that AOL Members could have asserted that AOL was liable for any failure of eToys to meet its obligations.  (Tr. 51:11-52:3; Dep. [Baig] 154:2-155:8, 163:15-166:17)

95.  AOL had a finite amount of advertising space which it could sell on its system and the effect of the termination of the Amended Agreement with eToys was to free up advertising space which could be sold to other customers at potentially higher rates. (Dep. [Baig] 162:12-162:16; Dep. [Burger] 172:20-175:7; Dep. [Brine] 126:2-126:16)

I.   eToys' Bankruptcy and Sale of Assets

96.  On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code.  (PT Stip. at 3)

97.  On the Petition Date, eToys also filed a motion seeking, inter alia, authority to auction the reorganized stock of eToys under a plan of reorganization or to sell substantially all its assets. (D.I. 19)

98.  After renewed efforts to identify potential purchasers for its assets or stock, eToys held an auction on March 22, 2001, at which a bidder was tentatively selected, who ultimately withdrew its bid. (Ex. D-67 at 10)

99.  On April 27, 2001, eToys filed a renewed motion to sell substantially all its assets (including inventory, plant, fixtures, intellectual property, and the right to solicit eToys' 3.4 million customers) to KB Consolidated, Inc., for $12.2 million.  (Ex. D-68 at TR 000229; Ex. D-67; Ex. D-69; Ex. D-78 at TR 001887)

100. The sale to KB was approved by Order dated May 2, 2001. (D.I. 279)

J.     Standard Tests of Solvency

101. There are three standard tests applicable to an analysis of solvency:  the balance sheet test, the capital adequacy test, and the cash flow test.  (Tr. 99:3-99:19)

102. The balance sheet test compares the fair value of a company's assets to the company's debts to determine solvency. (Tr. 99:4-99:9)

103. Application of the balance sheet test includes the following steps:  (1) determine the appropriate premise of value to apply; (2) determine the appropriate valuation methodology;  (3) construct a pro forma balance sheet; (4) analyze individual asset categories and determine the fair value of assets; and (5) compare the total value of the assets to the total debt to determine whether or not the company is solvent as of the transfer date.  (Tr. 103:5-103:16)

104. There are two alternative premises of value: a going concern premise and a liquidation premise.  (Tr. 103:22-104:20)

105. There are standard factors for a valuation analyst to consider in determining the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors.  (Tr. 104:22-105:15, 109:25-111:2)

106. The capital adequacy test evaluates whether the company had sufficient capital to fund operations for the foreseeable future. (Tr. 99:10-99:15)

107. The cash flow test addresses whether the company had the intent and ability to pay its debts as they matured.  (Tr. 99:16-99:19)

K.    eToys' Solvency as of November 15, 2000, Amendment

    1.    Balance Sheet Test

108. The going concern premise of value is the appropriate premise of value to apply in analyzing eToys' solvency as of the November 15 Amendment.  (Tr. 113:22-114:1)

109. From March to December 2000, eToys continued to make capital investments of nearly $100 million in property and equipment, including leasing a new headquarters and opening two new operating facilities from which it could ship products and provide customer service.  (Tr. 106:9-106:19; Dep. [Schoch] 112:23-114:7, 163:16-163:20)

110. eToys' full-time employees increased from 306 to more than 1,000 between March 1999 and December 2000.  (Tr. 109:18-109:24)

111. eToys' customer base increased from 1.7 million to 3.4 million between December 1999 and December 2000.  (Ex. D-78 at TR 001887)

112. eToys did not lose any major vendors before the November 15, 2000, Amendment.  (Tr. 110:14-111:2)

113. eToys had access to capital and credit during the relevant period: it raised $175.2 million at its initial public offering in May 1999, raised an additional $145 million through unsecured convertible notes in December 1999, raised $100 million more in June 2000 primarily from a preferred stock offering, and entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 106:7-107:7; Ex. D-75 at TR 001534-36; Dep. [Schoch] 119:12-119:15, 124:24-126:02, 133:17-133:23; Dep. [Lenk] 187:18-189:7)

114. As of November 2000, eToys was able to pay its debts as they came due and expected to have sufficient cash to do so through the spring of 2001.  (Dep. [Lenk] 155:14-155:17, 161:2-161:5; Dep. [Schoch] 49:22-52:16)

115. In early fall 2000, eToys' management and the investment community had a positive view about eToys' long-term prospects and believed that the company was competitive.  (Tr. 108:2-108:23)

116. eToys' management felt it was a going concern at least through Thanksgiving 2000.  (Dep. [Schoch] 94:14-94:19, 96:4-96:11, 131:16-133:16)

14

117. On November 10, 2000, investment analysts at ABN-AMRO issued a report saying that eToys was well-positioned for a record holiday season in 2000. (Tr. 108:24-109:10)

118. As of the Amendment date no material fraud had been uncovered at eToys. (Tr. 110:14-110:19; Dep. [Schoch] 153:23-154:4)

119. The fact that eToys had recurring operating losses does not, by itself, mean that the company was no longer a going concern. (Tr. 111:8-112:20)

120. Since its formation in 1997, eToys had experienced recurring operating losses, yet eToys' March 2000 audited financial statements did not contain any reservations about the company's ability to remain a going concern. (Tr. 111:12-111:16; Dep. [Schoch] 123:21-124:3)

121. As of October 30, 2000, eToys predicted that it would end the quarter with $100 to $120 million in cash, a better cash position than it had in September. (Tr. 112:7-112:13)

122. As of November 15, 2000, eToys had at least $80 million in working capital, which was sufficient to fund its continuing operations. (Tr. 112:2-112:5)

123. Using the going concern premise of value, a pro forma balance sheet based on eToys' actual balance sheet as of September 30, 2000, adjusted to reflect eToys' operating results through November 15, 2000, appropriately takes into account eToys' cash equivalents, inventory, prepaid and other current assets, property and equipment, goodwill, intangible value, and other assets. (Tr. 115:2-115:13)

124. In converting the book value of eToys' individual asset categories into fair market value, a conservative 21% upward adjustment is appropriate for the book value of eToys' inventory. (Tr. 115:24-116:2; Dep. [Schoch] 167:15-168:18)

125. No adjustment to the book value of cash, cash equivalents, prepaid expenses, and other current assets is appropriate. (Tr. 118:5-118:12)

126. A 33% downward adjustment is appropriate for the book value of property and equipment, including software. (Tr. 118:13-119:1, 174:19-175:10)

127. It is appropriate to adjust the value of eToys' goodwill from $124 million to zero. (Tr. 119:2-119:5)

15

128. It is appropriate to reduce the book value of eToys' other assets by 15%.  (Tr. 119:6-119:13)

129. As of November 15, 2000, BabyCenter was a wholly owned subsidiary of eToys.  (Tr. 119:14-119:16)

130.  In converting the book value of BabyCenter into fair market value, it is appropriate to increase the book value of BabyCenter to $5 million, which is a reasonable portion of the sale price ($10 million) to ascribe to the intangible value of BabyCenter which had only $1 million in net tangible assets at the time of its sale.  (Tr. 119:14-120:18)

131. It is appropriate, when conducting the balance sheet test, to make no adjustments to eToys' liabilities, but preferred stock should not be treated as debt.  (Tr. 121:11-121:17)

132. Including the value of eToys' intangible assets, the fair value of its assets exceeded its debts by approximately $258 million on November 15, 2000.  (Ex. D-81 at TR 001966; Tr. 121:1-121:3, 125:16-125:19; Dep. [Schoch] 49:14-49:21, 94:7-94:13, 100:14-100:25)

133. Even excluding the value of eToys' intangible assets, the total fair value of its other assets ($302.4 million) exceeded its debts ($287.2 million) by approximately $15.2 million as of November 15, 2000. (Tr. 121:18-122:8; Ex. D-83 at 15)

134. Thus, under the balance sheet test, eToys was solvent on the date of the Amendment because the fair value of its assets was greater than its total debts.  (Tr. 125:10-126:6)

   2.   Capital Adequacy Test

135. eToys did not have unreasonably small capital at the time of the November 15, 2000, Amendment.  (Tr. 122:9-122:22)

136. eToys' September 30, 2000, 10-Q report filed with the SEC stated that eToys had sufficient capital to fund its operations through June 2001.  (Ex. D-76 at TR 001715)

137. eToys' capital position did not change materially between September 30 and November 15, 2000.  (Tr. 122:24-123:4)

138. As of October 30, 2000, eToys expected to have more cash to fund operations on December 31, 2000, than it had on September 30, 2000.  (Tr. 123:7-123:16)

16

139. eToys entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 123:16-123:20)

140. The November 15 Amendment with AOL reduced eToys' debt obligations by nearly $10 million thereby increasing eToys' ability to fund future operations.  (Ex. P-3; Tr. 123:20-123:24)

141. Applying the capital adequacy test, eToys was solvent as of November 15, 2000.  (Tr. 122:15-122:22)

> 3.   Cash Flow Test

142. As of November 15, 2000, eToys was able to, and intended to, pay its debts as they came due.  (Dep. [Lenk] 56:25-57:3; Tr. 124:3-124:9)

143. Throughout November 2000, eToys was paying its debts as they came due.  (Dep. [Lenk] 63:5-63:7)

144. It did not become apparent until after the Thanksgiving weekend in 2000 that eToys would significantly miss hitting its sales targets for the holiday season.  (Dep. [Brine] 56:3-56:15)

145. As of November 15, 2000, eToys' current assets exceeded its current debts by $80 million.  (Tr. 124:10-124:15)

146. Applying the cash flow test, eToys was solvent as of November 15, 2000.  (Tr. 124:3-124:17)

147. The amount indicated in a company's accumulated deficit account is not relevant to an analysis of its solvency.  (Tr. 126:7-126:24)

148. The unsuccessful efforts of eToys to sell the company after December 15, 2000, are not relevant to its solvency as of November 15, 2000.  (Tr. 127:18-128:4)

> L.   eToys' Solvency as of Termination

149. As of February 28, 2001, eToys was insolvent.  EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

150. It is appropriate to use the liquidation premise of value in evaluating eToys' solvency as of February 28, 2001, because after December 2000: (1) eToys was not continuing to make any capital expenditures but was conserving its cash; (2) eToys was not able to access the capital or credit markets; (3) its management and the investment community were not optimistic and, in fact, were

voicing serious concerns about its ability to survive; (4) eToys
was firing substantial numbers of its employees; and (5) its
sales were vastly diminished from its projections.  (Tr. 104:16-
105:4, 110:6-111:25, 130:3-130:15; Dep. [Lenk] 169:6-169:15)

151. Using the liquidation premise of value, eToys' debts
exceeded its liabilities.  (Ex. D-83)

152. eToys did not have sufficient capital (or access to the
capital markets) to fund its continuing operations as of February
28, 2001.  (Ex. D-59)

153. Further, eToys did not have sufficient cash flow to continue
to pay its debts as they came due as of February 28, 2001.  (Ex.
D-59)

    M.    <u>eToys' Remaining Rights on Termination</u>

154. The value of the contract rights eToys lost as a result of
the termination of the 1999 Agreement must be determined as of
the date of the termination, February 28, 2001.  (Tr. 100:5-
100:17, 130:8-130:12)

155. The liquidation premise of value is appropriate in analyzing
the value of eToys' remaining rights under the 1999 Agreement as
of February 28, 2001.  (Tr. 130:8-130:12)

156. If the rights under the 1999 Agreement were not legally
transferable to a third party, the contract rights would have had
zero value, as eToys - which was not operating - could not use
them.  (Tr. 143:25-145:1)

157. Even if the 1999 Agreement were transferable, it had minimal
value.

158. Qualitative factors that would affect the value of eToys'
contract rights at the date of termination include the state of
the internet advertising industry, the state of the internet
industry, general economic conditions, the number of buyers who
would be interested in the contract rights at the time of
termination, and the remaining term of the contract rights.  (Tr.
134:24-135:6)

159. In 2000-2001, the rates at which viewers of impressions
clicked through to access an advertiser's website declined from
2% to roughly 0.3% resulting in significant deflation in the
prices charged for internet advertising.  (Tr. 135:11-135:18)

18

160. The internet advertising market shrank by 7.8% during the first six months of 2001, relative to the same time period in 2000.  (Tr. 135:21-136:4)

161. Between January 2000 and February 2002, 806 internet firms ceased operations.  (Tr. 136:19-136:20)

162. eToys also cited the public's concerns over the general economic deterioration as one of the reasons that it had a disappointing 2000 holiday season.  (Ex. D-77 at TR 001868)

163. There was not a significant pool of potential buyers for eToys after the disappointing 2000 holiday season.  (Tr. 137:15-137:24)

164. Under a liquidation premise of value, it is appropriate to use the purchase price paid by KB in its acquisition of eToys' other assets in bankruptcy as an indicator of the value of eToys' rights under the 1999 Agreement.  (Tr. 139:3-139:5)

165. KB paid $3.35 million for eToys' intangible assets, i.e., its brand, its website, its intellectual property assets, and the right to solicit its 3.4 million customers.  (Tr. 139:11-139:14; Ex. D-68 at TR 000229; Ex. D-69)

166. An indicator of the difference in value between liquidation and going concern is provided by the reduction in value of eToys' intangible assets from $243 million as of November 15, 2000, to the $3.35 million paid by KB for those intangibles or a discount of 98.6%.  (Tr. 140:16-141:5)

167. In mid-2000, when it was a going concern, eToys valued its customer base at roughly $166 per customer times its 3.4 million customers for a value of $564 million.  (Tr. 139:23-140:3; Ex. D-78 at TR 001887)

168. If all of the KB purchase price of $3.35 million was for access to eToys' customer base, the value of that asset was 99.4% less in liquidation than as a going concern. (Tr. 140:4-140:15)

169. The holiday season was particularly important for eToys as it received roughly 70% of its business during that period.  (Tr. 84:18-84:19; Dep. [Burger] 74:23-75:10, 82:19-83:5; Dep. [Iannuccilli] 34:12-34:19; Dep. [Lenk] 32:21-33:16)

170. Only one holiday season remained under the 1999 Agreement at the time of termination so, for purposes of applying the liquidation discount scenarios, the adjusted going concern value of the 1999 Agreement would have been one third of the contract

19

price or $2.75 million.  (Ex. P-1; Tr. 137:25-138:11, 142:12-142:16)

171. Applying the liquidation discount of 99.4% or 98.6% derived from the KB sale price for eToys' intangibles evidences that eToys' remaining rights under the 1999 Agreement at the time of termination had a value of $16,500 to $38,500.  (Tr. 142:25-143:13)

172. Because eToys announced its intent to file a bankruptcy petition on February 26, 2001, any sale of its rights under the 1999 Agreement would have been subject to applicable provisions of the Bankruptcy Code.  (Ex. D-59 at AOL 00349; Tr. 144:17-145:1)

173. The internet was in its early stages at the time the 1999 Agreement was executed and AOL wanted its retail partners to be successful to prove that online retail was a viable and easy way of doing business, and because AOL had a direct financial interest in the success of retail partners such as eToys.  (Tr. 42:13-42:18; Dep. [Burger] 21:3-22:6)

174. In the late 1990s the unfamiliar nature of internet shopping made reliability an important issue for AOL in selecting merchant partners that would give its members a good shopping experience.  (Tr. 25:6-25:25)

175. At that time, AOL Members were nervous about using their credit card numbers on the internet and also held other trust and safety concerns about the online shopping experience.  (Tr. 26:1-26:4)

176. In order to provide good products and service to AOL Members in the shopping area, AOL sought to provide recognizable brands, good products, and good pricing.  (Tr. 25:10-25:17)

177. AOL viewed eToys as a desirable retailer on its website because it felt eToys had the particular resources and commitment to deliver a high quality experience in all aspects of commerce from product selection to site design, transaction process, customer service, great merchandising, a broader selection of products than other online toy retailers, great promotion, and excellent marketing ideas and enthusiasm.  (Ex. D-19 at AOL 00444; Ex. D-27 at AOL 01708-09; Ex. D-12 at AOL 00454)

178. During the 1999 holiday season Fortune Magazine had rated eToys first among the top 49 websites in an independent study of how internet retailers performed.  (Ex. D-29 at AOL 00753)

179. AOL would not have entered into the 1999 Agreement with any company other than eToys. (Tr. 54:19-54:25)

180. At no point in 2001, either before or after eToys filed bankruptcy, did it contact AOL seeking to reverse the termination or to transfer the remaining services due to eToys under the 1999 Agreement to a third party. (Tr. 57:11-57:22)

II.    CONCLUSIONS OF LAW

    A.    November 15, 2000, Amendment

        1.    Fraudulent Conveyance under the Bankruptcy Code

1.    The version of section 548(a) of the Bankruptcy Code which is applicable to this case[3] establishes the requirements for avoiding a transfer as constructively fraudulent:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>
>     . . .
>
>     (B)   (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>         (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>         (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>         (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).

2.    The plaintiff bears the burden of proving each of the requirements of section 548(a), including that (1) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof and (2) the debtor received less than reasonably

_____

[3]    The amendments to section 548 contained in the Bankruptcy Abuse Prevention and Consumer Protection Act are not applicable.

equivalent value in exchange for such transfer.  <u>BFP v.</u>
<u>Resolution Trust Corp.</u>, 511 U.S. 531, 535 (1994); <u>Mellon Bank,</u>
<u>N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.(In</u>
<u>re R.M.L., Inc.)</u>, 92 F.3d 139, 144 (3d Cir. 1996).

3.   A company is solvent for purposes of section 548(a) if its
assets, at fair valuation, exceed its liabilities.  11 U.S.C. §
101(32)(A).

4.   Solvency is assessed as of the date of the transfer sought
to be avoided.  <u>R.M.L., Inc.</u>, 92 F.3d at 154.

5.   In evaluating the fair value of a company's assets for
purposes of determining solvency, the appropriate premise of
value must be applied:  either the going concern premise of value
or the liquidation premise of value.  <u>Travellers Int'l AG v.</u>
<u>Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>,
134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of
the debtor's assets required choice between going concern and
liquidation premises of value); <u>American Classic Voyages Co. v.</u>
<u>JP Morgan Chase Bank (In re American Classic Voyages Co.)</u>, 367
B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair
valuation' of the entity's assets, an initial decision to be made
is whether to value the assets on a going concern basis or a
liquidation basis.").

6.   The going concern premise of value will be applicable unless
the company's bankruptcy is imminent.  <u>See, e.g.</u>, <u>Moody v. Sec.</u>
<u>Pac. Bus. Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992)
("Where bankruptcy is not 'clearly imminent' on the date of the
challenged conveyance, the weight of authority holds that assets
should be valued on a going concern basis.").  <u>Accord</u> <u>American</u>
<u>Classic Voyages</u>, 367 B.R. at 508; <u>Lids Corp. v. Marathon Inv.</u>
<u>Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535, 541 (Bankr. D.
Del. 2002).

7.   The balance sheet test is a valid and accepted methodology
for valuing a company's assets for purposes of determining
solvency.  11 U.S.C. § 101(32)(A) ("'[I]nsolvent' means . . .
financial condition such that the sum of such entity's debts is
greater than all of such entity's property . . . .").  <u>See also</u>,
<u>Peltz v. Hatten</u>, 279 B.R. 710, 743 (D. Del. 2002) ("While the
[solvency] inquiry is labeled a 'balance sheet' test . . . . it
is appropriate to adjust items on the balance sheet that are
shown at higher or lower value than their going concern value and
to examine whether assets of a company that are not found on its
balance sheet should be included in its fair value."), <u>aff'd sub</u>
<u>nom. In re USN Commc'ns, Inc.</u>, 60 Fed. Appx. 401 (3d Cir. 2003).

8.   The fair value of a company's intangible assets generally is included when applying the balance sheet test.  <u>Mellon Bank, N.A.</u> <u>v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)</u>, 945 F.2d 635, 647 (3d Cir. 1991); <u>Schubert v. Lucent Technologies, Inc.</u> <u>(In re Winstar Commc'ns, Inc.)</u>, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on [GAAP]") (citation omitted).

9.   Applying the balance sheet test as of November 15, 2000, eToys was solvent.  (FOF 108-34)

10.  The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test, which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  <u>See also</u> <u>WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File</u> <u>Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

11.  eToys was not insolvent on November 15, 2000, under the cash-flow test as it had not as of that date incurred, nor did it believe that it would incur, debts that would be beyond its ability to pay when they matured.  In fact, at that time eToys was paying its debts as they came due.  (FOF 142-48)

12.  A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company has insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  <u>See also</u> <u>Moody</u>, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

13.  eToys was also solvent on November 15, 2000, under the unreasonably small capital test because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

14.  Therefore, the Amendment did not constitute or result in an avoidable transfer under section 548.

2.  Fraudulent Conveyance under State Law

15.  Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.  11 U.S.C. § 544.

16.  This case is governed by Virginia law (Ex. P-1 at AOL 00229) which provides that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ." Va. Code Ann. § 55-81 (West 2003).  See also In re Meyer, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

17.  "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." In re Best Products Co., 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).  See also C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does not require [the transfer of] reasonably equivalent value.").

18.  The November 15, 2000, Amendment is not avoidable under Virginia law because eToys was solvent at that time and was not rendered insolvent by the Amendment.

B.  Termination on February 28, 2001

1.  Fraudulent Conveyance under the Bankruptcy Code

19.  eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.  EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

20.  There was a transfer of a property interest of eToys on termination of the 1999 Agreement.  EBC I, Inc., 356 B.R. at 637.

21.  eToys received nothing in exchange for the termination of the 1999 Agreement.

22.  Therefore, the termination is avoidable under section 548 of the Bankruptcy Code.

24

a.   Value of Property Transferred

23.  Section 550 provides that where a transfer is avoided under
section 548, the estate may recover the property transferred or
the value of such property.   11 U.S.C. § 550(a)(1).

24.  Because the purpose of sections 548 and 550 is preservation
of the estate for the benefit of creditors, the value of property
transferred is determined from the perspective of the estate and
the creditor body.  See, e.g., Metro Commc'ns, Inc., 945 F.2d at
648 ("The purpose of [section 548] is estate preservation . . .
."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In
re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005)
("Section 550(a) is intended to restore the estate to the
financial condition it would have enjoyed if the transfer had not
occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] at 550-4
(Henry J. Sommer et al., eds., 3d ed. rev. 2007).

25.  Under sections 548 and 550, where property is not returned
to the estate as a result of avoidance, but instead the value of
the property is returned, the property transferred is valued as
of the transfer date.  See, e.g., R.M.L., Inc., 187 B.R. at 463;
Gennrich v. Montana Sport U.S.A. (In re International Ski
Service, Inc.), 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990) (noting
that under section 550 courts generally agree that the property
should be valued at the time of transfer) (citation omitted).

i.   Value to eToys

26.  When a corporation's failure and bankruptcy are imminent at
the time of a transfer sought to be avoided under section 548,
application of the liquidation premise of value is appropriate in
determining the fair value of the property transferred.  See,
e.g., Rochez Bros., Inc., 326 B.R. at 588-89 (rejecting a going
concern premise of value for avoided transfer of road salt
because, absent the transfer, the salt "would merely have been
subjected to the same forced liquidation sale that the Debtor
ultimately conducted" and thus the appropriate section 550(a)
value was the "forced sale" price); Active Wear, Inc. v. Parkdale
Mills, Inc., 331 B.R. 669, 672 (W.D. Va. 2005) (holding that
value under section 550 means "fair market value" and that fair
market value in the liquidation context "refers to the value that
the debtor/bankrupt could receive for the property in a
liquidation sale.").

27.  Given eToys' dire financial condition in February 2001,
eToys would have been unable to enjoy any benefit from the 1999
Agreement even if it had not been terminated.  (FOF 79-89)

25

28. Under Virginia law, eToys' announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL. (FOF 34-39, 92-94)

29. Because eToys had no further ability to benefit from any performance by AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

### ii. Transferability to Third Party

#### 1. Executory Contract

30. An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3 Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000).

31. In determining whether remaining obligations under a contract are material, applicable state law determines the consequences of breach. See Terrell v. Albaugh (In re Terrell), 892 F.2d 469, 471-72 (6th Cir. 1989) ("[F]ederal law defines the term executory contract but . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.") (citation omitted).

32. In Virginia, contracts that form a relationship in the nature of a business partnership, where mutual obligations are expected to be continuous and ongoing, are executory contracts. See, e.g., Broyhill v. DeLuca (In re DeLuca), 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (applying Virginia law and holding that an operating agreement governing a limited liability company was an executory contract); RW Power Partners v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (contract was executory since the parties both owed to each other obligations a material breach of which would have "'deprive[d] the injured party of the benefit that the party justifiably expected from the exchange.'" (quoting Farnsworth on Contracts § 8.16)); Horton v. Horton, 487 S.E. 2d. 200, 204 (Va. 1997) (holding that a material breach is one where "failure to perform [the contractual terms] defeats an essential purpose of the contract.").

26

33.  The 1999 Agreement was an executory contract as of February 28, 2001.  (FOF 16-41, 92-95)

2.  <u>Assignability</u>

34.  Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor.  11 U.S.C. § 365(c)(1)(A-B).

35.  Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract.  <u>See, e.g.</u>, <u>Stone Street Capital, Inc. v. Granati (In re Granati)</u>, 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material."), <u>aff'd</u>, 307 B.R. 827 (E.D. Va. 2002); <u>In re DeLuca</u>, 194 B.R. at 77 (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company.").

36.  Under Virginia law, the identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party. <u>See, e.g.</u>, <u>duPont de-Bie v. Vredenburgh</u>, 490 F.2d 1057, 1060 (4th Cir. 1974) ("[E]xecutory contracts for personal services or involving a relationship of confidence are not assignable."); <u>McGuire v. Brown</u>, 76 S.E. 295, 297 (Va. 1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); <u>Epperson v. Epperson</u>, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

37.  The AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its ability and experience, all of which were relevant to eToys' ability to assure AOL that eToys would adequately serve and protect the interests of AOL Members as set forth in the 1999 Agreement.  (FOF 16-41, 92-95, 173-79)

38.  Under Virginia law, AOL would not have been required to accept performance under the 1999 Agreement from any party other

than eToys, and the 1999 Agreement therefore was not assumable or assignable under section 365(c) of the Bankruptcy Code.

39.  Because eToys had announced prior to February 28, 2001, that it would cease operations and file bankruptcy, because all of eToys' assets (including its contracts and contract rights) would be liquidated in that bankruptcy proceeding, and because it was not assignable under section 365(c), the 1999 Agreement had no value as of that date.  Cf. Allan v. Archer-Daniels-Midland Co. (In re Commodity Merchants), 538 F.2d 1260, 1263 (7th Cir. 1976) ("The trustee argues . . . that the cancellation [of the contracts] deprived [the debtor] of its property right to resell the contracts.  If the contracts had been freely transferable, perhaps we could agree . . . ."); In re Bellanca Aircraft Corp., 850 F.2d 1275, 1285 (8th Cir. 1988) (holding that conditional right of assignment effectively precluded assignment of contract and therefore compelled the conclusion that the contract had no value).

40.  Even if eToys' remaining rights under the 1999 Agreement as of February 28, 2001, were transferable to a third party, their value was no more than $16,500 to $38,500.  (FOF 164-71)

41.  The substantial loss in the value of eToys' rights under the 1999 Agreement between November 15, 2000, and February 28, 2001, was caused by eToys' financial collapse and the deterioration of the internet industry and the economy generally during that time.  (FOF 155-62)

42.  No award of pre-judgment interest is appropriate, because the property transferred had no value and there is no evidence that AOL acted in bad faith in terminating the 1999 Agreement.  See, e.g., In re Hechinger Inv. Co. of Delaware Inc., 489 F.3d 568, 579-80 (3d Cir. 2007) (holding that pre-judgment interest may be denied so long as a sound reason is given); Bellanca Aircraft Corp., 850 F.2d at 1281 (stating that awards of pre-judgment interest are discretionary).

    2.    Fraudulent Transfer under State Law

43.  eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.  EBC I, Inc., 356 B.R. at 636.

44.  There was a transfer of a property interest of eToys when the 1999 Agreement was terminated.  EBC I, Inc., 356 B.R. at 637.

45.  Under Virginia law, the eToys announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of

28

eToys under the 1999 Agreement and the Amendment that were
material to AOL.  (FOF 34-39)

46.  Because eToys had no further rights to performance from AOL
under the terms of the 1999 Agreement, based on eToys' own
actions and circumstances, the 1999 Agreement had no further
value to eToys as of February 28, 2001.

47.  Because the 1999 Agreement had no value to eToys on that
date, there is no recovery the estate may have for any fraudulent
transfer under Virginia law.


Dated: January 10, 2008              BY THE COURT:

                                     Mary F. Walrath
                                     United States Bankruptcy Judge

EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION[1]

Before the Court is the Complaint filed by EBC I, Inc.,

f/k/a eToys, Inc. ("eToys") against America Online, Inc. ("AOL")

for avoidance of a fraudulent conveyance.  For the reasons stated

below, the Court will enter judgment in favor of AOL.


I.    BACKGROUND

On March 7, 2001, eToys filed a voluntary petition under

chapter 11 of the Bankruptcy Code.  On that same day, eToys

---

[1]  This Opinion, and the accompanying Findings of Fact
("FOF") and Conclusions of Law ("COL"), constitute the findings
of fact and conclusions of law of the Court pursuant to Rule 7052
of the Federal Rules of Bankruptcy Procedure.

ceased operations and shut down its website.  All of eToys'
assets were subsequently liquidated.

Prior to the bankruptcy filing, eToys and AOL had entered
into an Interactive Marketing Services Agreement dated August 10,
1999 (the "1999 Agreement"), under which AOL committed to provide
online advertisements and other services for eToys for three
years for $18 million, payable in installments.  (FOF 19)  eToys
paid $7.5 million through July 2000 in accordance with the 1999
Agreement, but AOL failed to perform its obligations, providing
less than half the advertisements promised in the first year.
(FOF 19, 44, 51, 55, 58)  As a result, the 1999 Agreement was
modified by an Amendment dated November 15, 2000.  (FOF 50, 54,
56)  eToys paid $750,000 at that time (in addition to the $7.5
million it had already paid) and AOL agreed to provide certain
advertisements for the following two years without further
payments by eToys.  (FOF 57)

After a disastrous holiday season, eToys realized it would
not be able to meet its projected sales figures.  (FOF 74, 144)
It began conserving cash, hired an investment banker, and
attempted to sell itself as a going concern.  (FOF 75, 77, 78)
By the end of February 2001, however, it was apparent that eToys'
marketing efforts were unsuccessful.  On February 26, 2001, eToys
issued a press release announcing its financial difficulties and

its intent to fire all its employees, shut down its website, and file bankruptcy. (FOF 88, 89)  Two days later, AOL terminated the 1999 Agreement pursuant to section 5.6, which allowed termination if eToys became insolvent or filed bankruptcy. (FOF 21, 91)

On January 3, 2003, eToys filed an adversary complaint (the "Complaint") against AOL seeking (1) to avoid and recover alleged fraudulent transfers pursuant to sections 548 and 544 of the Bankruptcy Code and applicable state law, (2) damages for breach of contract, and (3) equitable relief based on unjust enrichment. According to eToys, the payments made under the 1999 Agreement, the Amendment, and the termination of the 1999 Agreement by AOL were all avoidable transfers of property of eToys.

AOL filed a motion to dismiss the Complaint.  At oral argument held on April 30, 2003, the Court granted the motion to dismiss with respect to the unjust enrichment count because the parties conceded that their relationship was governed by the 1999 Agreement.

On May 14, 2004, eToys filed a motion for partial summary judgment, and AOL filed a motion for summary judgment on all counts.  eToys conceded in its response to AOL's motion that its breach of contract claim and any claim for recovery of payments made under the 1999 Agreement prior to the Amendment on November

3

15, 2000, should be dismissed.  On December 7, 2006, the Court granted AOL's motion for summary judgment in part and dismissed Counts IV and V of the Complaint.  The Court also granted eToys' Motion for Partial Summary Judgment on Count I of the Complaint (the fraudulent conveyance claim) in part and scheduled an evidentiary hearing on the remaining issues.

The evidentiary hearing was held on June 26, 2007, and the matter was taken under advisement.  Post-trial briefing is complete, and the matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (H) & (O).


III. <u>DISCUSSION</u>

A.    <u>Applicable Law</u>

The Plaintiff argues that both the November 15, 2000, Amendment to the 1999 Agreement and the February 28, 2001, termination of the 1999 Agreement are avoidable as constructively fraudulent conveyances under section 548 of the Bankruptcy Code and under applicable state law.

1.    Fraudulent Transfer under Section 548(a)(1)(B)

The version of section 548(a)(1) applicable to this case provides that:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>
> . . .
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).[2]  To recover under section 548, eToys has the burden of establishing that while it was insolvent there was a transfer of an interest in its property for less than reasonably equivalent value.  See, e.g., BFP v. Resolution Trust Corp., 511 U.S. 531, 535 (1994); Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,

---

[2]  Section 548 was modified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective October 17, 2005, after the instant adversary proceeding was commenced.

Inc.), 92 F.3d 139, 144 (3d Cir. 1996).

      2.  Fraudulent Transfer under State Law

Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.  11 U.S.C. § 544.

In this case, the 1999 Agreement provides that disputes concerning it are governed by Virginia law.  (Ex. P-1 at AOL 00229)  Virginia law provides, in relevant part, that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ."  Va. Code Ann. § 55-81 (West 2003).  See also In re Meyer, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

Even "slight consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context."  In re Best Products Co., 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).  See also C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does

not require [the transfer of] reasonably equivalent value.").
Therefore, to be avoidable as a fraudulent conveyance under
Virginia law, eToys had to be insolvent or rendered insolvent at
the time of the transfer and the transfer had to be for <u>no</u>
consideration.

     B.   <u>November 15, 2000, Amendment</u>

          1.   <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

              a.   <u>Solvency</u>

In the December 7, 2006, Opinion, the Court concluded that
there was a genuine issue of material fact in dispute as to
whether eToys was insolvent on November 15, 2000, at the time the
Amendment was executed.

At the trial, AOL presented testimony of an expert (Robert
Hutchins) to the effect that eToys was solvent on November 15,
2000. (FOF 134, 141, 146) eToys disputes this but did not
present any expert testimony in rebuttal.

The term insolvent is defined in the Bankruptcy Code
generally to mean a "financial condition such that the sum of
such entity's debts is greater than all of such entity's
property, at a fair valuation." 11 U.S.C. § 101(32)(A). In
evaluating the fair value of a company's assets for purposes of
determining solvency, the appropriate premise of value must be
applied: either the going concern premise of value or the

liquidation premise of value.  <u>Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>, 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of TWA's assets required choice between going concern and liquidation premises of value); <u>American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.)</u>, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

AOL's expert used the going concern premise of value in analyzing eToys' solvency as of November 15, 2000.  In doing so, he considered the standard factors a valuation analyst uses to determine the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors. (FOF 105)

The Court concludes that it was appropriate to use the going concern premise of value in analyzing eToys' solvency as of

November 15, 2000. (FOF 108) eToys concedes that it was

operating on that date. <u>See, e.g.</u>, <u>Moody v. Sec. Pac. Bus.</u>

<u>Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where

bankruptcy is not 'clearly imminent' on the date of the

challenged conveyance, the weight of authority holds that assets

should be valued on a going concern basis."). "[A] business does

not have to be thriving in order to receive a going concern

valuation. Before the going concern valuation is to be

abandoned, the business must be 'wholly inoperative, defunct or

dead on its feet.'" <u>American Classic Voyages</u>, 367 B.R. at 508

(<u>quoting</u> <u>Fryman v. Century Factors (In re Art Shirt Ltd., Inc.)</u>,

93 B.R. 333, 341 (E.D. Pa. 1988)). <u>Accord</u> <u>Lids Corp. v.</u>

<u>Marathon Inv. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535,

541 (Bankr. D. Del. 2002).

eToys argues, however, that the Court must consider that

eToys (and the internet industry generally) collapsed by the end

of 2000. eToys contends that it is "common sense" to conclude

that, because AOL's expert admits that eToys was insolvent by the

end of December 2000, and nothing unforeseen happened between

November 15 and December 31, 2000, eToys must have been insolvent

on November 15 as well. <u>Cf.</u> <u>American Classic Voyages</u>, 367 B.R.

at 512 (concluding that the debtor became insolvent as a result

of "the unforeseeable events of 9/11, and their effect upon the

9

travel industry as a whole [which] forced the Debtors into bankruptcy.").

The Court rejects eToys' analysis. eToys' condition was fundamentally different on November 15 and December 31, 2000. On November 15, eToys (and its investors and industry experts) all expected that it would have a tremendously successful holiday season. (FOF 115, 117) During the year prior to November 15, 2000, eToys expanded its warehouse operations and moved into a new headquarters. (FOF 109) Full-time employees increased from 300 to 1000 in the prior 18 months and eToys' customer base doubled between December 1999 and December 2000. (FOF 110, 111) In addition, eToys had access to capital and credit during that period; it was able to raise $175 million in its initial public offering in May 1999, $145 million by issuing unsecured convertible notes in December 1999, $100 million by a preferred stock offering in June 2000, and $40 million in a revolving line of credit on November 15, 2000. (FOF 113)

Further, at the time of the Amendment, both eToys' management and the investment community had positive views about its long-term prospects. (FOF 115) In fact, it was not until after the Thanksgiving weekend and even into December that it became apparent that eToys would not be able to make its sales projections. (FOF 74, 144) Although eToys did issue a press

10

release on December 15, 2000, adjusting its sales projections downward, eToys still felt that it would be able to sell its business as a going concern. (FOF 75) It hired an investment banker to find a buyer, and several prospective buyers expressed interest. (FOF 77, 78) In the interim eToys instituted cash management strategies to keep it operating until a sale could be consummated. (FOF 76, 79, 80) It was not until February that it became apparent that eToys would not be able to sell itself as a going concern and had to liquidate its assets. (FOF 82, 84-87) As a result, the Court concludes that AOL's expert used the appropriate methodology to value eToys' assets on its balance sheet as a going concern in determining whether eToys was solvent on November 15, 2000. (FOF 108)

i.  Balance Sheet Test

Applying the going concern premise of value to the balance sheet test, AOL's expert made various adjustments to the book value of eToys' assets to reflect their market value. See, e.g., Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002) ("While the [solvency] inquiry is labeled a 'balance sheet' test . . . . it is appropriate to adjust items on the balance sheet that are shown at a higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value.")

11

(emphasis added), aff'd sub nom. In re USN Commc'ns, Inc., 60
Fed. Appx. 401 (3d Cir. 2003).

eToys finds fault with many of the adjustments. For
example, AOL's expert made a 21% upward adjustment from the book
value of inventory (reflected at cost) which the Court finds was
conservative. eToys argues, however, that the inventory should
be valued at book value because that is what eToys could have
expected to receive on a forced sale and because it reflects the
"wholesale fair market value" of the inventory. The Court
disagrees. eToys was not a wholesaler; it was a retailer. To
conclude that the value of the inventory was only the book value
assumes that eToys was not selling it at anything above its cost
to eToys. That is contradicted by the evidence. At the time
(November 15, 2000), eToys was selling its inventory in the
ordinary course of business at a profit, not at the wholesale
price. (FOF 124) Therefore, the Court concludes that the
conservative upward adjustment to the book value of the inventory
was appropriate.[3]

---

[3] Both parties cite IRS Revenue Procedure 77-12 to support their
opposing arguments: eToys for the proposition that "[t]he
replacement cost method generally provides a good indication of
fair market value if inventory is readily replaceable in a
wholesale or retail business . . ." and AOL for the proposition
that inventory must be valued to reflect its resale value. See
I.R.S. Rev. Proc. 2003-51, 2003-2 C.B. 121 (replacing Rev. Proc.
77-12). The Court finds the Revenue Procedure, like generally
accepted accounting principles, to be unhelpful because the tax

The expert made further adjustments, including to the intangible assets listed on the books.[4]  eToys presented no evidence that these adjustments were not appropriate, but argues that it was inappropriate to include any value for intangibles because the balance sheet should include only tangible assets that are readily saleable.  See, e.g., In re WRT Energy Corp., 282 B.R. 343, 369 (W.D. La. 2001) (concluding that only assets capable of liquidation may be included in the valuation of assets); Kendall v. Sorani (In re Richmond Produce Co., Inc.), 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993) (assets, such as goodwill, that are speculative and cannot separately be sold should be excluded from the value of a debtor's assets), aff'd, 195 B.R. 455 (N.D. Cal. 1996); Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 672 (Bankr. S.D.N.Y. 1992); 2 Collier on Bankruptcy, ¶ 101.32[4] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2007). eToys also disagrees with the method by which AOL's expert valued

---

and accounting implications of how assets are listed on a company's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets.

[4]  For example, the expert reduced the book value of goodwill from $124 million to zero, the property and equipment (including software) by 33%, and miscellaneous other assets (excluding cash and cash equivalents) by 15%.  In addition, the expert valued eToys' interest in Babycenters at $5 million (or half the ultimate sale price of that asset).  (FOF 123-31)

the intangible assets (based on eToys' market capitalization)
because it disappeared overnight and had no rational connection
to the valuation of assets in a "conversion to cash" analysis.

The Court rejects eToys' arguments. The Third Circuit has
held that "in determining insolvency under § 548(a)(2)(B)(i), it
is appropriate to take into account intangible assets not carried
on the debtor's balance sheet, including, inter alia, good will."
Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns,
Inc.), 945 F.2d 635, 647 (3d Cir. 1991). See also Schubert v.
Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.), 348
B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance
sheet test may take into account value not "used to prepare a
typical balance sheet" because it is "based upon a fair valuation
and not based on generally accepted accounting principles.")
(citation omitted). See generally, Shannon P. Pratt et al.,
Valuing a Business 309-10 (4th ed. 2000) (inclusion of
intangibles is required under accepted valuation principles).

Further, the Third Circuit has stated that the Court should
consider the market capitalization of a company in valuing its
intangible assets. Indeed, the Third Circuit has expressed that
there is no error in "choosing to rely on the objective evidence
from the public equity and debt markets." VFB LLC. v. Campbell
Soup Co., 482 F.3d 624, 633 (3d Cir. 2007). Therefore, it was

14

appropriate for AOL's expert to include the value of eToys'
intangibles on the adjusted balance sheet.  (FOF 123, 130)

eToys also objects to the inclusion of any value for the
software, which was under license to eToys and may not have been
assignable.  AOL counters that the software had some value to
eToys because it was using it in its operations and, therefore,
the Court should consider it as part of the going concern value
of eToys.  The Court agrees with AOL that the software had some
value to eToys and, therefore, should be considered part of the
going concern value of eToys.  (FOF 126)

AOL's expert made no adjustment to eToys' liabilities, but
did not include the preferred stock as debt.  eToys asserts that
the expert should have treated the preferred stock as a liability
because it was listed on eToys' balance sheet as debt in the
amount of $37 million in accordance with generally accepted
accounting principles ("GAAP").  (Ex. P-11 at 4)  See, e.g.,
Trans World Airlines, 134 F.3d at 190 (holding that in
determining solvency, liabilities are to be taken at their face
value); Winstar, 348 B.R. at 278 ("[T]he insolvency test
anticipates that liabilities will be valued at their face
value."); Hanna v. Crenshaw (In re ORBCOMM Global, L.P.), Bankr.
No. 00-3636, Adv. No. 02-1914, 2003 WL 21362192, at *3 (Bankr. D.
Del. June 12, 2003) ("[F]or purposes of determining whether a

15

debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

AOL responds that GAAP is not relevant to determining the fair market value of assets (or liabilities). Although GAAP treats redeemable preferred stock as a liability, AOL notes that the SEC regulations confirm that preferred stock is neither a current nor a long-term liability. See Balance Sheets, 17 C.F.R. § 210.5-02 (2006).

The Court agrees with AOL. GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company. Cf. In re Lease-A-Fleet, Inc., 155 B.R. 666, 679 (Bankr. E.D. Pa. 1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."). Just as GAAP rules regarding the book value of assets does not determine their fair market value, similarly GAAP rules for treating debt as equity and vice versa are not relevant to determining whether they are truly debt or equity. Instead, the Court must consider the totality of the circumstances to determine if the obligation is, in fact, debt or equity. See, e.g., Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.), 143 B.R. 468, 473 (Bankr. E.D. Tenn. 1992) (rejecting contention of trustee's expert that preferred stock should be treated as debt for solvency analysis); Joshua Slocum, Ltd. v. Boyle (In re

<u>Joshua Slocum, Ltd.</u>), 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989) (holding that redemption value of redeemable stock is not a liability of the debtor), <u>aff'd</u>, 121 B.R. 442 (E.D. Pa. 1989). <u>Cf.</u> <u>In re Trace Int'l Holdings</u>, 301 B.R. 801, 805-06 (Bankr. S.D.N.Y. 2003) (treating preferred stock as a liability because the court had previously re-characterized the stock as debt); <u>See generally</u>, Robert J. Stearn, Jr., <u>Proving Solvency: Defending Preference and Fraudulent Transfer Litigation</u>, 62 Bus. Law. 359, 382-84 (2007) (surveying case law and concluding that preferred stock is treated as equity not debt in insolvency analyses).

In this case, the preferred stock was payable as debt at the discretion of eToys. (FOF 131)  Given its dire financial condition at the time, it is unlikely that eToys would have paid it as debt.[5]  Therefore, the Court concludes that the preferred stock need not be considered as debt for purposes of determining the going concern value of eToys under the balance sheet test. (FOF 131)  Consequently, the Court finds that the specific adjustments made by AOL's expert to eToys' balance sheet were appropriate.  (FOF 123-31)

Based on the adjustments to the balance sheet, AOL's expert concluded that the value of eToys' assets was approximately $302

---

[5]  In fact, in its plan of reorganization, eToys did not treat the preferred stock as general unsecured debt and, instead, canceled it.  (D.I. 1385, art. VII §§ 4.10 cl. 6, 7.1(b))

17

million without considering any value for the intangible assets and approximately $545 million with those assets. From this, the expert concluded that eToys' assets exceeded its debts by approximately $15 to $258 million. Thus, the Court concludes that, under the balance sheet test, eToys was solvent on November 15, 2000. (FOF 132-34)

### ii. Cash Flow Test

Even using other accepted methods of calculating solvency, AOL's expert opined that eToys was solvent as of November 15, 2000. The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III). See also WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.), 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

AOL's expert determined that eToys was solvent under the cash flow test because eToys was able to pay, intended to pay,

18

and in fact was paying its debts as they came due as of November
15, 2000.  The Court agrees with that conclusion.  (FOF 142-44)
Therefore, under the cash-flow test, the Court concludes that
eToys was solvent on November 15, 2000.

### iii. <u>Capital Adequacy Test</u>

A third test for solvency is the unreasonably small capital
test, which analyzes whether at the time of the transfer the
company had insufficient capital, including access to credit, for
operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  <u>See also</u> <u>Moody</u>,
971 F.2d at 1073 ("[I]t was proper for the district court to
consider availability of credit in determining whether [the
debtor] was left with an unreasonably small capital.").

AOL's expert concluded that eToys did not have unreasonably
small capital as of November 15, 2000, because eToys reported on
September 30, 2000, that it had sufficient capital to fund
operations through June 2001, and thereafter was able to obtain a
$40 million revolving line of credit in November 2000.  Again the
Court agrees with those conclusions and finds that, under the
capital adequacy test, eToys was also solvent on November 15,
2000, because it retained sufficient capital for operations,
including access to credit.  (FOF 135-41)

Consequently, the Court concludes that under any of the
standard methodologies, eToys was solvent as of November 15,

19

2000. As a result, the Amendment to the 1999 Agreement executed on that date cannot be avoided as a fraudulent conveyance under section 548 of the Bankruptcy Code.

      2.   <u>Fraudulent Transfer under State Law</u>

Because eToys was solvent on November 15, 2000, the Amendment executed on that date is not avoidable as a fraudulent transfer under Virginia law. Va. Code Ann. § 55-81 (West 2003). <u>See also</u> <u>Meyer</u>, 244 F.3d at 355.

    C.   <u>February 28, 2001, Termination of 1999 Agreement</u>

      1.   <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

        a.   <u>Solvency</u>

In the December 7 Opinion, the Court concluded that eToys was insolvent on February 28, 2001, when AOL terminated the 1999 Agreement. This was, in fact, conceded by AOL, which terminated the 1999 Agreement because of eToys' announcement that it was insolvent. At the evidentiary hearing held on June 26, 2007, AOL's expert opined that eToys became insolvent in early December 2000. Therefore, as of the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent. (FOF 149)

        b.   <u>Transfer of an Interest in Property</u>

In the December 7 Opinion, the Court also concluded that AOL's termination of the 1999 Agreement, and consequently the retention of the payments made by eToys in advance for services

never delivered, constituted a transfer of property of eToys, namely the advertising services for which eToys had pre-paid. See, e.g., EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 637 (Bankr. D. Del. 2006).

Further, the Court concluded that, even if the 1999 Agreement permitted termination or provided that payments made by eToys were non-refundable, they still might be recoverable as a fraudulent conveyance. See, e.g., R.M.L., 92 F.3d at 148 (concluding that even though fees were non-refundable, they may still be recoverable if their payment is found to be a fraudulent conveyance). The issue remaining, therefore, is not whether the 1999 Agreement provided for the payment of non-refundable fees but whether eToys received reasonably equivalent value for loss of the services for which those fees paid. Id.

The Court narrowed its ruling, however, by holding that only a contract whose termination resulted in the loss of valuable property rights of a debtor, such as entitlement to services for which the debtor had paid in advance, is potentially recoverable under section 548. "The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors." Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball,

21

<u>Inc. (In re Metro Water & Coffee Servs., Inc.)</u>, 157 B.R. 742, 747

(Bankr. W.D.N.Y. 1993).

           c.   <u>Less than Reasonably Equivalent Value</u>

               i.   <u>Law of the Case</u>

    eToys contends that the Court made several determinations in

the December 7 Opinion which are law of the case and mandate a

conclusion that eToys received less than reasonably equivalent

value as a result of the termination of the 1999 Agreement.  It

notes that the Court concluded that "to the extent [eToys] paid

more to AOL than the value of the services provided to it by AOL,

the termination of the Contract eliminated that value."  <u>EBC I</u>,

356 B.R. at 642.  eToys also contends that the Court found as a

fact that eToys had received only $2.3 million in services prior

to the Amendment of the 1999 Agreement while it had paid $8.25

million.  Therefore, eToys asserts that the only issue to be

determined in the evidentiary hearing was how much eToys had

received from AOL between the Amendment on November 15, 2000, and

termination of the 1999 Agreement on February 28, 2001.

    AOL disagrees with eToys' characterization of the Court's

December 7 Opinion.  It notes that neither the summary judgment

motion nor the Court's Opinion addressed the value that was

exchanged under the 1999 Agreement and Amendment or the proper

method for determining that value.

The Court agrees with AOL.  In the December 7 Opinion, the
Court did not make any finding as to the value that was received
by eToys under the Agreement and its Amendment nor how that value
should be calculated.  The Court did state that "the parties had
apparently reconciled the accounts for the first year of the
[1999 Agreement] . . . and agreed that AOL had provided $2.3
million in services" to eToys.  Id. at 642 (emphasis added).
However, because there was no evidence as to what services were
provided after the first year, the Court found there was a
dispute as to a genuine issue of material fact.  Id.  Thus, the
Court agrees with AOL that it did not decide the value issue and
it is not law of the case.  Coca-Cola Bottling Co. of Shreveport,
Inc. v. Coca-Cola Co., 988 F.2d 414, 429 (3d Cir. 1993) (holding
that the law of the case doctrine is discretionary and applies,
if at all, only to a ruling on a point of law, not to general
discussion of issues in the case).

Based on the evidence presented at the June 26, 2007,
hearing it is now clear that there was not an agreement as to the
"value" of the services provided by AOL in the first year of the
1999 Agreement.  Although the parties agreed that a certain
number of impressions had been provided (which were listed on the
1999 Agreement attachment at prices totaling only $2.3 million),
the parties also agreed in the Amendment that AOL had satisfied

23

in full its obligation to provide services to eToys in the first year.  Further, AOL presented evidence that the value of services provided by it under the 1999 Agreement was not limited to the list of impressions with prices which is attached to the Agreement.  For example, AOL notes that in the first year it provided a substantial number of Welcome Screen impressions to eToys, which eToys admitted were very valuable to it, even though no price was allocated to them in the Agreement.[6]  (FOF 27)

The Court agrees with AOL's contention that it must consider the value of all the services rendered by AOL under the 1999 Agreement and the Amendment (and compare them to the payments made) in order to determine if eToys received less than reasonably equivalent value under the 1999 Agreement and the Amendment as a result of the termination.

ii.  Determining Value Transferred

Section 550 provides that where a transfer is avoided under section 548, the estate may recover the property transferred or the value of such property.  11 U.S.C. § 550(a)(1).  Because the

---

[6]  No price was allocated to the Welcome Screen impressions because AOL did not sell them to others at that time.  (FOF 27-28)  The value of them to eToys was enormous because all AOL Members see the Welcome Screen when they sign in, few if anyone else had ads there, and it was easier to get customers to click through on such an ad early in their internet browsing.  (FOF 27)  AOL has since sold Welcome Screen impressions to others at substantial prices.  (FOF 28)

24

purpose of sections 548 and 550 is preservation of the estate for the benefit of creditors, the value of property transferred is determined from the perspective of the estate and the creditor body. See, e.g., Metro Commc'ns, Inc., 945 F.2d at 646 ("The purpose of [section 548] is estate preservation . . . ."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] (Henry J. Sommer et al., eds., 3d ed. rev. 2007) (same).

The Third Circuit has held that the Court must determine the net effect of the transaction on the debtor and that if the debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." Metro Commc'ns, Inc., 945 F.2d at 647. The Court, therefore, must consider what value the 1999 Agreement, as amended, had to eToys immediately before and after the termination.

### iii. Value to eToys

eToys contends that the value of the 1999 Agreement that was lost to eToys by its termination is calculated as follows. Because eToys paid $8.25 million and received only $2.3 million

25

in the first year, it was entitled to another $5.95 million in
services during the remaining two years of the Agreement.  The
termination occurred approximately six months later, leaving at
least 75% of the services to be performed.  Therefore, eToys
seeks approximately $4.5 million for the value of unperformed
services under the 1999 Agreement for which it had already paid.

AOL contends that under Virginia law, eToys was in breach of
the 1999 Agreement at the time of its termination and that,
consequently, eToys had no remaining rights that were lost by its
termination.  Specifically, AOL asserts that the eToys
announcement in February 2001 that it would shut down its website
and cease operations constituted a material breach of numerous
ongoing obligations of eToys under the 1999 Agreement and the
Amendment that were material to AOL.  (FOF 34-39)  Because eToys
had no further rights to performance from AOL under the terms of
the 1999 Agreement, based on eToys' own actions and
circumstances, AOL argues that the 1999 Agreement had no further
value to eToys as of February 28, 2001.  (FOF 154-57)  eToys
disagrees and contends instead that AOL was in breach of the
Agreement for failure to deliver the requisite number of
impressions.

The Court finds it unnecessary to decide this issue,
however, because it concludes that in any event, the 1999

Agreement had no value to eToys immediately before its termination.  As of the termination date, eToys was in dire financial straits. By the end of February eToys had finished its on-line sale of product (at drastically reduced prices) and had announced that it was firing all its employees, shutting down its website and ceasing operations.  (FOF 84, 89)  In fact, eToys did exactly that before it filed its chapter 11 petition on March 7, 2001.  It sold all its assets in a liquidation sale shortly afterwards.  (FOF 99, 100)  As a result, the Court concludes that the 1999 Agreement, which provided for the delivery of impressions and other ads for eToys' website, had no value to eToys because eToys was no longer operating.  Therefore, the Court concludes that eToys is entitled to no recovery in this case.  Cf., Metro Water & Coffee Servs., Inc., 157 B.R. at 746-47 (holding that termination of concession agreement was a transfer for purposes of fraudulent conveyance statute though it was not avoidable because the debtor's material defaults meant it had no legal rights).

      iv.  Value if Sold

        a.  Assignability

     eToys contends nonetheless that the 1999 Agreement had value because it could have been sold as part of the sale of eToys' business assets.  AOL disagrees contending that the 1999

Agreement was not assignable under state law or the Bankruptcy
Code.

Pursuant to section 365(c) of the Bankruptcy Code, a debtor
may not assume or assign an executory contract[7] if applicable
state law excuses a party to the contract (other than the debtor)
from accepting performance from or rendering performance to an
entity other than the debtor.   11 U.S.C. § 365(c)(1)(A-B).   Under
Virginia law, a contract is not assignable if the identity of the
contracting parties is material to the ongoing performance of the
contract.   See, e.g., Stone Street Capital, Inc. v. Granati (In
re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001)
("[C]ontract rights are freely assignable unless the identity of
the contracting parties is material . . . ."), aff'd, 307 B.R.
827 (E.D. Va. 2002), aff'd 63 Fed. Appx. 741 (4th Cir. 2003); In
re DeLuca, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (holding that
an operating agreement governing a limited liability company was
unassignable, since "the identity of the managers [of the company
was] material to the very existence of the company.").   The

---

[7]   An executory contract is "a contract under which the
obligation[s] of both the bankrupt and the other party to the
contract are so far unperformed that the failure of either to
complete performance would constitute a material breach excusing
performance of the other."   See, e.g., Sharon Steel Corp. v.
Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3
Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King
et al., eds., 15th ed. rev. 2000).   The 1999 Agreement was an
executory contract.   (FOF 16-41, 92-95)

identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party. See, e.g., McGuire v. Brown, 76 S.E. 295, 297 (Va. 1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); Epperson v. Epperson, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

In this case, the AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its experience, all of which were relevant to eToys' ability to serve AOL Members and protect their privacy interests as set forth in the 1999 Agreement. (FOF 173-79) Therefore, the Court concludes that under Virginia law AOL would not have been required to accept performance under the 1999 Agreement from any party other than eToys. Consequently, the 1999 Agreement was not assumable or assignable under section 365(c) of the Bankruptcy Code.

b.   <u>Value if Assignable</u>

Even if the 1999 Agreement could have been assigned by eToys as part of the sale of its assets in the bankruptcy case, AOL contends that the price it would have received would have been de minimis.  AOL's expert testified that the value of the 1999 Agreement, if it could have been assigned, was $16,500 to $38,500 based on the price which eToys' other assets realized in the sale under chapter 11.  (FOF 171)

eToys argues that AOL's expert used the wrong premise of value (liquidation) in valuing the 1999 Agreement and that a going concern premise of value should have been used.  eToys asserts that the Court must consider the fair market value of the impressions, not a liquidation value.  <u>See, e.g.</u>, <u>BFP</u>, 511 U.S. at 545 (stating that reasonably equivalent value under section 548 has "a meaning similar to fair market value."); <u>In re Fruehauf Trailer Corp.</u>, 444 F.3d 203, 213 (3d Cir. 2006) (requiring an examination of the totality of the circumstances to determine the fair market value of the benefit received as a result of the transfer).  <u>Accord</u> 5 <u>Collier on Bankruptcy</u> ¶ 550.02[3][a] (2007) ("When the value of the property is recovered, as opposed to the property itself, the term 'value' refers to fair market value.").

AOL argues that the liquidation premise of value is

appropriate because the Court must consider the condition eToys was in and its ability to sell the assets at issue. It contends that although eToys filed a chapter 11 petition, it was clear at that time that eToys was liquidating, not reorganizing. (FOF 150)

The Court agrees with AOL. The question is not under what chapter of the Bankruptcy Code eToys filed, but whether a liquidation of its assets was imminent, because a debtor can liquidate its assets under chapter 11 as well as under chapter 7 of the Bankruptcy Code. See, e.g., Gillman v. Scientific Research Prods. Inc. (In re Mama D'Angelo), 55 F.3d 552, 556-57 (10th Cir. 1995) ("Liquidation value is appropriate 'if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.'" (quoting In re Vadnais Lumber Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass. 1989))). See also Loop Corp. v. U.S. Trustee, 379 F.3d 511, 517 n.3 (8th Cir. 2004) (recognizing that liquidation under chapter 11 is permitted by most courts); In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1352 (5th Cir. 1989) (discussing the propriety of liquidating reorganizations and noting that "although Chapter 11 is titled 'Reorganization,' a plan may result in the liquidation of the debtor"); In re Jartran, Inc., 886 F.2d 859, 868 (7th Cir. 1989) (acknowledging the permissibility of liquidating plans

under chapter 11).

The totality of the circumstances test mandates that the Court consider eToys' actual circumstances and intentions at the time of termination of the 1999 Agreement.  Though a chapter 11 petition was filed, eToys announced in its press release its inability to continue as a going concern and its intention to liquidate.  Therefore, the liquidation premise of value was appropriately used by AOL's expert to conclude that, even if the 1999 Agreement had been assignable in eToys' bankruptcy case, the price paid for that contract would have been de minimis.

c.    Subsequent Sale by AOL

eToys argues nonetheless that it clearly lost something of value because the termination permitted AOL to sell the impressions previously reserved for eToys that were not provided to it.  eToys argues that the Court should consider, as evidence of the value of the 1999 Agreement, the price at which AOL subsequently sold the impressions to others because courts routinely determine the value of property recoverable from a transferee based on evidence of what the transferee actually did receive, or could have received, in a further disposition of the property at issue.  See, e.g., Kidder Skis Int'l v. Williams, 60 B.R. 808, 810 (W.D. Mo. 1985) (reversing bankruptcy court and reducing trustee's recovery under section 550(a)(1) based on

32

lesser amount transferee of ski inventory was able to obtain
through its resale of such items); Shearer v. Tepsic (In re
Emergency Monitoring Tech., Inc.), 366 B.R. 476, 510 (Bankr. W.D.
Pa. 2007) (authorizing trustee to recover value equal to the sale
price the transferee was able to obtain in later sale of
monitoring contracts it had seized from debtor); Baldi v. Lynch
(In re McCook Metals, L.L.C.), 319 B.R. 570, 593 (Bankr. N.D.
Ill. 2005) (authorizing trustee's recovery under section 550(a)
based on defendant's share of the benefit received when contract
to acquire smelter was transferred to entity that defendant
controlled); American Furn. Outlet USA, Inc. v. Woodmark
Originals, Inc. (In re American Furn. Outlet USA, Inc.), 209 B.R.
49, 52-53 (Bankr. M.D.N.C. 1997) (rejecting amount specified in
credit memo as a basis for determining the value of property
transferred under section 550(a) in favor of amounts actually
obtained by transferee in subsequent sale of property); Ferrari
v. Computer Assoc. Int'l, Inc. (In re First Software Corp.), 84
B.R. 278, 284 (Bankr. D. Mass. 1988) (stating "[i]t is axiomatic
that what a willing buyer will pay a willing seller is the
absolute best indication of fair market value" and holding that
value of property recoverable by trustee should be based on what
transferee actually received on resale of the property rather
than what was specified in credit memo issued to debtor);

<u>Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.)</u>, 57 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986) (authorizing trustee's recovery against landlord under section 550(a)(1) measured by the value of the additional rent the landlord was able to collect from new tenant following debtor's transfer of lease back to landlord). eToys argues that the best evidence of the value of the services it lost is represented by the prices contained in the Amendment because they were based on AOL's November 2000 rate card of prices quoted to other retailers. That totals approximately $4.5 million.

AOL contends, however, that eToys has failed to present any evidence of the fair market value of the impressions. It notes that there is no evidence in the record that AOL was able to resell those impressions or at what price. Even if they were resold, AOL argues that the prices on its rate card in November 2000 are not indicative of the fair market value because the evidence established that impressions were sold to large retailers like eToys at substantial discounts from the rate card prices. (FOF 22-24)

The Court agrees with AOL. While courts have considered subsequent sales by transferees of fraudulent conveyances as evidence of the property's fair market value, there is no evidence in this case of any subsequent sale or the value

34

received from that sale.  Further, courts have held that the
contract price that the parties had negotiated is not evidence of
the fair market value of the property.  See, e.g., American Furn.
Outlet, 209 B.R. at 53; First Software Corp., 84 B.R. at 284.
Therefore, eToys' reliance on the prices in the 1999 Agreement as
amended is not evidence of the value of the impressions nor
evidence that AOL was able to resell those impressions after the
termination.

    Given the fact that the 1999 Agreement had no value to eToys
once eToys ceased operating, was not assignable by eToys to
another, and had de minimis value, the Court finds that eToys has
failed to meet its burden of proving that it lost anything of
value by the termination of the 1999 Agreement.  In these
circumstances, the Court agrees with AOL that it would be an
impermissible windfall to creditors to make AOL pay eToys $4.5
million for the termination of the 1999 Agreement, when eToys
would have received little or nothing of value from the
continuation of the Agreement.  Therefore, the Court concludes
that eToys is not entitled to any recovery from AOL under section
548 of the Code.

        2.    Fraudulent Transfer under State Law

            a.    Solvency

    As noted above, the Court has already concluded that, as of

35

the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent.

          b.    <u>Transfer of an Interest in Property</u>

Also, as the Court concluded above, the termination of the 1999 Agreement on February 28, 2001, did constitute a transfer of an interest in property of eToys.

          c.    <u>Less than Reasonably Equivalent Value</u>

Under Virginia law, the test is not whether reasonably equivalent value was exchanged, but rather whether any value was exchanged. "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." <u>In re Best Products Co.</u>, 168 B.R. at 52. <u>See also</u> <u>C-T of Virginia,</u> 1992 WL 12307, at *2 (Virginia law "does not require [the transfer of] reasonably equivalent value."). As noted above, however, eToys lost nothing of value from the termination of the 1999 Agreement. Therefore, the Court concludes that even if the termination is avoidable under Virginia law, eToys is entitled to no recovery.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant judgment in favor of AOL.

An appropriate Order is attached.


Dated: January 10, 2008                    BY THE COURT:


                                           Mary F. Walrath
                                           United States Bankruptcy Judge


37

EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

**AND NOW**, this **10th** day of **JANUARY, 2008**, upon consideration of the Complaint of eToys against AOL and for the reasons set forth in the accompanying Opinion and Findings of Fact, it is hereby

**ORDERED** that judgment is entered in favor of AOL.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Richard D. Allen, Esquire[1]

_____

1  Counsel shall serve a copy of this Order and the accompanying Opinion, Findings of Fact and Conclusions of Law on all interested parties and file a Certificate of Service with the Court.

## CERTIFICATE OF SERVICE

I, Thomas W. Briggs, Jr., Esquire, certify that I am not less than 18 years of age, and that service of the foregoing NOTICE OF APPEAL was caused to be made on January 22, 2008, upon the attorneys listed below as follows:

### BY HAND DELIVERY AND BY ELECTRONIC SERVICE

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
Christina Thompson, Esquire
Connolly, Bove, Lodge & Hutz
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899

### BY U.S. FIRST-CLASS MAIL

Michael D. Snyder, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

_____
Thomas W. Briggs, Jr. (No. 4076)

870507

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| EBC I, INC., f/k/a ETOYS, INC., | ) Case No. 01-00706(MFW) |
| | ) |
| Reorganized Debtor. | ) |
| —————————————— | ) |
| | ) |
| EBC I, INC., f/k/a ETOYS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary No. 03-50003 |
| v. | ) |
| | ) |
| AMERICA ONLINE, INC., | ) |
| | ) |
| Defendant. | ) |
| —————————————— | |

**FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**[1]

I.   FINDINGS OF FACT

     A.   Parties and Background

1.   From October 1997 through December 2000 eToys, Inc.
("eToys") was the leading online retailer focused on toys and
children's products.  (Ex. D-1 at 1)[2]

2.   At all relevant times America Online, Inc. ("AOL") operated
as an internet service provider.  AOL provided its subscribers

---

[1]   These, together with the accompanying Opinion, constitute
the findings of fact and conclusions of law of the Court pursuant
to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2]   Citations to the Plaintiff's and Defendant's Exhibits are
to "Ex. P- at [page]" and "Ex. D- at [page]," respectively.
Citations to the transcript of the hearing held on June 26, 2007,
are to "Tr. [page:line]" and to depositions are to "Dep. [name]
[page:line]."  Citations to the Pretrial Stipulation and Order
are to "PT Stip. [page]."  Citations to pleadings are to the
docket as "D.I. [#]."

("AOL Members") with access to the internet at large and to news,
entertainment, sports, and online shopping services provided
through third party retailers. (Tr. 22:17-23:24)

3.    In the late 1990s AOL had approximately 20 million AOL
Members each of whom paid a subscription fee of approximately $20
per month. (Tr. 23:17-25:2)

4.    In the shopping area of the AOL site, people could locate
products, compare them to others, and buy them directly from
AOL's shopping partners. (Tr. 23:10-23:16)

5.    Third party retailers paid AOL for the opportunity to
provide shopping services to AOL Members. (Tr. 23:25-24:5)

6.    Shopping partners purchased advertisements ("impressions")
showing the retailers' logo or promotion ad in AOL's online
shopping mall and other areas that AOL Members were expected to
browse. (Tr. 26:24-27:22)

7.    AOL did not have direct control over how many impressions
would result from its contracts with marketing partners, because
it depended on how many AOL Members visited a particular site
over a particular period. (Tr. 30:4-30:12)

8.    For shopping partners, the goal of an impression was to
generate a "click through," whereby the AOL Member would visit
the retailer's own website to shop and hopefully purchase
products. (Tr. 28:3-28:11)

9.    As of the late 1990s, approximately 80% of AOL's revenues
resulted from subscriber fees paid by AOL Members and
approximately 20% resulted from payments by third parties,
including shopping partners. (Tr. 24:8-24:13)

    B.    1997 Interactive Marketing Services Agreement

10.   On October 1, 1997, the day that eToys launched its website,
eToys and AOL entered into their first Interactive Marketing
Services Agreement which was to last through December 31, 1999.
(PT Stip. at 2; Ex. D-1 at 1; Ex. D-2 at AOL 00491)

11.   At the time of the 1997 Agreement, eToys was the only online
toy retailer to provide a comprehensive selection of nationally
advertised and specialty toy brands, and eToys' prices were as
low as, or lower than, those of land-based toy retailers. (Ex.
D-1 at 1; Tr. 35:1-35:18)

2

12.   AOL provided a demographic profile that was particularly compatible with eToys' target customer profile.  (Dep. [Schoch] 65:9-65:18; Dep. [Lenk] 43:11-43:22)

13.   Under the 1997 Agreement, AOL was to provide eToys with approximately 17 million impressions plus a presence on the AOL Shopping Channel and Service Shopping Channel Toys Department. (Ex. D-2 at AOL 00488, 00492)

14.   If AOL failed to provide the required number of impressions in a year, AOL was required to "make good" by providing the impressions missed within four months.  (Ex. D-2 at AOL 00488-89)

15.   In the event that AOL failed to deliver more than 20% of the promised impressions, AOL would provide 1.5 times the missed impressions; if AOL failed to deliver more than 30% of the promised impressions, eToys had the right to terminate the 1997 Agreement.  (Ex. D-2 at AOL 00488-89)

   C.   1999 Interactive Marketing Services Agreement

16.   Before the end of the 1997 Agreement, eToys and AOL met to review the results achieved to date.  (Ex. D-4 at AOL 00374)

17.   eToys was eager to pursue additional promotional opportunities both online and offline and to increase its offers to AOL Members.  (Ex. D-4 at AOL 00374)

18.   eToys was interested in doing a large deal with AOL because it wanted to promote its brand and online store to become the dominant children's brand and compete effectively with established land-based toy retailers.  (Tr. 37:8-39:24; Ex. D-12 at AOL 00454)

19.   On August 10, 1999, eToys and AOL executed a new three-year Interactive Marketing Services Agreement (the "1999 Agreement"), whereby AOL made eToys' shopping services available to AOL Members and provided various forms of promotions for eToys in exchange for $18 million, payable in $1.5 million quarterly installments.  (PT Stip. at 2; Ex. P-1)

20.   eToys expressly agreed that its payments under the 1999 Agreement were "non-refundable."  (Ex. P-1 at AOL 00204; Dep. [Brine] 84:12-84:18)

21.   AOL had the right to terminate the 1999 Agreement if eToys became insolvent or ceased operations, which AOL felt was important to protect its Members and AOL's brand.  (Ex. P-1 at AOL 00207; Dep. [Burger] 21:3-25:6)

3

22.  The price paid by eToys under the 1999 Agreement was calculated by the sum of some (but not all) of the impressions to be delivered by AOL multiplied by a particular cost per thousand (CPM) reflected on AOL's rate card.  (Dep. [Burger] 40:1-41:6; Tr. 80:4-80:11)

23.  AOL's rate card represented an initial offer or starting point that AOL would use in negotiating an agreement with a retail partner like eToys.  (Dep. [Brine] 114:2-114:18; Tr. 33:6-33:9; Dep. [Burger] 57:2-57:7)

24.  Because eToys was negotiating a major agreement with AOL, the price reached was substantially below the rate card prices (averaging approximately 69% less).  (Dep. [Baig] 92:4-92:15)

25.  Based on the agreed prices, the 1999 Agreement provided that roughly $3.5 million in certain impressions would be provided by AOL in the first year, $5.8 million in the second year, and $8.7 million in the third year.  (Ex. P-21 at AOL 00704; Dep. [Baig] 88:1-90:4)

26.  Under the 1999 Agreement AOL agreed to provide in excess of 1 billion impressions with eToys' logo or ad.  In the event impressions were not provided, AOL agreed to provide make good impressions at a rate of 1.5 times the missed impressions.  (Ex. P-1 at AOL 00197-98, 00211-12, 00216-17; Dep. [Burger] 58:17-58:20; Dep. [Valle] 38:5-38:13)

27.  Although their value was not explicitly included in the price, eToys sought and received AOL's commitment to provide Welcome Screen impressions (impressions appearing on the AOL homepage) which eToys felt were valuable.  (Tr. 86:5-86:18; Dep. [Lenk] 118:6-119:23; Dep. [Valle] 83:20-84:14; Dep. [Brine] 22:4-22:18, 23:8-23:25, 24:1-24:23, 27:23-29:9; Dep. [Burger] 98:20-100:12; Dep. [Iannuccilli] 35:1-35:7, 65:1-65:7, 68:24-69:14; Ex. D-5 at AOL 01748; Ex. D-18 at AOL 01568)

28.  In later years AOL charged other parties for the type of Welcome Screen impressions that it gave eToys under the 1999 Agreement and Amendment.  (Tr. 86:16-86:18; Dep. [Burger] 99:6-100:4; Dep. [Baig] 77:6-77:11, 77:15-78:10)

29.  Under the Agreement, AOL also allowed eToys to use AOL's brand and made eToys a premier retailer with exclusivity on some AOL sites.  (Dep. [Baig] 86:16-87:2, 92:16-94:4, 137:1-137:11, 148:9-148:20, 149:6-149:12, 152:6-152:10)

4

30.  Specifically, under Exhibit G of the 1999 Agreement, eToys received a license to market, distribute, display, transmit, promote, and use certain trade names, trademarks, and service marks of AOL, which it did use in its television advertising. (Ex. P-1 at AOL 00226; Tr. 53:11-54:4)

31.  Under the 1999 Agreement, eToys was an "Anchor Tenant" in various AOL online shopping areas, including toys, educational toys, kid and infant gear, and electronic games. (Ex. P-1 at AOL 00200; Ex. D-82 at TR 001976; Dep. [Brine] 34:12-34:17)

32.  The 1999 Agreement also gave eToys exclusivity in some areas which meant that AOL would not put a competitor's placements in those areas. (Ex. P-1 at AOL 00199-200; Tr. 33:23-34:4; Dep. [Lenk] 88:9-89:9; Dep. [Burger] 116:18-117:6)

33.  eToys valued the preclusive effect that the 1999 Agreement had on potential agreements between its competitors and AOL. (Dep. [Lenk] 69:4-69:21)

34.  Section 1.5 of the 1999 Agreement provided that impressions delivered under the Agreement would link only to the eToys website and were limited to the categories of products listed on Exhibit D. (Ex. P-1 at AOL 00199, 00219)

35.  Section 2.1 of the 1999 Agreement required that at least 50% of the net sales of the products on eToys' website be derived from the sale of children's toys, hobbies, arts and crafts, video games, and software. (Ex. P-1 at AOL 00200; Tr. 49:22-50:6)

36.  The 1999 Agreement permitted eToys to collect and use information from AOL Members (which it did), but required that eToys comply with applicable privacy and disclosure requirements to protect the privacy of AOL Members, including their names, addresses, and purchases. (Ex. P-1 at AOL 00221, 00228; Tr. 52:10-54:18)

37.  The Operating Standards in Exhibit E required that eToys' website rank among the top three interactive websites in the toy industry in the categories of competitive pricing, scope and selection of products, customer service and fulfillment, and ease of use. (Ex. P-1 at AOL 00221; Tr. 50:22-51:10)

38.  If eToys failed to comply with the Operating Standards, section 2.7 of the 1999 Agreement allowed AOL to decrease or suspend the impressions it provided to eToys until such non-compliance was corrected. (Ex. P-1 at AOL 00203, Tr. 51:11-51:16)

39.  Exhibit F of the 1999 Agreement required that eToys conform
to AOL's Kids and Teens Policy, which was designed to protect
children and teenagers from being misled by what they saw on AOL
or the internet.  (Tr. 53:1-53:10; Ex. P-1 at AOL 00225)

40.  The parties agreed that, in the press release announcing the
1999 Agreement, eToys would be referred to as the premier
retailer of children's products such as toys, children's videos,
and children's books.  This was intended by eToys to generate
increased brand recognition, which it valued.  (Tr. 88:1-88:10;
Ex. D-17 at AOL 00844)

41.  The potential effect of the 1999 Agreement on the investor
community was important to eToys.  (Tr. 87:9-87:12; Dep.
[Iannuccilli] 99:19-99:24; Dep. [Schoch] 72:14-72:21; Dep. [Lenk]
51:4-51:15, 56:11-56:24, 69:4-69:21)

42.  Investors viewed eToys' association with AOL favorably.
(Dep. [Schoch] 40:9-40:11, 71:16-72:23; Dep. [Lenk] 113:6-113:13)

43.  In the ten days following the execution of the 1999
Agreement, the price of eToys' common stock rose from $31.25 to
$45.625, representing an increase in its market capitalization of
$1.564 billion.  (Ex. D-80 at TR 001965)

D.  <u>Performance of the 1999 Agreement</u>

44.  Almost immediately after signing the 1999 Agreement, eToys
expressed dissatisfaction with the results eToys was realizing
from the Agreement.  (Ex. D-26 at AOL 00397)

45.  During the 1999 holiday season, shortly after the Agreement
was signed, AOL began to deliver far fewer impressions than it
was obligated to deliver.   This was acknowledged by AOL in an
internal e-mail dated December 16, 1999, which reported that:
"We are VERY low on our impression delivery."  (Ex. P-22)

46.  The total shortfall in delivery of impressions during the
1999 holiday season was about 34 million.  (Ex. P-6 at AOL 00155;
Ex. P-18 at AOL 00722)

47.  AOL tried to work with eToys to compensate for the under-
delivery of impressions, including delivering more welcome screen
impressions.  (Dep. [Baig] 55:2-56:2, 70:20-71:12; Dep. [Burger]
78:24-79:9, 79:21-81:9, 104:16-105:2, 105:13-106:11; Dep. [Valle]
85:8-85:17; Dep. [Iannuccilli] 34:12-34:19)

48.   The under-delivery of impressions was, in part, the result of fewer AOL Members browsing the internet and seeing the areas where eToys' ads were placed.  (Dep. [Valle] 43:10-43:17)

49.   eToys also complained that AOL's redesign of its website caused eToys to lose business because it increased the options for AOL Members, thereby reducing the number of viewers of the eToys' impressions.  (Dep. [Baig] 116:14-116:22; Dep. [Lenk] 135:1-136:3; Dep.[Valle] 91:24-92:10)

50.   Because of AOL's inability to deliver impressions at the rate specified in the 1999 Agreement, eToys asked to restructure the Agreement beginning in February 2000.  (Ex. D-28 at AOL 00762; Dep. [Baig] 51:5-51:8)

51.   By late spring of 2000, AOL was aware that it would be unable to provide eToys with the impressions (including "make good" impressions) it was obligated to deliver in the first year of the 1999 Agreement and projected that there would be massive delivery shortfalls in the second and third years as well.  (Dep. [Burger] 104:16-105:12, 107:3-108:7)

52.   Internally, AOL recognized that the actual and projected shortfall in delivery of impressions "was material" and that eToys could assert it had the right to terminate the 1999 Agreement as a result.  (Ex. P-23; Dep. [Baig] 66:21-67:17, 107:22-109:19; Dep. [Burger] 140:5-140:19)

53.   AOL delayed renegotiation of the 1999 Agreement, however, because it felt it would have greater leverage over eToys closer to the holiday season.  (Ex. P-18 at AOL 00725; Dep. [Baig] 62:16-63:8; Dep.[Burger] 82:19-83:8)

54.   Renegotiation of the 1999 Agreement began in earnest in August and September 2000.  (Ex. D-45 at AOL 00629; Tr. 47:5-47:7)

55.   In the course of negotiations about the Amendment, AOL acknowledged that it had under-delivered impressions during the first year of the 1999 Agreement by approximately 54 million. (Dep. [Iannuccilli] 73:14-73:23)

     E.   November 15, 2000, Amendment

56.   On November 15, 2000, eToys and AOL executed the Amendment to the 1999 Agreement. (PT Stip. at 2; Ex. P-3 at AOL 00535)

57.   Under the Amendment, eToys paid an additional $750,000 to AOL and AOL agreed to provide impressions for the following two

years without any further payments by eToys.  (Ex. P-3 at AOL 00534, 00537)

58.  After the Amendment, therefore, the total price paid by eToys to AOL for the three-year period was reduced from $18 million to $8.25 million and was fully pre-paid.  (Ex. P-3 at AOL 00534, 00537; Dep. [Lenk] 154:11-155:1; Dep. [Baig] 166:18-166:21)

59.  An internal AOL summary stated that the total dollar figure paid under the Amendment was derived "for years 2 and 3 using current rate cards," which were significantly less than the rate card prices at the time the 1999 Agreement had been negotiated.  (Ex. P-3 at AOL 00534; Ex. P-10; Dep. [Brine] 114:2-115:11; Dep. [Valle] 90:23-91:14; Dep. [Baig] 130:8-131:4, 135:1-135:14)

60.  The Amendment deemed AOL to have satisfied all its obligations with respect to the delivery of impressions in the first year of the Agreement.  (Ex. P-3 at AOL 00534-35; Dep. [Burger] 171:3-171:14)

61.  The Amendment also reduced AOL's obligations to deliver priced impressions in the second and third years and eliminated eToys' exclusivity rights under the 1999 Agreement.  (Ex. P-3 at AOL 00534)

62.  However, under the Amendment, AOL agreed to provide eToys with one billion impressions in all categories, including 889 million Welcome Screen impressions, during the second and third years of the Agreement.  (Ex. P-3 at AOL 00541; Dep. [Iannuccilli] 120:14-120:21)

63.  In the event of a shortfall in AOL's delivery of impressions, AOL again agreed to deliver additional impressions but only at the rate of one times the missed impressions unless there was a shortfall of 50% or more of the combined number of promised impressions, in which case the make good impressions would equal 1.5 times the shortfall.  (Ex. P-3 at AOL 00536-37)

64.  Under the Amendment, AOL waived its right to collect $397,000 due from eToys' wholly owned subsidiary, BabyCenter, Inc.  (Ex. P-3 at 00537; Dep. [Lenk] 155:2-155:9)

65.  All terms of the 1999 Agreement not expressly modified by or in direct conflict with the Amendment remained in effect.  (Ex. P-3 at AOL 00538)

66.  In the negotiations that resulted in the Amendment, the parties did not allocate any value to exclusivity or the Welcome Screen impressions to be delivered. (Tr. 86:16-86:18; Dep. [Burger] 116:18-117:13)

     F.  <u>Performance of the 2000 Amendment</u>

67.  AOL produced schedules showing the impressions it delivered (1) from the commencement of the 1999 Agreement through termination, (2) from the Amendment through January 31, 2001, and (3) from February 1 to 26, 2001.  (Ex. P-4; Ex. P-5; Ex. P-6)

68.  However, AOL has said that: "a perfect comparison between the carriage plan contained in schedule A of the [A]mendment and the impressions actually provided is not possible.  Both changes in the nomenclature used by AOL and any changes agreed to by the parties regarding what impressions would actually be delivered make such a side-by-side comparison impossible.  There is thus no 'key' that ties the information in [the] exhibits . . . to schedule A of the [A]mendment."  (Ex. P-8)

69.  Nonetheless, the Exhibits evidence that AOL did not deliver any of the various impressions it committed to provide, including (a) "Pop-up" impressions to be delivered by the end of 2000, (b) Section 2 impressions, such as the "People.com" impressions, (c) the 10.7 million "Winter Holiday-Shopping Package" impressions, (d) the 1.6 million "Santa's Home Page" banners, and (e) the 600,000 "Baby Registries" banners.  (Ex. P-3 at AOL 00539-40; Ex. P-4; Ex. P-5; Ex. P-6)

70.  The Exhibits also demonstrate that AOL delivered only a small percentage of other impressions it was obligated to deliver: (a) 20,524 of the 3 million "Birthday Club" banners, (b) 29,486 of the 3 million "Run Of Parenting Channel" impressions, (c) 1,832,130 of the 7,533,334 "Movies: Gold" impressions, (d) 2,206,962 of the 10,777,778 "Books and Magazines: Gold" impressions, (e) 132,096 of the 490,000 "Kids Wish List" banners, (e) 432,643 of the 1,766,660 "Maternity: Gold" impressions, (f) 2,086,772 of the 9,252,000 "Home Page" impressions, (g) 1,507,342 of the 4,500,000 "Educational Toys: Anchor" impressions, and (h) 6,262,425 of the 15,750,000 "Toys & Games: Anchor" impressions. (Ex. P-3 at AOL 00540; Ex. P-4; Ex. P-5; Ex. P-6)

71.  However, eToys received a substantial number of the Welcome Screen impressions that it had sought in the Agreement and the Amendment: approximately 231 million from August 1999 to August 2000 and 475 million from August 2000 to February 2001.  (Tr. 86:5-86:15; Dep. [Burger] 75:7-75:10, 162:4-162:14; Dep.

9

[Iannuccilli] 65:11-65:14; Ex. P-6 at AOL 00155; Ex. P-4 at AOL 01802)

72.  The Amendment obligated AOL to deliver only 862,400,000 Welcome Screen impressions (not the impressions listed in Exhibit A as referenced in section 1a and the impressions listed in section 1b).  (Ex. P-3 at AOL 00535)

   G.   2000 Holiday Season

73.  Quite surprisingly, the 2000 holiday season was terrible; internet businesses particularly suffered.

74.  It was clear by mid-December 2000, that the 2000 holiday season was a failure and that eToys would miss its projected sales.  (Ex. D-77 at TR 001868; Dep. [Brine] 57:14-57:19; Dep. [Schoch] 54:2-54:16)

75.  On December 15, 2000, eToys revised its projected sales for the quarter downward from $210-$240 million to $120-$130 million. (Ex. D-77 at TR 001868)

76.  eToys' downward adjustment of its projected sales resulted in a downward revision in the estimate of cash the company would have on hand at the end of December from $100-$120 million to $50-$60 million.  (Ex. D-77 at TR 001868)

77.  To advise it on its options, eToys hired Goldman Sachs which quickly determined that financing was not available and began seeking strategic and financial buyers.  (Dep. [Lenk] 63:15-64:4)

78.  eToys and its management talked with numerous prospective buyers, none of whom presented an offer.  (Dep. [Lenk] 64:5-64:25; Dep. [Schoch] 55:24-57:11, 141:21-142:15)

79.  By January 3, 2001, eToys' management recognized that the company would not be able to proceed in its current configuration.  (Dep. [Schoch] 54:17-55:10, 132:10-133:2, 141:21-143:15; Dep. [Bousquette] 22:20-23:2)

80.  On January 4, 2001, eToys issued job elimination notices to approximately 700 of its 1,000 full-time employees.  (Ex. D-78 at TR 001963; Dep. [Brine] 18:5-18:8; Dep. [Schoch] 55:11-55:23)

81.  On January 10, 2001, eToys' unsecured creditors formed an informal committee which entered into a standstill agreement with eToys on January 16, 2001.  (Tr. 132:9-132:14)

82.  By the end of January 2001, eToys' search for a buyer was reaching the desperation stage.  (Dep. [Schoch] 145:5-145:11)

83.  On February 5, 2001, eToys issued job elimination notices to all its remaining employees.  (Tr. 132:15-132:19; Ex. D-78 at 001893)

84.  During the month of February, eToys tried to raise cash by selling large quantities of inventory on its website at discount prices in an informal liquidation.  (Dep. [Schoch] 99:21-100:7, 104:25-105:8; Dep. [Lenk] 169:6-169:15)

85.  During this period, eToys' management knew that paying all its bills would prevent it from continuing as a viable company and started to conserve cash.  (Dep. [Schoch] 50:7-52:16, 99:21-100:9; Dep. [Lenk] 165:14-165:19)

86.  While eToys was able to sell BabyCenter for $10 million, it was clear by February 26, 2001, that eToys would not be able to find a buyer for the company as a whole.  (Tr. 119:20-120:3; Dep. [Schoch] 148:15-148:22, 149:5-149:11, 184:11-184:23)

87.  By February 26, 2001, eToys had no alternative than to file for bankruptcy, and its Board of Directors authorized it to file a chapter 11 bankruptcy petition.  (Ex. P-16 at 6; Ex. D-59 at AOL 00349)

88.  On February 26, 2001, eToys began valuing its remaining assets on a piecemeal basis in preparation for selling them in a liquidation.  (Dep. [Schoch] 183:7-184:10)

89.  On that same day, eToys issued a press release announcing that it would cease operations, close its website, wind down its business and liquidate its assets because it had concluded that "under any scenario, its outstanding liabilities, which totaled approximately $274 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction."  (PT Stip. at 2; Ex. D-59 at AOL 00349; Dep. [Schoch] 183:7-184:23)

90.  AOL learned of eToys' intentions shortly after the press release was issued.  (Tr. 55:1-55:11)

    H.    Notice of Termination

91.  On February 28, 2001, AOL sent eToys a notice of termination of the 1999 Agreement as authorized by section 5.6 of the 1999 Agreement.  (Tr. 57:3-57:5; PT Stip. at 2; Ex. P-1 at AOL 00207)

11

92.  If eToys' banner and promotions continued to appear on AOL's website after eToys' website had shut down, AOL Members clicking on that banner would have seen a static splash page saying that eToys was no longer open and would not have received any of the services that eToys was obligated to provide under the 1999 Agreement.  (Dep. [Lenk] 68:8-68:20; Tr. 55:18-56:14)

93.  AOL was concerned that if there were continuing transactions between AOL Members and eToys after its announcement that it was going out of business, eToys would not have had the product or the necessary personnel to complete the sales and to ensure compliance with AOL's applicable merchant certification requirements.  (Tr. 56:15-57:12; Dep. [Baig] 154:2-155:8, 163:15-164:15; Dep. [Lenk] 170:5-170:7)

94.  AOL feared that AOL Members could have asserted that AOL was liable for any failure of eToys to meet its obligations.  (Tr. 51:11-52:3; Dep. [Baig] 154:2-155:8, 163:15-166:17)

95.  AOL had a finite amount of advertising space which it could sell on its system and the effect of the termination of the Amended Agreement with eToys was to free up advertising space which could be sold to other customers at potentially higher rates. (Dep. [Baig] 162:12-162:16; Dep. [Burger] 172:20-175:7; Dep. [Brine] 126:2-126:16)

    I.   eToys' Bankruptcy and Sale of Assets

96.  On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code.  (PT Stip. at 3)

97.  On the Petition Date, eToys also filed a motion seeking, inter alia, authority to auction the reorganized stock of eToys under a plan of reorganization or to sell substantially all its assets. (D.I. 19)

98.  After renewed efforts to identify potential purchasers for its assets or stock, eToys held an auction on March 22, 2001, at which a bidder was tentatively selected, who ultimately withdrew its bid. (Ex. D-67 at 10)

99.  On April 27, 2001, eToys filed a renewed motion to sell substantially all its assets (including inventory, plant, fixtures, intellectual property, and the right to solicit eToys' 3.4 million customers) to KB Consolidated, Inc., for $12.2 million.  (Ex. D-68 at TR 000229; Ex. D-67; Ex. D-69; Ex. D-78 at TR 001887)

100. The sale to KB was approved by Order dated May 2, 2001.
(D.I. 279)

    J.    Standard Tests of Solvency

101. There are three standard tests applicable to an analysis of
solvency:  the balance sheet test, the capital adequacy test, and
the cash flow test.  (Tr. 99:3-99:19)

102. The balance sheet test compares the fair value of a
company's assets to the company's debts to determine solvency.
(Tr. 99:4-99:9)

103. Application of the balance sheet test includes the following
steps:  (1) determine the appropriate premise of value to apply;
(2) determine the appropriate valuation methodology; (3)
construct a pro forma balance sheet; (4) analyze individual asset
categories and determine the fair value of assets; and (5)
compare the total value of the assets to the total debt to
determine whether or not the company is solvent as of the
transfer date.  (Tr. 103:5-103:16)

104. There are two alternative premises of value: a going concern
premise and a liquidation premise.  (Tr. 103:22-104:20)

105. There are standard factors for a valuation analyst to
consider in determining the appropriate premise of value: (1)
whether the company continued to make capital investments and
open new operating facilities during the relevant period; (2)
whether the company had access to capital and credit; (3)
whether management and the investment community were optimistic
about the company's prospects; (4) whether the company's
employment base was expanding; (5) whether there was a discovery
of material fraud; and (6) whether there was a loss of major
customers or vendors.  (Tr. 104:22-105:15, 109:25-111:2)

106. The capital adequacy test evaluates whether the company had
sufficient capital to fund operations for the foreseeable future.
(Tr. 99:10-99:15)

107. The cash flow test addresses whether the company had the
intent and ability to pay its debts as they matured.  (Tr. 99:16-
99:19)

K.  eToys' Solvency as of November 15, 2000, Amendment

1.  Balance Sheet Test

108. The going concern premise of value is the appropriate premise of value to apply in analyzing eToys' solvency as of the November 15 Amendment.  (Tr. 113:22-114:1)

109. From March to December 2000, eToys continued to make capital investments of nearly $100 million in property and equipment, including leasing a new headquarters and opening two new operating facilities from which it could ship products and provide customer service.  (Tr. 106:9-106:19; Dep. [Schoch] 112:23-114:7, 163:16-163:20)

110. eToys' full-time employees increased from 306 to more than 1,000 between March 1999 and December 2000.  (Tr. 109:18-109:24)

111. eToys' customer base increased from 1.7 million to 3.4 million between December 1999 and December 2000.  (Ex. D-78 at TR 001887)

112. eToys did not lose any major vendors before the November 15, 2000, Amendment.  (Tr. 110:14-111:2)

113. eToys had access to capital and credit during the relevant period: it raised $175.2 million at its initial public offering in May 1999, raised an additional $145 million through unsecured convertible notes in December 1999, raised $100 million more in June 2000 primarily from a preferred stock offering, and entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 106:7-107:7; Ex. D-75 at TR 001534-36; Dep. [Schoch] 119:12-119:15, 124:24-126:02, 133:17-133:23; Dep. [Lenk] 187:18-189:7)

114. As of November 2000, eToys was able to pay its debts as they came due and expected to have sufficient cash to do so through the spring of 2001.  (Dep. [Lenk] 155:14-155:17, 161:2-161:5; Dep. [Schoch] 49:22-52:16)

115. In early fall 2000, eToys' management and the investment community had a positive view about eToys' long-term prospects and believed that the company was competitive.  (Tr. 108:2-108:23)

116. eToys' management felt it was a going concern at least through Thanksgiving 2000.  (Dep. [Schoch] 94:14-94:19, 96:4-96:11, 131:16-133:16)

117. On November 10, 2000, investment analysts at ABN-AMRO issued a report saying that eToys was well-positioned for a record holiday season in 2000. (Tr. 108:24-109:10)

118. As of the Amendment date no material fraud had been uncovered at eToys. (Tr. 110:14-110:19; Dep. [Schoch] 153:23-154:4)

119. The fact that eToys had recurring operating losses does not, by itself, mean that the company was no longer a going concern. (Tr. 111:8-112:20)

120. Since its formation in 1997, eToys had experienced recurring operating losses, yet eToys' March 2000 audited financial statements did not contain any reservations about the company's ability to remain a going concern. (Tr. 111:12-111:16; Dep. [Schoch] 123:21-124:3)

121. As of October 30, 2000, eToys predicted that it would end the quarter with $100 to $120 million in cash, a better cash position than it had in September. (Tr. 112:7-112:13)

122. As of November 15, 2000, eToys had at least $80 million in working capital, which was sufficient to fund its continuing operations. (Tr. 112:2-112:5)

123. Using the going concern premise of value, a pro forma balance sheet based on eToys' actual balance sheet as of September 30, 2000, adjusted to reflect eToys' operating results through November 15, 2000, appropriately takes into account eToys' cash equivalents, inventory, prepaid and other current assets, property and equipment, goodwill, intangible value, and other assets. (Tr. 115:2-115:13)

124. In converting the book value of eToys' individual asset categories into fair market value, a conservative 21% upward adjustment is appropriate for the book value of eToys' inventory. (Tr. 115:24-116:2; Dep. [Schoch] 167:15-168:18)

125. No adjustment to the book value of cash, cash equivalents, prepaid expenses, and other current assets is appropriate. (Tr. 118:5-118:12)

126. A 33% downward adjustment is appropriate for the book value of property and equipment, including software. (Tr. 118:13-119:1, 174:19-175:10)

127. It is appropriate to adjust the value of eToys' goodwill from $124 million to zero. (Tr. 119:2-119:5)

15

128. It is appropriate to reduce the book value of eToys' other assets by 15%. (Tr. 119:6-119:13)

129. As of November 15, 2000, BabyCenter was a wholly owned subsidiary of eToys. (Tr. 119:14-119:16)

130.  In converting the book value of BabyCenter into fair market value, it is appropriate to increase the book value of BabyCenter to $5 million, which is a reasonable portion of the sale price ($10 million) to ascribe to the intangible value of BabyCenter which had only $1 million in net tangible assets at the time of its sale. (Tr. 119:14-120:18)

131. It is appropriate, when conducting the balance sheet test, to make no adjustments to eToys' liabilities, but preferred stock should not be treated as debt. (Tr. 121:11-121:17)

132. Including the value of eToys' intangible assets, the fair value of its assets exceeded its debts by approximately $258 million on November 15, 2000. (Ex. D-81 at TR 001966; Tr. 121:1-121:3, 125:16-125:19; Dep. [Schoch] 49:14-49:21, 94:7-94:13, 100:14-100:25)

133. Even excluding the value of eToys' intangible assets, the total fair value of its other assets ($302.4 million) exceeded its debts ($287.2 million) by approximately $15.2 million as of November 15, 2000. (Tr. 121:18-122:8; Ex. D-83 at 15)

134. Thus, under the balance sheet test, eToys was solvent on the date of the Amendment because the fair value of its assets was greater than its total debts. (Tr. 125:10-126:6)

   2.  Capital Adequacy Test

135. eToys did not have unreasonably small capital at the time of the November 15, 2000, Amendment. (Tr. 122:9-122:22)

136. eToys' September 30, 2000, 10-Q report filed with the SEC stated that eToys had sufficient capital to fund its operations through June 2001. (Ex. D-76 at TR 001715)

137. eToys' capital position did not change materially between September 30 and November 15, 2000. (Tr. 122:24-123:4)

138. As of October 30, 2000, eToys expected to have more cash to fund operations on December 31, 2000, than it had on September 30, 2000. (Tr. 123:7-123:16)

16

139. eToys entered into a $40 million two-year revolving credit facility on November 15, 2000. (Tr. 123:16-123:20)

140. The November 15 Amendment with AOL reduced eToys' debt obligations by nearly $10 million thereby increasing eToys' ability to fund future operations. (Ex. P-3; Tr. 123:20-123:24)

141. Applying the capital adequacy test, eToys was solvent as of November 15, 2000. (Tr. 122:15-122:22)

     3.  <u>Cash Flow Test</u>

142. As of November 15, 2000, eToys was able to, and intended to, pay its debts as they came due. (Dep. [Lenk] 56:25-57:3; Tr. 124:3-124:9)

143. Throughout November 2000, eToys was paying its debts as they came due. (Dep. [Lenk] 63:5-63:7)

144. It did not become apparent until after the Thanksgiving weekend in 2000 that eToys would significantly miss hitting its sales targets for the holiday season. (Dep. [Brine] 56:3-56:15)

145. As of November 15, 2000, eToys' current assets exceeded its current debts by $80 million. (Tr. 124:10-124:15)

146. Applying the cash flow test, eToys was solvent as of November 15, 2000. (Tr. 124:3-124:17)

147. The amount indicated in a company's accumulated deficit account is not relevant to an analysis of its solvency. (Tr. 126:7-126:24)

148. The unsuccessful efforts of eToys to sell the company after December 15, 2000, are not relevant to its solvency as of November 15, 2000. (Tr. 127:18-128:4)

    L.  <u>eToys' Solvency as of Termination</u>

149. As of February 28, 2001, eToys was insolvent. <u>EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)</u>, 356 B.R. 631, 636 (Bankr. D. Del. 2006).

150. It is appropriate to use the liquidation premise of value in evaluating eToys' solvency as of February 28, 2001, because after December 2000: (1) eToys was not continuing to make any capital expenditures but was conserving its cash; (2) eToys was not able to access the capital or credit markets; (3) its management and the investment community were not optimistic and, in fact, were

voicing serious concerns about its ability to survive; (4) eToys was firing substantial numbers of its employees; and (5) its sales were vastly diminished from its projections. (Tr. 104:16-105:4, 110:6-111:25, 130:3-130:15; Dep. [Lenk] 169:6-169:15)

151. Using the liquidation premise of value, eToys' debts exceeded its liabilities. (Ex. D-83)

152. eToys did not have sufficient capital (or access to the capital markets) to fund its continuing operations as of February 28, 2001. (Ex. D-59)

153. Further, eToys did not have sufficient cash flow to continue to pay its debts as they came due as of February 28, 2001. (Ex. D-59)

 M.   eToys' Remaining Rights on Termination

154. The value of the contract rights eToys lost as a result of the termination of the 1999 Agreement must be determined as of the date of the termination, February 28, 2001. (Tr. 100:5-100:17, 130:8-130:12)

155. The liquidation premise of value is appropriate in analyzing the value of eToys' remaining rights under the 1999 Agreement as of February 28, 2001. (Tr. 130:8-130:12)

156. If the rights under the 1999 Agreement were not legally transferable to a third party, the contract rights would have had zero value, as eToys - which was not operating - could not use them. (Tr. 143:25-145:1)

157. Even if the 1999 Agreement were transferable, it had minimal value.

158. Qualitative factors that would affect the value of eToys' contract rights at the date of termination include the state of the internet advertising industry, the state of the internet industry, general economic conditions, the number of buyers who would be interested in the contract rights at the time of termination, and the remaining term of the contract rights. (Tr. 134:24-135:6)

159. In 2000-2001, the rates at which viewers of impressions clicked through to access an advertiser's website declined from 2% to roughly 0.3% resulting in significant deflation in the prices charged for internet advertising. (Tr. 135:11-135:18)

160. The internet advertising market shrank by 7.8% during the first six months of 2001, relative to the same time period in 2000. (Tr. 135:21-136:4)

161. Between January 2000 and February 2002, 806 internet firms ceased operations. (Tr. 136:19-136:20)

162. eToys also cited the public's concerns over the general economic deterioration as one of the reasons that it had a disappointing 2000 holiday season. (Ex. D-77 at TR 001868)

163. There was not a significant pool of potential buyers for eToys after the disappointing 2000 holiday season. (Tr. 137:15-137:24)

164. Under a liquidation premise of value, it is appropriate to use the purchase price paid by KB in its acquisition of eToys' other assets in bankruptcy as an indicator of the value of eToys' rights under the 1999 Agreement. (Tr. 139:3-139:5)

165. KB paid $3.35 million for eToys' intangible assets, i.e., its brand, its website, its intellectual property assets, and the right to solicit its 3.4 million customers. (Tr. 139:11-139:14; Ex. D-68 at TR 000229; Ex. D-69)

166. An indicator of the difference in value between liquidation and going concern is provided by the reduction in value of eToys' intangible assets from $243 million as of November 15, 2000, to the $3.35 million paid by KB for those intangibles or a discount of 98.6%. (Tr. 140:16-141:5)

167. In mid-2000, when it was a going concern, eToys valued its customer base at roughly $166 per customer times its 3.4 million customers for a value of $564 million. (Tr. 139:23-140:3; Ex. D-78 at TR 001887)

168. If all of the KB purchase price of $3.35 million was for access to eToys' customer base, the value of that asset was 99.4% less in liquidation than as a going concern. (Tr. 140:4-140:15)

169. The holiday season was particularly important for eToys as it received roughly 70% of its business during that period. (Tr. 84:18-84:19; Dep. [Burger] 74:23-75:10, 82:19-83:5; Dep. [Iannuccilli] 34:12-34:19; Dep. [Lenk] 32:21-33:16)

170. Only one holiday season remained under the 1999 Agreement at the time of termination so, for purposes of applying the liquidation discount scenarios, the adjusted going concern value of the 1999 Agreement would have been one third of the contract

19

price or $2.75 million.  (Ex. P-1; Tr. 137:25-138:11, 142:12-142:16)

171. Applying the liquidation discount of 99.4% or 98.6% derived from the KB sale price for eToys' intangibles evidences that eToys' remaining rights under the 1999 Agreement at the time of termination had a value of $16,500 to $38,500.  (Tr. 142:25-143:13)

172. Because eToys announced its intent to file a bankruptcy petition on February 26, 2001, any sale of its rights under the 1999 Agreement would have been subject to applicable provisions of the Bankruptcy Code.  (Ex. D-59 at AOL 00349; Tr. 144:17-145:1)

173. The internet was in its early stages at the time the 1999 Agreement was executed and AOL wanted its retail partners to be successful to prove that online retail was a viable and easy way of doing business, and because AOL had a direct financial interest in the success of retail partners such as eToys.  (Tr. 42:13-42:18; Dep. [Burger] 21:3-22:6)

174. In the late 1990s the unfamiliar nature of internet shopping made reliability an important issue for AOL in selecting merchant partners that would give its members a good shopping experience. (Tr. 25:6-25:25)

175. At that time, AOL Members were nervous about using their credit card numbers on the internet and also held other trust and safety concerns about the online shopping experience.  (Tr. 26:1-26:4)

176. In order to provide good products and service to AOL Members in the shopping area, AOL sought to provide recognizable brands, good products, and good pricing.  (Tr. 25:10-25:17)

177. AOL viewed eToys as a desirable retailer on its website because it felt eToys had the particular resources and commitment to deliver a high quality experience in all aspects of commerce from product selection to site design, transaction process, customer service, great merchandising, a broader selection of products than other online toy retailers, great promotion, and excellent marketing ideas and enthusiasm.  (Ex. D-19 at AOL 00444; Ex. D-27 at AOL 01708-09; Ex. D-12 at AOL 00454)

178. During the 1999 holiday season Fortune Magazine had rated eToys first among the top 49 websites in an independent study of how internet retailers performed.  (Ex. D-29 at AOL 00753)

179. AOL would not have entered into the 1999 Agreement with any
company other than eToys. (Tr. 54:19-54:25)

180. At no point in 2001, either before or after eToys filed
bankruptcy, did it contact AOL seeking to reverse the termination
or to transfer the remaining services due to eToys under the 1999
Agreement to a third party. (Tr. 57:11-57:22)

II.    CONCLUSIONS OF LAW

    A.    November 15, 2000, Amendment

        1.    Fraudulent Conveyance under the Bankruptcy Code

1.    The version of section 548(a) of the Bankruptcy Code which
is applicable to this case[3] establishes the requirements for
avoiding a transfer as constructively fraudulent:

    (a)(1) The trustee may avoid any transfer of an
    interest of the debtor in property, or any obligation
    incurred by the debtor, that was made or incurred on or
    within one year before the date of the filing of the
    petition, if the debtor voluntarily or involuntarily -
                  . . .
        (B)  (i) received less than a reasonably
    equivalent value in exchange for such transfer or
    obligation; and
            (ii) (I) was insolvent on the date that such
    transfer was made or such obligation was incurred, or
    became insolvent as a result of such transfer or
    obligation;
            (II) was engaged in business or a
    transaction, or was about to engage in business or a
    transaction, for which any property remaining with the
    debtor was an unreasonably small capital; or
            (III) intended to incur, or believed
    that the debtor would incur, debts that would be beyond
    the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).

2.    The plaintiff bears the burden of proving each of the
requirements of section 548(a), including that (1) the debtor was
insolvent at the time of the transfer or became insolvent as a
result thereof and (2) the debtor received less than reasonably

      [3]  The amendments to section 548 contained in the Bankruptcy
Abuse Prevention and Consumer Protection Act are not applicable.

equivalent value in exchange for such transfer.  <u>BFP v.</u>
<u>Resolution Trust Corp.</u>, 511 U.S. 531, 535 (1994); <u>Mellon Bank,</u>
<u>N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.(In</u>
<u>re R.M.L., Inc.)</u>, 92 F.3d 139, 144 (3d Cir. 1996).

3.    A company is solvent for purposes of section 548(a) if its
assets, at fair valuation, exceed its liabilities.  11 U.S.C. §
101(32)(A).

4.    Solvency is assessed as of the date of the transfer sought
to be avoided.  <u>R.M.L., Inc.</u>, 92 F.3d at 154.

5.    In evaluating the fair value of a company's assets for
purposes of determining solvency, the appropriate premise of
value must be applied:  either the going concern premise of value
or the liquidation premise of value.  <u>Travellers Int'l AG v.</u>
<u>Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>,
134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of
the debtor's assets required choice between going concern and
liquidation premises of value); <u>American Classic Voyages Co. v.</u>
<u>JP Morgan Chase Bank (In re American Classic Voyages Co.)</u>, 367
B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair
valuation' of the entity's assets, an initial decision to be made
is whether to value the assets on a going concern basis or a
liquidation basis.").

6.    The going concern premise of value will be applicable unless
the company's bankruptcy is imminent.  <u>See, e.g.</u>, <u>Moody v. Sec.</u>
<u>Pac. Bus. Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992)
("Where bankruptcy is not 'clearly imminent' on the date of the
challenged conveyance, the weight of authority holds that assets
should be valued on a going concern basis.").  <u>Accord</u> <u>American</u>
<u>Classic Voyages</u>, 367 B.R. at 508; <u>Lids Corp. v. Marathon Inv.</u>
<u>Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535, 541 (Bankr. D.
Del. 2002).

7.    The balance sheet test is a valid and accepted methodology
for valuing a company's assets for purposes of determining
solvency.  11 U.S.C. § 101(32)(A) ("'[I]nsolvent' means . . .
financial condition such that the sum of such entity's debts is
greater than all of such entity's property . . . .").  <u>See also</u>,
<u>Peltz v. Hatten</u>, 279 B.R. 710, 743 (D. Del. 2002) ("While the
[solvency] inquiry is labeled a 'balance sheet' test . . . .  it
is appropriate to adjust items on the balance sheet that are
shown at higher or lower value than their going concern value and
to examine whether assets of a company that are not found on its
balance sheet should be included in its fair value."), <u>aff'd sub</u>
<u>nom.</u> <u>In re USN Commc'ns, Inc.</u>, 60 Fed. Appx. 401 (3d Cir. 2003).

8.    The fair value of a company's intangible assets generally is included when applying the balance sheet test.  <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)</u>, 945 F.2d 635, 647 (3d Cir. 1991); <u>Schubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.)</u>, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on [GAAP]") (citation omitted).

9.    Applying the balance sheet test as of November 15, 2000, eToys was solvent.  (FOF 108-34)

10.    The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test, which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  <u>See also WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

11.    eToys was not insolvent on November 15, 2000, under the cash-flow test as it had not as of that date incurred, nor did it believe that it would incur, debts that would be beyond its ability to pay when they matured.  In fact, at that time eToys was paying its debts as they came due.  (FOF 142-48)

12.    A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company has insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  <u>See also</u> <u>Moody</u>, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

13.    eToys was also solvent on November 15, 2000, under the unreasonably small capital test because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

14.    Therefore, the Amendment did not constitute or result in an avoidable transfer under section 548.

2. <u>Fraudulent Conveyance under State Law</u>

15. Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors. 11 U.S.C. § 544.

16. This case is governed by Virginia law (Ex. P-1 at AOL 00229) which provides that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ." Va. Code Ann. § 55-81 (West 2003). <u>See also</u> <u>In re Meyer</u>, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

17. "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." <u>In re Best Products Co.</u>, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), <u>aff'd</u>, 68 F.3d 26 (2d Cir. 1995). <u>See also</u> <u>C-T of Virginia, Inc.</u> <u>v. Euroshoe Assocs. Ltd. P'ship</u>, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does not require [the transfer of] reasonably equivalent value.").

18. The November 15, 2000, Amendment is not avoidable under Virginia law because eToys was solvent at that time and was not rendered insolvent by the Amendment.

B. <u>Termination on February 28, 2001</u>

1. <u>Fraudulent Conveyance under the Bankruptcy Code</u>

19. eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement. <u>EBC I, Inc. v. America Online,</u> <u>Inc. (In re EBC I, Inc.)</u>, 356 B.R. 631, 636 (Bankr. D. Del. 2006).

20. There was a transfer of a property interest of eToys on termination of the 1999 Agreement. <u>EBC I, Inc.</u>, 356 B.R. at 637.

21. eToys received nothing in exchange for the termination of the 1999 Agreement.

22. Therefore, the termination is avoidable under section 548 of the Bankruptcy Code.

24

a.    Value of Property Transferred

23.  Section 550 provides that where a transfer is avoided under
section 548, the estate may recover the property transferred or
the value of such property.    11 U.S.C. § 550(a)(1).

24.  Because the purpose of sections 548 and 550 is preservation
of the estate for the benefit of creditors, the value of property
transferred is determined from the perspective of the estate and
the creditor body.  See, e.g., Metro Commc'ns, Inc., 945 F.2d at
648 ("The purpose of [section 548] is estate preservation . . .
."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In
re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005)
("Section 550(a) is intended to restore the estate to the
financial condition it would have enjoyed if the transfer had not
occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] at 550-4
(Henry J. Sommer et al., eds., 3d ed. rev. 2007).

25.  Under sections 548 and 550, where property is not returned
to the estate as a result of avoidance, but instead the value of
the property is returned, the property transferred is valued as
of the transfer date.  See, e.g., R.M.L., Inc., 187 B.R. at 463;
Gennrich v. Montana Sport U.S.A. (In re International Ski
Service, Inc.), 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990) (noting
that under section 550 courts generally agree that the property
should be valued at the time of transfer) (citation omitted).

i.    Value to eToys

26.  When a corporation's failure and bankruptcy are imminent at
the time of a transfer sought to be avoided under section 548,
application of the liquidation premise of value is appropriate in
determining the fair value of the property transferred.  See,
e.g., Rochez Bros., Inc., 326 B.R. at 588-89 (rejecting a going
concern premise of value for avoided transfer of road salt
because, absent the transfer, the salt "would merely have been
subjected to the same forced liquidation sale that the Debtor
ultimately conducted" and thus the appropriate section 550(a)
value was the "forced sale" price); Active Wear, Inc. v. Parkdale
Mills, Inc., 331 B.R. 669, 672 (W.D. Va. 2005) (holding that
value under section 550 means "fair market value" and that fair
market value in the liquidation context "refers to the value that
the debtor/bankrupt could receive for the property in a
liquidation sale.").

27.  Given eToys' dire financial condition in February 2001,
eToys would have been unable to enjoy any benefit from the 1999
Agreement even if it had not been terminated.  (FOF 79-89)

28.  Under Virginia law, eToys' announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39, 92-94)

29.  Because eToys had no further ability to benefit from any performance by AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

ii.  <u>Transferability to Third Party</u>

1.  <u>Executory Contract</u>

30.  An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  <u>See, e.g.</u>, <u>Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.</u>, 872 F.2d 36, 39 (3d Cir. 1989); 3 <u>Collier on Bankruptcy</u> ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000).

31.  In determining whether remaining obligations under a contract are material, applicable state law determines the consequences of breach.  <u>See</u> <u>Terrell v. Albaugh (In re Terrell)</u>, 892 F.2d 469, 471-72 (6th Cir. 1989) ("[F]ederal law defines the term executory contract but . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.") (citation omitted).

32.  In Virginia, contracts that form a relationship in the nature of a business partnership, where mutual obligations are expected to be continuous and ongoing, are executory contracts. <u>See, e.g.</u>, <u>Broyhill v. DeLuca (In re DeLuca)</u>, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (applying Virginia law and holding that an operating agreement governing a limited liability company was an executory contract); <u>RW Power Partners v. Virginia Elec. & Power Co.</u>, 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (contract was executory since the parties both owed to each other obligations a material breach of which would have "'deprive[d] the injured party of the benefit that the party justifiably expected from the exchange.'" (<u>quoting</u> <u>Farnsworth on Contracts</u> § 8.16)); <u>Horton v. Horton</u>, 487 S.E. 2d. 200, 204 (Va. 1997) (holding that a material breach is one where "failure to perform [the contractual terms] defeats an essential purpose of the contract.").

33. The 1999 Agreement was an executory contract as of February 28, 2001. (FOF 16-41, 92-95)

## 2. Assignability

34. Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor. 11 U.S.C. § 365(c)(1)(A-B).

35. Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract. See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material."), aff'd, 307 B.R. 827 (E.D. Va. 2002); In re DeLuca, 194 B.R. at 77 (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company.").

36. Under Virginia law, the identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party. See, e.g., duPont de-Bie v. Vredenburgh, 490 F.2d 1057, 1060 (4th Cir. 1974) ("[E]xecutory contracts for personal services or involving a relationship of confidence are not assignable."); McGuire v. Brown, 76 S.E. 295, 297 (Va. 1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); Epperson v. Epperson, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

37. The AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its ability and experience, all of which were relevant to eToys' ability to assure AOL that eToys would adequately serve and protect the interests of AOL Members as set forth in the 1999 Agreement. (FOF 16-41, 92-95, 173-79)

38. Under Virginia law, AOL would not have been required to accept performance under the 1999 Agreement from any party other

than eToys, and the 1999 Agreement therefore was not assumable or
assignable under section 365(c) of the Bankruptcy Code.

39.  Because eToys had announced prior to February 28, 2001, that
it would cease operations and file bankruptcy, because all of
eToys' assets (including its contracts and contract rights) would
be liquidated in that bankruptcy proceeding, and because it was
not assignable under section 365(c), the 1999 Agreement had no
value as of that date.  Cf. Allan v. Archer-Daniels-Midland Co.
(In re Commodity Merchants), 538 F.2d 1260, 1263 (7th Cir. 1976)
("The trustee argues . . . that the cancellation [of the
contracts] deprived [the debtor] of its property right to resell
the contracts.  If the contracts had been freely transferable,
perhaps we could agree . . . ."); In re Bellanca Aircraft Corp.,
850 F.2d 1275, 1285 (8th Cir. 1988) (holding that conditional
right of assignment effectively precluded assignment of contract
and therefore compelled the conclusion that the contract had no
value).

40.  Even if eToys' remaining rights under the 1999 Agreement as
of February 28, 2001, were transferable to a third party, their
value was no more than $16,500 to $38,500.  (FOF 164-71)

41.  The substantial loss in the value of eToys' rights under the
1999 Agreement between November 15, 2000, and February 28, 2001,
was caused by eToys' financial collapse and the deterioration of
the internet industry and the economy generally during that time.
(FOF 155-62)

42.  No award of pre-judgment interest is appropriate, because
the property transferred had no value and there is no evidence
that AOL acted in bad faith in terminating the 1999 Agreement.
See, e.g., In re Hechinger Inv. Co. of Delaware Inc., 489 F.3d
568, 579-80 (3d Cir. 2007) (holding that pre-judgment interest
may be denied so long as a sound reason is given); Bellanca
Aircraft Corp., 850 F.2d at 1281 (stating that awards of pre-
judgment interest are discretionary).

        2.  Fraudulent Transfer under State Law

43.  eToys was insolvent as of February 28, 2001, the date AOL
terminated the 1999 Agreement.  EBC I, Inc., 356 B.R. at 636.

44.  There was a transfer of a property interest of eToys when
the 1999 Agreement was terminated.  EBC I, Inc., 356 B.R. at 637.

45.  Under Virginia law, the eToys announcement in February 2001
that it would shut down its website and cease operations
constituted a material breach of numerous ongoing obligations of

eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39)

46.  Because eToys had no further rights to performance from AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

47.  Because the 1999 Agreement had no value to eToys on that date, there is no recovery the estate may have for any fraudulent transfer under Virginia law.


Dated: January 10, 2008          BY THE COURT:

                                 Mary F. Walrath
                                 United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| EBC I, INC., f/k/a ETOYS, INC., | ) Case No. 01-00706(MFW) |
| | ) |
| Reorganized Debtor. | ) |
| ——————————— | ) |
| | ) |
| EBC I, INC., f/k/a ETOYS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary No. 03-50003 |
| v. | ) |
| | ) |
| AMERICA ONLINE, INC., | ) |
| | ) |
| Defendant. | ) |
| ——————————— | ) |

**ORDER**

**AND NOW**, this **10th** day of **JANUARY, 2008**, upon consideration of the Complaint of eToys against AOL and for the reasons set forth in the accompanying Opinion and Findings of Fact, it is hereby

**ORDERED** that judgment is entered in favor of AOL.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Richard D. Allen, Esquire[1]

—————————

1 Counsel shall serve a copy of this Order and the accompanying Opinion, Findings of Fact and Conclusions of Law on all interested parties and file a Certificate of Service with the Court.

SERVICE LIST

Richard D. Allen, Esquire
Thomas W. Briggs, Jr., Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Counsel for eToys

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
Counsel for America Online, Inc.

James R. Wrathall, Esquire
Carol J. Banta, Esquire
Gregory S. Chernack, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, N.W.
Washington, DC 20037
Counsel for America Online, Inc.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
|  | ) |  |
| Reorganized Debtor. | ) |  |
| _____ | ) |  |
|  | ) |  |
| EBC I, INC., f/k/a ETOYS, INC., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | Adversary No. 03-50003 |
| v. | ) |  |
|  | ) |  |
| AMERICA ONLINE, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ |  |  |

OPINION[1]

Before the Court is the Complaint filed by EBC I, Inc.,

f/k/a eToys, Inc. ("eToys") against America Online, Inc. ("AOL")

for avoidance of a fraudulent conveyance.  For the reasons stated

below, the Court will enter judgment in favor of AOL.


I.   BACKGROUND

On March 7, 2001, eToys filed a voluntary petition under

chapter 11 of the Bankruptcy Code.  On that same day, eToys

_____

[1]  This Opinion, and the accompanying Findings of Fact
("FOF") and Conclusions of Law ("COL"), constitute the findings
of fact and conclusions of law of the Court pursuant to Rule 7052
of the Federal Rules of Bankruptcy Procedure.

ceased operations and shut down its website. All of eToys'
assets were subsequently liquidated.

Prior to the bankruptcy filing, eToys and AOL had entered
into an Interactive Marketing Services Agreement dated August 10,
1999 (the "1999 Agreement"), under which AOL committed to provide
online advertisements and other services for eToys for three
years for $18 million, payable in installments. (FOF 19) eToys
paid $7.5 million through July 2000 in accordance with the 1999
Agreement, but AOL failed to perform its obligations, providing
less than half the advertisements promised in the first year.
(FOF 19, 44, 51, 55, 58) As a result, the 1999 Agreement was
modified by an Amendment dated November 15, 2000. (FOF 50, 54,
56) eToys paid $750,000 at that time (in addition to the $7.5
million it had already paid) and AOL agreed to provide certain
advertisements for the following two years without further
payments by eToys. (FOF 57)

After a disastrous holiday season, eToys realized it would
not be able to meet its projected sales figures. (FOF 74, 144)
It began conserving cash, hired an investment banker, and
attempted to sell itself as a going concern. (FOF 75, 77, 78)
By the end of February 2001, however, it was apparent that eToys'
marketing efforts were unsuccessful. On February 26, 2001, eToys
issued a press release announcing its financial difficulties and

2

its intent to fire all its employees, shut down its website, and
file bankruptcy. (FOF 88, 89) Two days later, AOL terminated
the 1999 Agreement pursuant to section 5.6, which allowed
termination if eToys became insolvent or filed bankruptcy. (FOF
21, 91)

On January 3, 2003, eToys filed an adversary complaint (the
"Complaint") against AOL seeking (1) to avoid and recover alleged
fraudulent transfers pursuant to sections 548 and 544 of the
Bankruptcy Code and applicable state law, (2) damages for breach
of contract, and (3) equitable relief based on unjust enrichment.
According to eToys, the payments made under the 1999 Agreement,
the Amendment, and the termination of the 1999 Agreement by AOL
were all avoidable transfers of property of eToys.

AOL filed a motion to dismiss the Complaint. At oral
argument held on April 30, 2003, the Court granted the motion to
dismiss with respect to the unjust enrichment count because the
parties conceded that their relationship was governed by the 1999
Agreement.

On May 14, 2004, eToys filed a motion for partial summary
judgment, and AOL filed a motion for summary judgment on all
counts. eToys conceded in its response to AOL's motion that its
breach of contract claim and any claim for recovery of payments
made under the 1999 Agreement prior to the Amendment on November

3

15, 2000, should be dismissed.  On December 7, 2006, the Court granted AOL's motion for summary judgment in part and dismissed Counts IV and V of the Complaint.  The Court also granted eToys' Motion for Partial Summary Judgment on Count I of the Complaint (the fraudulent conveyance claim) in part and scheduled an evidentiary hearing on the remaining issues.

The evidentiary hearing was held on June 26, 2007, and the matter was taken under advisement.  Post-trial briefing is complete, and the matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (H) & (O).


III. <u>DISCUSSION</u>

A.  <u>Applicable Law</u>

The Plaintiff argues that both the November 15, 2000, Amendment to the 1999 Agreement and the February 28, 2001, termination of the 1999 Agreement are avoidable as constructively fraudulent conveyances under section 548 of the Bankruptcy Code and under applicable state law.

1.  <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

The version of section 548(a)(1) applicable to this case

provides that:

> The trustee may avoid any transfer of an interest of
> the debtor in property, or any obligation incurred by
> the debtor, that was made or incurred on or within one
> year before the date of the filing of the petition, if
> the debtor voluntarily or involuntarily –
> . . .
>> (B)(i) received less than a reasonably
>> equivalent value in exchange for such
>> transfer or obligation; and
>>   (ii)(I) was insolvent on the date that
>> such transfer was made or such obligation was
>> incurred, or became insolvent as a result of
>> such transfer or obligation;
>>     (II) was engaged in business or a
>> transaction, or was about to engage in
>> business or a transaction, for which any
>> property remaining with the debtor was an
>> unreasonably small capital; or
>>     (III) intended to incur, or believed
>> that the debtor would incur, debts that would
>> be beyond the debtor's ability to pay as such
>> debts matured.

11 U.S.C. § 548(a)(1) (2004).[2]  To recover under section 548,

eToys has the burden of establishing that while it was insolvent

there was a transfer of an interest in its property for less than

reasonably equivalent value.  See, e.g., <u>BFP v. Resolution Trust</u>

<u>Corp.</u>, 511 U.S. 531, 535 (1994); <u>Mellon Bank, N.A. v. Official</u>

<u>Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,</u>

---

[2]  Section 548 was modified by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which
became effective October 17, 2005, after the instant adversary
proceeding was commenced.

<u>Inc.)</u>, 92 F.3d 139, 144 (3d Cir. 1996).

        2.   <u>Fraudulent Transfer under State Law</u>

    Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.  11 U.S.C. § 544.

    In this case, the 1999 Agreement provides that disputes concerning it are governed by Virginia law.  (Ex. P-1 at AOL 00229)  Virginia law provides, in relevant part, that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ."  Va. Code Ann. § 55-81 (West 2003).  <u>See also</u> <u>In re Meyer</u>, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

    Even "slight consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context."  <u>In re Best Products Co.</u>, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), <u>aff'd</u>, 68 F.3d 26 (2d Cir. 1995).  <u>See also</u> <u>C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship</u>, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does

not require [the transfer of] reasonably equivalent value.").
Therefore, to be avoidable as a fraudulent conveyance under
Virginia law, eToys had to be insolvent or rendered insolvent at
the time of the transfer and the transfer had to be for <u>no</u>
consideration.

     B.    <u>November 15, 2000, Amendment</u>

         1.    <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

           a.   <u>Solvency</u>

In the December 7, 2006, Opinion, the Court concluded that
there was a genuine issue of material fact in dispute as to
whether eToys was insolvent on November 15, 2000, at the time the
Amendment was executed.

At the trial, AOL presented testimony of an expert (Robert
Hutchins) to the effect that eToys was solvent on November 15,
2000. (FOF 134, 141, 146) eToys disputes this but did not
present any expert testimony in rebuttal.

The term insolvent is defined in the Bankruptcy Code
generally to mean a "financial condition such that the sum of
such entity's debts is greater than all of such entity's
property, at a fair valuation." 11 U.S.C. § 101(32)(A). In
evaluating the fair value of a company's assets for purposes of
determining solvency, the appropriate premise of value must be
applied: either the going concern premise of value or the

liquidation premise of value.  Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of TWA's assets required choice between going concern and liquidation premises of value); American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.), 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

AOL's expert used the going concern premise of value in analyzing eToys' solvency as of November 15, 2000.  In doing so, he considered the standard factors a valuation analyst uses to determine the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors. (FOF 105)

The Court concludes that it was appropriate to use the going concern premise of value in analyzing eToys' solvency as of

8

November 15, 2000.  (FOF 108)  eToys concedes that it was
operating on that date.  <u>See, e.g.</u>, <u>Moody v. Sec. Pac. Bus.
Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where
bankruptcy is not 'clearly imminent' on the date of the
challenged conveyance, the weight of authority holds that assets
should be valued on a going concern basis.").  "[A] business does
not have to be thriving in order to receive a going concern
valuation.  Before the going concern valuation is to be
abandoned, the business must be 'wholly inoperative, defunct or
dead on its feet.'" <u>American Classic Voyages</u>, 367 B.R. at 508
(<u>quoting</u> <u>Fryman v. Century Factors (In re Art Shirt Ltd., Inc.)</u>,
93 B.R. 333, 341 (E.D. Pa. 1988)).  <u>Accord</u> <u>Lids Corp. v.
Marathon Inv. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535,
541 (Bankr. D. Del. 2002).

     eToys argues, however, that the Court must consider that
eToys (and the internet industry generally) collapsed by the end
of 2000.  eToys contends that it is "common sense" to conclude
that, because AOL's expert admits that eToys was insolvent by the
end of December 2000, and nothing unforeseen happened between
November 15 and December 31, 2000, eToys must have been insolvent
on November 15 as well.  <u>Cf.</u> <u>American Classic Voyages</u>, 367 B.R.
at 512 (concluding that the debtor became insolvent as a result
of "the unforeseeable events of 9/11, and their effect upon the

9

travel industry as a whole [which] forced the Debtors into bankruptcy.").

The Court rejects eToys' analysis. eToys' condition was fundamentally different on November 15 and December 31, 2000. On November 15, eToys (and its investors and industry experts) all expected that it would have a tremendously successful holiday season. (FOF 115, 117) During the year prior to November 15, 2000, eToys expanded its warehouse operations and moved into a new headquarters. (FOF 109) Full-time employees increased from 300 to 1000 in the prior 18 months and eToys' customer base doubled between December 1999 and December 2000. (FOF 110, 111) In addition, eToys had access to capital and credit during that period; it was able to raise $175 million in its initial public offering in May 1999, $145 million by issuing unsecured convertible notes in December 1999, $100 million by a preferred stock offering in June 2000, and $40 million in a revolving line of credit on November 15, 2000. (FOF 113)

Further, at the time of the Amendment, both eToys' management and the investment community had positive views about its long-term prospects. (FOF 115) In fact, it was not until after the Thanksgiving weekend and even into December that it became apparent that eToys would not be able to make its sales projections. (FOF 74, 144) Although eToys did issue a press

release on December 15, 2000, adjusting its sales projections
downward, eToys still felt that it would be able to sell its
business as a going concern.  (FOF 75)  It hired an investment
banker to find a buyer, and several prospective buyers expressed
interest.  (FOF 77, 78)  In the interim eToys instituted cash
management strategies to keep it operating until a sale could be
consummated.  (FOF 76, 79, 80)  It was not until February that it
became apparent that eToys would not be able to sell itself as a
going concern and had to liquidate its assets.  (FOF 82, 84-87)
As a result, the Court concludes that AOL's expert used the
appropriate methodology to value eToys' assets on its balance
sheet as a going concern in determining whether eToys was solvent
on November 15, 2000.  (FOF 108)

> i.   <u>Balance Sheet Test</u>

Applying the going concern premise of value to the balance
sheet test, AOL's expert made various adjustments to the book
value of eToys' assets to reflect their market value.  <u>See, e.g.</u>,
<u>Peltz v. Hatten</u>, 279 B.R. 710, 743 (D. Del. 2002) ("While the
[solvency] inquiry is labeled a 'balance sheet' test . . . . it
is appropriate to adjust items on the balance sheet that are
shown at a higher or lower value than their <u>going concern value</u>
and to examine whether assets of a company that are not found on
its balance sheet should be included in its fair value.")

11

(emphasis added), <u>aff'd sub nom.</u> <u>In re USN Commc'ns, Inc.</u>, 60 Fed. Appx. 401 (3d Cir. 2003).

eToys finds fault with many of the adjustments. For example, AOL's expert made a 21% upward adjustment from the book value of inventory (reflected at cost) which the Court finds was conservative. eToys argues, however, that the inventory should be valued at book value because that is what eToys could have expected to receive on a forced sale and because it reflects the "wholesale fair market value" of the inventory. The Court disagrees. eToys was not a wholesaler; it was a retailer. To conclude that the value of the inventory was only the book value assumes that eToys was not selling it at anything above its cost to eToys. That is contradicted by the evidence. At the time (November 15, 2000), eToys was selling its inventory in the ordinary course of business at a profit, not at the wholesale price. (FOF 124) Therefore, the Court concludes that the conservative upward adjustment to the book value of the inventory was appropriate.[3]

---

[3]  Both parties cite IRS Revenue Procedure 77-12 to support their opposing arguments: eToys for the proposition that "[t]he replacement cost method generally provides a good indication of fair market value if inventory is readily replaceable in a wholesale or retail business . . ." and AOL for the proposition that inventory must be valued to reflect its resale value. <u>See</u> I.R.S. Rev. Proc. 2003-51, 2003-2 C.B. 121 (replacing Rev. Proc. 77-12). The Court finds the Revenue Procedure, like generally accepted accounting principles, to be unhelpful because the tax

The expert made further adjustments, including to the intangible assets listed on the books.[4]  eToys presented no evidence that these adjustments were not appropriate, but argues that it was inappropriate to include any value for intangibles because the balance sheet should include only tangible assets that are readily saleable.  See, e.g., In re WRT Energy Corp., 282 B.R. 343, 369 (W.D. La. 2001) (concluding that only assets capable of liquidation may be included in the valuation of assets); Kendall v. Sorani (In re Richmond Produce Co., Inc.), 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993) (assets, such as goodwill, that are speculative and cannot separately be sold should be excluded from the value of a debtor's assets), aff'd, 195 B.R. 455 (N.D. Cal. 1996); Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 672 (Bankr. S.D.N.Y. 1992); 2 Collier on Bankruptcy, ¶ 101.32[4] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2007). eToys also disagrees with the method by which AOL's expert valued

---

and accounting implications of how assets are listed on a company's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets.

[4]  For example, the expert reduced the book value of goodwill from $124 million to zero, the property and equipment (including software) by 33%, and miscellaneous other assets (excluding cash and cash equivalents) by 15%.  In addition, the expert valued eToys' interest in Babycenters at $5 million (or half the ultimate sale price of that asset).  (FOF 123-31)

the intangible assets (based on eToys' market capitalization) because it disappeared overnight and had no rational connection to the valuation of assets in a "conversion to cash" analysis.

The Court rejects eToys' arguments.  The Third Circuit has held that "in determining insolvency under § 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, <u>inter alia</u>, good will." <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)</u>, 945 F.2d 635, 647 (3d Cir. 1991).  <u>See also</u> <u>Schubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.)</u>, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on generally accepted accounting principles.") (citation omitted).  <u>See generally</u>, Shannon P. Pratt et al., <u>Valuing a Business</u> 309-10 (4th ed. 2000) (inclusion of intangibles is required under accepted valuation principles).

Further, the Third Circuit has stated that the Court should consider the market capitalization of a company in valuing its intangible assets.  Indeed, the Third Circuit has expressed that there is no error in "choosing to rely on the objective evidence from the public equity and debt markets." <u>VFB LLC. v. Campbell Soup Co.</u>, 482 F.3d 624, 633 (3d Cir. 2007).  Therefore, it was

14

appropriate for AOL's expert to include the value of eToys'
intangibles on the adjusted balance sheet.  (FOF 123, 130)

eToys also objects to the inclusion of any value for the
software, which was under license to eToys and may not have been
assignable.  AOL counters that the software had some value to
eToys because it was using it in its operations and, therefore,
the Court should consider it as part of the going concern value
of eToys.  The Court agrees with AOL that the software had some
value to eToys and, therefore, should be considered part of the
going concern value of eToys.  (FOF 126)

AOL's expert made no adjustment to eToys' liabilities, but
did not include the preferred stock as debt.  eToys asserts that
the expert should have treated the preferred stock as a liability
because it was listed on eToys' balance sheet as debt in the
amount of $37 million in accordance with generally accepted
accounting principles ("GAAP").  (Ex. P-11 at 4)  See, e.g.,
Trans World Airlines, 134 F.3d at 190 (holding that in
determining solvency, liabilities are to be taken at their face
value); Winstar, 348 B.R. at 278 ("[T]he insolvency test
anticipates that liabilities will be valued at their face
value."); Hanna v. Crenshaw (In re ORBCOMM Global, L.P.), Bankr.
No. 00-3636, Adv. No. 02-1914, 2003 WL 21362192, at *3 (Bankr. D.
Del. June 12, 2003) ("[F]or purposes of determining whether a

15

debtor is insolvent under section 547, the liabilities of the
debtor must be valued at face value.").

AOL responds that GAAP is not relevant to determining the
fair market value of assets (or liabilities).  Although GAAP
treats redeemable preferred stock as a liability, AOL notes that
the SEC regulations confirm that preferred stock is neither a
current nor a long-term liability.  See Balance Sheets, 17 C.F.R.
§ 210.5-02 (2006).

The Court agrees with AOL.  GAAP does not deal with the true
market value of assets or the determination of what are legal
liabilities of a company.  Cf. In re Lease-A-Fleet, Inc., 155
B.R. 666, 679 (Bankr. E.D. Pa. 1993) ("Courts are not required to
rely upon GAAP standards when determining the issue of
insolvency.").  Just as GAAP rules regarding the book value of
assets does not determine their fair market value, similarly GAAP
rules for treating debt as equity and vice versa are not relevant
to determining whether they are truly debt or equity.  Instead,
the Court must consider the totality of the circumstances to
determine if the obligation is, in fact, debt or equity.  See,
e.g., Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.), 143
B.R. 468, 473 (Bankr. E.D. Tenn. 1992) (rejecting contention of
trustee's expert that preferred stock should be treated as debt
for solvency analysis); Joshua Slocum, Ltd. v. Boyle (In re

16

<u>Joshua Slocum, Ltd.</u>), 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989)
(holding that redemption value of redeemable stock is not a
liability of the debtor), <u>aff'd</u>, 121 B.R. 442 (E.D. Pa. 1989).
<u>Cf.</u> <u>In re Trace Int'l Holdings</u>, 301 B.R. 801, 805-06 (Bankr.
S.D.N.Y. 2003) (treating preferred stock as a liability because
the court had previously re-characterized the stock as debt);
<u>See generally</u>, Robert J. Stearn, Jr., <u>Proving Solvency: Defending
Preference and Fraudulent Transfer Litigation</u>, 62 Bus. Law. 359,
382-84 (2007) (surveying case law and concluding that preferred
stock is treated as equity not debt in insolvency analyses).

In this case, the preferred stock was payable as debt at the
discretion of eToys.  (FOF 131)  Given its dire financial
condition at the time, it is unlikely that eToys would have paid
it as debt.[5]  Therefore, the Court concludes that the preferred
stock need not be considered as debt for purposes of determining
the going concern value of eToys under the balance sheet test.
(FOF 131)  Consequently, the Court finds that the specific
adjustments made by AOL's expert to eToys' balance sheet were
appropriate.  (FOF 123-31)

Based on the adjustments to the balance sheet, AOL's expert
concluded that the value of eToys' assets was approximately $302

---

[5]  In fact, in its plan of reorganization, eToys did not treat
the preferred stock as general unsecured debt and, instead,
canceled it.  (D.I. 1385, art. VII §§ 4.10 cl. 6, 7.1(b))

million without considering any value for the intangible assets
and approximately $545 million with those assets.  From this, the
expert concluded that eToys' assets exceeded its debts by
approximately $15 to $258 million.  Thus, the Court concludes
that, under the balance sheet test, eToys was solvent on November
15, 2000.  (FOF 132-34)

> ii.  <u>Cash Flow Test</u>

Even using other accepted methods of calculating solvency,
AOL's expert opined that eToys was solvent as of November 15,
2000.  The cash-flow test (also called the inability-to-pay-debts
test) is an alternative solvency test which assesses whether, at
the time of the transfer, the debtor intended to incur or
believed that it would incur debts beyond its ability to pay as
such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  <u>See also</u>
<u>WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File</u>
<u>Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343, 414-15 (Bankr.
W.D. La. 2001) ("The 'inability to pay debts' prong of section
548 is met if it can be shown that the debtor made the transfer
or incurred an obligation contemporaneous with an intent or
belief that subsequent creditors likely would not be paid as
their claims matured.").

AOL's expert determined that eToys was solvent under the
cash flow test because eToys was able to pay, intended to pay,

18

and in fact was paying its debts as they came due as of November 15, 2000.  The Court agrees with that conclusion.  (FOF 142-44)  Therefore, under the cash-flow test, the Court concludes that eToys was solvent on November 15, 2000.

### iii. <u>Capital Adequacy Test</u>

A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company had insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  <u>See also</u> <u>Moody</u>, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

AOL's expert concluded that eToys did not have unreasonably small capital as of November 15, 2000, because eToys reported on September 30, 2000, that it had sufficient capital to fund operations through June 2001, and thereafter was able to obtain a $40 million revolving line of credit in November 2000.  Again the Court agrees with those conclusions and finds that, under the capital adequacy test, eToys was also solvent on November 15, 2000, because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

Consequently, the Court concludes that under any of the standard methodologies, eToys was solvent as of November 15,

2000.  As a result, the Amendment to the 1999 Agreement executed
on that date cannot be avoided as a fraudulent conveyance under
section 548 of the Bankruptcy Code.

        2.   <u>Fraudulent Transfer under State Law</u>

    Because eToys was solvent on November 15, 2000, the
Amendment executed on that date is not avoidable as a fraudulent
transfer under Virginia law.  Va. Code Ann. § 55-81 (West 2003).
<u>See also</u> <u>Meyer</u>, 244 F.3d at 355.

    C.   <u>February 28, 2001, Termination of 1999 Agreement</u>

        1.   <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

            a.   <u>Solvency</u>

    In the December 7 Opinion, the Court concluded that eToys
was insolvent on February 28, 2001, when AOL terminated the 1999
Agreement.  This was, in fact, conceded by AOL, which terminated
the 1999 Agreement because of eToys' announcement that it was
insolvent.  At the evidentiary hearing held on June 26, 2007,
AOL's expert opined that eToys became insolvent in early December
2000.  Therefore, as of the termination of the 1999 Agreement on
February 28, 2001, eToys was insolvent.  (FOF 149)

            b.   <u>Transfer of an Interest in Property</u>

    In the December 7 Opinion, the Court also concluded that
AOL's termination of the 1999 Agreement, and consequently the
retention of the payments made by eToys in advance for services

never delivered, constituted a transfer of property of eToys,
namely the advertising services for which eToys had pre-paid.
See, e.g., EBC I, Inc. v. America Online, Inc. (In re EBC I,
Inc.), 356 B.R. 631, 637 (Bankr. D. Del. 2006).

Further, the Court concluded that, even if the 1999
Agreement permitted termination or provided that payments made by
eToys were non-refundable, they still might be recoverable as a
fraudulent conveyance.  See, e.g., R.M.L., 92 F.3d at 148
(concluding that even though fees were non-refundable, they may
still be recoverable if their payment is found to be a fraudulent
conveyance).  The issue remaining, therefore, is not whether the
1999 Agreement provided for the payment of non-refundable fees
but whether eToys received reasonably equivalent value for loss
of the services for which those fees paid.  Id.

The Court narrowed its ruling, however, by holding that only
a contract whose termination resulted in the loss of valuable
property rights of a debtor, such as entitlement to services for
which the debtor had paid in advance, is potentially recoverable
under section 548.  "The fraudulent conveyance statutes are
intended to prevent an insolvent or undercapitalized debtor's
estate and its creditors from being wrongfully deprived of assets
which could be otherwise utilized for the payment of creditors."
Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball,

21

Inc. (In re Metro Water & Coffee Servs., Inc.), 157 B.R. 742, 747 (Bankr. W.D.N.Y. 1993).

### c.    Less than Reasonably Equivalent Value

#### i.    Law of the Case

eToys contends that the Court made several determinations in the December 7 Opinion which are law of the case and mandate a conclusion that eToys received less than reasonably equivalent value as a result of the termination of the 1999 Agreement.  It notes that the Court concluded that "to the extent [eToys] paid more to AOL than the value of the services provided to it by AOL, the termination of the Contract eliminated that value."  EBC I, 356 B.R. at 642.  eToys also contends that the Court found as a fact that eToys had received only $2.3 million in services prior to the Amendment of the 1999 Agreement while it had paid $8.25 million.  Therefore, eToys asserts that the only issue to be determined in the evidentiary hearing was how much eToys had received from AOL between the Amendment on November 15, 2000, and termination of the 1999 Agreement on February 28, 2001.

AOL disagrees with eToys' characterization of the Court's December 7 Opinion.  It notes that neither the summary judgment motion nor the Court's Opinion addressed the value that was exchanged under the 1999 Agreement and Amendment or the proper method for determining that value.

The Court agrees with AOL.  In the December 7 Opinion, the Court did not make any finding as to the value that was received by eToys under the Agreement and its Amendment nor how that value should be calculated.  The Court did state that "the parties had apparently reconciled the accounts for the first year of the [1999 Agreement] . . . and agreed that AOL had provided $2.3 million in services" to eToys.  Id. at 642 (emphasis added).  However, because there was no evidence as to what services were provided after the first year, the Court found there was a dispute as to a genuine issue of material fact.  Id.  Thus, the Court agrees with AOL that it did not decide the value issue and it is not law of the case.  Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 988 F.2d 414, 429 (3d Cir. 1993) (holding that the law of the case doctrine is discretionary and applies, if at all, only to a ruling on a point of law, not to general discussion of issues in the case).

Based on the evidence presented at the June 26, 2007, hearing it is now clear that there was not an agreement as to the "value" of the services provided by AOL in the first year of the 1999 Agreement.  Although the parties agreed that a certain number of impressions had been provided (which were listed on the 1999 Agreement attachment at prices totaling only $2.3 million), the parties also agreed in the Amendment that AOL had satisfied

23

in full its obligation to provide services to eToys in the first
year.  Further, AOL presented evidence that the value of services
provided by it under the 1999 Agreement was not limited to the
list of impressions with prices which is attached to the
Agreement.  For example, AOL notes that in the first year it
provided a substantial number of Welcome Screen impressions to
eToys, which eToys admitted were very valuable to it, even though
no price was allocated to them in the Agreement.[6]  (FOF 27)

The Court agrees with AOL's contention that it must consider
the value of all the services rendered by AOL under the 1999
Agreement and the Amendment (and compare them to the payments
made) in order to determine if eToys received less than
reasonably equivalent value under the 1999 Agreement and the
Amendment as a result of the termination.

ii.  <u>Determining Value Transferred</u>

Section 550 provides that where a transfer is avoided under
section 548, the estate may recover the property transferred or
the value of such property.  11 U.S.C. § 550(a)(1).  Because the

---

[6]  No price was allocated to the Welcome Screen impressions
because AOL did not sell them to others at that time.  (FOF 27-
28)  The value of them to eToys was enormous because all AOL
Members see the Welcome Screen when they sign in, few if anyone
else had ads there, and it was easier to get customers to click
through on such an ad early in their internet browsing.  (FOF 27)
AOL has since sold Welcome Screen impressions to others at
substantial prices.  (FOF 28)

purpose of sections 548 and 550 is preservation of the estate for the benefit of creditors, the value of property transferred is determined from the perspective of the estate and the creditor body.  See, e.g., Metro Commc'ns, Inc., 945 F.2d at 646 ("The purpose of [section 548] is estate preservation . . . ."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] (Henry J. Sommer et al., eds., 3d ed. rev. 2007) (same).

The Third Circuit has held that the Court must determine the net effect of the transaction on the debtor and that if the debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." Metro Commc'ns, Inc., 945 F.2d at 647.  The Court, therefore, must consider what value the 1999 Agreement, as amended, had to eToys immediately before and after the termination.

### iii. Value to eToys

eToys contends that the value of the 1999 Agreement that was lost to eToys by its termination is calculated as follows. Because eToys paid $8.25 million and received only $2.3 million

in the first year, it was entitled to another $5.95 million in services during the remaining two years of the Agreement.  The termination occurred approximately six months later, leaving at least 75% of the services to be performed.  Therefore, eToys seeks approximately $4.5 million for the value of unperformed services under the 1999 Agreement for which it had already paid.

AOL contends that under Virginia law, eToys was in breach of the 1999 Agreement at the time of its termination and that, consequently, eToys had no remaining rights that were lost by its termination.  Specifically, AOL asserts that the eToys announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39)  Because eToys had no further rights to performance from AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, AOL argues that the 1999 Agreement had no further value to eToys as of February 28, 2001.  (FOF 154-57)  eToys disagrees and contends instead that AOL was in breach of the Agreement for failure to deliver the requisite number of impressions.

The Court finds it unnecessary to decide this issue, however, because it concludes that in any event, the 1999

26

Agreement had no value to eToys immediately before its termination.  As of the termination date, eToys was in dire financial straits. By the end of February eToys had finished its on-line sale of product (at drastically reduced prices) and had announced that it was firing all its employees, shutting down its website and ceasing operations.  (FOF 84, 89)  In fact, eToys did exactly that before it filed its chapter 11 petition on March 7, 2001.  It sold all its assets in a liquidation sale shortly afterwards.  (FOF 99, 100)  As a result, the Court concludes that the 1999 Agreement, which provided for the delivery of impressions and other ads for eToys' website, had no value to eToys because eToys was no longer operating.  Therefore, the Court concludes that eToys is entitled to no recovery in this case.  Cf., Metro Water & Coffee Servs., Inc., 157 B.R. at 746-47 (holding that termination of concession agreement was a transfer for purposes of fraudulent conveyance statute though it was not avoidable because the debtor's material defaults meant it had no legal rights).

iv.  Value if Sold

a.  Assignability

eToys contends nonetheless that the 1999 Agreement had value because it could have been sold as part of the sale of eToys' business assets.  AOL disagrees contending that the 1999

27

Agreement was not assignable under state law or the Bankruptcy Code.

Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract[7] if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor.  11 U.S.C. § 365(c)(1)(A-B).  Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract.  See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material . . . ."), aff'd, 307 B.R. 827 (E.D. Va. 2002), aff'd 63 Fed. Appx. 741 (4th Cir. 2003); In re DeLuca, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company.").  The

---

[7]  An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3 Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000).  The 1999 Agreement was an executory contract.  (FOF 16-41, 92-95)

identity of a party is material to the performance of a contract
if the contract is founded on one of the parties maintaining
trust or confidence in the ability to perform, judgment, or
business experience of the other party. <u>See, e.g.</u>, <u>McGuire v.
Brown</u>, 76 S.E. 295, 297 (Va. 1912) (contract not assignable
because the seller of certain real property "was prompted to
enter into th[e] contract . . . by her confidence in [the
counter-party's] judgment, ability, opportunity . . . and perhaps
other considerations which then appeared sufficient."); <u>Epperson
v. Epperson</u>, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory
contract[s] for personal service, founded on personal trust or
confidence, [are] not assignable.").

In this case, the AOL-eToys business relationship was
founded on AOL's trust and confidence in eToys' unique
attributes, as well as its experience, all of which were relevant
to eToys' ability to serve AOL Members and protect their privacy
interests as set forth in the 1999 Agreement. (FOF 173-79)
Therefore, the Court concludes that under Virginia law AOL would
not have been required to accept performance under the 1999
Agreement from any party other than eToys. Consequently, the
1999 Agreement was not assumable or assignable under section
365(c) of the Bankruptcy Code.

b.    Value if Assignable

Even if the 1999 Agreement could have been assigned by eToys as part of the sale of its assets in the bankruptcy case, AOL contends that the price it would have received would have been de minimis.  AOL's expert testified that the value of the 1999 Agreement, if it could have been assigned, was $16,500 to $38,500 based on the price which eToys' other assets realized in the sale under chapter 11.  (FOF 171)

eToys argues that AOL's expert used the wrong premise of value (liquidation) in valuing the 1999 Agreement and that a going concern premise of value should have been used.  eToys asserts that the Court must consider the fair market value of the impressions, not a liquidation value.  See, e.g., BFP, 511 U.S. at 545 (stating that reasonably equivalent value under section 548 has "a meaning similar to fair market value."); In re Fruehauf Trailer Corp., 444 F.3d 203, 213 (3d Cir. 2006) (requiring an examination of the totality of the circumstances to determine the fair market value of the benefit received as a result of the transfer).  Accord 5 Collier on Bankruptcy ¶ 550.02[3][a] (2007) ("When the value of the property is recovered, as opposed to the property itself, the term 'value' refers to fair market value.").

AOL argues that the liquidation premise of value is

30

appropriate because the Court must consider the condition eToys
was in and its ability to sell the assets at issue.  It contends
that although eToys filed a chapter 11 petition, it was clear at
that time that eToys was liquidating, not reorganizing.  (FOF
150)

The Court agrees with AOL.  The question is not under what
chapter of the Bankruptcy Code eToys filed, but whether a
liquidation of its assets was imminent, because a debtor can
liquidate its assets under chapter 11 as well as under chapter 7
of the Bankruptcy Code.  See, e.g., Gillman v. Scientific
Research Prods. Inc. (In re Mama D'Angelo), 55 F.3d 552, 556-57
(10th Cir. 1995) ("Liquidation value is appropriate 'if at the
time in question the business is so close to shutting its doors
that a going concern standard is unrealistic.'" (quoting In re
Vadnais Lumber Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass.
1989))).  See also Loop Corp. v. U.S. Trustee, 379 F.3d 511, 517
n.3 (8th Cir. 2004) (recognizing that liquidation under chapter
11 is permitted by most courts); In re Sandy Ridge Dev. Corp.,
881 F.2d 1346, 1352 (5th Cir. 1989) (discussing the propriety of
liquidating reorganizations and noting that "although Chapter 11
is titled 'Reorganization,' a plan may result in the liquidation
of the debtor"); In re Jartran, Inc., 886 F.2d 859, 868 (7th Cir.
1989) (acknowledging the permissibility of liquidating plans

31

under chapter 11).

The totality of the circumstances test mandates that the Court consider eToys' actual circumstances and intentions at the time of termination of the 1999 Agreement.  Though a chapter 11 petition was filed, eToys announced in its press release its inability to continue as a going concern and its intention to liquidate.  Therefore, the liquidation premise of value was appropriately used by AOL's expert to conclude that, even if the 1999 Agreement had been assignable in eToys' bankruptcy case, the price paid for that contract would have been de minimis.

c.    <u>Subsequent Sale by AOL</u>

eToys argues nonetheless that it clearly lost something of value because the termination permitted AOL to sell the impressions previously reserved for eToys that were not provided to it.  eToys argues that the Court should consider, as evidence of the value of the 1999 Agreement, the price at which AOL subsequently sold the impressions to others because courts routinely determine the value of property recoverable from a transferee based on evidence of what the transferee actually did receive, or could have received, in a further disposition of the property at issue.  <u>See, e.g.</u>, <u>Kidder Skis Int'l v. Williams</u>, 60 B.R. 808, 810 (W.D. Mo. 1985) (reversing bankruptcy court and reducing trustee's recovery under section 550(a)(1) based on

lesser amount transferee of ski inventory was able to obtain through its resale of such items); <u>Shearer v. Tepsic (In re Emergency Monitoring Tech., Inc.)</u>, 366 B.R. 476, 510 (Bankr. W.D. Pa. 2007) (authorizing trustee to recover value equal to the sale price the transferee was able to obtain in later sale of monitoring contracts it had seized from debtor); <u>Baldi v. Lynch (In re McCook Metals, L.L.C.)</u>, 319 B.R. 570, 593 (Bankr. N.D. Ill. 2005) (authorizing trustee's recovery under section 550(a) based on defendant's share of the benefit received when contract to acquire smelter was transferred to entity that defendant controlled); <u>American Furn. Outlet USA, Inc. v. Woodmark Originals, Inc. (In re American Furn. Outlet USA, Inc.)</u>, 209 B.R. 49, 52-53 (Bankr. M.D.N.C. 1997) (rejecting amount specified in credit memo as a basis for determining the value of property transferred under section 550(a) in favor of amounts actually obtained by transferee in subsequent sale of property); <u>Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.)</u>, 84 B.R. 278, 284 (Bankr. D. Mass. 1988) (stating "[i]t is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value" and holding that value of property recoverable by trustee should be based on what transferee actually received on resale of the property rather than what was specified in credit memo issued to debtor);

<u>Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.)</u>,
57 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986) (authorizing trustee's
recovery against landlord under section 550(a)(1) measured by the
value of the additional rent the landlord was able to collect
from new tenant following debtor's transfer of lease back to
landlord).  eToys argues that the best evidence of the value of
the services it lost is represented by the prices contained in
the Amendment because they were based on AOL's November 2000 rate
card of prices quoted to other retailers.  That totals
approximately $4.5 million.

AOL contends, however, that eToys has failed to present any
evidence of the fair market value of the impressions.  It notes
that there is no evidence in the record that AOL was able to
resell those impressions or at what price.  Even if they were
resold, AOL argues that the prices on its rate card in November
2000 are not indicative of the fair market value because the
evidence established that impressions were sold to large
retailers like eToys at substantial discounts from the rate card
prices.  (FOF 22-24)

The Court agrees with AOL.  While courts have considered
subsequent sales by transferees of fraudulent conveyances as
evidence of the property's fair market value, there is no
evidence in this case of any subsequent sale or the value

34

received from that sale.  Further, courts have held that the contract price that the parties had negotiated is not evidence of the fair market value of the property.  <u>See, e.g.</u>, <u>American Furn. Outlet</u>, 209 B.R. at 53; <u>First Software Corp.</u>, 84 B.R. at 284. Therefore, eToys' reliance on the prices in the 1999 Agreement as amended is not evidence of the value of the impressions nor evidence that AOL was able to resell those impressions after the termination.

Given the fact that the 1999 Agreement had no value to eToys once eToys ceased operating, was not assignable by eToys to another, and had de minimis value, the Court finds that eToys has failed to meet its burden of proving that it lost anything of value by the termination of the 1999 Agreement.  In these circumstances, the Court agrees with AOL that it would be an impermissible windfall to creditors to make AOL pay eToys $4.5 million for the termination of the 1999 Agreement, when eToys would have received little or nothing of value from the continuation of the Agreement.  Therefore, the Court concludes that eToys is not entitled to any recovery from AOL under section 548 of the Code.

    2.  <u>Fraudulent Transfer under State Law</u>

        a.  <u>Solvency</u>

As noted above, the Court has already concluded that, as of

the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent.

       b.   <u>Transfer of an Interest in Property</u>

Also, as the Court concluded above, the termination of the 1999 Agreement on February 28, 2001, did constitute a transfer of an interest in property of eToys.

       c.   <u>Less than Reasonably Equivalent Value</u>

Under Virginia law, the test is not whether reasonably equivalent value was exchanged, but rather whether any value was exchanged. "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." <u>In re Best Products Co.</u>, 168 B.R. at 52. <u>See also</u> <u>C-T of Virginia,</u> 1992 WL 12307, at *2 (Virginia law "does not require [the transfer of] reasonably equivalent value."). As noted above, however, eToys lost nothing of value from the termination of the 1999 Agreement. Therefore, the Court concludes that even if the termination is avoidable under Virginia law, eToys is entitled to no recovery.

IV.  <u>CONCLUSION</u>

    For the foregoing reasons, the Court will grant judgment in
favor of AOL.

    An appropriate Order is attached.


Dated: January 10, 2008              BY THE COURT:

                                     _Mary F. Walrath_

                                     Mary F. Walrath
                                     United States Bankruptcy Judge

37

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: *ADVERSARY 03-50003*  ○ BK  ◉ AP *(BAP-08-4)*
   If AP, related BK Case Number: *01-706*

Title of Order Appealed:
*Order Granting Judgment in favor of America Online, Inc.*
   Docket Number: *111, 112, 113*    Date Entered: *1/10/08*

Item Transmitted:  ◉ Notice of Appeal          ○ Motion for Leave to Appeal
               ○ Amended Notice of Appeal    ○ Cross Appeal
               Docket Number: _____    Date Filed: _____

*Appellant/Cross Appellant:                    *Appellee/Cross Appellee

Counsel for Appellant:                         Counsel for Appellee:
*Morris Nichols Arsht & Tunnell*              *Connolly Bove Lodge & Hutz*

*If additional room is needed, please attach a separate sheet.*

Filing Fee paid?  ◉ Yes  ○ No

IFP Motion Filed by Appellant?  ○ Yes  ◉ No

Have Additional Appeals to the Same Order been Filed?  ○ Yes  ◉ No
   If so, has District Court assigned a Civil Action Number?    ○ Yes  ○ No   Civil Action # _____

Additional Notes: _____

*2/14/08*
Date

By: *M.E. Behonan*
       Deputy Clerk

FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: *BAP-08-4*
7/6/06