IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC., et al., | ) | Bankruptcy Case No. 01-706 |
| | ) | Adv. No. 03-50003(MFW) |
| Debtors. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Appellant, | ) | Civil Action No. 08-100(JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Appellee. | ) | |

## EBC I, INC.'S OPENING BRIEF IN SUPPORT OF ITS APPEAL

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street, 18th Floor
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   *Attorneys for Appellant*
   *EBC I, Inc., f/k/a eToys, Inc.*

June 3, 2008

2309382

## TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT .................................................................................. 1

STATEMENT OF THE ISSUES ..................................................................................... 2

STATEMENT OF THE CASE ......................................................................................... 3

    I.      NATURE AND STAGE OF THE PROCEEDING. ............................................. 3

    II.     STATEMENT OF FACTS. ................................................................................. 4

          A.     Factual Background Related To The Interactive Marketing Agreement. ................................................................................. 4

          B.     The Bankruptcy Court's Summary Judgment Decision. .......................... 6

          C.     The Bankruptcy Court's Final Decision. ................................................. 7

STANDARD AND SCOPE OF REVIEW ...................................................................... 10

ARGUMENT .................................................................................................................. 11

    I.      THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL STANDARD. .................................................................................................... 11

          A.     The Bankruptcy Court Failed To Apply The Totality Of The Circumstances Test. ................................................................. 11

          B.     The Bankruptcy Court Erred By Failing To Value The Advertising Services. ......................................................................... 14

          C.     The Bankruptcy Court's Failure To Apply The Totality Of Circumstances Test Led It To Ignore Numerous Facts That Should Have Been Considered. ............................................................ 15

               1.     The Bankruptcy Court Erred In Failing To Take Into Account The Ability Of AOL To Resell The Advertising Services.................................................................. 15

               2.     The Bankruptcy Court Ignored Undisputed Evidence As To The Value Of The Advertising Services................................................................................... 16

          D.     Conclusion. ............................................................................................ 18

II.    THE TOTALITY OF CIRCUMSTANCES INDICATES A VALUE OF APPROXIMATELY $4.5 MILLION FOR THE ADVERTISING SERVICES TRANSFERRED TO AOL.................................. 18

III.   THE BANKRUPTCY COURT ERRED IN FINDING THE AGREEMENT WAS NON-ASSIGNABLE. ...................................... 19

       A.    The Agreement Was Not Executory. ...................................... 20

       B.    The Bankruptcy Court Erroneously Concluded That § 365(c)(1) Would Apply To An Assignment Of The Agreement. .......................................................................... 21

       C.    Applicable Law And The Express Terms Of the Agreement Did Not Render It Non-Assignable. ....................................... 22

       D.    The Record Contradicts The Bankruptcy Court's Finding Of "de minimis" Value. ........................................................ 27

IV.    ETOYS IS ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST................................................................................ 29

CONCLUSION ............................................................................................... 31

## TABLE OF AUTHORITIES

Page(s)

CASES

Aero-Fastener, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.),
    177 B.R. 120 (Bankr. D. Mass. 1994) ................................................................. 12

American Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),
    152 B.R. 420 (D. Del. 1993) ............................................................................... 10

American Furn. Outlet USA, Inc. v. Woodmark Originals, Inc. (In re American Furn.
    Outlet USA, Inc.),
    209 B.R. 49 (Bankr. M.D.N.C. 1997).............................................................12, 17

Baldi v. Lynch (In re McCook Metals, L.L.C.),
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ................................................................. 17

BFP v. Resolution Trust Corporation,
    511 U.S. 531 (1994)........................................................................................... 11

Brantley v. Weeks,
    116 B.R. 443 (Bankr. D.Md. 1990) ................................................................... 30

Brown v. Pennsylvania State Employees Credit Union,
    851 F.2d 81 (3d Cir. 1988)................................................................................. 10

Broyhill v. DeLuca (In re DeLuca),
    194 B.R. 65 (Bankr. E.D. Va. 1996)................................................................... 24

Drewes v. FM Da-Sota Elevator Co. (In re Da-Sota Elevator Co.),
    939 F.2d 654 (8th Cir. 1991).............................................................................. 26

Epperson v. Epperson,
    62 S.E. 344 (Va. 1908)....................................................................................... 24

Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.),
    84 B.R. 278 (Bankr. D. Mass. 1988) .................................................................. 17

Gennrich v. Montana Sport U.S.A., LTD (In re International Ski Serv., Inc.),
    119 B.R. 654 (Bankr. W.D. Wisc. 1990)............................................................. 12

In re Aerbox Composite Structures, LLC,
    373 B.R. 135 (Bankr. D.N.M. 2007) .................................................................. 23

In re ANC Rental Corp., Inc.,
    277 B.R. 226 (Bankr. D. Del.)............................................................................ 22

iv.

*In re Brun,*
   360 B.R. 669 (Bankr. C.D. Cal. 2007) ............................................................. 11

*In re Columbia Gas Sys. Inc.,*
   50 F.3d 233 (3d Cir. 1995) ............................................................................. 21

*In re Compass Van & Storage Corp.,*
   65 B.R. 10007 (Bankr. E.D.N.Y. 1986) ...................................................... 25, 26

*In re CVA General Contractors, Inc.,*
   267 B.R. 773 (Bankr. W.D. Tex. 2001) ........................................................... 21

*In re EBC I, Inc.,*
   356 B.R. 631 (Bankr. D. Del. 2006) .................................................................. 7

*In re Fastrax, Inc.,*
   129 B.R. 274 (Bankr. M.D. Fla. 1991) ............................................................ 26

*In re Federal-Mogul Global Inc.,*
   -- B.R. --, 2008 WL 783747 (Bankr. D. Del. March 19, 2008) .......................... 21

*In re Firemarms Import and Export Corp.,*
   131 B.R. 1009 (Bankr. S.D. Fla. 1991) ............................................................ 21

*In Re Freuhauf Trailer Corporation,*
   444 F.3d 203 (3d. Cir. 206) ........................................................................... 12

*In re Headquarters Dodge, Inc.,*
   13 F.3d 674 (3d Cir. 1994) ............................................................................. 26

*In re Hechinger Invs. Co.,*
   489 F.3d 568 (3d Cir. 2007) ........................................................................... 29

*In re Optimum Merchants Serv.,*
   163 B.R. 546 (Bankr. D. Neb. 1994) ............................................................... 26

*In Re R.M.L. Inc.,*
   92 F.3d 139 (3d Cir. 1996) ............................................................................. 12

*In re Ricke Home Centers, Inc.,*
   209 F.3d 291 (3d Cir. 2000) ........................................................................... 23

*In re Rooster, Inc.,*
   100 B.R. 228 (Bankr. E.D. Pa. 1989) .......................................................... 23, 26

*In re Sacred Heart Hosp. of Norristown,*
   200 B.R. 114 (Bankr. E.D. Pa 1996) ............................................................... 29

v.

*In re Surfside Resort and Suites, Inc.,*
   344 B.R. 179 (Bankr. M.D. Fla. 2006) ............................................................. 21

*In re Travelot Co.,*
   286 B.R. 447 (Bankr. S.D. Ga. 2002) .........................................................24, 25

*In re Wills Motors, Inc.,*
   133 B.R. 303 (Bankr. S.D.N.Y. 1991) ............................................................. 23

*Kepler v. Security Pac. Hous. Serv. (In re McLaughlin),*
   183 B.R. 171 (Bankr. W.D. Wisc. 1995) ......................................................... 12

*Kidder Skis Int'l v. Williams,*
   60 B.R. 808 (W.D. Mo. 1985)........................................................................... 16

*McFarland v. Leyh,*
   52 F.3d 1330 (5th Cir. 1995)............................................................................ 29

*McGuire v Brown,*
   76 S.E. 295 (Va. 1912)..................................................................................... 24

*Mellon Bank, N.A. v. Metro Communications, Inc.,*
   945 F.2d 635 (3d. Cir. 1991)......................................................................10, 13

*Merchants Fund, Inc. v. Bartl,*
   15 B.R. 448 (Bankr. E.D.Va. 1981) ................................................................. 19

*Peltz v. Worldnet Corp. (In re USN Comm., Inc.),*
   280 B.R. 573 (Bankr. D. Del. 2002)...........................................................29, 30

*Shearer v. Tepsic (In re Emergency Monitoring Tech., Inc.),*
   366 B.R. 476 (Bankr. W.D. Pa. 2007) ............................................................. 17

*Sigmon v. Royal Cake Co., Inc.,*
   13 F.3d 818 (4th Cir. 1994)............................................................................. 29

*Slutsky v. Michel Tire Co. (In re Vann),*
   26 B.R. 148 (Bankr. S.D. Ohio 1983).............................................................. 12

*Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.),*
   57 B.R. 999 (Bankr. E.D.N.Y. 1986) ............................................................... 17

*Stone Street Capital, Inc. v. Granati (In re Granati),*
   270 B.R. 575 (Bankr. E.D. Va. 2001)............................................................... 24

*U.C. Castings Co. v. Knight,*
   754 F.2d 1363 (7th Cir. 1985)......................................................................... 19

*Varisco v. Groweat Food Co. (In re Varisco),*
    16 B.R. 634 (Bankr. M.D. Fla. 1981) ............................................................... 26

*W.M. Jordan Co., Inc. v. Sielaff,*
    1988 WL 619397 (Va. Cir. Ct) ......................................................................... 19

*Walsh v. Gutshall (In re Walter),*
    261 B.R. 139 (Bankr. W.D. Pa. 2001) ............................................................. 12

*Widemire v. Siddiki Bros., Inc. (In re King Arthur Clock Co., Inc.),*
    105 B.R. 669 (Bankr. S.D. Ala. 1989) ............................................................. 12


**STATUTES**

11 U.S.C.
    § 365(b)(1)(C) ................................................................................................. 27
    § 365(c)(1) ................................................................................................. passim
    § 548 .......................................................................................................... passim

28 U.S.C.
    § 158(a)(1) ..................................................................................................... 1, 7
    § 1961 ............................................................................................................... 30


**OTHER AUTHORITIES**

5 Collier on Bankruptcy ¶ 550.02[3][a] ................................................................. 11

Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure .......................... 1

1.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1). EBC I, Inc. f/k/a eToys, Inc. ("eToys") brings this appeal as of right from the (1) Findings of Fact and Conslusions of Law (Adv. D.I. 111) (Appellant's Appendix at A1-29 (hereinafter, "App")) (the "FOF/COL"), (2) the Opinion Granting Judgment in Favor of America Online, Inc. (Adv. D.I. 112) (App. at A30-66) (the "Opinion" or "Op. at ___"), and (3) the Order Granting Judgment in Favor of America Online, Inc., dated January 10, 2008 (Adv. D.I. 113)  (App. at A67) (the "Final Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which constitutes a final, appealable order for purposes of 28 U.S.C. § 158(a)(1).   In accordance with Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), eToys filed its Notice of Appeal of the FOF/COL, the Opinion and the Final Order (Adv. D.I. 115) (App. at A68) (the "Notice of Appeal") on January 22, 2008, and filed its Statement Of Issues And Designation Of Items To Be Included In Record On Appeal By Appellant (Adv. D.I. 117) (App. at A71-105) with the Clerk of the Bankruptcy Court on February 1, 2008.   The Bankruptcy Court Clerk transmitted the record to this Court (Adv. D.I. 119), and this Court docketed the appeal on February 15, 2008 (D.D.I. 4).

2.

## STATEMENT OF THE ISSUES

1.  Whether the Bankruptcy Court erroneously concluded that the fully paid up contract rights of eToys under an agreement with America Online, Inc. n/k/a AOL LLC ("AOL") had no value because the Bankruptcy Court failed to apply the correct legal standard.

2.  Whether the Bankruptcy Court erred in failing to award damages to eToys because application of the correct legal standard mandated an award of $4,462,500.

3.  Whether the Bankruptcy Court erred in holding that the agreement was not assignable under Virginia law and/or 11 U.S.C. § 365(c)(1).

4.  Whether the Bankruptcy Court should award pre-judgment interest.

3.

<u>STATEMENT OF THE CASE</u>

I.    <u>NATURE AND STAGE OF THE PROCEEDING.</u>

On March 7, 2001, eToys and its affiliates filed a voluntary petition under title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>").  On the petition date, eToys filed a motion seeking, <u>inter alia</u>, the authority to auction and sell the reorganized stock of the debtors under a plan of reorganization or to sell substantially all of the debtors' assets.  In May 2001, the Bankruptcy Court approved a sale of substantially all of eToys' assets to KB Consolidated, Inc.

This adversary proceeding was commenced on January 3, 2003 by EBCI, Inc., the successor to eToys, Inc. under its Chapter 11 plan against AOL.  eToys asserted claims under §548 of the Bankruptcy Code, as well as under state law, arising from two events – the amendment of a contract between eToys and AOL in November 2000 and the termination of that contract by AOL in late February 2001, shortly before eToys filed its petition in bankruptcy.  In an opinion of December 7, 2006, the Bankruptcy Court granted partial summary judgment to eToys on its claim arising from the termination of the contract.  However, on January 10, 2008, the Bankruptcy Court issued an opinion, along with finding of fact and conclusions of law, ruling in favor of AOL on all claims.  eToys has appealed that decision with respect to its claims arising from the termination of the contract, but has not appealed with respect to its claims based on the amendment to the contract.  This is eToys' opening brief in support of its appeal.

4.

II.    STATEMENT OF FACTS.

    A.    Factual Background Related To The Interactive Marketing Agreement.

Most of the facts on which eToys' claims are based relating to the termination of the agreement were essentially undisputed. On August 10, 1999, eToys and AOL entered into a contract entitled Interactive Marketing Agreement (the "Agreement") (App. at A106-144), under which AOL agreed to provide over a three year period specified "impressions" on its website, which were essentially advertisements that would appear when AOL members logged on to the AOL system. eToys agreed to make 12 quarterly payments of $1.5 million over the three year term of the Agreement, for a total of $18 million (App. at A3, FOF 19).

During the first year of the agreement, eToys made all of the required payments but AOL delivered substantially fewer impressions than it was obligated to deliver. In addition, AOL realized that it would be unable to meet its obligations under the Agreement during the last two years. By the spring of 2000, eToys was seeking relief because of AOL's underperformance in delivering impressions. As the Bankruptcy Court found, AOL recognized that the underdelivery of impressions was material but wanted to delay negotiation until the holiday season when it would have greater leverage over eToys (App. at A7, FOF 52-53). The parties eventually negotiated an amendment to the Agreement (the "Amendment") (App. at A146-152), which was signed in mid-November, 2000. The Amendment resolved the dispute as to past underperformance by AOL, reduced the number of impressions AOL had to deliver in the future, and reduced the total payment obligation of eToys to $8.25 million.

By the time of the Amendment, eToys had already made five quarterly payments, totaling $7.5 million. It made one additional payment of $750,000 in connection with the amendment of the Agreement, and those payments satisfied in full eToys' payment obligations

5.

under the Agreement. The effect of the Amendment and the final payment was to change the Agreement from one in which eToys made payments over the term of the Agreement as services were delivered to one in which eToys had paid in advance for all services to be delivered by AOL for the last two years of the Agreement.

Slightly more than three months after the Amendment was signed, eToys announced its disappointing holiday sales and made statements indicating it was insolvent. Relying solely on eToys' insolvency, within days AOL gave notice purporting to terminate the Agreement, but did not return any of the money eToys had paid in advance for the services to be provided by AOL through August 2002. As the Bankruptcy Court found, AOL had a finite amount of advertising space that it could sell on its system and the effect of the termination was to free up advertising space which AOL could then resell to other customers at potentially higher rates (App. at A12, FOF 95).

Because in connection with the Amendment, the parties had agreed that the value of the services provided during the first year was approximately $2.3 million, the services to be provided over the remaining two years were valued by the parties at $5.95 million. AOL's recordkeeping system did not allow it to determine all of the impressions actually delivered by AOL prior to termination (App. at A153). However, as the Bankruptcy Court found, the evidence showed that AOL did not deliver any of certain types of impressions it was supposed to deliver by the end of 2000 and only a small percentage of other impressions it was supposed to deliver (App. at A9, FOF 69-70). On the other hand, AOL did deliver more impressions of a certain type than it was obligated to deliver (App. at A9-10, FOF 71-72). Overall, the evidence showed that, prior to termination of the Agreement, AOL had delivered approximately 25 percent of the impressions it was obligated to deliver in the last two years of the Agreement.

6.

AOL never disputed that number, and never offered any different number as to the value of the impressions delivered prior to termination. Thus, the essentially undisputed evidence showed that eToys had paid about $4.5 million for services to be delivered during the last two years which were never delivered by AOL because of the termination of the Agreement.

As noted, the Bankruptcy Court found that the effect of the termination was to free up advertising space which could then be sold by AOL. The Bankruptcy Court nonetheless found that there was no evidence of the fair market value of the impressions as of the date of the termination (Op. at 34). That conclusion, which was unnecessary given the basis for the Bankruptcy Court's holding, was simply incorrect. eToys offered into evidence the internal list of rates for such impressions of AOL which were in effect as of February 2001 when AOL terminated the Agreement (App. at A166). In addition, the price agreed to by the parties for such impressions only three months earlier when they negotiated the Amendment was strong evidence of the fair market value.

B.    The Bankruptcy Court's Summary Judgment Decision.

Following the completion of discovery, AOL filed a motion for summary judgment on all remaining claims of eToys, and eToys filed a motion for partial summary judgment. With respect to eToys' claims based on the termination of the Agreement, the Bankruptcy Court denied AOL's motion and granted partial summary judgment to eToys.

In the summary judgment opinion, the Bankruptcy Court noted that eToys sought "a determination that AOL's termination of the contract, and consequently the retention of payments made by the Debtor in advance for services never delivered, constitutes a fraudulent

7.

transfer as a matter of law under section 548."[1]  *In re EBC I, Inc.,*  356 B.R. 631, 636 (Bankr. D.

Del. 2006).  It was undisputed that the termination of the Agreement occurred within one year of

filing the bankruptcy petition and that eToys was insolvent at the time.  The Bankruptcy Court

found that "the termination of the contract by AOL resulted in the transfer of property of the

debtor, mainly the advertising services for which the debtor had prepaid."  356 B.R. at 637.  The

Bankruptcy Court also found "to the extent it (eToys) paid more to AOL than the value of the

services provided to it by AOL, the termination of the contract eliminated that value."  356 B.R.

at 642.  The Bankruptcy Court said that, on the then existing record, it was:

> unable to determine what value in services AOL provided to the
> debtor after the Amendment to the contract.  A further hearing
> will, therefore, be scheduled to consider evidence on this point.

*Id*.  As found by the Bankruptcy Court, eToys had paid a total of $8.25 million and had received

through the first year of the Agreement about $2.3 million in services.  Thus, under the

Bankruptcy Court's opinion, the only remaining issue on eToys' claims based on the termination

of the Agreement was the "value in services AOL provided to the debtor after the Amendment to

the contract."  356 B.R. at 642.  Once that fact issue was resolved, eToys was entitled under the

Bankruptcy Court's decision to recover the amount it had paid for services over the final two

years of the contract, which AOL never delivered because of the termination.

C.    The Bankruptcy Court's Final Decision.

In June 2007, a one-day trial was held on eToys' claim based on the amendment

of the Agreement and on what the Bankruptcy Court had said was the one remaining fact issue

---

[1]    Section 548 of the Bankruptcy Code permits a debtor to recover property, or the value
thereof, where it:  (1) voluntarily or involuntarily transferred property; (2) did not receive
reasonably equivalent value for the property transferred; (3) did so within one year of
filing its petition for bankruptcy; and (4) did so at a time when it was insolvent.  11
U.S.C. § 548(a)(1)(B).

8.

on eToys' claims based on the termination of the Agreement.  As to the latter, eToys presented a document record consisting principally of charts generated by AOL showing what impressions had been delivered prior to the termination and price list showing the value of such impressions.

Following post-trial briefing, the Bankruptcy Court issued its decision on January 10, 2008.  Much of the Bankruptcy Court's decision was devoted to eToys' claim based on the amendment of the Agreement, and the Bankruptcy Court found for several reasons that the Amendment did not constitute a constructively fraudulent transfer under § 548.

With respect to eToys' claim based on the termination of the Agreement, the Bankruptcy Court purported to reaffirm its decision on summary judgment (Op. at 20-24).  The Bankruptcy Court reiterated the conclusion in its summary judgment opinion that "the retention of the payments made by eToys in advance for services never delivered, constituted a <u>transfer of property</u> of eToys, namely <u>the advertising services</u> for which eToys had pre-paid."  (Op. at 20-21) (emphasis added).  The Bankruptcy Court also reaffirmed that "the loss of valuable property rights of a debtor, such as entitlement to services for which the debtor had paid in advance, is potentially recoverable under Section 548." *Id.*  In addition, while the Bankruptcy Court said that it had not on summary judgment decided the value issue, it reiterated that the way to determine the value transferred as a result of the termination of the Agreement was to compare the services provided by AOL before termination with the amounts paid:

> The Court agrees with AOL's contention that it must consider the value of all the services rendered by AOL under the 1999 Agreement and the Amendment (and compare them to the payments made) in order to determine if eToys received less than reasonably equivalent value under the 1999 Agreement and the Amendment as a result of the termination.

9.

(Op. at 24).[2]  However, nowhere in the Opinion did the Bankruptcy Court thereafter do that analysis – i.e., determine the value of all the services rendered by AOL prior to termination and compare that value to the payments made.  Similarly, the Bankruptcy Court never resolved, or even addressed, what it had said in the summary judgment opinion was the one remaining issue – "what value in services AOL provided to the Debtor after the Amendment to the contract."

Rather than valuing what it specifically identified as the property transferred – "the advertising services for which eToys had pre-paid" – the Bankruptcy Court took an entirely different analytical approach, and found that eToys' rights under the contract had no value for two reasons:  (1) eToys ceased its operations in connection with its bankruptcy filing, and the Agreement "had no value to eToys because eToys was no longer operating" (Op. at 27); and (2) the contract was not assignable and therefore could not have been sold as an asset in bankruptcy. The Bankruptcy Court went on to conclude that, even if the Agreement was assignable in bankruptcy, "the price paid for that contract would have been de minimus" (Op. at 32) and also found that there was no evidence of any subsequent sale by AOL of the impressions (Op. at 34-35) – however, that discussion is dicta because, even though AOL agreed that the contract had some value as an asset in bankruptcy, the Bankruptcy Court did not award eToys even that value.

---

[2]     AOL contended that it had provided other services besides the impressions and those services should also be valued in calculating what eToys received for its payments.

10.

## STANDARD AND SCOPE OF REVIEW

It is well-established that "[f]actual determinations of the bankruptcy court are subject to a clearly erroneous standard . . . while legal determinations are subject to *de novo* review." *American Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 152 B.R. 420, 423 (D. Del. 1993) (citing *In re Morrissey,* 717 F.2d 100, 104 (3d Cir. 1983) and *J.P. Fyfe, Inc. v. Bradco Supply Corp.,* 891 F.2d 66, 69 (3d Cir. 1989)); *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir. 1988).  Thus, although the appellate court must accept the Bankruptcy Court's "finding of historical or narrative facts," the appellate court exercises "plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts."   *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d. Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d. Cir. 1981)).  Because the relevant facts are largely undisputed, the appeal presents primarily legal issues.  The principal issue on appeal is whether the Bankruptcy Court's first decision, in which it held that eToys was entitled to recover the amounts paid for services never delivered, was correct or whether its second decision, in which it held eToys was entitled to nothing, was correct.

11.

<u>ARGUMENT</u>

I.    THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL
      STANDARD.

The Bankruptcy Court's conclusion that the property transferred by eToys to AOL as a result of the termination had no value was based on a flawed analysis reflecting at least three errors.  First, the Bankruptcy Court failed to apply the correct legal standard, under which the Court must examine the "totality of circumstances" in valuing the property transferred. Second, as a result, the Bankruptcy Court ended up valuing the wrong thing -- even though the Bankruptcy Court found that the result of the termination was the transfer of the advertising services for which eToys had prepaid, the Bankruptcy Court did not value those services but instead valued the Agreement assuming a hypothetical sale of it, which ignored the actual circumstances.  Third, the Bankruptcy Court further disregarded the actual circumstances by ignoring undisputed evidence of AOL's ability to resell those services as a result of the termination (which it could not have done had the contract been transferred) and the value of those services.

A.    The Bankruptcy Court Failed To Apply The Totality Of
      The Circumstances Test.

In determining that the property transferred had no value to eToys, the Bankruptcy Court applied the wrong legal standard.  It was undisputed that eToys received nothing when AOL terminated the Agreement.  Thus, as the Bankruptcy Court recognized, eToys was entitled to recover the value of the property transferred (Op. at 24).  Under settled law "[w]hen the value of property is recovered, as opposed to the property itself, the term 'value' refers to fair market value."  5 Collier on Bankruptcy ¶550.02[3][a](15th ed. rev. 2007), *BFP v. Resolution Trust Corporation,* 511 U.S. 531 (1994) ("the price which it might be expected to bring if offered for sale in a fair market"); *In re Brun,* 360 B.R. 669, 674 (Bankr. C.D. Cal. 2007)

12.

("[t]ypically, courts equate 'value' with the fair market value of the subject property at the time of the transfer.") (collecting cases); *Walsh v. Gutshall (In re Walter),* 261 B.R. 139, 145 (Bankr. W.D. Pa. 2001); *American Furn. Outlet USA, Inc. v. Woodmark Originals, Inc. (In re American Furn. Outlet USA, Inc.),* 209 B.R. 49, 52-53 (Bankr. M.D.N.C. 1997); *Kepler v. Security Pac. Hous. Serv. (In re McLaughlin),* 183 B.R. 171, 177 (Bankr. W.D. Wisc. 1995) ("The market price at the time of the transfer is the proper measure of § 550 damages."); *Aero-Fastener, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.),* 177 B.R. 120, 140 (Bankr. D. Mass. 1994); *Gennrich v. Montana Sport U.S.A., LTD (In re International Ski Serv., Inc.),* 119 B.R. 654, 659 (Bankr. W.D. Wisc. 1990); *Widemire v. Siddiki Bros., Inc. (In re King Arthur Clock Co., Inc.),* 105 B.R. 669, 672 (Bankr. S.D. Ala. 1989); *Slutsky v. Michel Tire Co. (In re Vann),* 26 B.R. 148, 149 (Bankr. S.D. Ohio 1983).

In the Third Circuit, the determination under Section 548 of the value of property transferred requires application of the totality of circumstances test. *In Re Freuhauf Trailer Corporation,* 444 F.3d 203, 213 (3d. Cir. 206); *In Re R.M.L. Inc.,* 92 F.3d 139, 154 (3d Cir. 1996). Under that test the Court must examine all of the circumstances of the transfer including the "fair market value of the benefit received as a result of the transfer." *In Re Freuhauf Trailer Corporation,* 444 F.3d at 213. In granting partial summary judgment to eToys, the Bankruptcy Court had found that the value of the advertising services which were transferred to AOL by reason of the termination was essentially the negotiated price for such services agreed to by the parties only three months earlier. For that reason, it concluded that the value of the services transferred was the difference between what eToys had paid in advance, and the value of the services received before termination. That analysis correctly looked at the fair market value of the property transferred – the advertising services.

13.

However, in its final opinion, the Bankruptcy Court did not purport to apply the totality of circumstances test at all.[3]    Instead, it looked only to the value of the contract to eToys when it was about to file a petition in bankruptcy saying that the Bankruptcy Court "must consider what value the 1999 Agreement, as amended, had to eToys immediately before and after the termination" (Op. at 25) and subsequently finding that the agreement "had no value to eToys immediately before its termination."   (Op. at 27) (emphasis added).   The Bankruptcy Court relied on *Mellon Bank N.A. v. Metro Communications Inc.*, 945 F.2d 635 (3d Cir. 1991) to support its assertion that the relevant inquiry was the "value to eToys", but that case does not support such an analysis.   To begin with, that decision preceded the later Third Circuit decisions which make clear that the court must consider the totality of circumstances in determining value. Moreover, that case involved a leveraged buyout in which all of the debtor's assets were secured to protect a loan to the buyer and the court said that, under such circumstances, it was appropriate to examine the going concern value of the corporation before and after the transaction.   However, in examining whether the debtor received reasonably equivalent value, the court examined all of the circumstances, and nothing in the decision supports the view that only the "value to the debtor" was relevant.   The totality of circumstances test required, at a minimum, that the Bankruptcy Court consider factors such as the value of the services as agreed upon by the parties only three months earlier, the value as reflected on quoted prices of AOL for such services at the time of termination, and the value as reflected by AOL's ability to resell those services.   The Bankruptcy Court erred in failing to apply the totality of circumstances test.

---

[3]      Only late in the opinion, in a section which is *dicta*, does the Bankruptcy Court even make a passing reference to the totality of circumstances test (Op. at 32).

14.

B.    The Bankruptcy Court Erred By Failing To Value The
Advertising Services.

The Bankruptcy Court compounded its error because, in failing to apply the totality of circumstances test, the Bankruptcy Court ended up valuing the wrong thing. The Bankruptcy Court expressly recognized both in its summary judgment decision and in its final decision that the property transferred as a result of the termination was "the advertising services for which eToys had pre-paid" (Op. at 21). That conclusion was plainly correct because, as the Bankruptcy Court found, the termination freed up advertising space which AOL could then sell to other customers. However, instead of valuing those services, it purported to value the contract itself in the context of a theoretical sale, rather than such services (Op. at 25).

The Agreement was not assigned by eToys, as the Bankruptcy Court's valuation analysis assumed. Instead, AOL terminated the Agreement pursuant to Section 5.6, relying solely on eToys' public announcement of its insolvency (App. at A171). The legal effect of the termination was to end the contract, and the practical effect was to transfer those advertising services back to AOL, which was both relieved of its obligation to provide the specified advertising services and able to resell at current rates the advertising space on its website that had been reserved for eToys. In contrast, in an assignment, the contract would have continued rather than terminated, and the practical effect would have been the opposite of termination because AOL would have remained obligated to perform and deliver services to the buyer and would not have been able to resell that advertising space to others. Thus, the Bankruptcy Court should have valued what it said was the property actually transferred to AOL – "the advertising services for which eToys had pre-paid" – because the termination returned that advertising space to AOL. In ignoring the actual facts of the termination and the effect of the termination, the Bankruptcy Court plainly did not examine the "totality of circumstances" or, for that matter, any of the actual

15.

circumstances.  The value of those services was, as the Bankruptcy Court had seemed to recognize on summary judgment, the amount paid by eToys and kept by AOL for the services never delivered.

        C.        **The Bankruptcy Court's Failure To Apply The Totality Of Circumstances Test Led It To Ignore Numerous Facts That Should Have Been Considered.**

Had the Bankruptcy Court properly applied the totality of circumstances test, and valued what was actually transferred, it would have considered numerous, essentially undisputed facts which it ignored.  The totality of circumstances test required that such facts be considered.

        1.        **The Bankruptcy Court Erred In Failing To Take Into Account The Ability Of AOL To Resell The Advertising Services.**

The Bankruptcy Court recognized that an actual resale of the property transferred by the transferee is strong evidence of the value of that property (Op. at 32-33), but concluded that "there is no evidence in this case of any subsequent sale or the value received from that sale" (Op. at 34-35), which is simply incorrect.  AOL's own system made it impossible to determine whether the specific advertising space reserved for eToys and freed up by the termination was later resold, but AOL's primary witnesses testified that in all likelihood such services were resold (App. at A174; App. at A176) and AOL's trial witness acknowledged:

        Q.    And had they been resold, the starting point in a resale would have been the then existing rate cards correct?

        A.    Yes.

(App. at A178).  Indeed, AOL's Rule 30(b)(6) witnesses testified that AOL considered the services it was to provide under the Amendment to have a higher value than the amount eToys had paid (App. at A173).  Thus, the fact that the termination freed up advertising space which

16.

AOL could then resell and the fact that its witnesses testified that it was likely such advertising

space was resold flatly contradict the Bankruptcy Court's conclusion.

> 2.    The Bankruptcy Court Ignored Undisputed
> Evidence As To The Value Of The Advertising
> Services.

The Bankruptcy Court also clearly erred in finding that there was no evidence of

the value of the services even if AOL had been able to resell them.  Specifically, the Bankruptcy

Court said:

> AOL contends, however, that eToys has failed to present any
> evidence of the fair market value of the impressions.  It notes that
> there is no evidence in the record that AOL was able to resell those
> impressions or at what price.  Even if they were resold, AOL
> argues that the prices on its rate card in November 2000 are not
> indicative of the fair market value because the evidence established
> that impressions were sold to large retailers like eToys at
> substantial discounts from the rate card prices.
>
> The Court agrees with AOL.

(Op. at 34) (emphasis added).  The conclusion that there was no evidence of fair market value is

simply nonsensical because the November 2000 amendment was in fact a sale of impressions not

just to a "large retailer like eToys", but to eToys itself.  Thus, that contract plainly established the

fair market value of those impressions only three months earlier.  Moreover, it was undisputed

that the rates internally published by AOL as shown on rate cards did not change between

November of 2000 and February of 2001.

Courts routinely determine the value of property recoverable from a transferee

based on evidence of what the transferee actually did receive, or could have received, in a further

disposition of the property at issue.  *See, e.g., Kidder Skis Int'l v. Williams,* 60 B.R. 808, 810

(W.D. Mo. 1985) (reversing bankruptcy court and reducing trustee's recovery under section

550(a)(1) based on lesser amount transferee of ski inventory was able to obtain through its resale

17.

of such items); *Shearer v. Tepsic (In re Emergency Monitoring Tech., Inc.),* 366 B.R. 476, 510 (Bankr. W.D. Pa. 2007) (authorizing trustee to recover value equal to the sale price the transferee was able to obtain in further sale of monitoring contracts it had seized from debtor); *Baldi v. Lynch (In re McCook Metals, L.L.C.),* 319 B.R. 570, 593 (Bankr. N.D. Ill. 2005) (authorizing trustee's recovery under section 550(a) based on defendant's share of the benefit received when contract to acquire smelter was transferred to entity that defendant controlled); *American Furn. Outlet USA, Inc. v. Woodmark Originals, Inc. (In re American Furn. Outlet USA, Inc.),* 209 B.R. 49 (Bankr. M.D.N.C. 1997) (rejecting amount specified in credit memo as a basis for determining the value of property transferred under section 550(a) in favor of amounts actually obtained by transferee in subsequent sale of property); *Ferrari v. Computer Assoc. Int'l, Inc. (In re First Software Corp.),* 84 B.R. 278, 284 (Bankr. D. Mass. 1988) (stating "[i]t is axiomatic that what a willing buyer will pay a willing seller is the absolute best indication of fair market value" and holding that value of property recoverable by trustee should be fixed based on the amount for which the transferee actually resold the property rather than what was specified in credit memo issued to debtor); *Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.),* 57 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986) (authorizing trustee's recovery against landlord under section 550(a)(1) measured by the value of the additional rent the landlord was able to collect from new tenant following debtor's transfer of lease back to landlord).  The undisputed evidence showed that AOL was both able to resell the space it had reserved for eToys and that it would have done so at no less than the price agreed to with eToys three months earlier, and if AOL resold the impressions to a buyer other than a "large retailer", it would have received a higher price than eToys had paid.

D.    Conclusion.

The Bankruptcy Court's decision led to a result which is simply inconsistent with the purposes of the Bankruptcy Code – AOL gets to retain money it was paid for services which it never performed, and which it was then able to resell, to the detriment of numerous creditors who actually provided services to eToys and were never paid for such services. The Bankruptcy Court was able to reach such a conclusion only by failing to apply the proper legal standard, by failing to value what it had twice found was the property transferred and by ignoring the undisputed evidence of the value of those services. The decision was incorrect and must be reversed.

II.    THE TOTALITY OF CIRCUMSTANCES INDICATES A VALUE OF APPROXIMATELY $4.5 MILLION FOR THE ADVERTISING SERVICES TRANSFERRED TO AOL.

As set forth below, had the Bankruptcy Court properly applied the "totality of circumstances" test to value the property actually transferred by eToys to AOL – the advertising services for which eToys had prepaid – the Bankruptcy Court would have arrived (on essentially undisputed evidence) at a value for the property transferred of $4,462,500. Here, the totality of the circumstances confirm that, as the Bankruptcy Court has already held, the proper valuation of the rights lost was the difference between what eToys had paid and what it received for several reasons: (a) that was the price negotiated at arms-length between the parties only three months earlier; (b) it was a price based on AOL's current rate cards; (c) those remained the rates shown on rate cards of AOL when it terminated the Agreement; (d) AOL by reason of the termination was relieved of its obligation to provide those services; and (e) AOL was then able to resell those services at its existing rates.

The undisputed evidence shows that the parties had agreed that the value of the services provided during the first year was approximately $2.3 million and that the services to be

provided over the remaining two years was $5.95 million.[4]  Overall, the evidence showed that, prior to the termination of the Agreement, AOL had delivered approximately 25 percent of the impressions it was obligated to deliver in the last two years, which the parties had valued at $5.95 million.  AOL never disputed that number and never offered contrary evidence as to the value of impressions delivered prior to termination.[5]  Thus, eToys is entitled to damages from the termination of the Agreement of $4,462,500, which is the amount it paid for services it did not receive.  This amount is fair to AOL, which was not only excused from its future performance but was also able to sell the advertising space to others.

III.    THE  BANKRUPTCY  COURT  ERRED  IN  FINDING  THE  AGREEMENT WAS NON-ASSIGNABLE.

As  discussed,  the  Bankruptcy  Court  used  the  wrong  legal  standard  when  it ignored  the  totality  of  circumstances  and  instead  valued  the  Agreement  "to  eToys"  in  a bankruptcy  liquidation.    Even  if  that  had  been  a  proper  approach,  the  Bankruptcy  Court

---

[4]    Under well-established law, a plaintiff need not provide an exact calculation of damages in order to recover.  Rather, a plaintiff need only provide a reasonable basis for a determination of damages. *Merchants Fund, Inc. v. Bartl*, 15 B.R. 448, 455 (Bankr. E.D.Va. 1981) (applying Virginia law); *see also, e.g., U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1371, 1373 (7th Cir. 1985) (damages are not rendered uncertain because they cannot be calculated with precision and defendant cannot complaint about inexactness of calculation where defendant's record keeping contributed to imprecision); *W.M. Jordan Co., Inc. v. Sielaff*, 1988 WL 619397, at *7 (Va. Cir. Ct). ("It is axiomatic that damages may be fixed when the circumstances are such as to permit a reasonable and probable estimate of them.").

[5]    AOL claims to have "substantially complied with its obligations" in year 2 prior to termination (AOL PFF 79, Adv. D.I. 101).  However, AOL's records show that it failed to deliver many of the impressions it was obligated to deliver by February 2001 (PFF 41-42, Adv. D.I. 102).  But even if AOL had "substantially complied," the schedules in the Amendment contemplated that only about 30% of the total impressions were due to be delivered by February 2001 (PFF 39-40, Adv. D.I. 102).

20.

committed clear errors in applying it.[6]  First, and as a threshold matter, the Bankruptcy Court erroneously concluded that the Agreement remained executory as of the Petition Date.  Second, the Bankruptcy Court erroneously concluded that section 365(c)(1) of the Bankruptcy Code applied, thereby allowing AOL the opportunity to interpose alleged restrictions on assignment contained within the Agreement.  Third, the Bankruptcy Court erroneously concluded, despite the express language of the Agreement, that eToys could never have assigned the Agreement in its bankruptcy case.  Finally, the Bankruptcy Court erroneously found that the Agreement had "de minimis" value.  Whether considered individually or cumulatively these fundamental errors require the reversal of the Bankruptcy Court's conclusion that the advertising services under the Agreement had no value.

A.     The Agreement Was Not Executory.

A threshold issue to be resolved before the Bankruptcy Court could embark upon its journey to conclude that the Agreement was not assignable was for the Bankruptcy Court to find that the Agreement was executory.  This it did in a seven word sentence in a footnote where the Bankruptcy Court pronounced without analysis that "[t]he 1999 Agreement was an executory contract."  (Op. at 28 n.7).

However, both at the time of AOL's purported termination of the Agreement and as of the Petition Date, eToys has fully performed all of its material obligations under the Agreement.  For the Agreement to remain executory on those dates, eToys had to have material remaining duties, the nonfulfillment of which would have subjected eToys to a claim for

---

[6]     This is yet another instance where the Bankruptcy Court, despite having reserved only the narrow issue of what value should be assigned to the services provided by AOL after the Agreement was amended in November 2000, belatedly reconsidered its earlier ruling and accepted post-trial arguments made by AOL without giving eToys a full and fair chance to respond.

21.

damages. *See In re Columbia Gas Sys. Inc.,* 50 F.3d 233, 241 (3d Cir. 1995) ("[I]f the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur.").  It is undisputed that eToys had by then fully funded the $8,250,000 it was required to pay to AOL under the Agreement.  All that was left to occur was for eToys to receive the benefits of its prepaid advertising services.[7]

> B.    The Bankruptcy Court Erroneously Concluded That § 365(c)(1) Would Apply To An Assignment Of The Agreement.

In erroneously concluding that section 365(c)(1) of the Bankruptcy Code applies to any agreement where the "identity of the contracting party is material to the ongoing performance of the contract," (Op. at 28), the Bankruptcy Court incorrectly abandoned the very analysis it had previously adopted and described as the view accepted by the majority of courts.[8]

---

[7]    One analogue to this situation involves a debtor's prepayment of premiums under an insurance policy.  As the Bankruptcy Court itself recently stated, "courts have recognized that where one of the parties to the insurance policy has fulfilled the central agreement to such contract, such as the obligation of the insured to pay the premium in exchange for the insurer's defense and payment of indemnity claims against the insured, the contract is no longer executory." *In re Federal-Mogul Global Inc.,* -- B.R. --, 2008 WL 783747, *8 (Bankr. D. Del. March 19, 2008) (Ex. 1 hereto).  *See also, e.g., In re Surfside Resort and Suites, Inc.,* 344 B.R. 179, 187 (Bankr. M.D. Fla. 2006); *In re CVA General Contractors, Inc.,* 267 B.R. 773, 779 (Bankr. W.D. Tex. 2001); *In re Firemarms Import and Export Corp.,* 131 B.R. 1009, 1013 (Bankr. S.D. Fla. 1991).

[8]    The relevant portions of section 365 state:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if-
>
> (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity *818 other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment;

(Continued . . .)

22.

*See In re ANC Rental Corp., Inc.,* 277 B.R. 226, 236 (Bankr. D. Del.) ("[W]e follow the majority of courts addressing this issue and conclude that, for section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances *where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."*) (collecting cases) (emphasis added), *aff'd,* 280 B.R. 808 (D. Del. 2002), *aff'd,* 57 Fed. Appx. 912, 2003 WL 328427 (3d Cir. 2003) (Unpublished).  Accordingly, it is the established rule in this District and elsewhere that the mere reservation of the right to "require approval by the contracting party to any assignment" is "not sufficient for application of section 365(c)(1) . . . ." *Id.* at 236.

C.    Applicable Law And The Express Terms Of the Agreement
      Did Not Render It Non-Assignable.

As was true in *ANC Rental* and numerous other cases, this Agreement was one that merely reserved the option to AOL to consent and did not flatly prohibit assignment.  The Agreement states:

> 23.    Assignment.    MP will not assign this Agreement or any
> right, interest or benefit under this Agreement without the
> prior written consent of AOL, which consent shall not be
> unreasonably withheld.

(App. at A138).  While AOL had to consent to any assignment, its consent could not unreasonably be withheld.  Accordingly, had AOL not terminated the Agreement, there remained the possibility that eToys' business could have been reorganized or its assets sold as a turnkey operation that would have allowed the Agreement to be assigned for substantial value.

---

(. . . continued)
11 U.S.C. § 365(c)(1).

23.

Other courts have similary concluded that the section 365(c)(1) exception to the free assignability of contracts does not bar assignment in bankruptcy when it merely conditions assignment, as is the case here, on the contracting party's consent, not to be unreasonably withheld.[9]  For example, in *In re Wills Motors, Inc.,* 133 B.R. 303, 308 (Bankr. S.D.N.Y. 1991), the court stated of an automobile dealer franchise statute containing comparable language that "[m]anifestly, this statute cannot be described as an anti-assignment law which triggers the application of 11 U.S.C. § 365(c)(1)" because "[a]ssignments of automobile franchise agreements are permitted . . . if the parties consent, or if the franchisor acts unreasonably in withholding consent."[10]  Thus, the Bankruptcy Court erred in concluding that the advertising services under the Agreement were without value because they were non-transferable when the Agreement contains language allowing assignment.

Likewise flawed was the Bankruptcy Court's reliance on a handful of cases to reach the conclusion that this Agreement was one Virginia law, to the extent it constitutes applicable law under section 365(c)(1), would render non-assignable.  (Op. at 28-29).  None of these cases suggests that Virginia's concept of what constitutes a personal services contract is in any way different from that which prevails elsewhere and none of the cases provides support for the conclusion that a Virginia court would deem this Agreement to be a personal services

---

[9]      "The Code generally favors free assignability as a means to maximize the value of the debtor's estate." *In re Ricke Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000).  As a result, courts have held that section 365(c)(1) must be construed narrowly.  *See, e.g., In re Rooster, Inc.,* 100 B.R. 228, 233 n.13 (Bankr. E.D. Pa. 1989).

[10]     *See also, e.g., In re Aerbox Composite Structures, LLC,* 373 B.R. 135, (Bankr. D.N.M. 2007) (stating in dicta that "[t]he Court agrees that the License Agreement does not prohibit assignment, and that by requiring Tubus Bauer not to unreasonably withhold its consent to assignment, the assignment term of the License Agreement is less restrictive than the general federal common law prohibition against assignment of patents absent consent of the licensor").

24.

contract.  For instance, *Stone Street Capital, Inc. v. Granati (In re Granati),* 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001), contained no analysis of what constitutes a non-assignable personal services contract under Virginia law and merely made the unremarkable statement without regard to the application of section 365(c)(1) that "[a]s a general proposition, contract rights are freely assignable unless the identity of the contracting parties is material or unless assignment is precluded by the terms of the contract itself or by public policy."[11]

The Bankruptcy Court ignored numerous cases involving agreements governing commercial relationships between sophisticated parties, which are far more apposite to the current situation.  Chief among these is *In re Travelot Co.,* 286 B.R. 447 (Bankr. S.D. Ga. 2002), where the debtor, an internet based provider of travel booking services, sought to assume its contract with Cable News Network ("CNN"), pursuant to which CNN agreed to provide Travelot with advertising services in the form of presentation on CNN's travel website and pop up ad impressions that its users could access.  The agreement contemplated a close working relationship, with the parties agreeing "that the key to success of the proposed venture was Travelot's obtaining a cooperative agreement with a technology partner that could provide the technical expertise in order to connect the CNN.com visitor with the provider and ultimately with the local travel agent." *Id.* at 450.  In addition, their agreement contained detailed provisions

---

[11]    Similarly, the agreement at issue in *Epperson v. Epperson,* 62 S.E. 344 (Va. 1908), was the quintessential personal services contract because it was one which obligated two sons to "jointly support and care for their parents, while they lived . . . ." *Id.* at 346.  Nor does the agreement at issue in *McGuire v Brown,* 76 S.E. 295 (Va. 1912), withstand any comparison to the instant situation because it was an agreement among relatives by which one group delegated exclusively to the other the responsibility for the sale of their land and gave him "an equal voice in all matters pertaining to a sale of this land," including equal control over the price at which the land should be sold.  Finally, the limited liability company operating agreement at issue in *Broyhill v. DeLuca (In re DeLuca),* 194 B.R. 65 (Bankr. E.D. Va. 1996), bears no similarity to this Agreement, as it involved an operating agreement to pursue a real estate development project under which the managing members had extremely broad discretion allocated to them by the other member.

governing the use of the CNN trademark and the manner in which Travelot's service was presented on the CNN.com website, including provisions which reflected "CNN's contractual retention of control over the manner in which Travelot was to present its product on the CNN website . . . ." *Id.* at 458. While the court did not specifically frame its analysis in terms of whether the agreement was in the nature of a contract for personal services, its careful analysis of all of these elements led it to conclude that the contract was not one that would be subject to section 365(c)(1)'s exception to the free assignability of contracts in bankruptcy.

Along the same lines, in *In re Compass Van & Storage Corp.,* 65 B.R. 10007 (Bankr. E.D.N.Y. 1986), the debtor was an entity engaged in the moving and storage business under the name of Allied Van Lines, Inc. ("Allied") pursuant to an agency agreement with Allied. The court acknowledged that "the . . . competency, financial stability and the integrity of the person at the helm of Compass [are] of material concern and consequence to Allied" and that "[p]rudent business practice warrants assurance that the chief operating officer of Compass has the knowledge and expertise in the moving and storage business." *Id.* at 1012. Nevertheless, relying on the terms of the agreement, the court reasoned as follows in concluding that the agreement was not in that narrow class of contracts which could not be assigned in bankruptcy:

> The Agency Contract by its terms is not dependent upon any special personal relationship, special knowledge, or unique skill or talent, but rather it typifies and tracks the ordinary consensual agency, franchise, or distributorship agreements, which have been consistently interpreted by the courts as not within the ambit or proscript of Section 365(c)(1)(A). . . . By its clear and specific terms, the contract quantifies as an agreement for the loyal, diligent and efficient performance of labor and service by Compass in strict compliance with Allied's reasonable rules and regulations and to keep and report in the manner prescribed by Allied or any governmental authority complete records and accounts pursuant to its duties and responsibilities thereunder. Thus, *the functional business pursuit and intendment of the parties* is explicit. The

instrument contains no reference of compelling personal service to
effectuate the objectives of the agency agreement.

*Id.* at 1011-12 (emphasis added).[12]

As in *Compass,* this Agreement is one drafted to outline the terms of a "functional

business pursuit" and is not committed to "a special knowledge, unique skill or talent, [or]

singular judgment and taste." *Compass,* 65 B.R. at 1011-12. At its most basic level, it is

undisputed that the Agreement was one pursuant to which AOL provided specialized internet

advertising services to eToys for a fee. Thus, if any party to the Agreement could treat it as

personal and nonassignable it was eToys and not AOL.

Furthermore, the express terms of the contract are not conditioned upon the

involvement of any individual associated with eToys' business. Nor do they suggest any feature

---

[12]    *See also, e.g., In re Headquarters Dodge, Inc.,* 13 F.3d 674 (3d Cir. 1994) (reversing
district court's categorical holding that franchise agreement was subject to section
365(c)(1) as a personal services contract and remanding for a factual determination of the
character of the contract); *Drewes v. FM Da-Sota Elevator Co. (In re Da-Sota Elevator
Co.),* 939 F.2d 654 (8th Cir. 1991) (although recognizing that "skilled workmanship and
sound management practices" were conducive to success and that customers would
"eschew entrusting their elevator maintenance work to any Tom, Dick or Harow who
turns up as the highest bidder at an auction to be held by a trustee in bankruptcy," the
court held that elevator service contract had commercial value that should result in their
being included in the debtor's estate and assignable); *In re Optimum Merchants Serv.,*
163 B.R. 546 (Bankr. D. Neb. 1994) (holding that nonexclusive agreement allowing
debtor to develop and market a bankcard program in the name of the non-debtor bank
contract party was not in the nature of a nonassignable personal services contract), *order
vacated by consent,* 199 B.R. 409 (D. Neb. 1995); *In re Fastrax, Inc.,* 129 B.R. 274, 278
(Bankr. M.D. Fla. 1991) (holding that debtor's contract to install computer system to be
used in connection with material handling system to be established pursuant to contract
with United States government was not a nonassignable personal services contract
despite acknowledging that the debtor "may be the party best suited to render
performance"); *In re Rooster, Inc.,* 100 B.R. 228 (Bankr. E.D. Pa. 1989) (holding that
licensing agreement for the manufacture and sale of "Bill Blass" neckwear was not a
nonassignable personal services contract where the parties' relationship and the debtor's
performance standards were extensively documented through the terms of the contract);
*Varisco v. Groweat Food Co. (In re Varisco),* 16 B.R. 634 (Bankr. M.D. Fla. 1981)
(holding that franchise contract pursuant to which franchisee obtained marketing and
distribution rights for franchisor's baked goods was not nonassignable personal services
contract).

that was particularly unique to eToys' business and which served as the primary impetus for the parties' contractual relationship. To the contrary, the Agreement contains numerous provisions that establish objective measures governing, among other things, the content of eToys' site, the technology used to implement eToys' site and the product offerings made available through eToys' site. *See* Agreement, Article 2 (describing in detail in five (5) pages of single spaced text the terms and conditions governing the operation of eToys' site) (App. at 109-113). In reaching its dubious conclusion that the Agreement was a personal services contract, the Bankruptcy Court ignored the terms of the Agreement and relied nearly exclusively on AOL's self-serving testimony (delivered years after-the-fact), which was to the effect that AOL subjectively believed eToys was the only company with which it would have entered into such a contract.[13] In short, the best evidence of the nature of the contract and that the parties were engaged in a "functional business pursuit" rather than a relationship of "trust and confidence" is in the terms of the Agreement, which the Bankruptcy Court entirely ignored.[14]

      D.     The Record Contradicts The Bankruptcy Court's Finding Of "de minimis" Value.

          Finally, the Bankruptcy Court's alternative conclusion that, even if the Agreement was assignable, the value under such circumstances would be "de minimis," was also erroneous

---

[13]    The Bankruptcy Court's one sentence application of the facts to the law in its Opinion consists of the following: "In this case, the AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its experience, all of which were relevant to eToys' ability to serve AOL Members and protect their privacy interests as set forth in the 1999 Agreement. (FOF 173-79)." (Op. at 29). The referenced findings of fact are based almost entirely on the aforementioned self-serving and after-the-fact testimony by AOL's representatives concerning what they believed years earlier when the Agreement was entered into.

[14]    Of course, AOL would have been able to adequately protect itself against the assumption and assignment of the Agreement to an unqualified party without attempting to torture it into the definition of a personal services contract because section 365(b)(1)(C) allowed AOL to demand "adequate assurance of future performance" in connection with any assumption or assignment of a contract or lease. *See* 11 U.S.C. § 365(b)(1)(C).

28.

because it did not apply (or even purport to apply) the totality of circumstances test.  The liquidation value determination was premised on the imaginary circumstance of the Agreement being sold three months later in bankruptcy, as opposed to the actual circumstances involving the termination of the contract in late February and the consequent ability of AOL to resell the advertising space.

Moreover, the Bankruptcy Court's conclusion that the Agreement had "de minimus" value ignored the fact that the Agreement was an important asset of eToys and simply assumed that it would have essentially the same value as eToys' other assets.  eToys only ceased taking new product orders immediately before its bankruptcy filing.  (App. at A11, FOF 89). The sale motion filed at the outset of eToys' bankruptcy case contemplated that eToys' could be sold as a "turnkey" operation which would have allowed a buyer to recapture the value of eToys as a going concern.  Indeed, a winning buyer for substantially all of eToys' assets was tentatively designated at the initial auction on March 22, 2001, although that party later withdrew its bid. (App. at A12, FOF 98).  Thus, what the Bankruptcy Court could not know – but nevertheless speculated upon in its Opinion – is what continued access to the advertising services AOL was required to provide would have meant to eToys' sale process and its ability to maximize returns for its creditors.

Further, the Bankruptcy Court's analysis ignored the fact that AOL would have had every incentive to purchase the Agreement because otherwise it would have had to continue to perform with a new counter-party not of its choosing (which AOL acknowledges was an important consideration for it).[15]  Indeed, had AOL purchased the Agreement, it then could have

---

[15]    This dynamic is not unusual in bankruptcy cases and is seen most typically where landlords will bid at bankruptcy auctions to take assignments of their own below-market
(Continued . . .)

29.

resold those advertising services at a rate that AOL acknowledged was likely higher than the price paid by eToys.[16]  As such, even assuming the Bankruptcy Court applied the correct legal standard, the Bankruptcy Court's analysis was deeply flawed and the case should be remanded.

IV.    ETOYS IS ENTITLED TO AN AWARD OF PREJUDGMENT INTEREST.

        The Bankruptcy Court should be directed to award prejudgment interest. Prejudgment interest is presumptively to be awarded, especially where necessary to make the debtor whole.  *See Sigmon v. Royal Cake Co., Inc.,* 13 F.3d 818, 822-23 (4th Cir. 1994) ("The award of prejudgment interest therefore serves to 'compensate the debtor's estate for [defendant's] use of those funds that were wrongfully withheld from the debtor's estate during the pendency of the current suit.'"); *In re Sacred Heart Hosp. of Norristown,* 200 B.R. 114, 119 (Bankr. E.D. Pa 1996) (prejudgment interest generally awarded); *In re Hechinger Invs. Co.,* 489 F.3d 568, 580 (3d Cir. 2007) ("[P]rejudgment interest should be awarded unless there is a sound reason not to do so.") (internal citation omitted).

        Here, AOL has had the use of the funds paid by eToys since the termination of the Agreement and eToys has been denied the use of those funds.  Consistent with the "purpose of . . . Section [548] . . . to make the estate whole," an award of "[p]rejudgment interest compensates the estate for the time it was without use of the transferred funds." *McFarland v. Leyh,* 52 F.3d 1330, 1339-40 (5th Cir. 1995) (affirming award of prejudgment interest in section 548 fraudulent transfer action); s*ee also Sigmon,* 13 F.3d at 822-23; *Peltz v. Worldnet Corp. (In re USN Comm.,*

_____

(. . . continued)
        leases with the debtor so as to have the opportunity to re-let the space at more favorable prevailing rates.

[16]    Further, even under its analysis, the Bankruptcy Court should have awarded the "de minimis" value it found – $16,500 to $38,500 – which it failed to do.  (Op. at 30).

30.

*Inc.),* 280 B.R. 573, 602-03 (Bankr. D. Del. 2002) (collecting cases).  As such, eToys can only

be made whole by an award of prejudgment interest and the Bankruptcy Court should be directed

to do so at the rate provided for in 28 U.S.C. §1961.  *See, e.g.*, *USN Comm.*, 280 B.R. at 603;

*Brantley v. Weeks*, 116 B.R. 443, 448 (Bankr. D.Md. 1990).

31.

<u>CONCLUSION</u>

For all of the foregoing reasons, the Court should reverse the Final Order of the

Bankruptcy Court and enter an Order awarding damages to eToys in the amount of $4,462,500,

plus prejudgment interest.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Thomas W. Briggs, Jr.*

_____

Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*rallen@mnat.com*
*gwerkheiser@mnat.com*
*tbriggs@mnat.com*
   *Attorneys for Appellant*
   *EBC I, Inc., f/k/a eToys, Inc.*

June 3, 2008

2309382

<u>CERTIFICATE OF SERVICE</u>

I, Thomas W. Briggs, Jr., hereby certify that on June 3, 2008, I caused the foregoing EBC I, Inc.'s Opening Brief in Support of Its Appeal to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE  19899

I further certify that copies were caused to be served on June 3, 2008 upon the following individuals in the manner indicated:

**BY HAND DELIVERY**

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE  19899

**BY U.S. FIRST-CLASS MAIL**

> Craig T. Goldblatt, Esquire
> Wilmer Cutler Pickering Hale and Dorr LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, D.C.  20006

*/s/  Thomas W. Briggs, Jr.*

_____

Thomas W. Briggs, Jr. (#4076)
*tbriggs@mnat.com*

2309382

# EXHIBIT 1

Westlaw.

**H**In re Federal-Mogul Global Inc.
Bkrtcy.D.Del.,2008.

United States Bankruptcy Court,D. Delaware.
In re FEDERAL-MOGUL GLOBAL INC., T & N
Limited, et al., Debtors.
**No. 01-10578 (JKF).**

March 19, 2008.

**Background:** Chapter 11 plan proponents and
objecting insurers moved for determination of
objections to confirmation concerning validity and
enforceability against insurers, under Bankruptcy
Code, of assignment to asbestos liabilities trust of
asbestos insurance policies subject to anti-assignment
or consent-to-assignment provisions incorporated in
policies and imposed by applicable state law.

**Holding:** The Bankruptcy Court, Judith K.
Fitzgerald, J., held that debtors' asbestos insurance
policies were property of bankruptcy estates, and
could be transferred to trust notwithstanding any anti-
assignment clauses in or incorporated into policies or
anti-assignment restrictions imposed by applicable
state law.

Objections overruled.

**[1] Bankruptcy 51 ⟛3553**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3548 Requisites of Confirmable Plan
                51k3553 k. Means of Implementation.
Most Cited Cases
Bankruptcy statute requiring that, notwithstanding
any otherwise applicable nonbankruptcy law, Chapter
11 plan provide adequate means for plan's
implementation, including transfer of part or all
estate property to one or more entities, is an
empowering statute that enhances the ability of
trustee or debtor-in-possession to deal with property
of the estate. 11 U.S.C.A. § 1123(a)(5)(B).

**[2] Bankruptcy 51 ⟛3553**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3548 Requisites of Confirmable Plan
                51k3553 k. Means of Implementation.
Most Cited Cases
Under bankruptcy statute requiring that,
notwithstanding any otherwise applicable
nonbankruptcy law, Chapter 11 plan provide
adequate means for plan's implementation, including
transfer of part or all estate property to one or more
entities, assignment of policy proceeds to asbestos
liabilities trust is not prohibited by anti-assignment
provisions in insurance policies. 11 U.S.C.A. §§
524(g), 1123(a)(5).

**[3] Insurance 217 ⟛1973**

217 Insurance
    217XIII Contracts and Policies
        217XIII(S) Transfers of Policies
            217k1973 k. Policy Provisions. Most Cited
Cases
Once an event occurs that gives rise to insurer's
liability under insurance policy, policy itself can be
assigned, notwithstanding anti-assignment
provisions. 11 U.S.C.A. § 1123(a)(5).

**[4] Bankruptcy 51 ⟛3553**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3548 Requisites of Confirmable Plan
                51k3553 k. Means of Implementation.
Most Cited Cases

**Bankruptcy 51 ⟛3570**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3570 k. Execution and Performance.
Most Cited Cases
Chapter 11 debtors' asbestos insurance policies,
which were estate property, could be transferred to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

asbestos liabilities trust notwithstanding anti-assignment clauses in or incorporated into policies or anti-assignment restrictions imposed by applicable state law under provisions of confirmed plan and pursuant to preemptive effect of bankruptcy statute requiring that, notwithstanding any otherwise applicable nonbankruptcy law, Chapter 11 plan provide adequate means for plan's implementation. 11 U.S.C.A. §§ 524(g), 541(c)(1), 1123(a)(5).

**[5] Bankruptcy 51 ☞3553**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3548 Requisites of Confirmable Plan
            51k3553 k. Means of Implementation. Most Cited Cases
Preemption under bankruptcy statute requiring that, notwithstanding any otherwise applicable nonbankruptcy law, Chapter 11 plan provide adequate means for plan's implementation, including transfer of part or all estate property to one or more entities, was not limited to nonbankruptcy laws relating to debtors' financial condition or restricted by Bankruptcy Code's administrative provision giving trustee authority to deal with estate property despite ex post facto clauses based upon debtor's insolvency or financial condition. 11 U.S.C.A. §§ 363(*l*), 1123(a)(5), 1142(a).

**[6] Statutes 361 ☞195**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
            361k195 k. Express Mention and Implied Exclusion. Most Cited Cases
Fundamental premise of statutory construction is that when Congress uses particular language in one section of a statute but omits it in another, its actions are purposeful and intentional.

**[7] Bankruptcy 51 ☞2549**

51 Bankruptcy
    51V The Estate
        51V(C) Property of Estate in General
            51V(C)2 Particular Items and Interests

            51k2549 k. Insurance Policies and Liabilities Thereon. Most Cited Cases
Insurance policies covering asbestos liabilities are assets held by debtor.

**[8] Bankruptcy 51 ☞3555**

51 Bankruptcy
    51XIV Reorganization
        51XIV(B) The Plan
            51k3548 Requisites of Confirmable Plan
            51k3555 k. Settlement, Adjustment, or Enforcement of Claims. Most Cited Cases
Just as insured asbestos liabilities may be transferred to asbestos liabilities trust created pursuant to Bankruptcy Code, so may the corresponding assets, the insurance policies, proceeds, or policy rights, as applicable in any given Chapter 11 plan, that stand to cover those liabilities. 11 U.S.C.A. § 524(g).

**[9] Bankruptcy 51 ☞3106**

51 Bankruptcy
    51IX Administration
        51IX(C) Debtor's Contracts and Leases
            51k3105 Contracts Assumable; Assignability
            51k3106 k. Executory Nature in General. Most Cited Cases
Chapter 11 debtors' asbestos insurance policies were non-executory contracts, given that policy coverage periods had expired long before debtors filed their bankruptcy petitions, that all premiums under policies were paid prior to petition date, and that debtors' remaining obligations of cooperation, retrospective premiums, deductibles, and notice were all ministerial. 11 U.S.C.A. § 365.

**[10] Insurance 217 ☞3211**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(B) Claim Procedures
            217XXVII(B)3 Cooperation
                217k3210 Effect of Failure to Cooperate
                217k3211 k. In General. Most Cited Cases
Insured's failure of obligation of cooperation with respect to a claim establishes only that insurer may

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                      Page 3
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))

have a defense to payment of that claim, and does not affect insurer's obligation regarding other claims.

James E. O'Neill, Laura Davis Jones, Michael Paul Migliore, Scotta Edelen McFarland, Curtis A. Hehn, Michael Seidl, Pachulski Stang Ziehl & Jones LLP, Eric Michael Sutty, Bayard, P.A., John S. Spadaro, Murphy Spadaro & Landon, Maribeth L. Minella, Timothy Edward Lengkeek, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Jay R. Bender, Bradley Arant Rose & White, LLP, Birmingham, AL, Julia S. Kreher, Buffalo, NY, Sheldon Samuel Toll, Sheldon S. Toll PLLC, Southfield, MI, for Debtors. Edward D. Robertson, Jr., Bartimus, Frickleton, Robertson, Gorny, Jefferson City, MO, for U.S. Trustee.

### MEMORANDUM OPINION REGARDING ASSIGNMENT AND PREEMPTION ISSUE[FN1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

*1 Before the court is an issue related to but bifurcated from the plan confirmation process. The court's jurisdiction is not disputed. As stated by the parties, the issue is: "Whether, under the Bankruptcy Code as a matter of law, the [assignment of Asbestos Insurance Policies to a § 524(g) trust] is valid and enforceable against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies and applicable state law."[FN2]

A hearing to consider confirmation of the Plan was held on June 18-21, July 9-10, 2007, and October 1-2, 2007, at which all objections to confirmation were considered. Thereafter, after devoting a considerable amount of time and effort, the Debtors, Plan Proponents,[FN3] Objecting Insurers,[FN4] and other interested parties were able to resolve all remaining objections to confirmation except those related to the Assignment and Preemption Issue.[FN5]

On October 17, 2007, the Plan Proponents and the certain Objecting Insurers filed a Joint Motion Seeking Determination of Asbestos Insurance Assignment and Preemption Issues Pursuant to the Plan[FN6] and seeking court approval of the Stipulation to Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue.[FN7]This stipulation was entered into by and among the Plan Proponents and certain Objecting Insurers. A separate stipulation was entered into by and among the Plan Proponents

and Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "LMI"), ("LMI" Stipulation).[FN8] The LMI Stipulation was subsequently added to the October 17, 2007, Joint Motion.[FN9]The certain Objecting Insurers' stipulation and the LMI Stipulation shall be collectively referred to herein as the "Stipulations." A hearing was held on October 25, 2007, and the court entered the Stipulation Orders on November 8, 2007.[FN10]

On November 8, 2007, this court entered an order (the "Confirmation Order") [FN11] confirming the Fourth Amended Joint Plan of Reorganization For Debtors and Debtors-In-Possession (As Modified) (the "Plan") [FN12] of Federal-Mogul Global Inc., T & N LIMITED, et al.,[FN13] ("Debtors") and also entered Findings of Fact and Conclusions of Law Regarding Confirmation of the Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-in-Possession (As Modified) (the "Findings of Fact and Conclusions of Law").[FN14] On November 13, 2007, the United States District Court for the District of Delaware entered an order (the "Affirmance Order") [FN15] affirming the Confirmation Order and adopting the Findings of Fact and Conclusions of Law. Consistent with the terms of the Order and Stipulation to Preserve Appeals on the Asbestos Insurance Assignment and Preemption Issue [FN16] and the Order and Stipulation Regarding Remaining London Market Objections to the Plan[FN17] (collectively, the "Stipulation Orders"), the Confirmation Order did not constitute or contain a ruling on the objections [FN18] of the Objecting Insurers to the confirmation of the Plan on the ground that assignment of the Insurance Rights to the Trust is not permitted, as a matter of law, under the Bankruptcy Code ("Assignment and Preemption Issue"). The Stipulation Orders provided that this court would address the Assignment and Preemption Issue separately from the confirmation of the Plan.[FN19] The question before this court, regarding the Assignment and Preemption Issue, is whether under the Bankruptcy Code, as a matter of law, the assignment of the Asbestos Insurance Policies to a § 524(g) trust is valid and enforceable, notwithstanding any anti-assignment or consent to assignment provisions incorporated in the Asbestos Insurance Policies and applicable state law. There is a dispute among the parties as to whether any anti-assignment provision of the policies is violated under state law at all, given the insurance neutrality provisions [FN20] in the Plan,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which preserve the insurers' right to argue state law in state courts. However, this court is not addressing whether the provisions of the policies and applicable state law are violated, only whether or not, in this case, they are preempted by the Bankruptcy Code.

**\*2** For the reasons explained in detail below, the Objecting Insurers' objections regarding the assignment and preemption issue will be overruled. The assignment of rights in certain insurance policies to the asbestos trust, as provided in part by Section 4.3 of the Plan, is valid and enforceable under §§ 524(g), 541(c)(1), 1123(a)(5)(B) and 1129(a)(1) of the Bankruptcy Code. The anti-assignment provisions in the policies and applicable state law are preempted. Among other authorities, we rely upon the decisions in *In reGlobal Industrial Technologies, Inc.,* 375 B.R. 155, 160-61 (Bankr.W.D.Pa.2007), *In re Kaiser Aluminum Corporation,* 343 B.R. 88 (D.Del.2006), and *In re Western Asbestos Co.,* 313 B.R. 456 (Bankr.N.D.Cal.2004), *aff'd*2004 WL 1944792 (N.D.Cal. April 16, 2004).

## DISCUSSION

Section 541 of the Bankruptcy Code defines property of the estate broadly to include "all legal or equitable interests of the debtor in property as of the commencement of the case,""[p]roceeds ... from the property of the estate," and "[a]ny interest in property that the estate acquires after commencement of the case."11 U.S.C. § 541(a)(1), (6), and (7) respectively. The Court of Appeals for the Third Circuit has expressly concluded that an insurance policy is property of the estate within the meaning of § 541, even if the policy has not matured, has no cash value, or is otherwise contingent.*Estate of Lellock v. Prudential Insurance. Co. of Am.,* 811 F.2d 186, 189 (3d Cir.1987).[FN21]

[1]Section 1123(a) provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall ... (5) provide adequate means for the plan's implementation, such as ... (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan."11 U.S.C. § 1123(a)(5)(B). Courts that have delved into the reach of § 1123 have found that it expressly preempts nonbankruptcy rights that might otherwise interfere with the implementation of a Chapter 11 plan. *See,*

*e.g., In re FCX, Inc.,* 853 F.2d 1149, 1155 (4th Cir.1988)(to the extent that any nonbankruptcy law or contract prohibits debtor from adequately implementing terms of a plan, "the plan may propose such actions notwithstanding nonbankruptcy law or agreements"), *cert. denied sub nom.Universal Cooperatives, Inc. v. FCX, Inc.,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989); *In re Stone & Webster, Inc.,* 286 B.R. 532, 543 (Bankr.D.Del.2002)("[§ ] 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law ...").Section 1123(a)(5) "is an empowering statute" that "enhanc[es] the ability of the trustee or debtor in possession to deal with property of the estate."*In re FCX, Inc.,* 853 F.2d at 1155.

[2] It is established in this circuit that under § 1123(a)(5) assignment of policy proceeds to a § 524(g) trust is not prohibited by anti-assignment provisions in insurance policies. *In re Combustion Engineering,* 391 F.3d 190 (3d Cir.2004). The Court of Appeals for the Third Circuit explained that "[p]ut simply, § 541 prohibits restrictions on the interests of the debtor, which includes the insurance policies held by [the debtor],"*id.* at 219, and, with respect to property of the estate, § 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity. *Id.* at n. 27.

**\*3**[3] Furthermore, once an event occurs that gives rise to the insurer's liability under the policy, the policy itself can be assigned. *See generally* 3 Couch on Insurance § 35.7 (3d ed.1999).*See also In re Western Asbestos Company,* 313 B.R. 456, 462 (Bankr.N.D.Cal.2004), *aff'd*2004 WL 1944792 (N.D.Cal. April 16, 2004) (policies or rights transferable under 11 U.S.C. § 1123(a)(5) notwithstanding contrary state law); *Viola v. Fireman's Fund Insurance Co.,* 965 F.Supp. 654, 658 (E.D.Pa.1997)("[u]nder Pennsylvania law, an insurer may not limit an insured's ability to assign ... rights under a policy after the occurrence of the event which gives rise to the insurer's liability"). The court in *Viola* also noted as follows:

[a]fter a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; it is an obligation or debt due from the insurer to the insured, subject only to such claims,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demands, or defenses as the insurer would have been entitled to make against the original insured.

965 F.Supp. at 658 (citation omitted). To the same effect see *National Memorial Services v. Metropolitan Life Insurance Co.*, 355 Pa. 155, 49 A.2d 382 (1946)(anti-assignment clause does not preclude beneficiaries of life insurance policy from assigning proceeds of policy after the event giving rise to liability; it applies only to assignments before liability). For federal cases to the same effect see *OneBeacon America Insurance Co. v. A.P.I., Inc.* 2006 WL 1473004 at *2-*3 (D.Minn. May 25, 2006)(anti-assignment clauses are to protect insurer from increase in the risk it agreed to insure but assignment of loss does not expand risk to insurer, simply allows change in identity to "reconnect the policy's coverage to the insured loss;" most courts follow the risk/loss distinction to allow insured to assign loss); *R.L. Vallee, Inc. v. American Intern. Specialty Lines Insurance Co.*, 431 F.Supp.2d 428, 435 (D.Vt.2006)(assignments after loss are permitted as there is no additional risk to insurer; anti-assignment clauses operate after loss occurs to limit the free assignability of claims, which is not favored by the law).

In this case, to the extent that the events giving rise to liability have already occurred, there will be no additional risk to the insurance companies by virtue of the assignments. Coverage issues, including, *inter alia,* proof that an event giving rise to liability occurred within the covered period before a specific policy can be accessed for coverage, are all preserved. [FN22]

The principle enunciated in *National Memorial Services, supra,* that an anti-assignment clause is unenforceable after the loss has occurred, was reiterated in *Egger v. Gulf Insurance Co.*, 588 Pa. 287, 903 A.2d 1219 (2006). The Pennsylvania Supreme Court in *Egger* noted that *National Memorial Services* involved a life insurance policy but applied the rule to the facts before it involving personal injury and an excess insurance policy. The court in *Egger* said:

  **\*4** The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money

claim. *See* G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed. 1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis. The triggering event for coverage in *Nat'l Mem'l* was the death of the insured. Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured."*Id.* at 382-83.

However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its primary liability policy with respect to its activities at the PECO plant. Foulke provided plant protection and security services pursuant to its contracts with PECO. Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.' " Trial Court Opinion at 2. It is an "Occurrence" that triggers the obligation of Foulke....

Consequently, in parsing the terms of the policy, the triggering event for coverage was bodily injury occasioned by Foulke, which arose out of an Occurrence during the period of the policy....

In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $ 1,000,000.00 of primary insurance coverage ...

This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been entered; (2) only after all

appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage.... This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.

We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage.

*Egger v. Gulf Insurance. Co.,* 903 A.2d at 1224-26 (citations omitted) (emphasis omitted).

**\*5** In *In re Western Asbestos Company,* 313 B.R. 832, 858 (Bankr.N.D.Cal.2003), the bankruptcy court concluded that under 11 U.S.C. § 1123(a)(5), policies or rights thereunder may be transferred to an asbestos personal injury trust, whether or not state law would permit assignment.

In a subsequent opinion in the same case, *In re Western Asbestos Co.,* 313 B.R. 456, 459 (Bankr.N.D.Cal.2004), *aff'd* 2004 WL 1944792 (N.D.Cal. April 16, 2004), the court held that, with respect to causes of action that were transferred to the trust pursuant to the plan of reorganization, the trust was designated as a successor to the debtors and a representative of the chapter 11 estates. The court noted that the trust was authorized as a matter of law to appear in and act for debtors in pending actions and to pursue causes of action for the benefit of holders of asbestos related claims. The court found that under § 1123(b)(3)(B), on the effective date of the plan,

the Trust shall be vested with and have the right to enforce against any Entity any and all of such causes of action, with the proceeds of the recovery of any such actions related to insurance for Asbestos Related Claims (including, without limitation, the Coverage Litigation) to be paid to the respective Debtor....

313 B.R. at 459.The court concluded that the debtors' insurance policies, rights under, and proceeds of those polices could be vested in the trust under § 1123(a)(5)(B), notwithstanding state law or contractual provisions to the contrary. *Id.* at 462.The

court further ruled that the vesting of insurance rights in the trust "shall neither diminish nor impair the enforceability of any of the Asbestos Insurance Policies against a party that is not a Released Party."*Id.* Likewise, it would not expand rights. *Id.* We agree with this analysis and, inasmuch as the plan provisions at issue here accord the same result, adopt it in this case.

In *In re Kaiser Aluminum Corp.,* 343 B.R. 88 (D.Del.2006), in affirming this court, the District Court for the District of Delaware permitted the debtor to assign insurance proceeds to a personal injury trust pursuant to 11 U.S.C. § 541(c)(1) and 11 U.S.C. § 1123(a)"which expressly provides for the preemption of nonbankruptcy law."*Id.* at 95.In *Kaiser* the nonbankruptcy law addressed was that purporting to limit or restrict a debtor's rights to assign interests in insurance policies. The District Court relied upon *Combustion Engineering,* 391 F.3d at 218-19, n. 27, in determining that § 541(c)(1) and § 1123(a) preempt anti-assignment clauses in insurance policies. *Kaiser, supra,* 343 B.R. at 95 ("Section 541(c)(1) and Section 1123(a)(5)(B) of the Bankruptcy Code expressly permits [sic] the assignment of a debtor's interest in insurance policies to a trust or other entity, even if the subject insurance policies contain a prohibition of assignment.") *Global Industrial Technologies, Inc.,* 375 B.R. at 160-61, ("The anti-assignment clauses in the insurance policies are preempted by the Bankruptcy Code").

**\*6[4]** Thus, the insurance policies are property of these estates by virtue of § 541 and their transfer to the § 524(g) trust is permitted notwithstanding anti-assignment clauses in or incorporated in the policies or applicable state law by virtue of § 1123(a)(5) and § 541(c)(1), as applicable.

Objecting Insurers raised a number of additional issues, which we address below:

***1. Objecting Insurers contend that there is a "strong presumption against preemption"[FN23] and that 1123(a)(5) cannot be interpreted to extend beyond "the limited preemption afforded by §§ 363(l) and 1142(a)."*** [FN24]

[5] Objecting Insurers argue that in determining the scope of preemption under § 1123(a)(5) there is a strong "presumption against preemption" as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                    Page 7
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

articulated in *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). However, this premise does not change the primacy of the language of § 1123(a)(5). The court in *Egelhoff v. Egelhoff ex rel. Breiner,* 532 U.S. 141, 151, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001), explained that the presumption against preemption "can be overcome where ... Congress has made clear its desire for pre-emption."[FN25]In *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993), the Supreme Court noted that it is well-recognized that the term "notwithstanding" as found in § 1123(a) expresses a clear statement of intent "to supercede all other laws." Despite the plain meaning of § 1123(a)(5), which this court is bound to consider first and foremost,[FN26] objecting Insurers ask the court to look past the plain meaning of § 1123(a)(5) and examine the other provisions of the Bankruptcy Code as a reference for a statutory framework. Specifically, they ask the court to look to § 1142 and § 363(*l*) of the Bankruptcy Code to limit the scope of preemption under § 1123(a)(5).

[6] The Objecting Insurers rely on *Pacific Gas and Electric Company v. California ex rel. California Dept. of Toxic Substances Control,* 350 F.3d 932 (9th Cir.2003), to argue that § 1123(a)(5) preempts applicable nonbankruptcy law only insofar as such law relates to a debtor's financial condition.*Pacific Gas* imports the words "relating to financial condition" from § 1142(a) into § 1123(a)(5). The holding in *Pacific Gas* squarely conflicts with the rationale of the Court of Appeals for the Third Circuit and other courts which have considered the issue. *See Combustion Engineering,* 391 F.3d at 219 n. 27 (interpreting § 1123(a)(5) without limiting applicable nonbankruptcy law to laws relating to financial condition); *Kaiser Aluminum,* 343 B.R. at 93 (same). This court, of course, is bound by pronouncements of the Court of Appeals for the Third Circuit, not the Ninth, and, therefore, follows *Combustion Engineering.*[FN27]

Objecting insurers argue that § 363(*l*) is "the governing statute" and directly applicable to the assignment of contractual rights arising under non-executory contracts pursuant to a plan. However, this argument, far from presenting a statutory framework, takes the Bankruptcy Code out of its logical sequence. As explained above, § 541 defines what is property of the estate, § 1123 delineates what a plan

can provide, and § 1129 lays out the requirements for plan confirmation. Section 363 is an administrative provision which gives the trustee authority to deal with property of the estate notwithstanding certain *ex post facto* clauses based upon the insolvency or financial condition of the debtor. Not all anti-assignment provisions are based upon a debtor's insolvency or financial condition. Thus, to do as we are asked would re-write the statute and modify the meaning of § 1123 in such a way that it becomes superfluous. This, we may not do. *TRW, Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)("It is a cardinal principle of statutory construction that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant' ") (citation omitted).*Accord Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001).

*7 Moreover, Objecting Insurers provide no authority for their contention that § 363(*l*) should be fashioned to limit the use made by this plan of § 1123(a)(5). However, a number of cases demonstrate the appropriate statutory framework (i.e., under §§ 524(g), 541, 1123, and 1129) for the assignment of insurance proceeds to a § 524(g) trust, pursuant to a plan. *See, e.g., In re Combustion Engineering,* 391 F.3d 190 (3d Cir.2004) (finding that assignment of insurance proceeds to a § 524(g) trust notwithstanding any anti-assignment provisions in subject insurance policies is valid and enforceable pursuant to § 541 and § 1123(a)(5)).*Accord In re Kaiser Aluminum Corp.,* 343 B.R. 88 (D.Del.2006); *In re Western Asbestos Company,* 313 B.R. 832, 857-8 (Bankr.N.D.Cal.2003). This plan is in accord with that precedent.

[7][8] In arguing for limiting the scope of preemption under § 1123(a), the Objecting Insurers suggest that "[u]nder the Proponents' theory of section 1123(a)(5)(B), a bankrupt debtor with no use for a particular insurance policy because it has no liabilities could sell its policy to any third party, including a party with liabilities but no insurance."[FN28]The argument ignores the context of the contested assignment. Section 524(g) of the Bankruptcy Code creates a new form of entity: a trust to which asbestos liabilities are channeled and which addresses and pays those liabilities. A § 524(g) trust is not a state law trust and likewise is not a creation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))

Page 8

of private agreement. Rather, a § 524(g) trust is one whose existence is authorized and whose contours are delineated by the Bankruptcy Code. Such a trust is the successor to the debtor's asbestos liabilities that are channeled to that trust, and those liabilities may include insured asbestos liabilities, inasmuch as § 524(g) clearly contemplates the transfer of insured liabilities to the trust.[FN29]Insurance policies covering asbestos liabilities are assets held by a debtor. Just as insured asbestos liabilities may be transferred to the trust, so may the corresponding assets, the insurance policies, proceeds, or policy rights, as applicable in any given Plan, that stand to cover those liabilities.[FN30]In this context, the logic of the Bankruptcy Code, in § 1123(a)(5)(B), which permits transfers of property of the estate (here, insurance policies or rights to proceeds thereunder) from a debtor to the successor vehicle to the debtor (the § 524(g) trust), is unassailable.

**2. Objecting Insurers contend that § 1123(a)(5) does not preempt private contracts.**

Objecting Insurers also argue that because the language of § 1123(a)(5) does not specifically refer to contracts, and other provisions of the Bankruptcy Code do, § 1123(a)(5) cannot preempt private contract rights. However, both the express language of § 541(c)(1) and courts construing that text have held that § 541(c)(1) prohibits a contractual restriction on the rights of a debtor to transfer or assign its interests in bankruptcy and § 1123(a)(5) permits the transfer of the property to a § 524(g) trust. Thus, § 1123(a)(5) provides for the adequate implementation of the plan. *See In re Combustion Engineering,* 391 F.3d 190, 219 n. 27 (3d Cir.2004) (insurance contracts); *In re Kaiser Aluminum Corp.,* 343 B.R. 88, 95 (D.Del.2006) (insurance policies); *In re FCX, Inc.,* 853 F.2d 1149, 1154-55 (4th Cir.1988) (bylaws of cooperative), *cert. denied sub nom.Universal Cooperatives, Inc. v. FCX, Inc.,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). The objection, therefore, is not well founded.[FN31]

**3. Objecting Insurers contend that the Asbestos Insurance Policies are Executory Contracts and therefore subject to § 365.**

*8[9] The Objecting Insurers argue that the Asbestos Insurance Policies are executory, and therefore fall under the restrictions on assignment contained in §

365 of the Bankruptcy Code. However, "[c]ourts have consistently held that insurance policies where the policy coverage period has expired prior to the insured's bankruptcy are not executory contracts despite ongoing obligations of the debtor."*Beloit Liquidating Trust v. United Insurance. Co.,* 287 B.R. 904, 906 (N.D.Ill.2002).*See also In re CVA General Contractors, Inc.,* 267 B.R. 773, 778 (Bankr.W.D.Tex.2001) (holding that the insurance policy was not a proper subject for § 365 analysis because it had expired as of the petition date). The court in *Columbia Cas. Co. v. Federal Press Co.,* 104 B.R. 56, 66 (Bankr.N.D.Ind.1989), explained that even though the terms and conditions of the policies may still be in effect for the periods covered by the policies, the executory period for the contract ends when the last effective date of the policies has passed. All the policy periods under the Asbestos Insurance Policies in this case have expired. In the case at bench, the last known policy period of any of the Asbestos Insurance Policies ended in 1991, long before the petition date.

Additionally, all premiums under such policies were paid prior to the petition date. The Court of Appeals for the Third Circuit has adopted the Countryman definition of executory contracts, which defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contact are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."*Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989) (quoting Countryman, *Executory Contracts in Bankruptcy, Part 1,* 57 Minn. L.Rev. 439, 460 (1973)); *In re Exide Technologies,* 340 B.R. 222, 229 (Bankr.D.Del.2006). Under the Countryman definition courts have recognized that where one of the parties to the insurance policy has fulfilled the central agreement to such contract, such as the obligation of the insured to pay the premium in exchange for the insurer's defense and payment of indemnity claims against the insured, the contract is no longer executory. *See In re Surfside Resort and Suites, Inc.,* 344 B.R. 179, 187 (Bankr.M.D.Fla.2006) (finding that where the premium had been paid in full prepetition, the insurance policy was not executory under the Countryman definition); *In re CVA General Contractors, Inc.,* 267 B.R. 773, 779 (Bankr.W.D.Tex.2001) (stating that when the "sole basis" for finding an insurance policy to be an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                    Page 9
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

executory contract, the continuing obligation to make premium payments, had been fulfilled, the insurance policy is not executory); *In re Firearms Import and Export Corp.,* 131 B.R. 1009, 1013 (Bankr.S.D.Fla.1991) (holding that the insurance policy was not an executory contract because the debtor had already paid the premiums in full). The payment of policy premiums prior to the petition date constitutes substantial compliance with the policy and renders the contracts non-executory in nature.

**\*9** The Objecting Insurers argue that, even though the premiums have been paid, the Debtors' ongoing obligations of cooperation, retrospective premiums, deductibles and notice make the policies executory. To the contrary, courts have found that such ministerial obligations do not transform an otherwise non-executory insurance policy into an executory contract. *See In re Grace Indus., Inc.,* 341 B.R. 399, 402-03 (Bankr.E.D.N.Y.2006) (stating that an insurance policy was not an executory contract despite the debtor's duties to pay retrospective premiums and deductibles/self-insurance); *In re Vanderveer Estates Holding, LLC,* 328 B.R. 18, 25-26 (Bankr.E.D.N.Y.2005) (stating that an insurance policy was not an executory contract despite the debtor's duty to pay a deductible); *In re Wisconsin Barge Line, Inc.,* 76 B.R. 695, 697 (Bankr.E.D.Mo.1987) (holding that the contract was not executory despite the debtor's duties to pay retroactive premiums).

[10] At the confirmation hearing, Objecting Insurers devoted a significant portion of their arguments in favor of designating the Asbestos Insurance Policies as executory contracts to concerns over the obligations of cooperation and notice. These concerns mirrored those in *In re Sudbury, Inc.,* 153 B.R. 776, 779-80 (Bankr.N.D.Ohio 1993), where the court held that the insurance policy was not an executory contract despite the debtor's duties with respect to retroactive premiums and the cooperation clause, including notice obligations, providing information demanded by the insurer, cooperating in the defense of claims, consent to settlements and preservation of the insurers' right to subrogation, because such duties were ministerial. Failure of cooperation with respect to a claim establishes only that an insurer may have a defense to payment of that claim and would not affect an insurer's obligation regarding other claims. Further, the court held that denying executory status

to the policies in issue would not impact the rights or remedies of the insurer.

This court finds that, because the premiums are paid, the policy coverage periods have expired, and the remaining obligations of the insureds are ministerial, the Asbestos Insurance Policies are non-executory contracts and therefore, do not fall under § 365 of the Bankruptcy Code.[FN32]

**CONCLUSION**

For the reasons discussed, the court will overrule the objections of the Objecting Insurers and the Certain Underwriters at Lloyds, London and London Market Companies regarding assignment and preemption on the ground that the assignment of rights in certain insurance policies to the Asbestos Trust, as provided in part by Section 4.3 of the Plan, is valid and enforceable under § 524(g), § 541(c)(1), § 1123(a)(5)(B) and § 1129(a)(1) of the Bankruptcy Code, and that the Bankruptcy Code preempts any anti-assignment contractual provisions and applicable state law.

An appropriate order will be entered.

**ORDER**

**AND NOW,** this *19th* day of March, 2008, for the reasons stated in the foregoing Memorandum Opinion, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the assignment of rights in certain insurance policies to the asbestos trust, as provided in part by Section 4.3 of the Fourth Amended Joint Plan of Reorganization For Debtors and Debtors-In-Possession (As Modified), Doc. No. 13360, is valid and enforceable pursuant to §§ 524(g), 541(c)(1), 1123(a)(5)(B) & § 1129(a)(1) of the Bankruptcy Code notwithstanding anti-assignment provisions in or incorporated in the policies and applicable state law. The Objections of the Objecting Insurers and of Certain Underwriters at Lloyds, London and London Market Companies, all as defined in the Memorandum Opinion, are **OVERRULED.**

**\*10** It is **FURTHER ORDERED** that counsel for Debtors shall immediately serve a copy of this Memorandum Opinion and Order on all parties on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----                                                                                    Page 10

--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201

**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

the current Service List and any other parties in interest and shall file proof of service forthwith.

FN1. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

FN2. Certain of the Objecting Insurers are parties to a Stipulation and Agreed Order (Doc. No. 10113 at Exhibit A, the "Insurance Stipulation"), which was approved by an order of this court dated September 19, 2006 (Doc. No. 10606), by which such Objecting Insurers narrowed the scope of their objections related to confirmation of the Plan, in relevant part, to the following legal issue: "Whether, under the Bankruptcy Code as a matter of law, the Assignment is valid and enforceable against the Insurers notwithstanding anti-assignment provisions in or incorporated in the Policies and applicable state law."Doc. No. 10606 at Exh. A, Insurance Stipulation at § 3(a)(i). The Insurance Stipulation further provided that the parties thereto would "request that the Bankruptcy Court determine such objections under the Bankruptcy Code as a matter of law" and "[e]ach Party retains all appellate rights with respect to any adjudication by the Bankruptcy Court or any higher court of the issues identified in Section 3(a) above, and may appeal any such adjudications."*Id.* at § 4(a), (f). Certain Underwriters at Lloyds, London and Certain London Market Companies (collectively "LMI") and Plan Proponents entered into a stipulation on July 10, 2007 (Doc. No. 13062, Exh. 1, the "LMI Insurance Stipulation"), in which they agreed that the only issue to be contested in the Plan confirmation between LMI and the Plan Proponents was "whether under the Bankruptcy Code, as a matter of law, the assignment of any Asbestos Insurance Policies subscribed by LMI, is valid and enforceable against LMI notwithstanding (i) anti-assignment/consent to assignment provisions in or incorporated in the Asbestos Insurance Policies subscribed by LMI and (ii) applicable state law."LMI Insurance Stipulation, ¶ 2 at 1.

FN3. The Plan Proponents are as follows: Debtors, the Official Committee of Unsecured Creditors, the Official Committee of Asbestos Claimants, the Legal Representatives for Future Asbestos Claims, the Official Committee of Equity Security Holders, and JPMorgan Chase Bank, N.A., as Administrative Agent under the Bank Credit Agreement.

FN4. The "Objecting Insurers" are: Ace Property & Casualty Insurance Company; Century Indemnity Company, as successor to CCI Insurance Company (successor to Insurance Company of North America) and CIGNA Specialty Insurance Company f/k/a California Union Insurance Company; Central National Insurance Company of Omaha (for certain policies issue through Cravens Dargan & Company, Pacific Coast, as Managing General Agent); Pacific Employers Insurance Company; Insurance Company of North America; St. Paul Mercury Insurance Company and United States Fire Insurance Company (collectively, "ACE"); AIG Casualty Company; AIU Insurance Company; American Home Assurance Company; Granite State Insurance Company; Insurance Company of the State of Pennsylvania; Lexington Insurance Company; National Union Fire Insurance Company of Pittsburgh, Pa; New Hampshire Insurance Company (collectively, "AIG Member Companies"); Allianz Global Corporate & Specialty AG (as successor-by-partial-merger to Allianz Versicherungs AG as to Policy No. H 0 001 456); Allianz Global Risks U.S. Insurance Company (f/k/a Allianz Underwriters, Inc.) (Collectively, "Allianz"); Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company, Both In Its Individual Capacity and As Successor To Certain Interests Of Harbor Insurance Company (collectively, "CNA Entities"); Fireman's Fund Insurance Company and National Surety Company (collectively, "Fireman's Fund"); Globe Indemnity Company ("Globe"); Hartford Accident and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

Indemnity Company, First State Insurance Company, and New England Insurance Company (collectively, "Hartford"); Certain Underwriters at Lloyds, London and Certain London Market Companies (collectively, "London"); OneBeacon America Insurance Company ("OneBeacon"); Royal Indemnity Company ("Royal"); Seaton Insurance Company ("Seaton"); Stonewall Insurance Company ("Stonewall"); TIG Insurance Company (solely as successor to International Insurance Company) ("TIG"); The Travelers Indemnity Company and certain affiliates and Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company (collectively, "Travelers"); Employers Insurance Company of Wausau ("Wausau").

FN5. Order of October 11, 2007, Approving Stipulation By and Among (I) Plan Proponents, (II) Cooper Parties, (III) PCT/Pneumo Parties, (IV) PepsiAmericas, Inc., and (V) Stipulating Pneumo Abex Insurers and Clarifying Effect of Plan B Settlement Agreement and Withdrawal of Objections Thereto, Doc. No. 582593568; Order of November 8, 2007, Authorizing and Approving Settlement with Stonewall Insurance Company, Doc. No. 13662; Order of November 8, 2007, Authorizing and Approving Settlement with Seaton Insurance Company, Doc. No. 13663; Order of November 8, 2007, Authorizing and Approving Settlement with OneBeacon American Insurance Company, Doc. No. 13664; Order of November 8, 2007, Authorizing and Approving Settlement with TIG Insurance Company, Doc. No. 13665; Order of November 8, 2007, Authorizing and Approving Settlement with ACE USA Companies, Doc. No. 13666; Order of November 8, 2007, Granting Motion For An Order Approving Proposed Settlement Agreement By, Between and Among Federal-Mogul Corporation, Federal-Mogul Products Inc., Cooper Industries, LLC, Magnetek, Inc., and Travelers, Doc. No. 13667; Order of November 8, 2007, Approving Stipulation By and Among the Debtors, the Official Committee of Asbestos Claimants, the Legal Representative for

Future Asbestos Claimants, and the CNA Entities, Doc. No. 13668; Order of November 8, 2007, (I) Approving Compromise and Settlement with Certain Insurers Pursuant to Asbestos Bodily Injury Coverage in Place Agreement and Related Commutation Agreement, (II) Authorizing Sale of Estate Property Free and Clear of Liens and Other Interests, And (III) Partially Allowing Travelers Claim No. 10163 as Class 1E Claim, Doc. No. 13669.

FN6. Doc. No. 13499.

FN7. Doc. No. 13499, Exhibit A.

FN8. Doc. No. 582593612.

FN9. Doc. No. 13499.

FN10. Doc. Nos. 13670 and 13671.

FN11. Doc. No. 13674.

FN12. Doc. No. 13360. ("This is the Plan as filed on June 5, 2007, at Doc. Nos. 1260, 12621 and 12622 updated to incorporate the Plan Modifications filed on July 31, 2007 (Doc. No. 582593567), September 26, 2007 (Doc. No. 13374), September 27, 2007 (Doc. No. 13391), October 30, 2007 (Doc. No. 13614), and November 5, 2007 (Doc. No. 13649)").

FN13. The U.S. Debtors (collectively, the "U.S. Debtors") are Carter Automotive Company, Inc., Federal-Mogul Corporation, Federal-Mogul Dutch Holdings Inc., Federal-Mogul FX, Inc., Federal-Mogul Global Inc., Federal-Mogul Global Properties, Inc., Federal-Mogul Ignition Company, Federal-Mogul Machine Tool, Inc., Federal-Mogul Mystic, Inc., Federal-Mogul Piston Rings, Inc., Federal-Mogul Powertrain, Inc., Federal-Mogul Products, Inc., Federal-Mogul Puerto Rico, Inc., Federal-Mogul U.K. Holdings, Inc., Federal-Mogul Venture Corporation, Federal-Mogul World Wide, Inc., Felt Products Manufacturing Co., FM International LLC,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

Ferodo America, Inc., Gasket Holdings Inc., J.W.J. Holdings, Inc., McCord Sealing, Inc., and T & N Industries Inc.

Those Debtors that are incorporated under the laws of England and Wales or Scotland and are subjects of the Plan (collectively, the "U.K. Debtors") are AE Piston Products Limited, Aeroplane & Motor Aluminum Castings Limited, Ashburton Road Services Limited, Brake Linings Limited, Duron Limited, Edmunds, Walker & Co. Limited, Federal-Mogul Aftermarket U.K. Limited, Federal-Mogul Bradford Limited, Federal-Mogul Bridgewater Limited, Federal-Mogul Camshaft Castings Limited, Federal-Mogul Camshafts Limited, Federal-Mogul Engineering Limited, Federal-Mogul Eurofriction Limited, Federal-Mogul Friction Products Limited, Federal-Mogul Global Growth Limited, Federal-Mogul Ignition (U.K.) Limited, Federal-Mogul Powertrain Systems International Limited, Federal-Mogul Sealing Systems (Cardiff) Limited, Federal-Mogul Sealing Systems (Rochdale) Limited, Federal-Mogul Sealing Systems (Slough) Limited, Federal-Mogul Sealing Systems Limited, Federal-Mogul Shoreham Limited, Federal Mogul Sintered Products Limited, Federal-Mogul Systems Protection Group Limited, Federal-Mogul Technology Limited, Ferodo Caernarfon Limited, Ferodo Limited, Fleetside Investments Limited, F-M U.K. Holding Limited, Friction Materials Limited, Greet Limited, Halls Gaskets Limited, Hepworth & Grandage Limited, J.W. Roberts Limited, Lanoth Limited, Newalls Insulation Company Limited, TAF International Limited, T & N Holdings Limited, T & N International Limited, T & N Investments Limited, T & N Limited, T & N Materials Research Limited, T & N Piston Products Group Limited, T & N Properties Limited, T & N Shelf Eighteen Limited, T & N Shelf Nineteen Limited, T & N Shelf One Limited, T & N Shelf Seven Limited, T & N Shelf Three Limited, T & N Shelf Twenty Limited, T & N Shelf Twenty-

One Limited, T & N Shelf Twenty-Six Limited, TBA Belting Limited, TBA Industrial Products Limited, Telford Technology Supplies Limited, The Washington Chemical Company Limited, Turner & Newall Limited, Turner Brothers Asbestos Company Limited, and Wellworthy Limited. Certain additional U.K. affiliates of the U.S. Debtors and U.K. Debtors have commenced chapter 11 cases but are not subjects of the Plan.

FN14. Doc. No. 13672.

FN15. Doc. No. 13698. The Affirmance Order was signed on November 13, 2007, entered on the Bankruptcy Court docket on November 14, 2007, and entered on the District Court docket on November 16, 2007 (Case No. 07-00198(JHR), D.I. 3). The plan became effective on December 27, 2007. *See* Notice of (A) Entry of Order Confirming Fourth Amended Joint Plan of Reorganization for Debtors and Debtors-In-Possession (As Modified); (B) Effective Date of the Plan; (C) Substantial Consumption of the Plan; And (D) Bar Dates for Certain Administrative Claims and Professional Claims, Doc. No. 13940.

FN16. Doc. No. 13671.

FN17. Doc. No. 13670.

FN18. The Objecting Insurers' objections regarding the Assignment and Preemption Issue were articulated in the briefs appended under Tabs 9a and 9b to the Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, and in prior submissions referred to therein. The Plan Proponents' responses to these objections were set forth in the Post-Trial Brief, Doc. No. 582593566, and Reply Brief of Plan Supporters in Support of Confirmation of Fourth Amended Joint Plan of Reorganization (As Modified), Doc. No. 13249, and in prior submissions referred to therein. Argument was held as part of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))

Confirmation Hearing.

FN19. The Order and Stipulation Regarding Remaining London Market Objections to the Plan, Doc. No. 13670, at 4, states: "... section 7.1 of the Plan sets forth the conditions to confirmation of the Plan, and there is no condition to confirmation stated in the Plan that the Bankruptcy Court or the District Court must approve the assignment of Insurance Rights or determine that the Bankruptcy Code, as a matter of law, preempts state law and contractual provisions prohibiting assignment absent the consent of the insurers. Hence, Plan confirmation does not depend on the entry of an Order determining the Preemption Issues (the 'Preemption Order') in favor of the Plan Proponents. Thus, regardless of who prevails on the Preemption Issues, the Plan may be confirmed. Hence, the Bankruptcy Court's consideration of the Preemption Issues is a separate determination from the Court's consideration of whether to confirm the Plan."

FN20.*See* Insurance Neutrality Provision, Section 10.4 of Plan, Doc. No. 13660.

FN21. The Court of Appeals for the Third Circuit's conclusion is consistent with those reached by the majority of other courts of appeals. *See e.g., Homsy v. Floyd (In re Vitek, Inc.),* 51 F.3d 530, 535 (5th Cir.1995)(insurance policies covering debtors' liability vis-a-vis third parties are estate property, as are the proceeds of those policies); *Health Ctr. v. Insurance. Co. of N. Am. (In re St. Clare's Hosp. & Health Ctr.),* 934 F.2d 15, 18 (2d Cir.1991)("the debtors' [sic] rights under its insurance policies are property of a debtor's estate under § 541(a)"); *In re Titan Energy, Inc.,* 837 F.2d 325, 329 (8th Cir.1988)(products liability policies in a debtor's name are estate property under § 541); *Tringali v. Hathaway Mach. Co.,* 796 F.2d 553, 560 (1st Cir.1986)(products liability policies are estate property).

FN22.*See* Plan Section 10.4 Insurance

Neutrality, Doc. No. 13660, at 152-55.

"10.4.1. The provisions of this Section 10.4.1 shall apply to all Entities (including, without limitation, all Asbestos Insurance Companies); provided, however, that with respect to Certain Underwriters at Lloyd's, London and Certain London Market Companies (collectively, "London Market Insurers and any Asbestos Insurance Policies subscribed by London Market Insurers (or any Asbestos Insurance Settlement Agreements applicable to such Asbestos Insurance Policies), the provisions of this Section 10.4.1 shall not be applicable, and the provisions of Section 10.4.2 shall be applicable.

10.4.1.1. Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan shall limit the right of any Asbestos Insurance Company to assert any Asbestos Insurer Coverage Defense.

10.4.1.2. The Plan, the Plan Documents, the Confirmation Order, and the Bankruptcy Insurance Stipulation shall be binding on the Debtors, the Reorganized Debtors, the Trust and the beneficiaries of the Trust. The obligations, if any, of the Trust to pay holders of Asbestos Personal Injury Claims and Demands shall be determined pursuant to the Plan and the Plan Documents. None of (I) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (II) the Confirmation Order or any findings and conclusions entered with respect to Confirmation, nor (III) any estimation or valuation of Asbestos Personal Injury Claims, either individually or in the aggregate (including, without limitation, any agreement as to the valuation of Asbestos Personal Injury Claims) in the Reorganization Cases shall, with respect to any Asbestos Insurance Company, constitute a trial or hearing on the merits or an adjudication or judgment;

or accelerate the obligations, if any, of any Asbestos Insurance Company under its Asbestos Insurance Policies; or be used as evidence in any form to prove:

(i) that any of the Debtors, the Trust, or any Asbestos Insurance Company is liable for, or otherwise obligated to pay with respect to, any individual Asbestos Personal Injury Claim or Demand;

(ii) that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are reasonable;

(iii) that the procedures established by the Plan, including the Asbestos Personal Injury Trust Distribution Procedures, for evaluating and paying Asbestos Personal Injury Claims and Demands are consistent with any procedures that were used to evaluate or settle Asbestos Personal Injury Claims against the Debtors before the Petition Date;

(iv) that the settlement of, or the value assigned to, any individual Asbestos Personal Injury Claim pursuant to the Asbestos Personal Injury Trust Distribution Procedures was reasonable and/or otherwise appropriate;

(v) that any of the Asbestos Insurance Companies participated in and/or consented to the negotiation of the Plan or any of the Plan Documents;

(vi) that any of the Debtors or the Trust has suffered an insured loss with respect to any Asbestos Personal Injury Claim or Demand; or

(vii) as to (A) the liability of the Debtors or the Trust for Asbestos Personal Injury Claims or Demands, whether such Claims or Demands are considered individually or on an aggregate basis; or (B) the value of

such Asbestos Personal Injury Claims or Demands, individually or in the aggregate.

**10.4.1.3.** Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

**10.4.1.4.** Nothing in this Section 10.4 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Asbestos Insurance Company with respect to any issue that is actually litigated by such Asbestos Insurance Company as part of its objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by such Asbestos Insurance Company in conjunction with or related to Confirmation of the Plan. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

**10.4.1.5.** Nothing in the Plan, the Plan Documents, the Confirmation Order, or any finding of fact and/or conclusion of law with respect to the Confirmation or consummation of the Plan shall limit the right, if any, of (i) any Asbestos Insurance Company, in any Asbestos Insurance Action, to assert any Asbestos Insurer Coverage Defense, including by presenting evidence and/or argument with respect to any of the matters specified in clauses (i) through (vii) of Section 10.4.1.2 of the Plan or (ii) any other party in any such Asbestos Insurance Action to assert any appropriate position. Except as provided in Section 10.4.1.4 above, none of the matters specified in clauses (i) through (vii) of Section 10.4.1.2 of the Plan shall have any res judicata or collateral estoppel effect against any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Asbestos Insurance Company.

**10.4.2. Insurance Neutrality Provisions Applicable Solely to London Market Insurers.** This Section 10.4.2 shall apply solely with respect to London Market Insurers and any Asbestos Insurance Policies subscribed by London Market Insurers (or Asbestos Insurance Settlement Agreements relating to such Asbestos Insurance Policies).

**10.4.2.1.** Except as provided in Section 10.4.2.2, notwithstanding anything to the contrary in the Confirmation Order, the Plan or any of the Plan Documents, nothing in the Confirmation Order, the Plan or any of the Plan Documents (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing London Market Insurers' legal, equitable or contractual rights, if any, in any respect. The rights of London Market Insurers shall be determined under the Asbestos Insurance Policies or Asbestos Insurance Settlement Agreements.

**10.4.2.2.** Nothing in the Plan or the Plan Documents shall affect or limit, or be construed as affecting or limiting, the protection afforded to any Settling Asbestos Insurance Company by the Supplemental Injunction, the Third Party Injunction, and/or the Asbestos Insurance Entity Injunction.

**10.4.2.3.** Nothing in this Section 10.4.2 is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against London Market Insurers with respect to any issue that is actually litigated by London Market Insurers as part of their objections, if any, to Confirmation of the Plan or as part of any contested matter or adversary proceeding filed by London Market Insurers in conjunction with or related to Confirmation of the Plan. Plan objections

that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated. The Plan Proponents and London Market Insurers have agreed in a stipulation separate from this Plan (the "London Market Insurers Stipulation" that the only issue London Market Insurers will litigate in connection with Confirmation of the Plan is whether, under the Bankruptcy Code as a matter of law, the assignment of any Asbestos Insurance Policies or other rights and obligations with respect to, arising under, or related to Asbestos Insurance Policies subscribed by London Market Insurers, is valid and enforceable against London Market Insurers notwithstanding (i) anti-assignment provisions in or incorporated in the Asbestos Insurance Policies subscribed by London Market Insurers and (ii) applicable state law."

FN23. Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, at Tab 9b-5.

FN24. Objections of Certain Underwriters at Lloyd's, London and Certain London Market Companies to Fourth Amended Joint Plan of Reorganization, Doc. No. 12576, at 16. *See also* Joint Submission of Plan Objectors' Post-Trial Briefs In Opposition To Confirmation Of Fourth Amended Joint Plan Of Reorganization, Doc. No. 13182, at Tab 9b-8.

FN25. *See also Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)("As a result, any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of congressional purpose'.... Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it").

FN26. *Connecticut Nat'l Bank v. Germain,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

FN27. We note that the language of each of § 363(*l*), § 1142(a) and § 1123(a)(5) varies. Section 363(*l*) speaks to "insolvency or financial condition." Section 1142(a) speaks only of "financial condition." Section 1123(a)(5) mentions neither insolvency nor financial condition. Inasmuch as the provisions address different time periods in the life cycle of a bankruptcy (§ 363(*l*) in Chapter 3 Subchapter IV Administrative Powers; § 1123(a) in Chapter 11, Subchapter II-The Plan; § 1142(a) in Chapter 11, Subchapter III-Post Confirmation Matters), we think it likely that Congress intended this difference in statutory language. Mindful of *Lamie v. United States Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms' ") (citations omitted), we will rely upon § 1123(a)(5)-a clearly written provision-as written without the need to incorporate words from other sections that Congress chose not to use in this one. We further note that § 363(*l*) parrots § 541(c)(1)(B), which nullifies most restrictions on the debtor's interests in property by, *inter alia,* agreement or applicable non-bankruptcy law conditioned upon the insolvency or financial condition of the debtor. Congress, therefore, made use of different words in different statutory sections. A fundamental premise of statutory construction is that when Congress uses particular language in one section of a statute but omits it in another, its actions are purposeful and intentional. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *Russello v. U.S.,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

FN28. Plan Objectors' Post Trial Brief, Doc. No. 13182, Tab 9a, at 5; *see also* Plan Objectors' Post Trial Brief, Doc. No. 13182, Tab 9b, at 10 (arguing that the Plan Supporters' proposed interpretation of § 1123(a)(5)(B) could be used "to amend a corporation's charter, contrary to state law, to provide that its purpose is to engage in the sale of illegal narcotics"). This argument ignores the premise that § 1123(a)(5)(B) will not be used to permit an entity to engage in a criminal enterprise. *Cf.* § 1129(a)(3)(plan shall be confirmed only if, *inter alia,* it has been proposed "in good faith and not by any means forbidden by law.")

FN29. Section 524(g)(2)(B) provides in relevant part: "The requirements of this subparagraph are that-

(i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization-

(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends; ...

(IV) is to use its assets or income to pay claims and demands ...".

11 U.S.C. § 524(g)(2)(B).

FN30. Section 524(g)(2)(B)(i)(IV) requires the debtor to "use its assets or income to pay claims and demands."

FN31. The court notes that the Supreme Court has ruled in another context that Congress has "reshaped debtor and creditor rights in marked departure from state

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201
**(Cite as: --- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.))**

law." <u>*Associates Commercial Corp. v. Rash,* 520 U.S. 953, 964, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).</u>

<u>FN32.</u> Debtors have acknowledged their remaining ministerial obligations under the policies and have agreed to perform them. If they fail, all coverage defenses are preserved pursuant to the insurance neutrality provisions described, *infra.*

Bkrtcy.D.Del.,2008.
In re Federal-Mogul Global Inc.
--- B.R. ----, 2008 WL 783747 (Bkrtcy.D.Del.), 49 Bankr.Ct.Dec. 201

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.