IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC., et al., | ) | Bankruptcy Case No. 01-706 |
| | ) | Adv. No. 03-50003(MFW) |
| Debtors. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Appellant, | ) | Civil Action No. 08-100(JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Appellee. | ) | |

**APPENDIX TO EBC I, INC.'S OPENING BRIEF
IN SUPPORT OF ITS APPEAL**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street, 18th Floor
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Appellant*
  *EBC I, Inc., f/k/a eToys, Inc.*

June 3, 2008

**INDEX**

| PAGE NOS. | DOCKET NO. | DESCRIPTION OF PLEADING/EVIDENCE |
|---|---|---|
| A1 – A29 | Adv. D.I. 111 | Findings of Fact and Conclusions of Law, filed 1/10/08 |
| A30 – A66 | Adv. D.I. 112 | Opinion Granting judgment in favor of America Online, Inc., filed 1/10/08 |
| A67 | Adv. D.I. 113 | Order Granting judgment in favor of America Online, Inc., filed 1/10/08 |
| A68 – A70 | Adv. D.I. 115 | Notice of Appeal, filed 1/22/08 |
| A71 – A105 | Adv. D.I. 117 | Statement of Issues and Designation of Items to be Included in Record on Appeal by Appellant |
| A106 – A144 | PX 1 | Interactive Marketing Agreement |
| A145 – A152 | PX 3 | Amended Agreement |
| A153 – A154 | PX 8 | 04-26-04 Letter to Richard D. Allen, Esq., from Gregory S. Chernack, Esq. |
| A155 – A170 | PX 10 | Responses and Objections of Defendant America Online, Inc. to Plaintiff's Second Set of Interrogatories Directed to Defendant |
| A171 | PX 15 | 02-28-01 Letter to Stephen E. Paul from Brian Dengler |
| A172 – A174 | | Excerpts of Deposition Transcript of Mirza Baig |
| A175 – A176 | | Excerpts of Deposition Transcript of Sue Burger |
| A177 – A178 | | Excerpts of Transcript of Hearing Before Honorable Mary F. Walrath, United States Bankruptcy Court Chief Judge |

2345542

CERTIFICATE OF SERVICE

I, Thomas W. Briggs, Jr., hereby certify that on June 3, 2008, I caused the foregoing Appendix to EBC I, Inc.'s Opening Brief in Support of Its Appeal to be electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following:

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE 19899

I further certify that copies were caused to be served on June 3, 2008 upon the following individuals in the manner indicated:

**BY HAND DELIVERY**

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE 19899

**BY U.S. FIRST-CLASS MAIL**

> Craig T. Goldblatt, Esquire
> Wilmer Cutler Pickering Hale and Dorr LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, D.C. 20006

*/s/ Thomas W. Briggs, Jr.*
_____
Thomas W. Briggs, Jr. (#4076)
*tbriggs@mnat.com*

2345542

# APPENDIX – PART 1 OF 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| EBC I, INC., f/k/a ETOYS, | ) Case No. 01-00706(MFW) |
| INC., | ) |
| | ) |
| Reorganized Debtor. | ) |
| | ) |
| ——————————————— | ) |
| | ) |
| EBC I, INC., f/k/a ETOYS, | ) |
| INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary No. 03-50003 |
| v. | ) |
| | ) |
| AMERICA ONLINE, INC., | ) |
| | ) |
| Defendant. | ) |
| ——————————————— | |

FINDINGS OF FACT
AND CONCLUSIONS OF LAW[1]

I.    FINDINGS OF FACT

A.    Parties and Background

1.    From October 1997 through December 2000 eToys, Inc.
("eToys") was the leading online retailer focused on toys and
children's products.  (Ex. D-1 at 1)[2]

2.    At all relevant times America Online, Inc. ("AOL") operated
as an internet service provider.  AOL provided its subscribers

---

[1]    These, together with the accompanying Opinion, constitute
the findings of fact and conclusions of law of the Court pursuant
to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2]    Citations to the Plaintiff's and Defendant's Exhibits are
to "Ex. P- at [page]" and "Ex. D- at [page]," respectively.
Citations to the transcript of the hearing held on June 26, 2007,
are to "Tr. [page:line]" and to depositions are to "Dep. [name]
[page:line]."  Citations to the Pretrial Stipulation and Order
are to "PT Stip. [page]."  Citations to pleadings are to the
docket as "D.I. [#]."

DATE FILED ⎍⎍⎍⎍⎍⎍

DOCKET NO. �__111__

**A 1**

("AOL Members") with access to the internet at large and to news, entertainment, sports, and online shopping services provided through third party retailers.  (Tr. 22:17-23:24)

3.  In the late 1990s AOL had approximately 20 million AOL Members each of whom paid a subscription fee of approximately $20 per month.  (Tr. 23:17-25:2)

4.  In the shopping area of the AOL site, people could locate products, compare them to others, and buy them directly from AOL's shopping partners.  (Tr. 23:10-23:16)

5.  Third party retailers paid AOL for the opportunity to provide shopping services to AOL Members.  (Tr. 23:25-24:5)

6.  Shopping partners purchased advertisements ("impressions") showing the retailers' logo or promotion ad in AOL's online shopping mall and other areas that AOL Members were expected to browse.  (Tr. 26:24-27:22)

7.  AOL did not have direct control over how many impressions would result from its contracts with marketing partners, because it depended on how many AOL Members visited a particular site over a particular period.  (Tr. 30:4-30:12)

8.  For shopping partners, the goal of an impression was to generate a "click through," whereby the AOL Member would visit the retailer's own website to shop and hopefully purchase products.  (Tr. 28:3-28:11)

9.  As of the late 1990s, approximately 80% of AOL's revenues resulted from subscriber fees paid by AOL Members and approximately 20% resulted from payments by third parties, including shopping partners.  (Tr. 24:8-24:13)

B.  1997 Interactive Marketing Services Agreement

10.  On October 1, 1997, the day that eToys launched its website, eToys and AOL entered into their first Interactive Marketing Services Agreement which was to last through December 31, 1999. (PT Stip. at 2; Ex. D-1 at 1; Ex. D-2 at AOL 00491)

11.  At the time of the 1997 Agreement, eToys was the only online toy retailer to provide a comprehensive selection of nationally advertised and specialty toy brands, and eToys' prices were as low as, or lower than, those of land-based toy retailers.  (Ex. D-1 at 1; Tr. 35:1-35:18)

2

**A 2**

12.   AOL provided a demographic profile that was particularly compatible with eToys' target customer profile.   (Dep. [Schoch] 65:9-65:18; Dep. [Lenk] 43:11-43:22)

13.   Under the 1997 Agreement, AOL was to provide eToys with approximately 17 million impressions plus a presence on the AOL Shopping Channel and Service Shopping Channel Toys Department. (Ex. D-2 at AOL 00488, 00492)

14.   If AOL failed to provide the required number of impressions in a year, AOL was required to "make good" by providing the impressions missed within four months.   (Ex. D-2 at AOL 00488-89)

15.   In the event that AOL failed to deliver more than 20% of the promised impressions, AOL would provide 1.5 times the missed impressions; if AOL failed to deliver more than 30% of the promised impressions, eToys had the right to terminate the 1997 Agreement.   (Ex. D-2 at AOL 00488-89)

     C.   <u>1999 Interactive Marketing Services Agreement</u>

16.   Before the end of the 1997 Agreement, eToys and AOL met to review the results achieved to date.   (Ex. D-4 at AOL 00374)

17.   eToys was eager to pursue additional promotional opportunities both online and offline and to increase its offers to AOL Members.   (Ex. D-4 at AOL 00374)

18.   eToys was interested in doing a large deal with AOL because it wanted to promote its brand and online store to become the dominant children's brand and compete effectively with established land-based toy retailers.   (Tr. 37:8-39:24; Ex. D-12 at AOL 00454)

19.   On August 10, 1999, eToys and AOL executed a new three-year Interactive Marketing Services Agreement (the "1999 Agreement"), whereby AOL made eToys' shopping services available to AOL Members and provided various forms of promotions for eToys in exchange for $18 million, payable in $1.5 million quarterly installments.   (PT Stip. at 2; Ex. P-1)

20.   eToys expressly agreed that its payments under the 1999 Agreement were "non-refundable."   (Ex. P-1 at AOL 00204; Dep. [Brine] 84:12-84:18)

21.   AOL had the right to terminate the 1999 Agreement if eToys became insolvent or ceased operations, which AOL felt was important to protect its Members and AOL's brand.   (Ex. P-1 at AOL 00207; Dep. [Burger] 21:3-25:6)

**A 3**

22. The price paid by eToys under the 1999 Agreement was calculated by the sum of some (but not all) of the impressions to be delivered by AOL multiplied by a particular cost per thousand (CPM) reflected on AOL's rate card. (Dep. [Burger] 40:1-41:6; Tr. 80:4-80:11)

23. AOL's rate card represented an initial offer or starting point that AOL would use in negotiating an agreement with a retail partner like eToys. (Dep. [Brine] 114:2-114:18; Tr. 33:6-33:9; Dep. [Burger] 57:2-57:7)

24. Because eToys was negotiating a major agreement with AOL, the price reached was substantially below the rate card prices (averaging approximately 69% less). (Dep. [Baig] 92:4-92:15)

25. Based on the agreed prices, the 1999 Agreement provided that roughly $3.5 million in certain impressions would be provided by AOL in the first year, $5.8 million in the second year, and $8.7 million in the third year. (Ex. P-21 at AOL 00704; Dep. [Baig] 88:1-90:4)

26. Under the 1999 Agreement AOL agreed to provide in excess of 1 billion impressions with eToys' logo or ad. In the event impressions were not provided, AOL agreed to provide make good impressions at a rate of 1.5 times the missed impressions. (Ex. P-1 at AOL 00197-98, 00211-12, 00216-17; Dep. [Burger] 58:17-58:20; Dep. [Valle] 38:5-38:13)

27. Although their value was not explicitly included in the price, eToys sought and received AOL's commitment to provide Welcome Screen impressions (impressions appearing on the AOL homepage) which eToys felt were valuable. (Tr. 86:5-86:18; Dep. [Lenk] 118:6-119:23; Dep. [Valle] 83:20-84:14; Dep. [Brine] 22:4-22:18, 23:8-23:25, 24:1-24:23, 27:23-29:9; Dep. [Burger] 98:20-100:12; Dep. [Iannuccilli] 35:1-35:7, 65:1-65:7, 68:24-69:14; Ex. D-5 at AOL 01748; Ex. D-18 at AOL 01568)

28. In later years AOL charged other parties for the type of Welcome Screen impressions that it gave eToys under the 1999 Agreement and Amendment. (Tr. 86:16-86:18; Dep. [Burger] 99:6-100:4; Dep. [Baig] 77:6-77:11, 77:15-78:10)

29. Under the Agreement, AOL also allowed eToys to use AOL's brand and made eToys a premier retailer with exclusivity on some AOL sites. (Dep. [Baig] 86:16-87:2, 92:16-94:4, 137:1-137:11, 148:9-148:20, 149:6-149:12, 152:6-152:10)

4

**A 4**

30.  Specifically, under Exhibit G of the 1999 Agreement, eToys received a license to market, distribute, display, transmit, promote, and use certain trade names, trademarks, and service marks of AOL, which it did use in its television advertising. (Ex. P-1 at AOL 00226; Tr. 53:11-54:4)

31.  Under the 1999 Agreement, eToys was an "Anchor Tenant" in various AOL online shopping areas, including toys, educational toys, kid and infant gear, and electronic games.  (Ex. P-1 at AOL 00200; Ex. D-82 at TR 001976; Dep. [Brine] 34:12-34:17)

32.  The 1999 Agreement also gave eToys exclusivity in some areas which meant that AOL would not put a competitor's placements in those areas.  (Ex. P-1 at AOL 00199-200; Tr. 33:23-34:4; Dep. [Lenk] 88:9-89:9; Dep. [Burger] 116:18-117:6)

33.  eToys valued the preclusive effect that the 1999 Agreement had on potential agreements between its competitors and AOL. (Dep. [Lenk] 69:4-69:21)

34.  Section 1.5 of the 1999 Agreement provided that impressions delivered under the Agreement would link only to the eToys website and were limited to the categories of products listed on Exhibit D.  (Ex. P-1 at AOL 00199, 00219)

35.  Section 2.1 of the 1999 Agreement required that at least 50% of the net sales of the products on eToys' website be derived from the sale of children's toys, hobbies, arts and crafts, video games, and software.  (Ex. P-1 at AOL 00200; Tr. 49:22-50:6)

36.  The 1999 Agreement permitted eToys to collect and use information from AOL Members (which it did), but required that eToys comply with applicable privacy and disclosure requirements to protect the privacy of AOL Members, including their names, addresses, and purchases.  (Ex. P-1 at AOL 00221, 00228; Tr. 52:10-54:18)

37.  The Operating Standards in Exhibit E required that eToys' website rank among the top three interactive websites in the toy industry in the categories of competitive pricing, scope and selection of products, customer service and fulfillment, and ease of use.  (Ex. P-1 at AOL 00221; Tr. 50:22-51:10)

38.  If eToys failed to comply with the Operating Standards, section 2.7 of the 1999 Agreement allowed AOL to decrease or suspend the impressions it provided to eToys until such non-compliance was corrected.  (Ex. P-1 at AOL 00203, Tr. 51:11-51:16)

**A 5**

39.  Exhibit F of the 1999 Agreement required that eToys conform to AOL's Kids and Teens Policy, which was designed to protect children and teenagers from being misled by what they saw on AOL or the internet.  (Tr. 53:1-53:10; Ex. P-1 at AOL 00225)

40.  The parties agreed that, in the press release announcing the 1999 Agreement, eToys would be referred to as the premier retailer of children's products such as toys, children's videos, and children's books.  This was intended by eToys to generate increased brand recognition, which it valued.  (Tr. 88:1-88:10; Ex. D-17 at AOL 00844)

41.  The potential effect of the 1999 Agreement on the investor community was important to eToys.  (Tr. 87:9-87:12; Dep. [Iannuccilli] 99:19-99:24; Dep. [Schoch] 72:14-72:21; Dep. [Lenk] 51:4-51:15, 56:11-56:24, 69:4-69:21)

42.  Investors viewed eToys' association with AOL favorably. (Dep. [Schoch] 40:9-40:11, 71:16-72:23; Dep. [Lenk] 113:6-113:13)

43.  In the ten days following the execution of the 1999 Agreement, the price of eToys' common stock rose from $31.25 to $45.625, representing an increase in its market capitalization of $1.564 billion.  (Ex. D-80 at TR 001965)

D.    Performance of the 1999 Agreement

44.  Almost immediately after signing the 1999 Agreement, eToys expressed dissatisfaction with the results eToys was realizing from the Agreement.  (Ex. D-26 at AOL 00397)

45.  During the 1999 holiday season, shortly after the Agreement was signed, AOL began to deliver far fewer impressions than it was obligated to deliver.   This was acknowledged by AOL in an internal e-mail dated December 16, 1999, which reported that: "We are VERY low on our impression delivery."  (Ex. P-22)

46.  The total shortfall in delivery of impressions during the 1999 holiday season was about 34 million.  (Ex. P-6 at AOL 00155; Ex. P-18 at AOL 00722)

47.  AOL tried to work with eToys to compensate for the under-delivery of impressions, including delivering more welcome screen impressions.  (Dep. [Baig] 55:2-56:2, 70:20-71:12; Dep. [Burger] 78:24-79:9, 79:21-81:9, 104:16-105:2, 105:13-106:11; Dep. [Valle] 85:8-85:17; Dep. [Iannuccilli] 34:12-34:19)

**A 6**

48. The under-delivery of impressions was, in part, the result of fewer AOL Members browsing the internet and seeing the areas where eToys' ads were placed. (Dep. [Valle] 43:10-43:17)

49. eToys also complained that AOL's redesign of its website caused eToys to lose business because it increased the options for AOL Members, thereby reducing the number of viewers of the eToys' impressions. (Dep. [Baig] 116:14-116:22; Dep. [Lenk] 135:1-136:3; Dep.[Valle] 91:24-92:10)

50. Because of AOL's inability to deliver impressions at the rate specified in the 1999 Agreement, eToys asked to restructure the Agreement beginning in February 2000. (Ex. D-28 at AOL 00762; Dep. [Baig] 51:5-51:8)

51. By late spring of 2000, AOL was aware that it would be unable to provide eToys with the impressions (including "make good" impressions) it was obligated to deliver in the first year of the 1999 Agreement and projected that there would be massive delivery shortfalls in the second and third years as well. (Dep. [Burger] 104:16-105:12, 107:3-108:7)

52. Internally, AOL recognized that the actual and projected shortfall in delivery of impressions "was material" and that eToys could assert it had the right to terminate the 1999 Agreement as a result. (Ex. P-23; Dep. [Baig] 66:21-67:17, 107:22-109:19; Dep. [Burger] 140:5-140:19)

53. AOL delayed renegotiation of the 1999 Agreement, however, because it felt it would have greater leverage over eToys closer to the holiday season. (Ex. P-18 at AOL 00725; Dep. [Baig] 62:16-63:8; Dep.[Burger] 82:19-83:8)

54. Renegotiation of the 1999 Agreement began in earnest in August and September 2000. (Ex. D-45 at AOL 00629; Tr. 47:5-47:7)

55. In the course of negotiations about the Amendment, AOL acknowledged that it had under-delivered impressions during the first year of the 1999 Agreement by approximately 54 million. (Dep. [Iannuccilli] 73:14-73:23)

E. November 15, 2000, Amendment

56. On November 15, 2000, eToys and AOL executed the Amendment to the 1999 Agreement. (PT Stip. at 2; Ex. P-3 at AOL 00535)

57. Under the Amendment, eToys paid an additional $750,000 to AOL and AOL agreed to provide impressions for the following two

**A 7**

years without any further payments by eToys.  (Ex. P-3 at AOL 00534, 00537)

58.  After the Amendment, therefore, the total price paid by eToys to AOL for the three-year period was reduced from $18 million to $8.25 million and was fully pre-paid.  (Ex. P-3 at AOL 00534, 00537; Dep. [Lenk] 154:11-155:1; Dep. [Baig] 166:18-166:21)

59.  An internal AOL summary stated that the total dollar figure paid under the Amendment was derived "for years 2 and 3 using current rate cards," which were significantly less than the rate card prices at the time the 1999 Agreement had been negotiated.  (Ex. P-3 at AOL 00534; Ex. P-10; Dep. [Brine] 114:2-115:11; Dep. [Valle] 90:23-91:14; Dep. [Baig] 130:8-131:4, 135:1-135:14)

60.  The Amendment deemed AOL to have satisfied all its obligations with respect to the delivery of impressions in the first year of the Agreement.  (Ex. P-3 at AOL 00534-35; Dep. [Burger] 171:3-171:14)

61.  The Amendment also reduced AOL's obligations to deliver priced impressions in the second and third years and eliminated eToys' exclusivity rights under the 1999 Agreement.  (Ex. P-3 at AOL 00534)

62.  However, under the Amendment, AOL agreed to provide eToys with one billion impressions in all categories, including 889 million Welcome Screen impressions, during the second and third years of the Agreement.  (Ex. P-3 at AOL 00541; Dep. [Iannuccilli] 120:14-120:21)

63.  In the event of a shortfall in AOL's delivery of impressions, AOL again agreed to deliver additional impressions but only at the rate of one times the missed impressions unless there was a shortfall of 50% or more of the combined number of promised impressions, in which case the make good impressions would equal 1.5 times the shortfall.  (Ex. P-3 at AOL 00536-37)

64.  Under the Amendment, AOL waived its right to collect $397,000 due from eToys' wholly owned subsidiary, BabyCenter, Inc.  (Ex. P-3 at 00537; Dep. [Lenk] 155:2-155:9)

65.  All terms of the 1999 Agreement not expressly modified by or in direct conflict with the Amendment remained in effect.  (Ex. P-3 at AOL 00538)

**A 8**

66.  In the negotiations that resulted in the Amendment, the parties did not allocate any value to exclusivity or the Welcome Screen impressions to be delivered. (Tr. 86:16-86:18; Dep. [Burger] 116:18-117:13)

F.    Performance of the 2000 Amendment

67.  AOL produced schedules showing the impressions it delivered (1) from the commencement of the 1999 Agreement through termination, (2) from the Amendment through January 31, 2001, and (3) from February 1 to 26, 2001.  (Ex. P-4; Ex. P-5; Ex. P-6)

68.  However, AOL has said that: "a perfect comparison between the carriage plan contained in schedule A of the [A]mendment and the impressions actually provided is not possible.  Both changes in the nomenclature used by AOL and any changes agreed to by the parties regarding what impressions would actually be delivered make such a side-by-side comparison impossible.  There is thus no 'key' that ties the information in [the] exhibits . . . to schedule A of the [A]mendment."  (Ex. P-8)

69.  Nonetheless, the Exhibits evidence that AOL did not deliver any of the various impressions it committed to provide, including (a) "Pop-up" impressions to be delivered by the end of 2000, (b) Section 2 impressions, such as the "People.com" impressions, (c) the 10.7 million "Winter Holiday-Shopping Package" impressions, (d) the 1.6 million "Santa's Home Page" banners, and (e) the 600,000 "Baby Registries" banners.  (Ex. P-3 at AOL 00539-40; Ex. P-4; Ex. P-5; Ex. P-6)

70.  The Exhibits also demonstrate that AOL delivered only a small percentage of other impressions it was obligated to deliver: (a) 20,524 of the 3 million "Birthday Club" banners, (b) 29,486 of the 3 million "Run Of Parenting Channel" impressions, (c) 1,832,130 of the 7,533,334 "Movies: Gold" impressions, (d) 2,206,962 of the 10,777,778 "Books and Magazines: Gold" impressions, (e) 132,096 of the 490,000 "Kids Wish List" banners, (e) 432,643 of the 1,766,660 "Maternity: Gold" impressions, (f) 2,086,772 of the 9,252,000 "Home Page" impressions, (g) 1,507,342 of the 4,500,000 "Educational Toys: Anchor" impressions, and (h) 6,262,425 of the 15,750,000 "Toys & Games: Anchor" impressions. (Ex. P-3 at AOL 00540; Ex. P-4; Ex. P-5; Ex. P-6)

71.  However, eToys received a substantial number of the Welcome Screen impressions that it had sought in the Agreement and the Amendment: approximately 231 million from August 1999 to August 2000 and 475 million from August 2000 to February 2001.  (Tr. 86:5-86:15; Dep. [Burger] 75:7-75:10, 162:4-162:14; Dep.

9

**A 9**

[Iannuccilli] 65:11-65:14; Ex. P-6 at AOL 00155; Ex. P-4 at AOL 01802)

72.  The Amendment obligated AOL to deliver only 862,400,000 Welcome Screen impressions (not the impressions listed in Exhibit A as referenced in section 1a and the impressions listed in section 1b).  (Ex. P-3 at AOL 00535)

   G.   2000 Holiday Season

73.  Quite surprisingly, the 2000 holiday season was terrible; internet businesses particularly suffered.

74.  It was clear by mid-December 2000, that the 2000 holiday season was a failure and that eToys would miss its projected sales.  (Ex. D-77 at TR 001868; Dep. [Brine] 57:14-57:19; Dep. [Schoch] 54:2-54:16)

75.  On December 15, 2000, eToys revised its projected sales for the quarter downward from $210-$240 million to $120-$130 million. (Ex. D-77 at TR 001868)

76.  eToys' downward adjustment of its projected sales resulted in a downward revision in the estimate of cash the company would have on hand at the end of December from $100-$120 million to $50-$60 million.  (Ex. D-77 at TR 001868)

77.  To advise it on its options, eToys hired Goldman Sachs which quickly determined that financing was not available and began seeking strategic and financial buyers.  (Dep. [Lenk] 63:15-64:4)

78.  eToys and its management talked with numerous prospective buyers, none of whom presented an offer.  (Dep. [Lenk] 64:5-64:25; Dep. [Schoch] 55:24-57:11, 141:21-142:15)

79.  By January 3, 2001, eToys' management recognized that the company would not be able to proceed in its current configuration.  (Dep. [Schoch] 54:17-55:10, 132:10-133:2, 141:21-143:15; Dep. [Bousquette] 22:20-23:2)

80.  On January 4, 2001, eToys issued job elimination notices to approximately 700 of its 1,000 full-time employees.  (Ex. D-78 at TR 001963; Dep. [Brine] 18:5-18:8; Dep. [Schoch] 55:11-55:23)

81.  On January 10, 2001, eToys' unsecured creditors formed an informal committee which entered into a standstill agreement with eToys on January 16, 2001.  (Tr. 132:9-132:14)

82.  By the end of January 2001, eToys' search for a buyer was reaching the desperation stage.  (Dep. [Schoch] 145:5-145:11)

83.  On February 5, 2001, eToys issued job elimination notices to all its remaining employees.  (Tr. 132:15-132:19; Ex. D-78 at 001893)

84.  During the month of February, eToys tried to raise cash by selling large quantities of inventory on its website at discount prices in an informal liquidation.  (Dep. [Schoch] 99:21-100:7, 104:25-105:8; Dep. [Lenk] 169:6-169:15)

85.  During this period, eToys' management knew that paying all its bills would prevent it from continuing as a viable company and started to conserve cash.  (Dep. [Schoch] 50:7-52:16, 99:21-100:9; Dep. [Lenk] 165:14-165:19)

86.  While eToys was able to sell BabyCenter for $10 million, it was clear by February 26, 2001, that eToys would not be able to find a buyer for the company as a whole.  (Tr. 119:20-120:3; Dep. [Schoch] 148:15-148:22, 149:5-149:11, 184:11-184:23)

87.  By February 26, 2001, eToys had no alternative than to file for bankruptcy, and its Board of Directors authorized it to file a chapter 11 bankruptcy petition.  (Ex. P-16 at 6; Ex. D-59 at AOL 00349)

88.  On February 26, 2001, eToys began valuing its remaining assets on a piecemeal basis in preparation for selling them in a liquidation.  (Dep. [Schoch] 183:7-184:10)

89.  On that same day, eToys issued a press release announcing that it would cease operations, close its website, wind down its business and liquidate its assets because it had concluded that "under any scenario, its outstanding liabilities, which totaled approximately $274 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction."  (PT Stip. at 2; Ex. D-59 at AOL 00349; Dep. [Schoch] 183:7-184:23)

90.  AOL learned of eToys' intentions shortly after the press release was issued.  (Tr. 55:1-55:11)

   H.   Notice of Termination

91.  On February 28, 2001, AOL sent eToys a notice of termination of the 1999 Agreement as authorized by section 5.6 of the 1999 Agreement.  (Tr. 57:3-57:5; PT Stip. at 2; Ex. P-1 at AOL 00207)

**A 11**

92.  If eToys' banner and promotions continued to appear on AOL's website after eToys' website had shut down, AOL Members clicking on that banner would have seen a static splash page saying that eToys was no longer open and would not have received any of the services that eToys was obligated to provide under the 1999 Agreement.  (Dep. [Lenk] 68:8-68:20; Tr. 55:18-56:14)

93.  AOL was concerned that if there were continuing transactions between AOL Members and eToys after its announcement that it was going out of business, eToys would not have had the product or the necessary personnel to complete the sales and to ensure compliance with AOL's applicable merchant certification requirements.  (Tr. 56:15-57:12; Dep. [Baig] 154:2-155:8, 163:15-164:15; Dep. [Lenk] 170:5-170:7)

94.  AOL feared that AOL Members could have asserted that AOL was liable for any failure of eToys to meet its obligations.  (Tr. 51:11-52:3; Dep. [Baig] 154:2-155:8, 163:15-166:17)

95.  AOL had a finite amount of advertising space which it could sell on its system and the effect of the termination of the Amended Agreement with eToys was to free up advertising space which could be sold to other customers at potentially higher rates. (Dep. [Baig] 162:12-162:16; Dep. [Burger] 172:20-175:7; Dep. [Brine] 126:2-126:16)

I.    eToys' Bankruptcy and Sale of Assets

96.  On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code.  (PT Stip. at 3)

97.  On the Petition Date, eToys also filed a motion seeking, inter alia, authority to auction the reorganized stock of eToys under a plan of reorganization or to sell substantially all its assets. (D.I. 19)

98.  After renewed efforts to identify potential purchasers for its assets or stock, eToys held an auction on March 22, 2001, at which a bidder was tentatively selected, who ultimately withdrew its bid. (Ex. D-67 at 10)

99.  On April 27, 2001, eToys filed a renewed motion to sell substantially all its assets (including inventory, plant, fixtures, intellectual property, and the right to solicit eToys' 3.4 million customers) to KB Consolidated, Inc., for $12.2 million.  (Ex. D-68 at TR 000229; Ex. D-67; Ex. D-69; Ex. D-78 at TR 001887)

**A 12**

100. The sale to KB was approved by Order dated May 2, 2001. (D.I. 279)

    J.   <u>Standard Tests of Solvency</u>

101. There are three standard tests applicable to an analysis of solvency: the balance sheet test, the capital adequacy test, and the cash flow test. (Tr. 99:3-99:19)

102. The balance sheet test compares the fair value of a company's assets to the company's debts to determine solvency. (Tr. 99:4-99:9)

103. Application of the balance sheet test includes the following steps: (1) determine the appropriate premise of value to apply; (2) determine the appropriate valuation methodology; (3) construct a pro forma balance sheet; (4) analyze individual asset categories and determine the fair value of assets; and (5) compare the total value of the assets to the total debt to determine whether or not the company is solvent as of the transfer date. (Tr. 103:5-103:16)

104. There are two alternative premises of value: a going concern premise and a liquidation premise. (Tr. 103:22-104:20)

105. There are standard factors for a valuation analyst to consider in determining the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors. (Tr. 104:22-105:15, 109:25-111:2)

106. The capital adequacy test evaluates whether the company had sufficient capital to fund operations for the foreseeable future. (Tr. 99:10-99:15)

107. The cash flow test addresses whether the company had the intent and ability to pay its debts as they matured. (Tr. 99:16-99:19)

**A 13**

K.    eToys' Solvency as of November 15, 2000, Amendment

1.    Balance Sheet Test

108. The going concern premise of value is the appropriate premise of value to apply in analyzing eToys' solvency as of the November 15 Amendment.  (Tr. 113:22-114:1)

109. From March to December 2000, eToys continued to make capital investments of nearly $100 million in property and equipment, including leasing a new headquarters and opening two new operating facilities from which it could ship products and provide customer service.  (Tr. 106:9-106:19; Dep. [Schoch] 112:23-114:7, 163:16-163:20)

110. eToys' full-time employees increased from 306 to more than 1,000 between March 1999 and December 2000.  (Tr. 109:18-109:24)

111. eToys' customer base increased from 1.7 million to 3.4 million between December 1999 and December 2000.  (Ex. D-78 at TR 001887)

112. eToys did not lose any major vendors before the November 15, 2000, Amendment.  (Tr. 110:14-111:2)

113. eToys had access to capital and credit during the relevant period: it raised $175.2 million at its initial public offering in May 1999, raised an additional $145 million through unsecured convertible notes in December 1999, raised $100 million more in June 2000 primarily from a preferred stock offering, and entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 106:7-107:7; Ex. D-75 at TR 001534-36; Dep. [Schoch] 119:12-119:15, 124:24-126:02, 133:17-133:23; Dep. [Lenk] 187:18-189:7)

114. As of November 2000, eToys was able to pay its debts as they came due and expected to have sufficient cash to do so through the spring of 2001.  (Dep. [Lenk] 155:14-155:17, 161:2-161:5; Dep. [Schoch] 49:22-52:16)

115. In early fall 2000, eToys' management and the investment community had a positive view about eToys' long-term prospects and believed that the company was competitive.  (Tr. 108:2-108:23)

116. eToys' management felt it was a going concern at least through Thanksgiving 2000.  (Dep. [Schoch] 94:14-94:19, 96:4-96:11, 131:16-133:16)

14

**A 14**

117. On November 10, 2000, investment analysts at ABN-AMRO issued a report saying that eToys was well-positioned for a record holiday season in 2000. (Tr. 108:24-109:10)

118. As of the Amendment date no material fraud had been uncovered at eToys. (Tr. 110:14-110:19; Dep. [Schoch] 153:23-154:4)

119. The fact that eToys had recurring operating losses does not, by itself, mean that the company was no longer a going concern. (Tr. 111:8-112:20)

120. Since its formation in 1997, eToys had experienced recurring operating losses, yet eToys' March 2000 audited financial statements did not contain any reservations about the company's ability to remain a going concern. (Tr. 111:12-111:16; Dep. [Schoch] 123:21-124:3)

121. As of October 30, 2000, eToys predicted that it would end the quarter with $100 to $120 million in cash, a better cash position than it had in September. (Tr. 112:7-112:13)

122. As of November 15, 2000, eToys had at least $80 million in working capital, which was sufficient to fund its continuing operations. (Tr. 112:2-112:5)

123. Using the going concern premise of value, a pro forma balance sheet based on eToys' actual balance sheet as of September 30, 2000, adjusted to reflect eToys' operating results through November 15, 2000, appropriately takes into account eToys' cash equivalents, inventory, prepaid and other current assets, property and equipment, goodwill, intangible value, and other assets. (Tr. 115:2-115:13)

124. In converting the book value of eToys' individual asset categories into fair market value, a conservative 21% upward adjustment is appropriate for the book value of eToys' inventory. (Tr. 115:24-116:2; Dep. [Schoch] 167:15-168:18)

125. No adjustment to the book value of cash, cash equivalents, prepaid expenses, and other current assets is appropriate. (Tr. 118:5-118:12)

126. A 33% downward adjustment is appropriate for the book value of property and equipment, including software. (Tr. 118:13-119:1, 174:19-175:10)

127. It is appropriate to adjust the value of eToys' goodwill from $124 million to zero. (Tr. 119:2-119:5)

15

**A 15**

128. It is appropriate to reduce the book value of eToys' other assets by 15%. (Tr. 119:6-119:13)

129. As of November 15, 2000, BabyCenter was a wholly owned subsidiary of eToys. (Tr. 119:14-119:16)

130. In converting the book value of BabyCenter into fair market value, it is appropriate to increase the book value of BabyCenter to $5 million, which is a reasonable portion of the sale price ($10 million) to ascribe to the intangible value of BabyCenter which had only $1 million in net tangible assets at the time of its sale. (Tr. 119:14-120:18)

131. It is appropriate, when conducting the balance sheet test, to make no adjustments to eToys' liabilities, but preferred stock should not be treated as debt. (Tr. 121:11-121:17)

132. Including the value of eToys' intangible assets, the fair value of its assets exceeded its debts by approximately $258 million on November 15, 2000. (Ex. D-81 at TR 001966; Tr. 121:1-121:3, 125:16-125:19; Dep. [Schoch] 49:14-49:21, 94:7-94:13, 100:14-100:25)

133. Even excluding the value of eToys' intangible assets, the total fair value of its other assets ($302.4 million) exceeded its debts ($287.2 million) by approximately $15.2 million as of November 15, 2000. (Tr. 121:18-122:8; Ex. D-83 at 15)

134. Thus, under the balance sheet test, eToys was solvent on the date of the Amendment because the fair value of its assets was greater than its total debts. (Tr. 125:10-126:6)

2. Capital Adequacy Test

135. eToys did not have unreasonably small capital at the time of the November 15, 2000, Amendment. (Tr. 122:9-122:22)

136. eToys' September 30, 2000, 10-Q report filed with the SEC stated that eToys had sufficient capital to fund its operations through June 2001. (Ex. D-76 at TR 001715)

137. eToys' capital position did not change materially between September 30 and November 15, 2000. (Tr. 122:24-123:4)

138. As of October 30, 2000, eToys expected to have more cash to fund operations on December 31, 2000, than it had on September 30, 2000. (Tr. 123:7-123:16)

16

A 16

139. eToys entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 123:16-123:20)

140. The November 15 Amendment with AOL reduced eToys' debt obligations by nearly $10 million thereby increasing eToys' ability to fund future operations.  (Ex. P-3; Tr. 123:20-123:24)

141. Applying the capital adequacy test, eToys was solvent as of November 15, 2000.  (Tr. 122:15-122:22)

     3.   Cash Flow Test

142. As of November 15, 2000, eToys was able to, and intended to, pay its debts as they came due.  (Dep. [Lenk] 56:25-57:3; Tr. 124:3-124:9)

143. Throughout November 2000, eToys was paying its debts as they came due.  (Dep. [Lenk] 63:5-63:7)

144. It did not become apparent until after the Thanksgiving weekend in 2000 that eToys would significantly miss hitting its sales targets for the holiday season.  (Dep. [Brine] 56:3-56:15)

145. As of November 15, 2000, eToys' current assets exceeded its current debts by $80 million.  (Tr. 124:10-124:15)

146. Applying the cash flow test, eToys was solvent as of November 15, 2000.  (Tr. 124:3-124:17)

147. The amount indicated in a company's accumulated deficit account is not relevant to an analysis of its solvency.  (Tr. 126:7-126:24)

148. The unsuccessful efforts of eToys to sell the company after December 15, 2000, are not relevant to its solvency as of November 15, 2000.  (Tr. 127:18-128:4)

     L.   eToys' Solvency as of Termination

149. As of February 28, 2001, eToys was insolvent.  EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

150. It is appropriate to use the liquidation premise of value in evaluating eToys' solvency as of February 28, 2001, because after December 2000: (1) eToys was not continuing to make any capital expenditures but was conserving its cash; (2) eToys was not able to access the capital or credit markets; (3) its management and the investment community were not optimistic and, in fact, were

A 17

voicing serious concerns about its ability to survive; (4) eToys was firing substantial numbers of its employees; and (5) its sales were vastly diminished from its projections.  (Tr. 104:16-105:4, 110:6-111:25, 130:3-130:15; Dep. [Lenk] 169:6-169:15)

151. Using the liquidation premise of value, eToys' debts exceeded its liabilities.  (Ex. D-83)

152. eToys did not have sufficient capital (or access to the capital markets) to fund its continuing operations as of February 28, 2001.  (Ex. D-59)

153. Further, eToys did not have sufficient cash flow to continue to pay its debts as they came due as of February 28, 2001.  (Ex. D-59)

   M.   eToys' Remaining Rights on Termination

154. The value of the contract rights eToys lost as a result of the termination of the 1999 Agreement must be determined as of the date of the termination, February 28, 2001.  (Tr. 100:5-100:17, 130:8-130:12)

155. The liquidation premise of value is appropriate in analyzing the value of eToys' remaining rights under the 1999 Agreement as of February 28, 2001.  (Tr. 130:8-130:12)

156. If the rights under the 1999 Agreement were not legally transferable to a third party, the contract rights would have had zero value, as eToys - which was not operating - could not use them.  (Tr. 143:25-145:1)

157. Even if the 1999 Agreement were transferable, it had minimal value.

158. Qualitative factors that would affect the value of eToys' contract rights at the date of termination include the state of the internet advertising industry, the state of the internet industry, general economic conditions, the number of buyers who would be interested in the contract rights at the time of termination, and the remaining term of the contract rights.  (Tr. 134:24-135:6)

159. In 2000-2001, the rates at which viewers of impressions clicked through to access an advertiser's website declined from 2% to roughly 0.3% resulting in significant deflation in the prices charged for internet advertising.  (Tr. 135:11-135:18)

160. The internet advertising market shrank by 7.8% during the first six months of 2001, relative to the same time period in 2000. (Tr. 135:21-136:4)

161. Between January 2000 and February 2002, 806 internet firms ceased operations. (Tr. 136:19-136:20)

162. eToys also cited the public's concerns over the general economic deterioration as one of the reasons that it had a disappointing 2000 holiday season. (Ex. D-77 at TR 001868)

163. There was not a significant pool of potential buyers for eToys after the disappointing 2000 holiday season. (Tr. 137:15-137:24)

164. Under a liquidation premise of value, it is appropriate to use the purchase price paid by KB in its acquisition of eToys' other assets in bankruptcy as an indicator of the value of eToys' rights under the 1999 Agreement. (Tr. 139:3-139:5)

165. KB paid $3.35 million for eToys' intangible assets, i.e., its brand, its website, its intellectual property assets, and the right to solicit its 3.4 million customers. (Tr. 139:11-139:14; Ex. D-68 at TR 000229; Ex. D-69)

166. An indicator of the difference in value between liquidation and going concern is provided by the reduction in value of eToys' intangible assets from $243 million as of November 15, 2000, to the $3.35 million paid by KB for those intangibles or a discount of 98.6%. (Tr. 140:16-141:5)

167. In mid-2000, when it was a going concern, eToys valued its customer base at roughly $166 per customer times its 3.4 million customers for a value of $564 million. (Tr. 139:23-140:3; Ex. D-78 at TR 001887)

168. If all of the KB purchase price of $3.35 million was for access to eToys' customer base, the value of that asset was 99.4% less in liquidation than as a going concern. (Tr. 140:4-140:15)

169. The holiday season was particularly important for eToys as it received roughly 70% of its business during that period. (Tr. 84:18-84:19; Dep. [Burger] 74:23-75:10, 82:19-83:5; Dep. [Iannuccilli] 34:12-34:19; Dep. [Lenk] 32:21-33:16)

170. Only one holiday season remained under the 1999 Agreement at the time of termination so, for purposes of applying the liquidation discount scenarios, the adjusted going concern value of the 1999 Agreement would have been one third of the contract

19

**A 19**

price or $2.75 million.   (Ex. P-1; Tr. 137:25-138:11, 142:12-142:16)

171. Applying the liquidation discount of 99.4% or 98.6% derived from the KB sale price for eToys' intangibles evidences that eToys' remaining rights under the 1999 Agreement at the time of termination had a value of $16,500 to $38,500.   (Tr. 142:25-143:13)

172. Because eToys announced its intent to file a bankruptcy petition on February 26, 2001, any sale of its rights under the 1999 Agreement would have been subject to applicable provisions of the Bankruptcy Code.   (Ex. D-59 at AOL 00349; Tr. 144:17-145:1)

173. The internet was in its early stages at the time the 1999 Agreement was executed and AOL wanted its retail partners to be successful to prove that online retail was a viable and easy way of doing business, and because AOL had a direct financial interest in the success of retail partners such as eToys.   (Tr. 42:13-42:18; Dep. [Burger] 21:3-22:6)

174. In the late 1990s the unfamiliar nature of internet shopping made reliability an important issue for AOL in selecting merchant partners that would give its members a good shopping experience.   (Tr. 25:6-25:25)

175. At that time, AOL Members were nervous about using their credit card numbers on the internet and also held other trust and safety concerns about the online shopping experience.   (Tr. 26:1-26:4)

176. In order to provide good products and service to AOL Members in the shopping area, AOL sought to provide recognizable brands, good products, and good pricing.   (Tr. 25:10-25:17)

177. AOL viewed eToys as a desirable retailer on its website because it felt eToys had the particular resources and commitment to deliver a high quality experience in all aspects of commerce from product selection to site design, transaction process, customer service, great merchandising, a broader selection of products than other online toy retailers, great promotion, and excellent marketing ideas and enthusiasm.   (Ex. D-19 at AOL 00444; Ex. D-27 at AOL 01708-09; Ex. D-12 at AOL 00454)

178. During the 1999 holiday season Fortune Magazine had rated eToys first among the top 49 websites in an independent study of how internet retailers performed.   (Ex. D-29 at AOL 00753)

**A 20**

179. AOL would not have entered into the 1999 Agreement with any company other than eToys.  (Tr. 54:19-54:25)

180. At no point in 2001, either before or after eToys filed bankruptcy, did it contact AOL seeking to reverse the termination or to transfer the remaining services due to eToys under the 1999 Agreement to a third party.  (Tr. 57:11-57:22)

II.    CONCLUSIONS OF LAW

    A.    November 15, 2000, Amendment

        1.    Fraudulent Conveyance under the Bankruptcy Code

1.    The version of section 548(a) of the Bankruptcy Code which is applicable to this case[3] establishes the requirements for avoiding a transfer as constructively fraudulent:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>
>    . . .
>
>    (B)    (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
>       (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
>       (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>
>       (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).

2.    The plaintiff bears the burden of proving each of the requirements of section 548(a), including that (1) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof and (2) the debtor received less than reasonably

---

   [3]  The amendments to section 548 contained in the Bankruptcy Abuse Prevention and Consumer Protection Act are not applicable.

A 21

equivalent value in exchange for such transfer.  BFP v. Resolution Trust Corp., 511 U.S. 531, 535 (1994); Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.(In re R.M.L., Inc.), 92 F.3d 139, 144 (3d Cir. 1996).

3.    A company is solvent for purposes of section 548(a) if its assets, at fair valuation, exceed its liabilities.  11 U.S.C. § 101(32)(A).

4.    Solvency is assessed as of the date of the transfer sought to be avoided.  R.M.L., Inc., 92 F.3d at 154.

5.    In evaluating the fair value of a company's assets for purposes of determining solvency, the appropriate premise of value must be applied:  either the going concern premise of value or the liquidation premise of value.  Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of the debtor's assets required choice between going concern and liquidation premises of value); American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.), 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

6.    The going concern premise of value will be applicable unless the company's bankruptcy is imminent.  See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis."). Accord American Classic Voyages, 367 B.R. at 508; Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.), 281 B.R. 535, 541 (Bankr. D. Del. 2002).

7.    The balance sheet test is a valid and accepted methodology for valuing a company's assets for purposes of determining solvency.  11 U.S.C. § 101(32)(A) ("'[I]nsolvent' means . . . financial condition such that the sum of such entity's debts is greater than all of such entity's property . . . ."). See also, Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002) ("While the [solvency] inquiry is labeled a 'balance sheet' test . . . . it is appropriate to adjust items on the balance sheet that are shown at higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value."), aff'd sub nom. In re USN Commc'ns, Inc., 60 Fed. Appx. 401 (3d Cir. 2003).

**A 22**

8.   The fair value of a company's intangible assets generally is included when applying the balance sheet test.   Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.), 945 F.2d 635, 647 (3d Cir. 1991); Schubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on [GAAP]") (citation omitted).

9.   Applying the balance sheet test as of November 15, 2000, eToys was solvent.  (FOF 108-34)

10.  The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test, which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  See also WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.), 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

11.  eToys was not insolvent on November 15, 2000, under the cash-flow test as it had not as of that date incurred, nor did it believe that it would incur, debts that would be beyond its ability to pay when they matured.  In fact, at that time eToys was paying its debts as they came due.  (FOF 142-48)

12.  A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company has insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  See also Moody, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

13.  eToys was also solvent on November 15, 2000, under the unreasonably small capital test because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

14.  Therefore, the Amendment did not constitute or result in an avoidable transfer under section 548.

**A 23**

### 2.    Fraudulent Conveyance under State Law

15.   Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.  11 U.S.C. § 544.

16.   This case is governed by Virginia law (Ex. P-1 at AOL 00229) which provides that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ."  Va. Code Ann. § 55-81 (West 2003).  See also In re Meyer, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

17.   "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context."  In re Best Products Co., 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).  See also C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does not require [the transfer of] reasonably equivalent value.").

18.   The November 15, 2000, Amendment is not avoidable under Virginia law because eToys was solvent at that time and was not rendered insolvent by the Amendment.

### B.    Termination on February 28, 2001

### 1.    Fraudulent Conveyance under the Bankruptcy Code

19.   eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.  EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

20.   There was a transfer of a property interest of eToys on termination of the 1999 Agreement.  EBC I, Inc., 356 B.R. at 637.

21.   eToys received nothing in exchange for the termination of the 1999 Agreement.

22.   Therefore, the termination is avoidable under section 548 of the Bankruptcy Code.

**A 24**

a.    Value of Property Transferred

23.    Section 550 provides that where a transfer is avoided under
section 548, the estate may recover the property transferred or
the value of such property.    11 U.S.C. § 550(a)(1).

24.    Because the purpose of sections 548 and 550 is preservation
of the estate for the benefit of creditors, the value of property
transferred is determined from the perspective of the estate and
the creditor body.    See, e.g., Metro Commc'ns, Inc., 945 F.2d at
648 ("The purpose of [section 548] is estate preservation . . .
."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In
re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005)
("Section 550(a) is intended to restore the estate to the
financial condition it would have enjoyed if the transfer had not
occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] at 550-4
(Henry J. Sommer et al., eds., 3d ed. rev. 2007).

25.    Under sections 548 and 550, where property is not returned
to the estate as a result of avoidance, but instead the value of
the property is returned, the property transferred is valued as
of the transfer date.    See, e.g., R.M.L., Inc., 187 B.R. at 463;
Gennrich v. Montana Sport U.S.A. (In re International Ski
Service, Inc.), 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990) (noting
that under section 550 courts generally agree that the property
should be valued at the time of transfer) (citation omitted).

i.    Value to eToys

26.    When a corporation's failure and bankruptcy are imminent at
the time of a transfer sought to be avoided under section 548,
application of the liquidation premise of value is appropriate in
determining the fair value of the property transferred.    See,
e.g., Rochez Bros., Inc., 326 B.R. at 588-89 (rejecting a going
concern premise of value for avoided transfer of road salt
because, absent the transfer, the salt "would merely have been
subjected to the same forced liquidation sale that the Debtor
ultimately conducted" and thus the appropriate section 550(a)
value was the "forced sale" price); Active Wear, Inc. v. Parkdale
Mills, Inc., 331 B.R. 669, 672 (W.D. Va. 2005) (holding that
value under section 550 means "fair market value" and that fair
market value in the liquidation context "refers to the value that
the debtor/bankrupt could receive for the property in a
liquidation sale.").

27.    Given eToys' dire financial condition in February 2001,
eToys would have been unable to enjoy any benefit from the 1999
Agreement even if it had not been terminated.    (FOF 79-89)

25

**A 25**

28.  Under Virginia law, eToys' announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39, 92-94)

29.  Because eToys had no further ability to benefit from any performance by AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

### ii.  Transferability to Third Party

#### 1.  Executory Contract

30.  An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3 Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000).

31.  In determining whether remaining obligations under a contract are material, applicable state law determines the consequences of breach.  See Terrell v. Albaugh (In re Terrell), 892 F.2d 469, 471-72 (6th Cir. 1989) ("[F]ederal law defines the term executory contract but . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.") (citation omitted).

32.  In Virginia, contracts that form a relationship in the nature of a business partnership, where mutual obligations are expected to be continuous and ongoing, are executory contracts.  See, e.g., Broyhill v. DeLuca (In re DeLuca), 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (applying Virginia law and holding that an operating agreement governing a limited liability company was an executory contract); RW Power Partners v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (contract was executory since the parties both owed to each other obligations a material breach of which would have "'deprive[d] the injured party of the benefit that the party justifiably expected from the exchange.'" (quoting Farnsworth on Contracts § 8.16)); Horton v. Horton, 487 S.E. 2d. 200, 204 (Va. 1997) (holding that a material breach is one where "failure to perform [the contractual terms] defeats an essential purpose of the contract.").

**A 26**

33.  The 1999 Agreement was an executory contract as of February 28, 2001.  (FOF 16-41, 92-95)

## 2.  Assignability

34.  Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor.  11 U.S.C. § 365(c)(1)(A-B).

35.  Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract.  See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material."), aff'd, 307 B.R. 827 (E.D. Va. 2002); In re DeLuca, 194 B.R. at 77 (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company.").

36.  Under Virginia law, the identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party.  See, e.g., duPont de-Bie v. Vredenburgh, 490 F.2d 1057, 1060 (4th Cir. 1974) ("[E]xecutory contracts for personal services or involving a relationship of confidence are not assignable."); McGuire v. Brown, 76 S.E. 295, 297 (Va. 1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); Epperson v. Epperson, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

37.  The AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its ability and experience, all of which were relevant to eToys' ability to assure AOL that eToys would adequately serve and protect the interests of AOL Members as set forth in the 1999 Agreement.  (FOF 16-41, 92-95, 173-79)

38.  Under Virginia law, AOL would not have been required to accept performance under the 1999 Agreement from any party other

27

**A 27**

than eToys, and the 1999 Agreement therefore was not assumable or assignable under section 365(c) of the Bankruptcy Code.

39.   Because eToys had announced prior to February 28, 2001, that it would cease operations and file bankruptcy, because all of eToys' assets (including its contracts and contract rights) would be liquidated in that bankruptcy proceeding, and because it was not assignable under section 365(c), the 1999 Agreement had no value as of that date.  Cf. Allan v. Archer-Daniels-Midland Co. (In re Commodity Merchants), 538 F.2d 1260, 1263 (7th Cir. 1976) ("The trustee argues . . . that the cancellation [of the contracts] deprived [the debtor] of its property right to resell the contracts.  If the contracts had been freely transferable, perhaps we could agree . . . ."); In re Bellanca Aircraft Corp., 850 F.2d 1275, 1285 (8th Cir. 1988) (holding that conditional right of assignment effectively precluded assignment of contract and therefore compelled the conclusion that the contract had no value).

40.   Even if eToys' remaining rights under the 1999 Agreement as of February 28, 2001, were transferable to a third party, their value was no more than $16,500 to $38,500.   (FOF 164-71)

41.   The substantial loss in the value of eToys' rights under the 1999 Agreement between November 15, 2000, and February 28, 2001, was caused by eToys' financial collapse and the deterioration of the internet industry and the economy generally during that time. (FOF 155-62)

42.   No award of pre-judgment interest is appropriate, because the property transferred had no value and there is no evidence that AOL acted in bad faith in terminating the 1999 Agreement. See, e.g., In re Hechinger Inv. Co. of Delaware Inc., 489 F.3d 568, 579-80 (3d Cir. 2007) (holding that pre-judgment interest may be denied so long as a sound reason is given); Bellanca Aircraft Corp., 850 F.2d at 1281 (stating that awards of pre-judgment interest are discretionary).

        2.   Fraudulent Transfer under State Law

43.   eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.   EBC I, Inc., 356 B.R. at 636.

44.   There was a transfer of a property interest of eToys when the 1999 Agreement was terminated.   EBC I, Inc., 356 B.R. at 637.

45.   Under Virginia law, the eToys announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of

**A 28**

eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39)

46.  Because eToys had no further rights to performance from AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

47.  Because the 1999 Agreement had no value to eToys on that date, there is no recovery the estate may have for any fraudulent transfer under Virginia law.

Dated: January 10, 2008                BY THE COURT:

                                       Mary F. Walrath
                                       United States Bankruptcy Judge

**A 29**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION[1]

Before the Court is the Complaint filed by EBC I, Inc.,
f/k/a eToys, Inc. ("eToys") against America Online, Inc. ("AOL")
for avoidance of a fraudulent conveyance. For the reasons stated
below, the Court will enter judgment in favor of AOL.

I.  BACKGROUND

On March 7, 2001, eToys filed a voluntary petition under
chapter 11 of the Bankruptcy Code. On that same day, eToys

---

1 This Opinion, and the accompanying Findings of Fact
("FOF") and Conclusions of Law ("COL"), constitute the findings
of fact and conclusions of law of the Court pursuant to Rule 7052
of the Federal Rules of Bankruptcy Procedure.

DATE FILED _____

DOCKET NO. _____

A 30

ceased operations and shut down its website. All of eToys'
assets were subsequently liquidated.

Prior to the bankruptcy filing, eToys and AOL had entered
into an Interactive Marketing Services Agreement dated August 10,
1999 (the "1999 Agreement"), under which AOL committed to provide
online advertisements and other services for eToys for three
years for $18 million, payable in installments. (FOF 19) eToys
paid $7.5 million through July 2000 in accordance with the 1999
Agreement, but AOL failed to perform its obligations, providing
less than half the advertisements promised in the first year.
(FOF 19, 44, 51, 55, 58) As a result, the 1999 Agreement was
modified by an Amendment dated November 15, 2000. (FOF 50, 54,
56) eToys paid $750,000 at that time (in addition to the $7.5
million it had already paid) and AOL agreed to provide certain
advertisements for the following two years without further
payments by eToys. (FOF 57)

After a disastrous holiday season, eToys realized it would
not be able to meet its projected sales figures. (FOF 74, 144)
It began conserving cash, hired an investment banker, and
attempted to sell itself as a going concern. (FOF 75, 77, 78)
By the end of February 2001, however, it was apparent that eToys'
marketing efforts were unsuccessful. On February 26, 2001, eToys
issued a press release announcing its financial difficulties and

2

**A 31**

its intent to fire all its employees, shut down its website, and file bankruptcy. (FOF 88, 89) Two days later, AOL terminated the 1999 Agreement pursuant to section 5.6, which allowed termination if eToys became insolvent or filed bankruptcy. (FOF 21, 91)

On January 3, 2003, eToys filed an adversary complaint (the "Complaint") against AOL seeking (1) to avoid and recover alleged fraudulent transfers pursuant to sections 548 and 544 of the Bankruptcy Code and applicable state law, (2) damages for breach of contract, and (3) equitable relief based on unjust enrichment. According to eToys, the payments made under the 1999 Agreement, the Amendment, and the termination of the 1999 Agreement by AOL were all avoidable transfers of property of eToys.

AOL filed a motion to dismiss the Complaint. At oral argument held on April 30, 2003, the Court granted the motion to dismiss with respect to the unjust enrichment count because the parties conceded that their relationship was governed by the 1999 Agreement.

On May 14, 2004, eToys filed a motion for partial summary judgment, and AOL filed a motion for summary judgment on all counts. eToys conceded in its response to AOL's motion that its breach of contract claim and any claim for recovery of payments made under the 1999 Agreement prior to the Amendment on November

3

**A 32**

15, 2000, should be dismissed.  On December 7, 2006, the Court granted AOL's motion for summary judgment in part and dismissed Counts IV and V of the Complaint.  The Court also granted eToys' Motion for Partial Summary Judgment on Count I of the Complaint (the fraudulent conveyance claim) in part and scheduled an evidentiary hearing on the remaining issues.

The evidentiary hearing was held on June 26, 2007, and the matter was taken under advisement.  Post-trial briefing is complete, and the matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (H) & (O).


III. <u>DISCUSSION</u>

A.   <u>Applicable Law</u>

The Plaintiff argues that both the November 15, 2000, Amendment to the 1999 Agreement and the February 28, 2001, termination of the 1999 Agreement are avoidable as constructively fraudulent conveyances under section 548 of the Bankruptcy Code and under applicable state law.

**A 33**

1.    <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

The version of section 548(a)(1) applicable to this case

provides that:

> The trustee may avoid any transfer of an interest of
> the debtor in property, or any obligation incurred by
> the debtor, that was made or incurred on or within one
> year before the date of the filing of the petition, if
> the debtor voluntarily or involuntarily -
> . . .
>> (B)(i) received less than a reasonably
>> equivalent value in exchange for such
>> transfer or obligation; and
>>     (ii)(I) was insolvent on the date that
>> such transfer was made or such obligation was
>> incurred, or became insolvent as a result of
>> such transfer or obligation;
>>         (II) was engaged in business or a
>> transaction, or was about to engage in
>> business or a transaction, for which any
>> property remaining with the debtor was an
>> unreasonably small capital; or
>>         (III) intended to incur, or believed
>> that the debtor would incur, debts that would
>> be beyond the debtor's ability to pay as such
>> debts matured.

11 U.S.C. § 548(a)(1) (2004).[2]  To recover under section 548,

eToys has the burden of establishing that while it was insolvent

there was a transfer of an interest in its property for less than

reasonably equivalent value.  <u>See, e.g.</u>, <u>BFP v. Resolution Trust</u>

<u>Corp.</u>, 511 U.S. 531, 535 (1994); <u>Mellon Bank, N.A. v. Official</u>

<u>Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,</u>

---

    2 Section 548 was modified by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which
became effective October 17, 2005, after the instant adversary
proceeding was commenced.

**A 34**

Inc.), 92 F.3d 139, 144 (3d Cir. 1996).

   2.  <u>Fraudulent Transfer under State Law</u>

  Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.  11 U.S.C. § 544.

  In this case, the 1999 Agreement provides that disputes concerning it are governed by Virginia law.  (Ex. P-1 at AOL 00229)  Virginia law provides, in relevant part, that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ."  Va. Code Ann. § 55-81 (West 2003).  <u>See also In re Meyer</u>, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

  Even "slight consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context."  <u>In re Best Products Co.</u>, 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), <u>aff'd</u>, 68 F.3d 26 (2d Cir. 1995).  <u>See also C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship</u>, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does

**A 35**

not require [the transfer of] reasonably equivalent value.").
Therefore, to be avoidable as a fraudulent conveyance under
Virginia law, eToys had to be insolvent or rendered insolvent at
the time of the transfer and the transfer had to be for <u>no</u>
consideration.

    B.    <u>November 15, 2000, Amendment</u>

        1.    <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

            a.    <u>Solvency</u>

In the December 7, 2006, Opinion, the Court concluded that
there was a genuine issue of material fact in dispute as to
whether eToys was insolvent on November 15, 2000, at the time the
Amendment was executed.

At the trial, AOL presented testimony of an expert (Robert
Hutchins) to the effect that eToys was solvent on November 15,
2000. (FOF 134, 141, 146) eToys disputes this but did not
present any expert testimony in rebuttal.

The term insolvent is defined in the Bankruptcy Code
generally to mean a "financial condition such that the sum of
such entity's debts is greater than all of such entity's
property, at a fair valuation." 11 U.S.C. § 101(32)(A). In
evaluating the fair value of a company's assets for purposes of
determining solvency, the appropriate premise of value must be
applied: either the going concern premise of value or the

**A 36**

liquidation premise of value.  Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of TWA's assets required choice between going concern and liquidation premises of value); American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.), 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

AOL's expert used the going concern premise of value in analyzing eToys' solvency as of November 15, 2000.  In doing so, he considered the standard factors a valuation analyst uses to determine the appropriate premise of value: (1) whether the company continued to make capital investments and open new operating facilities during the relevant period; (2) whether the company had access to capital and credit; (3) whether management and the investment community were optimistic about the company's prospects; (4) whether the company's employment base was expanding; (5) whether there was a discovery of material fraud; and (6) whether there was a loss of major customers or vendors. (FOF 105)

The Court concludes that it was appropriate to use the going concern premise of value in analyzing eToys' solvency as of

8

**A 37**

November 15, 2000.  (FOF 108)  eToys concedes that it was
operating on that date.  <u>See, e.g.</u>, <u>Moody v. Sec. Pac. Bus.</u>
<u>Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where
bankruptcy is not 'clearly imminent' on the date of the
challenged conveyance, the weight of authority holds that assets
should be valued on a going concern basis.").  "[A] business does
not have to be thriving in order to receive a going concern
valuation.  Before the going concern valuation is to be
abandoned, the business must be 'wholly inoperative, defunct or
dead on its feet.'" <u>American Classic Voyages</u>, 367 B.R. at 508
(<u>quoting</u> <u>Fryman v. Century Factors (In re Art Shirt Ltd., Inc.)</u>,
93 B.R. 333, 341 (E.D. Pa. 1988)).   <u>Accord</u> <u>Lids Corp. v.</u>
<u>Marathon Inv. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535,
541 (Bankr. D. Del. 2002).

    eToys argues, however, that the Court must consider that
eToys (and the internet industry generally) collapsed by the end
of 2000.  eToys contends that it is "common sense" to conclude
that, because AOL's expert admits that eToys was insolvent by the
end of December 2000, and nothing unforeseen happened between
November 15 and December 31, 2000, eToys must have been insolvent
on November 15 as well.  <u>Cf.</u> <u>American Classic Voyages</u>, 367 B.R.
at 512 (concluding that the debtor became insolvent as a result
of "the unforeseeable events of 9/11, and their effect upon the

9

**A 38**

travel industry as a whole [which] forced the Debtors into
bankruptcy.").

The Court rejects eToys' analysis. eToys' condition was
fundamentally different on November 15 and December 31, 2000. On
November 15, eToys (and its investors and industry experts) all
expected that it would have a tremendously successful holiday
season. (FOF 115, 117) During the year prior to November 15,
2000, eToys expanded its warehouse operations and moved into a
new headquarters. (FOF 109) Full-time employees increased from
300 to 1000 in the prior 18 months and eToys' customer base
doubled between December 1999 and December 2000. (FOF 110, 111)
In addition, eToys had access to capital and credit during that
period; it was able to raise $175 million in its initial public
offering in May 1999, $145 million by issuing unsecured
convertible notes in December 1999, $100 million by a preferred
stock offering in June 2000, and $40 million in a revolving line
of credit on November 15, 2000. (FOF 113)

Further, at the time of the Amendment, both eToys'
management and the investment community had positive views about
its long-term prospects. (FOF 115) In fact, it was not until
after the Thanksgiving weekend and even into December that it
became apparent that eToys would not be able to make its sales
projections. (FOF 74, 144) Although eToys did issue a press

10

**A 39**

release on December 15, 2000, adjusting its sales projections downward, eToys still felt that it would be able to sell its business as a going concern.  (FOF 75)  It hired an investment banker to find a buyer, and several prospective buyers expressed interest.  (FOF 77, 78)  In the interim eToys instituted cash management strategies to keep it operating until a sale could be consummated.  (FOF 76, 79, 80)  It was not until February that it became apparent that eToys would not be able to sell itself as a going concern and had to liquidate its assets.  (FOF 82, 84-87)  As a result, the Court concludes that AOL's expert used the appropriate methodology to value eToys' assets on its balance sheet as a going concern in determining whether eToys was solvent on November 15, 2000.  (FOF 108)

　　　　i.　Balance Sheet Test

Applying the going concern premise of value to the balance sheet test, AOL's expert made various adjustments to the book value of eToys' assets to reflect their market value.  See, e.g., Peltz v. Hatten, 279 B.R. 710, 743 (D. Del. 2002) ("While the [solvency] inquiry is labeled a 'balance sheet' test . . . . it is appropriate to adjust items on the balance sheet that are shown at a higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value.")

11

**A 40**

(emphasis added), aff'd sub nom. In re USN Commc'ns, Inc., 60 Fed. Appx. 401 (3d Cir. 2003).

eToys finds fault with many of the adjustments. For example, AOL's expert made a 21% upward adjustment from the book value of inventory (reflected at cost) which the Court finds was conservative. eToys argues, however, that the inventory should be valued at book value because that is what eToys could have expected to receive on a forced sale and because it reflects the "wholesale fair market value" of the inventory. The Court disagrees. eToys was not a wholesaler; it was a retailer. To conclude that the value of the inventory was only the book value assumes that eToys was not selling it at anything above its cost to eToys. That is contradicted by the evidence. At the time (November 15, 2000), eToys was selling its inventory in the ordinary course of business at a profit, not at the wholesale price. (FOF 124) Therefore, the Court concludes that the conservative upward adjustment to the book value of the inventory was appropriate.[3]

---

[3] Both parties cite IRS Revenue Procedure 77-12 to support their opposing arguments: eToys for the proposition that "[t]he replacement cost method generally provides a good indication of fair market value if inventory is readily replaceable in a wholesale or retail business . . ." and AOL for the proposition that inventory must be valued to reflect its resale value. See I.R.S. Rev. Proc. 2003-51, 2003-2 C.B. 121 (replacing Rev. Proc. 77-12). The Court finds the Revenue Procedure, like generally accepted accounting principles, to be unhelpful because the tax

12

**A 41**

The expert made further adjustments, including to the intangible assets listed on the books.[4]  eToys presented no evidence that these adjustments were not appropriate, but argues that it was inappropriate to include any value for intangibles because the balance sheet should include only tangible assets that are readily saleable.  See, e.g., In re WRT Energy Corp., 282 B.R. 343, 369 (W.D. La. 2001) (concluding that only assets capable of liquidation may be included in the valuation of assets); Kendall v. Sorani (In re Richmond Produce Co., Inc.), 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993) (assets, such as goodwill, that are speculative and cannot separately be sold should be excluded from the value of a debtor's assets), aff'd, 195 B.R. 455 (N.D. Cal. 1996); Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 672 (Bankr. S.D.N.Y. 1992); 2 Collier on Bankruptcy, ¶ 101.32[4] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2007). eToys also disagrees with the method by which AOL's expert valued

---

and accounting implications of how assets are listed on a company's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets.

[4]  For example, the expert reduced the book value of goodwill from $124 million to zero, the property and equipment (including software) by 33%, and miscellaneous other assets (excluding cash and cash equivalents) by 15%.  In addition, the expert valued eToys' interest in Babycenters at $5 million (or half the ultimate sale price of that asset).  (FOF 123-31)

13

A 42

the intangible assets (based on eToys' market capitalization) because it disappeared overnight and had no rational connection to the valuation of assets in a "conversion to cash" analysis.

The Court rejects eToys' arguments. The Third Circuit has held that "in determining insolvency under § 548(a)(2)(B)(i), it is appropriate to take into account intangible assets not carried on the debtor's balance sheet, including, _inter alia_, good will." Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.), 945 F.2d 635, 647 (3d Cir. 1991). See also Schubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on generally accepted accounting principles.") (citation omitted). See generally, Shannon P. Pratt et al., Valuing a Business 309-10 (4th ed. 2000) (inclusion of intangibles is required under accepted valuation principles).

Further, the Third Circuit has stated that the Court should consider the market capitalization of a company in valuing its intangible assets. Indeed, the Third Circuit has expressed that there is no error in "choosing to rely on the objective evidence from the public equity and debt markets." VFB LLC. v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007). Therefore, it was

14

**A 43**

appropriate for AOL's expert to include the value of eToys'
intangibles on the adjusted balance sheet.  (FOF 123, 130)

eToys also objects to the inclusion of any value for the
software, which was under license to eToys and may not have been
assignable.  AOL counters that the software had some value to
eToys because it was using it in its operations and, therefore,
the Court should consider it as part of the going concern value
of eToys.  The Court agrees with AOL that the software had some
value to eToys and, therefore, should be considered part of the
going concern value of eToys.  (FOF 126)

AOL's expert made no adjustment to eToys' liabilities, but
did not include the preferred stock as debt.  eToys asserts that
the expert should have treated the preferred stock as a liability
because it was listed on eToys' balance sheet as debt in the
amount of $37 million in accordance with generally accepted
accounting principles ("GAAP").  (Ex. P-11 at 4)  See, e.g.,
Trans World Airlines, 134 F.3d at 190 (holding that in
determining solvency, liabilities are to be taken at their face
value); Winstar, 348 B.R. at 278 ("[T]he insolvency test
anticipates that liabilities will be valued at their face
value."); Hanna v. Crenshaw (In re ORBCOMM Global, L.P.), Bankr.
No. 00-3636, Adv. No. 02-1914, 2003 WL 21362192, at *3 (Bankr. D.
Del. June 12, 2003) ("[F]or purposes of determining whether a

15

**A 44**

debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

AOL responds that GAAP is not relevant to determining the fair market value of assets (or liabilities). Although GAAP treats redeemable preferred stock as a liability, AOL notes that the SEC regulations confirm that preferred stock is neither a current nor a long-term liability. See Balance Sheets, 17 C.F.R. § 210.5-02 (2006).

The Court agrees with AOL. GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company. Cf. In re Lease-A-Fleet, Inc., 155 B.R. 666, 679 (Bankr. E.D. Pa. 1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency."). Just as GAAP rules regarding the book value of assets does not determine their fair market value, similarly GAAP rules for treating debt as equity and vice versa are not relevant to determining whether they are truly debt or equity. Instead, the Court must consider the totality of the circumstances to determine if the obligation is, in fact, debt or equity. See, e.g., Brown v. Shell Canada, Ltd. (In re Tenn. Chem. Co.), 143 B.R. 468, 473 (Bankr. E.D. Tenn. 1992) (rejecting contention of trustee's expert that preferred stock should be treated as debt for solvency analysis); Joshua Slocum, Ltd. v. Boyle (In re

16

**A 45**

<u>Joshua Slocum, Ltd.)</u>, 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989)
(holding that redemption value of redeemable stock is not a
liability of the debtor), <u>aff'd</u>, 121 B.R. 442 (E.D. Pa. 1989).
<u>Cf.</u> <u>In re Trace Int'l Holdings</u>, 301 B.R. 801, 805-06 (Bankr.
S.D.N.Y. 2003) (treating preferred stock as a liability because
the court had previously re-characterized the stock as debt);
<u>See generally</u>, Robert J. Stearn, Jr., <u>Proving Solvency: Defending</u>
<u>Preference and Fraudulent Transfer Litigation</u>, 62 Bus. Law. 359,
382-84 (2007) (surveying case law and concluding that preferred
stock is treated as equity not debt in insolvency analyses).

    In this case, the preferred stock was payable as debt at the
discretion of eToys.  (FOF 131)  Given its dire financial
condition at the time, it is unlikely that eToys would have paid
it as debt.[5]  Therefore, the Court concludes that the preferred
stock need not be considered as debt for purposes of determining
the going concern value of eToys under the balance sheet test.
(FOF 131)  Consequently, the Court finds that the specific
adjustments made by AOL's expert to eToys' balance sheet were
appropriate.  (FOF 123-31)

    Based on the adjustments to the balance sheet, AOL's expert
concluded that the value of eToys' assets was approximately $302

---

[5]  In fact, in its plan of reorganization, eToys did not treat
the preferred stock as general unsecured debt and, instead,
canceled it.  (D.I. 1385, art. VII §§ 4.10 cl. 6, 7.1(b))

17

**A 46**

million without considering any value for the intangible assets
and approximately $545 million with those assets.  From this, the
expert concluded that eToys' assets exceeded its debts by
approximately $15 to $258 million.  Thus, the Court concludes
that, under the balance sheet test, eToys was solvent on November
15, 2000.  (FOF 132-34)

### ii.  Cash Flow Test

Even using other accepted methods of calculating solvency,
AOL's expert opined that eToys was solvent as of November 15,
2000.  The cash-flow test (also called the inability-to-pay-debts
test) is an alternative solvency test which assesses whether, at
the time of the transfer, the debtor intended to incur or
believed that it would incur debts beyond its ability to pay as
such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  See also
WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File
Defendants (In re WRT Energy Corp.), 282 B.R. 343, 414-15 (Bankr.
W.D. La. 2001) ("The 'inability to pay debts' prong of section
548 is met if it can be shown that the debtor made the transfer
or incurred an obligation contemporaneous with an intent or
belief that subsequent creditors likely would not be paid as
their claims matured.").

AOL's expert determined that eToys was solvent under the
cash flow test because eToys was able to pay, intended to pay,

**A 47**

and in fact was paying its debts as they came due as of November 15, 2000.  The Court agrees with that conclusion.  (FOF 142-44)  Therefore, under the cash-flow test, the Court concludes that eToys was solvent on November 15, 2000.

### iii. Capital Adequacy Test

A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company had insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  See also Moody, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

AOL's expert concluded that eToys did not have unreasonably small capital as of November 15, 2000, because eToys reported on September 30, 2000, that it had sufficient capital to fund operations through June 2001, and thereafter was able to obtain a $40 million revolving line of credit in November 2000.  Again the Court agrees with those conclusions and finds that, under the capital adequacy test, eToys was also solvent on November 15, 2000, because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

Consequently, the Court concludes that under any of the standard methodologies, eToys was solvent as of November 15,

19

**A 48**

2000.  As a result, the Amendment to the 1999 Agreement executed on that date cannot be avoided as a fraudulent conveyance under section 548 of the Bankruptcy Code.

    2.   <u>Fraudulent Transfer under State Law</u>

Because eToys was solvent on November 15, 2000, the Amendment executed on that date is not avoidable as a fraudulent transfer under Virginia law.  Va. Code Ann. § 55-81 (West 2003).  <u>See also</u> <u>Meyer</u>, 244 F.3d at 355.

    C.   <u>February 28, 2001, Termination of 1999 Agreement</u>

    1.   <u>Fraudulent Transfer under Section 548(a)(1)(B)</u>

    a.   <u>Solvency</u>

In the December 7 Opinion, the Court concluded that eToys was insolvent on February 28, 2001, when AOL terminated the 1999 Agreement.  This was, in fact, conceded by AOL, which terminated the 1999 Agreement because of eToys' announcement that it was insolvent.  At the evidentiary hearing held on June 26, 2007, AOL's expert opined that eToys became insolvent in early December 2000.  Therefore, as of the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent.  (FOF 149)

    b.   <u>Transfer of an Interest in Property</u>

In the December 7 Opinion, the Court also concluded that AOL's termination of the 1999 Agreement, and consequently the retention of the payments made by eToys in advance for services

**A 49**

never delivered, constituted a transfer of property of eToys,

namely the advertising services for which eToys had pre-paid.

See, e.g., EBC I, Inc. v. America Online, Inc. (In re EBC I,

Inc.), 356 B.R. 631, 637 (Bankr. D. Del. 2006).

Further, the Court concluded that, even if the 1999

Agreement permitted termination or provided that payments made by

eToys were non-refundable, they still might be recoverable as a

fraudulent conveyance.  See, e.g., R.M.L., 92 F.3d at 148

(concluding that even though fees were non-refundable, they may

still be recoverable if their payment is found to be a fraudulent

conveyance).  The issue remaining, therefore, is not whether the

1999 Agreement provided for the payment of non-refundable fees

but whether eToys received reasonably equivalent value for loss

of the services for which those fees paid.  Id.

The Court narrowed its ruling, however, by holding that only

a contract whose termination resulted in the loss of valuable

property rights of a debtor, such as entitlement to services for

which the debtor had paid in advance, is potentially recoverable

under section 548.  "The fraudulent conveyance statutes are

intended to prevent an insolvent or undercapitalized debtor's

estate and its creditors from being wrongfully deprived of assets

which could be otherwise utilized for the payment of creditors."

Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball,

**A 50**

<u>Inc. (In re Metro Water & Coffee Servs., Inc.)</u>, 157 B.R. 742, 747 (Bankr. W.D.N.Y. 1993).

   c. <u>Less than Reasonably Equivalent Value</u>

    i. <u>Law of the Case</u>

  eToys contends that the Court made several determinations in the December 7 Opinion which are law of the case and mandate a conclusion that eToys received less than reasonably equivalent value as a result of the termination of the 1999 Agreement.  It notes that the Court concluded that "to the extent [eToys] paid more to AOL than the value of the services provided to it by AOL, the termination of the Contract eliminated that value."  <u>EBC I</u>, 356 B.R. at 642.  eToys also contends that the Court found as a fact that eToys had received only $2.3 million in services prior to the Amendment of the 1999 Agreement while it had paid $8.25 million.  Therefore, eToys asserts that the only issue to be determined in the evidentiary hearing was how much eToys had received from AOL between the Amendment on November 15, 2000, and termination of the 1999 Agreement on February 28, 2001.

  AOL disagrees with eToys' characterization of the Court's December 7 Opinion.  It notes that neither the summary judgment motion nor the Court's Opinion addressed the value that was exchanged under the 1999 Agreement and Amendment or the proper method for determining that value.

22

**A 51**

The Court agrees with AOL.  In the December 7 Opinion, the
Court did not make any finding as to the value that was received
by eToys under the Agreement and its Amendment nor how that value
should be calculated.  The Court did state that "the parties had
apparently reconciled the accounts for the first year of the
[1999 Agreement] . . . and agreed that AOL had provided $2.3
million in services" to eToys.  Id. at 642 (emphasis added).
However, because there was no evidence as to what services were
provided after the first year, the Court found there was a
dispute as to a genuine issue of material fact.  Id.  Thus, the
Court agrees with AOL that it did not decide the value issue and
it is not law of the case.  Coca-Cola Bottling Co. of Shreveport,
Inc. v. Coca-Cola Co., 988 F.2d 414, 429 (3d Cir. 1993) (holding
that the law of the case doctrine is discretionary and applies,
if at all, only to a ruling on a point of law, not to general
discussion of issues in the case).

Based on the evidence presented at the June 26, 2007,
hearing it is now clear that there was not an agreement as to the
"value" of the services provided by AOL in the first year of the
1999 Agreement.  Although the parties agreed that a certain
number of impressions had been provided (which were listed on the
1999 Agreement attachment at prices totaling only $2.3 million),
the parties also agreed in the Amendment that AOL had satisfied

**A 52**

in full its obligation to provide services to eToys in the first year.  Further, AOL presented evidence that the value of services provided by it under the 1999 Agreement was not limited to the list of impressions with prices which is attached to the Agreement.  For example, AOL notes that in the first year it provided a substantial number of Welcome Screen impressions to eToys, which eToys admitted were very valuable to it, even though no price was allocated to them in the Agreement.[6]  (FOF 27)

The Court agrees with AOL's contention that it must consider the value of all the services rendered by AOL under the 1999 Agreement and the Amendment (and compare them to the payments made) in order to determine if eToys received less than reasonably equivalent value under the 1999 Agreement and the Amendment as a result of the termination.

ii.  Determining Value Transferred

Section 550 provides that where a transfer is avoided under section 548, the estate may recover the property transferred or the value of such property.  11 U.S.C. § 550(a)(1).  Because the

---

[6]  No price was allocated to the Welcome Screen impressions because AOL did not sell them to others at that time.  (FOF 27-28)  The value of them to eToys was enormous because all AOL Members see the Welcome Screen when they sign in, few if anyone else had ads there, and it was easier to get customers to click through on such an ad early in their internet browsing.  (FOF 27)  AOL has since sold Welcome Screen impressions to others at substantial prices.  (FOF 28)

24

**A 53**

purpose of sections 548 and 550 is preservation of the estate for the benefit of creditors, the value of property transferred is determined from the perspective of the estate and the creditor body. See, e.g., Metro Commc'ns, Inc., 945 F.2d at 646 ("The purpose of [section 548] is estate preservation . . . ."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] (Henry J. Sommer et al., eds., 3d ed. rev. 2007) (same).

The Third Circuit has held that the Court must determine the net effect of the transaction on the debtor and that if the debtor's "realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received." Metro Commc'ns, Inc., 945 F.2d at 647. The Court, therefore, must consider what value the 1999 Agreement, as amended, had to eToys immediately before and after the termination.

### iii. Value to eToys

eToys contends that the value of the 1999 Agreement that was lost to eToys by its termination is calculated as follows. Because eToys paid $8.25 million and received only $2.3 million

25

**A 54**

in the first year, it was entitled to another $5.95 million in
services during the remaining two years of the Agreement.  The
termination occurred approximately six months later, leaving at
least 75% of the services to be performed.  Therefore, eToys
seeks approximately $4.5 million for the value of unperformed
services under the 1999 Agreement for which it had already paid.

AOL contends that under Virginia law, eToys was in breach of
the 1999 Agreement at the time of its termination and that,
consequently, eToys had no remaining rights that were lost by its
termination.  Specifically, AOL asserts that the eToys
announcement in February 2001 that it would shut down its website
and cease operations constituted a material breach of numerous
ongoing obligations of eToys under the 1999 Agreement and the
Amendment that were material to AOL.  (FOF 34-39)  Because eToys
had no further rights to performance from AOL under the terms of
the 1999 Agreement, based on eToys' own actions and
circumstances, AOL argues that the 1999 Agreement had no further
value to eToys as of February 28, 2001.  (FOF 154-57)  eToys
disagrees and contends instead that AOL was in breach of the
Agreement for failure to deliver the requisite number of
impressions.

The Court finds it unnecessary to decide this issue,
however, because it concludes that in any event, the 1999

26

**A 55**

Agreement had no value to eToys immediately before its termination. As of the termination date, eToys was in dire financial straits. By the end of February eToys had finished its on-line sale of product (at drastically reduced prices) and had announced that it was firing all its employees, shutting down its website and ceasing operations. (FOF 84, 89) In fact, eToys did exactly that before it filed its chapter 11 petition on March 7, 2001. It sold all its assets in a liquidation sale shortly afterwards. (FOF 99, 100) As a result, the Court concludes that the 1999 Agreement, which provided for the delivery of impressions and other ads for eToys' website, had no value to eToys because eToys was no longer operating. Therefore, the Court concludes that eToys is entitled to no recovery in this case. Cf., Metro Water & Coffee Servs., Inc., 157 B.R. at 746-47 (holding that termination of concession agreement was a transfer for purposes of fraudulent conveyance statute though it was not avoidable because the debtor's material defaults meant it had no legal rights).

### iv. Value if Sold

#### a. Assignability

eToys contends nonetheless that the 1999 Agreement had value because it could have been sold as part of the sale of eToys' business assets. AOL disagrees contending that the 1999

**A 56**

Agreement was not assignable under state law or the Bankruptcy Code.

Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract[7] if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor. 11 U.S.C. § 365(c)(1)(A-B). Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract. See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material . . . ."), aff'd, 307 B.R. 827 (E.D. Va. 2002), aff'd 63 Fed. Appx. 741 (4th Cir. 2003); In re DeLuca, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company."). The

---

[7]  An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3 Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000). The 1999 Agreement was an executory contract. (FOF 16-41, 92-95)

A 57

identity of a party is material to the performance of a contract

if the contract is founded on one of the parties maintaining

trust or confidence in the ability to perform, judgment, or

business experience of the other party.  See, e.g., McGuire v.

Brown, 76 S.E. 295, 297 (Va. 1912) (contract not assignable

because the seller of certain real property "was prompted to

enter into th[e] contract . . . by her confidence in [the

counter-party's] judgment, ability, opportunity . . . and perhaps

other considerations which then appeared sufficient."); Epperson

v. Epperson, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory

contract[s] for personal service, founded on personal trust or

confidence, [are] not assignable.").

In this case, the AOL-eToys business relationship was

founded on AOL's trust and confidence in eToys' unique

attributes, as well as its experience, all of which were relevant

to eToys' ability to serve AOL Members and protect their privacy

interests as set forth in the 1999 Agreement.  (FOF 173-79)

Therefore, the Court concludes that under Virginia law AOL would

not have been required to accept performance under the 1999

Agreement from any party other than eToys.  Consequently, the

1999 Agreement was not assumable or assignable under section

365(c) of the Bankruptcy Code.

29

**A 58**

b.    <u>Value if Assignable</u>

Even if the 1999 Agreement could have been assigned by eToys as part of the sale of its assets in the bankruptcy case, AOL contends that the price it would have received would have been de minimis.  AOL's expert testified that the value of the 1999 Agreement, if it could have been assigned, was $16,500 to $38,500 based on the price which eToys' other assets realized in the sale under chapter 11.  (FOF 171)

eToys argues that AOL's expert used the wrong premise of value (liquidation) in valuing the 1999 Agreement and that a going concern premise of value should have been used.  eToys asserts that the Court must consider the fair market value of the impressions, not a liquidation value.  <u>See, e.g.</u>, <u>BFP</u>, 511 U.S. at 545 (stating that reasonably equivalent value under section 548 has "a meaning similar to fair market value."); <u>In re Fruehauf Trailer Corp.</u>, 444 F.3d 203, 213 (3d Cir. 2006) (requiring an examination of the totality of the circumstances to determine the fair market value of the benefit received as a result of the transfer).  <u>Accord</u> 5 <u>Collier on Bankruptcy</u> ¶ 550.02[3][a] (2007) ("When the value of the property is recovered, as opposed to the property itself, the term 'value' refers to fair market value.").

AOL argues that the liquidation premise of value is

appropriate because the Court must consider the condition eToys
was in and its ability to sell the assets at issue.   It contends
that although eToys filed a chapter 11 petition, it was clear at
that time that eToys was liquidating, not reorganizing.   (FOF
150)

The Court agrees with AOL.   The question is not under what
chapter of the Bankruptcy Code eToys filed, but whether a
liquidation of its assets was imminent, because a debtor can
liquidate its assets under chapter 11 as well as under chapter 7
of the Bankruptcy Code.   See, e.g., Gillman v. Scientific
Research Prods. Inc. (In re Mama D'Angelo), 55 F.3d 552, 556-57
(10th Cir. 1995) ("Liquidation value is appropriate 'if at the
time in question the business is so close to shutting its doors
that a going concern standard is unrealistic.'" (quoting In re
Vadnais Lumber Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass.
1989))).   See also Loop Corp. v. U.S. Trustee, 379 F.3d 511, 517
n.3 (8th Cir. 2004) (recognizing that liquidation under chapter
11 is permitted by most courts); In re Sandy Ridge Dev. Corp.,
881 F.2d 1346, 1352 (5th Cir. 1989) (discussing the propriety of
liquidating reorganizations and noting that "although Chapter 11
is titled 'Reorganization,' a plan may result in the liquidation
of the debtor"); In re Jartran, Inc., 886 F.2d 859, 868 (7th Cir.
1989) (acknowledging the permissibility of liquidating plans

**A 60**

under chapter 11).

The totality of the circumstances test mandates that the Court consider eToys' actual circumstances and intentions at the time of termination of the 1999 Agreement. Though a chapter 11 petition was filed, eToys announced in its press release its inability to continue as a going concern and its intention to liquidate. Therefore, the liquidation premise of value was appropriately used by AOL's expert to conclude that, even if the 1999 Agreement had been assignable in eToys' bankruptcy case, the price paid for that contract would have been de minimis.

c. Subsequent Sale by AOL

eToys argues nonetheless that it clearly lost something of value because the termination permitted AOL to sell the impressions previously reserved for eToys that were not provided to it. eToys argues that the Court should consider, as evidence of the value of the 1999 Agreement, the price at which AOL subsequently sold the impressions to others because courts routinely determine the value of property recoverable from a transferee based on evidence of what the transferee actually did receive, or could have received, in a further disposition of the property at issue. See, e.g., Kidder Skis Int'l v. Williams, 60 B.R. 808, 810 (W.D. Mo. 1985) (reversing bankruptcy court and reducing trustee's recovery under section 550(a)(1) based on

32

**A 61**

lesser amount transferee of ski inventory was able to obtain
through its resale of such items); <u>Shearer v. Tepsic (In re</u>
<u>Emergency Monitoring Tech., Inc.)</u>, 366 B.R. 476, 510 (Bankr. W.D.
Pa. 2007) (authorizing trustee to recover value equal to the sale
price the transferee was able to obtain in later sale of
monitoring contracts it had seized from debtor); <u>Baldi v. Lynch</u>
<u>(In re McCook Metals, L.L.C.)</u>, 319 B.R. 570, 593 (Bankr. N.D.
Ill. 2005) (authorizing trustee's recovery under section 550(a)
based on defendant's share of the benefit received when contract
to acquire smelter was transferred to entity that defendant
controlled); <u>American Furn. Outlet USA, Inc. v. Woodmark</u>
<u>Originals, Inc. (In re American Furn. Outlet USA, Inc.)</u>, 209 B.R.
49, 52-53 (Bankr. M.D.N.C. 1997) (rejecting amount specified in
credit memo as a basis for determining the value of property
transferred under section 550(a) in favor of amounts actually
obtained by transferee in subsequent sale of property); <u>Ferrari</u>
<u>v. Computer Assoc. Int'l, Inc. (In re First Software Corp.)</u>, 84
B.R. 278, 284 (Bankr. D. Mass. 1988) (stating "[i]t is axiomatic
that what a willing buyer will pay a willing seller is the
absolute best indication of fair market value" and holding that
value of property recoverable by trustee should be based on what
transferee actually received on resale of the property rather
than what was specified in credit memo issued to debtor);

**A 62**

Speciner v. Gettinger Assoc. (In re Brooklyn Overall Co., Inc.), 57 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986) (authorizing trustee's recovery against landlord under section 550(a)(1) measured by the value of the additional rent the landlord was able to collect from new tenant following debtor's transfer of lease back to landlord). eToys argues that the best evidence of the value of the services it lost is represented by the prices contained in the Amendment because they were based on AOL's November 2000 rate card of prices quoted to other retailers. That totals approximately $4.5 million.

AOL contends, however, that eToys has failed to present any evidence of the fair market value of the impressions. It notes that there is no evidence in the record that AOL was able to resell those impressions or at what price. Even if they were resold, AOL argues that the prices on its rate card in November 2000 are not indicative of the fair market value because the evidence established that impressions were sold to large retailers like eToys at substantial discounts from the rate card prices. (FOF 22-24)

The Court agrees with AOL. While courts have considered subsequent sales by transferees of fraudulent conveyances as evidence of the property's fair market value, there is no evidence in this case of any subsequent sale or the value

34

**A 63**

received from that sale.  Further, courts have held that the
contract price that the parties had negotiated is not evidence of
the fair market value of the property.  See, e.g., American Furn.
Outlet, 209 B.R. at 53; First Software Corp., 84 B.R. at 284.
Therefore, eToys' reliance on the prices in the 1999 Agreement as
amended is not evidence of the value of the impressions nor
evidence that AOL was able to resell those impressions after the
termination.

Given the fact that the 1999 Agreement had no value to eToys
once eToys ceased operating, was not assignable by eToys to
another, and had de minimis value, the Court finds that eToys has
failed to meet its burden of proving that it lost anything of
value by the termination of the 1999 Agreement.  In these
circumstances, the Court agrees with AOL that it would be an
impermissible windfall to creditors to make AOL pay eToys $4.5
million for the termination of the 1999 Agreement, when eToys
would have received little or nothing of value from the
continuation of the Agreement.  Therefore, the Court concludes
that eToys is not entitled to any recovery from AOL under section
548 of the Code.

    2.   Fraudulent Transfer under State Law

        a.   Solvency

As noted above, the Court has already concluded that, as of

**A 64**

the termination of the 1999 Agreement on February 28, 2001, eToys was insolvent.

        b.   <u>Transfer of an Interest in Property</u>

Also, as the Court concluded above, the termination of the 1999 Agreement on February 28, 2001, did constitute a transfer of an interest in property of eToys.

        c.   <u>Less than Reasonably Equivalent Value</u>

Under Virginia law, the test is not whether reasonably equivalent value was exchanged, but rather whether any value was exchanged. "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." <u>In re Best Products Co.</u>, 168 B.R. at 52. <u>See also</u> <u>C-T of Virginia,</u> 1992 WL 12307, at *2 (Virginia law "does not require [the transfer of] reasonably equivalent value."). As noted above, however, eToys lost nothing of value from the termination of the 1999 Agreement. Therefore, the Court concludes that even if the termination is avoidable under Virginia law, eToys is entitled to no recovery.

**A 65**

IV.    <u>CONCLUSION</u>

    For the foregoing reasons, the Court will grant judgment in favor of AOL.

    An appropriate Order is attached.


Dated: January 10, 2008        BY THE COURT:


                                    Mary F. Walrath
                                    United States Bankruptcy Judge

**A 66**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | | |

**ORDER**

AND NOW, this 10th day of JANUARY, 2008, upon consideration

of the Complaint of eToys against AOL and for the reasons set

forth in the accompanying Opinion and Findings of Fact, it is

hereby

**ORDERED** that judgment is entered in favor of AOL.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc:  Richard D. Allen, Esquire[1]

———————————————

1  Counsel shall serve a copy of this Order and the
accompanying Opinion, Findings of Fact and Conclusions of Law on
all interested parties and file a Certificate of Service with the
Court.

**A 67**

DATE FILED  1/11/08

DOCKET NO.  113

# APPENDIX – PART 2 OF 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC. | ) | Case No. 01-0706 (MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proc. No. 03-50003 (MFW) |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF APPEAL

Plaintiff, EBC I, Inc., f/k/a EToys, Inc., appeals under 28 U.S.C. § 158(a) from the:

(1)    Findings of Fact and Conclusions of Law (Bankr. D.I. 111) (Exhibit A hereto);

(2)    Opinion Granting Judgment in Favor of America Online, Inc. (Bankr. D.I. 112) (Exhibit B hereto); and

(3)    Order Granting Judgment in Favor of America Online, Inc. (Bankr. D.I. 113) (Exhibit C hereto), entered in the case on January 10, 2008.

The names of the parties to the Opinion and Order appealed from, and the names, addresses and telephone numbers of their respective attorneys are as follows:

**A 68**

DATE FILED  1|22|08

DOCKET NO.  115

| PARTY | ATTORNEYS |
|-------|-----------|
| EBC I, Inc. | Richard D. Allen, Esquire<br>Gregory W. Werkheiser, Esquire<br>Thomas W. Briggs, Jr., Esquire<br>Morris Nichols Arsht & Tunnell LLP<br>1201 N. Market Street, 18th Floor<br>P.O. Box 1347<br>Wilmington, DE  19899-1347<br>Telephone:  (302) 658-9200<br>Facsimile:  (302) 658-3989 |
| America Online, Inc. | Karen C. Bifferato, Esquire<br>Marc J. Phillips, Esquire<br>Christina M. Thompson, Esquire<br>Connolly Bove Lodge & Hutz LLP<br>The Nemours Building<br>1007 N. Orange Street<br>Wilmington, DE  19899<br>Telephone:  (302) 658-9141<br>Facsimile:  (302) 658-5614 |
| | Michael D. Snyder, Esquire<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>1875 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20006<br>Telephone:  (202) 663-6000<br>Facsimile:  (202) 663-6363 |

MORRIS NICHOLS ARSHT & TUNNELL LLP

Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
*Attorneys for Appellant/Plaintiff*
*E-Toys, Inc.*

January 22, 2008

1395730

**A 69**

## CERTIFICATE OF SERVICE

I, Thomas W. Briggs, Jr., Esquire, certify that I am not less than 18 years of age, and that service of the foregoing NOTICE OF APPEAL was caused to be made on January 22, 2008, upon the attorneys listed below as follows:

### BY HAND DELIVERY AND BY ELECTRONIC SERVICE

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
Christina Thompson, Esquire
Connolly, Bove, Lodge & Hutz
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899

### BY U.S. FIRST-CLASS MAIL

Michael D. Snyder, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

_____
Thomas W. Briggs, Jr. (No. 4076)

870507

**A 70**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC. | ) | Case No. 01-0706 (MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proc. No. 03-50003 (MFW) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF ISSUES AND DESIGNATION OF ITEMS
TO BE INCLUDED IN RECORD ON APPEAL BY APPELLANT**

Appellant, EBC I, Inc., f/k/a eToys, Inc. ("Appellant" or "EBC I"), by its undersigned attorneys, hereby submits, pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure and Rule 8006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, its statement of issues to be presented on appeal and the items to be included in the record on appeal of (1) the Findings of Fact and Conclusions of Law (Adv.. D.I. 111) (the "FOF/COL"), (2) the Opinion Granting Judgment in Favor of America Online, Inc. (Adv. D.I. 112) (the "January 10, 2008 Opinion"), and (3) the Order Granting Judgment in Favor of America Online, Inc. (Adv. D.I. 113), each entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in the above-captioned adversary proceeding on January 10, 2008.

**A 71**

DATE FILED 2\1\08
DOCKET NO. 117

## STATEMENT OF ISSUES ON APPEAL

1.    Whether the Bankruptcy Court erred in concluding that Appellant was entitled to no recovery under 11 U.S.C. § 550 for any fraudulent transfer avoidable under 11 U.S.C. § 548.

2.    Whether the Bankruptcy Court erred in concluding that Appellant was entitled to no recovery for any fraudulent transfer avoidable under Virginia law.

3.    Whether the Bankruptcy Court erred in concluding that the fully paid up contract rights of eToys, Inc. ("eToys") under the Interactive Marketing Agreement between America Online, Inc. and eToys Inc., dated August 10, 1999, as amended by the Amendment, dated November 15, 2000 (collectively, the "Agreement"), had no value when the transfer occurred.

4.    Whether the Bankruptcy Court erred by applying the incorrect legal standard under 11 U.S.C. §§ 548 & 550 to determine the value of the property transferred to America Online, Inc., n/k/a AOL LLC ("AOL" or "Appellee"), when it terminated the Agreement.

5.    Whether the Bankruptcy Court erred by failing to consider the totality of circumstances to determine the value of the property transferred to AOL when it terminated the Agreement.

6.    Whether the Bankruptcy Court erred by failing to consider whether AOL gave eToys "value" under 11 U.S.C. § 548(a)(2) in exchange for the transfer of eToys' fully paid up contract rights that occurred upon termination of the Agreement.

7.    Whether the Bankruptcy Court erred in applying a forced sale, bankruptcy liquidation value premise to eToys' fully paid up contract rights under the Agreement, rather than valuing such rights at their fair market value at the time of the transfer.

8.    Whether the Bankruptcy Court erred by not valuing eToys' fully paid up contract rights under the Agreement when AOL terminated the Agreement in a manner that would have recognized eToys' expectancy interest in connection with the Agreement.

9.    Whether the Bankruptcy Court erred by not valuing eToys' fully paid up contract rights under the Agreement when AOL terminated the Agreement in a manner that would have recognized eToys' restitutionary interest in connection with the Agreement.

10.    Whether the Bankruptcy Court erred in not valuing eToys' fully paid up contract rights under the Agreement based on the negotiated contract price established by eToys and AOL pursuant to the Agreement.

11.    Whether the Bankruptcy Court erred in not valuing eToys' fully paid up contract rights under the Agreement based on the price AOL was able to obtain for the impressions it otherwise would have had to deliver to eToys under the Agreement when it resold them following its termination of the Agreement.

2

**A 72**

12.    Whether the Bankruptcy Court erred in ignoring uncontradicted evidence in the record that established that the impressions had significant value as reflected in the prices quoted by AOL for impressions at the time of the termination of the Agreement and that AOL had or could have resold the impressions at a price at least as high as what eToys paid for the impressions under the Agreement.

13.    Whether the Bankruptcy Court erred in holding that any sale of eToys' rights under the Agreement, had it not been terminated by AOL, would have been subject to the applicable provisions of the Bankruptcy Code because eToys had announced its intention to file bankruptcy immediately prior to AOL's termination of the Agreement.

14.    Whether the Bankruptcy Court erred in treating the Agreement as an executory contract, notwithstanding that eToys had previously paid all amounts due to AOL under the Agreement.

15.    Whether the Bankruptcy Court erred in holding that the Agreement was not assignable under Virginia law and/or 11 U.S.C. 365(c)(1).

16.    Whether the Bankruptcy Court erred in holding that any restrictions on assignability applicable to the Agreement required the conclusion that eToys' fully paid up contract rights under the Agreement had no value.

17.    Whether the Bankruptcy Court erred in stating in its FOF/COL that eToys was in material breach of the Agreement as a result of its announcement in February 2001 that it expected to shut down its website and cease operations when AOL relied upon only eToys' insolvency as a basis for terminating the Agreement.

18.    Whether the Bankruptcy Court statement in its FOF/COL (COL ¶ 28) that eToys was in material breach of the Agreement as a result of its announcement in February 2001 that it expected to shut down its website and cease operations should be disregarded as irreconcilably in conflict with the Bankruptcy Court's ruling in its January 10, 2008 Opinion (Op. 26-27) declining to reach the issue of whether such actions constituted material breaches of the Agreement.

19.    Whether the Bankruptcy Court erred in failing to apply the law of case doctrine to its prior determinations in its Opinion and Order, each dated December 7, 2006 (Adv. D.I. 72 & 73) (together, the "December 7, 2006 Decision"), concerning the methodology for valuing eToys' fully paid up contract rights under the Agreement transferred upon termination of the Agreement.

20.    Whether the Bankruptcy Court erred in allowing AOL to re-litigate the value of services it had provided to eToys under the Agreement from its inception through the date of the Amendment, despite AOL having previously conceded the value of such services and the Bankruptcy Court having previously determined the value of such services in the December 7, 2006 Decision.

**A 73**

21.    Whether the Bankruptcy Court erred in giving AOL credit for value provided to eToys in the form of "Welcome Screen impressions" and other services for which no value was assigned by the parties in the Agreement.

22.    Whether the Bankruptcy Court erred in denying pre-judgment interest to eToys.

## DESIGNATION OF ITEMS TO BE
## INCLUDED IN RECORD ON APPEAL

Appellant hereby designates the following items to be included in the record on appeal:

### Pleadings

| TAB NO. | DOCKET NO. | DESCRIPTION OF PLEADING/EVIDENCE |
|---------|------------|----------------------------------|
| 1 | 1 | Complaint To Avoid Fraudulent Transfers And Conveyances And To Recover Damages Due To Breach Of Contract And Unjust Enrichment, filed 1/03/03 |
| 2 | 16 | Answer of Defendant America Online, Inc., filed 5/19/03 |
| 3 | 24 | Order Granting in Part and Denying in Part Defendant America Online, Inc.'s Motion to Dismiss Complaint, filed 10/10/03 |
| 4 | 46 | Motion for Partial Summary Judgment, filed 5/14/04 |
| 5 | 47 | Opening Brief Of Plaintiff EBC I, Inc. In Support Of Its Motion For Partial Summary Judgment, filed 5/14/04 |
| 6 | 48 | Appendix, filed 5/14/04 |
| 7 | 49 | Motion For Summary Judgment of Defendant America Online, Inc., filed 5/14/04 |
| 8 | 50 | ENTERED IN ERROR, SEE DOCKET 52 Brief in Support of Defendant America Online, Inc.'s Motion for Summary Judgement (related document(s)49 ) Filed by America Online, Inc. (Attachments: # 1 Exhibit A to Brief# 2 Declaration of Robert A. Hutchins# 3 Expert Report of Robert A. Hutchins# 4 Exhibit A to Declaration of Robert A. Hutchins# 5 Exhibit B to Declaration of Robert A. Hutchins# 6 Exhibit B-1 to Declaration of Robert A. Hutchins# 7 Exhibit to Declaration of Robert A. Hutchins# 8 Exhibit B-3 to Declaration of Robert A. Hutchins# 9 Index B-4 to Declaration of Robert A. Hutchins# 10 Declaration of Carol Banta# 11 Exhibit A to Declaration of Carol Banta (Schoch Depo)# 12 Exhibit 6 to Schoch Depo# 13 Exhibit 8 to Schoch Depo# 14 Exhibit 9 to Schoch Depo# 15 Exhibit 11 to Schoch Depo# 16 Exhibit 13 to Schoch Depo# 17 Exhibit 17 |

4

**A 74**

| | | |
|---|---|---|
| | | to Schoch Depo# 18 Exhibit 21 to Schoch Depo# 19 Exhibit 22 to Schoch Depo# 20 Exhibit 23 to Schoch Depo# 21 Exhibit 24-1 to Schoch Depo# 22 Exhibit 24-2 to Schoch Depo# 23 Exhibit 24-3 to Schoch Depo# 24 Exhibit 24-4 to Schoch Depo# 25 Exhibit 24-5 to Schoch Depo# 26 Exhibit 25 to Schoch Depo# 27 Exhibit 26 to Schoch Depo) (Phillips, Marc) Modified on 5/20/2004 (MEB, ). (Entered: 05/14/2004) |
| 9 | 51 | ENTERED IN ERROR, SEE DOCKET 52 Supplemental Brief in Support of Defendant America Online, Inc.'s Motion for Summary Judgement (Exhibit's B, C,D,E,F, G,H,I,J,K,L Related to Docket No. 50) (related document(s)49 ) Filed by America Online, Inc. (Attachments: # 1 Exhibit 2 to Lenk Depo# 2 Exhibit 4 to Lenk Depo# 3 Exhibit 10 to Lenk Depo# 4 Exhibit 11 to Lenk Depo# 5 Exhibit 12 to Lenk Depo# 6 Exhibit 13 to Lenk Depo# 7 Exhibit 15 to Lenk Depo# 8 Exhibit C to Declaration of Carol Banta# 9 Exhibit D to Declaration of Carol Banta# 10 Exhibit E to Declaration of Carol Banta# 11 Exhibit F to Declaration of Carol Banta# 12 Exhibit G to Declaration of Carol Banta# 13 Exhibit H to Declaration of Carol Banta# 14 Exhibit Ito Declaration of Carol Banta# 15 Exhibit J to Declaration of Carol Banta# 16 Exhibit K to Declaration of Carol Banta# 17 Exhibit L to Declaration of Carol Banta# 18 Certificate of Service) (Phillips, Marc) Modified on 5/20/2004 (**MEB,** ). (Entered: 05/14/2004) |
| 10 | 53 | Corrected Brief Related to Docket No. 50 (PLEASE BACK DATE TO MAY 14, 2004), filed 5/18/04 |
| 11 | 54 | Continued Corrected Brief Related to Docket No. 50 (PLEASE BACK DATE TO MAY 14, 2004), filed 5/18/04 |
| 12 | 55 | Continued Corrected Brief Related to Docket Number 50 (PLEASE BACK DATE TO MAY 14, 2004), filed 5/18/04 |
| 13 | 56 | Corrected Supplemental Brief Related to Docket Number 51 (Starting with Exhibit B to Declaration of Carol Banta (Lenk Depo) through Exhibit 15 to Lenk Depo) (PLEASE BACK DATE TO MAY 14, 2004), filed 5/18/04 |
| 14 | 57 | Continued Corrected Supplemental Brief Related to Docket Number 51 (Starting with Exhibit C to Declaration of Carol Banta through Certificate of Service) (PLEASE BACK DATE TO MAY 14, 2004), filed 5/18/04 |
| 15 | 59 | Answering Brief of EBC I, Inc. in Opposition to AOL's Motion For Summary Judgment, filed 5/28/04 |
| 16 | 60 | Appendix, filed 5/28/04 |
| 17 | 61 | Brief in Opposition to Plaintiff EBC 1, Inc.'s Motion for Partial Summary Judgment Related to Docket Nos. 46 and 47, filed 5/28/04 |
| 18 | 63 | Reply Brief in Support of Defendant America Online, Inc.'s Motion for Summary Judgment, filed 6/11/04 |

**A 75**

| 19 | 64 | BRIEF OF PLAINTIFF EBC I, INC. IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT, filed 6/11/04 |
| 20 | 65 | Notice of Completion of Briefing related to D.I. 46, 47, 48, 61 and 64, filed 6/15/04 |
| 21 | 66 | Notice of Completion of Briefing, filed 6/15/04 |
| 22 | 71 | Statement Of Plaintiffs EBC I, Inc. f/k/a Etoys, Inc., Concerning Subsequent Authority Relating To Pending Cross-Motions For Summary Judgment, filed 4/13/06 |
| 23 | 72 | Opinion Granting in Part Debtor's Motion for Partial Summary Judgment and Granting in Part Motion for Summary Judgment, filed 12/07/06 |
| 24 | 73 | Order Granting in Part Debtor's Motion for Partial Summary Judgment and Granting in Part Motion for Summary Judgment, filed 12/07/06 |
| 25 | 74 | Notice of Service Re: Opinion and Order, filed 12/11/06 |
| 26 | 75 | Notice of Appeal, filed 12/18/06 |
| 27 | 76 | Receipt of filing fee for Notice of Appeal, filed 12/18/06 |
| 28 | 77 | Motion for Leave to Appeal, 12/18/06 |
| 29 | 78 | Amended Certificate of Service Regarding Notice of Appeal, 12/18/06 |
| 30 | 80 | Ex Parte Unopposed Motion Of Plaintiff EBC I, Inc., f/k/a Etoys, Inc., For Extension Of Time To Answer The Motion Of America Online, Inc., n/k/a AOL LLC, For Leave To Appeal, filed 12/20/06 |
| 31 | 82 | Order Granting Motion of Plaintiff EBC I, Inc. f/k/a Etoys, Inc. for Extension of Time to Answer the Motion of America Online, Inc. n/k/a AOL, LLC for Leave to Appeal, filed 12/27/06 |
| 32 | 83 | Memorandum of Law Of EBC I, Inc. In Opposition To The Motion For Leave To Appeal Of America Online, Inc., filed 1/05/07 |
| 33 | 84 | Notice of Completion of Briefing, filed 1/12/07 |
| 34 | 85 | Motion To Set A Trial, filed 2/14/07 |
| 35 | 86 | Proposed Pretrial Order RE: Motion to Set a Trial Date, filed 2/15/07 |
| 36 | 87 | Objection to EBC I Inc.'s Motion to Set Trial, filed 2/28/07 |
| 37 | 88 | Notice of Completion of Briefing and Request for Oral Argument re Motion to Set a Trial, filed 3/05/07 |
| 38 | 89 | Order Approving Motion to Set a Trial Date, filed 3/20/07 |
| 39 | 91 | Proposed Pretrial Order RE: Pretrial Stipulation and Order, filed 5/30/07 |
| 40 | 96 | Notice of Agenda of Matters Scheduled for Hearing, 6/22/07 |
| 41 | 98 | Certification of Counsel Filed by EBC I, Inc., f/k/a eToys, Inc.. re: Exhibit A, Amended Pretrial Stipulation and Order), filed 06/25/2007 |

**A 76**

| 42 | 100 | Transcript of Trial held on June 26, 2007 before the Honorable Mary F. Walrath, filed 7/03/2007) |
| 43 | 101 | Findings of Fact and Conclusions of Law Submitted by Defendant AOL LLC, filed 7/17/07 |
| 44 | 102 | EBC I, Inc.'s Proposed Findings of Fact and Conclusions of Law, filed 7/17/07 |
| 45 | 103 | Post-Trial Brief of Plantiff EBC I, Inc., filed 7/31/07 |
| 46 | 104 | Post-Trial Brief of Defendant AOL LLC, filed 7/31/07 |
| 47 | 105 | Appendix, filed 7/31/07 |
| 48 | 106 | Motion for Leave to File Supplemental Appendix to Post-Trial Brief of Defendant AOL LLC, filed 8/02/07 |
| 49 | 107 | Response to Motion for Leave to File Supplemental Appendix to Post-Trial Brief of Defendant AOL, LLC, filed 8/03/07 |
| 50 | 108 | Notice of Completion of Briefing, filed 8/09/07 |
| 51 | 109 | Order Granting Motion for Leave to File Reply, filed 8/15/07 |
| 52 | 111 | Findings of Fact and Conclusions of Law, filed 1/10/08 |
| 53 | 112 | Opinion Granting judgment in favor of America Online, Inc., filed 1/10/08 |
| 54 | 113 | Order Granting judgment in favor of America Online, Inc., filed 1/10/08 |
| 55 | 114 | Notice of Service, filed 1/14/08 |
| 56 | 115 | Notice of Appeal, filed 1/22/08 |

## Appellant's Exhibits Offered At Trial

| TRIAL EXHIBIT NO. | DATE OF EXHIBIT | DESCRIPTION OF PLEADING/EVIDENCE |
| --- | --- | --- |
| 1 | | The Interactive Marketing Agreement (PX 1) |
| 2 | 8/12/99 | eToys Deal Summary dated 8/12/99 (PX 5) |
| 3 | | The Amended Agreement (PX 15) |
| 4 | | Summary of impressions delivered (PX 20) |
| 5 | | Summary of impressions delivered (PX 21) |
| 6 | | Summary of impressions delivered (PX 22) |
| 7 | | Performance Summary of December 2000 (PX 19) |
| 8 | 4/26/04 | Letter of April 26, 2004 from Gregory S. Chernak to Richard D. Allen |

**A 77**

| TRIAL EXHIBIT NO. | DATE OF EXHIBIT | DESCRIPTION OF PLEADING/EVIDENCE |
|---|---|---|
| 9 | | Responses And Objections Of Defendant America Online Inc. To Plaintiff's First Set of Interrogatories To Defendant |
| 10 | | Responses And Objections of Defendant America Online Inc. To Plaintiff's Second Set Of Interrogatories Directed To Defendants (including documents attached thereto) |
| 11 | 9/30/00 | September 30, 2000 Form 10-Q (Schoch Ex. 23) |
| 12 | 11/15/00 | November 15, 2000  Form 8-K |
| 13 | 12/31/00 | December 31, 2000 Form 10-Q (Schoch Ex. 26) |
| 14 | 12/15/00 | December 15, 2000  Form 8-K (Schoch Ex. 17) |
| 15 | | Notice of Termination of Agreement from AOL (Schoch Ex. 13) |
| 16 | 2/26/01 | February 26, 2001 Board of Directors Meeting Minutes (Lenk Ex. 22) |
| 17 | 11/21/00 | E-mail of 11/21/00 from Baig to Wendy (PX 48) |
| 18 | | AOL Account Services Partner Restructuring  Form (PX 30) |
| 19 | | Summary of Negotiations with eToys (PX 9) |
| 20 | 8/9/00 | E-mail of 8/9/00 from Iannuccilli to Rigdon and Baig (PX 34) |
| 21 | | Collection of e-mails and charts (PX 6) |
| 22 | | E-mails (PX 27) |
| 23 | 9/7/00 | Text mail summary dated  September 7, 2000 (PX 37) |
| 24 | | Draft of the Amended  Agreement (PX 45) |
| 25 | | Draft of the Amended Agreement (PX 46) |
| 26 | | Draft of the Amended Agreement (PX 47) |

**A 78**

**Selected Appellee's Exhibits Offered At Trial**

| TRIAL EXHIBIT NO. | DATE OF EXHIBIT | DESCRIPTION OF PLEADING/EVIDENCE |
|---|---|---|
| 66 | | Disclosure Statement To Accompany Consolidated First Amended Liquidating Plan of Reorganization of EBC I, Inc. (Bankr. D.I. 1141) |
| 67 | | Renewed Motion Of Debtors And Debtors-In-Possession For Orders Under 11 U.S.C. §§ 105(A), 363(B), (F), And (M), 365, And 1146(C), And Fed. R. Bankr. P. 2002, 6004, 6006, 9014 And 9019 (A) Authorizing And Approving (I) Sale Of Substantially All Of Debtors' Assets Free And Clear Of Liens, Claims And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (III) The Compromise Of Certain Disputes With Respect To Assets To Be Conveyed, (IV) Certain Bid Protections, And (B) Granting Related Relief (Bankr. D.I. 274) |
| 68 | | Reply Of Debtors and Debtors In Possession In Support Of Renewed Motion Of Debtors And Debtors-In-Possession For Orders Under 11 U.S.C. §§ 105(a), 363(b), (f), And (m), 365, And 1146(c), And Fed. R. Bankr. P. 2002, 6004, 6006, 9014 And 9019 (a) Authorizing And Approving (i) Sale Of Substantially All Of Debtors' Assets Free And Clear Of Liens, Claims And Encumbrances, (ii) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (iii) The Compromise Of Certain Disputes With Respect To Assets To Be Conveyed, (iv) Certain Bid Protections, And (b) Granting Related Relief (Bankr. D.I. 350) |
| 69 | | Order (A) Authorizing And Approving (i) Sale Of Substantially All Of Debtors' Assets Free And Clear Of Liens, Claims And Encumbrances, (ii) The Compromise Of Certain Disputes With Respect To Assets To Be Conveyed And (B) Granting Related Relief (Bankr. D.I. 361) |

**Deposition Designations Offered At Trial**

Attached as **Exhibit A** hereto and incorporated herein by reference as part of the appellate record are deposition designations offered to the Bankruptcy Court at trial.

**A 79**

MORRIS NICHOLS ARSHT & TUNNELL LLP

Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 N. Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE  19899-1347

*Attorneys for Appellant/Plaintiff*
*EBC I, Inc., f/k/a eToys, Inc.*

February 1, 2008

1418315.5

**A 80**

10

# EXHIBIT A

**[Deposition Designations]**

E-TOYS DEPOSITION DESIGNATIONS

MIRZA BAIG

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 3 | 6 | 4 | 21 |
| 7 | 17 | 8 | 4 |
| 12 | 19 | 13 | 8 |
| 48 | 11 | 49 | 12 |
| 54 | 16 | 55 | 1 |
| 59 | 8 | 59 | 19 |
| 62 | 16 | 63 | 8 |
| 66 | 21 | 67 | 10 |
| 72 | 14 | 74 | 13 |
| 77 | 6 | 77 | 11 |
| 85 | 18 | 90 | 4 |
| 94 | 6 | 94 | 17 |
| 102 | 12 | 102 | 19 |
| 107 | 9 | 109 | 9 |
| 110 | 1 | 110 | 19 |
| 112 | 15 | 116 | 13 |
| 119 | 18 | 120 | 4 |
| 124 | 5 | 124 | 16 |
| 129 | 17 | 131 | 4 |
| 151 | 8 | 151 | 13 |
| 155 | 9 | 156 | 14 |
| 159 | 15 | 160 | 12 |
| 162 | 12 | 162 | 21 |
| 168 | 17 | 169 | 18 |
| 172 | 8 | 172 | 22 |
| | | | |



**A 82**

## E-TOYS DEPOSITION DESIGNATIONS

### PETER BRINE

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| 22 | 19 | 23 | 25 |
| 82 | 10 | 82 | 22 |
| 94 | 6 | 95 | 16 |
| 98 | 19 | 99 | 11 |
| 125 | 15 | 126 | 16 |

**A 83**

E-TOYS DEPOSITION DESIGNATIONS

JANINE BOUSQUETTE

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
|  |  |  |  |
| None |  |  |  |

**A 84**

## E-TOYS DEPOSITION DESIGNATIONS

### SUE BURGER

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 8 | 3 | 8 | 22 |
| 9 | 8 | 9 | 15 |
| 10 | 5 | 10 | 15 |
| 11 | 22 | 12 | 12 |
| 18 | 13 | 18 | 19 |
| 29 | 9 | 30 | 5 |
| 36 | 3 | 38 | 19 |
| 40 | 1 | 41 | 14 |
| 42 | 10 | 42 | 22 |
| 45 | 15 | 45 | 20 |
| 48 | 17 | 48 | 24 |
| 55 | 6 | 55 | 22 |
| 56 | 16 | 57 | 10 |
| 58 | 7 | 59 | 3 |
| 60 | 10 | 61 | 3 |
| 63 | 6 | 63 | 21 |
| 70 | 5 | 70 | 20 |
| 77 | 3 | 78 | 19 |
| 84 | 24 | 87 | 4 |
| 98 | 20 | 99 | 19 |
| 102 | 4 | 105 | 12 |
| 107 | 10 | 107 | 20 |
| 108 | 11 | 109 | 14 |
| 138 | 19 | 139 | 6 |
| 140 | 5 | 140 | 19 |
| 160 | 24 | 161 | 4 |

**A 85**



SUE BURGER (cont'd)

| 164 | 21 | 165 | 11 |
|-----|-----|-----|-----|
| 166 | 7 | 167 | 2 |
| 170 | 21 | 171 | 2 |
| 172 | 20 | 172 | 23 |
| 174 | 7 | 175 | 7 |
| 176 | 9 | 176 | 25 |
| 188 | 16 | 188 | 23 |
|  |  |  |  |

849476.1



**A 86**

## E-TOYS DEPOSITION DESIGNATIONS

### CHRISTOPHER IANNUCCILLI

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 3 | 17 | 4 | 24 |
| 23 | 2 | 24 | 14 |
| 25 | 1 | 25 | 19 |
| 50 | 16 | 52 | 5 |
| 58 | 12 | 58 | 24 |
| 62 | 24 | 63 | 7 |
| 66 | 1 | 66 | 24 |
| 70 | 7 | 72 | 11 |
| 73 | 20 | 76 | 15 |
| 81 | 5 | 84 | 24 |
| 85 | 12 | 90 | 15 |
| 95 | 19 | 97 | 2 |
| 103 | 22 | 104 | 20 |
| 106 | 8 | 107 | 5 |
| 112 | 20 | 114 | 4 |
| 119 | 14 | 121 | 3 |
| 126 | 7 | 127 | 8 |
| 129 | 4 | 130 | 9 |
| 131 | 16 | 132 | 2 |
| 135 | 9 | 135 | 18 |

851318.1

**A 87**

## E-TOYS DEPOSITION DESIGNATIONS

### EDWARD LENK

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 61 | 22 | 62 | 19 |
| 131 | 21 | 133 | 5 |
| 133 | 24 | 134 | 25 |
| 200 | 10 | 202 | 2 |

853003.1



**A 88**



# E-TOYS DEPOSITION DESIGNATIONS

## STEVEN SCHOCH

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 15 | 25 | 16 | 1 |
| 18 | 17 | 20 | 5 |
| 23 | 11 | 23 | 16 |
| 54 | 2 | 55 | 10 |
| 84 | 22 | 86 | 5 |
| 94 | 7 | 96 | 9 |
| 118 | 6 | 119 | 8 |
| 126 | 10 | 128 | 2 |
| 136 | 6 | 137 | 11 |
| 140 | 25 | 143 | 15 |
| 145 | 5 | 145 | 11 |
| 150 | 17 | 153 | 19 |
| 162 | 1 | 163 | 20 |
| 175 | 7 | 176 | 23 |
| 178 | 9 | 179 | 16 |
| 182 | 2 | 185 | 8 |

853591.1



**A 89**

## E-TOYS DEPOSITION DESIGNATIONS

### CHRISTOPHER VALLE

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 7 | 13 | 7 | 22 |
| 10 | 3 | 10 | 21 |
| 13 | 6 | 14 | 19 |
| 23 | 4 | 25 | 2 |
| 30 | 14 | 31 | 9 |
| 32 | 3 | 33 | 10 |
| 34 | 21 | 37 | 4 |
| 37 | 19 | 38 | 19 |
| 41 | 10 | 41 | 19 |
| 49 | 11 | 49 | 19 |
| 50 | 22 | 51 | 5 |
| 53 | 18 | 53 | 24 |
| 56 | 17 | 57 | 3 |
| 74 | 21 | 75 | 5 |
| 79 | 24 | 80 | 15 |
| 89 | 6 | 91 | 14 |
| 99 | 5 | 99 | 20 |
| 101 | 5 | 103 | 5 |
| 106 | 12 | 108 | 10 |

850888.1

**A 90**





## AOL's DEPOSITION DESIGNATIONS

**Mirza Baig**

| FROM | TO |
|------|-----|
| 4:3 | 4:22 |
| 5:2 | 5:13 |
| 7:17 | 8:4 |
| 14:4 | 15:3 |
| 15:10 | 18:7 |
| 20:16 | 22:8 |
| 23:16 | 24:1 |
| 34:7 | 35:22 |
| 45:6 | 46:4 |
| 51:5 | 52:17 |
| 53:3 | 53:21 |
| 58:1 | 58:13 |
| 71:3 | 71:18 |
| 77:15 | 78:10 |
| 84:11 | 85:3 |
| 86:1 | 87:2 |
| 88:2 | 89:8 |
| 90:13 | 92:2 |
| 92:16 | 94:4 |
| 96:18 | 97:22 |
| 117:5 | 117:16 |



**A 91**



| | |
|---|---|
| 123:2 | 123:17 |
| 128:9 | 129:16 |
| 131:22 | 132:6 |
| 135:1 | 135:14 |
| 137:1 | 137:11 |
| 138:17 | 139:4 |
| 143:3 | 143:22 |
| 144:1 | 151:13 |
| 152:4 | 152:10 |
| 152:18 | 153:4 |
| 154:2 | 155:8 |
| 157:1 | 158:18 |
| 160:13 | 161:5 |
| 163:15 | 166:17 |

**Christopher Iannuccilli**

| | |
|---|---|
| 1:1 | 1:24 |
| 3:17 | 4:19 |
| 12:24 | 13:9 |
| 34:12 | 35:13 |
| 35:24 | 36:19 |
| 38:22 | 39:18 |
| 60:8 | 61:10 |
| 65:1 | 65:14 |

**A 92**



| 66:1 | 66:24 |
|---|---|
| 68:24 | 69:14 |
| 84:4 | 84:21 |
| 98:15 | 100:2 |
| 138:3 | 138:13 |

**Christopher Valle**

| 8:1 | 12:17 |
|---|---|
| 24:13 | 25:2 |
| 38:5 | 38:19 |
| 39:14 | 39:23 |
| 40:3 | 41:9 |
| 42:7 | 43:9 |
| 59:5 | 59:9 |
| 61:4 | 61:15 |
| 67:1 | 67:19 |
| 73:10 | 73:15 |
| 83:3 | 83:14 |
| 97:10 | 98:24 |
| 108:11 | 110:7 |

**Janine Bousquette**

| 6:21 | 8:2 |
|---|---|
| 10:14 | 10:21 |



**A 93**



| 14:1 | 14:8 |
|------|------|
| 15:10 | 15:16 |
| 22:20 | 23:5 |

**Peter Brine**

| 12:20 | 15:9 |
|-------|------|
| 16:15 | 24:23 |
| 26:11 | 29:9 |
| 34:12 | 35:14 |
| 36:4 | 38:19 |
| 40:12 | 41:24 |
| 49:3 | 49:11 |
| 56:3 | 57:19 |
| 60:24 | 62:8 |
| 62:24 | 63:17 |
| 71:9 | 71:20 |
| 71:22 | 71:24 |
| 74:1 | 74:18 |
| 86:14 | 87:5 |
| 98:19 | 99:11 |
| 114:2 | 115:11 |

**Edward (Toby) Lenk**

| 25:3 | 26:22 |
|------|-------|



**A 94**

| | |
|---|---|
| 33:4 | 33:18 |
| 41:8 | 42:17 |
| 43:3 | 44:16 |
| 47:18 | 47:25 |
| 51:4 | 51:15 |
| 56:3 | 57:3 |
| 59:21 | 65:5 |
| 67:19 | 68:23 |
| 69:4 | 69:21 |
| 77:11 | 78:17 |
| 88:9 | 89:9 |
| 91:16 | 92:9 |
| 97:12 | 99:12 |
| 100:4 | 100:24 |
| 106:1 | 106:16 |
| 107:1 | 107:21 |
| 108:8 | 109:18 |
| 112:4 | 113:13 |
| 114:17 | 114:22 |
| 116:2 | 121:24 |
| 129:12 | 130:9 |
| 131:21 | 132:25 |
| 136:22 | 152:24 |
| 140:16 | 141:23 |

**A 95**



| | |
|---|---|
| 150:13 | 153:21 |
| 154:11 | 155:17 |
| 159:11 | 161:5 |
| 165:14 | 166:14 |
| 166:2 | 166:14 |
| 169:6 | 170:7 |
| 174:9 | 174:18 |
| 181:15 | 181:17 |
| 183:6 | 184:4 |
| 187:18 | 189:7 |
| 200:1 | 201:19 |



**Steven Schoch**

| | |
|---|---|
| 15:1 | 16:1 |
| 18:6 | 20:5 |
| 33:9 | 34:1 |
| 39:8 | 40:11 |
| 49:14 | 52:16 |
| 52:23 | 54:16 |
| 55:24 | 57:11 |
| 61:17 | 62:12 |
| 65:9 | 65:18 |
| 71:16 | 72:23 |
| 92:7 | 92:22 |

**A 96**



| | |
|---|---|
| 94:7 | 95:9 |
| 95:25 | 96:11 |
| 98:10 | 100:25 |
| 101:9 | 101:16 |
| 103:17 | 105:17 |
| 112:1 | 112:7 |
| 112:9 | 112:25 |
| 131:16 | 134:22 |
| 136:6 | 136:23 |
| 150:20 | 154:16 |
| 157:14 | 158:23 |
| 166:2 | 166:19 |
| 168:4 | 168:18 |
| 174:9 | 174:22 |
| 183:7 | 185:8 |

**A 97**



# E-TOYS COUNTER-DESIGNATIONS OF DEPOSITION TESTIMONY

## MIRZA BAIG

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| 15 | 4 | 15 | 9 |
| 22 | 9 | 23 | 15 |
| 46 | 5 | 46 | 11 |
| 52 | 18 | 53 | 2 |
| 92 | 3 | 92 | 15 |
| 98 | 1 | 98 | 14 |
| 132 | 7 | 132 | 13 |
| 166 | 18 | 166 | 21 |

## CHRISTOPHER IANNUCCILLI

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| 34 | 4 | 34 | 11 |
| 69 | 15 | 69 | 22 |

## CHRISTOPHER VALLE

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| 43 | 10 | 43 | 12 |
| 59 | 10 | 59 | 20 |

## JANINE BOUSQUETTE

| From | | To | |
|---|---|---|---|
| Page | Line | Page | Line |
| None | | | |

**A 98**





## PETER BRINE

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 35 | 15 | 36 | 3 |
| 49 | 12 | 49 | 17 |

## EDWARD (TOBY) LENK

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 47 | 2 | 47 | 17 |
| 181 | 18 | 182 | 1 |

## STEPHEN SCHOCH

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 40 | 12 | 40 | 24 |
| 101 | 17 | 101 | 18 |
| 134 | 23 | 135 | 5 |






**AOL's DEPOSITION COUNTER-DESIGNATIONS**

**Mirza Baig**

| FROM | TO |
| --- | --- |
| 8:5 | 8:14 |
| 55:2 | 56:5 |
| 56:10 | 57:22 |
| 58:14 | 59:7 |
| 63:9 | 64:9 |
| 65:11 | 68:6 |
| 71:19 | 72:13 |
| 75:7 | 75:17 |
| 76:22 | 77:5 |
| 77:18 | 77:21 |
| 94:19 | 95:6 |
| 96:18 | 98:8 |
| 102:20 | 103:3 |
| 106:1 | 106:7 |
| 109:10 | 109:22 |
| 116:14 | 120:22 |
| 121:19 | 123:1 |
| 124:17 | 125:1 |
| 156:15 | 156:22 |
| 159:8 | 159:13 |
| 161:22 | 162:61 |



**A 100**

| | |
|---|---|
| 166:22 | 168:2 |
| 168:16 | 169:81 |
| 169:19 | 170:16 |

**Christopher Iannuccilli**

| | |
|---|---|
| 24:15 | 24:20 |
| 50:7 | 50:15 |
| 52:12 | 52:22 |
| 59:4 | 59:16 |
| 67:1 | 67:17 |
| 72:12 | 73:19 |
| 76:16 | 81:4 |
| 85:1 | 85:11 |
| 90:16 | 91:14 |
| 93:5 | 94:2 |
| 94:20 | 95:4 |
| 97:3 | 98:15 |
| 100:3 | 103:21 |
| 104:21 | 105:8 |
| 107:6 | 107:16 |
| 110:4 | 111:1 |
| 118:15 | 119:13 |
| 121:4 | 123:6 |
| 137:9 | 137:16 |



**A 101**

6/15/2007

**Peter Brine**

| | |
|---|---|
| 49:18 | 49:25 |
| 83:9 | 83:17 |
| 84:12 | 84:18 |

**Edward (Toby) Lenk**

| | |
|---|---|
| 133:6 | 133:10 |
| 135:1 | 136:3 |
| 180:19 | 181:16 |

**Steven Schoch**

| | |
|---|---|
| 55:11 | 55:23 |
| 113:1 | 118:5 |
| 119:9 | 119:18 |
| 122:17 | 126:9 |
| 128:3 | 128:17 |
| 135:6 | 136:5 |
| 137:12 | 138:6 |
| 147:16 | 149:11 |
| 160:14 | 161:25 |
| 167:15 | 168:4 |
| 174:4 | 174:9 |
| 174:23 | 175:6 |
| 179:17 | 182:1 |

**A 102**

6/15/2007

**Christopher Valle**

| | |
|---|---|
| 7:23 | 7:25 |
| 12:24 | 13:5 |
| 20:21 | 21:7 |
| 25:17 | 30:8 |
| 38:20 | 39:3 |
| 43:13 | 43:17 |
| 44:18 | 47:17 |
| 48:4 | 49:10 |
| 49:20 | 49:21 |
| 54:1 | 54:5 |
| 78:10 | 81:23 |
| 83:15 | 87:3 |
| 91:15 | 92:10 |
| 99:21 | 101:4 |
| 104:15 | 105:19 |
| | |

**Sue Burger**

| | |
|---|---|
| 21:3 | 25:6 |
| 31:7 | 31:17 |
| 45:21 | 46:10 |
| 57:11 | 57:14 |
| 61:4 | 61:19 |



**A 103**

6/15/2007

| | |
|---|---|
| 66:6 | 67:17 |
| 70:21 | 71:9 |
| 72:4 | 72:14 |
| 74:16 | 75:13 |
| 75:22 | 76:2 |
| 78:20 | 83:21 |
| 99:20 | 100:12 |
| 103:12 | 104:23 |
| 105:13 | 106:11 |
| 107:2 | 108:70 |
| 110:8 | 110:17 |
| 115:10 | 117:18 |
| 140:20 | 140:22 |
| 162:4 | 162:14 |
| 171:3 | 171:22 |
| 172:5 | 174:6 |
| | |



**A 104**

## CERTIFICATE OF SERVICE

I, Gregory W. Werkheiser, Esquire, certify that I am not less than 18 years of age, and that service of the foregoing Statement Of Issues And Designation Of Items To Be Included In Record On Appeal By Appellant was caused to be made on February 1, 2008, upon the attorneys listed below as follows:

**BY HAND DELIVERY**

Karen C. Bifferato, Esquire
Marc J. Phillips, Esquire
Christina Thompson, Esquire
Connolly, Bove, Lodge & Hutz
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899

Fred Rosner, Esq.
Duane Morris LLP
1100 N. Market Street, Suite 1200
P.O. Box 195
Wilmington, DE 19801

Mark S. Kenney
Office of the U.S. Trustee
844 King Street
Suite 2207, Lockbox 35
Wilmington, DE 19801

**BY U.S. FIRST-CLASS MAIL**

Michael D. Snyder, Esquire
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Susan Balaschak, Esquire
Dreier LLP
499 Park Avenue
New York, NY 10022

Gregory W. Werkheiser (No. 4553)

1447188

**A 105**

**APPENDIX – PART 3 OF 4**

*Confidential*
INTERACTIVE MARKETING AGREEMENT

This Interactive Marketing Agreement (the "Agreement"), dated as of August 10, 1999 (the "Effective Date"), is between America Online, Inc. ("AOL"), a Delaware corporation, with offices at 22000 AOL Way, Dulles, Virginia 20166, and eToys Inc. ("Marketing Partner" or "MP"), a Delaware corporation, with offices at 3100 Ocean Park Boulevard, Suite 300, Santa Monica, California 90405. AOL and MP may be referred to individually as a "Party" and collectively as the "Parties."

INTRODUCTION

AOL and MP each desires to enter into an interactive marketing relationship whereby AOL will promote and distribute an interactive site referred to (and further defined) herein as the Affiliated MP Site. This relationship is further described below and is subject to the terms and conditions set forth in this Agreement. Defined terms used but not defined in the body of the Agreement will be as defined on Exhibit B attached hereto.

TERMS

1.    PROMOTION, DISTRIBUTION AND MARKETING.

1.1.    AOL Promotion of Affiliated MP Site. AOL will provide MP with the promotions for the Affiliated MP Site described on Exhibit A attached hereto and in Sections 1.2 and 1.3 below. Subject to MP's reasonable approval and to Section 1.4 hereof, AOL will have the right to fulfill its promotional commitments with respect to any of the foregoing by providing MP comparable promotional placements in appropriate alternative areas of the AOL Network taking into account the Relative Weighted Value (as defined below) of the Promotions and Impressions. In addition, except as otherwise provided in Section 1.4 hereof, if AOL is unable to deliver any particular Promotion, subject to MP's reasonable approval, AOL shall deliver a comparable promotional placement in lieu thereof taking into account the Relative Weighted Value of the Promotions and Impressions which will be MP's sole remedy for AOL's failure to deliver such Promotion (subject to referral to the Management Committee and the other procedures for conflict resolution set forth in Section 6). AOL reserves the right to redesign or modify the organization, structure, "look and feel," navigation and other elements of the AOL Network at any time. In the event such modifications materially and adversely affect any specific Promotion or the Promotions in the aggregate, subject to Section 1.4 hereof, AOL and MP will mutually agree upon a comparable promotional placement in lieu thereof taking into account the Relative Weighted Value of the Promotions and Impressions (such agreement not to be unreasonably withheld by either party), which will be MP's sole remedy for such modifications (subject to referral to the Management Committee and the other procedures for conflict resolution set forth in Section 6). As used herein, "Relative Weighted Value" of the Promotions and Impressions refers to the fact that, as acknowledged and agreed by the Parties hereto and as evidenced by Exhibit A hereto, the Impressions and Promotions described on Exhibit A hereto are not of equal value but rather, in order of descending relative value from the most to the least valuable, are categorized as follows: (a) Shopping (b) Level 1, (c) Level 2, (d) Level 3, (e) Level 4, and (f) Level 5 (Welcome Screen). Subject to Section 1.4 hereof, in any case arising under this Agreement that requires the Parties to value Promotions or Impressions that have been delivered, are required to be delivered or are required to be replaced with comparable promotional placements or any other comparable or similar valuation or circumstance, the Parties will take into account the Relative Weighted Value of the Promotions and Impressions. On each anniversary date of the Effective Date (or as soon thereafter as practicable), the

**Plaintiff's Exhibits**
Adv. Pro. No. 03-50003
**01**

**A 106**

Deposition Exhibit PX-1
Deponent: C. Valle
Date: November 20, 2003
Reporter: Jane Grossman, CSR No. 5225

AOL 00197

Parties shall discuss in good faith the Relative Weighted Value assigned to the various categories of Promotions. In the event that the Parties are unable to agree on modifications to the Relative Weighted Value of the various categories of Promotions, the issue shall be referred to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.2.    <u>Impressions Commitment</u>. During the Term, AOL shall deliver at least one billion (1,000,000,000) Impressions to the Affiliated MP Site through the Promotions (the "Impressions Commitment"). AOL shall use commercially reasonable efforts to divide the Impressions Commitment among the three years of the Term in the manner set forth on Exhibit A hereto. In addition, AOL shall use commercially reasonable efforts to deliver at least 35% of the Impressions Commitment for any year during the three-month period ending December 20 of such year (the "Holiday Quarter"). Within 30 days following each anniversary of the Effective Date, AOL will deliver to MP a report indicating the number of Impressions delivered in the preceding year and whether there has occurred any shortfall in the required delivery of Impressions as set forth in Exhibit A during the preceding year in any particular area or component of the AOL Network. In the event that a shortfall has occurred in any year, subject to MP's reasonable approval and Section 1.4 hereof, AOL shall deliver comparable promotional placements taking into account the Relative Weighted Value of the Impressions during the first six months of the year following the year in which the shortfall occurred or such other time period as may be agreed to by MP. Notwithstanding the foregoing, subject to Section 1.4 hereof, in the event that (i) at the end of Year 1 AOL has delivered in the aggregate fewer Impressions than the Year 1 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 1 Penalty, (ii) at the end of Year 2 AOL has delivered in the aggregate fewer Impressions than the Year 2 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 2 Penalty, and (iii) at the end of Year 3 AOL has delivered in the aggregate fewer Impressions than the Year 3 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 3 Penalty, in the case of each of (i), (ii) and (iii), such Impressions to be delivered within the first six months of the year following the year in which the shortfall occurred. In the event that a significant shortfall has occurred during the Holiday Quarter of any year (i.e. significantly less than 35% of the Impressions to be delivered in such year), MP may request that the Management Committee determine an appropriate remedy for MP. The foregoing shall be MP's sole remedies with respect to any shortfall in the delivery of Promotions and Impressions by AOL hereunder; provided, however, that nothing herein shall prohibit any Party from referring any dispute hereunder to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.3.    <u>Additional Welcome Screen Promotions</u>. In addition to the Impressions provided under Section 1.2, AOL shall deliver at least twenty-five million (25,000,000) Impressions to the Affiliated Site from the Promotions on the AOL Service Welcome Screen during each quarter of the Term that MP provides at least one mutually agreed upon AOL Special Offer (as described in Section 2.6) for promotion on the AOL Welcome Screen. In the event that at any time during the Term (i) AOL is unable or unwilling to deliver the Impressions required under this Section 1.3 and Level 5 of Exhibit A in a "graphic" format generally, and (ii) as a result of such inability or unwillingness, MP suffers at least a thirty-five percent (35%) decrease in the "click-through" rate of such Promotions by AOL Users, then the Parties shall discuss in good faith the number of Impressions to be delivered by AOL to MP in order to compensate MP for such decrease. In the event that the Parties are unable to agree on the appropriate number, the issue shall be referred to the

**CONFIDENTIAL**
**Execution Copy**

2

**A 107**

Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.4.    **Guarantee of Shopping Impressions**. In the event of any shortfall in the delivery of Impressions required under "Shopping" on Exhibit A hereto, AOL agrees that it shall remedy each such shortfall by delivery of the required number of Impressions in the respective "Commerce" area in which such shortfall occurred. Notwithstanding the foregoing, the Parties agree that in the event of any shortfall in the delivery of Impressions in any department of the "Kids Commerce Center", AOL shall remedy each such shortfall by delivery of the required number of Impressions in the department in which such shortfall occurred.

1.5    **Content of Promotions**. The Promotions will link only to the Affiliated MP Site and will promote only the Promotable Products and Content and the Promotable Functions as defined on Exhibit D. The specific MP Content to be contained within the Promotions described in Exhibit A (the "Promo Content") will be determined by MP, subject to AOL's technical limitations, the terms of this Agreement and AOL's then-applicable policies relating to advertising and promotions (which policies shall be generally applicable to all marketing partners in relationships comparable to MP's relationship with AOL). MP will submit in advance to AOL for its review a quarterly online marketing plan with respect to the Promo Content to be included in the Promotions of the Affiliated MP Site on the AOL Network. The Parties will meet in person or by telephone at least monthly to review operations and performance hereunder, including a review of the Promo Content to ensure that it is designed to maximize performance. MP agrees to update the Promo Content when and as MP determines it to be necessary or desirable in MP's reasonable discretion. Except to the extent expressly described herein, the specific form, placement, duration and nature of the Promotions will be as determined by AOL in its reasonable editorial discretion (consistent with the editorial composition of the applicable screens).

1.6    **MP Promotion of Affiliated MP Site and AOL**. During the Term hereof, MP will promote the availability of the Affiliated MP Site through the AOL Network as set forth in Exhibit C hereof.

1.7    **AOL's Promotion of MP as Premiere Children's Retailer**. Promptly following the Effective Date, AOL and MP shall jointly issue a press release in a form mutually agreeable to the Parties announcing the effectiveness of this Agreement. Such press release will, among other things, identify MP as the "Premiere Retailer of Children's Products on the AOL Network, including toys, video games, videos, software, books, music and baby products."

1.8    **Wish Lists**.

1.8.1    Kids Only Holiday Wish List. During the Term, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the Kids Only Holiday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Holiday Wish List Section"). Beginning September 1, 2000, for the duration of the Term, MP shall be the exclusive provider of products promoted in the Music gift category of the Kids Only Holiday Wish List Section. MP agrees to (i) market and promote in the Kids Only Holiday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

1.8.2    Kids Only Birthday Wish List. During Year 1, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the

**A 108**

AOL 00199

Kids Only Birthday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Birthday Wish List Section"). MP agrees to (i) market and promote in the Kids Only Birthday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

1.9    **Toy Decision Guide.** During the Term, MP shall receive the premier advertising anchor button on the AOL Service Toy Decision Guide (the "Decision Guide") main screen. In the event that MP contributes data and other content (e.g. product descriptions, product photographs) to the Decision Guide database and AOL, in its sole discretion elects to use such data and other content in the Decision Guide, MP shall receive a button on each page of the Decision Guide. MP shall receive a link on the "Results" page of the Decision Guide.

2.    **AFFILIATED MP SITE.**

2.1    **Content.** There shall be no limitation on the Content, products, services, community or functions that are or may be offered on the Affiliated MP Site except that, during each of Year 1, Year 2 and Year 3 of the Term, net sales of products on the Affiliated MP Site (after deducting charges for shipping, handling, gift wrapping, sales tax, coupons or other discounts, and product returns) shall be derived (i) at least fifty percent (50%) from, collectively, the sale of children's toys, hobbies, arts and crafts, video games and software, and (ii) at least seventy-five percent (75%) from or through a direct sales format. Unless AOL shall otherwise consent, the products, services, content, community and functions that may be advertised, marketed and promoted by MP through the Promotions and Impressions provided for hereunder shall be limited to (a) the Promotable Products and Content (as defined on Exhibit D hereto) and (b) with respect to up to 200,000,000 of the Impressions provided for hereunder, the Promotable Functions (as defined on Exhibit D hereto); provided, however, that (i) all promotions of Promotable Functions shall describe such Promotable Functions generically and shall not reference any branding of such Promotable Function (i.e. "find toy decision guides at keyword: eToys" would be permitted, but "come check out the eToys Toy Decision Guide" would not be permitted) and (ii) in the event that AOL desires to lessen the maximum number of promotions of Promotable Functions permitted hereunder, eToys will consider in good faith whether to lessen such number and will negotiate in good faith with AOL with respect thereto, and in the event the Parties are unable to agree on a lesser number, the matter shall be referred to the Management Committee for consideration, provided that nothing herein shall require that MP agree to lessen the number of promotions of Promotable Functions. MP will review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated MP Site in accordance with the terms of this Agreement. MP will ensure that the Affiliated MP Site does not in any respect promote, advertise, market or distribute the products, services or content of any other Interactive Service, except that MP may include on the Affiliated MP Site:

2.1.1    branding for another Interactive Service to the extent such branding (i) merely indicates MP's use of such Interactive Service's integrated technology, (ii) does not provide a link to any other Interactive Site, and (iii) is required under MP's written agreement with such Interactive Service. Notwithstanding the foregoing sentence, MP agrees that in the event that (x) MP proposes to purchase, license or otherwise acquire for use on the Affiliated MP Site any integrated technology not in use on the Affiliated MP Site as of the Effective Date or with respect to which MP has not entered into negotiation or discussion prior to the Effective Date (MP represents and warrants that it has not entered into negotiations or discussions regarding instant messaging, e-mail or chat technology), and (y) AOL

4

**CONFIDENTIAL**
**Execution Copy**

offers market competitive and relevant similar technology, MP shall notify AOL of its intention to purchase, license or otherwise acquire such new integrated technology and:

2.1.1.1 In the case of any instant messaging, e-mail or chat technology or, in each of Year 2 and Year 3, one other type of technology as specified in writing by AOL (a "Specified Technology"), MP shall conduct good faith negotiations exclusively with AOL for at least thirty (30) days regarding MP's possible purchase, license or other acquisition of such Specified Technology from AOL. During such time, AOL shall, if it so desires, make an offer to MP setting forth in reasonable detail the product specifications for such technology and the price and other terms on which it is willing to provide such technology to MP (the "AOL Technology Offer"). If MP rejects the AOL Technology Offer, then MP may not accept an offer for such Specified Technology unless MP determines, in the exercise of its good faith business judgment, that the product specifications, price and terms offered by such third party are, in the aggregate, materially more favorable to MP than the AOL Technology Offer; and

2.1.1.2 In the case of any other integrated technology, MP shall consider in good faith the possible purchase, license or other acquisition of such integrated technology from AOL.

Notwithstanding the foregoing, AOL agrees that other than with respect to any Specified Technology listed in Section 2.1.1.1., in the event MP creates or acquires in connection with the acquisition of another business enterprise (a "Business Acquisition") any integrated technology, MP shall be free to promote, advertise, market and distribute such integrated technology on the Affiliated MP Site, whether under the "eToys" name or any other name, without restriction or penalty under this Agreement; provided, that, unless otherwise required under an agreement to which MP becomes a party as a result of a Business Acquisition, nothing in this paragraph shall permit the establishment of a link to any Interactive Service.

2.1.2    screens which promote, advertise, market or distribute the products, services or content of another Interactive Service, if such screens are not accessible to any AOL Users while using the AOL Network unless such AOL Users have accessed such screens directly from such Interactive Service;

2.1.3    references to another Interactive Service made solely in connection with special charitable offers (e.g., Toys for Tots, March of Dimes) co-branded with such Interactive Service, provided that such references do not provide a link to the other Interactive Service. To the extent it has authority to do so, MP shall make reasonable efforts to include AOL as a co-sponsor of any such special charitable offer; and

2.1.4    a linked button for the online shopping mall branded "Shopper Connection" appearing below the fold on MP's home page, of no greater prominence than the largest button appearing at the bottom of the Affiliated MP Site; provided, however, that MP shall be permitted for two one-week periods during each year of the Term (but not more than one during any Holiday Quarter) to include on the Affiliated MP Site a more prominent above the fold promotion for "Shopper Connection" if required under MP's agreement with "Shopper Connection."

5

CONFIDENTIAL
Execution Copy

AOL 00201

A 110

2.1.5   with respect to any Interactive Service that advertises, markets or promotes itself or otherwise maintains a presence on the AOL Network (an "AOL Associated Interactive Service"), if MP desires to enter into a relationship pursuant to which the Affiliated MP Site will promote, advertise, market or distribute the products, services or content of such AOL Associated Interactive Service, upon MP's request, AOL will consider such request in good faith and may grant its permission for MP to enter into such relationship with such AOL Associated Interactive Service, if AOL reasonably determines that the granting of such permission would not be adverse to AOL's interests; provided, however, that nothing herein shall require that AOL grant such permission.

2.2   <u>Production Work</u>.  Except as agreed to in writing by the Parties pursuant to the "Production Work" section of the Standard Online Commerce Terms & Conditions attached hereto as Exhibit F, MP will be responsible for all production work associated with the Affiliated MP Site, including all related costs and expenses.

2.3.   <u>Technology</u>.  MP will take all commercially reasonable steps necessary to conform its promotion and sale of Products through the Affiliated MP Site to the then-existing technologies identified by AOL which are optimized for AOL.  Notwithstanding the foregoing, the parties hereto agree that, unless MP otherwise consents, MP will not be required to incorporate or implement into or on the Affiliated MP Site any "quick checkout" tool that AOL may implement (including any modifications thereof) to facilitate purchase of products by AOL Users other than such a tool (including any modifications thereof) with specifications that substantially conform to those set forth on Exhibit I attached hereto and which is otherwise reasonably acceptable to MP. MP shall use commercially reasonable efforts to implement the "quick checkout" tool on the Affiliated MP Site prior to September 30, 1999, provided, however, that unless any such "quick checkout" tool has been fully implemented or incorporated on or into the Affiliated MP Site no later than September 30, 1999, MP shall be entitled to cease all efforts to implement such technology and not resume such efforts until January 2000.  Once implemented into the Affiliated MP Site, subject to the following sentence, such tool may not be modified in any material manner or in any manner that requires a material modification of the Affiliated MP Site unless MP consents to such modification, which consent shall not be unreasonably withheld. Notwithstanding the foregoing sentence, (i) AOL shall be entitled to modify the "quick checkout" tool to make any necessary protocol changes (e.g., fix bugs, remedy security holes, etc.); provided that AOL shall use commercially reasonable efforts to make any new protocol compatible with the Affiliated MP Site as the Affiliated MP site is then configured, and (ii) in the event of such a modification, MP shall use commercially reasonable efforts to conform the Affiliated MP Site, if necessary, to operate with such modifications.  AOL will be entitled to require reasonable changes to the Content (including, without limitation, the features or functionality) within any linked pages of the Affiliated MP Site to the extent such Content will adversely affect any material operational aspect of the AOL Network.  AOL reserves the right to review and test the Affiliated MP Site from time to time to determine whether the site is compatible with AOL's then-available client and host software and the AOL Network. Notwithstanding any provision of this Agreement to the contrary, in the event that MP suffers a material decrease in sales on the Affiliated MP Site as a result of its implementation of "quick checkout" (and MP has established such causal relationship to AOL), then MP shall be permitted to discontinue its use of "quick checkout".

2.4.   <u>Product Offering</u>.  Subject to the restrictions set forth in Section 2.1, MP will ensure that the Affiliated MP Site includes all of the Promotable Products and Content and Promotable Functions (including, without limitation, any features, offers, contests, functionality or technology) that are then made available by or on behalf of MP through

AOL 00202

**A 111**

any Additional MP Channel; provided, however, that such inclusion will not be required where it is commercially or technically impractical to either Party (i.e., inclusion would cause either Party to incur substantial incremental costs).

2.5.    <u>Pricing and Terms</u>.  Other than periodic special contests, sweepstakes, coupons, discounts, product enhancements, premiums, unique services, auctions, subscriptions or other advertising, marketing or promotional offers, campaigns or initiatives that are targeted at specific customers or groups of customers other than AOL Users ("Non-AOL Special Offers"), MP will ensure that: (i) the prices (and any other required consideration) for Products in the Affiliated MP Site do not generally exceed the prices for the Products or substantially similar Products offered by or on behalf of MP through any Additional MP Channel; and (ii) the terms and conditions related to Products in the Affiliated MP Site are not generally less favorable than the terms and conditions for the Products or substantially similar Products offered by or on behalf of MP through any Additional MP Channel.  Notwithstanding the foregoing, MP agrees that, in the event that in any of Year 1, Year 2 or Year 3, the Non-AOL Special Offers during such year are in the aggregate materially more valuable than the AOL Special Offers in the aggregate during such year, the Parties shall conduct good faith discussions to devise a means of providing AOL Users with additional AOL Special Offers to compensate for such discrepancy in aggregate value.  In the event that the Parties are unable to agree on an appropriate remedy, the matter shall be referred to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

2.6.    <u>Special Offers/Member Benefits</u>.  At least once per calendar quarter for not less than seven (7) consecutive days, MP shall promote through the Affiliated MP Site a special offer that is promoted specifically for AOL Users (the "AOL Special Offers").   The AOL Special Offer made available by MP shall provide a substantial member benefit to AOL Users, either by virtue of a meaningful price discount, product enhancement, unique service benefit or other special feature, or opportunity to purchase a new Product.  Such AOL Special Offer will be made exclusively to AOL Users, except that, with respect to such the opportunity to purchase a new Product, AOL acknowledges that MP is unable to provide such an opportunity on an exclusive basis, but MP will only advertise the availability of the new Product to AOL Users during the term of the AOL Special Offer, thereby increasing the likelihood that AOL Users will have the opportunity to purchase the new Product before other MP customers.    MP will provide AOL with reasonable prior notice of AOL Special Offers so that AOL can market the availability of such AOL Special Offers in the manner AOL deems appropriate in its editorial discretion. AOL Special Offers that are appropriate for promotion on the AOL Service Welcome Screen, as mutually agreed by the Parties (which agreement shall not be unreasonably withheld by either party), shall be promoted as set forth in Section 1.2.

2.7.    <u>Operating Standards</u>.  MP will ensure that the Affiliated MP Site complies at all times with the standards set forth in Exhibit E. To the extent site standards are not established in Exhibit E with respect to any aspect or portion of the Affiliated MP Site (or the Products or other Content contained therein), MP will provide such aspect or portion at a level of accuracy, quality, completeness, and timeliness which meets or exceeds prevailing standards in the toys industry.  In the event MP fails to comply with any standards set forth in Exhibit E, as of the seventh calendar day following such non-compliance, AOL will have the right (in addition to any other remedies available to AOL hereunder) to decrease the promotion it provides to MP until such time as MP corrects its non-compliance (and in such event, AOL will be relieved of the proportionate amount of any promotional commitment made to MP by AOL hereunder corresponding to such decrease in promotion) and any New Customer and Impressions threshold(s) set forth in Sections 4

and 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

2.8.  Underline{Advertising}.  Except for Non-material Advertisements, the Affiliated MP Site shall not advertise or promote any third party, without AOL's prior written consent.  Any consent by AOL shall be conditioned upon the Parties agreeing in writing to a revenue splitting arrangement (with respect to revenues in excess of the thresholds in the following sentence) for such advertising. For the purposes of this Section 2.8, "Non-material Advertisements" shall mean (i) in Year 1, advertisements valued in the aggregate at not more than two million dollars ($2,000,000), (ii) in Year 2, advertisements valued in the aggregate at not more than four million dollars ($4,000,000), and (iii) in Year 3, advertisements valued in the aggregate at not more than six million dollars ($6,000,000). The value of advertising shall be the total consideration (but not including in-kind, reciprocal advertising) received by MP for such advertising.

2.9.  <u>Traffic Flow</u>.  The Parties will work together on implementing mutually acceptable links from the Affiliated MP Site back to the AOL Service. In the event that AOL points to the Affiliated MP Site or any other MP Interactive Site or otherwise delivers traffic to such site hereunder, MP will ensure that navigation back to the AOL Network from such site, whether through a particular pointer or link, the "back" button on an Internet browser, the closing of an active window, or any other return mechanism, shall not be interrupted by MP through the use of any intermediate screen or other device not specifically requested by the user, including without limitation through the use of any html popup window or any other similar device.  Rather, such AOL traffic shall be pointed directly back to the AOL Network as designated by AOL.

3.  **AOL CDROM DISTRIBUTION**. During the 90 day period following the Effective Date, MP shall use commercially reasonable efforts to provide AOL with such information and data reasonably requested by AOL for determining the feasibility and likely success of a marketing test for AOL and CompuServe CD-ROM distribution; provided, however, that MP shall have no obligation to provide such information in the event that MP reasonably believes that such act would violate any policy of MP or be impracticable or competitively disadvantageous. Thereafter, the Parties shall discuss in good faith the feasibility of entering into a marketing arrangement, pursuant to which MP would distribute CD-ROMs on behalf of AOL in consideration of bounty payments by AOL to MP for new subscribers.

4.  **PAYMENTS**.

4.1  Underline{Required Payments}. MP will pay AOL a non-refundable payment of Eighteen Million Dollars (US$18,000,000) payable on the dates and in the amounts as follows:

| Payment Due Date | Payment Amount |
| --- | --- |
| Effective Date | $1,500,000 |
| October 15, 1999 | $1,500,000 |
| January 15, 2000 | $1,500,000 |
| April 15, 2000 | $1,500,000 |
| July 15, 2000 | $1,500,000 |
| October 15, 2000 | $1,500,000 |
| January 15, 2001 | $1,500,000 |
| April 15, 2001 | $1,500,000 |
| July 15, 2001 | $1,500,000 |

CONFIDENTIAL
Execution Copy

8

AOL 00204

A 113

| | |
|---|---|
| October 15, 2001 | $1,500,000 |
| January 15, 2002 | $1,500,000 |
| April 15, 2002 | $1,500,000 |

4.2 <u>Bounty for New Customers</u>. In addition to the amounts payable under Section 4.1 above,

4.2.1    during the Initial Term, after MP has acquired One Million Eight Hundred Thousand (1,800,000) New Customers (the "New Customer Threshold") through the AOL Network, MP shall pay to AOL, within thirty (30) days of the end of each three month period ending March 31, June 30, September 30 or December 31 (each a "Quarter"), ten dollars ($10) for each additional New Customer acquired over the New Customer Threshold through the AOL Network thereafter during the Term; and

4.2.2    during the Continued Link Period, provided that AOL maintains the Continued Link and provided that the New Customer Threshold has been achieved during the time period consisting of the Initial Term and any portion of the Continued Link Period during which AOL has maintained the Continued Link, MP shall pay to AOL, within thirty (30) days of the end of each Quarter, ten dollars ($10) for each additional New Customer acquired over the New Customer Threshold through the AOL Network thereafter during the Term. For purposes of clarification, only one $10 fee shall be paid for each New Customer over the New Customer Threshold, and there shall be no duplication of the fees paid under Section 4.2.1 and 4.2.2.

4.3 <u>Late Payments; Wired Payments</u>. All amounts owed hereunder not paid when due and payable will bear interest from the date such amounts are due and payable at the prime rate in effect at such time as reported by The Chase Manhattan Bank, New York, New York. All payments required hereunder will be paid in immediately available, non-refundable U.S. funds wired to the "America Online" account, Account Number 323070752 at The Chase Manhattan Bank, 1 Chase Manhattan Plaza, New York, NY 10081 (ABA: 021000021).

4.4 <u>Auditing Rights</u>. MP will maintain complete, clear and accurate records in connection with the performance of this Agreement. For the sole purpose of ensuring compliance with this Agreement, AOL (or its representative) will have the right to conduct a reasonable and necessary inspection of portions of the books and records of MP which are relevant to MP's performance pursuant to this Agreement. Any such audit may be conducted after twenty (20) business days prior written notice to MP. AOL shall bear the expense of any audit conducted pursuant to this Section 4.4 unless such audit shows an error in AOL's favor amounting to a deficiency to AOL in excess of five percent (5%) of the actual amounts paid and/or payable to AOL hereunder, in which event MP shall bear the reasonable expenses of the audit. MP shall pay AOL the amount of any deficiency discovered by AOL within thirty (30) days after receipt of notice thereof from AOL.

4.5 <u>Taxes</u>. MP will collect and pay and indemnify and hold AOL harmless from, any sales, use, excise, import or export value added or similar tax or duty not based on AOL's income, including any penalties and interest, as well as any costs associated with the collection or withholding thereof, including attorneys' fees.

4.6 <u>Reports</u>.

4.6.1    <u>Sales Reports</u>. MP will provide AOL in an automated manner with a quarterly report setting forth summary aggregate sales information for the Affiliated MP Site

AOL 00205

**A 114**

("Sales Reports"). AOL will be entitled to use the Sales Reports in its business operations, subject to the terms of this Agreement. AOL acknowledges that such reports may contain Confidential Information as defined herein. Additionally, upon request, MP shall provide to AOL a certificate executed by an executive officer of MP certifying MP's compliance with the first sentence of Section 2.1 of this Agreement.

4.6.2   Usage Reports. AOL shall provide MP with standard usage information related to the Promotions (e.g. a schedule of the Impressions delivered by AOL at such time) which is similar in substance and form to the reports provided by AOL to other interactive marketing partners similar to MP. AOL acknowledges that such information is currently audited by an independent third party. In the event that at any time during the Term, such information is no longer audited by an independent third party, the Parties shall discuss in good faith the reporting obligations of AOL and shall modify such obligations as the Parties shall mutually agree. MP acknowledges that such information may be Confidential Information as defined herein. AOL shall also provide MP with the reports listed on Exhibit J.

4.6.3   Fraudulent Transactions. To the extent permitted by applicable laws and any privacy policy followed by MP, MP will, at its reasonable discretion, provide AOL with a report of any order that has been finally determined to MP's satisfaction to be fraudulent, including the date, screenname or email address and amount associated with such order. All information provided to AOL pursuant to this Section 4.6.3 shall be considered Confidential Information. MP shall not be held liable for any losses suffered by AOL or any of its affiliates arising in whole or in part from any failure to provide the information required hereby.

5.   **TERM; RENEWAL; TERMINATION.**

5.1   Term. Unless earlier terminated as set forth herein, the initial term of this Agreement will be three (3) years from the Effective Date (the "Term").

5.2   Continued Links. For up to three (3) years after expiration of the Term (the "Continued Link Period"), AOL may, at its discretion, continue to promote one or more "pointers" or links from the AOL Network to an MP Interactive Site and continue to use MP's trade names, trade marks and service marks in connection therewith (collectively, a "Continued Link"). So long as AOL maintains a Continued Link, (a) MP shall pay AOL the bounty required pursuant to Section 4.2.2, and (b) Sections 4.4 and 4.5 along with the terms of Exhibit G hereto shall continue to apply with respect to the Continued Link and any transactions arising therefrom.

5.3   Termination for Breach. Except as expressly provided elsewhere in this Agreement, either Party may terminate this Agreement at any time in the event of a material breach of the Agreement by the other Party which remains uncured after thirty (30) days written notice thereof to the other Party (or such shorter period as may be specified elsewhere in this Agreement); provided that the cure period with respect to any scheduled payment will be fifteen (15) days from receipt of notice of nonpayment. Notwithstanding the foregoing, in the event of a material breach of a provision that expressly requires action to be completed within an express period shorter than 30 days, either Party may terminate this Agreement if the breach remains uncured after written notice thereof to the other Party and the expiration of such shorter cure period (if any).

**CONFIDENTIAL**
**Execution Copy**

**AOL 00206**

**A 115**

5.5     <u>Termination on Change of Control</u>.

     5.5.1    In the event of a Change of Control of MP resulting in control of MP by an Interactive Service, AOL may terminate this Agreement by providing thirty (30) days prior written notice of such intent to terminate.

     5.5.2    In the event of a Change of Control of AOL resulting in control of AOL by an MP Competitor, MP may terminate this Agreement by providing thirty (30) days prior written notice of such intent to terminate.

5.6     <u>Termination for Bankruptcy/Insolvency</u>. Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party (i) ceases to do business in the normal course, (ii) becomes or is declared insolvent or bankrupt, (iii) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) calendar days or (iv) makes an assignment for the benefit of creditors.

## 6.   MANAGEMENT COMMITTEE/ARBITRATION.

6.1     <u>Management Committee</u>. The Parties will act in good faith and use commercially reasonable efforts to promptly resolve any claim, dispute, controversy or disagreement (each a "Dispute") between the Parties or any of their respective subsidiaries, affiliates, successors and assigns under or related to this Agreement or any document executed pursuant to this Agreement or any of the transactions contemplated hereby. If the Parties cannot resolve the Dispute by such means within 10 days, the Dispute will be submitted to the Management Committee for resolution. For ten (10) days following submission of the Dispute to the Management Committee, the Management Committee will have the exclusive right to resolve such Dispute. If the Management Committee is unable to amicably resolve the Dispute during the ten-day period, then the Management Committee will consider in good faith the possibility of retaining a third party mediator to facilitate resolution of the Dispute. In the event the Management Committee elects not to retain a mediator, the dispute will be subject to the resolution mechanisms described below. "Management Committee" will mean a committee made up of a senior executive from each of the Parties for the purpose of resolving Disputes under this Section 6 and generally overseeing the relationship between the Parties contemplated by this Agreement. Neither Party will seek, nor will be entitled to seek, binding outside resolution of the Dispute unless and until the Parties have been unable amicably to resolve the Dispute as set forth in this Section 6 and then, only in compliance with the procedures set forth in this Section 6.

6.2     <u>Arbitration</u>. Except for Disputes relating to issues of proprietary rights, including but not limited to intellectual property and confidentiality, any Dispute not resolved by amicable resolution as set forth in Section 6.1 will be governed exclusively and finally by arbitration. Such arbitration will be conducted by the American Arbitration Association ("AAA") in Washington, D.C. and will be initiated and conducted in accordance with the Commercial Arbitration Rules ("Commercial Rules") of the AAA, including the AAA Supplementary Procedures for Large Complex Commercial Disputes ("Complex Procedures"), as such rules will be in effect on the date of delivery of a demand for arbitration ("Demand"), except to the extent that such rules are inconsistent with the provisions set forth herein. Notwithstanding the foregoing, the Parties may agree in good faith that the Complex Procedures will not apply in order to promote the efficient arbitration of Disputes where the nature of the Dispute, including without limitation the amount in controversy, does not justify the application of such procedures.

6.3 <u>Selection of Arbitrators.</u>  The arbitration panel will consist of three arbitrators.  Each Party will name an arbitrator within ten (10) days after the delivery of the Demand.  The two arbitrators named by the Parties may have prior relationships with the naming Party, which in a judicial setting would be considered a conflict of interest.  The third arbitrator, selected by the first two, shall be a neutral participant, with no prior working relationship with either Party.  If the two arbitrators are unable to select a third arbitrator within ten (10) days, a third neutral arbitrator will be appointed by the AAA from the panel of commercial arbitrators of any of the AAA Large and Complex Resolution Programs.  If a vacancy in the arbitration panel occurs after the hearings have commenced, the remaining arbitrator or arbitrators may not continue with the hearing and determination of the controversy, unless the Parties agree otherwise.

6.4 <u>Governing Law.</u>  The Federal Arbitration Act, 9 U.S.C. Secs. 1-16, and not state law, will govern the arbitrability of all Disputes.  The arbitrators will allow such discovery as is appropriate to the purposes of arbitration in accomplishing a fair, speedy and cost-effective resolution of the Disputes.  The arbitrators will reference the Federal Rules of Civil Procedure then in effect in setting the scope and timing of discovery.  The Federal Rules of Evidence will apply in toto.  The arbitrators may enter a default decision against any Party who fails to participate in the arbitration proceedings.

6.5 <u>Arbitration Awards.</u>  The arbitrators will have the authority to award compensatory damages only.  Any award by the arbitrators will be accompanied by a written opinion setting forth the findings of fact and conclusions of law relied upon in reaching the decision.  The award rendered by the arbitrators will be final, binding and non-appealable, and judgment upon such award may be entered by any court of competent jurisdiction.  The Parties agree that the existence, conduct and content of any arbitration will be kept confidential and no Party will disclose to any person any information about such arbitration, except as may be required by law, by any governmental authority, by the rules and regulations of any securities exchange on which either party's securities are listed or for financial reporting purposes in each Party's financial statements.

6.6 <u>Fees.</u>  Each Party will pay the fees of its own attorneys, expenses of witnesses and all other expenses and costs in connection with the presentation of such Party's case (collectively, "Attorneys' Fees").  The remaining costs of the arbitration, including without limitation, fees of the arbitrators, costs of records or transcripts and administrative fees (collectively, "Arbitration Costs") will be borne equally by the Parties.  Notwithstanding the foregoing, the arbitrators may modify the allocation of Arbitration Costs and award Attorneys' Fees in those cases where fairness dictates a different allocation of Arbitration Costs between the Parties and an award of Attorneys' Fees to the prevailing Party as determined by the arbitrators.

6.7 <u>Non Arbitratable Disputes.</u>  Any Dispute that is not subject to final resolution by the Management Committee or to arbitration under this Section 6 or by law (collectively, "Non-Arbitration Claims") will be brought in a court of competent jurisdiction in Washington, D.C.  Each Party irrevocably consents to the exclusive jurisdiction of the courts of Washington, D.C. and the federal courts situated therein over any and all Non-Arbitration Claims and any and all actions to enforce such claims or to recover damages or other relief in connection with such claims.

7. <u>**STANDARD TERMS.**</u>  The Standard Online Commerce Terms & Conditions set forth on Exhibit F attached hereto, the Standard Legal Terms & Conditions set forth on Exhibit G attached hereto and the other exhibits and schedules attached hereto are each hereby made a part of this Agreement.

8. <u>**NO INTERNATIONAL RIGHTS; NO BABYCENTER RIGHTS.**</u>  For purposes of clarification and notwithstanding anything to the contrary contained herein, AOL acknowledges and agrees that the provisions contained in this Agreement (a) relate only to the version or versions of interactive sites or

**AOL 00208**

**A 117**

areas that are operated by MP within the United States and not to any version or versions of interactive sites or areas that are operated internationally by MP and (b) do not relate to the operations of, or interactive sites owned or operated by, MP's wholly owned subsidiary, BabyCenter, Inc., which has a separate agreement with AOL.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

AMERICA ONLINE, INC.                      ETOYS INC.

By: _____              By: _____
Name  ERIK L. KELLER                      Name  PHILIP POLISHUK
Title:  VICE PRESIDENT, BUSINESS AFFAIRS  Title:  Vice-President Marketing

Date: August 10, 1999                     Date: August 10, 1999

CONFIDENTIAL
Execution Copy

13

AOL 00209

A 118

EXHIBIT A

Placement/Promotion

Relative
Weighted Value
Switching
matrix:

| From / To | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | Shopping |
|---|---|---|---|---|---|---|
| Level 1 | 1:1 | 1:2 | 1:9 | 1:24 | N/A | N/A |
| Level 2 | 2:1 | 1:1 | 1:4 | 1:10 | N/A | N/A |
| Level 3 | 9:1 | 4:1 | 1:1 | 1:3 | N/A | N/A |
| Level 4 | 24:1 | 10:1 | 3:1 | 1:1 | N/A | N/A |
| Level 5 | N/A | N/A | N/A | N/A | N/A | N/A |
| Shopping | N/A | N/A | N/A | N/A | N/A | N/A |

CONFIDENTIAL
Execution Copy

AOL 00210

A 119

| Level 1 - 75,457,112 impressions | Year 1 | Year 2 | Year 3 | 3 Year Total |
|---|---|---|---|---|
| What to Expect Sponsorship Banners | 2,400,000 | 3,000,000 | 3,450,000 | 8,850,000 |
| Toys Decision Guide (Banner/Commerce Link,-10/99 Start) | 12,000,000 | 14,640,000 | 16,836,000 | 43,476,000 |
| Babies Registry | 2,640,000 | 3,036,000 | 3,491,140 | 9,167,140 |
| Babies Registry Promotional Open Banners | 500,000 | 610,000 | 701,500 | 1,811,500 |
| Babies Registry Banners | 264,000 | 322,080 | 370,392 | 956,472 |
| Birthday Club Banner | 625,000 | 1,525,000 | 1,753,750 | 3,903,750 |
| *4th Quarter Promotions* | | | | |
| Santa's Home Page Banners | 300,000 | 345,000 | 396,750 | 1,041,750 |
| Santa's Home Page Banners | 300,000 | 345,000 | 396,750 | 1,041,750 |
| Kid's Wish List | 1,500,000 | 1,725,000 | 1,983,750 | 5,208,750 |
| **Level 1 Totals:** | 20,529,000 | 25,548,080 | 29,380,032 | 75,457,112 |

| Level 2 - 74,762,925 impressions | | | | |
|---|---|---|---|---|
| Run of Channel Families | 1,000,000 | 1,150,000 | 1,322,500 | 3,472,500 |
| Run of Channel Games | 2,410,000 | 2,771,500 | 3,187,225 | 8,368,725 |
| *4th Quarter Promotions* | | | | |
| Tour of Toys Page Sponsorship | 500,000 | 575,000 | 661,250 | 1,736,250 |
| Slideshow Rotation of toys | 500,000 | 575,000 | 661,250 | 1,736,250 |
| *Write Santa Sponsorship* | | | | |
| Write Santa Page Sponsorship | 200,000 | 230,000 | 264,500 | 694,500 |
| 4TH Quarter Packages (3 Halloween/1 Thksgvng/1 Wntr Holiday/1 NewYr) | 300,000 | 345,000 | 396,750 | 1,041,750 |
| *AOL.com* | | | | |
| Hometown AOL - Run of Family Life - Member Pages | 500,000 | 575,000 | 661,250 | 1,736,250 |
| Search and Explore Games - Search Results | 200,000 | 230,000 | 264,500 | 694,500 |
| AOL.com Targeted Search - Toys (terms to be supplied) | 7,500,000 | 8,625,000 | 9,918,750 | 26,043,750 |
| *Netscape* | | | | |
| Babies Department Main Page Banner | 200,000 | 230,000 | 264,500 | 694,500 |
| Families ROS Banner | 720,000 | 828,000 | 952,200 | 2,500,200 |
| Netscape Search: Toys (terms to be supplied) | 7,500,000 | 8,625,000 | 9,918,750 | 26,043,750 |
| **Level 2 Totals:** | 21,530,000 | 24,759,500 | 28,473,425 | 74,762,925 |

| Level 3 - 66,508,050 impressions | | | | |
|---|---|---|---|---|
| Babies Department Main Page Text Link | 1,040,000 | 1,196,000 | 1,375,400 | 3,611,400 |
| Birthday Club Button | 625,000 | 1,525,000 | 1,753,750 | 3,903,750 |
| What to Expect Sponsorship Button | 2,400,000 | 3,000,000 | 3,450,000 | 8,850,000 |
| Families ROS Text Link | 6,240,000 | 7,176,000 | 8,252,400 | 21,668,400 |
| NSCP ROS Text Link | 8,200,000 | 9,430,000 | 10,844,500 | 28,474,500 |
| **Level 3 Totals:** | 18,505,000 | 22,327,000 | 25,676,050 | 66,508,050 |

| Level 4 – 224,087,718 Impressions | | | | |
|---|---|---|---|---|
| *AOL Network* | | | | |
| AOL Network ROS - 4th Quarter | 9,383,000 | 10,790,450 | 12,409,018 | 32,582,468 |
| 4TH Quarter Email Thanksgiving - 12/24 | 5,200,100 | 5,980,115 | 6,877,132 | 18,057,347 |

CONFIDENTIAL
Execution Copy

15

AOL 00211

**A 120**

| | | | |
|---|---|---|---|
| AOL Network ROS | 28,149,000 | 32,371,350 | 37,227,053 | 97,747,403 |
| *AOL.com* | | | | |
| AOL.com Home Page | 2,100,000 | 2,415,000 | 2,777,250 | 7,292,250 |
| Netfind Home Page 4TH QUARTER | 700,000 | 805,000 | 925,750 | 2,430,750 |
| *Netscape* | | | | |
| NSCP Home Page Banner | 5,000,000 | 5,750,000 | 6,612,500 | 17,362,500 |
| NSCP ROS Banner | 14,000,000 | 16,100,000 | 18,515,000 | 48,615,000 |
| Level 4 Totals: | 64,532,100 | 74,211,915 | 85,343,703 | 224,087,718 |

| Level 5 – 736,971,399 Impressions | | | | |
|---|---|---|---|---|
| AOL Service | | | | |
| Welcome Screen | 97,040,000 | 111,596,000 | 128,335,400 | 336,971,400 |
| Welcome Screen - promotions | 100,000,000 | 100,000,000 | 100,000,000 | 300,000,000 |
| Log-off screen | 33,333,333 | 33,333,333 | 33,333,333 | 99,999,999 |
| Level 5 Totals: | 230,373,333 | 244,929,333 | 261,668,733 | 736,971,399 |

| Shopping – 151,626,112 Impressions | | | | |
|---|---|---|---|---|
| TOYS ANCHOR | 4,350,202 | 6,670,310 | 9,876,227 | 20,896,739 |
| EDUCATIONAL TOYS ANCHOR | 3,107,267 | 4,764,476 | 7,054,402 | 14,926,145 |
| KID & INFANT GEAR ANCHOR | | 6,670,308 | 9,876,225 | 16,546,533 |
| KID & INFANT GEAR GOLD | 3,728,745 | | | 3,728,745 |
| COLLECTIBLES ANCHOR | 4,350,201 | 6,670,308 | 9,876,225 | 20,896,734 |
| ELECTRONIC GAMES ANCHOR | 4,350,202 | 6,670,310 | 9,876,225 | 20,896,737 |
| BOOKS & MAGAZINES GOLD | 3,728,745 | 5,717,409 | 8,465,339 | 17,911,493 |
| MUSIC & VIDEO GOLD | 3,728,745 | 5,717,409 | 8,455,339 | 17,911,493 |
| SOFTWARE SILVER | 3,728,745 | 5,717,409 | 8,465,339 | 17,911,493 |
| Shopping Totals: | 31,072,852 | 48,597,939 | 71,955,321 | 151,626,112 |

| Grand Total: | 386,542,285 | 440,373,767 | 502,497,264 | 1,329,413,316 |
|---|---|---|---|---|

CONFIDENTIAL
Execution Copy

AOL 00212

**A 121**

EXHIBIT B

Definitions

The following definitions will apply to this Agreement:

**Additional MP Channel.** Any other distribution channel (e.g., an Interactive Service other than AOL) through which MP makes available an offering comparable in nature to the Affiliated MP Site within the United States.

**Affiliated MP Site.** The specific customized area or web site offered in the United States to be promoted and distributed by AOL hereunder accessible through MP's keyword or the Promotions through which MP can market and complete transactions regarding its Products.

**AOL Interactive Site.** Any Interactive Site which is managed, maintained, owned or controlled by AOL or its agents.

**AOL Look and Feel.** The elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with Interactive Sites within the AOL Service or AOL.com.

**AOL Member.** Any authorized user of the AOL Service, including any sub-accounts using the AOL Service under an authorized master account.

**AOL Network.** (i) The AOL Service, (ii) AOL.com, (iii) CompuServe, (iv) Netcenter, (v) any other product or service owned, operated, distributed or authorized to be distributed by or through AOL or its affiliates worldwide (and including those properties excluded from the definitions of the AOL Service or AOL.com), and (vi) any of the foregoing products and services authorized by AOL or its Affiliates to be distributed through a third party, including on a private label basis (including without limitation AOL's Custom Netcenter product).

**AOL Service.** The standard narrow-band U.S. version of the America Online® brand service, specifically excluding (a) AOL.com, Netcenter or any other AOL Interactive Site, (b) the international versions of an America Online service (e.g., AOL Japan), (c) the CompuServe® brand service and any other CompuServe products or services, (d) "Driveway," "ICQ™," "AOL NetFind™," "AOL Instant Messenger™," "Digital City," "NetMail™," "Electra", "Thrive", "Real Fans", "Love@AOL", "Entertainment Asylum," "AOL Hometown," "My News" or any similar independent product, service or property which may be offered by, through or with the U.S. version of the America Online® brand service, (e) any programming or Content area offered by or through the U.S. version of the America Online® brand service over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through the U.S. version of the America Online® brand service, (g) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (h) any other version of an America Online service which is materially different from the standard narrow-band U.S. version of the America Online brand service, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-

AOL 00213

A 122

branded version of the service or any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer.

**AOL User.** Any user of the AOL Service, AOL.com, CompuServe, Netcenter, or the AOL Network.

**AOL.com.** AOL's primary Internet-based Interactive Site marketed under the "AOL.COM™" brand, specifically excluding (a) the AOL Service, (b) Netcenter, (c) any international versions of such site, (d) "ICQ," "AOL NetFind™," "AOL Instant Messenger™," "NetMail™," "AOL Hometown," "My News" or any similar independent product or service offered by or through such site or any other AOL Interactive Site, (e) any programming or Content area offered by or through such site over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any programming or Content area offered by or through such site which was operated, maintained or controlled by the former AOL Studios division (e.g., Electra), (g) any yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through such site or any other AOL Interactive Site, (h) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (i) any other version of an America Online Interactive Site which is materially different from AOL's primary Internet-based Interactive Site marketed under the "AOL.COM™" brand, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-branded versions or any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer.

**Change of Control.** (a) The consummation of a reorganization, merger or consolidation or sale or other disposition of substantially all of the assets of a party or (b) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1933, as amended) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under such Act) of more than 50% of either (i) the then outstanding shares of common stock of such party; or (ii) the combined voting power of the then outstanding voting securities of such party entitled to vote generally in the election of directors.

**CompuServe.** The standard, narrow-band U.S. version of the CompuServe brand service, specifically excluding (a) any international versions of such service, (b) any web-based service including "compuserve.com", "cserve.com" and "cs.com", or any similar product or service offered by or through the U.S. version of the CompuServe brand service, (c) Content areas owned, maintained or controlled by CompuServe affiliates or any similar "sub-service," (d) any programming or Content area offered by or through the U.S. version of the CompuServe brand service over which CompuServe does not exercise complete or substantially complete operational control (e.g., third-party Content areas), (e) any yellow pages, white pages, classifieds or other search, directory or review services or Content and (f) any co-branded or private label branded version of the U.S. version of the CompuServe brand service, (g) any version of the U.S. version of the CompuServe brand service which offers Content, distribution, services and/or functionality materially different from the Content, distribution, services and/or functionality associated with the standard, narrow-band U.S. version of the CompuServe brand service, including, without limitation, any version of such service distributed through any platform or device other than a desktop personal computer and (h) any property, feature, product or service which CompuServe or its affiliates may acquire subsequent to the Effective Date.

**Confidential Information.** Any information relating to or disclosed in the course of the Agreement, which is or should be reasonably understood to be confidential or proprietary to the disclosing Party, including, but not limited to, the material terms of this Agreement, information about AOL Members, AOL Users, New Customers and MP customers, technical processes and formulas, source codes, product designs, sales, cost and other unpublished financial information, product and business plans, projections, and marketing data. "Confidential Information" will not include information (a) already lawfully known to or independently developed by the receiving Party, (b) disclosed in published materials, (c) generally known to the public, or (d) lawfully obtained from any third party.

AOL 00214

A 123

**Content**.  Text, images, video, audio (including, without limitation, music used in synchronism or timed relation with visual displays) and other data, Products, advertisements, promotions, URLs, links, pointers and software, including any modifications, upgrades, updates, enhancements and related documentation.

**Impression**.  Any access by a user to the applicable Promotion, as the same may be reasonably determined and measured by AOL in accordance with (a) its standard methodologies and protocols, (b) the methodologies and protocols used to determine and measure exposure for other parties in relationships with AOL that are comparable to the relationship established by this Agreement and (c) the methodologies and protocols that may be established from time to time by the Internet Advertising Bureau Standards.

**Interactive Service**.  An entity offering one or more of the following: (i) online or Internet connectivity services (e.g., an Internet service provider) (ii) an interactive site or service featuring a broad selection of aggregated third party interactive content (or navigation thereto) (e.g., an online service or search and directory service) and/or marketing a broad selection of products and/or services across numerous interactive commerce categories (e.g., an online mall or online department store offering numerous categories of products, such as books, music, electronics and videos); and/or (iii) communications software capable of serving as the principal means through which a user creates, sends and receives electronic mail or real time online messages.

**Interactive Site**. Any interactive site or area, including, by way of example and without limitation, (i) an MP site on the World Wide Web portion of the Internet or (ii) a channel or area delivered through a "push" product such as the Pointcast Network or interactive environment such as Microsoft's Active Desktop.

**Keyword Search Terms.**  (a) The Keyword™ online search terms made available on the AOL Network, combining AOL's Keyword™ online search modifier with a term or phrase specifically related to MP (and determined in accordance with the terms of this Agreement), and (b) the Go Word online search terms made available on CompuServe, combining CompuServe's Go Word online search modifier with a term or phrase specifically related to MP and determined in accordance with the terms of this Agreement).

**Licensed Content**. The names, marks, symbols, links and other designations associated with the Affiliated MP Site and such portion of the Content as may be approved by MP or its agents for use in connection herewith (e.g., offline or online promotional Content, Promotions, AOL "slideshows" , etc.), including in each case, any modifications, upgrades, updates, enhancements, and related documentation.

**MP Competitor**. Any person or entity that is engaged, directly or indirectly, as a significant part of its business, in the manufacture, marketing, promotion and/or sale of children and baby products, including, without limitation, ToysRUs, Mattel, Hasbro, Amazon.com,, Wal-Mart, Target and The Walt Disney Company, and any person or entity controlling, controlled by or under common control with any of the foregoing.

**MP Interactive Site**. Any Interactive Site (other than the Affiliated MP Site) which is managed, maintained, owned or controlled by MP or its agents in the United States.

**Netcenter.**  Netscape Communications Corporation's primary Internet-based Interactive Site marketed under the "Netscape Netcenter™" brand, specifically excluding (a) the AOL Service, (b) AOL.com, (c) any international versions of such site, (d) "ICQ," "AOL Netfind™," "AOL Instant Messenger™," "NetMail™," "AOL Hometown," "My News," "Digital City™," or any similar independent product or service offered by or through such site or any other AOL Interactive Site, (e) any programming or Content area offered by or through such site over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any programming or Content area offered by or through the U.S. version of the America Online® brand service which was operated, maintained or controlled by the former AOL Studios division (e.g., Electra), (g) any

yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through such site or any other AOL Interactive Site, (h) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (i) any other version of an AOL or Netscape Communications Corporation Interactive Site which is materially different from Netscape Communications Corporation's primary Internet-based Interactive Site marketed under the "Netscape Netcenter™" brand, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer (e.g. Custom NetCenters built specifically for third parties).

New Customer. An MP customer who (a) prior to the Effective Date had not completed the purchase of any products (i.e., purchased, accepted delivery and paid in full) from the Affiliated MP Site or any other MP Interactive Site, as determined in good faith by MP based on its customer database existing as of the Effective Date, (b) on or after the Effective Date had not completed the purchase of any products (i.e., purchased, accepted delivery and paid in full) from the Affiliated MP Site or any other MP Interactive Site after arriving at the Affiliated MP Site or any other MP Interactive Site from a source other than a direct connection from an Impression or Keyword Search Term on the AOL Network, as determined in good faith by MP based on its customer database, and (c) on or after the Effective Date, enters the Affiliated MP Site directly from an Impression or Keyword Search Term on the AOL Network and for the first time selects and purchases a product from the Affiliated MP Site, accepts delivery of the product at the shipping destination, and remits payment in full to MP.

Product. Any product, good or service which MP (or others acting on its behalf or as distributors) offers, sells, provides, distributes or licenses to AOL Users directly or indirectly through (i) the Affiliated MP Site (including through any Interactive Site linked thereto), (ii) any MP Interactive Site (including through any Interactive Site linked thereto), (iii) any other electronic means directed at AOL Users (e.g., e-mail offers), or (iv) an "offline" means (e.g., toll-free number) for receiving orders related to specific offers within the Affiliated MP Site or any MP Interactive Site requiring purchasers to reference a specific promotional identifier or tracking code, including, without limitation, products sold through surcharged downloads (to the extent expressly permitted hereunder).

Promotions. The promotions described on Exhibit A and any comparable promotions delivered by AOL in accordance with Sections 1.1, 1.2 and 1.3, and any additional promotions of the Affiliated MP Site provided by AOL.

Run of Service Inventory. A collection of inventory made up of all areas of the relevant AOL property or service. If Advertiser has purchased Run of Service Inventory, AOL will place Advertiser's creative in different locations throughout the relevant property or service in accordance with AOL internal policies. Run of Service Impressions will be delivered reasonably evenly over a given time period. Advertiser may not control placement within a Run of Service Inventory purchase and AOL does not guarantee placement on any particular screen or group of screens (except that Run of Channel Inventory will be run only in the specified Channel).

Year 1. The period commencing on the Effective Date and ending on the first anniversary of the Effective Date.

Year 1 Penalty. An amount equal to (a) 1.5, multiplied by (b) (i) the Year 1 Target minus (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 1.

Year 1 Target. 221,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement).

20

CONFIDENTIAL
Execution Copy

AOL 00216

A 125

<u>Year 2</u>. The period commencing on the day after the first anniversary of the Effective Date and ending on the second anniversary of the Effective Date.

<u>Year 2 Penalty</u>. An amount equal to (a) 1.5, <u>multiplied</u> by (b) (i) the Year 2 Target <u>minus</u> (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 2 exclusive of any Impressions delivered in Year 2 for purposes of compensating for any Year 1 shortfall.

<u>Year 2 Target</u>. 279,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement)..

<u>Year 3</u>. The period commencing on the day after the second anniversary of the Effective Date and ending on the third anniversary of the Effective Date.

<u>Year 3 Penalty</u>. An amount equal to (a) 1.5, <u>multiplied</u> by (b) (i) the Year 3 Target <u>minus</u> (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 3 exclusive of any Impressions delivered in Year 3 for purposes of compensating for any Year 1 or 2 shortfall.

<u>Year 3 Target</u>. 326,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement).

AOL 00217

**A 126**

EXHIBIT C

<u>MP Cross-Promotion</u>

<u>Offline</u>. In no less than sixty percent (60%) of all impressions in MP's television and print advertisements, MP will include specific references or mentions of the Affiliated MP Site's availability through AOL, subject to MP's reasonable editorial discretion and the "Keyword Guidelines" set forth on Exhibit H hereto in each instance.  MP shall also work with AOL in good faith to explore opportunities for MP and AOL to jointly fund, produce and program joint AOL-MP television commercials.

<u>Online</u>. Within each MP Interactive Site, AOL shall have the right, at its option, to modify the AOL "Certified Merchant Guarantee" button to include the AOL logo, the words "America Online" or another AOL Mark, provided that such modification shall be subject to MP's reasonable approval of the creative content and shall not increase the size of such button from its current size.

AOL 00218
**A 127**

EXHIBIT D

Description of Products and Other Content

As used in this Agreement, the "Promotable Products and Content" shall consist of:

(a) the following children and baby products, services and content:

Toys
Games
Video Games
Videos (VHS and DVD)
Music (CDs Cassettes)
Software (other than downloadable software)
Baby Gear
Apparel (other than school uniforms)
Bedding and Linens
Books
Hobby Items
Arts and Crafts
Party Supplies
Artwork
Book Plates
School Supplies (other than school uniforms)
Sporting Goods
Magazines
Children and baby furniture

subject to the following limitations on music, books, videos, sporting goods and magazines:

Books – MP may not promote books (i) on the AOL Service, if MP derives at least ten percent (10%) of its revenue from the sale of books, or (ii) on AOL.com or Netcenter;

Videos – MP may not promote Videos (i) on the AOL Service (Entertainment Channel-Home Video Main, Families Channel-Weekend Activities Main, (ii) on CompuServe ("DVD" subscreen of the Sight & Sound and Arts & Entertainment Channels) or (iii) Netcenter;

Music – MP may not promote Music on (i) on the AOL Service (Music Channel, Shopping Channel (anchor tenancy limitation only), and Entertainment Channel Main Screen only) (ii) on AOL.com (Homepage, Netfind, Entertainment Channel and Music Channel) or (iii) Netcenter;

Sporting Goods – MP may not promote Sporting Goods (including sports apparel) on (i) AOL Service (Sports Channel) or (ii) Netcenter; and

Magazines – MP may not promote Magazines on (i) AOL Service or (ii) Netcenter; and

(b) such other categories of children and baby products, services and content as MP shall request and AOL shall reasonably approve, such approval not to be unreasonably withheld; provided that, unless (i) the promotion thereof is limited or prohibited by any then-existing contractual obligation of AOL, or (ii) AOL reasonably believes, in the exercise of its good faith business judgment, that the promotion of such products, services or content would be disadvantageous (other than negligibly disadvantageous) to AOL notwithstanding the absence of any contractual prohibition or limitation, then AOL shall permit the addition of such new category. In the event that AOL does not approve a new category and AOL is not then subject to an exclusive agreement prohibiting such promotion or AOL is not marketing for its own account

AOL 00219

A 128

a competitive product, then, at MP's request, the matter of such request shall be referred to the Management Committee and the other procedures for conflict resolution set forth in Section 6 to determine whether AOL has acted properly in denying such request.

As used in this Agreement. the "Promotable Functions" consist of

(a) the following functions:

Child "Savings" or "Allowance" accounts*
Auctions (but in no event person-to-person auctions)
Decision Guides

and (b) such other functions (excluding chat, e-mail and instant messaging) as MP shall request, and AOL shall approve, such approval not to be unreasonably withheld

* = shall no longer be a Promotable Function as of the ninetieth day after AOL launches a substantially similar functionality on the AOL Network.

CONFIDENTIAL
Execution Copy

24

AOL 00220
A 129

## EXHIBIT E

### Operations

1. <u>General</u>. The Affiliated MP Site (including the Products and other Content contained therein) will rank among the top three (3) Interactive Sites operating principally in the toys industry on the World Wide Web in the following categories: (i) competitive pricing of Products; (ii) scope and selection of Products, (iii) customer service and fulfillment associated with the marketing and sale of Products and (iv) ease of use. As described elsewhere in this Agreement, MP is fully responsible for all aspects of hosting and administration of the Affiliated MP Site and must ensure that the site satisfies the specified access and performance requirements as outlined in this Exhibit E.

2. <u>Affiliated MP Site Infrastructure</u>. MP will be responsible for all communications, hosting and connectivity costs and expenses associated with the Affiliated MP Site. MP will provide all hardware, software, telecommunications lines and other infrastructure necessary to meet traffic demands on the Affiliated MP Site from the AOL Network. MP will design and implement the network between the AOL Service and Affiliated MP Site such that (i) no single component failure will have a materially adverse impact on AOL Members seeking to reach the Affiliated MP Site from the AOL Network and (ii) no single line under material control by MP will run at more than 70% average utilization for a 5-minute peak in a daily period. In the event that MP elects to create a custom version of the Affiliated MP Site in order to comply with the terms of this Agreement, MP will bear responsibility for all aspects of the implementation, management and cost of such customized site.

3. <u>Optimization; Speed</u>. MP will use commercially reasonable efforts to ensure that: (a) the functionality and features within the Affiliated MP Site are optimized for the client software then in use by AOL Members; and (b) the Affiliated MP Site is designed and populated in a manner that minimizes delays when AOL Members attempt to access such site. At a minimum, MP will use commercially reasonable efforts to ensure that the Affiliated MP Site's data transfers initiate within fewer than fifteen (15) seconds on average. Prior to commercial launch of any material promotions described herein, MP will permit AOL to conduct performance and load testing of the Affiliated MP Site (in person or through remote communications), with such commercial launch not to commence until such time as AOL is reasonably satisfied with the results of any such testing.

4. <u>User Interface</u>. MP will maintain a graphical user interface within the Affiliated MP Site that is competitive in all material respects with interfaces of other similar sites based on similar form technology. AOL reserves the right to conduct focus group testing to assess compliance with respect to such competitiveness and with respect to MP's compliance with the preceding sentence.

5. <u>Technical Problems</u>. MP agrees to use commercially reasonable efforts to address material technical problems (over which MP exercises control) affecting use by AOL Members of the Affiliated MP Site (a "MP Technical Problem") promptly following notice thereof. In the event that MP is unable to promptly resolve a MP Technical Problem following notice thereof from AOL (including, without limitation, infrastructure deficiencies producing user delays), AOL will have the right to regulate the promotions it provides to MP hereunder until such time as MP corrects the MP Technical Problem at issue, provided that such regulation of promotions will not reduce the total number of Impressions that AOL is required to deliver to MP hereunder.

6. <u>Monitoring</u>. MP will ensure that the performance and availability of the Affiliated MP Site is monitored on a continuous basis. MP will provide AOL with contact information (including e-mail, phone, pager and fax information, as applicable, for both during and after business hours) for MP's principal business and technical representatives, for use in cases when issues or problems arise with respect to the Affiliated MP Site.

7. <u>Telecommunications</u>. Where applicable MP will utilize encryption methodology to secure data communications between the Parties' data centers. The network between the Parties will be configured such that no single component failure will significantly impact AOL Users. The network will be sized such that no single line over which the MP has material control runs at more than 70% average utilization for a 5-minute peak in a daily period.

8. <u>Security</u>. MP will utilize Internet standard encryption technologies (e.g., Secure Socket Layer – SSL) to provide a secure environment for conducting transactions and/or transferring private member information (e.g. credit card numbers, banking/financial information, and member address information) to and from the Affiliated MP Site. MP will facilitate periodic reviews of the Affiliated MP Site by AOL in order to evaluate the security risks of such site. MP will promptly remedy any material security risks or breaches of security as may be identified in good faith by AOL's Operations Security team.

9. <u>Technical Performance</u>.

   i.     MP will design the Affiliated MP Site to support the AOL-client embedded versions of the Microsoft Internet Explorer 3.XX and 4.XX browsers (Windows and Macintosh)and the Netscape Browser 4.XX and make commercially reasonable efforts to support all other AOL browsers listed at: "http://webmaster.info.aol.com."

   ii.    To the extent MP creates customized pages on the Affiliated MP Site for AOL Members, MP will develop and employ a methodology to detect AOL Members (e.g. examine the HTTP User-Agent field in order to identify the "AOL Member-Agents" listed at: "http://webmaster. info.aol.com)."

   iii.   MP will periodically review the technical information made available by AOL at http://webmaster.info.aol.com.

   iv.    MP will design its site to support HTTP 1.0 or later protocol as defined in RFC 1945 and to adhere to AOL's parameters for

AOL 00221

**A 130**

refreshing or preventing the caching of information in AOL's proxy system as outlined in the document provided at the following URL: http://webmaster.info.aol.com.  MP is responsible for the manipulation of these parameters in web-based objects so as to allow them to be cached or not cached as outlined in RFC 1945.

v.      Prior to releasing material, new functionality or features through the Affiliated MP Site ("New Functionality"), MP will test the New Functionality to confirm its compatibility with AOL Service client software .  Should any new material, new functionality or features through the Affiliated MP Site be released without notification to AOL, AOL will not be responsible for any adverse member experience until such time that compatibility tests can be performed and the new material, functionality or features qualified for the AOL Service

10.   <u>AOL Internet Services MP Support</u>.  AOL will provide MP with access to the standard online resources, standards and guidelines documentation, technical phone support, monitoring and after-hours assistance that AOL makes generally available to similarly situated web-based parties.  AOL support will not, in any case, be involved with content creation on behalf of MP or support for any technologies, databases, software or other applications which are not supported by AOL or are related to any MP area other than the Affiliated MP Site.  Support to be provided by AOL is contingent on MP providing to AOL demo account information (where applicable), a detailed description of the Affiliated MP Site's software, hardware and network architecture and access to the Affiliated MP Site for purposes of such performance and load testing as AOL elects to conduct.

AOL 00222

A 131

EXHIBIT F

Standard Online Commerce Terms & Conditions

1.  AOL Network Distribution. MP will not authorize or permit any third party to distribute or promote the Products or any MP Interactive Site through the AOL Network absent AOL's prior written approval or as permitted hereunder.  The Promotions and any other promotions or advertisements purchased from or provided by AOL will link only to the Affiliated MP Site, will be used by MP solely for its own benefit and will not be resold, traded, exchanged, bartered, brokered or otherwise offered to any third party.

2.  Provision of Other Content. In the event that AOL notifies MP that (i) as reasonably determined by AOL, any Content within the Affiliated MP Site violates AOL's then-standard Terms of Service (as set forth on the America Online® brand service at Keyword term "TOS"), for the AOL Service or any other AOL property through which the affiliated Site is promoted, the terms of this Agreement or any other standard, written AOL policy or (ii) AOL reasonably objects to the inclusion of any Content within the Affiliated MP Site (other than any specific items of Content which may be expressly identified in this Agreement), then AOL may, at its option, restrict access from the AOL Network to the Content in question using technology available to AOL.  MP will cooperate with AOL's reasonable requests to the extent AOL elects to implement any such access restrictions.

3.  Contests.  MP will take all steps necessary to ensure that any contest, sweepstakes or similar promotion conducted or promoted through the Affiliated MP Site (a "Contest") complies with all applicable federal, state and local laws and regulations.

4.  Navigation.  Subject to the prior consent of MP, which consent may be withheld in MP's sole discretion, AOL will be entitled to establish navigational icons, links and pointers connecting the Affiliated MP Site (or portions thereof) with other content areas on or outside of the AOL Network.  Additionally, in cases where an AOL User performs a search for MP through any search or navigational tool or mechanism that is accessible or available through the AOL Network (e.g., Promotions, Keyword Search Terms, or any other promotions or navigational tools), AOL shall have the right to direct such AOL User to the Affiliated MP Site, or any other MP Interactive Site determined by AOL in its reasonable discretion.

5.  Disclaimers.  Upon AOL's request, MP agrees to include within the Affiliated MP Site a product disclaimer (the specific form and substance to be mutually agreed upon by the Parties) indicating that transactions are solely between MP and AOL Users purchasing Products from MP.

6.  Look and Feel.  MP acknowledges and agrees that AOL will own all right, title and interest in and to the elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with online areas contained within the AOL Network, subject to MP's ownership rights in any MP trademarks or copyrighted material within the Affiliated MP Site, any MP

Interactive Site and the AOL Network.  AOL acknowledges and agrees that MP will own all right, title and interest in and to the elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with online areas contained within the Affiliated MP Site and any other MP Interactive Site, subject to AOL's ownership rights in any AOL trademarks or copyrighted material therein.

7.  Management of Sites.  MP will manage, review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated MP Site, in a timely and professional manner and in accordance with the terms of this Agreement.  MP will ensure that the Affiliated MP Site is current, accurate and well-organized at all times.  MP warrants that the Products and other Licensed Content: (i) will not infringe on or violate any copyright, trademark, U.S. patent or any other third party right, including without limitation, any music performance or other music-related rights; (ii) will not violate AOL's then-applicable Terms of Service for the AOL Service and any other AOL property through which the Affiliated MP Site will be promoted or any other standard, written AOL policy; and (iii) will not violate any applicable law or regulation, including those relating to contests, sweepstakes or similar promotions.  Additionally, MP represents and warrants that it owns or has a valid license to all rights to any Licensed Content used in AOL "slideshow" or other formats embodying elements such as graphics, animation and sound, free and clear of all encumbrances and without violating the rights of any other person or entity.  MP also warrants that a reasonable basis exists for all Product performance or comparison claims appearing through the Affiliated MP Site.  Except in connection with the press release contemplated by Section 1.6 hereof, MP shall not in any manner, including, without limitation in any Promotion, the Licensed Content or the Materials state or imply that AOL recommends or endorses MP or MP's Products (e.g., no statements that MP is an "official" or "preferred" provider of products or services for AOL).  AOL will have no obligations with respect to the Products available on or through the Affiliated MP Site, including, but not limited to, any duty to review or monitor any such Products.  AOL will manage, review, delete, edit, create, update and otherwise manage the AOL Network in a timely and professional manner and in accordance with the terms of this Agreement. AOL will ensure that the AOL Network is current, accurate and well-organized at all times. AOL warrants that the AOL Network: (i) will not infringe on or violate any copyright, trademark, U.S. patent or any other third party right, including without limitation, any music performance or other music-related rights; and (ii) will not violate any applicable law or regulation. Additionally, AOL represents and warrants that it owns or has a valid license to all rights to names, marks, symbols, designations or other intellectual or proprietary rights licensed by AOL to MP hereunder, free and clear of all encumbrances and without violating the rights of any other person or entity.

3.   Duty to Inform.  MP will promptly inform AOL of any information related to the Affiliated MP Site which could reasonably lead to a claim, demand, or liability of or against AOL and/or its affiliates by any third party. AOL will promptly inform MP of any information related to the AOL Network which could reasonably lead to a claim, demand, or liability of or against MP and/or its affiliates by any third party.

9.   Customer Service.  It is the sole responsibility of MP to provide customer service to persons or entities purchasing Products through the AOL Network ("Customers"). MP will bear full responsibility for all customer service, including without limitation, order processing, billing, fulfillment, shipment, collection and other customer service associated with any Products offered, sold or licensed through the Affiliated MP Site, and AOL will have no obligations whatsoever with respect thereto.  MP will receive all emails from Customers via a computer available to MP's customer service staff and generally respond to such emails within one business day of receipt. MP will receive all orders electronically and generally process all orders within one business day of receipt, provided Products ordered are not advance order items. MP will ensure that all orders of Products are received, processed, fulfilled and delivered on a timely and professional basis. MP will offer AOL Users who purchase Products through such Affiliated MP Site a money back satisfaction guarantee.  MP will bear all responsibility for compliance with federal, state and local laws in the event that Products are out of stock or are no longer available at the time an order is received. MP will also comply with the requirements of any federal, state or local consumer protection or disclosure law.  Payment for Products will be collected by MP directly from customers. MP's order fulfillment operation will be subject to AOL's reasonable review.

10.   Production Work.  In the event that MP requests AOL's production assistance in connection with (i) ongoing programming and maintenance related to the Affiliated MP Site, (ii) a redesign of or addition to the Affiliated MP Site (e.g., a change to an existing screen format or construction of a new custom form), (iii) production to modify work performed by a third party provider or (iv) any other type of production work, MP will work with AOL to develop a detailed production plan for the requested production assistance (the "Production Plan"). Following receipt of the final Production Plan, AOL will notify MP of (i) AOL's availability to perform the requested production work, (ii) the proposed fee or fee structure for the requested production and maintenance work and (iii) the estimated development schedule for such work. To the extent the Parties reach agreement regarding implementation of the agreed-upon Production Plan, such agreement will be reflected in a separate work order signed by the Parties. To the extent MP elects to retain a third party provider to perform any such production work, work produced by such third party provider must generally conform to AOL's standards & practices (as provided on the America Online brand service at Keyword term "styleguide"). The specific production resources which AOL allocates to any production work to be performed on behalf of MP will be as determined by AOL in its sole discretion. With respect to any routine production, maintenance or related services which AOL reasonably determines are necessary for AOL to perform in order to support the proper functioning and integration of the Affiliated MP Site ("Routine

Services"), MP will pay the then-standard fees charged by AOL for such Routine Services.

11.   Overhead Accounts.  To the extent AOL has granted MP any overhead accounts on the AOL Service, MP will be responsible for the actions taken under or through its overhead accounts, which actions are subject to AOL's applicable Terms of Service and for any surcharges, including without limitation, all premium charges, transaction charges, and any applicable communication surcharges incurred by any overhead Account issued to MP, but MP will not be liable for charges incurred by any overhead account relating to the standard monthly usage fees and standard hourly charges, which charges AOL will bear.  Upon the termination of this Agreement, all overhead accounts, related screen names and any associated usage credits or similar rights, will automatically terminate.  AOL will have no liability for loss of any data or content related to the proper termination of any overhead account.

12.   Navigation Tools.  Any Keyword Search Terms to be directed to the Affiliated MP Site shall be (i) subject to availability for use by MP, and (ii) limited to the combination of the Keyword™ search modifier combined with a registered trademark of MP (e.g. "AOL keyword: XYZ Company Name"). AOL agrees that MP's Keyword Search Term shall initially be "eToys" and may be changed by MP at its discretion subject to compliance with the foregoing provision of this Agreement.  AOL reserves the right to revoke at any time MP's use of any Keyword Search Terms which do not incorporate registered trademarks of MP. MP acknowledges that its utilization of a Keyword Search Term will not create in it, nor will it represent it has, any right, title or interest in or to such Keyword Search Term, other than the right, title and interest MP holds in MP's registered trademark independent of the Keyword Search Term. Without limiting the generality of the foregoing, MP will not: (a) attempt to register or otherwise obtain trademark or copyright protection in the Keyword Search Term; or (b) use the Keyword Search Term, except for the purposes expressly required or permitted under this Agreement. Upon the termination of this Agreement, MP's rights to any Keyword Search Terms and bookmarking will terminate.

13.   Merchant Certification Program.  MP will participate in any generally applicable "Certified Merchant" program operated by AOL or its authorized agents or contractors. Such program may require merchant participants on an ongoing basis to meet certain reasonable, generally applicable standards relating to provision of electronic commerce through the AOL Network (including, as a minimum, use of 40-bit SSL encryption and if requested by AOL, 128-bit encryption) and may also require the payment of certain reasonable certification fees to the applicable entity operating the program. Each Certified Merchant in good standing will be entitled to place on its affiliated interactive Site an AOL designed and approved button promoting the merchant's status as an AOL Certified Merchant.

14.   Search Terms.  To the extent this Agreement sets forth any mechanism by which the Affiliated MP site will be promoted in connection with specified search terms within any AOL product or service, MP hereby represents and warrants that MP has all consents, authorizations, approvals, licenses, permits or other rights necessary

**CONFIDENTIAL**
**Execution Copy**

28

AOL 00224

A 133

for MP to use such specified search terms. Notwithstanding the
foregoing, AOL shall have the right to suspend the use of any search
term if AOL has reason to believe continued use may subject AOL to
liability or other adverse consequences. Subject to the Carriage Plan
included on Exhibit A, AOL hereby acknowledges and agrees that the
Affiliated MP Site will be promoted throughout the AOL Network with
the search terms set forth on Exhibit K hereto.

15. Kids and Teens Policy. MP agrees that, at all times during the
Term of this Agreement, MP and the Affiliated MP Site shall comply
with all applicable laws pertaining to children and the use of the
Internet, including all laws pertaining to children's privacy. In addition,
MP acknowledges that it has reviewed AOL's current Kids and Teens
Policy and agrees that, during the Term of this Agreement, it will
consult and cooperate in good faith with AOL in an effort to provide a
safe and secure environment for children on the Affiliated MP Site in
keeping with the general intent and spirit of such policy. In the event
that the Parties are unable to agree on MP's compliance with this
Section 15, the matter shall be referred to the Management Committee
and the other procedures for dispute resolution set forth in Section 6 of
the Agreement.

AOL 00225

**A 134**

**EXHIBIT G**

Standard Legal Terms & Conditions

1.    Promotional Materials/Press Releases.  Each Party will submit to the other Party, for its prior written approval, which will not be unreasonably withheld or delayed, any marketing, advertising, or other promotional materials, excluding Press Releases, referencing the other Party and/or its trade names, trademarks, and service marks (the "Promotional Materials"); provided, however, that (a) either Party's use of screen shots of the Affiliated MP Site for promotional purposes will not require the approval of the other Party so long as America Online® is clearly identified as the source of such screen shots; (b) following the initial public announcement of the business relationship between the Parties in accordance with the approval and other requirements contained herein, either Party's subsequent factual reference to the existence of a business relationship between the Parties in Promotional Materials  will not require the approval of the other Party and (c) to the extent MP is referencing only the "AOL Keyword" or "America Online Keyword", no prior submission or approval shall be required. Each Party will solicit and reasonably consider the views of the other Party in designing and implementing such Promotional Materials. Once approved, the Promotional Materials may be used by a Party and its affiliates for the purpose of promoting the Affiliated MP Site and the content contained therein and reused for such purpose until such approval is withdrawn with reasonable prior notice. In the event such approval is withdrawn, existing inventories of Promotional Materials may be depleted.

2.    License.  MP hereby grants AOL a non-exclusive, non-transferable, non-sublicenseable, royalty-free  worldwide license to market, distribute, reproduce, display, perform, transmit and promote the Licensed Content (or any portion thereof) through such areas or features of the AOL Network as AOL deems appropriate for purposes of providing Impressions as required hereby, providing AOL Users with access to the Affiliated MP Site and otherwise complying with its obligations hereunder.  MP acknowledges and agrees that the foregoing license permits AOL to distribute portions of the Licensed Content in synchronism or timed relation with visual displays prepared by MP or AOL (e.g., as part of an AOL "slideshow"). In addition, AOL Users will have the right to access and use the Affiliated MP Site.

3.    Trademark License.  For purposes of designing and implementing the Materials and subject to the other provisions contained herein, AOL hereby grants MP a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to market, distribute, reproduce, display, perform, transmit, promote and use the following trade names, trademarks, and service marks of AOL:  the "America Online®" brand service, "AOL™" service/software and AOL's triangle logo and, in connection therewith, MP shall comply with the AOL styleguide available at Keyword: "style guide"; and AOL and its affiliates will be entitled to use the trade names, trademarks, and service marks of MP for

which MP holds all rights necessary for use in connection with this Agreement (collectively, together with the AOL marks listed above, the "Marks"); provided that each Party: (i) does not create a unitary composite mark involving a Mark of the other Party without the prior written approval of such other Party; and (ii) displays symbols and notices clearly and sufficiently indicating the trademark status and ownership of the other Party's Marks in accordance with applicable trademark law and practice.

4.    Ownership of Trademarks.  Each Party acknowledges the ownership right of the other Party in the Marks of the other Party and agrees that all use of the other Party's Marks will inure to the benefit, and be on behalf, of the other Party.  Each Party acknowledges that its utilization of the other Party's Marks will not create in it, nor will it represent it has, any right, title, or interest in or to such Marks, other than the licenses expressly provided herein. Each Party agrees not to do anything contesting or impairing the trademark rights of the other Party.

5.    Quality Standards.  Each Party agrees that the nature and quality of its products and services supplied in connection with the other Party's Marks will conform to quality standards set by the other Party. Each Party agrees to supply the other Party, upon request, with a reasonable number of samples of any Materials publicly disseminated by such Party which utilize the other Party's Marks. Each Party will comply with all applicable laws, regulations, and customs and obtain any required government approvals pertaining to use of the other Party's marks.

6.    Infringement Proceedings.  Each Party agrees to promptly notify the other Party of any unauthorized use of the other Party's Marks of which it has actual knowledge. Each Party will have the sole right and discretion to bring proceedings alleging infringement of its Marks or unfair competition related thereto; provided, however, that each Party agrees to provide the other Party with its reasonable cooperation and assistance with respect to any such infringement proceedings.

7.    Representations and Warranties.  Each Party represents and warrants to the other Party that: (i) such Party has the full corporate right, power and authority to enter into this Agreement and to perform the acts required of it hereunder; (ii) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (iii) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (iv) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof that are not expressly provided for in this Agreement. MP hereby represents and warrants that it possesses all

AOL 00226
**A 135**

authorizations, approvals, consents, licenses, permits, certificates or other rights and permissions necessary to sell the Products.

8.    Confidentiality. Each Party acknowledges that Confidential Information may be disclosed to the other Party during the course of this Agreement. Each Party agrees that it will take reasonable steps, at least substantially equivalent to the steps it takes to protect its own proprietary information, during the term of this Agreement, and for a period of three years following expiration or termination of this Agreement, to prevent the duplication or disclosure of Confidential Information of the other Party, other than by or to its employees or agents who must have access to such Confidential Information to perform such Party's obligations hereunder, who will each agree to comply with this section. Each Party further agrees that it will only use the Confidential Information of the other Party for purposes of carrying out its obligations under this Agreement.  For purposes of this Agreement, all information (other than aggregated information) relating to impressions, click rates and conversion rates shall be deemed to be Confidential Information.  Furthermore, all information in AOL's possession gathered as a result of MP's implementation of AOL Quick Checkout shall be deemed Confidential Information and shall be subject to the provisions Exhibit I hereof. Notwithstanding the foregoing, either Party may issue a press release or other disclosure containing Confidential Information without the consent of the other Party, to the extent such disclosure is required by law, rule, regulation or government or court order.  In such event, the disclosing Party will provide at least ten (10) business days prior written notice of such proposed disclosure to the other Party.  Further, in the event such disclosure is required of either Party under the laws, rules or regulations of the Securities and Exchange Commission or any other applicable governing body, such Party will (i) redact mutually agreed-upon portions of this Agreement to the fullest extent permitted under applicable laws, rules and regulations and (ii) submit a request to such governing body that such portions and other provisions of this Agreement receive confidential treatment under the laws, rules and regulations of the Securities and Exchange Commission or otherwise be held in the strictest confidence to the fullest extent permitted under the laws, rules or regulations of any other applicable governing body.

9.    Limitation of Liability; Disclaimer; Indemnification.

9.1    Liability.  UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, THE SALE OF PRODUCTS, THE USE OR INABILITY TO USE THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED MP SITE, OR ARISING FROM ANY OTHER PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS (COLLECTIVELY, "DISCLAIMED DAMAGES"); PROVIDED THAT EACH PARTY WILL REMAIN LIABLE TO THE OTHER PARTY TO THE EXTENT ANY

DISCLAIMED DAMAGES ARE CLAIMED BY A THIRD PARTY AND ARE SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 9.3.  EXCEPT AS PROVIDED IN SECTION 9.3, (I) LIABILITY ARISING UNDER THIS AGREEMENT WILL BE LIMITED TO DIRECT, OBJECTIVELY MEASURABLE DAMAGES, AND (II) THE MAXIMUM LIABILITY OF ONE PARTY TO THE OTHER PARTY FOR ANY CLAIMS ARISING IN CONNECTION WITH THIS AGREEMENT WILL NOT EXCEED THE AGGREGATE AMOUNT OF FIXED GUARANTEED PAYMENT OBLIGATIONS OWED BY MP HEREUNDER IN THE YEAR IN WHICH THE EVENT GIVING RISE TO LIABILITY OCCURS; PROVIDED THAT EACH PARTY WILL REMAIN LIABLE FOR THE AGGREGATE AMOUNT OF ANY PAYMENT OBLIGATIONS OWED TO THE OTHER PARTY PURSUANT TO THE AGREEMENT.

9.2    No Additional Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY, AND EACH PARTY HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED MP SITE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH OF AOL AND MP SPECIFICALLY DISCLAIMS ANY WARRANTY REGARDING THE PROFITABILITY OF THE AFFILIATED MP SITE.

9.3    Indemnity.  Either Party will defend, indemnify, save and hold harmless the other Party and the officers, directors, agents, affiliates, distributors, franchisees and employees of the other Party from any and all third party claims, demands, liabilities, costs or expenses, including reasonable attorneys' fees ("Liabilities"), resulting from the indemnifying Party's material breach of any duty, representation, or warranty of this Agreement.

9.4    Claims. If a Party entitled to indemnification hereunder (the "Indemnified Party") becomes aware of any matter it believes is indemnifiable hereunder involving any claim, action, suit, investigation, arbitration or other proceeding against the Indemnified Party by any third party (each an "Action"), the Indemnified Party will give the other Party (the "Indemnifying Party") prompt written notice of such Action.  Such notice will (i) provide the basis on which indemnification is being asserted and (ii) be accompanied by copies of all relevant pleadings, demands, and other papers related to the Action and in the possession of the Indemnified Party.  The Indemnifying Party will have a period of ten (10) days after delivery of such notice to respond.  If the Indemnifying Party elects to defend the Action or does not respond within the requisite ten (10) day period, the Indemnifying Party will be obligated to defend the Action, at its own expense, and by counsel reasonably satisfactory to the Indemnified Party.  The Indemnified Party will cooperate, at the expense of the Indemnifying Party, with the Indemnifying Party and its counsel in the defense and the Indemnified Party will have the

AOL 00227
A 136

right to participate fully, at its own expense, in the defense of such Action. If the Indemnifying Party responds within the required ten (10) day period and elects not to defend such Action, the Indemnified Party will be free, without prejudice to any of the Indemnified Party's rights hereunder, to compromise or defend (and control the defense of) such Action. In such case, the Indemnifying Party will cooperate, at its own expense, with the Indemnified Party and its counsel in the defense against such Action and the Indemnifying Party will have the right to participate fully, at its own expense, in the defense of such Action. Any compromise or settlement of an Action will require the prior written consent of both Parties hereunder, such consent not to be unreasonably withheld or delayed.

10.    Acknowledgment.  AOL and MP each acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all risks (both known and unknown) associated with the transactions contemplated hereunder. The limitations and disclaimers related to warranties and liability contained in this Agreement are intended to limit the circumstances and extent of liability. The provisions of this Section 10 will be enforceable independent of and severable from any other enforceable or unenforceable provision of this Agreement.

11.    Solicitation of AOL Users.  During the term of the Agreement and for a two year period thereafter, MP will not use the AOL Network (including, without limitation, the e-mail network contained therein) to solicit AOL Users on behalf of another Interactive Service. More generally, MP will not send unsolicited, commercial e-mail (i.e., "spam") or other online communications through or into AOL's products or services, absent a Prior Business Relationship. For purposes of this Agreement, a "Prior Business Relationship" will mean that the AOL User to whom commercial e-mail or other online communication is being sent has voluntarily either (i) engaged in a transaction with MP or with any third party that is acting on MP's behalf or (ii) provided information to MP or any third party that is acting on MP's behalf through a contest, registration, or other communication, which included clear notice to the AOL User that the information provided could result in commercial e-mail or other online communication being sent to that AOL User by MP or any third party acting on MP's behalf. Any commercial e-mail or other online communications to AOL Users which are otherwise permitted hereunder, will (a) include a prominent and easy means to "opt-out" of receiving any future commercial communications from MP, and (b) shall also be subject to AOL's then-standard restrictions on distribution of bulk e-mail (e.g., related to the time and manner in which such e-mail can be distributed through or into the AOL product or service in question).

12.    AOL User Communications.  To the extent that MP is permitted to communicate with AOL Users under Section 11 of this Exhibit G, in any such communications to AOL Users on or off the Affiliated MP Site (including, without limitation, e-mail solicitations), MP will not encourage AOL Users to take any action in violation of the terms of this Agreement. Additionally, with respect to such AOL User

communications, MP shall not encourage such AOL Users to access the Affiliated MP Site through any means other than the AOL Network.

13.    Collection and Use of User Information.  MP shall ensure that its collection, use and disclosure of information obtained from AOL Users under this Agreement ("User Information") complies with (i) all applicable laws and regulations and (ii) AOL's standard privacy policies, available on the AOL Service at the keyword term "Privacy" (or, in the case of the Affiliated MP Site, MP's standard privacy policies so long as such policies are prominently published on the site and provide adequate notice, disclosure and choice to users regarding MP's collection, use and disclosure of user information). MP will not disclose User Information collected hereunder to any third party in a manner that identifies AOL Users as end users of an AOL product or service or use Member Information collected under this Agreement to market another Interactive Service.

14.    Excuse.  Neither Party will be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence.

15.    Independent Contractors.  The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or employee of the other Party. Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind, the other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.

16.    Notice.  Any notice, approval, request, authorization, direction or other communication under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered by electronic mail on the AOL Network (to screenname "AOLNotice@AOL.com" in the case of AOL) or by confirmed facsimile; (ii) on the delivery date if delivered personally to the Party to whom the same is directed; (iii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iv) five business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available. In the case of AOL, such notice will be provided to both the Senior Vice President for Business Affairs (fax no. 703-265-1206) and the Deputy General Counsel (fax no. 703-265-1105), each at the address of AOL set forth in the first paragraph of this Agreement. In the case of MP, except as otherwise specified herein, the notice address will be the address for MP set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax

AOL 00228

A 137

number or AOL e-mail address, to be as reasonably identified by AOL.

17. <u>No Waiver</u>. The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect.

18. <u>Return of Information</u>. Upon the expiration or termination of this Agreement, each Party will, upon the written request of the other Party, return or destroy (at the option of the Party receiving the request and provided such Party certifies in writing to such destruction) all confidential information, documents, manuals and other materials specified the other Party.

19. <u>Survival</u>. Sections 4.2.2 and 6 (and 4.4 and 4.5 if AOL elects to establish a Continued Link) of the body of the Agreement, Sections 8 through 30 of this Exhibit, any payment obligations accrued prior to termination or expiration, and any other terms which by their nature are designed to survive termination or expiration of this Agreement, will survive the completion, expiration, termination or cancellation of this Agreement.

20. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein, including, without limitation, the Interactive Marketing Agreement between the parties dated October 1, 1997, as amended. Neither Party will be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.

21. <u>Amendment</u>. No change, amendment or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment, and in the case of AOL, by an executive of at least the same standing to the executive who signed the Agreement.

22. <u>Further Assurances</u>. Each Party will take such action (including, but not limited to, the execution, acknowledgment and delivery of documents) as may reasonably be requested by any other Party for the implementation or continuing performance of this Agreement.

23. <u>Assignment</u>. MP will not assign this Agreement or any right, interest or benefit under this Agreement without the prior written consent of AOL, which consent shall not be unreasonably withheld. AOL will not assign this Agreement or any right, interest or benefit under this Agreement to any MP Competitor without the prior written consent of MP, which may be withheld in MP's sole discretion. Subject to the foregoing, this Agreement will be fully binding upon,

inure to the benefit of and be enforceable by the Parties hereto and their respective successors and assigns.

24. <u>Construction; Severability</u>. In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement, (i) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law, and (ii) the remaining terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect.

25. <u>Remedies</u>. Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity; provided that, in connection with any dispute hereunder, MP will not be entitled to offset any amounts that it claims to be due and payable from AOL against amounts otherwise payable by MP to AOL.

26. <u>Applicable Law</u>. Except as otherwise expressly provided herein, this Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the Commonwealth of Virginia except for its conflicts of laws principles.

27. <u>Export Controls</u>. Both Parties will adhere to all applicable laws, regulations and rules relating to the export of technical data and will not export or re-export any technical data, any products received from the other Party or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations and rules unless properly authorized.

28. <u>Headings</u>. The captions and headings used in this Agreement are inserted for convenience only and will not affect the meaning or interpretation of this Agreement.

29. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same document.

30. <u>Press Releases</u>. Each Party will submit to the other Party, for its prior written approval, which will not be unreasonably withheld or delayed, any press release or any other public statement ("Press Release") regarding the transactions contemplated hereunder. Notwithstanding the foregoing, either Party may issue Press Releases and other disclosures as required by law without the consent of the other Party and in such event, the disclosing Party will provide at least five (5) business days prior written notice of such disclosure. Any Party who fails to provide the other Party with prior notice in accordance with this Section 30 (the "Issuing Party"), shall, at the option of the other Party (the "Non-Issuing Party"), issue a retraction of such press release in a form reasonably acceptable to such other Party. Failure to issue a retraction in accordance with this Section 30 shall constitute a material breach of this Agreement. Notwithstanding the foregoing, nothing in this Section 30 shall limit the liability of the Issuing Party under this Agreement and the issuance of a retraction pursuant to this Section

AOL 00229

A 138

30 shall be in addition to any other damages and remedies to which
the Non-Issuing Party may be entitled.

CONFIDENTIAL
Execution Copy

AOL 00230

A 139

EXHIBIT H

## Keyword Guidelines

**AOL Keyword: eToys**

- Capitalization – listing should appear in initial caps only.
  Note: When America Online is abbreviated to AOL – AOL <u>must</u> appear in all caps.
  K of Keyword must always be capitalized
- Subject to the terms in Exhibit C, in cases where MP displays its URL in a form other than as a part of its logo (e.g. 'www.eToys.com') MP will also display 'AOL Keyword: eToys' (the "Keyword Display") in the same style font and shall use commercially reasonable efforts to include the Keyword Display in a size no smaller than 67% of the size of the font used for the URL, but in no event shall such Keyword Display be in a size smaller than 50% of the size of the font used for the URL .
- AOL may opt out of Keyword promotions at its discretion.

**BROADCAST/RADIO**
"America Online Keyword" or "AOL Keyword" must be announced entirely.  Example voiceover would read:
  "Visit us at www.etoys.com or at AOL Keyword: eToys"

- <u>AOL must approve all uses prior to usage if not consistent with the guidelines set forth herein.</u>

**CONFIDENTIAL**
**Execution Copy**

35

AOL 00231
**A 140**

## Exhibit I

### Quick Checkout Provisions

The parties agree that MP's implementation of AOL Quick Checkout ("QC") shall conform to the following specifications and restrictions:

1.    MP will offer QC as an option only to AOL Users accessing MP's checkout process via a recognized IP address or browser detection technology. AOL shall provide or make available to MP (e.g., posted on the Web) a complete and updated list of IP addresses on a regular basis.

2.    In MP's implementation of QC on the Affiliated MP Site, (i) AOL Users signing up for QC for the first time or editing user information shall be required to view a minimum number of pages necessary to support data collection as compared to completing the same purchase using MP's normal checkout process, and (ii) AOL Users who are existing QC users shall be required to see no more than one additional webpage as compared to completing the same purchase using MP's normal checkout process. Furthermore, as the Parties shall mutually agree, the additional webpage shall be co-branded by AOL and MP, and conform to the "look and feel" of the Affiliated MP Site.

3.    AOL acknowledges and understands that MP requires purchasers on the Affiliated MP Site to create an account (combination of email address and password). MP acknowledges and understands that AOL is considering modifying the QC system to provide the ability for AOL Users to create, store, and retrieve MP-specific account information. To the extent that AOL modifies the QC system as such, AOL will make available to MP such system and such system will recall MP-specific account login information for future purchases on the Affiliated MP Site. AOL acknowledges that MP will not, and is not required to, implement QC until such modification is made. AOL acknowledges MP will not implement QC in the event that AOL includes in QC technology to track a customer's activity on the Affiliated MP Site and compile data as a result thereof. AOL shall notify MP in the event that QC contains any such technology.

4.    All financial data obtained by AOL as a result of the implementation of QC on the Affiliated MP Site, including, without limitation, the number of AOL Users signing up for QC on the Affiliated MP Site, the number of AOL Users completing a purchase on the Affiliated MP Site using QC, the aggregate quantity and dollar value of items sold on the Affiliated MP Site, and any data related to the sale of individual items sold on the Affiliated MP Site, shall be deemed to be the sole property of MP and shall be treated as Confidential Information hereunder by AOL. To the extent AOL is ever deemed to acquire any ownership interest in such property, AOL agrees to take such steps, and execute such documents, as MP may reasonably request in order to transfer sole ownership thereof to MP. MP shall be entitled to audit AOL's procedures relating to the maintenance of the Confidential Information described herein.

5.    It is understood by MP that AOL may use the following information to include as a non-identifiable part of publicly reported aggregate data for all AOL users: 1) the total number of AOL Users completing a purchase on the Affiliated MP Site using QC, and 2) the total dollars spent by AOL Users completing a purchase on the Affiliated MP Site using QC. However, AOL shall not use any of the aforementioned data to publicly report on aggregate data for any subcategories such as toys, games, baby products, or children's products.

6.    Behavioral data (e.g. product purchase information, but excluding information in the "wallet" component of QC) gathered about individual AOL Users by AOL as a result of MP's implementation of QC on the Affiliated MP Site ("Individual Data") shall remain the sole property of MP and shall be treated as Confidential Information hereunder by AOL. Furthermore, AOL shall not use Individual Data to target any type of advertising or promotional messages to AOL Users, whether on behalf of AOL or a third party. At least once per year during the term of this Agreement, Individual Data held by AOL will be destroyed, the destruction of which will be certified by AOL to MP. MP shall be entitled to audit AOL's procedures relating to the maintenance of the Confidential Information described herein.

7.    Notwithstanding anything to the contrary contained in this Agreement, MP shall not provide to AOL, and AOL shall not receive or be entitled to receive, any data pertaining to particular products or SKUs

CONFIDENTIAL
Execution Copy

36

AOL 00232

**A 141**

purchased by individual customers; rather, only total purchase amounts and date for customers may be made available to AOL.

CONFIDENTIAL
Execution Copy

AOL 00233

A 142

**Exhibit J**

<u>Welcome Screen</u>* AOL shall provide on a monthly basis the number of Impressions, number of click throughs and click through rate per Promotion, broken down by day and time.

<u>Departments</u>* – AOL shall provide on a monthly basis the number of Impressions, number of click throughs and click through rate per placement, broken down by day and by brand (ie AOL, CIS, Netscape, AOL.com).

<u>Ad Banners</u> – MP shall have access to the AOL ASIS system.

<u>Text Links</u>* -- AOL shall provide on a monthly basis the number of Impressions broken down by day.

*=All monthly reporting data will be sent by the 15th of the following month.

AOL shall not be required to continue to supply any category of information required under this Exhibit J in the event that such information is no longer at any time during the Term routinely compiled by AOL in the ordinary course of its business.

AOL 00234

**A 143**

## EXHIBIT K
### Search Terms

baby names
Baby shower
babycare
babynames
Babyshower
birth
birth
Birthday
Birthdays
Childcare
Console
Consoles
Doll
Dolls
e toys
etoys
etoys.com
Gifts
infant apparel
infant clothes
infant clothing
kids
nanny agencies
nursery
pregnancy
Stuffed
toy
toy store
toy stores
Toys
toys.com
toystores
Video
Video games
Videogames

www.etoys.com

barbie
Barbie Doll
barbies
beanie
beanie babies
beaniebabie
Beaniebabies
Beanies
beany
Blue
Blues Clues
Bluesclues
Brio
Disney
Disneyworld
Elmo
fisher price
Fisherprice
Furby
gerber
Hasbro
Hotwheels
Jawas
Jedi
Jedi Knights
Kenner
leggo
LEGO
Lego
legos
Light Saber
Matchbox
Mattel

Nick
Nickelodeon
Nintendo
Nintendo 64
Playmobil
Playstation
Playstation
Games
pokemon
pokemon cards
pokemon game
pokemon games
Pooh
Rogue Squadron
rugrat
Rugrats
Safety 1st
safety first
safetyfirst
Sesame
Sesame Street
Sesamestreet
Sony Playstation
SonyPlaystation
Star Wars
starwars
Teletubbie
Teletubbies
Teletubby
Tikes
Tyco
Winnie
Yoda

CONFIDENTIAL
Execution Copy

AOL 00235

A 144

| eToys Addendum Summary | |
|---|---|
| Deal Team: Baig, Thottam, Burger, Rhodes | Last Updated: November 21, 2000 |

**General Overview:** AOL and eToys have agreed to amend their existing Interactive Marketing Agreement. One year after signing a 3 year $18MM deal in Aug, '99, eToys approached AOL to restructure their agreement. The existing deal terms were:

- **Term/Size/CPM/Discount**-3 years beginning 08/99, $18.0 mm, $13.8 Avg. CPM, 69% off rate card.
- **Carriage**-1.3 B impressions on AOL Service, AOL.com, CIS (Shopping only), and Netcenter.
- **Revenue Recognized:** To date recognized $5.3 mm and will recognize $525,286 per month moving forward.
- **Value delivered:** Approximately $3mm in value has been delivered to eToys.

**Issues:**
We were forced to restructure the deal because of the following issues:
1) **Massive projected shortfalls** in all of the Shop@ placements over the next two years — pursuant to the contract Shop@ placements had to be made good through only the specific department within 6 months of year end.
2) **Failure to provide** specified channel impression in both Shop@ and other key integration places in the first year of the contract. More importantly, AOL did not expect to be able to make-good on the Shop@ shortfall from the first year for at least a year.
3) **Redesign** of the Shop @ channel that led to significantly poor results for eToys. EToys clickthrough and conversion dropped significantly after the re-design of the channel.
4) **Collapse** in the electronic toys retailers category. AOL was left with only two toys e-tailers. We need to retain as robust an offering to our members as possible -- currently the only other major toys e-tailer on AOL is ToysrUs.

**Key Take-Aways:**
➢ **Impressions Delivery** – eToys acknowledges that AOL has satisfied its obligations with respect to delivery of Impressions during Year 1 of the Agreement. In Year 2 and 3 of the agreement AOL shall provide impressions as set forth in the amendment, consisting of Welcome Screen and Shop@ placements. AOL will use commercially reasonably efforts to evenly allocate Welcome Screen Impressions through the quarters, unless otherwise mutually agreed by eToys and AOL, subject to availability and seasonality.
➢ **Promotion**- If eToys provides special holiday promotion of its AOL Keyword, AOL will consider in good faith making additional Welcome Screen Impressions available commensurate with the promotion.
➢ **Impressions Shortfall**-In the event that there is a shortfall in the delivery of Impressions to be delivered, AOL will provide eToys as its sole remedy, with make good impressions as set forth in the amendment.
➢ **Payment**- eToys will make a non-refundable payment to AOL of $750,000 due upon execution of this agreement. Upon AOL's receipt of the foregoing amount, AOL acknowledges that eToys has paid in full all obligations (representing an aggregate amount of $8,25MM). AOL, also agrees to waive its right to collect the $335K presently owed to AOL by eToys subsidiary Baby Center
➢ **Exclusivity**- Beginning on the Amendment Effective date, AOL will no longer have any obligations to provide exclusivity to eToys as designated by the original Interactive Marketing Agreement.
➢ **Quick Checkout**- Following January 3, 2001, eToys will consider in good faith whether it will implement AOL's Quick Checkout tool on their site.
➢ **Time Warner Placements**- From January 3, 2001 and February 28, 2001, eToys will consider at their sole discretion in good faith proposals from AOL for eToys to purchase Time Warner Ad placements with a value of up to $9 MM.

**Economics:** AOL has agreed to reduce the value of the deal by $9.75 MM to a total value of $8.25MM over 3 years. This $$ figure was arrived at by re-pricing the carriage for Years 2 and 3 using current rate cards. While in the process eliminating all exclusivites in the Toys area and preserving revenue recognition through year-end 2000.
- Revised Deal Size: $8.25mm (reduction of deal by $9.75mm)
- Revenued recognized as of October 2000: $6.49mm
- Revenue expected to be recognized in Q2: $806k. (dropped from scheduled recognition of $1.94mm)
- Revenue recognition per quarter going forward: $245k.

**Signoffs:**
    -Interactive Marketing/Account Services – Berlow, Staley and Burger
    -Legal – Litsinger, Heller
    -BA – Keller/Colburn
    -Shop@ -- Gates and Borscenik
    - IM Finance and Communications – Wilsey (IM) and Wendy Goldberg (PR)

**Plaintiff's Exhibits**
Adv. Pro. No. 03-500
**03**

**CONFIDENTIAL**

**AOL 00534**

**A 145**

Deposition Exhibit *PX-15*
Deponent: C. Valle
Date: November 20, 2003

CONFIDENTIAL
EXECUTION COPY

*Confidential*

## AMENDMENT TO
## INTERACTIVE MARKETING AGREEMENT

This amendment to the INTERACTIVE MARKETING AGREEMENT (this "Amendment") is made and entered as of November 15, 2000 (the "Amendment Effective Date") by and between America Online, Inc. ("AOL"), a Delaware corporation, and eToys Inc. ("eToys"), a Delaware corporation with offices at 12200 Olympic Boulevard, Los Angeles, California 90064 (each a "Party" and collectively the "Parties").

### Introduction

AOL and eToys have previously entered into that certain Interactive Marketing Agreement dated as of August 10, 1999 (the "Marketing Agreement"). The Parties wish to amend the Marketing Agreement as described in this Amendment. Capitalized terms used but not defined herein shall be as defined in the Marketing Agreement. The Marketing Agreement as amended by this Amendment shall be herein referred to as the "Agreement".

### Terms

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained in this Amendment and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, AOL and eToys agree as follows:

1. Delivery of Impressions. Notwithstanding anything to the contrary contained in Sections 1.1 through 1.4 of the Marketing Agreement and Exhibit A thereto and notwithstanding AOL's actual delivery or under-delivery of Impressions through the Amendment Effective Date, eToys acknowledges and agrees that AOL is hereby deemed to have satisfied its obligations with respect to delivery of Impressions during Year 1 of the Agreement, and eToys agrees that, notwithstanding Exhibit A of the Marketing Agreement, AOL's sole obligation with respect to delivery of a certain number of Impressions under the Agreement during Year 2 and Year 3 shall be as follows:

    a. AOL will deliver in accordance with the Agreement the Impressions set forth on Schedule A attached hereto and will use commercially reasonable efforts to deliver such Impressions in accordance with the time frames set forth on Schedule A.

    b. AOL will deliver in accordance with the Agreement Eight Hundred Sixty Two Million Four Hundred Thousand (862,400,000) Impressions on the "Welcome" screen of the AOL Service between October 1, 2000 and August 9, 2002, in accordance with Section 2 below.

2. "Welcome" Screen Impressions. The "Welcome" screen Impressions referenced in Section 1(b) of this Amendment (the "Welcome Impressions") will all include graphical promotions (as opposed to solely textual promotions), to the extent appropriate graphics are supplied by eToys in accordance with the requirements of Agreement. AOL will use commercially reasonable efforts to deliver the Welcome Impressions in approximately the following increments:

| | |
|---|---|
| October to December, 2000: | 225,000,000 Impressions |
| January to March, 2001: | 73,330,000 Impressions |
| April to June, 2001: | 73,330,000 Impressions |
| July to September, 2001 | 73,330,000 Impressions |
| October to December 2001: | 225,000,000 Impressions |
| January to March, 2002: | 73,330,000 Impressions |
| April to June, 2002: | 73,330,000 Impressions |
| July to August 9, 2002: | 45,750,000 Impressions |

1

AOL 00535
A 146

CONFIDENTIAL
EXECUTION COPY

AOL will use commercially reasonable efforts to allocate the Welcome Screen Impressions approximately evenly throughout the quarters indicated above, unless otherwise mutually agreed by eToys and AOL, subject to availability and seasonality (e.g., holiday traffic spikes). AOL will, when commercially reasonable, strive to accommodate eToys' requests for particular days and times for delivery of the Welcome Screen Impressions. AOL and eToys will review the Welcome Screen Impression schedule on a monthly basis, and AOL will consider in good faith any request of eToys to reallocate the Welcome Screen Impressions among the quarters indicated above or on a monthly basis. At least 200,000,000 of the Welcome Screen Impressions will contain AOL Special Offers provided by eToys; provided, however, that AOL shall not be in breach of this Agreement for any deficiency in the number of such Welcome Screen Impressions, or be required to make-up any such deficiency, if such deficiency was attributable to eToys' failure to provide sufficient AOL Special Offers to AOL (which AOL Special Offers shall be deemed sufficient if they are similar to the AOL Special Offers eToys has provided to AOL and AOL Members under the Marketing Agreement up to the Amendment Effective Date) on a timely basis. In addition, if eToys provides special holiday promotions of its AOL Keyword (for example, through a catalog), AOL will consider in good faith making additional welcome screen impressions available in a manner commensurate with the promotions, which additional welcome screen impressions shall not count toward the required number of Welcome Screen Impressions set forth in Section 1(b) above. The provisions contained in Section 1 and 2 of this Amendment regarding Welcome Screen Impressions replace Section 1.3 of the Marketing Agreement in its entirety.

3.  Impressions Shortfall. Notwithstanding anything to the contrary in the Marketing Agreement, in the event there is (or will be in AOL's reasonable judgment) a shortfall in the delivery of Impressions to be delivered under Schedule A and Section 1 and 2 of this Amendment, AOL shall provide eToys, as its sole remedy, with make-good Impressions in accordance with the following:

   (a)  Shortfalls in the "Kid and Baby Essentials" department may only be replaced with Impressions in that department (or any successor thereto), and shortfalls in the "Toys & Games" department may only be replaced with Impressions in that department (or any successor thereto);

   (b)  Shortfalls in "Shopping" departments other than "Kid and Baby Essentials" and "Toys and Games" may only be replaced with Impressions in one or more of the "Shopping" categories outlined in Schedule A, Section 3 (including "Kid and Baby Essentials" but not including "Toys & Games");

   (c)  AOL may set off any shortfall in "Shopping" departments other than "Kid and Baby Essentials" and "Toys and Games" with actual Impressions in excess of those to be delivered under Schedule A, Section 3 in another "Shopping" department (including "Kid and Baby Essentials" but not including "Toys and Games");

   (d)  Shortfalls in Welcome Screen Impressions may be replaced only with Welcome Screen Impressions;

   (e)  AOL will use commercially reasonable efforts to make-up any shortfalls in the 225,000,000 Welcome Screen Impressions to be provided pursuant to Section 2 above during the October to December 2000 quarter during the October to December 2001 quarter, and if AOL is unable to make-up such a shortfall during the October to December 2001 quarter, then AOL may make-up such shortfall thereafter;

   (f)  Shortfalls in general "carriage" Impressions (as opposed to Shopping or Welcome Screen Impressions) may be replaced with Impressions (i) anywhere on the AOL Network where AOL provides Impressions to eToys pursuant to this Agreement, provided that the replacement Impressions have a comparable Relative Weighted Value to the shortfall Impressions, and (ii) on other locations on the AOL Network,

AOL 00536
**A 147**

CONFIDENTIAL
EXECUTION COPY

provided that the Parties shall agree upon the value of such replacement Impressions, provided further that the Parties agree that Run of Service Inventory anywhere on the AOL Network on a service-wide basis (e.g., AOL Service or CompuServe) shall be deemed to have a Relative Weighted Value of 4; and

(g)  The penalty under Section 1.2 of the Agreement, which provides that, under certain circumstances, the number of make-good Impressions is equal to 1.5 times the number of shortfall Impressions, will apply in the event of a shortfall of fifty percent (50%) or more of the combined number of "Shopping" and "Carriage" Impressions promised during Year 2 or Year 3 under the Agreement.

Except as otherwise noted above, AOL may elect, in its discretion, to replace any shortfall either during the Term of the Agreement through over-delivery in certain periods or by extending the Term, at no cost to eToys, an amount of time sufficient to enable it to deliver the make-good Impressions.

4.   Payment.  eToys shall make a non-refundable payment to AOL of Seven Hundred Fifty Thousand Dollars (US$ 750,000.00).  Such payment shall be due and payable upon the execution of this Amendment.  Notwithstanding Section 4.3 of the Marketing Agreement, no interest will accrue with respect to the foregoing amount until the date ten (10) business days after the Amendment Effective Date.  Upon AOL's receipt of the foregoing amount, AOL acknowledges that eToys has paid all amounts due under Section 4.1 of the Agreement through and including the payment due on October 15, 2000 (representing an aggregate of $8,250,000 in payments) and that eToys shall not be required to pay any of the remaining payments due following October 15, 2000 through and including April 15, 2002 described in Section 4.1 of the Agreement (representing an aggregate of $9,750,000).  Additionally, upon AOL's receipt of such payment, AOL agrees to waive its right to collect the Three Hundred Thirty Five Thousand Dollars (US$ 335,000.00) presently owed to AOL by eToys' wholly owned subsidiary, BabyCenter, Inc. ("BabyCenter") under that certain Anchor Tenant Agreement between AOL and BabyCenter dated June 1, 1999 (the "BabyCenter Agreement"), as well as the Sixty Two Thousand Five Hundred Dollars (US$ 62,500.00) due from the extension of such agreement through the Amendment Effective Date.  Accordingly, upon receipt of the final payment from eToys of $750,000 described in the first sentence of this section, AOL acknowledges that (i) payment obligations of BabyCenter to AOL under Section 1.5 of the BabyCenter Agreement and (ii) amounts owed by BabyCenter to AOL for carriage of BabyCenter promotions provided by AOL on the AOL Network after the expiration of the BabyCenter Agreement are extinguished.  Any extension of the terminated BabyCenter Agreement, or any additional carriage of BabyCenter promotions by AOL, is at AOL's sole option and expense.

5.   Termination of Exclusivity.  Beginning on the Amendment Effective Date, AOL shall no longer have any obligations under Sections 1.8.1 and 1.8.2 of the Marketing Agreement, and accordingly those Sections are hereby deleted from the Agreement in their entirety.

6.   Quick Checkout Tool.  Following January 3, 2001, eToys shall consider in good faith whether it desires to implement AOL's "Quick Checkout" tool on the eToys Interactive Site (which tool allows AOL Users to enter payment and shipping information which is then passed from AOL's centralized server unit to eToys for order fulfillment).  No later than March 1, 2001, eToys will decide whether or not it will implement AOL's "Quick Checkout" tool.  Such decision will be made by eToys in its sole and absolute discretion.

7.   Time Warner Placements.  During the period between January 3, 2001 and February 28, 2001, assuming AOL is then in a position to offer such inventory, eToys will consider in good faith proposals from AOL for eToys to purchase Time Warner, Inc. advertising placements ("TW Placements") with a value of up to US $9,000,000.  eToys may accept or reject all or any portion of these proposed TW Placements in eToys' sole and absolute discretion.  Following February 28, 2001, except for any TW Placements that eToys, in its sole and absolute discretion, has agreed in writing to purchase, eToys shall have no further obligation with respect to the proposed TW Placements.  Notwithstanding anything to the contrary, the parties acknowledge that AOL does not

AOL 00537

A 148

CONFIDENTIAL
EXECUTION COPY

have any authority whatsoever to bind Time Warner, Inc., nor make any commitments or offers on its behalf.

8. <u>Miscellaneous</u>.

a. This Amendment is supplementary to and modifies the Marketing Agreement. The terms of this Amendment supersede provisions of the Marketing Agreement only to the extent that it is expressly provided for herein, or to the extent that the terms hereof expressly conflict with the terms of the Marketing Agreement. However, nothing contained in this Amendment should be interpreted as invalidating the Marketing Agreement, and provisions of the Marketing Agreement will continue to govern relations between the Parties insofar as they do not expressly conflict with this Amendment.

b. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, if any.

c. The parties may execute this Amendment in one or more identical counterparts, all of which when taken together will constitute one and the same instrument.

d. The parties hereto acknowledge that the parties and their respective counsel have each reviewed and revised this Amendment, and that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Amendment or any exhibits hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to the INTERACTIVE MARKETING AGREEMENT to be effective for all purposes as of the Amendment Effective Date.

AMERICA ONLINE, INC.

By: _____
Name:  Steven E. Rindner
Title:  Senior Vice President
        Exec. Director Business Affairs

ETOYS INC.

By: _____
Name:  Clyde E Foal
Title: VP of Business Development

4

AOL 00538

A 149

CONFIDENTIAL
EXECUTION COPY

## SCHEDULE A

## CARRIAGE PLAN

Section 1 – Shopping impressions to be delivered by 2/15/01 unless otherwise noted below

| Level | Brand | Placement | Size | Approx. Start Date | Approx. End Date | Impressions |
|---|---|---|---|---|---|---|
| 1 | Compuserve | Log-in Pop-up | 590x294 | 12/06/2000 | 12/06/2000 | 1,300,000 |
| 1 | Compuserve | Log-in Pop-up | 590x294 | 12/13/2000 | 12/13/2000 | 1,300,000 |
| 1 | Compuserve | Family Pop-up | 200x250 | 11/01/2000 | 11/07/2000 | 15,000 |
| 1 | Compuserve | Family Pop-up | 200x250 | 11/15/2000 | 11/21/2000 | 15,000 |
| 1 | Compuserve | Family Pop-up | 200x250 | 11/22/2000 | 11/28/2000 | 15,000 |
| 1 | Shop@ | Great Gift Ideas: Gifts for Kids | Graphic | 10/20/2000 | 08/31/2001 | 807,800 |
| 1 | Shop@ | Great Gift Ideas; Halloween | Graphic | 10/20/2000 | 10/31/2000 | 450,000 |
| 1 | Shop@ | Great Gift Ideas: Hot Toys | Text | 11/01/2000 | 12/31/2000 | 619,000 |
| 1 | Shop@ | Great Gift Ideas: July 4th | Text | 06/15/2001 | 07/04/2001 | 143,000 |
| 1 | Shop@ | Maternity - Gold | | 09/01/2000 | 09/01/2002 | 1,766,666 |
| 1 | Shop@ | Toys & Games – Search Integration | | 10/15/2000 | 09/21/2000 | NA |
| 1 | Shop@ | Crafts & Hobbies – Search Integration | | 10/15/2000 | 09/21/2000 | NA |
| 1 | Shop@ | Kids & Baby - Search Integration | | 10/15/2000 | 09/21/2000 | NA |
| | | | | | L1 TOTAL: | 6,446,466 |

| Level | Brand | Placement | Size | Start Date | End Date | Impressions |
|---|---|---|---|---|---|---|
| 2 | Compuserve | Kids Pop-up | 200x250 | 11/01/2000 | 11/07/2000 | 17,000 |
| 2 | Compuserve | Kids Pop-up | 200x250 | 11/15/2000 | 11/21/2000 | 17,000 |
| 2 | Compuserve | Kids Pop-up | 200x250 | 11/22/2000 | 11/28/2000 | 17,000 |
| | | | | | L2 TOTAL: | 51,000 |
| | | | | | SECTION 1 TOTAL: | 6,497,466 |

5

AOL 00539

A 150

CONFIDENTIAL
EXECUTION COPY

Section 2 – Ad Banners/Sponsorships to be delivered by 2/15/01 unless otherwise indicated below

| Level | Brand | Placement | Size | Approx. Start Date | Approx. End Date | |
|---|---|---|---|---|---|---|
| 1 | AOL Service | Run of Parenting | 234x60 | 10/23/2000 | 08/31/2002 | 3,000,000 |
| 1 | AOL Service | Busy Parents Sponsorship | 88x31 | 11/01/2000 | 03/31/2001 | 33,333 |
| 1 | AOL Service | House & Home: Kids Space Sponsorship | 88x31 | 10/23/2000 | 08/31/2001 | 111,000 |
| 1 | AOL Service | Run of House & Home | 234x60, 468x60 | 10/23/2000 | 02/15/2001 | 3,000,000 |
| 1 | AOL Service | AOL Search - AOL - Directory - Home Kids | 468x60 | 10/23/2000 | 02/15/2001 | 250,000 |
| 1 | AOL Service | Run of Home & Family | 120x60 | 10/23/2000 | 12/31/2000 | 100,000 |
| 1 | AOL Service | Run of Home & Family | 120x60 | 01/01/2000 | 08/15/2001 | 1,100,000 |
| 1 | AOL Service | Parenting News: Sleep Like a Baby | 234x60 | 10/23/2000 | 12/31/2000 | 175,000 |
| | | | | | | L1 TOTAL: 7,769,333 |
| 2 | Netscape | Lifestyles: Women - Text Link | 194x15 | 10/23/2000 | 02/15/2001 | 250,000 |
| 2 | Partner | People.com - Homepage | 468x60 | 10/23/2000 | 02/15/2001 | 250,000 |
| 2 | Partner | People.com - Features | 468x60 | 10/23/2000 | 02/15/2001 | 2,000,000 |
| 2 | Partner | People.com - Celebrities | 468x60 | 10/23/2000 | 02/15/2001 | 2,000,000 |
| 2 | Partner | People.com - 25 Most Intriguing People Special | 468x60 | 10/23/2000 | 12/31/2000 | 2,136,000 |
| 2 | AOL.com | Homepage | 100x70 | 10/23/2000 | 12/15/2001 | 9,252,000 |
| | | | | | | L2 TOTAL: 15,888,000 |
| 3 | AOL Service | Email In Box | 175x45 | 10/23/2000 | 12/15/2001 | 9,252,000 |
| | | | | | | L3 TOTAL: 9,252,000 |
| 4 | Partner | American Greetings - Public - Christmas/Hannukah | 468x60 | 11/01/2000 | 12/31/2000 | 1,497,787 |
| 4 | Partner | American Greetings - AOL - Birthday | 468x60 | 10/23/2000 | 08/15/2001 | 1,500,000 |
| 4 | Partner | American Greetings - AOL - Christmas/Hannukah | 468x60 | 10/23/2000 | 12/31/2000 | 6,000,000 |
| 4 | Partner | Winter Holiday - Shopping Package | 120x120 | 11/01/2000 | 01/31/2001 | 10,700,000 |
| | | | | | | L4 TOTAL: 19,697,787 |
| | | | | | | SECTION 2 TOTAL: 52,607,120 |

AOL 00540

6

**A 151**

CONFIDENTIAL
EXECUTION COPY

### Section 3 – Shopping and Ad Banners/Sponsorships to be delivered in Years 2 and 3

| Level | | Impressions Year 2 | Impressions Year 3 | Total Impressions (Y2 & Y3) |
|---|---|---|---|---|
| | **Shopping Placements (8/10/00-8/9/02)** | 8/10/2000-8/9/2001 | 8/10/2001-8/9/2002 | |
| 1 | Toys & Games: Anchor (eToys) | 7,875,000 | 7,875,000 | 15,750,00 |
| 1 | Educational Toys: Anchor (e Toys) | 2,250,000 | 2,250,000 | 4,500,00 |
| 1 | Crafts & Hobbies : Anchor (eToys) | 1,762,500 | 1,762,500 | 3,525,00 |
| 1 | Books & Magazines: Gold (eToys) | 5,388,889 | 5,388,889 | 10,777,777 |
| 1 | Printers, Software & Accessories: Silver (eToys) | 3,900,000 | 3,900,000 | 7,800,00 |
| 1 | Movies: Gold (eToys) | 3,766,677 | 3,766,677 | 7,533,33 |
| 1 | Kids & Baby: Essentials: Anchor (eToys) | 2,625,000 | 2,625,000 | 5,250,00 |
| | **TOTAL SHOPPING** | 27,568,056 | 27,568,056 | 55,136,11 |
| | **Ad Banners/Sponsorships** | | | |
| | **AOL Service (8/10/00-8/9/02)** | | | |
| 1 | Baby Registries | | | |
| 1 | Santa's Home Page Banners | 720,000 | 720,000 | 1,440,00 |
| 1 | Babies Registries Banners | 800,000 | 800,000 | 1,600,00 |
| 1 | Birthday Club Banner | 300,000 | 300,000 | 600,000 |
| 1 | Kids Wish List | 1,500,000 | 1,500,000 | 3,000,000 |
| 1 | Run of Channel Families | 245,000 | 245,000 | 490,000 |
| 2 | Tour of Toys Page Sponsorship | 750,000 | 750,000 | 1,500,000 |
| 2 | Slideshow Rotation of toys | 500,000 | 500,000 | 1,000,000 |
| | **TOTAL BANNERS/SPONSORSHIPS** | 575,0000 | 575,000 | 1,150,00 |
| | **Other Services (Crossbrand, Welcome Screen)** | 5,390,000 | 5,390,000 | 10,780,00 |
| n/a | Welcome Screen | 444,500,000 | 444,500,000 | 889,000,000 |
| 2 | Search 2000 Keywords | 10,675,750 | 10,675,750 | 21,351,50 |
| | **SECTION 3 TOTAL:** | 455,175,750 | 455,175,750 | 455,175,750 |
| | **CONTRACT TOTAL:** | | | 969,456,08 |

910,351,500

7

AOL 00541

A 152

# APPENDIX – PART 4 OF 4

WILMER CUTLER PICKERING LLP

2445 M STREET, N.W.

WASHINGTON, DC 20037-1420

TELEPHONE +1 (202) 663 6000
FACSIMILE +1 (202) 663 6363
WWW.WILMER.COM

GREGORY CHERNACK
(202) 663-6753
GREGORY.CHERNACK@WILMER.COM

April 26, 2004

*By Facsimile and First Class Mail*

Richard D. Allen, Esq.
Morris Nichols Arsht and Tunnell
1201 N. Market Street
Wilmington, DE 19801

> Re:  *EBC I, Inc., f/k/a eToys, Inc. v. America Online, Inc.*, Adv. Proc. No. 03-50003 (MFW) (Bankr. D. Del.).

Dear Rick:

I am writing in response to your letter of April 1, 2004.

1.      With the documents produced last month, AOL has produced all of the eToys' media plans it could locate. The document dated November 2, 2000 (AOL01966-70) is not, however, the "final media plan created after agreement had been reached on the amendment," as the amendment was not signed for almost another two weeks after this document was prepared. Your reference to a "final media plan" is also incorrect—media plans would be frequently changed based upon what worked best for eToys and AOL. This particular document was prepared during the negotiation of the amendment and was being used by AOL to determine what impressions would be provided should the amendment be entered into. The CPMs listed on this document do not, however, reflect an agreed upon price for these impressions as discussed more fully below.

2.      As for exhibits 20 and 22, AOL believes that these documents state what impressions were delivered between August 1999 and January 2001. Despite Ms. Burger's testimony regarding this issue, AOL does not contest that these documents list the impressions that were provided up through January 2001. As for exhibit 21, this document is the only information AOL has regarding the impressions delivered in February 2001, and, as Mr. Valle testified, it appears to be incomplete. As there are no other documents that AOL knows of nor is it possible to generate any new document, we cannot provide you with any additional information. Moreover, a perfect comparison between the carriage plan contained in schedule A of the amendment and the impressions actually provided is not possible. Both changes in the nomenclature used by AOL and any changes agreed to by the parties regarding what impressions would actually be delivered make such a side-by-side comparison impossible. There is thus no "key" that ties the information in exhibits 20 and 22 to schedule A of the amendment.

**Plaintiff's
Exhibits**
Adv. Pro. No. 03-50003
**08**

**A 153**

Richard D. Allen, Esq.
April 26, 2004
Page 2 of 2

3.      Your point on value is premised upon a factual error you continue to make.  As has been explained, when the parties negotiated the contract (including the amendment), they discussed the various services AOL would provide (including, but not limited to, the delivery of impressions) and how much eToys would pay for the entire bundle of services.  (*See, e.g.,* Baig Depo. at 58, 93-94.)  But the negotiations were not over the particular CPM to be paid for certain types of impressions.  (*See, e.g., id.* at 130-31, 135.)  There is evidence indicating that based upon the total price and at least some of the impressions to be delivered, a CPM was determined which would, as a matter of simple mathematics, ensure that the total number of impressions multiplied by the CPM would equal the total contract price.  A number of documents providing such a CPM have been produced to you, and, indeed, you asked the witnesses about them repeatedly.  However, there was no "agreed CPM" as the agreement was not negotiated in this manner.  Because the parties did not agree to specific CPMs for different line items, there are no documents that could be produced on this subject.  We reiterate that all of this is irrelevant to your claims in this litigation.

4.      We still have not yet received confirmation that you have completed the search for additional documents such as those referenced in my letter of January 23, 2004, e.g., trial balances, profit-and-loss analyses, and business/strategic plans.  At this point, we are assuming you were unable to locate responsive documents.

Please feel free to contact us if you have any further questions.

Sincerely yours,

Gregory S. Chernack

cc:     Charles E. Graf, Esq.
        James R. Wrathall, Esq.
        Carol J. Banta, Esq.

**A 154**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re EBC I, INC., f/k/a ETOYS, INC., | Chapter 11 |
| Reorganized Debtor. | Case No. 01-0706 (MFW) |
| EBC I, INC., f/k/a ETOYS, INC., | |
| Plaintiff, | Adv. Proc. No. 03-50003 (MFW) |
| v. | |
| AMERICA ONLINE, INC., | |
| Defendant. | |

### RESPONSES AND OBJECTIONS OF DEFENDANT AMERICA ONLINE, INC. TO PLAINTIFF'S SECOND SET OF INTERROGATORIES DIRECTED TO DEFENDANT

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure, Defendant America Online, Inc. ("AOL") hereby submits the following Responses and Objections to Plaintiff's Second Set of Interrogatories Directed to Defendant (the "Interrogatories").

### GENERAL OBJECTIONS

The General Objections (the "General Objections") set forth in the Verified Responses and Objections to Plaintiff's First Set of Interrogatories to Defendant, served on July 3, 2003, are incorporated by reference and apply to each Interrogatory. The General Objections are to be considered continuing objections and respond to each of Plaintiff's Definitions and individual Interrogatories, whether or not referred to in the response to a specific Interrogatory. AOL reserves the right to supplement its responses to these Requests to the extent additional information is collected through discovery or otherwise prior to the pre-trial conference

## Responses and Objections to Specific Interrogatories

**Interrogatory No. 1:** For each request for admission in Plaintiff's First Set Of Requests for Admission Directed To Defendant which you do not unqualifiedly admit, state:

    a.    All bases for your failure to admit unqualifiedly the request for admission;

    b.    All facts on which you rely in support of those bases;

    c.    All documents which reflect, evidence, or discuss such facts..

**Response and Objections:**  Subject to and without waiving its General Objections, AOL refers Plaintiff to its Responses and Objections to Plaintiff's First Set of Requests for Admission Directed to Defendant, served herewith.  AOL further states that it reserves the right to introduce additional evidence and provide additional argument in support of its positions at trial.

**Interrogatory No. 2:**  For each type of impression listed on Schedule A to the Amendment to the Interactive Marketing Agreement, provide the price listed on the rate card in effect as of November 15, 2000 and, if you contend that plaintiff and AOL agreed to some different price for any item, provide that price, the bases for your claim that AOL and plaintiff agreed to that price, all facts on which you rely in support of that claim, and all documents which reflect evidence or discuss such facts.

**Response and Objections:**  Subject to and without waiving its General Objections, AOL states that it is producing the rate card in effect as of November 15, 2000.  *See* AOL 01951-01953.  AOL further states that the number of impressions AOL agreed to provide under the Amended Agreement is one of numerous factors that determined the amount eToys agreed to pay to AOL.  AOL further states that it and eToys did not negotiate regarding the price of specific types of impressions, only over the total amount eToys would pay and what services eToys would receive in return.

**A 156**

Karen C. Bifferato (No. 3279)
Marc J. Phillips (No. 4445)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street, P.O. Box 2207
Wilmington, DE 19899
Tel: (302) 658-9141
Fax: (302) 658-5614

James R. Wrathall
Carol J. Banta
Gregory S. Chernack
Wilmer Cutler Pickering LLP
2445 M Street, N.W.
Washington, DC 20037
Tel: (202) 663-6000
Fax: (202) 663-6363

March 12, 2004

**A 157**

3

America Online, Inc
**Accounting for Multi-Brand Revenues and Inventory Pricing Guidelines**
Effective: FY2001 Q1

## Purpose

The purpose of this Policy statement is to communicate America Online, Inc.'s (the Company) treatment of Multi-Brand deals and Inventory Pricing Guidelines. Specifically, this policy provides the framework within which all of the Company's applicable parties must operate in determining proper allocation of revenue and expenses for Multi-Brand deals.

Multi-Brand deals are contracts that are entered into by the Company in which value will be provided to the business partner by more than one of the Company's Brands or distinct organizations. Examples of the Brands include AIS, CIS or DCI. Examples of distinct organizations include Marketing or Member Services.

In situations where category-level strategies involve changes to established pricing, the changes will need to be approved by the impacted brands if they trigger the approvals listed below. In all cases, if strategies involve increases in prices, the increases will be allocated back to the brands using the principles outlined in these guidelines.

## Policy

**Generally, revenue will be allocated using the official AOL Internal rate card.**

- The Internal rate card (attached) lists CPM by inventory for all brands. The numbers have been derived based on historical cash contracts.
- For deals which do not guarantee impressions or that do not specify where the impressions are to run, the AOL internal carriage plan will be used to allocate revenues. Non-guaranteed impressions will be valued equally to guaranteed impressions, except where there is no means to count the impressions. Impressions that can not be counted in any way will not be valued or included in allocations.
- Premiums and discounts in contracts will be allocated proportionately among each of the brands.
- Discounts will be allowed as follows:
    - For deals over $800,000 IM Business Development Category lead VPs may discount up to **15%** off of rate card, at their discretion. Deals under this threshold may be discounted **15%** off of rate card by IM Regional Directors, at their discretion. The Director of Interactive Marketing (IM) Pricing must approve discounts between 15% - 30%. Discounts greater than **30%** will require approval from the President of IM and affected brands through the COO of Interactive Properties and the COO of Interactive Services (to be facilitated by the Director of IM Pricing).
    - Remnant inventory which may be discounted up to **50%** without brand approval.
    - Volume discounts will be given only on a case by case basis, and will be guided by the discounting policies above.
- Unless expected delivered impressions can be broken out by brand, cross-brand product revenues will be allocated based on the impressions dedicated by each of the brands to drive traffic to the product. The following products will be accounted for according to this method, and revenues will be split as shown below.





| AOL | 70.48% | | AOL | 59% | | AOL | 66% |
|-----|--------|--|-----|-----|--|-----|-----|
| CS | 13.58% | | CS | 2% | | CS | 8% |
| NSCP | 13.09% | | NSCP | 11% | | NSCP | 24% |
| Spinner | 1.35% | | DCI | 28% | | ICQ | 2% |
| Gateway.Net | 1.50% | | | | | | |

**Additional factors affecting revenue allocation**

- **Exclusivity** – A premium will be added to the CPM of Brands providing exclusivity to the partner across affected pieces of inventory. Because the value of exclusivity will vary market to market, and client to client, the premium will be considered and granted if the brand providing the exclusivity can quantify the value at the partner level. Initial exclusivity premium will be determined by the Director of IM Pricing. Additional approval will be given by the affected brands. Final approval if necessary will be given by the Corporate Controller.
- **Variable Revenues (revenue sharing)** – will be allocated in accordance with the carriage allocations.
- **Equity (Stock and Warrants)** – will be allocated in accordance with the carriage allocations.

# A 158

CONFIDENTIAL

AOL 01948

AOL Confidential

**Post-deal Changes in Carriage**
- Clients will be allowed to switch from one level of inventory to another provided such changes:
  - Proportionally reflect the value of the respective tiers of inventory
  - Exchanges are made at the ratios represented in the current rate card and do not take into account any discounts given in the original deal
- Clients may not change into Level One inventory without prior approval from the Director of IM Pricing
- Switching must be done with like inventory (banners for banners, promotional inventory for promotional inventory). Switching banners for promotions may not occur without prior approval from the Director of IM Pricing.
- Deals, which involve switching of more than $200k per qtr from an affected brand, will be reallocated according to the new carriage plan. Director of IM Pricing will determine exceptions.
- Deal language should not lock in pricing, exchange ratios or relative values in the future, but instead should refer to the "current rate card."
- Contracts with pre-established exchange rates built in will be honored, but future deals should not include such clauses.

**Expense Chargebacks**
- Commissions and Sales expenses will not be charged back to any of the brands.
- Expenses for contractually obligated sales revenue guarantees will be reviewed on a case by case basis to determine their allocation back to the brands. The allocation will be determined by evaluating the underlying reason for their inclusion in the deal.
- Barter and In-Kind costs will be allocated to whichever brand(s) receive the benefit. As an example, if promotion is received in a contract, whichever party is specifically being promoted will record the expense without regard to the revenue allocation.
- Bad Debt and Sales Allowance Reserves will be allocated to each brand at the same percentage of revenue as the total deal.
- Production services provided by one brand but which benefit all of the brands in a deal will be reviewed on a deal by deal basis. Where costs are over plan, affected group should cover costs using the ex-budget process.
- Other Expenses (Partner Conferences, Ad Server, Agency Fees, Promotion Expenses) will not be charged back to any of the brands except under extraordinary circumstances agreed to by all impacted departments.

**ICQ Deal Treatment**
- The value of ICQ deals will be broken into two parts: an impressions component and a communications component.
- The impression's component will be valued according to these guidelines.
- Given that the communications component (Client integration) is customized for each partner. Pricing of the communications component should be established on a deal by deal basis, on what the prospective partner values the customized communications component to be worth, separate to the impression's based parts of the carriage plan. This value will not be switch-able to other brands post deal. This condition should be clearly understood by the partner pre-deal. Should the overall deal value be negotiated down once value is established, the overall deal discount will apply proportionately to all elements of the plan including the ICQ communications component.

**Issue Resolution**
- The Director of IM Pricing will be the initial arbiter of issues that cannot be resolved. Any issues that still cannot be resolved will be escalated to the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller for final resolution.

**Implementation**
- These guidelines will be released one month prior to the end of the quarter, to be in full effect by the start of the next quarter.

**Review and Revisions**
The Pricing Guidelines will be reviewed and revised quarterly by the Director of IM Pricing and will be approved by the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller.

**CONFIDENTIAL**

AOL 01949

AOL Confidential

**A 159**

**Cross-Brand Pricing Guidelines, FY2001 Q1**
**Note: All prices are net to AOL.**

## Level 1 - $75-100

| | |
|---|---|
| Babies & Pregnancy | Home & Garden |
| Beauty | Personal Finance (Insurance, Legal, Taxes and |
| Candy, Flowers & Gifts | Banking categories only) |
| Consumer Electronics | Shopping (misc. screens not covered by strategy) |
| Families | SOHO/Office |
| Fashion, Apparel & Accessories | Toys |
| Health (Nutrition , Medical/Care, Fitness) | Travel - Business |
| Holidays | Wedding |

## Level 2 - $50-75

| | |
|---|---|
| Auctions | Health (Other) |
| Auto | Male |
| Books | New Members |
| Business News | Outdoor/Extreme/Participatory Sports |
| Cards | Personal Finance (Main screen and other not defined) |
| Careers/Employment | Pets |
| Classifieds | Pictures |
| College/Student | Real Estate |
| Computing (Pros, Power Users, Hardware, Software) | All Search terms. (Search phrases – 20% premium) |
| Coupons | Seniors |
| Education | Telecommunications |
| Entertainment (Movies, TV and Other, excl. Music) | Women |
| Food, Gourmet & Grocery | **Specific Market Buys** (includes specific city HP's) |

## Level 3 - $25-50

| | |
|---|---|
| Compuserve Main (Plus 20% premium) | Music |
| Computing (Other) | News |
| Ethnic | Personal Finance Stock Quotes |
| Games | Political |
| Gay | Sports |
| Genealogy | Teens |
| International | Travel (excluding Business) |
| Kids | Weather |
| Maps (Specific inventory) | **Geographic and Demographic Buys** |
| Moviefone 120 by 60 | |

## Level 4 - $10-25

| | |
|---|---|
| Religion & Beliefs | Maps (ROS) |
| Home Page – AOL.com, NSCP, DCI (Citypicker)  & | Functional/Utility not defined |
| Winamp HP | |

## Level 5 - $5-10

| | |
|---|---|
| Email | Channelized Chat |
| Run of available service | Singles/Romance |

## Level 6 - $3-5

| | |
|---|---|
| AIM | Member Directory |
| Chat | Download Screen |

- **Specific screen: 20% premium**
- **Pop-ups:** Top end of the pricing range for the appropriate category.  Full screen log-in pop up is high end L1
- **Hometown and Yellow Pages rates drop down one level from the applicable category.**
- **Remnant, Non-Graphic Text Links, Below the Fold and Branded Non-Clickable Graphics - 50% off applicable rate above. Remnant priced below rate card can be pre-empted at any time by higher paying remnant buy**

America Online, Inc
**Accounting for Multi-Brand Revenues and Inventory Pricing Guidelines**
**Effective: FY2001 Q2**

## Purpose

The purpose of this Policy statement is to communicate America Online, Inc.'s (the Company) treatment of Multi-Brand deals and Inventory Pricing Guidelines. Specifically, this policy provides the framework within which all of the Company's applicable parties must operate in determining proper allocation of revenue and expenses for Multi-Brand deals.

Multi-Brand deals are contracts that are entered into by the Company in which value will be provided to the business partner by more than one of the Company's Brands or distinct organizations. Examples of the Brands include AIS, CIS or DCI. Examples of distinct organizations include Marketing or Member Services.

In situations where category-level strategies involve changes to established pricing, the changes will need to be approved by the impacted brands if they trigger the approvals listed below. In all cases, if strategies involve increases in prices, the increases will be allocated back to the brands using the principles outlined in these guidelines.

## Policy
**Generally, revenue will be allocated using the official AOL Internal rate card.**

- The Internal rate card (attached) lists CPM by inventory for all brands. The numbers have been derived based on historical cash contracts.
- For deals which do not guarantee impressions or that do not specify where the impressions are to run, the AOL internal carriage plan will be used to allocate revenues. Non-guaranteed impressions will be valued equally to guaranteed impressions, except where there is no means to count the impressions. Impressions that can not be counted in any way will not be valued or included in allocations.
- Premiums and discounts in contracts will be allocated proportionately among each of the brands.
- Discounts will be allowed as follows:
  - For deals over $800,000 IM Business Development Category lead VPs may discount up to **15%** off of rate card, at their discretion. Deals under this threshold may be discounted **15%** off of rate card by IM Regional Directors, at their discretion. The Director of Interactive Marketing (IM) Pricing must approve discounts between 15% - 30%. Discounts greater than **30%** will require approval from the President of IM and affected brands through the COO of Interactive Properties and the COO of Interactive Services (to be facilitated by the Director of IM Pricing).
  - Remnant inventory which may be discounted up to **50%** without brand approval.
  - Volume discounts will be given only on a case by case basis, and will be guided by the discounting policies above.
- Unless expected delivered impressions can be broken out by brand, cross-brand product revenues will be allocated based on the impressions dedicated by each of the brands to drive traffic to the product. The following products will be accounted for according to this method, and revenues will be split as shown below.

| Shop@aol | | Classifieds | | Search Banners | | Search Directory Sponsorship | |
|---|---|---|---|---|---|---|---|
| AOL | 71.0% | AOL | 70% | AOL | 59.1% | AOL | 75% |
| CS | 13.1% | NSCP | 7% | CS | 5.2% | NSCP | 25% |
| NSCP | 11.8% | DCI | 23% | NSCP | 33.6% | | |
| Spinner | 2.6% | | | ICQ | 2.1% | | |
| Gateway | 1.5% | | | | | | |




## Additional factors affecting revenue allocation

- **Exclusivity** – A premium will be added to the CPM of Brands providing exclusivity to the partner across affected pieces of inventory. Because the value of exclusivity will vary market to market, and client to client, the premium will be considered and granted if the brand providing the exclusivity can quantify the value at the partner level. Initial exclusivity premium will be determined by the Director of IM Pricing. Additional approval will be given by the affected brands. Final approval if necessary will be given by the Corporate Controller.
- **Variable Revenues (revenue sharing)** – will be allocated in accordance with the carriage allocations.
- **Equity (Stock and Warrants)** – will be allocated in accordance with the carriage allocations.

**A 161**

**CONFIDENTIAL**

AOL 01951

AOL Confidential

**Post-deal Changes in Carriage**
- Clients will be allowed to switch from one level of inventory to another provided such changes:
    - Proportionally reflect the value of the respective tiers of inventory
    - Exchanges are made at the ratios represented in the current rate card and do not take into account any discounts given in the original deal
    - Clients may not change into Level One inventory without prior approval from the Director of IM Pricing
    - Switching must be done with like inventory (banners for banners, promotional inventory for promotional inventory). Switching banners for promotions may not occur without prior approval from the Director of IM Pricing.
    - Deals, which involve switching of more than $200k per qtr from an affected brand, will be reallocated according to the new carriage plan. Director of IM Pricing will determine exceptions.
    - Deal language should not lock in pricing, exchange ratios or relative values in the future, but instead should refer to the "current rate card."
    - Contracts with pre-established exchange rates built in will be honored, but future deals should not include such clauses.

**Expense Chargebacks**
- Commissions and Sales expenses will not be charged back to any of the brands.
- Expenses for contractually obligated sales revenue guarantees will be reviewed on a case by case basis to determine their allocation back to the brands. The allocation will be determined by evaluating the underlying reason for their inclusion in the deal.
- Barter and In-Kind costs will be allocated to whichever brand(s) receive the benefit. As an example, if promotion is received in a contract, whichever party is specifically being promoted will record the expense without regard to the revenue allocation.
- Bad Debt and Sales Allowance Reserves will be allocated to each brand at the same percentage of revenue as the total deal.
- Production services provided by one brand but which benefit all of the brands in a deal will be reviewed on a deal by deal basis. Where costs are over plan, affected group should cover costs using the ex-budget process.
- Other Expenses (Partner Conferences, Ad Server, Agency Fees, Promotion Expenses) will not be charged back to any of the brands except under extraordinary circumstances agreed to by all impacted departments.

**ICQ Deal Treatment**
- The value of ICQ deals will be broken into two parts: an impressions component and a communications component.
- The impression's component will be valued according to these guidelines.
- Given that the communications component (Client integration) is customized for each partner. Pricing of the communications component should be established on a deal by deal basis, on what the prospective partner values the customized communications component to be worth, separate to the impression's based parts of the carriage plan. This value will not be switch-able to other brands post deal. This condition should be clearly understood by the partner pre-deal. Should the overall deal value be negotiated down once value is established, the overall deal discount will apply proportionately to all elements of the plan including the ICQ communications component.

**Flat Rate Pricing**
- For components of carriage where advertising value is clearly not based on impressions, pricing and internal valuation will be based on rates that have been internally published on Market AOL. Examples of this type of advertising program include Netscape bookmarks, Moviefone Previews, Shop@ search integration pricing, Yellow page database listings, DCI directory integration and AOL Keywords. Overall deal discounts or premiums will be applied to flat rate priced line items as is consistent with impression based line items.

**Issue Resolution**
- The Director of IM Pricing will be the initial arbiter of issues that cannot be resolved. Any issues that still cannot be resolved will be escalated to the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller for final resolution.

**Implementation, Review and Revisions**
- These guidelines will be released one month prior to the end of the quarter, to be in full effect by the start of the next quarter. The Pricing Guidelines will be reviewed and revised quarterly by the Director of IM Pricing and will be approved by the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller.

**A 162**

CONFIDENTIAL

AOL 01952

AOL Confidential

**Cross-Brand Pricing Guidelines, FY2001 Q2**
**Note: All prices are net to AOL.**

## Level 1 - $75-100

| | |
|---|---|
| Babies & Pregnancy | Home & Garden |
| Beauty | Personal Finance (Insurance, Legal, Taxes and |
| Candy, Flowers & Gifts | Banking categories only) |
| Consumer Electronics | Shopping (misc. screens not covered by strategy) |
| Families | SOHO/Office |
| Fashion, Apparel & Accessories | Toys |
| Health (Nutrition , Medical/Care, Fitness) | Travel - Business |
| Holidays | Wedding |

## Level 2 - $50-75

| | |
|---|---|
| Auctions | Health (Other) |
| Auto | Male |
| Books | New Members |
| Business News | Outdoor/Extreme/Participatory Sports |
| Cards | Personal Finance (Main screen and other not defined) |
| Careers/Employment | Pets |
| Classifieds | Pictures |
| College/Student | Real Estate |
| Computing (Pros, Power Users, Hardware, Software) | All Search terms. (Search phrases – 20% premium) |
| Coupons | Seniors |
| Education | Telecommunications |
| Entertainment (Movies, TV and Other, excl. Music) | Women |
| Food, Gourmet & Grocery | **Specific Market Content** (incl. specific city HP's) |

## Level 3 - $25-50

| | |
|---|---|
| Compuserve Main (Plus 20% premium) | Music |
| Computing (Other) | News |
| Ethnic | Personal Finance Stock Quotes |
| Games | Political |
| Gay | Sports |
| Genealogy | Teens |
| International | Travel (excluding Business) |
| Kids | Weather |
| Maps (Specific inventory) | **Demographic Filter for L4-6** |
| Moviefone 120 by 60 | |

## Level 4 - $10-25

| | |
|---|---|
| Religion & Beliefs | Maps (ROS) |
| Home Page – AOL.com, NSCP, DCI (Citypicker) & | Functional/Utility not defined |
| Winamp HP | **Geographic Filter for L4-6 inventory** |

## Level 5 - $5-10

| | |
|---|---|
| Email | Channelized Chat |
| Run of available service | Singles/Romance |

## Level 6 - $3-5

| | |
|---|---|
| AIM | Member Directory |
| Chat | Download Screen |

- **Specific screen: 20% premium**
- **Pop-ups:** Top end of the pricing range for the appropriate category.  Full screen log-in pop up is high end L1
- Hometown and Yellow Pages rates drop down one level from the applicable category.
- **Remnant, Non-Graphic Text Links, Below the Fold and Branded Non-Clickable Graphics** - 50% off applicable rate above. Remnant priced below rate card can be pre-empted at any time by higher paying remnant buy

**America Online, Inc**
**Accounting for Multi-Brand Revenues and Inventory Pricing Guidelines**
**Effective:  CY2001 Q1**

## Purpose

The purpose of this Policy statement is to communicate America Online, Inc.'s (the Company) treatment of Multi-Brand deals and Inventory Pricing Guidelines.  Specifically, this policy provides the framework within which all of the Company's applicable parties must operate in determining proper allocation of revenue and expenses for Multi-Brand deals.

Multi-Brand deals are contracts that are entered into by the Company in which value will be provided to the business partner by more than one of the Company's Brands or distinct organizations.  Examples of the Brands include AIS, CIS or DCI.  Examples of distinct organizations include Marketing or Member Services.

In situations where category-level strategies involve changes to established pricing, the changes will need to be approved by the impacted brands if they trigger the approvals listed below.  In all cases, if strategies involve increases in prices, the increases will be allocated back to the brands using the principles outlined in these guidelines.

## Policy

**Generally, revenue will be allocated using the official AOL Internal rate card.**
- The Internal rate card (attached) lists CPM by inventory for all brands.  The numbers have been derived based on historical cash contracts.
- For deals which do not guarantee impressions or that do not specify where the impressions are to run, the AOL internal carriage plan will be used to allocate revenues. Non-guaranteed impressions will be valued equally to guaranteed impressions, except where there is no means to count the impressions. Impressions that can not be counted in any way will not be valued or included in allocations.
- Premiums and discounts in contracts will be allocated proportionately among each of the brands.
- Discounts will be allowed as follows:
  - For deals over $800,000 IM Business Development Category lead VPs may discount up to **20%** off of rate card, at their discretion.  Deals under this threshold may be discounted **20%** off of rate card by IM Regional Directors, at their discretion.  The Director of Interactive Marketing (IM) Pricing must approve discounts between 20% - 35%.  Discounts greater than **35%** will require approval from the President of IM and affected brands through the COO of Interactive Properties and the COO of Interactive Services (to be facilitated by the Director of IM Pricing).
  - Remnant inventory which may be discounted up to **50%** without brand approval.
  - Volume discounts will be given only on a case by case basis, and will be guided by the discounting policies above.
- Unless expected delivered impressions can be broken out by brand, cross-brand product revenues will be allocated based on the impressions dedicated by each of the brands to drive traffic to the product. The following products will be accounted for according to this method, and revenues will be split as shown on page 4 of this document.

## Additional factors affecting revenue allocation

- **Exclusivity** – A premium will be added to the CPM of Brands providing exclusivity to the partner across affected pieces of inventory.  Because the value of exclusivity will vary market to market, and client to client, the premium will be considered and granted if the brand providing the exclusivity can quantify the value at the partner level.  Initial exclusivity premium will be determined  by the Director of IM Pricing. Additional approval will be given by the affected brands. Final approval if necessary will be given by the Corporate Controller.
- **Variable Revenues (revenue sharing)** – will be allocated in accordance with the carriage allocations.
- **Equity (Stock and Warrants)** – will be allocated in accordance with the carriage allocations.


# A 164

**Post-deal Changes in Carriage**
- Clients will be allowed to switch from one level of inventory to another provided such changes:
  - Proportionally reflect the value of the respective tiers of inventory
  - Exchanges are made at the ratios represented in the current rate card and do not take into account any discounts given in the original deal
  - Clients may not change into Level One inventory without prior approval from the Director of IM Pricing
  - Switching must be done with like inventory (banners for banners, promotional inventory for promotional inventory). Switching banners for promotions may not occur without prior approval from the Director of IM Pricing.
- Deals, which involve switching of more than $200k per qtr from an affected brand, will be reallocated according to the new carriage plan. Director of IM Pricing will determine exceptions.
- Deal language should not lock in pricing, exchange ratios or relative values in the future, but instead should refer to the "current rate card."
- Contracts with pre-established exchange rates built in will be honored, but future deals should not include such clauses.

**Expense Chargebacks**
- Commissions and Sales expenses will not be charged back to any of the brands.
- Expenses for contractually obligated sales revenue guarantees will be reviewed on a case by case basis to determine their allocation back to the brands. The allocation will be determined by evaluating the underlying reason for their inclusion in the deal.
- Barter and In-Kind costs will be allocated to whichever brand(s) receive the benefit. As an example, if promotion is received in a contract, whichever party is specifically being promoted will record the expense without regard to the revenue allocation.
- Bad Debt and Sales Allowance Reserves will be allocated to each brand at the same percentage of revenue as the total deal.
- Production services provided by one brand but which benefit all of the brands in a deal will be reviewed on a deal by deal basis. Where costs are over plan, affected group should cover costs using the ex-budget process.
- Other Expenses (Partner Conferences, Ad Server, Agency Fees, Promotion Expenses) will not be charged back to any of the brands except under extraordinary circumstances agreed to by all impacted departments.

**ICQ Deal Treatment**
- The value of ICQ deals will be broken into two parts: an impressions component and a communications component.
- The impression's component will be valued according to these guidelines.
- Given that the communications component (Client integration) is customized for each partner. Pricing of the communications component should be established on a deal by deal basis, on what the prospective partner values the customized communications component to be worth, separate to the impression's based parts of the carriage plan. This value will not be switch-able to other brands post deal. This condition should be clearly understood by the partner pre-deal. Should the overall deal value be negotiated down once value is established, the overall deal discount will apply proportionately to all elements of the plan including the ICQ communications component.

**Flat Rate Pricing**
- For components of carriage where advertising value is clearly not based on impressions, pricing and internal valuation will be based on rates that have been internally published on Market AOL. Examples of this type of advertising program include Netscape bookmarks, Moviefone Previews, Shop@ search integration pricing, Yellow page database listings, DCI directory integration and AOL Keywords. Overall deal discounts or premiums will be applied to flat rate priced line items as is consistent with impression based line items.

**Issue Resolution**
- The Director of IM Pricing will be the initial arbiter of issues that cannot be resolved. Any issues that still cannot be resolved will be escalated to the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller for final resolution.

**Implementation, Review and Revisions**
- These guidelines will be released one month prior to the end of the quarter, to be in full effect by the start of the next quarter. The Pricing Guidelines will be reviewed and revised quarterly by the Director of IM Pricing and will be approved by the President of Interactive Marketing, the COO of Services, the COO of the brands and the Corporate Controller.

**CONFIDENTIAL**

AOL 01955

AOL Confidential
**A 165**

**Cross-Brand Pricing Guidelines, CY2001 Q1**
Note:  All prices are net to AOL.

## Level 1 - $75-100

| | |
|---|---|
| Babies & Pregnancy | Home & Garden |
| Beauty | Personal Finance (Insurance, Legal, Taxes and |
| Candy, Flowers & Gifts | Banking categories only) |
| Consumer Electronics | Shopping (misc. screens not covered by strategy) |
| Families | SOHO/Office |
| Fashion, Apparel & Accessories | Travel - Business |
| Health (Nutrition , Medical/Care, Fitness) | Wedding |
| Holidays | |

## Level 2 - $50-75

| | |
|---|---|
| Auto | New Members |
| Books | Outdoor/Extreme/Participatory Sports |
| Business News | Personal Finance (Main screen and other not defined) |
| Careers/Employment (General Search L4, ROC L4) | Pets |
| College/Student | Pictures |
| Computing (Pros, Power Users, Hardware, Software) | Real Estate |
| Coupons | All Search terms. (Search phrases – 20% premium) |
| Education | Seniors |
| Entertainment (Movies, TV and Other, excl. Music) | Telecommunications |
| Food, Gourmet & Grocery | Toys |
| Health (Other) | Women |
| Male | **Specific Market Content** (incl. specific city HP's) |

## Level 3 - $25-50

| | |
|---|---|
| Auctions (General Search L4, ROC L4) | Maps (Specific inventory) |
| Classifieds | Moviefone (120x 60) |
| Cards (ROC L4) | Music |
| Compuserve Main (Plus 20% premium) | News |
| Computing (Other) | Personal Finance Stock Quotes |
| Ethnic | Political |
| Games | Sports |
| Gay | Teens |
| Genealogy | Travel (excluding Business) |
| International | Weather |
| ICQ Today | **Demographic Filter for L4-6** |
| Kids | |

## Level 4 - $10-25

| | |
|---|---|
| Religion & Beliefs | Maps (ROS) |
| Home Page – AOL.com, NSCP, DCI (Citypicker), | Functional/Utility or not defined |
| Winamp HP, ICQ Welcome Screen | **Geographic Filter for L4-6 inventory** |

## Level 5 - $5-10

| | |
|---|---|
| Email (E-Mail inbox + 20%) | Channelized Chat |
| Run of available service and Search | Singles/Romance |

## Level 6 - $3-5

| | |
|---|---|
| AIM | Member Directory |
| Chat | Download Screen |

- **Specific screen:** 20% premium
- **Pop-ups:** Top end of the pricing range for the appropriate category.  Full screen log-in pop up is high end L1
- **Hometown and Yellow Pages** rates drop down one level from the applicable category.
- **Remnant, Non-Graphic Text Links, Below the Fold and Branded Non-Clickable Graphics** - 50% off applicable rate above. Remnant priced below rate card can be pre-empted at any time by higher paying remnant buy

**Cross Brand Product Revenue Allocation, CY2001 Q1**

**Shop@**
AOL 56.48%
AOL.com 14.51%
Netscape 13.68%
Compuserve 13.30%
Gateway 1.50%
Spinner 0.53%

**Classifieds Plus**
AOL: 16.6%
AOL.COM: 59.7%
CompuServe: 0%
Digital City: 17.6%
Netscape: 6.1%

**Search Inventory**
Search 468x60 banners:
AOL 40%
AOL.COM 29%
Compuserve 6%
ICQ 2%
Netscape 23%

Directory Sponsorship Inventory (120x60):
AOL Service 48%
AOL.com 24%
Netscape 28%

**Travel**
Airline, Lodging, Car Rental
Travel Main

AOL 80%
AOL.com 5%
CSI 7%
NSCP 6%
DCI 2%

Travel Other, including ROC

AOL 88%
AOL.com 3%
CSI 4%
NSCP 5%
DCI 0%

**A 167**

**CONFIDENTIAL**

AOL 01957

AOL Confidential

Note : All prices are net to AOL.

## Premium Inventory

| | | |
|---|---|---|
| Auctions | Entertainment | Pictures |
| Auto | Families | Real Estate |
| Babies & Pregnancy | Fashion, Apparel & | Shopping/Coupons |
| Banking | Accessories | SOHO/Business |
| Beauty | Food, Gourmet & Grocery | Taxes |
| Brokerage | Health & Fitness | Toys |
| Cards, Candy, Flowers & Gifts | Hobbies | Travel |
| Careers/Employment | Holidays | Wedding |
| Classifieds | Home & Garden | Women's |
| Consumer Electronics | Insurance | |
| Education/Research & Learn | Pets | |

## Secondary Inventory

| | | |
|---|---|---|
| College/Student | International | Seniors |
| Computing | News | Sports |
| Games | Personal Finance | Teens |
| Gay | Political | Weather |

## Tertiary Inventory

| | |
|---|---|
| Kids | Romance/Singles |

---

### Pricing Guidelines

**Level 1 - $50+**

Premium Inventory Types (screen by screen)

**Level 2 - $40**

| | |
|---|---|
| ROC Premium Inventory Types | Secondary Inventory Types (screen by screen) |
| Search Terms in Premium Inventory categories | DCI Market buys |
| Hometown in Premium categories | Geographic buys |

**Level 3 - $25**

| | |
|---|---|
| Remnant Premium Inventory | Tertiary Inventory (screen by screen) |
| ROC Secondary Inventory categories | ROS (DCI, Compuserve, AOL International) |
| Search Terms in Secondary Inventory categories | Network Programming |
| Hometown in Secondary Categories | Demographic buys |

**Level 4 - $10**

| | |
|---|---|
| Remnant Secondary Inventory | .com/NetFind Main |
| Hometown in Tertiary categories | Email |
| Search Terms in Tertiary Inventory categories | Channelized chat |
| ROS (AOL, .com, NF, Search) | |

**Level 5 - $5**

| | |
|---|---|
| Remnant Tertiary | Chat |
| ROS AIM | Member Directory |

**Remnant - $3**

Remnant Service

Note: ROS and remnant priced below rate card can be pre-empted at any time by higher-paying ROS and remnant buyers.

**A 168**

# AOL Cross-Brand Pricing Guidelines
**FY2000 Q2**
Note: All prices are net to AOL.

| Pricing Guidelines |
|---|

## Level 1 - $75-100

| | |
|---|---|
| Babies & Pregnancy | Consumer Electronics |
| Beauty | Families |
| Books | Fashion, Apparel & Accessories |
| Cards, Candy, Flowers & Gifts | Health (Nutrition and Medical/Care) |
| Holiday | Shopping (misc. screens not covered by strategy) |
| Home & Garden | SOHO/Office |
| Real Estate | Toys |

## Level 2 - $50-75

| | |
|---|---|
| Auctions | New Members |
| Auto | Outdoor/Extreme/Participatory Sports |
| Careers/Employment | Personal Finance (including Insurance, Legal, Taxes |
| Classifieds | and Banking, excluding stock quotes) |
| College/Student | Pets |
| Computing (Pros, Power Users, Hardware, Software) | Pictures |
| Coupons | Telecommunications |
| Education | Travel – Family and Business |
| Entertainment (Movies, TV, Music and Other) | Women |
| Fitness | **Specific Market Buys** |
| Food, Gourmet & Grocery | |

## Level 3 - $25-50

| | |
|---|---|
| Computing (Other) | Political |
| Ethnic | Seniors |
| Games | Sports |
| Gay | Teens |
| International | Weather |
| Male | **Geographic and Demographic Buys** |
| News | |
| Personal Finance Stock Quotes | |

## Level 4 - $10-25

| | |
|---|---|
| Beliefs | Singles/Romance |
| Kids | |

## Level 5 - $5-10

| | |
|---|---|
| **Email** | Channelized Chat |
| **Run of available service** | |

## Level 6 - $3-5

| | |
|---|---|
| **AIM** | **Member Directory** |
| **Chat** | Download Screens |

**A 169**

- Specific screen, search phrases: 20% premium
- **Search, Hometown and Yellow Pages rates drop down one level from the applicable category.**
- **Remnant, Non-Graphic Text Links, Below the Fold and Branded Non-Clickable Graphics - 50% off applicable rate above**
- **Remnant priced below rate card can be pre-empted at any time by higher paying remnant buyers.**

CONFIDENTIAL

AOL 01959

**AOL Cross-Brand Pricing Guidelines, FY2000 Q3**
Note:  All prices are net to AOL.

**Level 1 - $75-100**

| | |
|---|---|
| Babies & Pregnancy | Families |
| Beauty | Fashion, Apparel & Accessories |
| Candy, Flowers & Gifts | Health (Nutrition , Medical/Care, Fitness) |
| Consumer Electronics | |
| Holiday | Toys |
| Personal Finance (Insurance, Legal, Taxes and | Pets |
| Banking categories only) | Travel - Business |
| Shopping (misc. screens not covered by strategy) | |
| SOHO/Office | Wedding |

**Level 2 - $50-75**

| | |
|---|---|
| Auctions | Health (Other) |
| Auto | Food, Gourmet & Grocery |
| Books | New Members |
| Business News | Outdoor/Extreme/Participatory Sports |
| Cards | Personal Finance (Main screen and other not defined) |
| Careers/Employment | Pictures |
| Classifieds | Telecommunications |
| College/Student | Women |
| Computing (Pros, Power Users, Hardware, Software) | Home & Garden |
| Coupons | Real Estate |
| Entertainment (Movies, TV and Other, excluding | Seniors |
| Music) | **Specific Market Buys** (except Singles/Romance) |

**Level 3 - $25-50**

| | |
|---|---|
| Computing (Other) | Sports |
| Ethnic | Teens |
| Games | Travel (excluding Business) |
| Gay | Weather |
| International | Music |
| Male | Education |
| News | Compuserve Main (Plus 20% premium) |
| Personal Finance Stock Quotes | **Geographic and Demographic Buys** |
| Political | |

**Level 4 - $10-25**

| | |
|---|---|
| Religion & Beliefs | Maps |
| Kids | |
| AOL.com main, Netscape HP, Netfind Main, DCI HP | Functional/Utility not defined |

**Level 5 - $5-10**

| | |
|---|---|
| Email | Channelized Chat |
| Run of available service | Singles/Romance (Includes specific Market buys) |

**Level 6 - $3-5**

| | |
|---|---|
| AIM | Member Directory |
| Chat | Download Screens |

**A 170**

- Specific screen, search phrases: 20% premium
- **Search, Hometown and Yellow Pages rates drop down one level from the applicable category.**
- **Remnant, Non-Graphic Text Links, Below the Fold and Branded Non-Clickable Graphics - 50% off applicable rate above**
- **Remnant priced below rate card can be pre-empted at any time by higher paying remnant buyers.**

**CONFIDENTIAL**

AOL Confidential

AOL 01960



**AMERICA ONLINE**
I N C O R P O R A T E D

February 28, 2001

<u>VIA FACSIMILE AND</u>
<u>FEDERAL EXPRESS</u>

Stephen E. Paul
Vice President of Business Development
eToys Inc.
3100 Ocean Park Boulevard
Suite 300
Santa Monica, CA 90405

EXHIBIT

13

12-19-03    1PG

Re:    <u>Notice of Termination</u>

Dear Mr. Paul:

This letter shall constitute written notice to eToys that pursuant to Section 5.6(ii) of the Interactive Marketing Agreement dated August 10, 1999, by and between eToys and America Online, Inc. ("AOL") (the "Original Agreement"), as amended by the Amendment To Interactive Marketing Agreement, dated November 15, 2000 (the "Amended Agreement") (collectively, the "Agreement"), AOL hereby terminates the Agreement effective immediately.

Section 5.6 of the Original Agreement provides that either party may terminate the Agreement "following written notice of the other Party if the other Party . . . (ii) becomes . . . insolvent." In a press release dated February 26, 2001, eToys states, among other things, that "under any scenario, its outstanding liabilities, which totaled approximately $274.0 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction."

It is therefore clear that eToys has "become[] insolvent." Pursuant to Section 5.6(ii) of the Original Agreement, AOL hereby terminates the Agreement effective immediately and unconditionally. As a result of this termination, eToys is required to remove, effective immediately, any reference to being an "AOL Certified Merchant" from its web site and any other promotional materials.

AOL also expressly reserves all rights to seek recovery of any and all unpaid amounts due and owing to AOL under the Agreement.

**Plaintiff's
Exhibits**
Adv. Pro. No. 03-50003
**15**

Sincerely,

Brian Dengler
Vice President and Associate General Counsel

**A 171**

AOL 00184

1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT

 2             FOR THE DISTRICT OF DELAWARE

 3

 4    --------------------------------x

 5    IN RE:                    : Chapter 11

 6    EBC I, INC, f/k/a ETOYS, INC., : Case No. 01-00706

 7        Reorganized Debtor.        :   (MFW)

 8    --------------------------------

 9    EBC I, INC., f/k/a ETOYS, INC.,:

10    v.                        : Adv. Proc. No.:

11    AMERICA ONLINE, INC.,        :   03-50003 (MFW)

12        Defendant.            :

13    --------------------------------x

14

15    Deposition of:

16                    MIRZA BAIG

17    was taken on Monday, January 12, 2004, commencing

18    at 9:30 a.m., at the offices of Wilmer, Cutler &

19    Pickering, 1600 Tysons Blvd., Suite 1000, McLean,

20    Virginia, before Lohna Esteb, Court Reporter

21    and Notary Public.

22
```

**A 172**



ORIGINAL

151

1   amended agreement it would only be delivering

2   services with a value of two and a quarter million

3   dollars?

4       A     No.  The value of the service -- that's

5   the -- that's the amount that's being paid for it.

6   The value of the services is a lot more because

7   these are deeply, deeply discounted impressions.

8       Q     Are you saying that AOL's view was that

9   even though it was only going to be paid under the

10  amended agreement eight and quarter million

11  dollars, it was, nonetheless, delivering services

12  having a much higher value?

13      A     Yes.

14      Q     And what was the total value of the

15  services under the amended agreement that AOL was

16  delivering?

17      A     I think when the amendment was done we

18  were looking at the current rate cards for years

19  two and three exclusivity, premiership -- couple

20  other things were off the table -- and we were

21  looking at that and saying, "Yes, it makes sense."

22            I believe there was still a deep

**A 173**

162

1    quarter, we would have looked at the amount of

2    money that is not recognized, but considered, sort

3    of, on the balance sheet side, as deferred revenue.

4          And we would have said -- that would be

5    the calculation that would have been done.  This is

6    the amount that is there.

7      Q    And by that you mean that would have

8    been revenue received from eToys prior to the

9    termination but not yet recognized as revenue by

10   AOL?

11     A    Yes.

12     Q    Now, did the termination of the

13   interactive marketing agreement free up impressions

14   that AOL was then at least in a position to sell to

15   someone else?

16     A    Yes.

17     Q    And do you know whether, in fact, AOL

18   was able to sell any of the impressions freed up as

19   result of the termination of the interactive

20   marketing agreement with eToys?

21     A    They may have but I'm not aware of it.

22     Q    Is there any way to find that out?

**A 174**

CONFIDENTIAL, PURSUANT TO PROTECTIVE ORDER

IN THE UNITED STATES DISTRICT BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---oOo---

IN RE:                        )
                              )
EBC I, INC., f/k/a ETOYS,     )    Chapter 11
INC.,                         )    Case No. 01-00706 (MFW)
                              )
        Reorganized Debtor.)
                              )



_____)
                              )
EBC I, INC., f/k/a ETOYS,     )
INC.,                         )
          Plaintiff,          )
    vs.                       )    Adversary Proceeding
                              )    No. 03-50003 (MFW)
AMERICA ONLINE, INC.,         )
                              )
        Defendant.            )
_____)


*TRANSCRIPT DESIGNATED CONFIDENTIAL*

*PURSUANT TO PROTECTIVE ORDER*


**DEPOSITION OF SUE BURGER**

November 21, 2003


Taken before JANE GROSSMAN
CSR No. 5225


JANE GROSSMAN REPORTING SERVICES
Certified Shorthand Reporters
3756 Grand Avenue, No. 406
Oakland, California  94610
(510) 653-2579


**A 175**

CONFIDENTIAL, PURSUANT TO PROTECTIVE ORDER

1    Interactive Marketing Agreement was signed between AOL

2    and eToys in November of 2000, within AOL it was

3    necessary to reserve the inventory that it anticipated

4    would be needed for AOL to perform its obligations in

5    Years 2 and 3?

6          A.    Yes.

7          Q.    Now, jumping ahead, is it correct that the

8    Interactive Marketing Agreement between AOL and eToys

9    was terminated late in February of 2001?

10         A.    Yes.

11         Q.    Was the effect of that termination to then

12   free up inventory within AOL for possible sale to other

13   customers?

14         A.    Yes.

15         Q.    Do you know whether the inventory that was

16   freed up as a result of the termination of the AOL/eToys

17   deal, in fact, was subsequently sold by AOL to other

18   customers?

19         A.    I suppose it was.

20               I wouldn't know that specifically because the

21   number of SKU items in the media planning system is a

22   lot.  It was a very, very big number.  So, there would

23   be no way -- and the way the system works, once it's

24   released, it just goes into a pool.  So, you wouldn't be

25   able to track that that was an eToys impression and

**A 176**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .     Case No. 01-706 - 01-709 (MFW)
                                .     Adv. No. 03-50003 (MFW)
                                .
ETOYS, INC., et al.,            .
                                .     824 Market Street
                                .     Wilmington, Delaware 19801
                                .
          Debtors.              .     June 26, 2007
. . . . . . . . . . . . ..       .     9:30 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

For the Debtors:          Morris, Nichols, Arsht & Tunnell
                          By:  THOMAS BRIGGS, ESQ.
                               RICHARD ALLEN, ESQ.
                          1201 North Market St.
                          Wilmington, DE 19899

For AOL, Inc.:            Connolly Bove Lodge & Hutz, LLP
                          By:  KAREN BIFFERATO, ESQ.
                          1220 Market Street
                          Wilmington, DE 19899

                          Wilmer Cutler Pickering Hale & Dorr
                          By:  JAMES WRATHALL, ESQ.
                               MICHAEL SNYDER, ESQ.
                          1875 Pennsylvania Avenue
                          Washington, DC 20006

Audio Operator:           Sherry Johnson

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311     Fax No. (609) 587-3599

A 177

1 Q    When AOL terminated the agreement, is it correct that the

2 effect was to free up advertising space that AOL was then able

3 to sell to other customers?

4 A    It was one effect.  The other effect was to protect the

5 member experience.

6 Q    And at least as far as you know AOL, in fact, was able to

7 resell the advertising space freed up as a result of the

8 termination of the agreement with eToys, is that correct?

9         MR. WRATHALL:  Objection, Your Honor.  It's a vague

10 question.  There's lack of foundation.

11        THE COURT:  Overruled.  She can answer.

12        THE WITNESS:  The -- it's not that black and white.

13 We would not have been able to sell the eToys agreement in

14 total but the impressions would have gone back into ad server

15 so, you know, could they have been resold?  Sure.

16 Q    And had they been resold, the starting point in a resale

17 would have been the then existing rate cards, correct?

18 A    Yes.

19        MR. ALLEN:  Thank you, Ms. Burger.  I have no further

20 questions, Your Honor.

21                    REDIRECT EXAMINATION

22 BY MR. WRATHALL:

23 Q    Just a few more questions, Ms. Burger.  Going back to the

24 timing of the amendment and you had testified that in response

25 to Mr. Allen's questions that one of the reasons reflected on

**A 178**