## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EBC I, INC. f/k/a ETOYS, INC., et al.,<br><br>    Reorganized Debtor. | Bankruptcy Case No. 01-706<br><br>Adv. Proc. No. 03-50003 (MFW) |
| EBC I, INC., f/k/a ETOYS, INC.,<br><br>    Plaintiff/Appellant<br><br>    v.<br><br>AMERICA ONLINE INC.<br>(now named AOL LLC),<br><br>    Defendant/Appellee | Civil Action No. 08-100 (JJF) |

### AOL LLC'S APPELLEE'S BRIEF

Karen C. Bifferato (Bar #3279)
Marc J. Phillips (Bar #4445)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207
(302) 658-9141
kbifferato@cblh.com
mphillips@cblh.com

Attorneys for AOL LLC

Craig Goldblatt
Lisa Ewart
WILMER CUTLER PICKERING HALE AND
   DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
craig.goldblatt@wilmerhale.com
lisa.ewart@wilmerhale.com

July 11, 2008

## TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES ..................................................................................II

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT .......................................1

JURISDICTIONAL STATEMENT ..........................................................................4

STATEMENT OF THE ISSUES..............................................................................4

STANDARD OF REVIEW ...................................................................................4

STATEMENT OF THE CASE................................................................................5

STATEMENT OF FACTS ...................................................................................5
    A.    *Background* ................................................................................5
    B.    *AOL/eToys Partnership and the 1999 Agreement* ....................................6
    C.    *2000 Amendment*.......................................................................9
    D.    *Termination*..............................................................................9
    E.    *Bankruptcy* ..............................................................................11

ARGUMENT ................................................................................................11

I.    THE "IMPRESSIONS" ALLEGEDLY "TRANSFERRED" FROM ETOYS TO
    AOL UPON TERMINATION OF THE 1999 AGREEMENT HAD NO VALUE. .........11

II.    THE BANKRUPTCY COURT PROPERLY DETERMINED THAT THE
    AGREEMENT WAS UNASSIGNABLE IN BANKRUPTCY.....................................16
    A.    The 1999 Agreement Was An Executory Contract. ...............................17
    B.    Virginia Law Excuses AOL From Accepting Performance From Any
        Party Other Than eToys. ...............................................................19

III.    EVEN IF THE AGREEMENT WERE ASSIGNABLE, THE COURT
    PROPERLY FOUND THAT THE VALUE ETOYS COULD REALIZE FROM
    THE ASSIGNMENT IS DE MINIMIS. ..........................................................24

IV.    THE TERMINATION OF A CONTRACT IN ACCORDANCE WITH ITS
    TERMS IS NOT A FRAUDULENT CONVEYANCE. ....................................25

V.    THE BANKRUPTCY COURT PROPERLY EXERCISED ITS DISCRETION IN
    REFUSING TO AWARD PREJUDGMENT INTEREST................................28

CONCLUSION................................................................................................29

## TABLE OF AUTHORITIES

### CASES

*American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir. 1999) ...................................................................................................................4

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) .................................................1

*DuPont de-Bie v. Vredenburgh*, 490 F.2d 1057 (4th Cir. 1974) .................................21

*Epperson v. Epperson*, 62 S.E. 344 (Va. 1908) .........................................................21

*Erie Telecomms, Inc. v. City of Erie*, 853 F.2d 1084 (3d Cir. 1988) ...........................26

*In re ANC Rental Corp.*, 277 B.R. 226 (Bankr. D. Del. 2002) ..............................19, 20

*In re Catron*, 158 B.R. 624 (Bankr. E.D. Va. 1992) ..................................................20

*In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674 (D.N.J. 1992) ..........................27, 28

*In re Columbia Gas Systems, Inc.*, 50 F.3d 233 (3d Cir. 1995) ..................................18

*In re Compass Van & Storage Corp.*, 65 B.R. 1007 (Bankr. E.D.N.Y. 1986) ..............22

*In re Da-Sota Elevator Co.*, 939 F.2d 654 (8th Cir. 1991) .........................................22

*In re DeLuca*, 194 B.R. 65 (Bankr. E.D. Va. 1996) ..............................................18, 20

*In re Emergency Monitoring Techs., Inc.*, 366 B.R. 476 (Bankr. W.D. Pa. 2007) .........15

*In re Fastrax, Inc.*, 129 B.R. 274 (Bankr. M.D. Fla. 1991) ........................................22

*In re First Software Corp.*, 84 B.R. 278 (Bankr. D. Mass. 1988) ...............................15

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) ...................................13, 14

*In re Gen. DataComm Indus., Inc.*, 407 F.3d 616 (3d Cir. 2005) ............................18, 19

*In re Grady*, 202 B.R. 120 (Bankr. N.D. Iowa 1996) .................................................27

*In re Granati*, 270 B.R. 575 (Bankr. E.D. Va. 2001) .................................................20

*In re Headquarters Dodge, Inc.*, 13 F.3d 674 (3d Cir. 1993) ..................................21, 24

*In re Hechinger Inv. Co. of Delaware, Inc.*, 489 B.R. 568 (3d Cir. 2007) ....................28

*In re Indri*, 126 B.R. 443 (Bankr. D.N.J. 1991).................................................................27

*In re Jermoo's Inc.*, 38 B.R. 197 (Bankr. W.D. Wis. 1984) .........................................27

*In re Kaiser Aluminum Corp.*, 380 B.R. 344 (D. Del. 2008).........................................4

*In re LiTenda Mortgage Corp.*, 246 B.R. 185 (Bankr. D.N.J. 2000) ...........................27

*In re Mama D'Angelo, Inc.*, 55 F.3d 552 (10th Cir. 1995) ...........................................25

*In re Metro Water & Coffee Servs. Inc.*, 157 B.R. 742 (Bankr. W.D.N.Y. 1993)........28

*In re Optimum Merchants Services*, 163 B.R. 546 (Bankr. D. Neb. 1994) ...................22

*In re Rochez Bros., Inc.*, 326 B.R. 579 (Bankr. W.D. Pa. 2005) ..................................12

*In re Rooster, Inc.*, 100 B.R. 228 (Bankr. E.D. Pa. 1989) ...........................................22

*In re Terrell*, 892 F.2d 469 (6th Cir. 1989)...................................................................17

*In re Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002) ............................................22

*In re Veretto*, 131 B.R. 732 (Bankr. D.N.M. 1991) ......................................................27

*In re Varisco*, 16 B.R. 634 (Bankr. M.D. Fla. 1981) ....................................................22

*In re Wey*, 854 F.2d 196 (7th Cir. 1988)......................................................................28

*J. Maury Dove Co. v. New River Coal Co.*, 143 S.E. 317 (Va. 1928)...........................21

*Kidder Skis Int'l v. Williams*, 60 B.R. 808 (W.D. Mo. 1985) ......................................14

*McGuire v. Brown*, 76 S.E. 295 (Va. 1912)..................................................................21

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991) ...........11, 14

*Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir. 1984)..............................................27

*RW Power Partners v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490 (E.D. Va. 1995)......17, 18

*Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36 (3d Cir. 1989).....17, 19

## STATUTES

11 U.S.C. § 365(c)(1)(A) ...................................................................................... *passim*

11 U.S.C. § 548.................................................................................................. *passim*

## MISCELLANEOUS

Douglas G. Baird, *The Elements of Bankruptcy* 143–45 (rev. ed. 1993)........................................1

Margaret Howard and Robert Zinman, *Bankruptcy Overview: Issues, Law and Policy*
    54–55 (4th ed. 2002).........................................................................................................1

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The basic purpose of fraudulent conveyance law is to allow a bankruptcy trustee to unwind transactions that a debtor entered into prior to bankruptcy, if such a transaction was improperly disadvantageous to the debtor's creditors—either because the debtor intended to move its assets beyond the reach of its creditors for the purpose of defrauding them, or because the transaction was "constructively fraudulent," meaning that the transaction was so disadvantageous to the debtor that it can be unwound even without actual intent to harm creditors. *See generally BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994); Douglas G. Baird, *The Elements of Bankruptcy* 143–45 (rev. ed. 1993); Margaret Howard and Robert M. Zinman, *Bankruptcy Overview: Issues, Law and Policy* 54–55 (4th ed. 2002).

The transaction challenged in this case as a fraudulent conveyance is AOL's termination—as no one disputes it was contractually entitled to do—of a 1999 agreement it had with eToys on account of eToys' insolvency.[1] The first question the bankruptcy court considered was whether AOL's termination of the contract was a "transfer" that was subject to a fraudulent conveyance challenge at all. It answered that question in the affirmative, concluding (incorrectly, in AOL's view) at the summary judgment stage that AOL's termination of the agreement constituted a "transfer of an interest of the debtor in property" within the meaning of Section 548 of the Bankruptcy Code.

The court then held a trial to determine the *value*, if any, of that transfer. On that issue, the bankruptcy court—after hearing witnesses and considering the evidence—found as a matter of fact that the alleged "transfer" had no value at all. Specifically, the court held that the right to

---

[1]     The formal parties to this appeal are EBC I, Inc., the legal entity created under the eToys reorganization plan that was vested with, *inter alia*, the right to pursue certain of the estate's causes of action, and AOL LLC (as the successor entity to America Online, Inc.). For simplicity and convenience, this Brief will refer to the parties simply as "eToys" and "AOL."

receive "impressions," the only "property" that could have been said to have been "transferred" from eToys to AOL by virtue of AOL's termination, had no value at all to eToys because eToys was in liquidation at the time of the termination and could not have realized any benefit from the delivery of impressions had they been delivered as originally contemplated. Further, because the 1999 agreement ("Agreement") under which eToys received impressions was one of trust and confidence, it could not lawfully be transferred to a third party without AOL's consent. Thus, eToys' therefore could not have realized value by selling the rights to receive those impressions to any third-party buyer.

Although the bankruptcy court observed that AOL could potentially re-sell the impressions to another buyer, eToys chose not to argue that AOL had *in fact* re-sold those "impressions." Instead, eToys rested on the apparent theory that regardless of whether AOL actually obtained any economic value by re-selling the impressions, the price negotiated months earlier—before the market collapse that precipitated eToys' own bankruptcy filing—was an appropriate proxy for the "value" of the transfer.

Such a theory makes no sense at all, as it captures neither the value eToys would have obtained had the "transfer" not occurred, nor any value that AOL might have obtained by virtue of the "transfer." And while eToys mightily complains that the bankruptcy court failed to apply the "totality of the circumstances" test in valuing the "transfer," the truth is this is precisely what the bankruptcy court did. And while the bankruptcy court may not have used eToys' preferred magic words, its careful decision leaves no doubt that the court examined the "totality" of the relevant evidence, and based on that review correctly concluded that—viewed from any sensible perspective—the "transfer" had no value at all. In sum, rather than apply the "wrong legal standard," as eToys asserts, the bankruptcy court properly rejected eToys preferred (and

- 2 -

essentially incoherent) theory for valuing the "transfer," and looked instead at the body of evidence that was actually put before the court at trial in determining the value of the "transfer." The bankruptcy court was thus entirely right to conclude that eToys was entitled to recover nothing from AOL on account of that "transfer."

While the bankruptcy court's judgment can certainly be affirmed on this basis—one that is right on the law and firmly grounded in the bankruptcy court's assessment of the record and evidence before it—the judgment can also be affirmed on the alternative ground that the termination was not a transfer at all under Section 548 or applicable state law. The purpose of fraudulent conveyance law, after all, is to protect creditors from certain actions a debtor might take, prior to bankruptcy, whose purpose or effect is to harm the creditors' interests. But the *debtor* did not take any such action when AOL terminated the contract. Rather, AOL simply exercised the contractual rights it had *previously* obtained when it entered into the initial agreement in 1999. Immediately prior to the termination, the only rights that eToys had under the contract were to receive impressions *if it remained solvent.* When it became insolvent, the contract allowed AOL to terminate the contract.

But for fraudulent conveyance purposes, the only *transfer*, properly understood, took place when eToys, the Debtor, gave AOL the right to terminate if eToys became insolvent—not when AOL exercised that right. And no one contends that the 1999 transaction under which AOL obtained that right is an avoidable transfer—the transaction took place outside the statutory look-back period, at a time when eToys was unquestionably solvent, and was an arm's-length negotiated agreement in accord with then-prevailing market terms. While the bankruptcy court rejected, at the summary judgment stage, AOL's argument that the termination was not a "transfer" within the meaning of fraudulent conveyance law, the bankruptcy court's ultimate

judgment can be affirmed on any ground.  Accordingly, even if the Court were to conclude that the bankruptcy court's determination that the "transfer" had no value was in error—and it certainly is not—the bankruptcy court's judgment to deny eToys' any recovery on its claim should in any event be affirmed.

## JURISDICTIONAL STATEMENT

The bankruptcy court entered final judgment in favor of AOL on January 10, 2008.  This Court has jurisdiction, pursuant to 28 U.S.C. § 158(a), over this appeal, brought by eToys, from that judgment.

## STATEMENT OF THE ISSUES

1.   Whether the bankruptcy court correctly determined that the Agreement had no value to at the time of termination.

2.   Whether the bankruptcy court correctly determined that the Agreement between AOL and eToys was an unassignable contract.

3.   Whether, even if the Agreement were assignable, the bankruptcy court properly concluded that any value to eToys from this assignment is *de minimis*.

4.   Whether the proper termination of a contract constitutes a "transfer" of any rights or interests for purposes of Section 548 of the Bankruptcy Code.

5.   Whether the bankruptcy court properly exercised its discretion in refusing to award prejudgment interest.

## STANDARD OF REVIEW

As to each of the issues presented in this appeal, the bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*. *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999); *In re Kaiser Aluminum Corp.*, 380 B.R. 344, 346–47 (D. Del. 2008).  eToys' contentions (Appellant's Opening Brief ("Br.") at 10) that "the relevant facts are undisputed" and that "this appeal presents primarily legal issues" are manifestly incorrect.  The bankruptcy court's determination that the alleged "transfer" had no value

- 4 -

is a factual finding that reflected the bankruptcy court's weighing of the testimony and

evidence, and can be reversed on appeal only if it is found to be clearly erroneous.

## STATEMENT OF THE CASE

eToys brought this adversary proceeding against AOL in January 2003, seeking:  (1) to

avoid and recover alleged fraudulent transfers pursuant to Sections 548 and 544 of the

Bankruptcy Code and applicable state law; (2) damages for breach of contract; and (3) equitable

relief for unjust enrichment.  The bankruptcy court dismissed the claims for unjust enrichment

and breach of contract.  At the summary judgment stage, the bankruptcy court determined that

AOL's termination of its agreement with eToys on account of eToys' insolvency was a

"transfer" within the meaning of the fraudulent conveyance law, and set for trial the question of

the value of that transfer.  That trial was held on June 26, 2007.  The bankruptcy court issued its

opinion granting judgment in favor of AOL on January 10, 2008.  This appeal followed.

## STATEMENT OF FACTS

A.    *Background*

At the times relevant to this appeal, AOL operated an Internet service provider servicing

approximately 20 million subscribers ("Members").  App. 1, Findings of Fact and Conclusions of

Law [D.I. 111] ("FOF" or "COL"), FOF ¶ 2, 3.[2]  AOL provided its Members with access to the

Internet and a full range of safe, reliable, and top quality online services, including online

shopping services.  App. 1, FOF  ¶ 2.  AOL's site included a shopping area where Internet users

"could locate products, compare them to others, and buy them directly from AOL's shopping

partners."  App. 1, FOF  ¶ 4.  These shopping services were the equivalent of a shopping mall in

---

[2]      Appellants submit with this brief Appellee's Appendix that contains the more significant
record documents (or relevant portions thereof) to which Appellee refers in this brief.
References to documents contained in the Appendix shall be cited as "App. ____."

which retailers paid AOL for access to the AOL Member base and to sell products directly to

AOL Members through its website. App. 1, FOF ¶ 5; App. 2, Hearing Transcript, *In re EToys,*

*Inc.*, No. 01-706 and Adv. Proc. No. 03-50003 (Bankr. D. Del. June 26, 2007) ("Tr.") at 24.

From October 1997 through December 2000, eToys was the leading online retailer of

toys and children's products and sought to become a dominant children's brand in the 21st

century. App. 1, FOF ¶ 1; App. 3, Defendant's Exhibit ("D. Ex.") 12 at AOL 00454; App. 2, Tr.

at 39–40. Consistent with this goal, by mid-1999, eToys had achieved tremendous success and

was ranked by Fortune magazine as the number one retailer on the Internet. App. 1, FOF ¶ 178.

eToys' finances reflected this success: As of August 10, 1999, eToys had a market capitalization

of $3.154 billion, and it raised more than $420 million in the 1998–2000 period. App. 4, D. Ex.

80 at TR 001965; App. 5, D. Ex. 75 at TR 001534–36.

B.    *AOL/eToys Partnership and the 1999 Agreement*

From October 1997 through February 2001, AOL and eToys engaged in an online

marketing relationship. App. 6, D. Ex. 1 at 1; App. 7, D. Ex. 2 at AOL 00488; Amended Pretrial

Stipulation [Adv. D.I. 98] at 2. From the start, eToys viewed this relationship as important to its

business strategy. App. 2, Tr. at 37; App. 3, D. Ex. 12 at AOL 00454. Shortly after its

successful IPO in mid-1999, eToys sought to enter into a "big deal" with AOL, in the range of

$20 million. App. 1, FOF ¶ 18; App. 8, D. Ex. 5 at AOL 01748. During the negotiations

resulting in the 1999 Agreement ("Agreement"), eToys requested, and AOL agreed, that eToys

would be named as a "premier" partner and that its brand and links to its website would be

placed prominently (and in many cases exclusively) in the most valuable areas of the AOL

service. App. 1, FOF ¶ 29; App. 9, Plaintiff's Exhibit ("P. Ex.") 1 at AOL 00200.

AOL was also enthusiastic about the relationship, but faced substantial risks. At the time

of the Agreement, the Internet was in its early stages. App. 1, FOF ¶ 173. In light of AOL's

- 6 -

interest in demonstrating to the marketplace that online retail was a viable and easy way of doing business, AOL had a clear stake in the in the success of its retail partners such as eToys. App. 1, FOF ¶ 173. The unfamiliar nature of Internet shopping also made reliability an important issue for AOL. App. 1, FOF ¶ 174. For this reason, it sought merchant partners that would give its member good shopping experiences. App. 1, FOF ¶ 174. Indeed, AOL Members were nervous at the time about using their credit card numbers on the Internet and also had an array of other trust and safety concerns about the online shopping experience. App. 1, FOF ¶ 175. Thus, in order to provide good products and services to AOL Members in the shopping area, "AOL sought to provide recognizable brands, good products, and good pricing." App. 1, FOF ¶ 176.

AOL believed eToys fit this description. It viewed eToys as a desirable retailer on its website because it felt eToys had the particular resources and commitment to deliver a high quality experience in all aspects of commerce—including product selection, site design, customer service, merchandising, and marketing creativity. App. 1, FOF ¶ 177. Indeed, AOL would not have entered into the 1999 Agreement with any other online toy company than eToys. App. 1, FOF ¶ 179.

The new three-year Agreement was executed on August 10, 1999. App. 1, FOF ¶ 19. Under the Agreement, AOL made eToys' shopping services available to AOL Members and provided various promotions for eToys in exchange for $18 million, payable in $1.5 million quarterly installments. App. 1, FOF ¶ 19.[3] "eToys expressly agreed that its payments under the Agreement were 'non-refundable.'" App. 1, FOF ¶ 20.

---

[3]    In view of the magnitude of this Agreement, this price was, unsurprisingly, substantially below AOL's baseline "rate card" prices. App. 1, FOF ¶¶ 23–24.

In the Agreement, eToys also agreed that: (1) eToys must maintain at least 50% of its net sales of products on the website from the sale of children's toys, hobbies, arts and crafts, video games, and software, App. 1, FOF ¶ 35; (2) eToys must "comply with applicable privacy and disclosure requirements to protect the privacy of AOL Members," whose information eToys was permitted, under the Agreement, to collect and use, App. 1, FOF ¶ 36; (3) eToys' website must "rank among the top three interactive websites in the toy industry in the categories of competitive pricing, scope and selection of products, customer service and fulfillment, and ease of use," App. 1, FOF ¶ 37; and (4) eToys must "conform to AOL's Kids and Teens Policy, which was designed to protect children and teenagers from being misled by what they saw on AOL or the Internet," App. 1, FOF ¶ 39. These ongoing obligations of eToys were material— indeed, they were critical—to AOL. Deposition Designation of Sue Burger, November 21, 2003 ("Burger Dep. Desig."), at 21:3–25:06.

In return, AOL agreed to provide a variety of services to eToys, including: (1) placement on the AOL "Welcome Screen," the home page through which all AOL Members entered the AOL service, App. 1, FOF ¶ 27 and (2) over 1 billion "impressions" with the eToys' logo or advertisements, App. 1, FOF ¶ 26.

Because AOL's success was based on its reputation as a reliable and safe online service, and because AOL relied on eToys to provide top-quality products and customer service to AOL Members, the Agreement also gave AOL the right to terminate the Agreement if eToys became insolvent or ceased operations—a right that AOL deemed "important to protect its Members and AOL's brand." App. 1, FOF ¶ 21.

The announcement of this new relationship with AOL provided an immediate benefit to eToys. App. 1, FOF ¶ 40–43. In an effort by eToys to generate increased brand recognition, a

press release announcing the Agreement referred to eToys as the "premier retailer of children's products such as toys, children's videos, and children's books." App. 1, FOF ¶ 40. "Investors viewed eToys' association with AOL favorably," and "in the ten days following the execution of the Agreement, the price of eToys' common stock rose from $31.25 to $45.625, representing an increase in eToys' market capitalization of $1.564 *billion*." App. 1, FOF ¶¶ 42, 43 (emphasis added).

      C.    *2000 Amendment.*

Soon after the signing of the Agreement, eToys expressed dissatisfaction with its financial results under the Agreement, and in February 2000, the parties began discussions about a restructuring. App. 1, FOF ¶¶ 44, 50. These discussions resulted in an Amendment executed on November 15, 2000. App. 1, FOF ¶ 56. Under the Amendment, the total price eToys paid to AOL for the three-year period was reduced from $18 million to $8.25 million—an amount that was fully paid as of the effective date of the Amendment. App. 1, FOF ¶ 58. The price per impression under the 2000 Amendment was based on the then-current rate-card prices, which— reflecting the beginning of the downturn in the dot-com sector—were substantially lower than the rate-card prices at the time of the original 1999 Agreement. App. 1, FOF ¶ 59.

      D.    *Termination.*

Notwithstanding eToys' initial success, eToys faced substantial uncertainty in the market. In the words of eToys' senior marketing officer, "no one kn[ew] what [was] going to work in this space." App. 10, D. Ex 10 at AOL 00469. As the holiday sales numbers were reported in mid-December 2000, it became clear that eToys had missed its revenue targets. App. 1, FOF ¶ 74. Over the next two months, as the dot-com bubble burst, eToys unsuccessfully tried to find a buyer for the company, laid off most of its work force, and began to liquidate its assets. App. 1, FOF ¶¶ 80, 82–84.

By February 26, 2001, the following facts were clear: (1) "eToys would not be able to find a buyer for the company as a whole;" (2) "eToys had no alternative than to file for bankruptcy," and its Board of Directors gave such authorization; and (3) eToys started to value is remaining assets on a piecemeal basis to prepare for selling them in a liquidation. App. 1, FOF ¶¶ 86, 87, 88. Consistent with this turn of events, on February 26, 2001, eToys announced in a press release that it would "cease operations, close its website, wind down its business and liquidate its assets." App. 1, FOF ¶ 89. eToys concluded that it had no choice because "under any scenario, [eToys'] outstanding liabilities, which totaled approximately $274 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction." App. 1X, FOF ¶ 89.

AOL learned of eToys' intentions shortly after the press release was issued. On February 28, 2001, "AOL sent eToys a notice of termination as authorized by section 5.6 of the Agreement." App. 1, FOF ¶ 91. AOL's concerns over the business and financial operations of eToys, the protection of its members, and the protection of the AOL brand led AOL to exercise its right to terminate. In particular, AOL was concerned that if, after eToys' website ceased operating, eToys' banner and promotions continued to appear on AOL's website, "AOL Members clicking on that banner would have seen a static splash page saying that eToys was no longer open and would not receive any of the services that eToys was obligated to provide under the Agreement." App. 1, FOF ¶ 92. Second, AOL was concerned that if transactions continued between eToys and AOL Members after eToys' announcement that it was going out of business, "eToys would not have had the product or the necessary personnel to complete the sales and to ensure compliance with AOL's applicable merchant certification requirements." App. 1, FOF ¶

93. Third, AOL feared that AOL Members could seek to hold AOL "liable for any failure of eToys to meet its obligations." App. 1, FOF ¶ 94.

E.    *Bankruptcy*

On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code. App. 1, FOF ¶ 96. In April, 2001, eToys sought approval to sell substantially all its assets (including inventory, plant, fixtures, intellectual property, and the right to solicit eToys' 3.4 million customers) to KB Consolidated, Inc., for $12.2 million. App. 1, FOF ¶ 99. The bankruptcy court approved that sale in May 2001. [Bankr. D.I. 361] eToys initiated this adversary proceeding against AOL on January 3, 2003. Bankruptcy Court Opinion, January 10. 2003 ("Op.") at 3.

## ARGUMENT

After extensive consideration of the evidence before it, the bankruptcy court determined that eToys did not meet its burden of showing that the right to receive "impressions" had any value to eToys at the time AOL terminated the Agreement. Because nothing of value to eToys had been transferred to AOL, the bankruptcy court held that eToys could not recover from AOL on the theory that AOL's termination of the parties Agreement was a fraudulent conveyance within the meaning of either Section 548 or applicable state law. As explained in more detail below, the bankruptcy court's decision is correct as a matter of fact and law and should be affirmed.

## I.    THE "IMPRESSIONS" ALLEGEDLY "TRANSFERRED" FROM ETOYS TO AOL UPON TERMINATION OF THE 1999 AGREEMENT HAD NO VALUE.

Congress enacted Sections 548 and 550 of the Bankruptcy Code to prevent harm to creditors resulting from pre-bankruptcy transactions that depleted assets of a debtor's estate. *See Mellon Bank, N.A. v. Metro Commc'ns*, 945 F.2d 635, 647 (3d Cir. 1991); COL ¶ 24. Contrary

- 11 -

to eToys' various arguments, these statutory provisions do not require the bankruptcy court to

engage in an analysis of what eToys historically paid or received under the Agreement. Rather,

the statute requires eToys, as the plaintiff seeking to avoid a transfer as a fraudulent conveyance,

to prove by a preponderance of the evidence what value the estate would have expected to realize

from the transferred assets had the termination not occurred. *See In re Rochez Bros., Inc.*, 326

B.R. 579, 588 (Bankr. W.D. Pa. 2005) ("Section 550(a) is intended to restore the estate to the

financial condition it would have enjoyed if the transfer had not occurred."). Thus, the

bankruptcy court properly concluded that "the value of property transferred is determined from

the perspective of the estate and creditor body." Op. at 25 (citing *Metro Commc'ns*, 945 F.2d at

646).[4]

The bankruptcy court correctly found that at the time of termination, the Agreement had

no value to eToys. In support of this finding, the bankruptcy court reviewed eToys' financial

and operational status at the time of the termination. Specifically, the bankruptcy court found

that eToys was in dire financial straits. Op. at 27. Indeed, "[b]y the end of February [2001,]

eToys had finished its on-line sale of product (at drastically reduced prices) and had announced

that it was firing all its employees, shutting down its website and ceasing operations." Op. at 27.

In light of this total cessation of business, the bankruptcy court properly concluded that the

---

[4]    Analyzing Virginia law, the bankruptcy court concluded that "the test is not whether
reasonably equivalent value was exchanged, but rather whether any value was exchanged.
'[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to
save such a transfer from avoidance [under Virginia law] in the commercial context.'" Op. at 36.
Because the Court held that eToys transferred nothing of value upon the termination of the
Agreement, the Court also found that even if the termination is avoidable under Virginia law,
eToys is not entitled to recovery. *Id.* While eToys objects to the bankruptcy court's findings
concerning the value of the Agreement to eToys, it does not contest the bankruptcy court's
recitation of Virginia law.

"delivery of impressions and other ads for eToys' website" provided for under the Agreement had no value to eToys. Op. at 27.[5]

eToys does not appear to disagree with the bankruptcy court's determination that eToys itself had no use for the advertising services; instead, it argues that the bankruptcy court erred in failing to apply the "totality of the circumstances" test and in failing to consider the value of those services to AOL. Br. at 11–19. In particular, eToys argues that if the bankruptcy court would have applied the "totality of the circumstances" standard and considered the value to AOL of being able to sell these advertising services in a subsequent transfer, the bankruptcy court would have concluded that the value to eToys was approximately $4.5 million. Br. at 18.

eToys' arguments fail. It is certainly true that case law supports the common sense proposition that in determining the value a debtor received in exchange for a transfer, like any other question of valuation, a court should consider the totality of the circumstances, looking at any evidence that it considers relevant to ascertain the property's value—rather than simply engaging in some formulaic or mechanistic exercise. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (noting that in conducting the factual analysis of whether the debtor received equivalent value for the property transferred, "a court does look to the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,'

---

[5]     The bankruptcy court also concluded that eToys could not recover based on eToys' theory that an Amendment to the Agreement constituted a fraudulent conveyance because eToys was solvent at the time the parties entered into the Amendment. eToys does not challenge this conclusion on appeal. Br. at 3.

and (3) the transferee's good faith." (quoting *In re R.M.L., Inc.*, 92 F.3d 139, 148–49, 153 (3d Cir. 1996))).

Such an approach, however, does not mean that the court must abandon its common sense by giving substantial weight to evidence that is irrelevant to the question before it. Nor does it preclude a court from rejecting a plaintiff's far-fetched theory of valuation in favor of a straightforward method of determining the effect of the transaction on the estate. And it certainly does not require a bankruptcy court to search out evidence that the plaintiff—the party with the burden of proof—failed to develop or put into the record. *Cf. In re Fruehauf Trailer*, 444 F.3d at 212 (finding that the debtor gave up something of value and then applying the totality of the circumstances test to determine whether the debtor received reasonably equivalent value in return).

While eToys faults the bankruptcy court for failing to incant the magic words "totality of the circumstances," there can be no meaningful quarrel with the substance of the court's careful analysis. The bankruptcy court quite properly concluded, in light of the facts and circumstances of the case, that the most sensible and reliable means to determine the value of the "impressions" transferred when the Agreement was terminated was to ascertain how much better off the eToys estate would have been had AOL not terminated the Agreement. *See Metro Commc'ns*, 945 F.2d at 647; App. 1, COL ¶ 24. And it reached the sensible and correct conclusion that the answer to that question is "not at all."

It is certainly true that, in cases involving the transfer of assets that are readily marketable, courts have also looked to subsequent arms' length sale of property by the transferee as evidence of the value of the transferred asset. *See, e.g., Kidder Skis Int'l v. Williams*, 60 B.R. 808, 810 (W.D. Mo. 1985) (considering fair market value of the property sold by transferee to

- 14 -

determine value of transferred property); *In re Emergency Monitoring Techs., Inc.*, 366 B.R. 476 (Bankr. W.D. Pa. 2007) (finding value recoverable to the trustee as the value that the transferee was able to obtain in further sale of the property it had seized from the debtor); *In re First Software Corp.*, 84 B.R. 278, 284 (Bankr. D. Mass. 1988) (fixing value of property as the value that the transferee was able to obtain in the marketplace, not the value that the parties agreed to in a credit memo), *aff'd*, 107 B.R. 417 (D. Mass. 1989).

That unsurprising proposition, however, hardly requires the adoption of eToys' far-fetched valuation theory. The record that eToys developed at trial simply did not allow the bankruptcy court to determine whether AOL was able to "re-sell" any of the impressions it "recaptured" by virtue of the termination of the Agreement. As the bankruptcy court correctly determined (Op. at 34), eToys failed to introduce any evidence that any subsequent sale of the advertising services actually took place, much less the value AOL obtained by virtue of any such sale. *See* Op. at 34.

The snippets of transcripts to which eToys now points surely do not support the proposition that AOL sold the impressions and/or do not provide evidence about any actual value that AOL may have received from those impressions. Nor do they provide any evidence of the fair market value for these impressions. At most, the trial record supports a position that AOL *may* have been able to resell *some* of the impressions. *See* Deposition Designation of Mirza Baig, January 12, 2004 ("Baig Dep. Desig.") at 162:12-21 ("They may have [been able to resell the space] but I'm not aware of it."); Burger Dep. Desig. at 174:7-175:7 ("I wouldn't know that specifically.").

In the absence of any such evidence, eToys resorts (Br. 16–17) to its "pro-ration" theory, under which, it contends, the court was required to look to the value of each "impression" based

on the contract the parties had entered months earlier—and at a time of unprecedented volatility, even implosion, in the dot-com and e-commerce markets. That approach makes little sense because in failing to put forth any evidence of the number of impression that AOL was in fact able to re-sell, or the price at which it might have re-sold them, eToys' "pro-ration" theory of valuation says absolutely nothing about the economic benefit, if any, that AOL might have obtained by virtue of the termination.

Accordingly, in light of eToys' utter failure to present the bankruptcy court with any reliable or relevant evidence on the issue of valuation, the bankruptcy court was certainly entitled to look at the relevant evidence that the parties *had* developed and presented at trial—the value that eToys would have realized had AOL not terminated the agreement. And the answer to that question, based on the record developed at trial, is "none."

## II.     THE BANKRUPTCY COURT PROPERLY DETERMINED THAT THE AGREEMENT WAS UNASSIGNABLE IN BANKRUPTCY.

eToys' further argument that the value of the transfer should be measured by the amount it could have received had it been able to sell the right to receive AOL impressions to a third-party buyer during the bankruptcy case also fails. The 1999 Agreement is an executory contract. And as the bankruptcy court correctly held, under Section 365(c)(1) of the Bankruptcy Code, an executory contract may not be assumed or assigned if "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties." 11 U.S.C. § 365(c)(1)(A). Here, the bankruptcy court correctly concluded that the Agreement was an executory contract that was unassignable under Virginia law, and therefore could not be assigned

- 16 -

under Section 365(c)(1)(A). Accordingly, AOL's termination of the Agreement cannot have

deprived eToys of any value that it otherwise would have been able to realize.

### A.    The 1999 Agreement Was An Executory Contract.

The bankruptcy court properly concluded that the Agreement was an executory contract.

*See* Op. at 28 n.7; App. 1, COL ¶¶ 30–33. An executory contract is a "contract under which the

obligation of both the bankrupt and the other party to the contract are so far unperformed that the

failure of either to complete performance would constitute a material breach excusing

performance of the other." *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872

F.2d 36, 39 (3d Cir. 1989). The court must look to relevant non-bankruptcy law to determine

whether any remaining obligations exist under the contract and if so, whether failure to perform

those remaining obligations would constitute a material breach. *See In re Columbia Gas*

*Systems, Inc.*, 50 F.3d 233, 240 n.10 (3d Cir. 1995).[6] Under Virginia law, "a material breach

deprives the injured party of the benefit that party justifiably expected through the exchange."[7]

*RW Power Partners v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490, 1496 (E.D. Va. 1995).

As sole support for the argument that the contract is not executory, eToys asserts that by

making the required payments under the Agreement, eToys had fully performed its obligations

thereunder. Br. 20–21. But this assertion is contrary to the bankruptcy court's manifestly correct

factual finding that the parties had material ongoing obligations under the Agreement at the time

of termination. For example, the bankruptcy court found that under the Agreement, eToys had

---

[6]    *See also In re Terrell*, 892 F.2d 469, 471–72 (6th Cir. 1989) ("[F]ederal law defines the
term executory contract but . . . the question of the legal consequences of one party's failure to
perform its remaining obligations under a contract is an issue of state contract law.") (citation
omitted).

[7]    The parties agree that the applicable non-bankruptcy law is Virginia.

the obligation to remain solvent and in operation. App. 1, FOF ¶ 21. If eToys failed to remain

solvent or ceased business operations, AOL had the option to terminate the contract. App. 1,

FOF ¶ 21. AOL's right to terminate upon insolvency was important "to protect its Members and

AOL's brand." App. 1, FOF ¶ 21. eToys was also obligated to derive at least 50% of its net

website sales from children's toys, hobbies, arts and crafts, video games, and software. App. 1,

FOF ¶ 21. In addition, under the Agreement, eToys' website had to remain ranked among the

top three interactive websites in the toy industry in the categories of competitive pricing, scope

and selection of products, customer service and fulfillment, and ease of use. App. 1, FOF ¶¶ 35,

37. eToys was also obligated to maintain its website such that it conformed to AOL's Kids and

Teens Policy, which AOL designed "to protect children and teenagers from being misled by

what they saw on AOL or the Internet." App. 1, FOF ¶ 39.

As the findings of fact make clear, under the Agreement, even after eToys' made

payment, AOL justifiably expected eToys (and indeed, eToys was obligated) to remain solvent

and provide, among other things, high quality shopping experiences, customer service, and a

broad selection of merchandise. Breach of these obligations by eToys would have "deprive[d]

[AOL] of the benefit that the party expected from the exchange." *See RW Power Partners*, 899

F. Supp. at 1496. In light of these continuing obligations and expectations and the effect of the

breach of such obligations, the bankruptcy court correctly determined that the contract was

executory as of February 28, 2001. *See In re DeLuca*, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996)

(holding that contracts of a business nature with mutual continuous and ongoing obligations are

executory contracts) (superseded by statute on unrelated grounds).[8]

---

[8]    Alternatively, the Third Circuit has held that the contract language itself may indicate that certain acts or events constitute a material breach, precluding the need to look to relevant state law to determine whether the contract is executory. *See In re Gen. DataComm Indus., Inc.*, 407

**B.      Virginia Law Excuses AOL From Accepting Performance From Any Party Other Than eToys.**

eToys advances two arguments as to why the bankruptcy court erred in concluding that the Agreement was unassignable: (1) that AOL's reservation of the right to object to assignment in the Agreement cannot by itself render the agreement unassignable; and (2) that the bankruptcy court erred in reaching the conclusion that the Agreement was an unassignable personal services contract under Virginia law.

With respect to the first argument, the bankruptcy court did not hold, nor does AOL argue, that the mere reservation of AOL's right to object to assignment renders the Agreement unassignable. eToys entirely misconstrues *In re ANC Rental Corp.*, 277 B.R. 226 (Bankr. D. Del. 2002), which simply stands for the otherwise non-controversial position that in order for Section 365(c)(1) to apply, "the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the [applicable law] that the identity of the contracting party is crucial to the contract." *Id.* at 236. The remainder of the cases cited by eToys stand for the proposition that if a party consents to an assignment or consent to an otherwise assignable agreement is unreasonably

F.3d 616, 623–24 (3d Cir. 2005). In *In re General DataComm Industries*, a provision of the contract in question allowed for termination upon a breach of that provision. *Id.* at 623. The Third Circuit concluded that the contract was executory because the continuing obligation not to breach that particular provision was material in that a breach of that provision would excuse future performance of the non-breaching party. *Id.* at 623–24.

This Court is faced with the same situation. Section 5.6 of the Agreement provided that AOL could terminate the Agreement in the event that eToys became insolvent. App. 9, Pl. Ex. 1. Thus, eToys' failure to remain solvent would (and indeed did) constitute a material breach. Thus, under *In re General Datacomm Industries*, the Agreement is executory. *See In re General DataComm Indus.*, 407 F.3d at 623–24; *Sharon Steel Corp.*, 872 F.2d at 39.

- 19 -

withheld, then Section 365(c)(1) does not render the contract unassignable. *See* Br. at 23–24

(citing *In re Wills Motors, Inc.*, 133 B.R. 303, 308 (Bankr. S.D.N.Y. 1991); *In re Aerobox*

*Composite Structures, LLC*, 373 B.R. 135 (Bankr. D.N.M. 2007)). Here, AOL did not consent to

the assignment, nor was this, as the bankruptcy court concluded, an otherwise assignable

contract. In any event, the bankruptcy court viewed assignment as a hypothetical, and thus was

not faced with a situation where consent to an assignment had been granted or unreasonably

withheld.

    As to eToys' second argument, the bankruptcy court properly concluded that the "AOL-

eToys business relationship was founded on AOL's trust and confidence in eToys' unique

attributes, as well as its experience, all of which were relevant to eToys' ability to serve AOL

members and protect their privacy interests as set forth in the 1999 Agreement." Op. at 29. As

such, "AOL would not have been required to accept performance under the Agreement from any

party other than eToys, and the Agreement therefore was not assumable or assignable under

[S]ection 365(c) of the Bankruptcy Code." App. 1, COL ¶ 38; Op. at 29.

    eToys does not dispute the bankruptcy court's conclusion that under Virginia law "a

contract is not assignable if the identity of the contracting parties is material to the ongoing

performance of the contract." App. 1, COL ¶ 35.[9] Nor does eToys dispute that under Virginia

---

[9]     *See also In re Granati*, 270 B.R. 575, 581–82 (Bankr. E.D. Va. 2001) ("[C]ontract rights
are freely assignable unless the identity of the contracting parties is material . . . ."), *aff'd*, 307
B.R. 827 (E.D. Va. 2002), *aff'd*, 63 Fed. Appx. 741 (4th Cir. 2003); *In re DeLuca*, 194 B.R. 65,
77 (Bankr. E.D. Va. 1996) (holding that an operating agreement governing a limited liability
company was unassignable, because "the identity of the managers [of the company was] material
to the very existence of the company"); *In re Catron*, 158 B.R. 624, 627 (Bankr. E.D. Va. 1992)
("One type of executory contract which cannot be assigned or assumed by a debtor under
[§ 365(c)(1)] is a personal service contract, which requires the performance of the party to the
contract and not of a substitute."), *aff'd*, 158 B.R. 629 (E.D. Va. 1993), *aff'd mem.*, 25 F.3d 1038
(4th Cir. 1994).

law, "the identity of a party is material to the performance of a contract if the contract is founded

on one of the parties maintaining trust or confidence in the ability to perform, judgment, or

business experience of the other party." App. 1, COL ¶ 36.[10]  Indeed, the only dispute that

eToys seems to have is with the bankruptcy court's finding that the Agreement was one of "trust

and confidence" as opposed to what eToys calls one of a "functional business pursuit." Br. at 27.

The bankruptcy court's determination in this regard is a question of fact and thus can only be

overturned if this Court determines that the bankruptcy court's findings were clearly erroneous.

See In re Headquarters Dodge, Inc., 13 F.3d 674, 683 (3d Cir. 1993) (reversing and remanding

---

[10]      See also DuPont de-Bie v. Vredenburgh, 490 F.2d 1057, 1060 (4th Cir. 1974)
(recognizing that under Virginia law, "executory contracts for personal services or involving a
relationship of confidence are not assignable"); J. Maury Dove Co. v. New River Coal Co., 143
S.E. 317, 327 (Va. 1928) (recognizing that under Virginia law, "[w]hen the contract contains
mutual obligations and liabilities, or involves a relation of personal confidence, it cannot be
assigned by one party without the consent of the other"); McGuire v. Brown, 76 S.E. 295, 297
(Va. 1912) (Under Virginia law, "[w]here the personal services of another are expressly
contracted for or are necessarily involved in the subject-matter of the contract, the contract is not
assignable until the services have been performed"); Epperson v. Epperson, 62 S.E. 344, 346
(Va. 1908) (Under Virginia law, "an executory contract for personal service, founded on
personal trust or confidence, is not assignable").

the district court's holding that contract was personal services contract because it was error for

the district court, acting as the appellate court, to answer such a question of fact).[11]

Far from being clearly erroneous, the bankruptcy court's finding that the Agreement was

a contract of trust and confidence is well supported by the record in this case. During the late

---

[11]    To support its position that the Agreement is one of "functional business," eToys primarily relies on two non-binding cases: *In re Travelot Co.*, 286 B.R. 447 (Bankr. S.D. Ga. 2002) and *In re Compass Van & Storage Corp.*, 65 B.R. 1007 (Bankr. E.D.N.Y. 1986). The *In re Travelot* court did not even address whether the contract between the parties was a personal services or trust and confidence contract. Likewise flawed is eToys' reliance on *In re Compass Van & Storage Corp.* The Agreement in this case is factually distinct from the "functional business" Agency Contract at issue in *In re Compass.* That contract merely required Compass to, among other things, loyally perform labor and services under the Allied Van Lines, Inc. name and to maintain and report records as required by Allied or any government agency. In that case, the court specifically found that the contract did not reference "compelling personal service[s] to effectuate the objectives of the agency agreement." *In re Compass Van & Storage Corp.*, 65 B.R. at 1012.

In contrast, the Agreement required eToys to maintain its status as the top website in its genre, underscoring the importance of (1) eToys' unique position as the leading children's toy and product online retailer at the time, and (2) AOL's reliance on eToys' singular judgment and taste in children's toys and products that would encourage AOL members to shop online.

The remaining cases cited by eToys in its footnote 12 are equally inapposite. *See In re Da-Sota Elevator Co.*, 939 F.2d 654, 656 (8th Cir. 1991) (assignability determination unrelated to question of whether the contract was a personal services contract); *In re Optimum Merchants Services*, 163 B.R. 546, 554–55 (Bankr. D. Neb. 1994) (contract not a personal services contract where addendum specifically deleted previous personal service provisions and provided that such services could be provided by other entities), *order vacated by consent*, 199 B.R. 409 (D. Neb. 1995); *In re Fastrax, Inc.*, 129 B.R. 274, 278 (Bankr. M.D. Fla. 1991) (finding contract not personal services contract only after considering the nature/subject matter of the contract, the circumstances surrounding the contract, and the intention of the parties, all of which did not suggest contract was personal services contract); *In re Rooster, Inc.*, 100 B.R. 228, 233–34 (Bankr. E.D. Pa. 1989) (holding contract not a personal services contract when debtor had little to no control under the contract); *In re Varisco*, 16 B.R. 634, 638 (Bankr. M.D. Fla. 1981) (finding franchise agreement not a personal services contract because lack of evidence of special trust and confidence between parties, particularly when parties where not original parties to the agreement). At most, the cases cited by eToys underscore that the inquiry into whether a contract is a personal services contract is a fact-intensive one.

1990s, the Internet was in its early stages and Internet shopping was unfamiliar to many AOL members. App. 1, FOF ¶¶ 173–74; App. 2, Tr. 42:13–42:18; App. 2, Tr. 25:6–25:25. Members had serious concerns about using their credit card numbers online and harbored serious misgivings about the safety of online shopping. App. 1, FOF ¶ 175; App. 2X, Tr. 26:1–26:4. AOL, therefore, needed to provide recognizable brands, good products, good pricing, and high quality service to its Members. App. 1, FOF ¶ 176; App. 2, Tr. 25:10–25:17. AOL's success depended on its reputation as a reliable and safe online service provider; therefore, AOL had a direct financial interest in the success of its retail partners, such as eToys. App. 1, FOF ¶ 173; App. 2, Tr. 42:13–42:18. AOL also needed its retail partners to succeed in order to prove the viability of an online retail business model. App. 1, FOF ¶ 173; App. 2, Tr. 42:13–42:18. As such, AOL made reliability a critical consideration when selecting merchant partners to provide retail services to its Members. App. 1, FOF ¶ 174; App. 2, Tr. 25:6–25:25.

From AOL's perspective, a partnership with eToys presented an excellent opportunity to achieve its online retail goals. From October 1997 through December 2000, eToys was the leading online retailer for children's toys and products. Indeed, during the 1999 holiday season Fortune Magazine ranked eToys as the number one Internet retailer. App. 1, FOF ¶ 178; App. 11, Ex. D-29 at AOL 00753. AOL viewed eToys as the "best of breed" in children's retail shopping and was confident in eToys' success and reliability. App. 2, Tr. 42:4–6; App. 1, FOF ¶ 177; App. 12, Ex. D-19 at AOL 00444; App. 13, Ex. D-27 at AOL 01708–09; App. 3, Ex. D-12 at AOL 00454. AOL thus entered into a partnership with eToys, entrusting eToys to provide high quality customer experiences in all areas, including broader product selection than other online toy retailers, along with superior site design, transactional processes, customer service, merchandising, promotion, and marketing creativity. App. 1, FOF ¶ 177. At the time AOL and

eToys entered into the Agreement, eToys was the only company that could provide AOL with the desired recognizable brands, quality products and service, and could be entrusted with AOL's reputation. App. 1, FOF ¶ 179; App. 2, Tr. 54:19–54:25. As such, the bankruptcy court correctly found that the Agreement was one of trust and confidence. Op. at 29.

Because, as the bankruptcy court correctly found, the Agreement was one of trust and confidence between the parties, under Virginia law, AOL is excused from accepting performance from any party other than eToys. As such, the bankruptcy court properly concluded that the Agreement is unassignable under Section 365(c)(1).[12]

## III. EVEN IF THE AGREEMENT WERE ASSIGNABLE, THE COURT PROPERLY FOUND THAT THE VALUE ETOYS COULD REALIZE FROM THE ASSIGNMENT IS DE MINIMIS.

eToys argues that the bankruptcy court erred in failing to apply the "totality of the circumstances" test and in finding that any value to eToys from the Agreement was *de minimis*. But as explained above, the bankruptcy court properly examined the totality of the reliable evidence in concluding that eToys would not have been better off had AOL not terminated the Agreement. The same basic principle supports the bankruptcy court's alternative finding that any value that the eToys estate might have realized would have been *de minimis*.[13]

---

[12]    The Third Circuit has also stated that "whether a contract is personal in nature depends 'upon the nature of the subject of the contract, the circumstances of the case, and the intent of the parties to the contract.'" *In re Headquarters Dodge, Inc.*, 13 F.3d at 682–83 (quoting 2 COLLIER ON BANKRUPTCY § 365.05 (Lawrence P. King, ed., 15th ed. 1992)). Here, as the bankruptcy court's Findings of Fact relating to the subject matter of the contract and the relationship of the parties show, the Agreement meets this standard. *See* App. 1, FOF ¶¶ 16–41, 92–95, and 173–79.

[13]    *See* Op. at 32 (noting that "the totality of the circumstances test mandates that the Court consider eToys' actual circumstances and intentions at the time of termination of the 1999 Agreement").

eToys' alternative version of the "totality of the circumstances" test—one that relies entirely on the mathematic equation the bankruptcy court properly rejected—is inapposite for the same reasons addressed above. The bankruptcy court was correct to disregard this approach, and to conclude that if the Agreement were assignable, then any value to eToys would be determined by analyzing the amount the estate would have expected to realize if it had retained the rights under the Agreement and sold them to a willing third-party buyer. Because the estate was liquidating, the proper approach to valuation is to apply the liquidation premise of value. Op. at 30–31 (finding that liquidation was imminent and liquidation premise of value was appropriate); *see also In re Mama D'Angelo, Inc.*, 55 F.3d 552, 556–57 (10th Cir. 1995). As AOL's expert testified, this approach yields a *de minimis* value of approximately $16,500 to $38,500. Op. at 30.

The bankruptcy court's finding that liquidation was imminent is a finding of fact that is supported—indeed compelled—by the record and is far from being clearly erroneous: (1) as of February 26, 2001, "eToys began valuing its remaining assets on a piecemeal basis in preparation for selling them in a liquidation," *see* App. 1, FOF ¶ 88; and (2) in the February 26, 2001, press release, eToys stated that "the company will focus solely on the winding down of its business and the liquidation of its assets," *see* App. 14, D. Ex. 59 at AOL 00349. Because eToys was liquidating, the application of the liquidation premise of value is appropriate, and as AOL's expert, who was credited by the bankruptcy court, explained at trial, that value was *de minimis*.

## IV.    THE TERMINATION OF A CONTRACT IN ACCORDANCE WITH ITS TERMS IS NOT A FRAUDULENT CONVEYANCE.

The bankruptcy court's determination that eToys is not entitled to recovery because the "Agreement had no value to eToys immediately before [AOL's] termination," Op. at 26-27, is correct and this Court should uphold the bankruptcy court's judgment in favor of AOL on this

basis. But the judgment may also be affirmed on the alternative ground, rejected by the bankruptcy court at the summary judgment stage, that the proper termination of a contract according to its terms cannot itself constitute a transfer for purposes of 11 U.S.C. § 548.[14]

It is fundamental that a party to a contract only has a right (or property interest) to that for which it bargained. The transfer of these bargained for rights occurs when the contract is executed—the time when the parties agree to be bound by the terms of the contract and gain and/or relinquish certain rights as provided for by the contract. Here, at the time eToys entered into the Agreement with AOL in August 1999, eToys agreed, among other things, that AOL's contractual obligation to provide services to eToys was limited to when eToys remained solvent. In the event of insolvency, the Agreement provided AOL the unilateral right to terminate the contract. When AOL unilaterally terminated the Agreement on February 28, 2001, it did so pursuant to a provision to which both parties agreed to in August of 1999. *See* App. 9, Pl. Ex. 1. When AOL exercised its rights of termination in 2001 on account of eToys' insolvency under the pre-existing Agreement, no transfer occurred that was properly subject to a fraudulent conveyance challenge. The only relevant "transfer" took place in 1999, when eToys gave AOL the right to terminate in the event of insolvency.

For precisely this reason, many courts have held that as a matter of law, the termination of a service contract according to its terms does not constitute a "transfer of interest of the debtor

---

[14]    AOL first advanced the argument that the termination is not a "transfer" as part of the summary judgment motion, filed on May 14, 2004. While the bankruptcy court reached a contrary conclusion in ruling on summary judgment, the court's ultimate conclusion that AOL is not liable under Sections 548 and 544 may be affirmed on any ground supported by the record. *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1089 n.10 (3d Cir. 1988) ("An appellate court may affirm a correct decision by a lower court on grounds different than those used by the lower court in reaching its decision.").

in property" avoidable under Section 548 of the Bankruptcy Code. *See In re LiTenda Mortgage Corp.*, 246 B.R. 185, 191 (Bankr. D.N.J. 2000) ("[A] pre-petition termination of a contract pursuant to its terms and the consequent cessation of a debtor's rights under a contract does not constitute a transfer within the meaning of . . . [11 U.S.C.] § 548(a)."), *aff'd mem.*, 276 F.3d 578 (3d Cir. 2001); *see also In re Wey*, 854 F.2d 196, 199 (7th Cir. 1988); *In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674, 677–78 (D.N.J. 1992), *aff'd mem.*, 5 F.3d 1488 (3d Cir. 1993); *In re Jermoo's Inc.*, 38 B.R. 197, 203–06 (Bankr. W.D. Wis. 1984).[15]

That conclusion accords with the purpose of Section 548. The basic purpose (and indeed a requirement) of fraudulent conveyance law is to prevent creditors from being deprived of value transferred from the debtor for inadequate consideration at a time when the debtor is insolvent. *See* 11 U.S.C. § 548. Here, as explained above, the bargain between eToys and AOL was made in 1999 at a time when eToys was solvent. It is inappropriate to now invoke Section 548— which requires insolvency—to reallocate that bargain.

In addition, this outcome is consistent with the purpose and limitations of Section 365 of the Bankruptcy Code, which does not provide the debtor the ability to revive a contract that has expired or been terminated prepetition. *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1214 (7th Cir. 1984) (holding, with respect to Section 365, that "[w]here a contract has been validly terminated pre-bankruptcy, the debtors' rights to continued performance under the contract have

---

[15]    The only cases even to suggest that contract termination could be subject to avoidance under Section 548 have involved transfers in real property, rather than vendor services contracts. In such cases, it is not the termination of the contract but the concomitant "forfeiture of an equity interest under a real estate contract" that may constitute a transfer. *See In re Veretto*, 131 B.R. 732, 737 (Bankr. D.N.M. 1991); *see also In re Grady*, 202 B.R. 120, 123 (Bankr. N.D. Iowa 1996); *In re Indri*, 126 B.R. 443, 446 (Bankr. D.N.J. 1991).

expired. The filing of a petition under chapter 11 cannot resuscitate those rights"); *In re Coast Cities Truck Sales*, 147 B.R. at 677–78 ("[Section] 548 has never been construed, nor was it intended, to afford debtors the option of reinstating involuntarily terminated executory contracts . . . the implications of a contrary finding would render virtually every validly terminated executory contract revivable by a debtor by simply initiating bankruptcy proceedings."); *In re Metro Water & Coffee Servs. Inc.*, 157 B.R. 742, 747–48 (Bankr. W.D.N.Y. 1993) (Allowing Section 548 "to be used to avoid a prepetition, ordinary course of commercial business, non-collusive termination of an executory contract in accordance with its terms when the Debtor has materially defaulted under the contract would be devastating.").

Accordingly, the bankruptcy court's judgment can be affirmed on the alternative ground that no transfer occurred when AOL terminated the Agreement.

## V.    THE BANKRUPTCY COURT PROPERLY EXERCISED ITS DISCRETION IN REFUSING TO AWARD PREJUDGMENT INTEREST.

In this case, the bankruptcy court concluded that prejudgment interest is inappropriate "because the property transferred had no value and there is no evidence that AOL acted in bad faith in terminating the 1999 Agreement." App. 1, FOF ¶ 42. Here, eToys offers no evidence of AOL's bad faith, but simply asserts that "eToys can only be made whole by an award of prejudgment interest and the bankruptcy court should be directed to do so at the rate provided for in 28 U.S.C. § 1961." Br. at 30.

Because the decision to enter judgment on the merits in favor of AOL was correct and should be affirmed, there is no occasion for this Court to reach the question whether—had eToys prevailed in avoiding a transfer and recovering damages—prejudgment interest should be awarded on such a (hypothetical) award. But in any event, the law is clear that this is a matter committed to the discretion of the bankruptcy court. *In re Hechinger Inv. Co. of Delaware, Inc.*,

489 F.3d 568 (3d Cir. 2007).  Here, the bankruptcy court found that there was no evidence of bad

faith and that the property transferred had no value.  Thus, it was not an abuse of discretion to

deny eToys prejudgment interest.

**CONCLUSION**

For the foregoing reasons, the bankruptcy court's judgment should be affirmed.

Respectfully submitted,

/s/ Karen C. Bifferato

Craig Goldblatt                                      Karen C. Bifferato (Bar #3279)
Lisa Ewart                                          Marc J. Phillips (Bar #4445)
WILMER CUTLER PICKERING HALE AND                    CONNOLLY BOVE LODGE & HUTZ LLP
  DORR LLP                                 The Nemours Building
1875 Pennsylvania Avenue, N.W.                       1007 North Orange Street
Washington, D.C.  20006                              P.O. Box 2207
(202) 663-6000                                       Wilmington, DE  19899-2207
craig.goldblatt@wilmerhale.com                       (302) 658-9141
lisa.ewart@wilmerhale.com                            kbifferato@cblh.com
                                                     mphillips@cblh.com

                                                     Attorneys for AOL LLC

July 11, 2008

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Karen C. Bifferato, hereby certify that on July 11, 2008, I caused the foregoing

**AOL LLC's Appellee's Brief** to be electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing(s) to the following:

> Richard D. Allen, Esquire
> Thomas W. Briggs, Jr., Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE 19801
> rallen@mnat.com
> tbriggs@mnat.com

I further certify that copies were caused to be served on July 11, 2008 upon the

following individuals in the manner indicated:

> ### BY HAND DELIVERY
> Richard D. Allen, Esquire
> Thomas W. Briggs, Jr., Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE 19801

> /s/ Karen C. Bifferato
> Karen C. Bifferato (No. 3279)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE 19801
> (302) 658-9141
> kbifferato@cblh.com

#622412v1