IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>EBC I, INC. f/k/a ETOYS, INC., et al.,<br><br>    Reorganized Debtor. | Bankruptcy Case No. 01-706<br><br>Adv. Proc. No. 03-50003 (MFW) |
| EBC I, INC., f/k/a ETOYS, INC.,<br><br>    Plaintiff/Appellant<br><br>    v.<br><br>AMERICA ONLINE INC.<br>(now named AOL LLC),<br><br>    Defendant/Appellee | Civil Action No. 08-100 (JJF) |

## AOL LLC'S APPENDIX

Karen C. Bifferato (Bar #3279)
Marc J. Phillips (Bar #4445)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207
(302) 658-9141

Attorneys for AOL LLC

Craig Goldblatt
Lisa Ewart
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

July 11, 2008

*In re EBC I, Inc. f/k/a eToys, Inc., et al.*
**United States Bankruptcy Court for the District of Delaware**
**Case No. 01-706 (MFW) and Adv. Proc. No. 03-50003 (MFW)**

*EBC I, Inc. f/k/a eToys, Inc., et al. v. America Online, Inc..*
**United States District Court for the District of Delaware**
**Civ. Action No. 08-100 (JJF)**

## APPENDIX TO AOL LLC'S BRIEF ON APPEAL

| <u>App.</u> | <u>Document</u> |
| --- | --- |
| 1. | Findings of Fact and Conclusions of Law |
| 2. | Hearing Transcript, *In re EToys, Inc.*, No. 01-706 and Adv. Proc. No. 03-50003 (Bankr. D. Del. June 26, 2007) |
| 3. | Defendant's Exhibit 12, E-mail re eToys Release (AOL 00454-00455) |
| 4. | Defendant's Exhibit 80, Chart – Price History –IDC / Exshare as of May 29, 2007 (TR 001965) |
| 5. | Defendant's Exhibit 75, SEC Filing 10-Q filed 8/14/2000 (TR 001525-1695) |
| 6. | Defendant's Exhibit 1, eToys Press Release as of November 18, 1997 |
| 7. | Defendant's Exhibit 2, Interactive Marketing Agreement as of October 1, 1997 (AOL 00488-00504) |
| 8. | Defendant's Exhibit 5, E-mail re AOL eToys Proposal (AOL 01748) |
| 9. | Plaintiff's Exhibit 1, Interactive Marketing Agreement as of August 10, 1999 |
| 10. | Defendant's Exhibit 10, E-mail re Follow Up (AOL 00469-00470) |
| 11. | Defendant's Exhibit 29, E-mail re eToys Named Top Overall Web Site of '99 Holiday Season (AOL 00753-00754) |
| 12. | Defendant's Exhibit 19, E-mail re eToys kickoff (AOL 00444) |
| 13. | Defendant's Exhibit 27, Goldman Sachs Investment Research re eToys Inc., November 10, 1999 (AOL 01707-01726) |
| 14. | Defendant's Exhibit 59, Press Release as of February 26, 2001 (AOL 00349-00352) |

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Karen C. Bifferato, hereby certify that on July 11, 2008, I caused the foregoing

**AOL LLC's Appendix** to be electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing(s) to the following:

> Richard D. Allen, Esquire
> Thomas W. Briggs, Jr., Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE 19801
> rallen@mnat.com
> tbriggs@mnat.com

I further certify that copies were caused to be served on July 11, 2008 upon the

following individuals in the manner indicated:

> **BY HAND DELIVERY**
> Richard D. Allen, Esquire
> Thomas W. Briggs, Jr., Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 North Market Street
> Wilmington, DE 19801

> /s/ Karen C. Bifferato
> Karen C. Bifferato (No. 3279)
> Connolly Bove Lodge & Hutz LLP
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE 19801
> (302) 658-9141
> kbifferato@cblh.com

#622458v1

# App. 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| EBC I, INC., f/k/a ETOYS, | ) Case No. 01-00706(MFW) |
| INC., | ) |
| | ) |
|     Reorganized Debtor. | ) |
| | ) |
| | ) |
| EBC I, INC., f/k/a ETOYS, | ) |
| INC., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Adversary No. 03-50003 |
|     v. | ) |
| | ) |
| AMERICA ONLINE, INC., | ) |
| | ) |
|     Defendant. | ) |

**FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW[1]**

I.   FINDINGS OF FACT

    A.   Parties and Background

1.   From October 1997 through December 2000 eToys, Inc.
("eToys") was the leading online retailer focused on toys and
children's products.   (Ex. D-1 at 1)[2]

2.   At all relevant times America Online, Inc. ("AOL") operated
as an internet service provider.   AOL provided its subscribers

---

[1] These, together with the accompanying Opinion, constitute
the findings of fact and conclusions of law of the Court pursuant
to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] Citations to the Plaintiff's and Defendant's Exhibits are
to "Ex. P- at [page]" and "Ex. D- at [page]," respectively.
Citations to the transcript of the hearing held on June 26, 2007,
are to "Tr. [page:line]" and to depositions are to "Dep. [name]
[page:line]."   Citations to the Pretrial Stipulation and Order
are to "PT Stip. [page]."   Citations to pleadings are to the
docket as "D.I. [#]."

("AOL Members") with access to the internet at large and to news, entertainment, sports, and online shopping services provided through third party retailers. (Tr. 22:17-23:24)

3.   In the late 1990s AOL had approximately 20 million AOL Members each of whom paid a subscription fee of approximately $20 per month. (Tr. 23:17-25:2)

4.   In the shopping area of the AOL site, people could locate products, compare them to others, and buy them directly from AOL's shopping partners. (Tr. 23:10-23:16)

5.   Third party retailers paid AOL for the opportunity to provide shopping services to AOL Members. (Tr. 23:25-24:5)

6.   Shopping partners purchased advertisements ("impressions") showing the retailers' logo or promotion ad in AOL's online shopping mall and other areas that AOL Members were expected to browse. (Tr. 26:24-27:22)

7.   AOL did not have direct control over how many impressions would result from its contracts with marketing partners, because it depended on how many AOL Members visited a particular site over a particular period. (Tr. 30:4-30:12)

8.   For shopping partners, the goal of an impression was to generate a "click through," whereby the AOL Member would visit the retailer's own website to shop and hopefully purchase products. (Tr. 28:3-28:11)

9.   As of the late 1990s, approximately 80% of AOL's revenues resulted from subscriber fees paid by AOL Members and approximately 20% resulted from payments by third parties, including shopping partners. (Tr. 24:8-24:13)

B.   1997 Interactive Marketing Services Agreement

10.   On October 1, 1997, the day that eToys launched its website, eToys and AOL entered into their first Interactive Marketing Services Agreement which was to last through December 31, 1999. (PT Stip. at 2; Ex. D-1 at 1; Ex. D-2 at AOL 00491)

11.   At the time of the 1997 Agreement, eToys was the only online toy retailer to provide a comprehensive selection of nationally advertised and specialty toy brands, and eToys' prices were as low as, or lower than, those of land-based toy retailers. (Ex. D-1 at 1; Tr. 35:1-35:18)

2

12. AOL provided a demographic profile that was particularly compatible with eToys' target customer profile. (Dep. [Schoch] 65:9-65:18; Dep. [Lenk] 43:11-43:22)

13. Under the 1997 Agreement, AOL was to provide eToys with approximately 17 million impressions plus a presence on the AOL Shopping Channel and Service Shopping Channel Toys Department. (Ex. D-2 at AOL 00488, 00492)

14. If AOL failed to provide the required number of impressions in a year, AOL was required to "make good" by providing the impressions missed within four months. (Ex. D-2 at AOL 00488-89)

15. In the event that AOL failed to deliver more than 20% of the promised impressions, AOL would provide 1.5 times the missed impressions; if AOL failed to deliver more than 30% of the promised impressions, eToys had the right to terminate the 1997 Agreement. (Ex. D-2 at AOL 00488-89)

### C.   1999 Interactive Marketing Services Agreement

16. Before the end of the 1997 Agreement, eToys and AOL met to review the results achieved to date. (Ex. D-4 at AOL 00374)

17. eToys was eager to pursue additional promotional opportunities both online and offline and to increase its offers to AOL Members. (Ex. D-4 at AOL 00374)

18. eToys was interested in doing a large deal with AOL because it wanted to promote its brand and online store to become the dominant children's brand and compete effectively with established land-based toy retailers. (Tr. 37:8-39:24; Ex. D-12 at AOL 00454)

19. On August 10, 1999, eToys and AOL executed a new three-year Interactive Marketing Services Agreement (the "1999 Agreement"), whereby AOL made eToys' shopping services available to AOL Members and provided various forms of promotions for eToys in exchange for $18 million, payable in $1.5 million quarterly installments. (PT Stip. at 2; Ex. P-1)

20. eToys expressly agreed that its payments under the 1999 Agreement were "non-refundable." (Ex. P-1 at AOL 00204; Dep. [Brine] 84:12-84:18)

21. AOL had the right to terminate the 1999 Agreement if eToys became insolvent or ceased operations, which AOL felt was important to protect its Members and AOL's brand. (Ex. P-1 at AOL 00207; Dep. [Burger] 21:3-25:6)

3

22.   The price paid by eToys under the 1999 Agreement was
calculated by the sum of some (but not all) of the impressions to
be delivered by AOL multiplied by a particular cost per thousand
(CPM) reflected on AOL's rate card.  (Dep. [Burger] 40:1-41:6;
Tr. 80:4-80:11)

23.   AOL's rate card represented an initial offer or starting
point that AOL would use in negotiating an agreement with a
retail partner like eToys.  (Dep. [Brine] 114:2-114:18; Tr. 33:6-
33:9; Dep. [Burger] 57:2-57:7)

24.   Because eToys was negotiating a major agreement with AOL,
the price reached was substantially below the rate card prices
(averaging approximately 69% less).  (Dep. [Baig] 92:4-92:15)

25.   Based on the agreed prices, the 1999 Agreement provided that
roughly $3.5 million in certain impressions would be provided by
AOL in the first year, $5.8 million in the second year, and $8.7
million in the third year.  (Ex. P-21 at AOL 00704; Dep. [Baig]
88:1-90:4)

26.   Under the 1999 Agreement AOL agreed to provide in excess of
1 billion impressions with eToys' logo or ad.  In the event
impressions were not provided, AOL agreed to provide make good
impressions at a rate of 1.5 times the missed impressions.  (Ex.
P-1 at AOL 00197-98, 00211-12, 00216-17; Dep. [Burger] 58:17-
58:20; Dep. [Valle] 38:5-38:13)

27.   Although their value was not explicitly included in the
price, eToys sought and received AOL's commitment to provide
Welcome Screen impressions (impressions appearing on the AOL
homepage) which eToys felt were valuable.  (Tr. 86:5-86:18; Dep.
[Lenk] 118:6-119:23; Dep. [Valle] 83:20-84:14; Dep. [Brine] 22:4-
22:18, 23:8-23:25, 24:1-24:23, 27:23-29:9; Dep. [Burger] 98:20-
100:12; Dep. [Iannuccilli] 35:1-35:7, 65:1-65:7, 68:24-69:14; Ex.
D-5 at AOL 01748; Ex. D-18 at AOL 01568)

28.   In later years AOL charged other parties for the type of
Welcome Screen impressions that it gave eToys under the 1999
Agreement and Amendment.  (Tr. 86:16-86:18; Dep. [Burger]
99:6-100:4; Dep. [Baig] 77:6-77:11, 77:15-78:10)

29.   Under the Agreement, AOL also allowed eToys to use AOL's
brand and made eToys a premier retailer with exclusivity on some
AOL sites.  (Dep. [Baig] 86:16-87:2, 92:16-94:4, 137:1-137:11,
148:9-148:20, 149:6-149:12, 152:6-152:10)

4

30. Specifically, under Exhibit G of the 1999 Agreement, eToys received a license to market, distribute, display, transmit, promote, and use certain trade names, trademarks, and service marks of AOL, which it did use in its television advertising. (Ex. P-1 at AOL 00226; Tr. 53:11-54:4)

31. Under the 1999 Agreement, eToys was an "Anchor Tenant" in various AOL online shopping areas, including toys, educational toys, kid and infant gear, and electronic games. (Ex. P-1 at AOL 00200; Ex. D-82 at TR .001976; Dep. [Brine] 34:12-34:17)

32. The 1999 Agreement also gave eToys exclusivity in some areas which meant that AOL would not put a competitor's placements in those areas. (Ex. P-1 at AOL 00199-200; Tr. 33:23-34:4; Dep. [Lenk] 88:9-89:9; Dep. [Burger] 116:18-117:6)

33. eToys valued the preclusive effect that the 1999 Agreement had on potential agreements between its competitors and AOL. (Dep. [Lenk] 69:4-69:21)

34. Section 1.5 of the 1999 Agreement provided that impressions delivered under the Agreement would link only to the eToys website and were limited to the categories of products listed on Exhibit D. (Ex. P-1 at AOL 00199, 00219)

35. Section 2.1 of the 1999 Agreement required that at least 50% of the net sales of the products on eToys' website be derived from the sale of children's toys, hobbies, arts and crafts, video games, and software. (Ex. P-1 at AOL 00200; Tr. 49:22-50:6)

36. The 1999 Agreement permitted eToys to collect and use information from AOL Members (which it did), but required that eToys comply with applicable privacy and disclosure requirements to protect the privacy of AOL Members, including their names, addresses, and purchases. (Ex. P-1 at AOL 00221, 00228; Tr. 52:10-54:18)

37. The Operating Standards in Exhibit E required that eToys' website rank among the top three interactive websites in the toy industry in the categories of competitive pricing, scope and selection of products, customer service and fulfillment, and ease of use. (Ex. P-1 at AOL 00221; Tr. 50:22-51:10)

38. If eToys failed to comply with the Operating Standards, section 2.7 of the 1999 Agreement allowed AOL to decrease or suspend the impressions it provided to eToys until such non-compliance was corrected. (Ex. P-1 at AOL 00203, Tr. 51:11-51:16)

39.  Exhibit F of the 1999 Agreement required that eToys conform to AOL's Kids and Teens Policy, which was designed to protect children and teenagers from being misled by what they saw on AOL or the internet.  (Tr. 53:1-53:10; Ex. P-1 at AOL 00225)

40.  The parties agreed that, in the press release announcing the 1999 Agreement, eToys would be referred to as the premier retailer of children's products such as toys, children's videos, and children's books.  This was intended by eToys to generate increased brand recognition, which it valued.  (Tr. 88:1-88:10; Ex. D-17 at AOL 00844)

41.  The potential effect of the 1999 Agreement on the investor community was important to eToys.  (Tr. 87:9-87:12; Dep. [Iannuccilli] 99:19-99:24; Dep. [Schoch] 72:14-72:21; Dep. [Lenk] 51:4-51:15, 56:11-56:24, 69:4-69:21)

42.  Investors viewed eToys' association with AOL favorably. (Dep. [Schoch] 40:9-40:11, 71:16-72:23; Dep. [Lenk] 113:6-113:13)

43.  In the ten days following the execution of the 1999 Agreement, the price of eToys' common stock rose from $31.25 to $45.625, representing an increase in its market capitalization of $1.564 billion.  (Ex. D-80 at TR 001965)

D.  Performance of the 1999 Agreement

44.  Almost immediately after signing the 1999 Agreement, eToys expressed dissatisfaction with the results eToys was realizing from the Agreement.  (Ex. D-26 at AOL 00397)

45.  During the 1999 holiday season, shortly after the Agreement was signed, AOL began to deliver far fewer impressions than it was obligated to deliver.  This was acknowledged by AOL in an internal e-mail dated December 16, 1999, which reported that: "We are VERY low on our impression delivery."  (Ex. P-22)

46.  The total shortfall in delivery of impressions during the 1999 holiday season was about 34 million.  (Ex. P-6 at AOL 00155; Ex. P-18 at AOL 00722)

47.  AOL tried to work with eToys to compensate for the under-delivery of impressions, including delivering more welcome screen impressions.  (Dep. [Baig] 55:2-56:2, 70:20-71:12; Dep. [Burger] 78:24-79:9, 79:21-81:9, 104:16-105:2, 105:13-106:11; Dep. [Valle] 85:8-85:17; Dep. [Iannuccilli] 34:12-34:19)

6

48.   The under-delivery of impressions was, in part, the result of fewer AOL Members browsing the internet and seeing the areas where eToys' ads were placed.  (Dep. [Valle] 43:10-43:17)

49.   eToys also complained that AOL's redesign of its website caused eToys to lose business because it increased the options for AOL Members, thereby reducing the number of viewers of the eToys' impressions.  (Dep. [Baig] 116:14-116:22; Dep. [Lenk] 135:1-136:3; Dep.[Valle] 91:24-92:10)

50.   Because of AOL's inability to deliver impressions at the rate specified in the 1999 Agreement, eToys asked to restructure the Agreement beginning in February 2000.  (Ex. D-28 at AOL 00762; Dep. [Baig] 51:5-51:8)

51.   By late spring of 2000, AOL was aware that it would be unable to provide eToys with the impressions (including "make good" impressions) it was obligated to deliver in the first year of the 1999 Agreement and projected that there would be massive delivery shortfalls in the second and third years as well.  (Dep. [Burger] 104:16-105:12, 107:3-108:7)

52.   Internally, AOL recognized that the actual and projected shortfall in delivery of impressions "was material" and that eToys could assert it had the right to terminate the 1999 Agreement as a result.  (Ex. P-23; Dep. [Baig] 66:21-67:17, 107:22-109:19; Dep. [Burger] 140:5-140:19)

53.   AOL delayed renegotiation of the 1999 Agreement, however, because it felt it would have greater leverage over eToys closer to the holiday season.  (Ex. P-18 at AOL 00725; Dep. [Baig] 62:16-63:8; Dep.[Burger] 82:19-83:8)

54.   Renegotiation of the 1999 Agreement began in earnest in August and September 2000.  (Ex. D-45 at AOL 00629; Tr. 47:5-47:7)

55.   In the course of negotiations about the Amendment, AOL acknowledged that it had under-delivered impressions during the first year of the 1999 Agreement by approximately 54 million.  (Dep. [Iannuccilli] 73:14-73:23)

E.   November 15, 2000, Amendment

56.   On November 15, 2000, eToys and AOL executed the Amendment to the 1999 Agreement. (PT Stip. at 2; Ex. P-3 at AOL 00535)

57.   Under the Amendment, eToys paid an additional $750,000 to AOL and AOL agreed to provide impressions for the following two

years without any further payments by eToys.  (Ex. P-3 at AOL 00534, 00537)

58.  After the Amendment, therefore, the total price paid by eToys to AOL for the three-year period was reduced from $18 million to $8.25 million and was fully pre-paid.  (Ex. P-3 at AOL 00534, 00537; Dep. [Lenk] 154:11-155:1; Dep. [Baig] 166:18-166:21)

59.  An internal AOL summary stated that the total dollar figure paid under the Amendment was derived "for years 2 and 3 using current rate cards," which were significantly less than the rate card prices at the time the 1999 Agreement had been negotiated.  (Ex. P-3 at AOL 00534; Ex. P-10; Dep. [Brine] 114:2-115:11; Dep. [Valle] 90:23-91:14; Dep. [Baig] 130:8-131:4, 135:1-135:14)

60.  The Amendment deemed AOL to have satisfied all its obligations with respect to the delivery of impressions in the first year of the Agreement.  (Ex. P-3 at AOL 00534-35; Dep. [Burger] 171:3-171:14)

61.  The Amendment also reduced AOL's obligations to deliver priced impressions in the second and third years and eliminated eToys' exclusivity rights under the 1999 Agreement.  (Ex. P-3 at AOL 00534)

62.  However, under the Amendment, AOL agreed to provide eToys with one billion impressions in all categories, including 889 million Welcome Screen impressions, during the second and third years of the Agreement.  (Ex. P-3 at AOL 00541; Dep. [Iannuccilli] 120:14-120:21)

63.  In the event of a shortfall in AOL's delivery of impressions, AOL again agreed to deliver additional impressions but only at the rate of one times the missed impressions unless there was a shortfall of 50% or more of the combined number of promised impressions, in which case the make good impressions would equal 1.5 times the shortfall.  (Ex. P-3 at AOL 00536-37)

64.  Under the Amendment, AOL waived its right to collect $397,000 due from eToys' wholly owned subsidiary, BabyCenter, Inc.  (Ex. P-3 at 00537; Dep. [Lenk] 155:2-155:9)

65.  All terms of the 1999 Agreement not expressly modified by or in direct conflict with the Amendment remained in effect.  (Ex. P-3 at AOL 00538)

8

66.   In the negotiations that resulted in the Amendment, the parties did not allocate any value to exclusivity or the Welcome Screen impressions to be delivered. (Tr. 86:16-86:18; Dep. [Burger] 116:18-117:13)

F.   Performance of the 2000 Amendment

67.   AOL produced schedules showing the impressions it delivered (1) from the commencement of the 1999 Agreement through termination, (2) from the Amendment through January 31, 2001, and (3) from February 1 to 26, 2001.   (Ex. P-4; Ex. P-5; Ex. P-6)

68.   However, AOL has said that: "a perfect comparison between the carriage plan contained in schedule A of the [A]mendment and the impressions actually provided is not possible.  Both changes in the nomenclature used by AOL and any changes agreed to by the parties regarding what impressions would actually be delivered make such a side-by-side comparison impossible.  There is thus no 'key' that ties the information in [the] exhibits . . . to schedule A of the [A]mendment."  (Ex. P-8)

69.   Nonetheless, the Exhibits evidence that AOL did not deliver any of the various impressions it committed to provide, including (a) "Pop-up" impressions to be delivered by the end of 2000, (b) Section 2 impressions, such as the "People.com" impressions, (c) the 10.7 million "Winter Holiday-Shopping Package" impressions, (d) the 1.6 million "Santa's Home Page" banners, and (e) the 600,000 "Baby Registries" banners.  (Ex. P-3 at AOL 00539-40; Ex. P-4; Ex. P-5; Ex. P-6)

70.   The Exhibits also demonstrate that AOL delivered only a small percentage of other impressions it was obligated to deliver: (a) 20,524 of the 3 million "Birthday Club" banners, (b) 29,486 of the 3 million "Run Of Parenting Channel" impressions, (c) 1,832,130 of the 7,533,334 "Movies: Gold" impressions, (d) 2,206,962 of the 10,777,778 "Books and Magazines: Gold" impressions, (e) 132,096 of the 490,000 "Kids Wish List" banners, (e) 432,643 of the 1,766,660 "Maternity: Gold" impressions, (f) 2,086,772 of the 9,252,000 "Home Page" impressions, (g) 1,507,342 of the 4,500,000 "Educational Toys: Anchor" impressions, and (h) 6,262,425 of the 15,750,000 "Toys & Games: Anchor" impressions. (Ex. P-3 at AOL 00540; Ex. P-4; Ex. P-5; Ex. P-6)

71.   However, eToys received a substantial number of the Welcome Screen impressions that it had sought in the Agreement and the Amendment: approximately 231 million from August 1999 to August 2000 and 475 million from August 2000 to February 2001.   (Tr. 86:5-86:15; Dep. [Burger] 75:7-75:10, 162:4-162:14; Dep.

9

[Iannuccilli] 65:11-65:14; Ex. P-6 at AOL 00155; Ex. P-4 at AOL 01802)

72.    The Amendment obligated AOL to deliver only 862,400,000 Welcome Screen impressions (not the impressions listed in Exhibit A as referenced in section 1a and the impressions listed in section 1b).  (Ex. P-3 at AOL 00535)

G.    2000 Holiday Season

73.    Quite surprisingly, the 2000 holiday season was terrible; internet businesses particularly suffered.

74.    It was clear by mid-December 2000, that the 2000 holiday season was a failure and that eToys would miss its projected sales.  (Ex. D-77 at TR 001868; Dep. [Brine] 57:14-57:19; Dep. [Schoch] 54:2-54:16)

75.    On December 15, 2000, eToys revised its projected sales for the quarter downward from $210-$240 million to $120-$130 million. (Ex. D-77 at TR 001868)

76.    eToys' downward adjustment of its projected sales resulted in a downward revision in the estimate of cash the company would have on hand at the end of December from $100-$120 million to $50-$60 million.  (Ex. D-77 at TR 001868)

77.    To advise it on its options, eToys hired Goldman Sachs which quickly determined that financing was not available and began seeking strategic and financial buyers.  (Dep. [Lenk] 63:15-64:4)

78.    eToys and its management talked with numerous prospective buyers, none of whom presented an offer.  (Dep. [Lenk] 64:5-64:25; Dep. [Schoch] 55:24-57:11, 141:21-142:15)

79.    By January 3, 2001, eToys' management recognized that the company would not be able to proceed in its current configuration.  (Dep. [Schoch] 54:17-55:10, 132:10-133:2, 141:21-143:15; Dep. [Bousquette] 22:20-23:2)

80.    On January 4, 2001, eToys issued job elimination notices to approximately 700 of its 1,000 full-time employees.  (Ex. D-78 at TR 001963; Dep. [Brine] 18:5-18:8; Dep. [Schoch] 55:11-55:23)

81.    On January 10, 2001, eToys' unsecured creditors formed an informal committee which entered into a standstill agreement with eToys on January 16, 2001.  (Tr. 132:9-132:14)

82.  By the end of January 2001, eToys' search for a buyer was
reaching the desperation stage.  (Dep. [Schoch] 145:5-145:11)

83.  On February 5, 2001, eToys issued job elimination notices to
all its remaining employees.  (Tr. 132:15-132:19; Ex. D-78 at
001893)

84.  During the month of February, eToys tried to raise cash by
selling large quantities of inventory on its website at discount
prices in an informal liquidation.  (Dep. [Schoch] 99:21-100:7,
104:25-105:8; Dep. [Lenk] 169:6-169:15)

85.  During this period, eToys' management knew that paying all
its bills would prevent it from continuing as a viable company
and started to conserve cash.  (Dep. [Schoch] 50:7-52:16,
99:21-100:9; Dep. [Lenk] 165:14-165:19)

86.  While eToys was able to sell BabyCenter for $10 million, it
was clear by February 26, 2001, that eToys would not be able to
find a buyer for the company as a whole.  (Tr. 119:20-120:3; Dep.
[Schoch] 148:15-148:22, 149:5-149:11, 184:11-184:23)

87.  By February 26, 2001, eToys had no alternative than to file
for bankruptcy, and its Board of Directors authorized it to file
a chapter 11 bankruptcy petition.  (Ex. P-16 at 6; Ex. D-59 at
AOL 00349)

88.  On February 26, 2001, eToys began valuing its remaining
assets on a piecemeal basis in preparation for selling them in a
liquidation.  (Dep. [Schoch] 183:7-184:10)

89.  On that same day, eToys issued a press release announcing
that it would cease operations, close its website, wind down its
business and liquidate its assets because it had concluded that
"under any scenario, its outstanding liabilities, which totaled
approximately $274 million as of January 31, 2001, will
substantially exceed the value of any proceeds or assets that may
be received in a strategic transaction."  (PT Stip. at 2; Ex. D-
59 at AOL 00349; Dep. [Schoch] 183:7-184:23)

90.  AOL learned of eToys' intentions shortly after the press
release was issued.  (Tr. 55:1-55:11)

H.    Notice of Termination

91.  On February 28, 2001, AOL sent eToys a notice of termination
of the 1999 Agreement as authorized by section 5.6 of the 1999
Agreement.  (Tr. 57:3-57:5; PT Stip. at 2; Ex. P-1 at AOL 00207)

11

92. If eToys' banner and promotions continued to appear on AOL's website after eToys' website had shut down, AOL Members clicking on that banner would have seen a static splash page saying that eToys was no longer open and would not have received any of the services that eToys was obligated to provide under the 1999 Agreement. (Dep. [Lenk] 68:8-68:20; Tr. 55:18-56:14)

93. AOL was concerned that if there were continuing transactions between AOL Members and eToys after its announcement that it was going out of business, eToys would not have had the product or the necessary personnel to complete the sales and to ensure compliance with AOL's applicable merchant certification requirements. (Tr. 56:15-57:12; Dep. [Baig] 154:2-155:8, 163:15-164:15; Dep. [Lenk] 170:5-170:7)

94. AOL feared that AOL Members could have asserted that AOL was liable for any failure of eToys to meet its obligations. (Tr. 51:11-52:3; Dep. [Baig] 154:2-155:8, 163:15-166:17)

95. AOL had a finite amount of advertising space which it could sell on its system and the effect of the termination of the Amended Agreement with eToys was to free up advertising space which could be sold to other customers at potentially higher rates. (Dep. [Baig] 162:12-162:16; Dep. [Burger] 172:20-175:7; Dep. [Brine] 126:2-126:16)

I.    eToys' Bankruptcy and Sale of Assets

96. On March 7, 2001, eToys filed a voluntary petition under chapter 11 of the Bankruptcy Code. (PT Stip. at 3)

97. On the Petition Date, eToys also filed a motion seeking, inter alia, authority to auction the reorganized stock of eToys under a plan of reorganization or to sell substantially all its assets. (D.I. 19)

98. After renewed efforts to identify potential purchasers for its assets or stock, eToys held an auction on March 22, 2001, at which a bidder was tentatively selected, who ultimately withdrew its bid. (Ex. D-67 at 10)

99. On April 27, 2001, eToys filed a renewed motion to sell substantially all its assets (including inventory, plant, fixtures, intellectual property, and the right to solicit eToys' 3.4 million customers) to KB Consolidated, Inc., for $12.2 million. (Ex. D-68 at TR 000229; Ex. D-67; Ex. D-69; Ex. D-78 at TR 001887)

12

100. The sale to KB was approved by Order dated May 2, 2001.
(D.I. 279)

J.   Standard Tests of Solvency

101. There are three standard tests applicable to an analysis of
solvency:  the balance sheet test, the capital adequacy test, and
the cash flow test.  (Tr. 99:3-99:19)

102. The balance sheet test compares the fair value of a
company's assets to the company's debts to determine solvency.
(Tr. 99:4-99:9)

103. Application of the balance sheet test includes the following
steps:  (1) determine the appropriate premise of value to apply;
(2) determine the appropriate valuation methodology; (3)
construct a pro forma balance sheet; (4) analyze individual asset
categories and determine the fair value of assets; and (5)
compare the total value of the assets to the total debt to
determine whether or not the company is solvent as of the
transfer date.  (Tr. 103:5-103:16)

104. There are two alternative premises of value: a going concern
premise and a liquidation premise.  (Tr. 103:22-104:20)

105. There are standard factors for a valuation analyst to
consider in determining the appropriate premise of value: (1)
whether the company continued to make capital investments and
open new operating facilities during the relevant period; (2)
whether the company had access to capital and credit; (3)
whether management and the investment community were optimistic
about the company's prospects; (4) whether the company's
employment base was expanding; (5) whether there was a discovery
of material fraud; and (6) whether there was a loss of major
customers or vendors.  (Tr. 104:22-105:15, 109:25-111:2)

106. The capital adequacy test evaluates whether the company had
sufficient capital to fund operations for the foreseeable future.
(Tr. 99:10-99:15)

107. The cash flow test addresses whether the company had the
intent and ability to pay its debts as they matured.  (Tr. 99:16-
99:19)

13

K.   eToys' Solvency as of November 15, 2000, Amendment

1.   Balance Sheet Test

108. The going concern premise of value is the appropriate premise of value to apply in analyzing eToys' solvency as of the November 15 Amendment.   (Tr. 113:22-114:1)

109. From March to December 2000, eToys continued to make capital investments of nearly $100 million in property and equipment, including leasing a new headquarters and opening two new operating facilities from which it could ship products and provide customer service.  (Tr. 106:9-106:19; Dep. [Schoch] 112:23-114:7, 163:16-163:20)

110. eToys' full-time employees increased from 306 to more than 1,000 between March 1999 and December 2000.   (Tr. 109:18-109:24)

111. eToys' customer base increased from 1.7 million to 3.4 million between December 1999 and December 2000.  (Ex. D-78 at TR 001887)

112. eToys did not lose any major vendors before the November 15, 2000, Amendment.   (Tr. 110:14-111:2)

113. eToys had access to capital and credit during the relevant period: it raised $175.2 million at its initial public offering in May 1999, raised an additional $145 million through unsecured convertible notes in December 1999, raised $100 million more in June 2000 primarily from a preferred stock offering, and entered into a $40 million two-year revolving credit facility on November 15, 2000.  (Tr. 106:7-107:7; Ex. D-75 at TR 001534-36; Dep. [Schoch] 119:12-119:15, 124:24-126:02, 133:17-133:23; Dep. [Lenk] 187:18-189:7)

114. As of November 2000, eToys was able to pay its debts as they came due and expected to have sufficient cash to do so through the spring of 2001.  (Dep. [Lenk] 155:14-155:17, 161:2-161:5; Dep. [Schoch] 49:22-52:16)

115. In early fall 2000, eToys' management and the investment community had a positive view about eToys' long-term prospects and believed that the company was competitive.  (Tr. 108:2-108:23)

116. eToys' management felt it was a going concern at least through Thanksgiving 2000.  (Dep. [Schoch] 94:14-94:19, 96:4-96:11, 131:16-133:16)

14

117. On November 10, 2000, investment analysts at ABN-AMRO issued a report saying that eToys was well-positioned for a record holiday season in 2000.   (Tr. 108:24-109:10)

118. As of the Amendment date no material fraud had been uncovered at eToys. (Tr. 110:14-110:19; Dep. [Schoch] 153:23-154:4)

119. The fact that eToys had recurring operating losses does not, by itself, mean that the company was no longer a going concern. (Tr. 111:8-112:20)

120. Since its formation in 1997, eToys had experienced recurring operating losses, yet eToys' March 2000 audited financial statements did not contain any reservations about the company's ability to remain a going concern. (Tr. 111:12-111:16; Dep. [Schoch] 123:21-124:3)

121. As of October 30, 2000, eToys predicted that it would end the quarter with $100 to $120 million in cash, a better cash position than it had in September. (Tr. 112:7-112:13)

122. As of November 15, 2000, eToys had at least $80 million in working capital, which was sufficient to fund its continuing operations.   (Tr. 112:2-112:5)

123. Using the going concern premise of value, a pro forma balance sheet based on eToys' actual balance sheet as of September 30, 2000, adjusted to reflect eToys' operating results through November 15, 2000, appropriately takes into account eToys' cash equivalents, inventory, prepaid and other current assets, property and equipment, goodwill, intangible value, and other assets.   (Tr. 115:2-115:13)

124. In converting the book value of eToys' individual asset categories into fair market value, a conservative 21% upward adjustment is appropriate for the book value of eToys' inventory. (Tr. 115:24-116:2; Dep. [Schoch] 167:15-168:18)

125. No adjustment to the book value of cash, cash equivalents, prepaid expenses, and other current assets is appropriate.   (Tr. 118:5-118:12)

126. A 33% downward adjustment is appropriate for the book value of property and equipment, including software. (Tr. 118:13-119:1, 174:19-175:10)

127. It is appropriate to adjust the value of eToys' goodwill from $124 million to zero.   (Tr. 119:2-119:5)

15

128. It is appropriate to reduce the book value of eToys' other assets by 15%. (Tr. 119:6-119:13)

129. As of November 15, 2000, BabyCenter was a wholly owned subsidiary of eToys. (Tr. 119:14-119:16)

130. In converting the book value of BabyCenter into fair market value, it is appropriate to increase the book value of BabyCenter to $5 million, which is a reasonable portion of the sale price ($10 million) to ascribe to the intangible value of BabyCenter which had only $1 million in net tangible assets at the time of its sale. (Tr. 119:14-120:18)

131. It is appropriate, when conducting the balance sheet test, to make no adjustments to eToys' liabilities, but preferred stock should not be treated as debt. (Tr. 121:11-121:17)

132. Including the value of eToys' intangible assets, the fair value of its assets exceeded its debts by approximately $258 million on November 15, 2000. (Ex. D-81 at TR 001966; Tr. 121:1-121:3, 125:16-125:19; Dep. [Schoch] 49:14-49:21, 94:7-94:13, 100:14-100:25)

133. Even excluding the value of eToys' intangible assets, the total fair value of its other assets ($302.4 million) exceeded its debts ($287.2 million) by approximately $15.2 million as of November 15, 2000. (Tr. 121:18-122:8; Ex. D-83 at 15)

134. Thus, under the balance sheet test, eToys was solvent on the date of the Amendment because the fair value of its assets was greater than its total debts. (Tr. 125:10-126:6)

2. Capital Adequacy Test

135. eToys did not have unreasonably small capital at the time of the November 15, 2000, Amendment. (Tr. 122:9-122:22)

136. eToys' September 30, 2000, 10-Q report filed with the SEC stated that eToys had sufficient capital to fund its operations through June 2001. (Ex. D-76 at TR 001715)

137. eToys' capital position did not change materially between September 30 and November 15, 2000. (Tr. 122:24-123:4)

138. As of October 30, 2000, eToys expected to have more cash to fund operations on December 31, 2000, than it had on September 30, 2000. (Tr. 123:7-123:16)

16

139. eToys entered into a $40 million two-year revolving credit facility on November 15, 2000.   (Tr. 123:16-123:20)

140. The November 15 Amendment with AOL reduced eToys' debt obligations by nearly $10 million thereby increasing eToys' ability to fund future operations.   (Ex. P-3; Tr. 123:20-123:24)

141. Applying the capital adequacy test, eToys was solvent as of November 15, 2000.   (Tr. 122:15-122:22)

### 3.   Cash Flow Test

142. As of November 15, 2000, eToys was able to, and intended to, pay its debts as they came due.   (Dep. [Lenk] 56:25-57:3; Tr. 124:3-124:9)

143. Throughout November 2000, eToys was paying its debts as they came due.   (Dep. [Lenk] 63:5-63:7)

144. It did not become apparent until after the Thanksgiving weekend in 2000 that eToys would significantly miss hitting its sales targets for the holiday season.   (Dep. [Brine] 56:3-56:15)

145. As of November 15, 2000, eToys' current assets exceeded its current debts by $80 million.   (Tr. 124:10-124:15)

146. Applying the cash flow test, eToys was solvent as of November 15, 2000.   (Tr. 124:3-124:17)

147. The amount indicated in a company's accumulated deficit account is not relevant to an analysis of its solvency.   (Tr. 126:7-126:24)

148. The unsuccessful efforts of eToys to sell the company after December 15, 2000, are not relevant to its solvency as of November 15, 2000.   (Tr. 127:18-128:4)

### L.   eToys' Solvency as of Termination

149. As of February 28, 2001, eToys was insolvent.   EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

150. It is appropriate to use the liquidation premise of value in evaluating eToys' solvency as of February 28, 2001, because after December 2000: (1) eToys was not continuing to make any capital expenditures but was conserving its cash; (2) eToys was not able to access the capital or credit markets; (3) its management and the investment community were not optimistic and, in fact, were

17

voicing serious concerns about its ability to survive; (4) eToys was firing substantial numbers of its employees; and (5) its sales were vastly diminished from its projections. (Tr. 104:16-105:4, 110:6-111:25, 130:3-130:15; Dep. [Lenk] 169:6-169:15)

151. Using the liquidation premise of value, eToys' debts exceeded its liabilities. (Ex. D-83)

152. eToys did not have sufficient capital (or access to the capital markets) to fund its continuing operations as of February 28, 2001. (Ex. D-59)

153. Further, eToys did not have sufficient cash flow to continue to pay its debts as they came due as of February 28, 2001. (Ex. D-59)

M.     eToys' Remaining Rights on Termination

154. The value of the contract rights eToys lost as a result of the termination of the 1999 Agreement must be determined as of the date of the termination, February 28, 2001. (Tr. 100:5-100:17, 130:8-130:12)

155. The liquidation premise of value is appropriate in analyzing the value of eToys' remaining rights under the 1999 Agreement as of February 28, 2001. (Tr. 130:8-130:12)

156. If the rights under the 1999 Agreement were not legally transferable to a third party, the contract rights would have had zero value, as eToys - which was not operating - could not use them. (Tr. 143:25-145:1)

157. Even if the 1999 Agreement were transferable, it had minimal value.

158. Qualitative factors that would affect the value of eToys' contract rights at the date of termination include the state of the internet advertising industry, the state of the internet industry, general economic conditions, the number of buyers who would be interested in the contract rights at the time of termination, and the remaining term of the contract rights. (Tr. 134:24-135:6)

159. In 2000-2001, the rates at which viewers of impressions clicked through to access an advertiser's website declined from 2% to roughly 0.3% resulting in significant deflation in the prices charged for internet advertising. (Tr. 135:11-135:18)

18

160. The internet advertising market shrank by 7.8% during the first six months of 2001, relative to the same time period in 2000.  (Tr. 135:21-136:4)

161. Between January 2000 and February 2002, 806 internet firms ceased operations.  (Tr. 136:19-136:20)

162. eToys also cited the public's concerns over the general economic deterioration as one of the reasons that it had a disappointing 2000 holiday season.  (Ex. D-77 at TR 001868)

163. There was not a significant pool of potential buyers for eToys after the disappointing 2000 holiday season.  (Tr. 137:15-137:24)

164. Under a liquidation premise of value, it is appropriate to use the purchase price paid by KB in its acquisition of eToys' other assets in bankruptcy as an indicator of the value of eToys' rights under the 1999 Agreement.  (Tr. 139:3-139:5)

165. KB paid $3.35 million for eToys' intangible assets, i.e., its brand, its website, its intellectual property assets, and the right to solicit its 3.4 million customers.  (Tr. 139:11-139:14; Ex. D-68 at TR 000229; Ex. D-69)

166. An indicator of the difference in value between liquidation and going concern is provided by the reduction in value of eToys' intangible assets from $243 million as of November 15, 2000, to the $3.35 million paid by KB for those intangibles or a discount of 98.6%.  (Tr. 140:16-141:5)

167. In mid-2000, when it was a going concern, eToys valued its customer base at roughly $166 per customer times its 3.4 million customers for a value of $564 million.  (Tr. 139:23-140:3; Ex. D-78 at TR 001887)

168. If all of the KB purchase price of $3.35 million was for access to eToys' customer base, the value of that asset was 99.4% less in liquidation than as a going concern. (Tr. 140:4-140:15)

169. The holiday season was particularly important for eToys as it received roughly 70% of its business during that period.  (Tr. 84:18-84:19; Dep. [Burger] 74:23-75:10, 82:19-83:5; Dep. [Iannuccilli] 34:12-34:19; Dep. [Lenk] 32:21-33:16)

170. Only one holiday season remained under the 1999 Agreement at the time of termination so, for purposes of applying the liquidation discount scenarios, the adjusted going concern value of the 1999 Agreement would have been one third of the contract

19

price or $2.75 million.   (Ex. P-1; Tr. 137:25-138:11, 142:12-142:16)

171. Applying the liquidation discount of 99.4% or 98.6% derived from the KB sale price for eToys' intangibles evidences that eToys' remaining rights under the 1999 Agreement at the time of termination had a value of $16,500 to $38,500.   (Tr. 142:25-143:13)

172. Because eToys announced its intent to file a bankruptcy petition on February 26, 2001, any sale of its rights under the 1999 Agreement would have been subject to applicable provisions of the Bankruptcy Code.   (Ex. D-59 at AOL 00349; Tr. 144:17-145:1)

173. The internet was in its early stages at the time the 1999 Agreement was executed and AOL wanted its retail partners to be successful to prove that online retail was a viable and easy way of doing business, and because AOL had a direct financial interest in the success of retail partners such as eToys.   (Tr. 42:13-42:18; Dep. [Burger] 21:3-22:6)

174. In the late 1990s the unfamiliar nature of internet shopping made reliability an important issue for AOL in selecting merchant partners that would give its members a good shopping experience.   (Tr. 25:6-25:25)

175. At that time, AOL Members were nervous about using their credit card numbers on the internet and also held other trust and safety concerns about the online shopping experience.   (Tr. 26:1-26:4)

176. In order to provide good products and service to AOL Members in the shopping area, AOL sought to provide recognizable brands, good products, and good pricing.   (Tr. 25:10-25:17)

177. AOL viewed eToys as a desirable retailer on its website because it felt eToys had the particular resources and commitment to deliver a high quality experience in all aspects of commerce from product selection to site design, transaction process, customer service, great merchandising, a broader selection of products than other online toy retailers, great promotion, and excellent marketing ideas and enthusiasm.   (Ex. D-19 at AOL 00444; Ex. D-27 at AOL 01708-09; Ex. D-12 at AOL 00454)

178. During the 1999 holiday season Fortune Magazine had rated eToys first among the top 49 websites in an independent study of how internet retailers performed.   (Ex. D-29 at AOL 00753)

20

179. AOL would not have entered into the 1999 Agreement with any company other than eToys.  (Tr. 54:19-54:25)

180. At no point in 2001, either before or after eToys filed bankruptcy, did it contact AOL seeking to reverse the termination or to transfer the remaining services due to eToys under the 1999 Agreement to a third party.  (Tr. 57:11-57:22)

## II.  CONCLUSIONS OF LAW

### A.  November 15, 2000, Amendment

#### 1.  Fraudulent Conveyance under the Bankruptcy Code

1.   The version of section 548(a) of the Bankruptcy Code which is applicable to this case[3] establishes the requirements for avoiding a transfer as constructively fraudulent:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -

. . .
(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1) (2004).

2.   The plaintiff bears the burden of proving each of the requirements of section 548(a), including that (1) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof and (2) the debtor received less than reasonably

---

[3]   The amendments to section 548 contained in the Bankruptcy Abuse Prevention and Consumer Protection Act are not applicable.

App. 0021

equivalent value in exchange for such transfer. <u>BFP v. Resolution Trust Corp.</u>, 511 U.S. 531, 535 (1994); <u>Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)</u>, 92 F.3d 139, 144 (3d Cir. 1996).

3.    A company is solvent for purposes of section 548(a) if its assets, at fair valuation, exceed its liabilities.  11 U.S.C. § 101(32)(A).

4.    Solvency is assessed as of the date of the transfer sought to be avoided.  <u>R.M.L., Inc.</u>, 92 F.3d at 154.

5.    In evaluating the fair value of a company's assets for purposes of determining solvency, the appropriate premise of value must be applied:  either the going concern premise of value or the liquidation premise of value.  <u>Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)</u>, 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of the debtor's assets required choice between going concern and liquidation premises of value); <u>American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.)</u>, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

6.    The going concern premise of value will be applicable unless the company's bankruptcy is imminent.  <u>See, e.g.</u>, <u>Moody v. Sec. Pac. Bus. Credit, Inc.</u>, 971 F.2d 1056, 1067 (3d Cir. 1992) ("Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis.").  <u>Accord</u> <u>American Classic Voyages</u>, 367 B.R. at 508; <u>Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)</u>, 281 B.R. 535, 541 (Bankr. D. Del. 2002).

7.    The balance sheet test is a valid and accepted methodology for valuing a company's assets for purposes of determining solvency.  11 U.S.C. § 101(32)(A) ("'[I]nsolvent' means . . . financial condition such that the sum of such entity's debts is greater than all of such entity's property . . . .").  <u>See also</u>, <u>Peltz v. Hatten</u>, 279 B.R. 710, 743 (D. Del. 2002) ("While the [solvency] inquiry is labeled a 'balance sheet' test . . . . it is appropriate to adjust items on the balance sheet that are shown at higher or lower value than their going concern value and to examine whether assets of a company that are not found on its balance sheet should be included in its fair value."), <u>aff'd sub nom. In re USN Commc'ns, Inc.</u>, 60 Fed. Appx. 401 (3d Cir. 2003).

22

8.    The fair value of a company's intangible assets generally is included when applying the balance sheet test.  <u>Mellon Bank, N.A. v. Metro Commc'ns, Inc. (In re Metro Commc'ns, Inc.)</u>, 945 F.2d 635, 647 (3d Cir. 1991); <u>Schubert v. Lucent Technologies, Inc. (In re Winstar Commc'ns, Inc.)</u>, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (indicating that the balance sheet test may take into account value not "used to prepare a typical balance sheet" because it is "based upon a fair valuation and not based on [GAAP]") (citation omitted).

9.    Applying the balance sheet test as of November 15, 2000, eToys was solvent.  (FOF 108-34)

10.   The cash-flow test (also called the inability-to-pay-debts test) is an alternative solvency test, which assesses whether, at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B)(ii)(III).  <u>See also WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)</u>, 282 B.R. 343, 414-15 (Bankr. W.D. La. 2001) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured.").

11.   eToys was not insolvent on November 15, 2000, under the cash-flow test as it had not as of that date incurred, nor did it believe that it would incur, debts that would be beyond its ability to pay when they matured.  In fact, at that time eToys was paying its debts as they came due.  (FOF 142-48)

12.   A third test for solvency is the unreasonably small capital test, which analyzes whether at the time of the transfer the company has insufficient capital, including access to credit, for operations.  11 U.S.C. § 548(a)(1)(B)(ii)(II).  <u>See also</u> <u>Moody</u>, 971 F.2d at 1073 ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").

13.   eToys was also solvent on November 15, 2000, under the unreasonably small capital test because it retained sufficient capital for operations, including access to credit.  (FOF 135-41)

14.   Therefore, the Amendment did not constitute or result in an avoidable transfer under section 548.

## 2.   Fraudulent Conveyance under State Law

15.   Under section 544 of the Bankruptcy Code, a debtor may avoid any transfer of property of the estate that is voidable under applicable state law by certain creditors.   11 U.S.C. § 544.

16.   This case is governed by Virginia law (Ex. P-1 at AOL 00229) which provides that "[e]very gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law . . . by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made . . . ."   Va. Code Ann. § 55-81 (West 2003).   See also In re Meyer, 244 F.3d 352, 355 (4th Cir. 2001) (discussing valuation of consideration for purposes of avoidance action).

17.   "[S]light consideration, rather than 'fair' or 'reasonably equivalent' consideration, will suffice to save such a transfer from avoidance [under Virginia law] in the commercial context." In re Best Products Co., 168 B.R. 35, 52 (Bankr. S.D.N.Y. 1994), aff'd, 68 F.3d 26 (2d Cir. 1995).   See also C-T of Virginia, Inc. v. Euroshoe Assocs. Ltd. P'ship, No. 91-1578, 1992 WL 12307, at *2 (4th Cir. Jan. 29, 1992) (Virginia law "does not require [the transfer of] reasonably equivalent value.").

18.   The November 15, 2000, Amendment is not avoidable under Virginia law because eToys was solvent at that time and was not rendered insolvent by the Amendment.

### B.   Termination on February 28, 2001

#### 1.   Fraudulent Conveyance under the Bankruptcy Code

19.   eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.   EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 636 (Bankr. D. Del. 2006).

20.   There was a transfer of a property interest of eToys on termination of the 1999 Agreement.   EBC I, Inc., 356 B.R. at 637.

21.   eToys received nothing in exchange for the termination of the 1999 Agreement.

22.   Therefore, the termination is avoidable under section 548 of the Bankruptcy Code.

24

### a.   Value of Property Transferred

23.   Section 550 provides that where a transfer is avoided under section 548, the estate may recover the property transferred or the value of such property.   11 U.S.C. § 550(a)(1).

24.   Because the purpose of sections 548 and 550 is preservation of the estate for the benefit of creditors, the value of property transferred is determined from the perspective of the estate and the creditor body.   See, e.g., Metro Commc'ns, Inc., 945 F.2d at 648 ("The purpose of [section 548] is estate preservation . . . ."); Rochez Bros., Inc. v. Sears Ecological Applications Co., (In re Rochez Bros., Inc.), 326 B.R. 579, 588 (Bankr. W.D. Pa. 2005) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); 2 Collier Bankruptcy Manual ¶ 550.02[3] at 550-4 (Henry J. Sommer et al., eds., 3d ed. rev. 2007).

25.   Under sections 548 and 550, where property is not returned to the estate as a result of avoidance, but instead the value of the property is returned, the property transferred is valued as of the transfer date.   See, e.g., R.M.L., Inc., 187 B.R. at 463; Gennrich v. Montana Sport U.S.A. (In re International Ski Service, Inc.), 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990) (noting that under section 550 courts generally agree that the property should be valued at the time of transfer) (citation omitted).

### i.   Value to eToys

26.   When a corporation's failure and bankruptcy are imminent at the time of a transfer sought to be avoided under section 548, application of the liquidation premise of value is appropriate in determining the fair value of the property transferred.   See, e.g., Rochez Bros., Inc., 326 B.R. at 588-89 (rejecting a going concern premise of value for avoided transfer of road salt because, absent the transfer, the salt "would merely have been subjected to the same forced liquidation sale that the Debtor ultimately conducted" and thus the appropriate section 550(a) value was the "forced sale" price); Active Wear, Inc. v. Parkdale Mills, Inc., 331 B.R. 669, 672 (W.D. Va. 2005) (holding that value under section 550 means "fair market value" and that fair market value in the liquidation context "refers to the value that the debtor/bankrupt could receive for the property in a liquidation sale.").

27.   Given eToys' dire financial condition in February 2001, eToys would have been unable to enjoy any benefit from the 1999 Agreement even if it had not been terminated.   (FOF 79-89)

28.   Under Virginia law, eToys' announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of eToys under the 1999 Agreement and the Amendment that were material to AOL.   (FOF 34-39, 92-94)

29.   Because eToys had no further ability to benefit from any performance by AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

### ii.   Transferability to Third Party

### 1.   Executory Contract

30.   An executory contract is "a contract under which the obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."   See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); 3 Collier on Bankruptcy ¶ 365.02[1] at 365-17 n.1 (Lawrence P. King et al., eds., 15th ed. rev. 2000).

31.   In determining whether remaining obligations under a contract are material, applicable state law determines the consequences of breach.   See Terrell v. Albaugh (In re Terrell), 892 F.2d 469, 471-72 (6th Cir. 1989) ("[F]ederal law defines the term executory contract but . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.") (citation omitted).

32.   In Virginia, contracts that form a relationship in the nature of a business partnership, where mutual obligations are expected to be continuous and ongoing, are executory contracts. See, e.g., Broyhill v. DeLuca (In re DeLuca), 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (applying Virginia law and holding that an operating agreement governing a limited liability company was an executory contract); RW Power Partners v. Virginia Elec. & Power Co., 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (contract was executory since the parties both owed to each other obligations a material breach of which would have "'deprive[d] the injured party of the benefit that the party justifiably expected from the exchange.'" (quoting Farnsworth on Contracts § 8.16)); Horton v. Horton, 487 S.E. 2d. 200, 204 (Va. 1997) (holding that a material breach is one where "failure to perform [the contractual terms] defeats an essential purpose of the contract.").

33.  The 1999 Agreement was an executory contract as of February 28, 2001.  (FOF 16-41, 92-95)

## 2.  Assignability

34.  Pursuant to section 365(c) of the Bankruptcy Code, a debtor may not assume or assign an executory contract if applicable state law excuses a party to the contract (other than the debtor) from accepting performance from or rendering performance to an entity other than the debtor.  11 U.S.C. § 365(c)(1)(A-B).

35.  Under Virginia law, a contract is not assignable if the identity of the contracting parties is material to the ongoing performance of the contract.  See, e.g., Stone Street Capital, Inc. v. Granati (In re Granati), 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001) ("[C]ontract rights are freely assignable unless the identity of the contracting parties is material."), aff'd, 307 B.R. 827 (E.D. Va. 2002); In re DeLuca, 194 B.R. at 77 (holding that an operating agreement governing a limited liability company was unassignable, since "the identity of the managers [of the company was] material to the very existence of the company.").

36.  Under Virginia law, the identity of a party is material to the performance of a contract if the contract is founded on one of the parties maintaining trust or confidence in the ability to perform, judgment, or business experience of the other party. See, e.g., duPont de-Bie v. Vredenburgh, 490 F.2d 1057, 1060 (4th Cir. 1974) ("[E]xecutory contracts for personal services or involving a relationship of confidence are not assignable."); McGuire v. Brown, 76 S.E. 295, 297 (Va. 1912) (contract not assignable because the seller of certain real property "was prompted to enter into th[e] contract . . . by her confidence in [the counter-party's] judgment, ability, opportunity . . . and perhaps other considerations which then appeared sufficient."); Epperson v. Epperson, 62 S.E. 344, 346 (Va. 1908) ("[E]xecutory contract[s] for personal service, founded on personal trust or confidence, [are] not assignable.").

37.  The AOL-eToys business relationship was founded on AOL's trust and confidence in eToys' unique attributes, as well as its ability and experience, all of which were relevant to eToys' ability to assure AOL that eToys would adequately serve and protect the interests of AOL Members as set forth in the 1999 Agreement.  (FOF 16-41, 92-95, 173-79)

38.  Under Virginia law, AOL would not have been required to accept performance under the 1999 Agreement from any party other

27

than eToys, and the 1999 Agreement therefore was not assumable or assignable under section 365(c) of the Bankruptcy Code.

39.   Because eToys had announced prior to February 28, 2001, that it would cease operations and file bankruptcy, because all of eToys' assets (including its contracts and contract rights) would be liquidated in that bankruptcy proceeding, and because it was not assignable under section 365(c), the 1999 Agreement had no value as of that date.  Cf. Allan v. Archer-Daniels-Midland Co. (In re Commodity Merchants), 538 F.2d 1260, 1263 (7th Cir. 1976) ("The trustee argues . . . that the cancellation [of the contracts] deprived [the debtor] of its property right to resell the contracts.  If the contracts had been freely transferable, perhaps we could agree . . . ."); In re Bellanca Aircraft Corp., 850 F.2d 1275, 1285 (8th Cir. 1988) (holding that conditional right of assignment effectively precluded assignment of contract and therefore compelled the conclusion that the contract had no value).

40.   Even if eToys' remaining rights under the 1999 Agreement as of February 28, 2001, were transferable to a third party, their value was no more than $16,500 to $38,500.  (FOF 164-71)

41.   The substantial loss in the value of eToys' rights under the 1999 Agreement between November 15, 2000, and February 28, 2001, was caused by eToys' financial collapse and the deterioration of the internet industry and the economy generally during that time. (FOF 155-62)

42.   No award of pre-judgment interest is appropriate, because the property transferred had no value and there is no evidence that AOL acted in bad faith in terminating the 1999 Agreement. See, e.g., In re Hechinger Inv. Co. of Delaware Inc., 489 F.3d 568, 579-80 (3d Cir. 2007) (holding that pre-judgment interest may be denied so long as a sound reason is given); Bellanca Aircraft Corp., 850 F.2d at 1281 (stating that awards of pre-judgment interest are discretionary).

### 2.   Fraudulent Transfer under State Law

43.   eToys was insolvent as of February 28, 2001, the date AOL terminated the 1999 Agreement.  EBC I, Inc., 356 B.R. at 636.

44.   There was a transfer of a property interest of eToys when the 1999 Agreement was terminated.  EBC I, Inc., 356 B.R. at 637.

45.   Under Virginia law, the eToys announcement in February 2001 that it would shut down its website and cease operations constituted a material breach of numerous ongoing obligations of

28

eToys under the 1999 Agreement and the Amendment that were material to AOL.  (FOF 34-39)

46.  Because eToys had no further rights to performance from AOL under the terms of the 1999 Agreement, based on eToys' own actions and circumstances, the 1999 Agreement had no further value to eToys as of February 28, 2001.

47.  Because the 1999 Agreement had no value to eToys on that date, there is no recovery the estate may have for any fraudulent transfer under Virginia law.

Dated: January 10, 2008          BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

29

# App. 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .      Case No. 01-706 - 01-709 (MFW)
                                .      Adv. No. 03-50003 (MFW)
                                .
ETOYS, INC., et al.,            .
                                .      824 Market Street
                                .      Wilmington, Delaware 19801
                                .
        Debtors.               .      June 26, 2007
. . . . . . . . . . . . . . .          9:30 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES:

For the Debtors:           Morris, Nichols, Arsht & Tunnell
                           By:   THOMAS BRIGGS, ESQ.
                                 RICHARD ALLEN, ESQ.
                           1201 North Market St.
                           Wilmington, DE 19899

For AOL, Inc.:             Connolly Bove Lodge & Hutz, LLP
                           By:   KAREN BIFFERATO, ESQ.
                           1220 Market Street
                           Wilmington, DE 19899

                           Wilmer Cutler Pickering Hale & Dorr
                           By:   JAMES WRATHALL, ESQ.
                                 MICHAEL SNYDER, ESQ.
                           1875 Pennsylvania Avenue
                           Washington, DC 20006

Audio Operator:            Sherry Johnson

Proceedings recorded by electronic sound recording, transcript
                   produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

App. 0030

# I N D E X

| WITNESSES FOR THE DEFENDANT | PAGE |
|---|---|

**SUSAN BURGER**
Direct Examination by Mr. Wrathall            20
Cross Examination by Mr. Allen               58
Redirect Examination by Mr. Wrathall         83

**ROBERT HUTCHINS**
Direct Examination by Mr. Wrathall           91
Cross Examination by Mr. Briggs             148
Redirect Examination by Mr. Wrathall        173

| EXHIBITS | EV |
|---|---|

1 through 26    Documents                     19
1 through 82    Documents                    179
83    Illustrative aid                       178
84    List of information resources          178

App. 0031

1  Q    Can you explain generally what that entailed?

2  A    I worked with partners at the time to do deals and then

3  manage them after they were signed.

4  Q    What was your next position with AOL after being director

5  of business development and partner relations?

6  A    I became an executive director of -- oh, I'm sorry.   I

7  went to the interactive marketing group at AOL in January of

8  1997.

9  Q    What was your position there?

10 A    Director of account services.

11 Q    And what did that group do?

12 A    We were a group that was established to work with

13 interactive marketing partners who had signed agreements with

14 us to build relationships and implement deals and optimize the

15 deals to make them work.

16 Q    You mentioned partners.  What kind of partners are we

17 talking about?

18 A    They were companies that provided either assets that would

19 display on the AOL service or content or partners that were in

20 our shopping channel.

21 Q    You use the word optimize and you said make the deals

22 work.  Can you tell us what you mean by that?

23 A    Well, the Internet was an online in general was a

24 fledgling place.  So everybody was trying to figure out how to

25 make online work.  So people would sign interactive marketing

1  agreements with us and we would work with them to make sure the
2  placements ran where they were supposed to run and make sure
3  things were tracking and to make adjustments to make it work
4  out for the partner.
5  Q   Were there particular industries that you were responsible
6  for during the time period from 1999 to 2001?
7  A   At that time my team was managing retailers and travel
8  partners.
9  Q   Was eToys one of the retailers that was in that group?
10  A   Yes.
11  Q   Were you personally involved in the AOL/EToys
12  relationship?
13  A   Yes.
14  Q   Can you tell us what your role was with that?
15  A   I managed a team of folks who worked on that business on
16  the day-to-day, but I had side management responsibilities.
17  Q   Let me then turn back to a broader topic which is AOL's
18  overall business in this time frame of the late 1990's.  What
19  business was AOL in at that time?
20  A   AOL was an Internet service provider.
21  Q   Who were AOL's customers?
22  A   Our customers were people across the country who wanted to
23  get online.  Who paid a monthly fee for access to America
24  Online.
25  Q   And what did the customers get out of having access to

1 America Online?

2  A    They would get the ability to, through their computer, get
3  online to the AOL service and then through the service to the
4  Internet at large.

5  Q    Were there other services associated with that beyond just
6  the access?

7  A    There was -- in addition to the access there was also the
8  content.  So people would come to us for channels or categories
9  of information like news or entertainment, sports, shopping.

10 Q    What exactly was shopping?

11 A    Shopping was a little bit different than news or
12 entertainment or information.  It was an area in which people
13 could come to look at products, compare products, buy things.
14 So it was different than going to sports and looking up an
15 article on a sports team.  It was more meant to help people buy
16 products that they were interested int.

17 Q    Do you recall approximately the monthly fee that AOL
18 members were paying at this time?

19 A    It was approximately $20 a month.

20 Q    Did AOL provide the content in shopping itself or did it
21 have other arrangements to provide those?

22 A    AOL -- the content in shopping was different as I was
23 saying than the other channels because it was provided through
24 third party retailers.

25 Q    And in terms of AOL's revenues -- strike that.  The

1 relationship with the third party retailers what was the
2 financial arrangement there?

3 A    The third party retailers paid to be in the shopping area
4 -- paid AOL to be in the shopping area.  But the members did
5 not pay separately to go to that shopping channel.

6 Q    That was part of their monthly subscription?
7 A    Yes.

8 Q    Can you give us an approximate breakdown in this time
9 period in the late 1990's of what proportion of AOL's revenues
10 were generated from subscription fees on the one hand and the
11 revenues from partners on the other?

12 A    I would say it was 80 percent or greater came from
13 subscription revenues and the rest came from partner revenues.

14 Q    You indicated that your group was involved in supporting
15 the partners in these arrangements.  Beyond those efforts did
16 AOL spend money in marketing to expand its own customer base?
17 A    It was a real time of growth so yes, AOL did a lot of
18 marketing.  We distributed disc to get people to sign up for
19 the AOL service.  And a lot of other advertising, primarily
20 intrusional things TV and radio and less online was less
21 established then.

22 Q    Did a lot of people sign up for AOL service at that point?
23 A    Yes.

24 Q    Do you have an approximate number of how many people were
25 AOL members at that time period?

1  A    I'd say somewhere in the neighborhood of 20 million
2  members.

3  Q    Were those costs, say those marketing costs, passed along
4  to the shopping partners or were those incurred by AOL?

5  A    They were incurred by AOL.

6  Q    In entering into these deals with third party partners to
7  branch for shopping, what were AOL's objectives with respect to
8  AOL members?  What things was AOL trying to provide in that
9  shopping experience?

10 A    AOL was trying to provide good service to our members.  So
11 where shopping was concerned we were looking to provide a
12 friendly place where people could see brands that they knew and
13 recognized and good products and good pricing and a good
14 experience for shopping.  At the time the Internet was just
15 starting out.  So people getting on the Internet to shop was a
16 little foreign and so we were trying to make it as much like
17 the real world as we could given that it was online.

18 Q    Was reliability an issue with shopping partners?

19 A    Yes.

20 Q    Can you explain that?

21 A    Well, we wanted to make sure that people had a good
22 experience because it was a reflection on the AOL service.  So
23 if somebody came into shopping and bought something and had a
24 bad experience then it reflected a little bit on AOL not just
25 the retailer.

1  Q    Were there any issues associated with trust and safety for

2  AOL members in the shopping experience?

3  A    Yes.  At the time people were concerned about shopping on

4  line, primarily putting their credit card on the Internet.

5  Q    This business, I take it, wasn't entirely online, it was a

6  virtual business.  Is that right?

7  A    Yes.

8  Q    And is there any analogy that you draw to the physical

9  world in thinking about AOL's business at that point?

10 A    It would be like a shopping mall.

11 Q    Can you elaborate on how that would be true?

12 A    Well, a shopping mall is a physical place where there are

13 anchored stores, big stores, well known brands like a Sears or

14 a Penneys that draw people in, but there are also specialty

15 boutiques that sell maybe just women's clothing or just

16 children's clothing.  So online we tried to do the same thing,

17 but with the benefits of it being online.  To do things that

18 you could do online that you couldn't do in a physical mall.

19 So in our shopping it was a mall you would come to and then you

20 would go through the mall based on the kind of products you

21 were looking for.  So you could go in and just look at flowers,

22 gifts and candy, or could go in and look at, you know, just

23 sporting goods or what have you.

24 Q    And how would partners like eToys participate in the

25 online mall?

1  A    They would buy placement in that mall.  So that if you

2  went to the toys category you would see all of the folks that

3  had -- all of the retailers that were in the toys category.

4  Q    You mentioned placements.  Can you tell us exactly what

5  placements were in these transactions?

6  A    They would be an area where the retailers' logo or

7  promotion, an asset would appear on the page.

8  Q    Did AOL and the partners also use the term impression in

9  this context?

10  A   Yes.

11  Q   What exactly is an impression?

12  A    An impression is when you're looking at the AOL service or

13  an Internet page and you basically view -- what you're viewing

14  is an impression.

15  Q   Is there an analogy to that in the mall scenario?

16  A    It would be if you're in the mall and you walk by

17  Nordstrom's that would be an impression.

18  Q   How did AOL use this concept of impressions in its

19  agreement with marketing partners?

20  A    We would estimate the amount of impressions we thought

21  that a partner would get by having a certain placement, and we

22  would document those and put those in the agreement.

23  Q   What was the purpose of doing that?

24  A    Because the retailers were paying us for placement we had

25  to have a way of estimating what they were buying, and

Burger - Direct/Wrathall                    28

1 measuring and tracking what we were delivering against what was
2 in the agreement.

3 Q    Beyond having somebody walk by the store was there an
4 additional point to having an impression for the merchant
5 partners?

6 A    Yes.  Because like in a physical mall you want somebody to
7 walk into Nordstrom's not just pass by.  So online that would
8 be called the click through.  So someone sees the page, sees a
9 retailer's placement and click on it to go to their site.

10 Q    And what would that result in, hopefully?

11 A    That would result hopefully in a sale.

12 Q    Was there any particular rate at which impressions would
13 result in click throughs and sales?

14 A    Could you repeat the questions?

15 Q    Yes.  Generally speaking was the rate at which impressions
16 would result in click throughs and sales standard or was that
17 variable?

18 A    Variable.

19 Q    What did it depend on?

20 A    It depended on the strength of the brand and it depended
21 on the quality of the product, the pricing of the product, the
22 customer service.

23 Q    In your relationship with marketing partners did they
24 attempt to quantify the value that they were receiving from
25 being part of the online AOL mall?

**J&J COURT TRANSCRIBERS, INC.**

Burger - Direct/Wrathall                              29

1  A    Yes.

2  Q    What types of ways did they do that?

3  A    At that time we had partners evaluating based on just did

4  they get the impressions, or how many click throughs did they

5  get.  And sometimes we had retailers that were more focused on

6  the return and investment.  And that could be cost per order,

7  it could be gross sales, it could be costs for acquiring a

8  customer.  There were a number of different metrics.

9  Q    Let's talk about eToys for a second.  Do you remember a

10 person by the name of Peter Brian at eToys?

11 A    Yes.

12 Q    What was his position at eToys?

13 A    He was the marketing manager or director.

14 Q    Did you interact with Mr. Brian in the context of the

15 marketing partnership with eToys?

16 A    Yes.

17 Q    Mr. Brian gave his deposition in this case, and I'm going

18 to play you a couple of clips from that that addressed this

19 question of how eToys valued its relationship with AOL and then

20 I'll ask you a couple of questions about that.

21                     (Deposition clip playing)

22 Q    Did you have discussions with eToys in this time frame of

23 the late 1990's about the cost per sale analysis of value in

24 the contract?

25 A    Yes.

1 placements in whatever area was determined to be exclusive.

2 Q    Was that an attribute of the 1999 eToys agreement?

3 A    They had a form of exclusivity called premier children's

4 products provider or something like that.

5 Q    There's also reference in the documents to a media plan or

6 a carriage plan.  What is that?

7 A    That is the schedule of placements by placement line item.

8 Q    And what relevance was that to these partnerships?

9 A    The partners would work with us and they would tell us

10 where they wanted to have their placements and we would go back

11 and forth and agree on the schedule for the media plan.

12 Q    What I would like to do next is turn to some documents and

13 move to the actual relationship with eToys in the time period.

14 First, starting with defendant's Exhibit 1.  This is a press

15 release dated November 18, 1997 entitled "eToys announces

16 multimillion dollar agreement with America Online."  Were you

17 part of the team working with eToys as of this date?

18 A    Yes.

19 Q    And do you recall the deal that's referred to in this

20 press release?

21 A    Yes.

22 Q    Was this the first agreement between AOL and eToys?

23 A    Yes.

24 Q    And do you remember, was eToys' website new at this point?

25 A    Yes.

1  Q    Going into the body of the press release, and in
2  particular a comment from Mr. Bob Pittman president and CEO of
3  AOL networks.  "eToys' decision to team with us also
4  demonstrates AOL's ability to bring the best values in
5  cyberspace to Internet and online shoppers."  From your
6  perspective was that an important aspect of the partnership
7  with eToys?

8  A    Yes.

9  Q    How so?

10 A    Well, we were building a shopping menu online and so we
11 wanted to bring the best partners that we could that had the
12 best products, the best pricing so that we could provide value
13 for our members' monthly fees.

14 Q    Further on in the press release it says that eToys is the
15 only online toy retailer to provide a comprehensive selection
16 of nationally advertised and specialty toy brands.  Did you
17 believe that that statement was true at that time?

18 A    Yes.

19 Q    Looking at defendant's Exhibit 4.  It's an email, now in
20 February 9, 1999, and it's from M. Tolasko to Peter at
21 eToys.com and you're cc'd on this email.  Do you know whose
22 email address Peter at eToys.com is?

23 A    Yes.

24 Q    Who's that?

25 A    Peter Brian.

**J&J COURT TRANSCRIBERS, INC.**

Burger - Direct/Wrathall                                    36

1  Q    That's the same marketing director that you were
2  discussing earlier?

3  A    Yes.

4  Q    Can you tell us what the context of this email was?

5  A    We had a meeting to review the performance of eToys' deal
6  with us.

7  Q    Why were you having that meeting, do you remember?

8  A    We, on a regular basis met with our marketing partners to
9  check in and make sure that things were working.

10 Q    And further in the email there's a series of bullets
11 called key take aways the first of which says, "eToys key
12 metric for success is cost per order." Is cost per order
13 different than impressions, then, is that what we're
14 concluding?

15 A    Yes.

16 Q    Where it says eToys is eager to pursue additional
17 promotional opportunities both online and offline, was that
18 true in your experience working with eToys?

19 A    Yes.

20 Q    Moving on to defendant's Exhibit 5, this is now an email
21 May 12th 1999 forwarding another email with the subject
22 AOL/EToys proposal. Can you tell us, do you recall what the
23 context of this email was?

24 A    It's a -- can you go back up to the top? It's about the
25 new deal they were interested in signing with us.

Burger - Direct/Wrathall                    37

1  Q    What was the new deal?

2  A    It was a deal that would have followed the deal we had.

3  Q    So you had one contract in place beginning in 1997, is

4  that right?

5  A    Yes.

6  Q    And was this going to be an additional, a new contract?

7  A    I believe it would have superceded the one we had.

8  Q    In the body of the email Mr. Brian says, "As we've

9  expressed on many occasions we have no problem doing a $20

10 million deal with AOL, however the value must be there."  Then

11 he says at the bottom, "We are very excited about doing a big

12 deal with AOL both in terms of dollar figures and AOL eToys

13 integration."  Did people from eToys express to you at that

14 time in this time period why they were interested in doing a

15 big deal with AOL?

16 A    Yes.

17 Q    What were they saying?

18 A    They were trying to establish their brand and online

19 store.  So they were trying to get as many people as possible

20 to come and shop at the store.

21 Q    You mentioned the eToys brand.  What were they saying

22 about that?

23 A    They were competing against other toy retailers that were

24 stores like Toys R Us, and so they were trying to compete, but

25 whereas Toys R Us had stores they were only online.  So they

1 were trying to establish themselves with AOL's member base.

2 Q    Looking at Exhibit 10 an email from Peter Brian to you

3 dated July 27, 1999. And let me just, because it's a long

4 detailed email, just a couple of sentences I want to ask you

5 about. The first sentence of the email says, "per my

6 conversation with Mary yesterday we want to test everything."

7 Can you tell us what your understanding of that sentence was

8 when you received this email?

9 A    On the media plan there were many different line items.

10 And eToys was very interested in testing every placement, every

11 line item. So they wanted to test different kinds of creative,

12 they wanted to -- I mean, different kinds of creative to help

13 with click through, but also different kinds of creative that

14 not only resulted in click through, but also a sale. So they

15 were very thorough about their testing of assets and offers and

16 things like that.

17 Q    Further down in the email at the top of the fifth

18 paragraph Mr. Brian says, "Bottom line is no one knows what is

19 going to work in this space." Would you have agreed with that

20 statement in July 1999?

21 A    Yes.

22 Q    The exhibit is defendant's Exhibit 12. This is a few days

23 later, date July 30, 1999. And it's at the top, being sent to

24 you. Is that right?

25 A    Yes.

Burger - Direct/Wrathall                                      39

1  Q    It's forwarding a draft eToys press release.  Is that
2  right?

3  A    Yes.

4  Q    Do you recall reviewing this draft press release at this
5  time?

6  A    Yes.

7  Q    Do you know why a draft press release was being prepared
8  at this time?

9  A    We were about to sign and then announce the deal, the new
10 deal with eToys.

11 Q    Was this the deal that ultimately was the August 10, 1999
12 interactive marketing agreement?

13 A    Yes.

14 Q    Looking more closely at the press release, the draft press
15 release.  In the second, call that section, Toby Lenk has a
16 sentence.  Do you remember Toby Lenk from this time period?

17 A    Yes.

18 Q    What was his position?

19 A    He was president of eToys.

20 Q    And he says, "This deal builds significantly on that
21 relationship and advances our strategic objective of becoming a
22 dominant children's brand in the next century."  Was that your
23 understanding of eToys' objective at the time?

24 A    Yes.

25 Q    Further down there's a quote that was going to be

**J&J COURT TRANSCRIBERS, INC.**

1  attributed to Bob Pittman president and CEO of AOL Networks
2  saying, "Our goal is to continue making the shopping experience
3  across AOL's family of brands as easy, convenient and valuable
4  as possible." In your position from account services group did
5  you believe that this eToys contract was in furtherance of that
6  goal?

7  A    Yes.

8  Q    Defendant's Exhibit 16 is an agenda for something called a
9  kickoff meeting August 24, 1999. Do you recall that meeting?

10 A    Yes.

11 Q    Can you please tell us what that meeting was about?

12 A    We did kickoff meetings after we signed big agreements
13 with partners because we wanted to get all of the players that
14 would be participating in implementing and making the deal
15 successful. So we would talk about what would make it
16 successful and the various components of the deal.

17 Q    What was your role with respect to this meeting?

18 A    I think I led this meeting.

19 Q    There's lists in the agenda of the different attendees of
20 the meeting. Do you remember whether everybody attended in
21 person or some people attended by phone?

22 A    I think many people attended in person. There might have
23 been one or two that attended by phone.

24 Q    Do you have any recollection of whether this list
25 constitutes the people that actually attended the meeting?

1 A    It should have been.  Our practice was to put the
2 attendees on the agenda.

3 Q    Going on to what is defendant's Exhibit 18, this is a
4 series of Power Point slides that is called eToys and AOL
5 partnership kickoff meeting August 24, 1999.  Did you have a
6 role with respect to these slides?

7 A    Yes.

8 Q    What was that?

9 A    I probably reviewed them.  Someone on my team probably
10 prepared them.

11 Q    Did you use them at the meeting?

12 A    Yes.

13 Q    Let me stop and focus on the word "partnership."  Why were
14 you using the word partnership in connection with your
15 relationship with eToys at this point?

16 A    We viewed these marketing companies as partners because we
17 were trying to work with them to make these agreements work.
18 So it was beyond us to just providing services or impressions.
19 It was about making it work.  So in that way we thought of
20 ourselves as being a partnership with the companies we did
21 deals with.

22 Q    Turning to the fifth page of the presentation called
23 partnership objectives, the third bullet says, "Provide AOL
24 members with best of breed children's retail shopping
25 experience, merchandise and product offers.  What does that

1  phrase, "best of breed," mean?

2  A    It means the best practices in the space at the time in

3  the Internet space.

4  Q    To be clear, was AOL looking to eToys to provide that best

5  of breed practices?

6  A    Yes.

7  Q    Going on to Page 6 of the presentation called the

8  partnership assets.  And the last bullet on this page says,

9  "Commitment to our mutual success."  Was AOL committed to the

10  mutual success in this relationship?

11  A    Yes.

12  Q    Can you tell us more about that?

13  A    As I said, the Internet was just getting started and so we

14  needed -- in shopping in particular we needed our retail

15  partners to be successful, and eToys wanted us to be successful

16  because then we would have more members to bring to their

17  store.  And we were trying to prove the space.  We were trying

18  to prove that you could do retail online.

19  Q    Now, this was a very long presentation.  Remember, turning

20  back to the agenda, how long the meeting went?

21  A    I would have -- I don't remember exactly.  I'd have to

22  guess.  A couple of hours.

23  Q    A couple of hours.  And going then back to the --

24           MR. ALLEN:  Jim, excuse me.

25           MR. WRATHALL:  Yes.

1        MR. ALLEN:  Your Honor, I want to make a relevance
2   objection.

3        THE COURT:  All right, please remain seated so the --
4        MR. ALLEN:  Oh, I'm sorry.

5        THE COURT:  -- you can be picked up.  But you may
6   object.  Yes, relevance?

7        MR. ALLEN:  Well, Mr. Wrathall, the last three
8   exhibits he used, which I think are 12, 16, and 18, are all
9   documents to which we stated a relevance objection among other
10  objections.  And frankly we did it because when I saw the
11  documents, I had no idea what the relevance was to the
12  remaining issues.  Having now heard testimony on it, I really
13  don't see the relevance of any of this to the issues before the
14  Court.  It seems to me it goes beyond what he described in his
15  opening statement as giving, you know, factual context based on
16  assumptions underlying the agreement.

17       On the other hand if the Court wants to permit it,
18  then I just ask to have standing objection to it.

19       THE COURT:  All right.  I'll permit a little leeway.
20  I don't think we need to get into as much detail perhaps as we
21  are.  But I'll allow some leeway and you can have your standing
22  relevance objection.

23       MR. WRATHALL:  Might I address the objection, Your
24  Honor?

25       THE COURT:  No.

Burger - Direct/Wrathall                    44

1    MR. WRATHALL:  I just -- so it would be clear that
2  the relevance of this testimony --
3    THE COURT:  Well, I'll allow you to go ahead --
4    MR. WRATHALL:  Okay, thank you, Your Honor.
5    THE COURT:  -- and see if you can establish it
6  through the testimony.
7    MR. WRATHALL:  Thank you, Your Honor.
8  Q    Moving onto, I believe, the 54th page of this
9  presentation, the -- these are -- what are these that are
10  showing up on this page?
11  A    Those are mockups of promotions that we were planning to
12  do in the holiday season.
13  Q    Were these promotions that were potentially going to
14  involve eToys?
15  A    Yes.
16  Q    There's one particular promotion -- we've got an image of
17  it -- called Santa's Homepage.  Just by way of example to
18  illustrate the relationship, what -- can you please tell the
19  Court exactly how Santa's Homepage was envisioned at this
20  point?
21  A    So, during holiday, it would have been -- it was an area
22  that kids could go to within the AOL service, and go to see the
23  content around holiday, and Christmas, and Santa.
24  Q    What role did eToys have in that?
25  A    eToys as part of their agreement was going to have

Burger - Direct/Wrathall                                          45

1  placement in something called "Tour of Toys".

2  Q    Did that relate to the Santa's Homepage?

3  A    It was one of the links off of "Planned" within the area.

4                              (Pause)

5  Q    Let me go briefly to Defendant's Exhibit 27, I'm moving

6  along here.  And this is an analyst report that was issued by

7  Goldman Sachs dated November 10, 1999 on eToys.  And I want to

8  draw your attention to a section of the Santa's report that

9  says, "Value proposition, eToys rises above other kid

10 retailers."  It says in the middle, "eToys continue to improve

11 the customer experience on its easy to use website.  The

12 company has developed the best online merchandising techniques

13 which we think will be a key differentiator among winners and

14 losers."  At this time point, would you have agreed with this

15 report's understanding of what eToys was offering in the

16 market?

17 A    Yes.

18 Q    And then moving onto Defendant's Exhibit 29 -- this is a

19 press release dated, February 22nd, 2000.  Do you recall that

20 you received this press release at the time?

21 A    Yes.

22 Q    It says, "eToys named top overall website of 1999 Holiday

23 Season."  What was your reaction to that?

24 A    We thought it was great because it -- because eToys was

25 within AOL shopping, that their experience was recognized as

**J&J COURT TRANSCRIBERS, INC.**

1 and other content contained therein will rank among the top
2 three interactive sites operating principally in the toys
3 industry on the World Wide Web in the following categories."
4 And they list some categories. From your perspective, what was
5 the significance of this operating requirement applicable to
6 eToys?

7 A     Because they had the premier children's product provision
8 in their contract, we wanted them to be the best in the online
9 space in terms of pricing and their product selection and
10 customer service.

11 Q     Going back to Section 2.7 which established the obligation
12 for operating standards. Further in, in the seventh line down
13 towards the end, it says, "AOL will have the right in addition
14 to any other remedies available to AOL hereunder to decrease
15 the promotion it provides to MP until such time as MP corrects
16 noncompliance with the operating standards." Was there -- what
17 -- do you have a sense of what the reason was, why AOL might
18 need to decrease promotions if there was noncompliance with the
19 operating standards?

20 A     So if a partner's website went black for instance -- say,
21 if they had a server problem and they had an issue or something
22 like that, we might be allowed to not serve those impressions
23 to them because, again, we were protecting the member's
24 experience. They pay money to come to our service. And if
25 we're taking them to sites that are not working, then that's

Burger - Direct/Wrathall                              52

1 not good.  So, if they aren't adhering to the operating
2 standards, then, you know, we want to give them some incentive
3 to do that.

4 Q   Do you recall generally what other kinds of operating
5 standards you cared about at that time?  And I can put that
6 section up.

7 A   In general, I -- so --

8 Q   Let me be more specific.

9 A   Yeah.

10 Q   There's a section in the operating standards that's
11 called, "Security".  What was the -- what was the significance
12 of that?

13 A   We were -- because the Internet was -- one of the
14 obstacles for people buying things on the Internet was that
15 they were afraid to put their credit card information.  They
16 were afraid somebody could hack in or steal it.  And so,
17 because our members were going to retailer sites such as eToys,
18 we wanted to make sure that they had taken the steps on their
19 end to make sure that it was safe and that member's credit card
20 information wouldn't be stolen.

21 Q   Going on to Appendix -- see if I'm going to get lost now
22 -- sorry.  Exhibit E, "Standard Online Commerce Terms and
23 Conditions" and specifically to the 15th of those conditions.
24 You can blow that up.  It's called, "Kids and Teens Policy."
25 Can you tell us what the Kids and Teens Policy was?

**J&J COURT TRANSCRIBERS, INC.**

Burger - Direct/Wrathall                          53

1  A     The Kids and Teens Policy were -- was a different policy
2  than for adults that were on the AOL service.  And the Kids and
3  Teens Policy was designed to protect children and teenagers
4  from being misled by what they saw on AOL or on the Internet.
5  So we had specific guidelines for what was acceptable and not
6  acceptable for placements -- partner placements that showed up
7  in the areas that were deemed to be kids or teens.

8  Q     Was that provision significant to you in your relationship
9  with eToys?

10 A     Yes, eToys had some placements in kids areas.

11 Q     Going on to Exhibit G, "Standard Legal Terms and
12 Conditions" and to the third such term, "Trademark License".
13 "For purposes of designing and implementing the materials and
14 subject to the provisions contained herein, AOL hereby grants
15 MP a nonexclusive license."  And it relates to the AOL
16 trademark and name, service marks -- did eToys use the AOL name
17 and service marks in the context of the agreement with AOL?

18 A     Yes, I believe they did.

19 Q     How so?

20 A     They were doing advertising in print and on TV.  And so
21 they -- we were encouraging our marketing partners to use their
22 AOL keyword.  So, if somebody was watching the television or
23 reading something in a magazine and they saw an add for eToys,
24 they couldn't do anything necessarily about that to go to the
25 store.  So, it was a -- the key word was a shortcut.  So, it

**J&J COURT TRANSCRIBERS, INC.**

Burger - Direct/Wrathall                        54

1  said, "AOL" and then the key word so that you could come to

2  the AOL service and then go right to eToys. And so that

3  license provision is giving them the ability to use our name

4  and our trademark in that context.

5  Q    Further down, there's a Paragraph 13, "Collection and Use

6  of User Information". It imposes a requirements that the MP

7  shall ensure that its collection, use, and disclosure of

8  information obtained from AOL users under this agreement

9  complied with certain requirements relating to privacy and

10 disclosure. Did eToys collect and use information from AOL

11 users?

12 A    Yes.

13 Q    From your perspective, what was the significance of their

14 requirement here restricting their use of that user

15 information?

16 A    It was aimed at protecting the AOL member's privacy, so

17 -- about their name, where they live, their mailing address,

18 what they purchased.

19 Q    Okay. To summarize then, in light of all the attributes

20 of eToys and the way that you're working together and what they

21 brought to the table that you discussed as well as the nature

22 of the agreement, I'd like to ask you whether you believe that

23 in this 1999, 2000 time frame, would AOL have done this deal

24 with any company other than eToys?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

1 | Q    In the early 2001 time frame, did you come to understand

2 | that eToys was facing financial problems?

3 | A    In the early --

4 | Q    Early 2001 time frame.

5 | A    Yes.

6 | Q    When did -- did you in fact here that they were going to

7 | be going out of business?

8 | A    Yes.

9 | Q    Do you recall approximately when you first came to learn

10 | that?

11 | A    February of 2001.

12 | Q    I'm going to play a deposition clip from Toby Lenk.  You

13 | said earlier he was the CEO of eToys, correct.

14 | A    I think I made a mistake and said he was president.  But

15 | he was CEO.

16 | Q    Okay.  Thank you.

17 |              (Deposition of clip from Toby Lenk played.)

18 | Q    Can you tell us what a static splash page is?

19 | A    That would have been a page that popped up, I think, over

20 | their site that said whatever messaging you wanted on the

21 | static web page.  So, in their case that they were going out of

22 | business.

23 | Q    Then finally, let me refer you to Defendant's Exhibit 59

24 | which is a press release that was issued by eToys dated

25 | February 26, 2001 indicating that "eToys today announced that

1  it plans to file for protection under federal bankruptcy laws

2  within approximately the next five to ten days."

3       And in the third paragraph in the last sentence, it

4  says, "The company anticipates that it will close the eToys.com

5  website on or about March 8, 2001.  And thereafter the company

6  will focus solely on the winding down of its business and

7  liquidation of its assets."  Would Mr. Lenk's testimony about a

8  static splash page and this press release saying that eToys.com

9  website would be closed -- what would be the impact of those

10 events with respect to AOL and its members?

11 A    Well it would not be a good experience if someone came to

12 AOL, came to shopping, went to the toys section, clicked on

13 eToys, and basically went to a business or a shop that was out

14 of business.

15 Q    And with respect to customer service, if eToys stopped

16 providing any customer service, would that have had an impact

17 on AOL and its members?

18 A    Yes.  I think our concern would have been around would

19 -- if they were doing any transactions at all, if they were

20 letting people buy at all in a limited capacity, would they be

21 -- would they have the product, would they still have the

22 people to be able to fulfill the product in the -- you know, to

23 the standard that they had before or to a good customer service

24 standard anyway, and would there be issue with returns or

25 things like that.  So, it went to the whole experience that the

Burger - Direct/Wrathall                57

1  AOL member would have through a store that, you know, we

2  couldn't really tell what their service level would be.

3  Q    Do you recall what AOL's response was to learning this

4  information?

5  A    Our legal folks drafted a termination of the contract.

6  Q    And what practically speaking occurred with respect to the

7  eToys placements -- well, let me restate the question.  After

8  the contract was terminated, were eToys' placements displayed

9  further on the AOL site in that immediate time period?

10 A    No.

11 Q    In your recollection at this point around February 26th,

12 did anybody at eToys to your knowledge contact AOL and say, we

13 got a valuable asset here with you.  We'd like to work out a

14 mechanism to try and transfer to a third party?

15 A    No.

16 Q    To your knowledge either before or after the bankruptcy

17 filing, in this time period of the spring of 2001, did anybody

18 associated with the bankruptcy estate contact AOL and say, we

19 need to unterminate this contract and get these rates because

20 we think they're valuable and we want to try and work out a way

21 to provide those to another party?

22 A    No.

23          MR. WRATHALL:  I have nothing further for the moment.

24                    (Pause)

25               CROSS EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

# App. 3

ˈ Subj: Fwd: eToys release
Date: 7/30/99 4:42:28 PM Pacific Daylight Time
From: DStaley
To:    BurgerSH
Sent on:  AOL 4.0 for Windows 95 sub 14



pls help  tx
----------

Forward Verified: Sat Jul 31 13:02:52 1999
Subj:  eToys release
Date:  7/30/99 10:53:02 AM Pacific Daylight Time
From: WendyG229
To:    ELKeller, GregRigdon, YangBness, Bankoff, DStaley
To:    Pegfry, KyleJ111, Mitchbrown
Sent on:  AOL 4.0 for Windows 95 sub 22

All, below please find a draft eToys release. They put the original together, not us, and framed it as an eToys-alone release rather than a joint release; we usually do that for small partners but for deals of this size we could offer a joint release to them if you think it would make them happy.

My one concern here is that I haven't gotten any feedback on whether or not they are allowed to call themselves the "Premier Retailer of Children's Products" -- I need to know what the deal is on that front ASAP because this has real partner implications and is not a battle that should be fought on the Communcations front.

Please review and let me know your thoughts, comments, etc. Thanks.

### eToys Signs $18 Million Marketing Agreement with America Online

**3-Year Deal Names eToys as Premier Retailer of Children's Products in Shop@ AOL, Shop @AOL.COM, Shop ·@CompuServe and Shop @Netscape Online E-Commerce Destinations; eToys Expects Agreement To Drive Over 1 Billion eToys Consumer Impressions**

SANTA MONICA, Calif., (Date, 1999) - eToys Inc. (Nasdaq:ETYS), the leading Internet retailer of children's products, today announced it is extending and expanding its cornerstone marketing relationship across several America Online, Inc. brands through a three-year, $18 million deal that names eToys as the premier retailer of children's products on AOL.
                        *department*
Under the agreement, eToys gains key positioning in the Toys, Educational Toys, Kids & Baby Gear, Hobbies and Collectibles and Electronic Games categories of the new Shop @ AOL, Shop @ CompuServe, Shop @ AOL.COM and Shop @Netscape online shopping destinations. eToys will also be the exclusive provider of products promoted in the Toys, Video, and Video Games categories of AOL's Holiday and Birthday Wish Lists of AOL's "Kids Only" Channel and will be highly visible in the Books and Magazines, Music and Video, and Software departments.
                        *shopping*
Overall, eToys said it expected to generate over one billion consumer impressions through the life of the deal by having eToys prominently placed at locations through AOL, which has over 17 million members, and on other AOL, Inc. brands.  **I don't know if I like this...ok with you guys or not?**

The agreement represents a significant expansion of a 1997 marketing agreement between AOL and eToys, and ensures that two of the online world's most highly regarded brands will continue their strong working relationship.  For eToys, the AOL agreement is a linchpin of its accelerated online marketing efforts and will complement a full range of offline initiatives intended to aggressively drive eToys' brand awareness with current and prospective customers.

"We've enjoyed a high-impact relationship with AOL since our company was launched two years ago," said Toby Lenk chief executive officer of eToys.  "This deal builds significantly on that relationship and advances our strategic objective of becoming a dominant children's brand in the next century."

"Our goal is to continue making the shopping experience across AOL's family of brands as easy, convenient and valuable as possible," said Bob Pittman, president and CEO of AOL Networks. "We're pleased to renew and expand our agreement with eToys, which has shown that it offers top-notch products and customer service to AOL members and will now be able to offer them to CompuServe members and visitors to AOL.COM and Netscape as well."

CONFIDENTIAL

AOL 00454

App. 0060

DX0012-0001



DEFENDANT'S
EXHIBIT
12

Subj: Fwd: eToys release
Date: 7/30/99 4:42:28 PM Pacific Daylight Time
From: DBtaley
To: BurgerBH
Sent on: AOL 4.0 for Windows 95 sub 14

pls help fr

Forward Verified: Sat Jul 31 13:02:32 1999
Subj: eToys release
Date: 7/30/99 10:23:02 AM Pacific Daylight Time
From: WendyG228
To: ELKeller, Greglingdon, YangBonzai, Bankall, DBadey
To: Pegfry, KyleJ111, Mitchbrown
Sent on: AOL 4.0 for Windows 95 sub 22

All, below phone find a draft eToys release. They put the original together, not us, and framed it as an eToys-store
release rather than a joint release; we usually do that for small partners but for deals of this size we could offer a
joint release to them if you think it would make them happy.

My one concern here is that I haven't gotten any feedback on whether or not they are allowed to call themselves the

## eToys Signs $18 Million Marketing Agreement with America Online

### 3-Year Deal Names eToys as Premier Retailer of Children's Products in Shop@ AOL, Shop @AOL.COM, Shop @CompuServe and Shop @Netscape Online E-Commerce Destinations; eToys Expects Agreement To Drive Over 1 Billion eToys Consumer Impressions

SANTA MONICA, Calif., (Date, 1999) - eToys Inc. (Nasdaq:ETYS), the leading Internet retailer of children's products, today announced it is extending and expanding its cornerstone marketing relationship across several America Online, Inc. brands through a three-year, $18 million deal that names eToys as the premier retailer of children's products on AOL.

Books and Magazines, Music and Video, and Software departments

Overall, eToys said it expected to generate over one billion consumer impressions through the life of the deal by having eToys prominently placed at locations through AOL, which has over 17 million members, and on other AOL, Inc. brands. I don't

"We've enjoyed a high-impact relationship with AOL since our company was launched two years ago," said Toby Lenk chief executive officer of eToys. "This deal builds significantly on that relationship and advances our strategic objective of becoming a dominant children's brand in the next century."

"Our goal is to continue making the shopping experience across AOL's family of brands as easy, convenient and valuable as possible," said Bob Pittman, president and CEO of AOL Networks. "We're pleased to renew and expand our agreement with eToys, which has shown that it offers top-notch products and customer service to AOL members and will now be able to offer them to CompuServe members and visitors to AOL.COM and Netscape as well."

CONFIDENTIAL                    AOL 00454

App. 0061



**About eToys**

Based in Santa Monica, California, eToys Inc. (www.etoys.com; AOL keyword: eToys) is a leading Internet retailer for children's products, carrying more than 100,000 items, including both nationally advertised and specialty toys, software, videos, music, video games, books and baby-oriented products. By combining this extensive selection, an attractive, easy-to-use Web site and excellent customer service, eToys offers consumers a unique one-stop source for children's products. Through its wholly owned subsidiary, BabyCenter, Inc. (www.babycenter.com), eToys offers Webby-award winning content and community for new and expectant parents.

CONFIDENTIAL

**AOL 00455**



DX0012-0002

# App. 4

ETYSQ 297862104 2623267 OTC Common stock
View Price Change...
Security Has Not Traded For 1128 Days

U.S. Dollar
Split / Spinoff - Adjusted

| Date | Volume | Open | High | Low | Close | Amount Change | Return | Cumulative Return | Market Cap |
|---|---|---|---|---|---|---|---|---|---|
| 02-Aug-1999 | 187,200 | | 39.875 | 38.000 | 39.000 | -0.938 | -2.3 | -49.1 | 4033.41471 |
| 03-Aug-1999 | 383,300 | | 39.250 | 36.500 | 38.000 | -1.000 | -2.6 | -50.4 | 3929.99382 |
| 04-Aug-1999 | 651,300 | | 37.750 | 32.500 | 33.250 | -4.750 | -12.5 | -56.6 | 3438.744593 |
| 05-Aug-1999 | 1,063,800 | | 33.625 | 28.500 | 33.125 | -0.125 | -0.4 | -56.7 | 3425.816981 |
| 06-Aug-1999 | 303,300 | | 35.938 | 31.000 | 33.000 | -0.125 | -0.4 | -56.9 | 3412.88637 |
| 09-Aug-1999 | 425,800 | | 33.500 | 29.000 | 30.000 | -3.000 | -9.1 | -60.8 | 3102.6267 |
| 10-Aug-1999 | 645,000 | | 31.250 | 28.125 | 30.500 | 0.500 | 1.7 | -60.2 | 3154.337145 |
| 11-Aug-1999 | 1,022,300 | | 33.250 | 29.125 | 31.375 | 0.875 | 2.9 | -59.0 | 3244.830424 |
| 12-Aug-1999 | 962,000 | | 34.125 | 31.000 | 33.750 | 2.375 | 7.6 | -55.9 | 3490.455038 |
| 13-Aug-1999 | 676,200 | | 38.000 | 35.000 | 36.875 | 3.125 | 9.3 | -51.8 | 3813.645319 |
| 16-Aug-1999 | 479,000 | | 39.000 | 35.125 | 36.063 | -0.813 | -2.2 | -52.9 | 3729.615946 |
| 17-Aug-1999 | 1,129,300 | | 40.688 | 36.063 | 40.250 | 4.188 | 11.6 | -47.4 | 4162.690823 |
| 18-Aug-1999 | 2,763,000 | | 48.750 | 43.000 | 45.188 | 4.938 | 12.3 | -41.0 | 4673.331467 |
| 19-Aug-1999 | 1,526,200 | | 48.188 | 39.500 | 40.000 | -5.188 | -11.5 | -47.8 | 4136.8356 |
| 20-Aug-1999 | 974,900 | | 45.625 | 41.000 | 45.625 | 5.625 | 14.1 | -40.4 | 4718.578106 |
| 23-Aug-1999 | 753,200 | | 48.000 | 46.000 | 46.875 | 1.250 | 2.7 | -38.8 | 4847.854219 |
| 24-Aug-1999 | 771,800 | | 48.000 | 44.625 | 47.063 | 0.188 | 0.4 | -38.5 | 4867.345636 |
| 25-Aug-1999 | 440,900 | | 47.875 | 45.000 | 46.063 | -1.000 | -2.1 | -39.8 | 4763.824746 |
| 26-Aug-1999 | 877,000 | | 49.875 | 45.375 | 45.750 | -0.313 | -0.7 | -40.2 | 4731.505718 |
| 27-Aug-1999 | 374,600 | | 48.313 | 44.875 | 45.875 | 0.125 | 0.3 | -40.1 | 4744.433329 |
| 30-Aug-1999 | 401,400 | | 47.500 | 45.125 | 45.688 | -0.188 | -0.4 | -40.3 | 4725.041912 |
| 31-Aug-1999 | 661,700 | | 46.500 | 40.625 | 43.500 | -2.188 | -4.8 | -43.2 | 4498.808715 |



Source: Factset Research Systems, IDC/Exshare and Reuters Global Fundamentals

TR 001965

App. 0063

**Desc:** Table: eToys, Inc. Share Price Trading and Volume, August 1999
**First Page ID:** DX0080-0001
**Current Page ID:** DX0080-0001

*Page 1 of 1*

DX0080-0001




DX0080-0001

# Price History - IDC / Exshare
## eToys, Inc. (ETYSQ)



| Date | Volume | Open | High |
|------|--------|------|------|
| 02-Aug-1999 | 187,200 | | 39.875 |
| 03-Aug-1999 | 383,300 | | 39.250 |
| 04-Aug-1999 | 651,300 | | 37.750 |
| 05-Aug-1999 | 1,063,800 | | 33.625 |
| 06-Aug-1999 | 303,300 | | 35.938 |
| 09-Aug-1999 | 425,800 | | 33.500 |
| 10-Aug-1999 | 645,000 | | 31.250 |
| 11-Aug-1999 | 1,022,300 | | 33.250 |
| 12-Aug-1999 | 962,000 | | 34.125 |
| 13-Aug-1999 | 676,200 | | 38.000 |
| 16-Aug-1999 | 479,000 | | 39.000 |
| 17-Aug-1999 | 1,129,300 | | 40.688 |
| 18-Aug-1999 | 2,763,000 | | 48.750 |
| 19-Aug-1999 | 1,526,200 | | 48.188 |
| 20-Aug-1999 | 974,900 | | 45.625 |

Source: Factset Research Systems, IDC/Exshare and Reuters Global Fundamentals



TR 001965

App. 0064

# App. 5 (Part 1)



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

## 10-Q

FORM 10-Q
Filed on 08/14/2000 -- Period: 06/30/2000
File Number 000-25709

DEFENDANT'S
EXHIBIT
75

GSI

www.gsionline.com

TR 001525

App. 0065



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

--------------------------

FORM 10-Q

QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarter ended JUNE 30, 2000          Commission file number 000-25709

--------------------------

ETOYS INC.
(Exact name of registrant as specified in its charter)

DELAWARE                                        95-4633006
(State or other jurisdiction of              (I.R.S. Employer
incorporation or organization)               Identification No.)

3100 OCEAN PARK BLVD., SUITE 300
SANTA MONICA, CALIFORNIA 90405
(Address of principal executive offices, zip code)

Registrant's telephone number, including area code: (310) 664-8100

--------------------------

    Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes /X/  No / /

122,004,411 shares of $0.0001 par value common stock outstanding as of July 31,
2000

Page 1 of 40
Exhibit Index on Page 40

TR 001526

App. 0066


DX0075-0002

eTOYS INC.

FORM 10-Q

FOR THE QUARTER ENDED JUNE 30, 2000

INDEX

|  | PAGE |
|---|---|
| PART I--FINANCIAL INFORMATION | |
| Item 1. Consolidated Financial Statements................ | 3 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations................ | 13 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk..................................... | 36 |
| PART II--OTHER INFORMATION | |
| Item 1. Legal Proceedings............................... | 37 |
| Item 2. Changes in Securities and Use of Proceeds......... | 37 |
| Item 3. Defaults upon Senior Securities.................. | 37 |
| Item 4. Submission of Matters to a Vote of Security Holders...................................... | 37 |
| Item 5. Other Information............................... | 37 |
| Item 6. Exhibits and Reports on Form 8-K................ | 38 |
| Signatures................................................ | 39 |
| Exhibit Index............................................. | 40 |

2

TR 001527

App. 0067



PART I--FINANCIAL INFORMATION

ITEM 1. CONSOLIDATED FINANCIAL STATEMENTS

### eTOYS INC.

#### CONSOLIDATED STATEMENTS OF OPERATIONS

(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | QUARTER ENDED JUNE 30, | |
|  | 2000 | 1999 |
|  | (UNAUDITED) | (UNAUDITED) |
| Net sales................................................. | $ 24,862 | $ 7,975 |
| Cost of sales............................................. | 19,415 | 6,457 |
| Gross profit.............................................. | 5,447 | 1,518 |
| Operating expenses: | | |
| Marketing and sales.................................... | 29,603 | 11,573 |
| Web site and technology................................ | 12,526 | 4,835 |
| General and administrative............................. | 7,500 | 2,956 |
| Goodwill amortization.................................. | 8,490 | 80 |
| Deferred compensation amortization..................... | 3,109 | 3,782 |
| Total operating expenses............................. | 61,228 | 23,226 |
| Operating loss........................................... | (55,781) | (21,708) |
| Other income (expense): | | |
| Interest income........................................ | 1,809 | 944 |
| Interest expense....................................... | (2,985) | (18) |
| Provision for taxes...................................... | -- | (1) |
| Net loss................................................. | (56,957) | (20,783) |
| Accretion of discount and dividends on preferred stock...... | (2,506) | -- |
| Net loss applicable to common shareholders.................. | $(59,463) | $(20,783) |
| Basic and diluted net loss per common share................. | $ (0.49) | $ (0.32) |
| Shares used in computation of basic and diluted net loss per common share........................................... | 121,534 | 65,959 |

See accompanying notes.

3

TR 001528

App. 0068


DX0075-0004

eTOYS INC.

CONSOLIDATED BALANCE SHEETS

(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

|  | JUNE 30, 2000 | MARCH 31, 2000 |
|---|---|---|
|  | (UNAUDITED) |  |
| **ASSETS** |  |  |
| Current assets: |  |  |
| Cash and cash equivalents.................................. | $ 162,145 | $139,627 |
| Inventories............................................... | 52,500 | 60,309 |
| Prepaids and other current assets......................... | 17,552 | 14,350 |
| Total current assets...................................... | 232,197 | 214,286 |
| Property and equipment.................................... | 102,671 | 60,717 |
| Accumulated depreciation and amortization................. | (9,152) | (6,229) |
|  | 93,519 | 54,488 |
| Goodwill (net of accumulated amortization of $34,276 and $25,786 at June 30, 2000 and March 31, 2000, respectively)............................................. | 135,979 | 142,828 |
| Other assets.............................................. | 13,315 | 13,556 |
| Total assets.............................................. | $ 475,010 | $425,158 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |
| Current liabilities: |  |  |
| Accounts payable.......................................... | $ 33,547 | $ 32,422 |
| Accrued expenses.......................................... | 7,730 | 10,789 |
| Current portion of long-term notes payable and capital lease obligations....................................... | 7,977 | 6,090 |
| Total current liabilities................................. | 49,254 | 49,301 |
| Long-term notes payable and capital lease obligations....... | 12,550 | 10,471 |
| Long-term convertible subordinated notes.................... | 150,000 | 150,000 |
| Series D Redeemable Convertible Preferred Stock; $.0001 par value, 10,000 shares authorized; 10,000 and none issued and outstanding at June 30, 2000 and March 31, 2000, respectively............................................. | 74,075 | -- |
| Commitments and contingencies |  |  |
| Stockholders' equity: |  |  |
| Common stock; $.0001 par value, 600,000,000 shares authorized; 121,962,257 and 121,214,105 issued and outstanding at June 30, 2000 and March 31, 2000, respectively............................................. | 12 | 12 |
| Additional paid-in capital................................ | 504,028 | 476,529 |
| Receivables from stockholders............................. | (1,817) | (1,817) |
| Deferred compensation..................................... | (32,370) | (37,082) |
| Accumulated other comprehensive loss...................... | (806) | (1,803) |
| Accumulated deficit....................................... | (279,916) | (220,453) |
| Total stockholders' equity................................ | 189,131 | 215,386 |
| Total liabilities and stockholders' equity................. | $ 475,010 | $425,158 |

See accompanying notes.

4

TR 001529

App. 0069



eTOYS INC.

CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY

(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | RECEIVABLES FROM STOCKHOLDERS | DEFERRED COMPENSATION | ACCUMULATED OTHER COMPREHENSIVE LOSS | ACCUMULATED DEFICIT |
|---|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | | | | | |
| Balance at March 31, 2000..... | 121,334,105 | 812 | $496,529 | $(11,817) | $(39,082) | $(1,803) | $(230,433) |
| Exercise of stock options and warrants........... | 356,059 | -- | 278 | -- | -- | -- | -- |
| Issuance of common stock under Employee Stock Purchase Plan........... | 143,493 | -- | 968 | -- | -- | -- | -- |
| Common stock issued for acquisition of eParties Inc. ........... | 250,000 | -- | 1,661 | -- | -- | -- | -- |
| Deferred compensation, net of cancellations........... | -- | -- | (1,603) | -- | 1,603 | -- | -- |
| Amortization of deferred compensation........... | -- | -- | -- | -- | 3,209 | -- | -- |
| Beneficial conversion feature from issuance of Series D Redeemable Convertible Preferred Stock........... | -- | -- | 10,000 | -- | -- | -- | -- |
| Issuance of warrants to purchase common stock in connection with the Series D Redeemable Convertible Preferred Stock offering........... | -- | -- | 15,055 | -- | -- | -- | -- |
| Dividends on Series D Redeemable Convertible Preferred Stock........... | -- | -- | 354 | -- | -- | -- | (354) |
| Accretion of discount on Series D Redeemable Convertible Preferred Stock........... | -- | -- | -- | -- | -- | -- | (1,363) |
| Comprehensive loss: | | | | | | | |
| Net loss........... | -- | -- | -- | -- | -- | -- | (56,957) |
| Net unrealized gain on investments........... | -- | -- | -- | -- | -- | 1,529 | -- |
| Foreign currency translation loss........... | -- | -- | -- | -- | -- | (533) | -- |
| Comprehensive loss........ | | | | | | | |
| Balance at June 30, 2000..... | 121,962,357 | 812 | $504,020 | $(11,817) | $(35,270) | $ (806) | $(289,106) |

| | TOTAL |
|---|---|
| Balance at March 31, 2000..... | $214,381 |
| Exercise of stock options and warrants........... | 278 |
| Issuance of common stock under Employee Stock Purchase Plan........... | 968 |
| Common stock issued for acquisition of eParties Inc........... | 1,661 |
| Deferred compensation, net of cancellations........... | -- |
| Amortization of deferred compensation........... | 3,209 |
| Beneficial conversion feature from issuance of Series D Redeemable Convertible Preferred Stock........... | 10,000 |
| Issuance of warrants to purchase common stock in connection with the Series D Redeemable Convertible Preferred Stock offering........... | 15,055 |
| Dividends on Series D Redeemable Convertible Preferred Stock........... | -- |
| Accretion of discount on Series D Redeemable Convertible Preferred Stock........... | (1,363) |
| Comprehensive loss: | |
| Net loss........... | (56,957) |
| Net unrealized gain on investments........... | 1,529 |
| Foreign currency translation loss........... | (533) |
| Comprehensive loss........ | (55,958) |
| Balance at June 30, 2000..... | $189,111 |

See accompanying notes.

5

TR 001530

App. 0070



eTOYS INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

(IN THOUSANDS)

| | QUARTER ENDED JUNE 30, | |
|---|---|---|
| | 2000 | 1999 |
| | (UNAUDITED) | (UNAUDITED) |
| **OPERATING ACTIVITIES** | | |
| Net loss.................................................... | $ (56,957) | (20,783) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation............................................. | 2,961 | 314 |
| Amortization of intangibles.............................. | 9,050 | 189 |
| Deferred compensation amortization related to stock options........................................... | 3,109 | 3,782 |
| Other, net............................................... | -- | 3 |
| Changes in operating assets and liabilities: | | |
| Inventories............................................ | 7,809 | (5,950) |
| Prepaids and other current assets...................... | (2,001) | (2,005) |
| Accounts payable....................................... | 1,727 | 8,947 |
| Accrued expenses....................................... | (3,082) | 1,216 |
| Net cash used in operations................................ | (37,384) | (14,287) |
| **INVESTING ACTIVITIES** | | |
| Capital expenditures for property and equipment........... | (41,487) | (3,302) |
| Proceeds from the sale of property and equipment.......... | 4,936 | -- |
| Other, net................................................ | -- | (2,330) |
| Net cash used in investing activities..................... | (36,551) | (5,632) |
| **FINANCING ACTIVITIES** | | |
| Net proceeds from issuance of Series D Redeemable Convertible Preferred Stock............................. | 97,788 | -- |
| Proceeds from issuance of common stock and exercise of stock options................................................ | 1,242 | 176,074 |
| Payments on notes payable and capital leases............. | (2,054) | (85) |
| Proceeds from receivables from stockholders.............. | -- | 107 |
| Net cash provided by financing activities................. | 96,976 | 176,096 |
| Effect of foreign exchange rate changes on cash.......... | (523) | -- |
| Net increase in cash and cash equivalents................. | 22,518 | 156,177 |
| Cash and cash equivalents at beginning of period......... | 139,627 | 20,173 |
| Cash and cash equivalents at end of period............... | $ 152,145 | $176,350 |
| Supplemental disclosures: | | |
| Income taxes paid........................................ | $     -- | $     1 |
| Interest paid........................................... | $  5,003 | $    18 |
| Notes payable and capital lease obligations incurred..... | $  6,021 | $ 3,864 |

See accompanying notes.

6

TR 001531

App. 0071



DX0075-0007

eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(UNAUDITED)

1. ACCOUNTING POLICIES

UNAUDITED INTERIM FINANCIAL INFORMATION

The consolidated financial statements as of June 30, 2000 and 1999 have been prepared by eToys Inc. ("the Company") pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). These statements are unaudited and, in the opinion of management, include all adjustments (consisting of normal recurring adjustments and accruals) necessary to present fairly the results for the periods presented. The balance sheet at March 31, 2000 has been derived from the audited financial statements at that date. Certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been omitted pursuant to such SEC rules and regulations. Operating results for the quarter ended June 30, 2000 are not necessarily indicative of the results that may be expected for the fiscal year ending March 31, 2001. These consolidated financial statements should be read in conjunction with the audited financial statements and the accompanying notes included in the Company's Annual Report on Form 10-K for the fiscal year ended March 31, 2000.

Certain prior-period balances have been reclassified to conform to the current-period presentation.

CASH AND CASH EQUIVALENTS

All highly liquid investments with maturities of three months or less at the date of purchase are considered to be cash equivalents and are carried at cost plus accrued interest, which approximates fair value.

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated.

FOREIGN CURRENCY TRANSLATION

The functional currency of the Company's foreign subsidiary is the local currency. Assets and liabilities of the foreign subsidiary are translated into U.S. dollars at the period end exchange rates, and revenues and expenses are translated at average rates prevailing during the periods presented. Translated adjustments are included in accumulated other comprehensive loss, a separate component of stockholders' equity. Transaction gains or losses arising from transactions denominated in a currency other than the functional currency of the entity involved, which have been insignificant, are included in the consolidated statements of operations.

USE OF ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

7

TR 001532

App. 0072



eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(UNAUDITED)

1. ACCOUNTING POLICIES (CONTINUED)
COMPREHENSIVE LOSS

As of April 1, 1999, the Company adopted Statement of Financial Accounting Standards No. 130, Reporting Comprehensive Income, which establishes standards for the reporting and display of comprehensive loss and its components in the financial statements. Comprehensive loss is composed of net loss, net unrealized gains or losses on investments and foreign currency translation adjustments. Comprehensive loss was $56.0 million and $20.8 million for the quarters ended June 30, 2000 and 1999, respectively.

NET LOSS PER COMMON SHARE

Basic and diluted net loss per common share is computed by dividing net loss applicable to common shareholders, which consists of net loss less accretion of discount and dividends on preferred stock, by the weighted average number of common stock shares outstanding during each period. Shares associated with stock options and the Series A, B, C and D Redeemable Convertible Preferred Stock are not included because they are antidilutive. Effective upon the closing of the Company's initial public stock offering in May 1999, the shares of Series A, B and C Redeemable Convertible Preferred Stock automatically converted into common stock and are included in the calculation of the weighted average number of shares as of that date.

The following table sets forth the computation of basic and diluted net loss per common share for the periods indicated (in thousands, except per share amounts):

| | QUARTER ENDED JUNE 30, | |
| --- | --- | --- |
| | 2000 | 1999 |
| Numerator: | | |
| Net loss | $(56,957) | $(20,783) |
| Accretion of discount and dividends on preferred stock | (2,506) | -- |
| Net loss applicable to common shareholders | $(59,463) | $(20,783) |
| Denominator: | | |
| Weighted average shares | 121,534 | 65,959 |
| Denominator for basic and diluted net loss per common share calculation | 121,534 | 65,959 |
| Basic and diluted net loss per common share | $ (0.49) | $ (0.32) |

RECENT ACCOUNTING PRONOUNCEMENTS

In March 2000, the Financial Accounting Standards Board issued Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation--an Interpretation of APB 25" ("FIN 44"). This Interpretation clarifies certain issues relating to stock compensation. FIN 44 is effective July 1, 2000; however, certain conclusions in this Interpretation cover specific events that occur after either December 15, 1998, or January 12, 2000. To the extent that this Interpretation covers events occurring during the period after December 15, 1998, or January 12, 2000, but before the effective date of July 1, 2000, the effects of applying this Interpretation are recognized on a prospective

8

TR 001533

App. 0073



Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0009          Page 9 of 171          DX0075-0009

eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(UNAUDITED)

1. ACCOUNTING POLICIES (CONTINUED)

basis from July 1, 2000. The Company does not believe the effects of adopting FIN 44 will be material to its financial position or results of operations.

In March 2000, the Emerging Issues Task Force (EITF) of the Financial Accounting Standards Board reached a consensus on EITF Issue 00-2, "Accounting for Web Site Development Costs" ("Issue 00-2"). This consensus provides guidance on what types of costs incurred to develop Web sites should be capitalized or expensed. The consensus is effective for Web site development costs incurred for fiscal quarters beginning after June 30, 2000. The Company does not believe the effects of adopting this consensus will be material to its financial position or results of operations.

In July 2000, the EITF reached a consensus on EITF Issue 00-10, "Accounting for Shipping and Handling Fees and Costs" ("Issue 00-10"). Specifically, Issue 00-10 addresses in a sale transaction for goods, how the seller should classify amounts billed and incurred for shipping and handling in the income statement, and the composition or types of costs that would be required to be classified as costs of sales. The EITF concluded that all shipping and handling billings to a customer in a sale transaction represent the fees earned for the goods provided and, accordingly, amounts billed related to shipping and handling should be classified as revenue. The consensus does not address how costs incurred by the seller for shipping and handling should be classified. The adoption of this consensus will not impact the Company's financial position or results of operations as the Company already records all charges for outbound shipping and handling as revenue. Additionally, all fulfillment costs incurred for shipping and handling by the Company are classified within marketing and sales expenses.

2. LONG-TERM CONVERTIBLE SUBORDINATED NOTES

In December 1999, the Company issued $150 million principal amount of 6.25% convertible subordinated notes (the "Convertible Notes") due December 1, 2004. In connection with the issuance of the Convertible Notes, the Company incurred financing costs of $4.8 million, resulting in net proceeds to the Company of $145.2 million. The Convertible Notes are unsecured and are subordinated to existing and future senior debt as defined in the indenture pursuant to which the Convertible Notes were issued. The principal amount of the Convertible Notes will be due on December 1, 2004 and will bear interest at an annual rate of 6.25%, payable twice a year, on June 1 and December 1, beginning June 1, 2000, until the principal amount of the Convertible Notes is fully repaid. The Convertible Notes may be converted into the Company's common stock at the option of the holder at any time prior to December 1, 2004, unless the Convertible Notes have been previously redeemed or repurchased by the Company. The conversion rate, subject to adjustment in certain circumstances, is 13.5323 shares of the Company's common stock for each $1,000 principal amount of the Convertible Notes, which is equivalent to a conversion price of approximately $73.90 per share. Additionally, on or after December 1, 2002, the Company may redeem all or a portion of the Convertible Notes that have not been previously redeemed or repurchased, at any time at redemption prices set forth in the indenture pursuant to which the Convertible Notes were issued, plus any accrued and unpaid interest to the redemption date. The Company currently has an effective shelf registration statement with the Securities and Exchange Commission covering resales of the $150 million of Convertible Notes and common stock issuable upon conversion of the Convertible Notes.

9

TR 001534

App. 0074



eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(UNAUDITED)

3. REDEEMABLE CONVERTIBLE PREFERRED STOCK

On June 12, 2000, the Company issued 10,000 shares of non-voting Series D Redeemable Convertible Preferred Stock ("Series D"), $10,000 stated value per share, and warrants to purchase 5,018,296 shares of the Company's common stock with a current warrant exercise price of $7.17375 per share in a private placement to select institutional investors. The total proceeds of the offering were $100.0 million. The Series D shares carry a dividend rate of 7% per annum, payable semi-annually during the first year and quarterly thereafter or upon conversion or redemption. At the Company's option, dividends may be paid in cash or shares of common stock, subject to certain conditions described within the documents relating to the issuance of Series D and related warrants.

The Series D shares mature on June 12, 2003, subject to extension in some circumstances, at which time the Series D shares must be redeemed or converted at the Company's option. If the Company elects to redeem any Series D shares outstanding on June 12, 2003, the amount required to be paid will be equal to the liquidation preference of the Series D shares, which equals the price originally paid for such shares plus accrued and unpaid dividends. If the Company elects to convert any Series D shares outstanding on June 12, 2003, the Company will be required to issue shares in an amount determined based upon the criteria described below.

For the period from the date of issuance to January 30, 2001, the Company has the sole right to require conversion of any or all of the outstanding Series D shares, subject to certain conditions. During this period, except in limited circumstances, the securityholders do not have the right to convert any of the Series D shares. After January 30, 2001, the holders of the Series D shares have the right to convert their shares of Series D without restriction. Regardless of whether the selling securityholders elect to convert or the Company requires conversion, the number of shares of common stock to be issued upon conversion of a Series D share is determined by dividing the sum of $10,000 plus accrued and unpaid dividends by the applicable conversion price. The applicable conversion price will be a percentage of the lowest closing bid price of the Company's common stock for the five consecutive trading days ending on and including the conversion date, provided that the conversion price will not exceed $25.00 per share, subject to adjustment. The conversion percentage equals 100% on June 12, 2000 and then decreases permanently one percentage point on the first day of every calendar month following June 12, 2000, provided that the conversion percentage will never be less than 85%, except in the event the Company requires conversion following the announcement of a merger transaction.

The Company also has the right, provided specified conditions are satisfied, to redeem some or all of the outstanding Series D shares for cash equal to a percentage of the price paid for each preferred share plus accrued dividends. The redemption percentage equals 100% on June 12, 2000 and then increases permanently one percentage point on the first day of every calendar month following June 12, 2000, provided that the redemption percentage will never be greater than 124%.

Under the terms of the agreement pursuant to which the Company sold the Series D shares, the Company is obligated to deliver to each holder of the Series D shares a conversion election notice and/or redemption notice on each of the following mandatory election dates: August 31, 2000, September 29, 2000, October 31, 2000, November 30, 2000 and December 29, 2000. The number of shares of Series D designated for conversion and/or redemption in such notices, when combined with the number of Series D shares converted and/or redeemed prior to such dates, must generally be equal to 10%, 20%, 30%, 40% and 50% of the number of Series D shares initially issued, respectively. Accordingly, between the date on which Series D was issued and the date upon which the conversion

10

TR 001535

App. 0075



eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(UNAUDITED)

3. REDEEMABLE CONVERTIBLE PREFERRED STOCK (CONTINUED)

and/or redemption set forth in the December 29, 2000 notice is consummated, at least an aggregate of one-half of the shares of Series D initially issued are required to be converted and/or redeemed.

The net cash proceeds of the offering, after expenses, were approximately $97.8 million. The proceeds were further discounted by $15.9 million, representing the valuation of the 5,018,296 warrants issued in connection with the sale of the Series D shares, and $10.0 million allocated to the beneficial conversion feature associated with the Series D shares. The beneficial conversion feature represents the difference between the fair market value of the Company's common stock on the date of conversion and the discounted conversion price as described above that is available to the securityholders upon conversion. The discount amounts representing the warrants valuation and the issuance costs and expenses will be amortized, or accreted, over thirty-six months and the amount representing the beneficial conversion feature will be accreted over fifteen months in order to adjust the Series D shares to their appropriate redemption value at any given point in time for the period that the Series D shares are outstanding. The accretion amounts are charged against accumulated deficit and are included in net loss applicable to common shareholders in the calculation of net loss per common share. Additionally, the 7% dividend payable associated with the Series D shares are also charged against accumulated deficit and are included in net loss applicable to common shareholders in the calculation of net loss per common share. For the quarter ended June 30, 2000, the accretion of discount and dividends on the Series D shares was $2.5 million.

Subsequent to June 30, 2000, 835 shares of Series D stock were converted into 1,526,253 shares of the Company's common stock.

4. COMMITMENTS AND CONTINGENCIES

LEGAL PROCEEDINGS

From time to time, the Company is subject to legal proceedings and claims in the ordinary course of business, including employment related claims and claims of alleged infringement of trademarks, copyrights and other intellectual property rights. The Company currently is not aware of any such legal proceedings or claims that it believes will have, individually or in the aggregate, a material adverse effect on its business, prospects, financial condition and operating results.

5. STOCKHOLDERS' EQUITY

In March 1999, the Company's Board of Directors declared a stock split of three shares for every one share of common stock then outstanding. The stock split was effective May 24, 1999, the date the Company's public offering of common stock closed. Accordingly, the accompanying financial statements and footnotes have been restated to reflect the stock split. The par value of the shares of common stock to be issued in connection with the stock split was credited to common stock and a like amount charged to additional paid-in capital.

On May 24, 1999, the Company completed its initial public offering of 9,568,000 shares of its common stock. Net proceeds to the Company aggregated $175.8 million. As of the closing date of the offering, all of the Series A, B and C convertible preferred stock then outstanding was converted into an aggregate of 58,779,267 shares of common stock.

11

TR 001536

App. 0076

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0012          *Page 12 of 171*

DX0075-0012

eTOYS INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

(UNAUDITED)

6. DEFERRED COMPENSATION

The following table shows the amounts of deferred compensation amortization that would have been recorded under the following income statement categories had deferred compensation amortization not been separately stated in the consolidated statements of operations (in thousands):

|  | QUARTER ENDED JUNE 30, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Marketing and sales.......................................... | $   803 | $   977 |
| Web site and technology..................................... | 1,019 | 1,239 |
| General and administrative.................................. | 1,287 | 1,566 |
|  | $3,109 | $3,782 |

12

TR 001537

App. 0077



ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS

This Form 10-Q and the following "Management's Discussion and Analysis of
Financial Condition and Results of Operations" include "forward-looking
statements" within the meaning of the Private Securities Litigation Reform Act
of 1995. This Act provides a "safe harbor" for forward-looking statements to
encourage companies to provide prospective information about themselves so long
as they identify these statements as forward-looking and provide meaningful
cautionary statements identifying important factors that could cause actual
results to differ from the projected results. All statements other than
statements of historical fact made by us in this Form 10-Q are forward-looking.
In particular, the statements herein regarding industry prospects and our future
results of operations or financial position are forward-looking statements.
Forward-looking statements reflect our current expectations and are inherently
uncertain. Our actual results may differ significantly from our expectations,
and we assume no responsibility to update forward-looking statements made
herein. The section entitled "Additional Factors That May Affect Future Results"
describes some, but not all, of the factors that could cause these differences.

In July 2000, the Emerging Issues Task Force (EITF) reached a consensus on
EITF Issue 00-10, "Accounting for Shipping and Handling Fees and Costs" ("Issue
00-10"). Specifically, Issue 00-10 addresses in a sale transaction for goods,
how the seller should classify amounts billed and incurred for shipping and
handling in the income statement, and the composition or types of costs that
would be required to be classified as costs of sales. The EITF concluded that
all shipping and handling billings to a customer in a sale transaction represent
the fees earned for the goods provided and, accordingly, amounts billed related
to shipping and handling should be classified as revenue. However, the EITF
overturned its previous tentative conclusion that all costs incurred by the
seller for shipping and handling should be classified as cost of sales. In
addition, the EITF decided not to address the types of costs that would be
required to be classified as costs of sales. The adoption of this consensus will
not impact our financial position or results of operations as we already record
all charges for outbound shipping and handling as revenue. Additionally, we
currently record all fulfillment costs incurred for shipping and handling within
marketing and sales expenses. However, there may exist the possibility that
accounting standard setters may in the future address the classification of
costs related to shipping and handling incurred by a seller and require such
costs to be included within cost of sales.

RESULTS OF OPERATIONS

NET SALES

|  | QUARTER ENDED JUNE 30, | | |
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| Net sales................................. | $ 24,862 | $ 7,975 | 212% |

Net sales consist of product sales to customers and charges to customers for
outbound shipping and handling and gift wrapping and are net of product returns,
promotional discounts and coupons. The growth in net sales for the quarter ended
June 30, 2000 as compared to the same period in the prior year reflects a
significant increase in units sold due to the growth of our customer base,
repeat purchases from our existing customers and growth in our baby and toy
categories, partially offset by a downturn in video game sales. Cumulative
customer accounts increased to more than 2.1 million during the quarter ended
June 30, 2000 as compared to 467,000 cumulative customer accounts at June 30,
1999. International sales, which consists of export sales to customers outside
the US from our US Web

13

TR 001538

App. 0078

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0014



DX0075-0014

site as well sales by our Web site in the United Kingdom, eToys.co.uk. to customers within the United Kingdom and Europe, were not material during the quarter ended June 30, 2000.

GROSS PROFIT

| | QUARTER ENDED JUNE 30, | | |
|---|---|---|---|
| | 2000 | 1999 | % CHANGE |
| | (IN THOUSANDS) | | |
| Gross profit............................ | $ 5,447 | $ 1,518 | 259% |

Gross profit is net sales less cost of sales, which consists of the costs of products sold to customers, outbound and inbound shipping and handling costs, and gift wrapping costs. Gross profit increased in absolute dollars for the quarter ended June 30, 2000 as compared to the same period in the prior year, reflecting our increased sales volume. Our gross profit increased as a percentage of net sales by approximately 2.9% for the quarter ended June 30, 2000 as compared to the same period in the prior year. This increase in gross profit as a percentage of net sales is primarily attributable to higher product margins in most categories as well as the seasonally higher mix of our baby business, partially offset by the impact of shipping margins.

Shipping margins were adversely impacted for the quarter ended June 30, 2000 as compared to the same period in the prior year primarily due to an increase in the shipments of larger baby merchandise which has higher shipping costs. In addition, overall shipping margins in the quarters ended June 30, 2000 and 1999 were adversely impacted by the location of our distribution centers principally in the western United States. This resulted in increased shipping costs as we shipped cross-country to the majority of our customer base located in the eastern United States. We expect that our new distribution center locations in Danville, Virginia and Greensboro, North Carolina, which began shipping operations in June 2000, will allow us to reduce the costs incurred from shipping since they are located closer to the majority of our customers. The loss from shipping, which represents shipping revenues less outbound shipping and handling costs included in cost of sales, was $0.4 million in the quarter ended June 30, 2000. During the quarter ended June 30, 1999, no loss on shipping was incurred as shipping revenue was comparable to outbound shipping and handling costs.

We believe that providing our customers with superior customer service is an essential component of our business strategy. Accordingly, we may incur additional costs in order to meet customer expectations, which could decrease gross profit. Over time, we intend to expand our operations by adding product categories and by expanding the breadth and depth of our product or service offerings. In subsequent periods, we expect to improve gross margin through changes in product mix (including higher margin private label products), additional non-fulfillment revenues such as sponsorship fees, improved purchasing terms with higher volume purchasing and reduced shipping costs as a result of our bi-coastal distribution centers.

MARKETING AND SALES

| | QUARTER ENDED JUNE 30, | | |
|---|---|---|---|
| | 2000 | 1999 | % CHANGE |
| | (IN THOUSANDS) | | |
| Marketing and sales...................... | $ 29,601 | $ 11,573 | 156% |

Marketing and sales expenses consist of advertising expense, fulfillment, customer service and credit card fees, and other marketing and sales expense, including personnel and general overhead. Marketing and sales expenses increased in absolute dollars for the quarter ended June 30, 2000 as

14

TR 001539

App. 0079



compared to the same period in the prior year. This increase is primarily attributable to increases in our advertising expenditures incurred during our spring branding campaign, increased payroll and related costs for fulfilling the higher level of customer demand, and additional costs incurred in the expansion of our distribution facilities. Marketing and sales expenses decreased as a percentage of net sales during the quarter ended June 30, 2000 as compared to the same period in the prior year due to the significant increase in net sales during such period.

During the quarter ended June 30, 2000, advertising expense was $15.6 million or 63% of net sales. Although we intend to continue to devote a substantial amount of our capital resources to the pursuit of an aggressive branding and marketing campaign, we expect advertising expense to decrease significantly as a percentage of net sales in future periods.

During the quarter ended June 30, 2000, fulfillment, customer service and credit card fees were $9.9 million or 40% of net sales. Although we expect the expansion and refinement of our distribution facilities to accommodate increases in sales volume, coupled with costs incurred to meet customer expectations, to result in continued increases in these expenses in absolute dollars, we believe these expenses will decline significantly as a percentage of net sales and will not materially exceed our gross profits during this fiscal year. During the fiscal year ending March 31, 2002, we expect our gross profits to exceed these expenses. We plan to reduce fulfillment, customer service and credit card fees as a percentage of net sales through increased productivity arising from greater automation and operating experience in fulfilling customer orders, as well as through higher utilization of our distribution centers as revenues increase and seasonality decreases.

On March 31, 2000, we ceased receiving fulfillment services from our third-party vendor, Fingerhut Business Services. And since that time we have relied solely on our own distribution centers located in California, North Carolina and Virginia for domestic fulfillment operations and in Swindon, England for international fulfillment operations. The transition of inventory from Fingerhut facilities was completed during July 2000. Total costs incurred associated with this transition were not material. We expect to incur expenses associated with the continued development and enhancement of our own distribution operations and from our efforts to meet customer expectations with respect to timely and accurate order fulfillment.

WEB SITE AND TECHNOLOGY

|  | QUARTER ENDED JUNE 30, | | |
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| Web site and technology................... | $ 12,526 | $ 4,835 | 159% |

Web site and technology expenses consist primarily of payroll and related expenses for merchandising, development, and systems and telecommunications personnel, and infrastructure costs related to systems and telecommunications. Web site and technology also includes costs related to the development of internal-use software. All development costs incurred in the preliminary project stage, as well as maintenance and training, are expensed as incurred. Certain plans of development are so uncertain that it is not probable that they will be completed and are therefore expensed when incurred. Once the development project has completed the preliminary project stage and it is deemed probable that the project will be completed and used as intended, the project is considered to have moved into the application development stage. All costs incurred for the development or purchase of internal-use software that are incurred in the application development stage are capitalized as incurred within property and equipment and amortized over their estimated useful lives.

15

TR 001540

App. 0080



DX0075-0016

Web site and technology expenses increased in absolute dollars for the quarter ended June 30, 2000 as compared to the same period in the prior year. This increase is primarily attributable to increased expenses associated with our significant investment in both front-end and back-end infrastructure and maintenance of our existing systems and telecommunications hardware. This included increased staffing of systems and telecommunication personnel, increased investment in systems and telecommunications hardware as well as increased costs incurred for projects intended to enhance the features, content and functionality of our Web site and transaction-processing systems. Such project costs arise from either costs incurred in the preliminary development stage, which are expensed as incurred, or from amortization of such project costs that had been capitalized within the quarter or a previous period and have been placed into service. Web site and technology expenses decreased as a percentage of net sales during the quarter ended June 30, 2000 as compared to the same period in the prior year due to the significant increase in net sales during such period. We believe that continued investment in Web site and technology is critical to attaining our strategic objectives. In addition to ongoing investments in our online stores and infrastructure, we intend to increase investments in product, service and international expansion. As a result, Web site and technology expenses may increase significantly in absolute dollars, but decrease as a percentage of net sales.

GENERAL AND ADMINISTRATIVE

|  | QUARTER ENDED JUNE 30, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| General and administrative................. | $ 7,500 | $ 2,956 | 154% |

General and administrative expenses consist of payroll and related expenses for executive and administrative personnel, facilities expenses, professional services expenses, travel and other general corporate expenses. General and administrative expenses increased in absolute dollars for the quarter ended June 30, 2000 as compared to the same period in the prior year. This increase was primarily due to increased headcount and associated costs, professional fees, facilities and other related costs. General and administrative expenses decreased as a percentage of net sales during the quarter ended June 30, 2000 as compared to the same period in the prior year due to the significant increase in net sales during such period. We expect general and administrative expenses to increase in absolute dollars, but decrease as a percentage of net sales, as we expand our staff and incur additional costs related to the growth of our business.

GOODWILL AND INTANGIBLE ASSETS AMORTIZATION

|  | QUARTER ENDED JUNE 30, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| Goodwill amortization.................. | $ 8,490 | $    80 | 10,513% |

Goodwill represents the excess of the purchase price over the fair value of the net tangible assets acquired in a business combination. As a result of the acquisition of BabyCenter on July 1, 1999, we recorded goodwill of approximately $189.0 million, which is being amortized over five years. Additionally, in June 2000 we completed the acquisition of certain assets of eParties Inc. which resulted in recording approximately $1.6 million of goodwill. The $1.6 million of goodwill arising from the eParties acquisition will also be amortized over five years. Accordingly, goodwill amortization for the quarter ended June 30, 2000 reflects amortization of goodwill from the BabyCenter and eParties purchases, in addition to amortization of goodwill recorded from a previous acquisition. In

16

TR 001541

App. 0081


DX0075-0017

January 2000, we completed the sale of substantially all of the assets and related liabilities of BabyCenter's Consumer Health Interactive division for approximately $20 million in a combination of cash and registrable securities. As a result of the sale, goodwill amortization will decrease in amounts proportionate to the sale proceeds in future periods due to the reduction of goodwill related to CHI. To the extent that we do not generate additional sufficient cash flow to recover the amount of the investment recorded, the investment may be considered impaired or be subject to earlier write-off. In such event, our net loss in any given period could be greater than anticipated.

DEFERRED COMPENSATION AMORTIZATION

|  | QUARTER ENDED JUNE 30, | | |
|---|---|---|---|
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| Deferred compensation amortization......... | $ 3,109 | $ 3,782 | (18)% |

In the fiscal years ended March 31, 2000 and 1999, we recorded total deferred stock compensation of $58.5 million in connection with stock options granted during these periods. This amount represents the difference between the exercise price of stock option grants and the deemed fair value of our common stock at the time of such grants. Such amount has been reduced as a result of amortization of deferred stock compensation initially recorded as well as subsequent cancellations of stock options that originally generated the deferred stock compensation charge. Deferred stock compensation is amortized to expense over the vesting periods of the applicable options. Deferred compensation amortization decreased for the quarter ended June 30, 2000 as compared to the same period in the prior year. This decrease was primarily due to subsequent cancellations of stock options that originally generated the deferred stock compensation charge. We expect to record $9.8 million of amortization over the remaining nine months ended March 31, 2001.

Amortization of deferred compensation for each of the next three fiscal years is expected to be as follows:

| YEAR ENDED | AMOUNTS IN THOUSANDS |
|---|---|
| March 31, 2002........................................... | $13,113 |
| March 31, 2003........................................... | 9,157 |
| March 31, 2004........................................... | 262 |

INTEREST INCOME AND EXPENSE

|  | QUARTER ENDED JUNE 30, | | |
|---|---|---|---|
|  | 2000 | 1999 | % CHANGE |
|  | (IN THOUSANDS) | | |
| Interest income.................................. | $1,809 | $944 | 92% |
| Interest expense................................. | (2,985) | $(18) | 16,483% |

Interest income consists of earnings on our cash and cash equivalents. Interest income increased for the quarter ended June 30, 2000 as compared to the same period in the prior year. This increase was due to higher cash balances resulting from the proceeds of the issuance of $150 million of Convertible Notes and proceeds from the sale of the Series D Redeemable Convertible Preferred Stock in June 2000. Interest expense consists primarily of interest from the issuance of the Convertible Notes, the amortization of debt financing costs related to the Convertible Notes as well as interest on asset

17

TR 001542

App. 0082



acquisitions financed through notes payable and capital leases. Interest expense increased for the quarter ended June 30, 2000 as compared to the same period in the prior year due to interest on the Convertible Notes and additional asset acquisitions financed through notes payable and capital lease obligations.

INCOME TAXES

We have not generated any taxable income to date and therefore have not paid any federal income taxes since inception. Utilization of our net operating loss carryforwards, which begin to expire in 2012, may be subject to certain limitations under Section 382 of the Internal Revenue Code of 1986, as amended. We have provided a full valuation allowance on the deferred tax asset, consisting primarily of net operating loss carryforwards, because of uncertainty regarding its realizability.

LIQUIDITY AND CAPITAL RESOURCES

At June 30, 2000, the Company's principal source of liquidity consisted of $152.1 million of cash and cash equivalents compared to $139.6 million of cash and cash equivalents at March 31, 2000.

Net cash used in operating activities for the quarter ended June 30, 2000 was $37.4 million. Net operating cash flows were primarily attributable to net losses, reduced by noncash charges of depreciation and amortization, as well as an increase in prepaid expenses and other and a decrease in accrued expenses, which were offset by a decrease in inventories and an increase in accounts payable. Net cash used in operating activities for the quarter ended June 30, 1999 was $14.3 million. Net operating cash flows were primarily attributable to net losses, reduced by noncash charges of depreciation and amortization, as well as increases in inventories, prepaid expenses and other, which were offset by increases in accounts payable and accrued expenses.

Net cash used in investing activities for the quarter ended June 30, 2000 was $36.6 million and consisted of purchases of fixed assets and other assets, partially offset by proceeds from the sale of fixed assets. Net cash used in investing activities for the quarter ended June 30, 1999 was $5.6 million and consisted of purchases of fixed assets and other assets.

Net cash provided by financing activities for the quarter ended June 30, 2000 was $97.0 million and resulted from a combination of the net proceeds from the issuance of Series D Redeemable Convertible Preferred Stock and the issuance of common stock and exercise of stock options, partially offset by payments on notes payable and capital leases. Net cash provided by financing activities for the quarter ended June 30, 1999 was $176.1 million and resulted from net proceeds from the issuance of common stock in our initial public offering.

As of June 30, 2000, our principal commitments consisted of the $150 million of Convertible Notes outstanding, operating lease obligations, notes payable and capital lease obligations incurred to finance fixed asset acquisitions and future advertising commitments.

The Convertible Notes, issued in December 1999, are unsecured and are subordinated to our existing and future senior debt as defined in the indenture pursuant to which the Convertible Notes were issued. The principal amount of the Convertible Notes will be due on December 1, 2004 and will bear interest at an annual rate of 6.25%, payable twice a year, on June 1 and December 1, beginning June 1, 2000, until the principal amount of the Convertible Notes is fully repaid. The Convertible Notes may be converted into our common stock at the option of the holder at any time prior to December 1, 2004, unless the Convertible Notes have been previously redeemed or repurchased by us. The conversion rate, subject to adjustment in certain circumstances, is 13.5323 shares of our common stock for each $1,000 principal amount of convertible notes, which is equivalent to a conversion price of approximately $73.90 per share. Additionally, on or after December 1, 2002, we may redeem all or a portion of the Convertible Notes, that have not been previously redeemed or repurchased, at any time

18

TR 001543

App. 0083



Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0019

DX0075-0019

at redemption prices set forth in the indenture pursuant to which the Convertible Notes were issued, plus any accrued and unpaid interest to the redemption date.

In December 1999, we entered into an eleven year lease agreement to relocate our corporate offices. The lease begins in October 2000. In connection with the lease commitment, we delivered two letters of credit to the lessor totaling $15.0 million, both of which we have cash collateralized. The letters of credit will be held as security during the initial lease term.

We believe that current cash and cash equivalents and cash that may be generated from operations will be sufficient to meet our anticipated cash needs through June 30, 2001. However, any projections of future cash needs and cash flows are subject to substantial uncertainty. If current cash, cash equivalents and cash that may be generated from operations are insufficient to satisfy our liquidity requirements, we will likely seek to sell additional equity or debt securities or to obtain a line of credit. The sale of additional equity or equity-related securities would result in additional dilution to our stockholders. In addition, we will, from time to time, consider the acquisition of or investment in complementary businesses, products, services and technologies, which might impact our liquidity requirements or cause us to issue additional equity or debt securities. There can be no assurance that financing will be available in amounts or on terms acceptable to us, if at all.

<div align="center">19</div>

TR 001544

App. 0084

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0020

*Page 20 of 171*



DX0075-0020

ADDITIONAL FACTORS THAT MAY AFFECT FUTURE RESULTS

In addition to the factors discussed in the "Overview" and "Liquidity and Capital Resources" sections of this "Management's Discussion and Analysis of Financial Condition and Results of Operations", the following additional risk factors may affect our future results.

RISKS RELATED TO OUR
SERIES D PREFERRED STOCK

THE CONVERSION OF OUR SERIES D PREFERRED SHARES AND THE EXERCISE OF THE RELATED WARRANTS COULD RESULT IN SUBSTANTIAL NUMBERS OF ADDITIONAL SHARES BEING ISSUED IF OUR MARKET PRICE DECLINES.

On June 12, 2000, we issued 10,000 shares of our series D convertible preferred stock, $10,000 stated value per share, and warrants to purchase 5,018,296 shares of our common stock with a current warrant exercise price of $7.17375 per share. The series D preferred shares convert at a floating rate based on the market price of our common stock, provided the conversion price may not exceed $25.00 per share, subject to adjustment. As a result, the lower the price of our common stock at the time of conversion, the greater the number of shares the holder will receive.

To the extent the series D preferred shares are converted or dividends on the series D preferred shares are paid in shares of common stock rather than cash, a significant number of shares of common stock may be sold into the market, which could decrease the price of our common stock and encourage short sales by selling securityholders or others. Short sales could place further downward pressure on the price of our common stock. In that case, we could be required to issue an increasingly greater number of shares of our common stock upon future conversions of the series D preferred shares, sales of which could further depress the price of our common stock.

The conversion of and the payment of dividends in shares of common stock in lieu of cash on the series D preferred shares may result in substantial dilution to the interests of other holders of our common stock. Even though no selling securityholder may convert its series D preferred shares if upon such conversion the selling securityholder together with its affiliates would have acquired a number of shares of common stock during the 60-day period ending on the date of conversion which, when added to the number of shares of common stock held at the beginning of such 60-day period, would exceed 9.99% of our then outstanding common stock, excluding for purposes of such determination shares of common stock issuable upon conversion of series D preferred shares which have not been converted and upon exercise of warrants which have not been exercised, this restriction does not prevent a selling securityholder from selling a substantial number of shares in the market. By periodically selling shares into the market, an individual selling securityholder could eventually sell more than 9.99% of our outstanding common stock while never holding more than 9.99% at any specific time.

WE MAY ISSUE ADDITIONAL SHARES, RESULTING IN DILUTION FOR EXISTING STOCKHOLDERS.

Some events could result in the issuance of additional shares of our common stock, which would result in dilution for existing stockholders. We may issue additional shares of common stock or preferred stock:

- to raise additional capital or finance acquisitions,

- upon the exercise or conversion of outstanding options, warrants and shares of convertible preferred stock, and/or

- in lieu of cash payment of dividends.

As of June 30, 2000, other than the warrants issued to the holders of series D preferred shares, there were outstanding warrants to acquire an aggregate of 4,000 shares of common stock, and there were outstanding options to acquire an aggregate of 28,870,040 shares of common stock. If converted

20

TR 001545

App. 0085



or exercised, these securities would dilute the percentage ownership of common stock by existing stockholders. These securities, unlike the common stock, provide for anti-dilution protection upon the occurrence of stock splits, redemptions, mergers, reclassifications, reorganizations and other similar corporate transactions, and, in some cases, major corporate announcements. If one or more of these events occur, the number of shares of common stock that may be acquired upon conversion or exercise would increase. In addition, as disclosed in the preceding risk factor, the number of shares that may be issued upon conversion of or payment of dividends in lieu of cash on the series D preferred shares could increase substantially if the market price of our common stock decreases during the period the series D preferred shares are outstanding.

WE MAY BE REQUIRED TO DELIST OUR SHARES FROM NASDAQ IF SPECIFIC EVENTS OCCUR.

In accordance with Nasdaq Rule 4460, which generally requires stockholder approval for the issuance of securities representing 20% or more of an issuer's outstanding listed securities, and under the terms of the agreement pursuant to which we sold the series D preferred shares and related warrants, we must solicit stockholder approval of the issuance of such preferred shares and warrants, including the shares of common stock issuable upon conversion of the series D preferred shares and exercise of the warrants, at a meeting of our stockholders, which shall occur on or before September 30, 2000. If we obtain stockholder approval, there is no limit on the amount of shares that could be issued upon conversion of the series D preferred shares. If we do not obtain stockholder approval and are not obligated to issue shares because of restrictions relating to Nasdaq Rule 4460, we may be required to redeem all or a portion of the series D preferred shares. If we fail to redeem any series D preferred shares as requested, the holders of at least two-thirds of the outstanding series D preferred shares have the right to require that we voluntarily delist our shares of common stock from the Nasdaq Stock Market. In that event, trading in our shares would likely decrease substantially, and the price of our shares of common stock may decline.

SUBSTANTIAL SALES OF OUR COMMON STOCK COULD CAUSE OUR STOCK PRICE TO FALL.

If our stockholders sell substantial amounts of our common stock, including shares issued upon the exercise of outstanding options and upon conversion of and issuance of common stock dividends on the series D preferred shares and exercise of the related warrants, the market price of our common stock could fall. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. As of June 30, 2000, we had outstanding 121,962,257 shares of common stock and options to acquire an aggregate of 28,870,040 shares of common stock, of which 6,024,479 options were vested and exercisable. As of June 30, 2000, of the shares that are currently outstanding, 50,712,421 are freely tradeable in the public market and 71,249,836 are tradeable in the public market subject to the restrictions, if any, applicable under Rule 144 and Rule 145 of the Securities Act of 1933, as amended. All shares acquired upon exercise of options will be freely tradeable in the public market.

In general, under Rule 144 as currently in effect, a person who has beneficially owned restricted securities for at least one year would be entitled to sell within any three-month period a number of shares that does not exceed the greater of (a) one percent of the number of shares of common stock then outstanding (which for eToys was 1,219,622 shares as of June 30, 2000) or (b) the average weekly trading volume of the common stock during the four calendar weeks preceding the sale. Sales under Rule 144 are also subject to requirements with respect to manner of sale, notice, and the availability of current public information about us. Under Rule 144(k), a person who is not deemed to have been our affiliate at any time during the three months preceding a sale, and who has beneficially owned the shares proposed to be sold for at least two years, is entitled to sell such shares without complying with the manner of sale, public information, volume limitation or notice provisions of Rule 144. Sales by

21


DX0075-0022

stockholders of a substantial amount of our common stock could adversely affect the market price of our common stock.

WE MAY BE REQUIRED TO PAY SUBSTANTIAL PENALTIES TO THE HOLDERS OF THE SERIES D PREFERRED SHARES AND RELATED WARRANTS IF SPECIFIC EVENTS OCCUR.

In accordance with the terms of the documents relating to the issuance of the series D preferred shares and the related warrants, we are required to pay substantial penalties to a holder of the series D preferred shares under specified circumstances, including, among others,

- the nonpayment of dividends on the series D preferred shares in a timely manner,

- our failure to deliver shares of our common stock upon conversion of the series D preferred shares or upon exercise of the related warrants after a proper request,

- the nonpayment of the redemption price at maturity of the series D preferred shares,

- failure to hold a meeting of our stockholders on or before September 30, 2000 to approve the issuance of the shares of common stock issuable upon conversion of and in lieu of cash dividends on the series D preferred stock and upon exercise of the related warrants, or

- the registration statement relating to the series D preferred shares and related warrants is unavailable to cover the resale of the shares of common stock underlying such securities.

Such penalties are generally paid in the form of interest payments, subject to any restrictions imposed by applicable law, on the amount that a holder of series D preferred shares was entitled to receive on the date of determination.

RISKS RELATED TO OUR CONVERTIBLE NOTES

AS A RESULT OF THE ISSUANCE OF OUR CONVERTIBLE NOTES, WE HAVE A SIGNIFICANT AMOUNT OF DEBT AND MAY HAVE INSUFFICIENT CASH FLOW TO SATISFY OUR DEBT SERVICE OBLIGATIONS. IN ADDITION, THE AMOUNT OF OUR DEBT COULD IMPEDE OUR OPERATIONS AND FLEXIBILITY.

As a result of the issuance of $150 million of our 6.25% Convertible Subordinated Notes due December 1, 2004, we have a significant amount of debt and debt service obligations. If we are unable to generate sufficient cash flow or otherwise obtain funds necessary to make required payments on the notes, including from cash and cash equivalents on hand, we will be in default under the terms of the indenture which could, in turn, cause defaults under our other existing and future debt obligations.

Even if we are able to meet our debt service obligations, the amount of debt we have could adversely affect us in a number of ways, including by:

- limiting our ability to obtain any necessary financing in the future for working capital, capital expenditures, debt service requirements or other purposes;

- limiting our flexibility in planning for, or reacting to, changes in our business;

- placing us at a competitive disadvantage relative to our competitors who have lower levels of debt;

- making us more vulnerable to a downturn in our business or the economy generally;

- requiring us to use a substantial portion of our cash flow from operations to pay principal and interest on our debt, instead of contributing those funds to other purposes such as working capital and capital expenditures; and

- requiring us to maintain specific financial ratios and comply with other restrictive covenants in our existing and future agreements governing our debt obligations.

22

TR 001547

App. 0087



. To be able to meet our debt service requirements we must successfully implement our business strategy. We cannot assure you that we will successfully implement our business strategy or that we will be able to generate sufficient cash flow from operating activities to meet our debt service obligations and working capital requirements. Our ability to meet our obligations will be dependent upon our future performance, which will be subject to prevailing economic conditions and to financial, business and other factors.

To implement our business strategy, we will need to seek additional financing. If we are unable to obtain such financing on terms that are acceptable to us, we could be forced to dispose of assets to make up for any shortfall in the payments due on our debt under circumstances that might not be favorable to realizing the highest price for those assets. A substantial portion of our assets consist of intangible assets, the value of which will depend upon a variety of factors, including without limitation, the success of our business. As a result, we cannot assure you that our assets could be sold quickly enough, or for amounts sufficient, to meet our obligations, including our obligations under the notes.

WE MAY BE UNABLE TO REPURCHASE THE NOTES UPON THE OCCURRENCE OF A CHANGE OF CONTROL.

Upon the occurrence of a change of control of eToys, we are required to offer to repurchase all outstanding notes. Although the indenture governing the notes allows us, subject to satisfaction of certain conditions, to repurchase the notes using shares of our common stock, if a change of control were to occur, our ability to repurchase the notes with cash will depend on the availability of sufficient funds and compliance with the terms of any debt ranking senior to the notes. Our failure to repurchase tendered notes upon a change of control would constitute an event of default under the indenture, which could result in the acceleration of the maturity of the notes and all of our other outstanding debt. These repurchase requirements may also delay or make it harder for others to obtain control of us.

CLAIMS BY HOLDERS OF THE NOTES WILL BE SUBORDINATED TO CLAIMS BY HOLDERS OF OUR SENIOR DEBT.

The notes rank behind all of our existing and future senior debt and effectively behind all existing and future liabilities (including trade payables) of our subsidiaries. As a result, if we declare bankruptcy, liquidate, reorganize, dissolve or otherwise wind up our affairs or are subjected to similar proceedings, we must repay all senior debt before we will be able to make any payments on the notes. Likewise, upon a default in payment with respect to any of our debt or an event of default with respect to this debt resulting in its acceleration, our assets will be available to pay the amounts due on the notes only after all senior debt has been paid in full. In addition, we have located all of our inventory purchasing, distribution fulfillment functions, customer service functions and other related activities in our distribution subsidiary, eToys Distribution, LLC. The effect of this will be to increase the amount of our subsidiary liabilities, especially during the third and fourth calendar quarters. We may not have sufficient assets remaining to pay amounts due on any or all of the notes then outstanding. The indenture does not prohibit us or our subsidiaries from incurring additional senior debt, other debt or other liabilities. Our ability to pay our obligations on the notes could be adversely affected if we or our subsidiaries incur more debt.

As of June 30, 2000, we had outstanding $20.5 million of senior debt and $30.1 million of subsidiary liabilities (of which $9.0 million also qualifies as senior debt) to which the notes are subordinated. Both we and our subsidiaries expect that from time to time we will incur additional debt to which the notes will be subordinated.

23

TR 001548

App. 0088

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0024

*Page 24 of 171*



DX0075-0024

RISKS RELATED TO OUR BUSINESS

OUR LIMITED OPERATING HISTORY MAKES FUTURE FORECASTING DIFFICULT.

We were incorporated in November 1996. We began selling products on our Web site in October 1997. As a result of our limited operating history, it is difficult to accurately forecast our net sales and we have limited meaningful historical financial data upon which to base planned operating expenses. We base our current and future expense levels on our operating plans and estimates of future net sales, and our expenses are to a large extent fixed. Sales and operating results are difficult to forecast because they generally depend on the volume and timing of the orders we receive. As a result, we may be unable to adjust our spending in a timely manner to compensate for any unexpected revenue shortfall. This inability could cause our net losses in a given quarter to be greater than expected.

WE ANTICIPATE FUTURE LOSSES AND NEGATIVE CASH FLOW.

We expect operating losses and negative cash flow to continue for the foreseeable future. Among other things, the sources of such losses will include costs and expenses related to:

- brand development, marketing and other promotional activities;

- the expansion of our inventory management and distribution operations;

- the continued development of our Web site and consumer-driven technology, transaction processing systems and our computer network;

- the expansion of our product offerings and Web site content;

- development of relationships with strategic business partners;

- international operations; and

- assimilation of operational personnel acquired with BabyCenter.

As of June 30, 2000, we had an accumulated deficit of $279.9 million. We incurred net losses of $57.0 million for the quarter ended June 30, 2000.

Also, as a result of our acquisition of BabyCenter, we have recorded a significant amount of goodwill, the amortization of which will significantly reduce our earnings and profitability for the foreseeable future. The recorded goodwill of approximately $189.0 million is being amortized over a five-year period. To the extent we do not generate sufficient cash flow to recover the amount of the investment recorded, the investment may be considered impaired and could be subject to earlier write-off. In such event, our net loss in any given period could be greater than anticipated and the market price of our stock could decline.

Our ability to become profitable depends on our ability to generate and sustain substantially higher net sales while maintaining reasonable expense levels. If we do achieve profitability, we cannot be certain that we would be able to sustain or increase profitability on a quarterly or annual basis in the future.

ANY FAILURE BY US TO SUCCESSFULLY EXPAND OUR DISTRIBUTION OPERATIONS WOULD HAVE A MATERIAL ADVERSE EFFECT ON US.

Any failure by us to successfully expand our distribution operations to accommodate increases in demand and customer orders would have a material adverse effect on our business prospects, financial condition and operating results. Under such circumstances, the material adverse effects may include, among other things, an inability to increase net sales in accordance with the expectations of securities analysts and investors; increases in costs that we may incur to meet customer expectations; increases in fulfillment expenses if we are required to rely on more expensive fulfillment systems than anticipated or

24

TR 001549

App. 0089


DX0075-0025

incur additional costs for balancing merchandise inventories among multiple distribution facilities; loss of customer loyalty and repeat business from customers if they become dissatisfied with our delivery services; and damage to our reputation and brand image arising from uncertainty with respect to our distribution operations. These risks are greatest during the fourth calendar quarter of each year, when our sales increase substantially relative to other quarters and the demand on our distribution operations increases proportionately. In addition, consistent with industry practice for online retailers, we notify our customers via our Web site that we cannot guarantee all products ordered after a specified date in December will be delivered by Christmas day, which may deter potential customers from purchasing from us following that date. Since our limited operating history makes it difficult to accurately estimate the number of orders that may be received during the fourth calendar quarter, we may experience either inadequate or excess fulfillment capacity during this quarter, either of which could have a material adverse impact on us. The occurrence of one or more of these events would be likely to cause the market price of our securities to decline.

We currently conduct our distribution operations through four facilities operated by us, consisting of an approximately 105,000 square foot facility in Commerce, California; an approximately 438,500 square foot facility in Pittsylvania County, Virginia; an approximately 272,000 square foot facility in Greensboro, North Carolina; and an approximately 46,000 square foot facility in Swindon, England. Commencing in the fall of 2000, we also plan to conduct distribution operations from an approximately 763,000 square foot facility in Ontario, California that is currently being developed and to augment our Virginia facility with an additional 715,000 square foot facility adjacent to the existing facility. We have also entered into a lease for an approximately 108,000 square foot distribution facility in Belgium. We have in the past and continue to devote substantial resources to the expansion of our distribution operations among these facilities. This expansion may cause disruptions in our business as well as unexpected costs. We are not experienced with coordinating and managing distribution operations in geographically distant locations. This may result in increased costs as we seek to meet customers' expectations, balance merchandise inventories among our distribution facilities and take other steps that may be necessary to meet the demands placed on our distribution operations, particularly during the fourth calendar quarter of the year. Despite the fact that we devote substantial resources to the expansion and refinement of our distribution operations, there can be no assurance that our existing or future distribution operations will be sufficient to accommodate increases in demand and customer orders.

IF WE EXPERIENCE PROBLEMS IN OUR DISTRIBUTION OPERATIONS, WE COULD LOSE CUSTOMERS.

We rely upon third-party carriers for product shipments, including shipments to and from our distribution facilities. We are therefore subject to the risks, including employee strikes and inclement weather, associated with such carriers' ability to provide delivery services to meet our shipping needs. In addition, failure to deliver products to our customers in a timely and accurate manner would damage our reputation and brand. We also depend upon temporary employees to adequately staff our distribution facilities, particularly during the holiday shopping season. If we do not have sufficient sources of temporary employees, we could lose customers.

OUR OPERATING RESULTS ARE VOLATILE AND DIFFICULT TO PREDICT. IF WE FAIL TO MEET THE EXPECTATIONS OF PUBLIC MARKET ANALYSTS AND INVESTORS, THE MARKET PRICE OF OUR SECURITIES MAY DECLINE SIGNIFICANTLY.

Our annual and quarterly operating results have fluctuated in the past and may fluctuate significantly in the future due to a variety of factors, many of which are outside of our control. Because our operating results are volatile and difficult to predict, we believe that quarter-to-quarter comparisons of our operating results are not a good indication of our future performance. It is likely that in some future quarter our operating results may fall below the expectations of securities analysts and investors. In this event, the trading price of our securities may decline significantly.

25

TR 001550

App. 0090

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0026

DX0075-0026



Factors that may harm our business or cause our operating results to fluctuate include the following:

- our inability to obtain new customers at reasonable cost, retain existing customers, or encourage repeat purchases;

- decreases in the number of visitors to our Web site or our inability to convert visitors to our Web site into customers;

- the mix of children's products, including toys, video games, books, software, videos, music and baby-oriented products sold by us;

- seasonality;

- our inability to manage inventory levels or control inventory shrinkage;

- our inability to manage our distribution operations;

- our inability to adequately maintain, upgrade and develop our Web site, the systems that we use to process customers' orders and payments or our computer network;

- the ability of our competitors to offer new or enhanced Web sites, services or products;

- price competition;

- an increase in the level of our product returns;

- fluctuations in the demand for children's and baby products associated with movies, television and other entertainment events;

- our inability to obtain popular children's products, including toys, video games, books, software, videos, music and baby-oriented products from our vendors;

- fluctuations in the amount of consumer spending on children's products, including toys, video games, books, software, videos, music and baby-oriented products;

- the termination of existing or failure to develop new marketing relationships with key business partners;

- the extent to which we are not able to participate in cooperative advertising campaigns with major brand names as we have done in the past;

- increases in the cost of online or offline advertising;

- the amount and timing of operating costs and capital expenditures relating to expansion of our operations, including international expansion;

- unexpected increases in shipping costs or delivery times, particularly during the holiday season;

- technical difficulties, system downtime or Internet brownouts;

- government regulations related to use of the Internet for commerce or for sales and distribution of children's products, including toys, video games, books, software, videos, music and baby-oriented products; and

- economic conditions specific to the Internet, online commerce and the children's and baby products industries.

A number of factors will cause our gross margins to fluctuate in future periods, including the mix of children's products, including toys, video games, books, software, videos, music and baby-oriented products sold by us, inventory management, inbound and outbound shipping and handling costs, the

26

TR 001551

App. 0091

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0027



DX0075-0027

level of product returns and the level of discount pricing and promotional coupon usage. Any change in one or more of these factors could reduce our gross margins in future periods.

BECAUSE WE EXPERIENCE SEASONAL FLUCTUATIONS IN OUR NET SALES, OUR QUARTERLY RESULTS WILL FLUCTUATE AND OUR ANNUAL RESULTS COULD BE BELOW EXPECTATIONS.

We have historically experienced and expect to continue to experience seasonal fluctuations in our net sales. These seasonal patterns will cause quarterly fluctuations in our operating results. In particular, a disproportionate amount of our net sales have been realized during the fourth calendar quarter and we expect this trend to continue in the future.

In anticipation of increased sales activity during the fourth calendar quarter, we hire a significant number of temporary employees to bolster our permanent staff and we significantly increase our inventory levels. For this reason, if our net sales were below seasonal expectations during this quarter, our annual operating results could be below the expectations of securities analysts and investors.

Due to our limited operating history, it is difficult to predict the seasonal pattern of our sales and the impact of such seasonality on our business and financial results. In the future, our seasonal sales patterns may become more pronounced, may strain our personnel and warehousing and order shipment activities and may cause a shortfall in net sales as compared to expenses in a given period.

WE FACE SIGNIFICANT INVENTORY RISK BECAUSE CONSUMER DEMAND CAN CHANGE FOR PRODUCTS BETWEEN THE TIME THAT WE ORDER PRODUCTS AND THE TIME THAT WE RECEIVE THEM.

We carry a significant level of inventory. As a result, the rapidly changing trends in consumer tastes in the market for children's products, including toys, video games, books, software, videos, music and baby-oriented products, subject us to significant inventory risks. It is critical to our success that we accurately predict these trends and do not overstock unpopular products. The demand for specific products can change between the time the products are ordered and the date of receipt. We are particularly exposed to this risk because we derive a majority of our net sales in the fourth calendar quarter of each year. Our failure to sufficiently stock popular toys and other products in advance of such fourth calendar quarter would harm our operating results for the entire fiscal year.

In the event that one or more products do not achieve widespread consumer acceptance, we may be required to take significant inventory markdowns, which could reduce our net sales and gross margins. This risk may be greatest in the first calendar quarter of each year, after we have significantly increased inventory levels for the holiday season. We believe that this risk will increase as we open new departments or enter new product categories due to our lack of experience in purchasing products for these categories. In addition, to the extent that demand for our products increases over time, we may be forced to increase inventory levels. Any such increase would subject us to additional inventory risks.

BECAUSE WE DO NOT HAVE LONG-TERM OR EXCLUSIVE VENDOR CONTRACTS, WE MAY NOT BE ABLE TO GET SUFFICIENT QUANTITIES OF POPULAR CHILDREN'S PRODUCTS IN A TIMELY MANNER. AS A RESULT, WE COULD LOSE CUSTOMERS.

If we are not able to offer our customers sufficient quantities of toys or other products in a timely manner, we could lose customers and our net sales could be below expectations. Our success depends on our ability to purchase products in sufficient quantities at competitive prices, particularly for the holiday shopping season. As is common in the industry, we do not have long-term or exclusive arrangements with any vendor or distributor that guarantee the availability of toys or other children's products for resale. Therefore, we do not have a predictable or guaranteed supply of toys or other products.

27

TR 001552

App. 0092



TO MANAGE OUR GROWTH AND EXPANSION, WE NEED TO IMPROVE AND IMPLEMENT FINANCIAL AND MANAGERIAL CONTROLS AND REPORTING SYSTEMS AND PROCEDURES. IF WE ARE UNABLE TO DO SO SUCCESSFULLY, OUR RESULTS OF OPERATIONS WILL BE IMPAIRED.

Our rapid growth in personnel and operations has placed, and will continue to place, a significant strain on our management, information systems and resources. In addition, with the acquisition of BabyCenter, we added over 160 new employees, including managerial, technical and operations personnel, and have been required to assimilate substantially all of BabyCenter's operations into our operations. Further, during 1999 and 2000, we continued to expand our distribution operations, which now include four facilities operated by us, consisting of an approximately 105,000 square foot facility in Commerce, California; an approximately 438,500 square foot facility in Pittsylvania County, Virginia; an approximately 272,000 square foot facility in Greensboro, North Carolina; and an approximately 46,000 square foot facility in Swindon, England. Commencing in the fall of 2000, we also plan to conduct distribution operations from an approximately 763,000 square foot facility in Ontario, California that is currently being developed and to augment our Virginia facility with an additional 715,000 square foot facility adjacent to the existing facility. We have also entered into a lease for an approximately 108,000 square foot distribution facility in Belgium. This expansion may cause disruptions in our business as well as unexpected costs. We are not experienced with coordinating and managing distribution operations in geographically distant locations.

In order to manage this growth effectively, we need to continue to improve our financial and managerial controls and reporting systems and procedures. If we continue to experience a significant increase in the number of our personnel and expansion of our distribution operations, our existing management team may not be able to effectively train, supervise and manage all of our personnel or effectively oversee all of our distribution operations. In addition, our existing information systems may not be able to handle adequately the increased volume of information and transactions that would result from increased growth. Our failure to successfully implement, improve and integrate these systems and procedures would cause our results of operations to be below expectations.

RISK OF INTERNATIONAL EXPANSION

In October 1999, we launched eToys.co.uk, which serves customers in the United Kingdom, and in November 1999, we began serving all provinces of Canada through our eToys.com store. We also offer content and community to parents and expectant parents through BabyCentre.co.uk. Our European operations are conducted through a Netherlands subsidiary, and we are exploring opportunities to separately finance its operations and will only continue to expand our presence in foreign markets in a manner consistent with the availability and extent of such financing opportunities. Then can be no assurance that such financing opportunities will be available on terms acceptable to us or at all.

We have relatively little experience in purchasing, marketing and distributing products or services for these markets and may not benefit from any first-to-market advantages. It will be costly to establish international facilities and operations, promote our brand internationally, and develop localized Web sites and stores and other systems. We may not succeed in our efforts in these countries. If net sales from international activities do not offset the expense of establishing and maintaining foreign operations, our business prospects, financial condition and operating results will suffer.

As the international online commerce market continues to grow, competition in this market will likely intensify. In addition, governments in foreign jurisdictions may regulate Internet or other online services in such areas as content, privacy, network security, encryption or distribution. This may affect our ability to conduct business internationally.

TR 001553

App. 0093

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0029      *Page 29 of 171*          DX0075-0029

**WE MAY NOT BE ABLE TO COMPETE SUCCESSFULLY AGAINST CURRENT AND FUTURE COMPETITORS.**

The online commerce market is new, rapidly evolving and intensely competitive. Increased competition is likely to result in price reductions, reduced gross margins and loss of market share, any of which could seriously harm our net sales and results of operations. We expect competition to intensify in the future because current and new competitors can enter our market with little difficulty and can launch new Web sites at a relatively low cost. In addition, the children's products industries, including toy, video game, books, software, video, music and baby-oriented products, are intensely competitive.

We currently or potentially compete with a variety of other companies, including:

- other online companies that include toys and children's and baby products as part of their product offerings, such as Amazon.com, Barnesandnoble.com, CDnow, Beyond.com, iBaby, BabyCatalog.com, iVillage and Women.com;

- traditional store-based toy and children's and baby products retailers such as Toys R Us, FAO Schwarz, Zany Brainy, Noodle Kidoodle, babyGap, GapKids, Gymboree, KB Toys, The Right Start and Babies R Us;

- major discount retailers such as Wal-Mart, Kmart and Target;

- online efforts of these traditional retailers, including the online stores operated by Toys R Us, Wal-Mart, FAO Schwarz, babyGap, GapKids, KB Toys (i.e., KB Kids) and Gymboree;

- physical and online stores of entertainment entities that sell and license children and baby products, such as The Walt Disney Company and Warner Bros.;

- catalog retailers of children's and baby products as well as products for toddlers and expectant mothers;

- vendors or manufacturers of children's and baby products that currently sell some of their products directly online, such as Mattel and Hasbro;

- Internet portals and online service providers that feature shopping services, such as AOL, Yahoo!, Excite and Lycos; and

- various smaller online retailers of children's and baby products, such as Smarterkids.com.

Many traditional store-based and online competitors have longer operating histories, larger customer or user bases, greater brand recognition and significantly greater financial, marketing and other resources than we do. Many of these competitors can devote substantially more resources to Web site development than we can. In addition, larger, well-established and well-financed entities may join with online competitors or suppliers of children's products, including toys, video games, books, software, video, music and baby-oriented products as the use of the Internet and other online services increases.

Our competitors may be able to secure products from vendors on more favorable terms, fulfill customer orders more efficiently and adopt more aggressive pricing or inventory availability policies than we can. Traditional store-based retailers also enable customers to see and feel products in a manner that is not possible over the Internet.

29

TR 001554

App. 0094



**IF WE ENTER NEW BUSINESS CATEGORIES THAT DO NOT ACHIEVE MARKET ACCEPTANCE, OUR BRAND AND REPUTATION COULD BE DAMAGED AND WE COULD FAIL TO ATTRACT NEW CUSTOMERS.**

Any new department or product category that is launched or acquired by us which is not favorably received by consumers could damage our brand or reputation. This damage could impair our ability to attract new customers, which could cause our net sales to fall below expectations. The expansion of our business to include any new department or product category will require significant additional expensea, and strain our management, financial and operational resources. This type of expansion would also subject us to increased inventory risk. We may choose to expand our operations by developing other new departments or product categories, promoting new or complementary products, expanding the breadth and depth of products and services offered or expanding our market presence through relationships with third parties. In addition, we may pursue the acquisition of other new or complementary businesses, products or technologies.

**IF WE DO NOT SUCCESSFULLY EXPAND OUR WEB SITE AND THE SYSTEMS THAT PROCESS CUSTOMERS' ORDERS, WE COULD LOSE CUSTOMERS AND OUR NET SALES COULD BE REDUCED.**

If we fail to rapidly upgrade our Web site in order to accommodate increased traffic, we may lose customers, which would reduce our net sales. Furthermore, if we fail to rapidly expand the computer systems that we use to process and ship customer orders and process payments, we may not be able to successfully distribute customer orders. As a result, we could lose customers and our net sales could be reduced. In addition, our failure to rapidly upgrade our Web site or expand these computer systems without system downtime, particularly during the fourth calendar quarter, would further reduce our net sales. We may experience difficulty in improving and maintaining such systems if our employees or contractors that develop or maintain our computer systems become unavailable to us. We have experienced periodic systems interruptions, which we believe will continue to occur, while enhancing and expanding these computer systems.

**OUR FACILITIES AND SYSTEMS ARE VULNERABLE TO NATURAL DISASTERS AND OTHER UNEXPECTED PROBLEMS. THE OCCURRENCE OF A NATURAL DISASTER OR OTHER UNEXPECTED PROBLEM COULD DAMAGE OUR REPUTATION AND BRAND AND REDUCE OUR NET SALES.**

We are vulnerable to natural disasters and other unanticipated problems that are beyond our control. Our office facilities in California and London, England, house substantially all of our product development and information systems. Our third-party Web site hosting facilities located in Sunnyvale, California and Herndon, Virginia, house substantially all of our computer and communications hardware systems. Our distribution facilities located in California, North Carolina, Virginia and England house substantially all of our product inventory. A natural disaster, such as an earthquake, or harsh weather or other comparable problems that are beyond our control could cause interruptions or delays in our business and loss of data or render us unable to accept and fulfill customer orders. Any such interruptions or delays at these facilities would reduce our net sales. In addition, our systems and operations are vulnerable to damage or interruption from fire, flood, power loss, telecommunications failure, break-ins, earthquakes and similar events. We have no formal disaster recovery plan and our business interruption insurance may not adequately compensate us for losses that may occur. In addition, the failure by the third-party facilities to provide the data communications capacity required by us, as a result of human error, natural disaster or other operational disruptions, could result in interruptions in our service. The occurrence of any or all of these events could damage our reputation and brand and impair our business.

**OUR NET SALES COULD DECREASE IF OUR ONLINE SECURITY MEASURES FAIL.**

Our relationships with our customers may be adversely affected if the security measures that we use to protect their personal information, such as credit card numbers, are ineffective. If, as a result,

30

TR 001555

App. 0095



we lose many customers, our net sales could decrease. We rely on security and authentication technology that we license from third parties. With this technology, we perform real-time credit card authorization and verification with our bank. We cannot predict whether events or developments will result in a compromise or breach of the technology we use to protect a customer's personal information.

Furthermore, our servers may be vulnerable to computer viruses, physical or electronic break-ins, denial of service attacks and similar disruptions. We may need to expend significant additional capital and other resources to protect against a security breach or to alleviate problems caused by any breaches. We cannot assure that we can prevent all security breaches.

OUR NET SALES AND GROSS MARGINS WOULD DECREASE IF WE EXPERIENCE SIGNIFICANT CREDIT CARD FRAUD.

A failure to adequately control fraudulent credit card transactions would reduce our net sales and our gross margins because we do not carry insurance against this risk. We have developed technology to help us to detect the fraudulent use of credit card information. Nonetheless, to date, we have suffered losses as a result of orders placed with fraudulent credit card data even though the associated financial institution approved payment of the orders. Under current credit card practices, we are liable for fraudulent credit card transactions because we do not obtain a cardholder's signature.

WE FACE THE RISK OF INVENTORY SHRINKAGE.

If the security measures we use at our distribution facilities do not reduce or prevent inventory shrinkage, our gross profit margin may decrease. We have undertaken a number of measures designed to address inventory shrinkage, including the installation of enhanced security measures at our distribution facilities. These measures may not successfully reduce or prevent inventory shrinkage in future periods. Our failure to successfully improve the security measures we use at our distribution facilities may cause our gross profit margins and results of operations to be significantly below expectations in future periods.

IF WE DO NOT RESPOND TO RAPID TECHNOLOGICAL CHANGES, OUR SERVICES COULD BECOME OBSOLETE AND WE COULD LOSE CUSTOMERS.

If we face material delays in introducing new services, products and enhancements, our customers may forego the use of our services and use those of our competitors. To remain competitive, we must continue to enhance and improve the functionality and features of our online store. The Internet and the online commerce industry are rapidly changing. If competitors introduce new products and services embodying new technologies, or if new industry standards and practices emerge, our existing Web site and proprietary technology and systems may become obsolete.

To develop our Web site and other proprietary technology entails significant technical and business risks. We may use new technologies ineffectively or we may fail to adapt our Web site, our transaction processing systems and our computer network to meet customer requirements or emerging industry standards.

INTELLECTUAL PROPERTY CLAIMS AGAINST US CAN BE COSTLY AND COULD IMPAIR OUR BUSINESS.

Other parties may assert infringement or unfair competition claims against us. In the past, a toy distributor using a name similar to ours sent us notice of a claim of infringement of proprietary rights, which claim was subsequently withdrawn. We have also received a claim from the holders of a home shopping video catalog patent and a remote query communication system patent that our Internet marketing program and Web site operations, respectively, infringe such patents, and BabyCenter has received a claim from the holder of an automated registry patent that its Web site infringes such patent. We expect to receive other notices from other third parties in the future. We cannot predict

31

TR 001556

App. 0096

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0032     *Page 32 of 171*      DX0075-0032

whether third parties will assert claims of infringement against us, or whether any past or future assertions or prosecutions will harm our business. If we are forced to defend against any such claims, whether they are with or without merit or are determined in our favor, then we may face costly litigation, diversion of technical and management personnel, or product shipment delays. As a result of such a dispute, we may have to develop non-infringing technology or enter into royalty or licensing agreements. Such royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all. If there is a successful claim of product infringement against us and we are unable to develop non-infringing technology or license the infringed or similar technology on a timely basis, it could impair our business.

IF THE PROTECTION OF OUR TRADEMARKS AND PROPRIETARY RIGHTS IS INADEQUATE, OUR BRAND AND REPUTATION COULD BE IMPAIRED AND WE COULD LOSE CUSTOMERS.

The steps we take to protect our proprietary rights may be inadequate. We regard our copyrights, service marks, trademarks, trade dress, trade secrets and similar intellectual property as critical to our success. We rely on trademark and copyright law, trade secret protection and confidentiality or license agreements with our employees, customers, partners and others to protect our proprietary rights. We currently hold registered trademarks for "eToys" and "BabyCenter". Effective trademark, service mark, copyright and trade secret protection may not be available in every country in which we will sell our products and services online. Furthermore, the relationship between regulations governing domain names and laws protecting trademarks and similar proprietary rights is unclear. Therefore, we may be unable to prevent third parties from acquiring domain names that are similar to, infringe upon or otherwise decrease the value of our trademarks and other proprietary rights.

THE LOSS OF THE SERVICES OF ONE OR MORE OF OUR KEY PERSONNEL, OR OUR FAILURE TO ATTRACT, ASSIMILATE AND RETAIN OTHER HIGHLY QUALIFIED PERSONNEL IN THE FUTURE, COULD DISRUPT OUR OPERATIONS AND RESULT IN A REDUCTION IN NET SALES.

The loss of the services of one or more of our key personnel could seriously interrupt our business. We depend on the continued services and performance of our senior management and other key personnel, particularly Edward C. Lenk, our President, Chief Executive Officer and Chairman of the Board. Our future success also depends upon the continued service of our executive officers and other key sales, marketing and support personnel as well as the successful integration of BabyCenter's management with our senior management team. Our relationships with our officers and key employees are generally at will. We do not have "key person" life insurance policies covering any of our employees.

THERE ARE RISKS ASSOCIATED WITH THE BABYCENTER MERGER AND OTHER POTENTIAL ACQUISITIONS. AS A RESULT, WE MAY NOT ACHIEVE THE EXPECTED BENEFITS OF THE BABYCENTER MERGER AND OTHER POTENTIAL ACQUISITIONS.

We may not realize the anticipated benefits from the BabyCenter merger.

In February 2000, we announced that we were uniting our baby businesses, which then consisted of BabyCenter and the Baby Store at eToys, under the BabyCenter brand. As part of this initiative, we have directed all eToys customers seeking baby-related content and commerce to the BabyCenter.com site. In addition, we will move all BabyCenter commerce functions, such as distribution and customer service, from San Francisco to Southern California. The transition, which is expected to be completed during the summer of 2000, will reduce overlapping positions at BabyCenter and relocate other positions to eToys.

We may not be able to successfully assimilate BabyCenter's additional personnel, operations, acquired technology and products into our business. The merger may further strain our existing

32

TR 001557

App. 0097



financial and managerial controls and reporting systems and procedures. In addition, key BabyCenter personnel may decide not to work for us. These difficulties could disrupt our ongoing business, distract management and employees or increase our expenses. Further, the physical expansion in facilities that has occurred as a result of this merger may result in disruptions that seriously impact our business. In particular, we have operations in multiple facilities in geographically distant areas. We are not experienced in managing facilities or operations in geographically distant areas.

If we are presented with appropriate opportunities, we intend to make other investments in complementary companies, products or technologies. We may not realize the anticipated benefits of any other acquisition or investment. If we buy another company, we will likely face the same risks, uncertainties and disruptions as discussed above with respect to the BabyCenter merger. Furthermore, we may have to incur debt or issue equity securities to pay for any additional future acquisitions or investments, the issuance of which would be dilutive to us or our existing securityholders and could affect the price of our securities.

IT MAY BE DIFFICULT FOR A THIRD PARTY TO ACQUIRE US EVEN IF DOING SO WOULD BE BENEFICIAL TO OUR SECURITYHOLDERS.

Provisions of our amended and restated certificate of incorporation, our amended and restated bylaws and Delaware law could make it more difficult for a third party to acquire us, even if doing so would be beneficial to our securityholders.

We are subject to Section 203 of the Delaware General Corporation Law, which regulates corporate acquisitions. In general, Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the date the person became an interested stockholder, unless:

- the board of directors approved the transaction in which such stockholder became an interested stockholder prior to the date the interested stockholder attained such status;

- upon consummation of the transaction that resulted in the stockholder's becoming an interested stockholder, he or she owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding shares owned by persons who are directors and also officers; or

- on or subsequent to such date the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders.

A "business combination" generally includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. In general, an "interested stockholder" is a person who, together with affiliates and associates, owns, or within three years prior to the determination of interested stockholder status, did own, 15% or more of a corporation's voting stock.

Our amended and restated certificate of incorporation and amended and restated bylaws do not provide for the right of stockholders to act by written consent without a meeting or for cumulative voting in the election of directors. In addition, our amended and restated certificate of incorporation permits the board of directors to issue preferred stock with voting or other rights without any stockholder action. Following our 2000 annual meeting of stockholders on September 12, 2000, our amended and restated certificate of incorporation provides for the board of directors to be divided into three classes, with staggered three-year terms. As a result, only one class of directors will be elected at each annual meeting of stockholders. Each of the two other classes of directors will continue to serve for the remainder of its respective three-year term. These provisions, which require the vote of stockholders holding at least a majority of the outstanding common stock to amend, may have the effect of deterring hostile takeovers or delaying changes in our management.

33

TR 001558

App. 0098


DX0075-0034

**App. 5 (Part 2)**

RISKS RELATED TO OUR INDUSTRY

**IF WE ARE UNABLE TO ACQUIRE THE NECESSARY WEB DOMAIN NAMES, OUR BRAND AND REPUTATION COULD BE DAMAGED AND WE COULD LOSE CUSTOMERS.**

We may be unable to acquire or maintain Web domain names relating to our brand in the United States and other countries in which we may conduct business. As a result, we may be unable to prevent third parties from acquiring and using domain names relating to our brand. Such use could damage our brand and reputation and take customers away from our Web site. We currently hold various relevant domain names, including the "eToys.com" and "BabyCenter.com" domain names. The acquisition and maintenance of domain names generally is regulated by governmental agencies and their designees. The regulation of domain names in the United States and in foreign countries is subject to change in the near future. Such changes in the United States are expected to include the creation of additional top-level domains. Governing bodies may establish additional top-level domains, appoint additional domain name registrars or modify the requirements for holding domain names.

**WE MAY NEED TO CHANGE THE MANNER IN WHICH WE CONDUCT OUR BUSINESS IF GOVERNMENT REGULATION INCREASES.**

The adoption or modification of laws or regulations relating to the Internet could adversely affect the manner in which we currently conduct our business. In addition, the growth and development of the market for online commerce may lead to more stringent consumer protection laws, both in the United States and abroad, that may impose additional burdens on us. Laws and regulations directly applicable to communications or commerce over the Internet are becoming more prevalent. The United States Congress recently enacted Internet laws regarding children's privacy, copyrights, taxation and the transmission of sexually explicit material, and the Federal Trade Commission's Children's Online Privacy Protection Act became effective April 21, 2000. The European Union recently enacted its own privacy regulations. In addition, we are subject to existing federal, state and local regulations pertaining to consumer protection, such as the Federal Trade Commission's Mail and Telephone Order Rule. The law of the Internet, however, remains largely unsettled, even in areas where there has been some legislative action. It may take years to determine whether and how existing laws such as those governing intellectual property, privacy, libel and taxation apply to the Internet. Any failure by us to comply with the rules and regulations applicable to our business could result in action being taken against us that could have a material adverse effect on our business and results of operations.

In order to comply with new or existing laws regulating online commerce, we may need to modify the manner in which we do business, which may result in additional expenses. For instance, we may need to spend time and money revising the process by which we fulfill customers' orders to ensure that each shipment complies with applicable laws. We may need to hire additional personnel to monitor our compliance with applicable laws. We may also need to modify our software to further protect our customers' personal information.

**WE MAY BE SUBJECT TO LIABILITY FOR THE INTERNET CONTENT THAT WE PUBLISH.**

As a publisher of online content, we face potential liability for defamation, negligence, copyright, patent or trademark infringement, or other claims based on the nature and content of materials that we publish or distribute. In particular, our BabyCenter Web site offers a variety of content for new and expectant parents, including content relating to pregnancy, fertility and infertility, nutrition, child rearing and related subjects. If we face liability, then our reputation and our business may suffer. In the past, plaintiffs have brought these types of claims and sometimes successfully litigated them against online services. Although we carry general liability insurance to cover claims of these types, there can be no assurance that such insurance will be adequate to indemnify us for all liability that may be imposed on us.

34

TR 001559

App. 0099

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0035

Page 35 of 171



DX0075-0035

OUR NET SALES COULD DECREASE IF WE BECOME SUBJECT TO SALES AND OTHER TAXES.

If one or more states or any foreign country successfully asserts that we should collect sales or other taxes on the sale of our products, our net sales and results of operations could be harmed. We do not currently collect sales or other similar taxes for physical shipments of goods into states other than California. However, one or more local, state or foreign jurisdictions may seek to impose sales tax collection obligations on us. In addition, any new operation in states outside California could subject our shipments in such states to state sales taxes under current or future laws. If we become obligated to collect sales taxes, we will need to update our system that processes customers' orders to calculate the appropriate sales tax for each customer order and to remit the collected sales taxes to the appropriate authorities. These upgrades will increase our operating expenses. In addition, our customers may be discouraged from purchasing products from us because they have to pay sales tax, causing our net sales to decrease. As a result, we may need to lower prices to retain these customers.

### RISKS RELATED TO SECURITIES MARKETS

WE MAY BE UNABLE TO MEET OUR FUTURE CAPITAL REQUIREMENTS.

We cannot be certain that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-related or debt securities, such securities may have rights, preferences or privileges senior to those of the rights of our common stock and our stockholders will experience additional dilution. We require substantial working capital to fund our business. Since our inception, we have experienced negative cash flow from operations and expect to experience significant negative cash flow from operations for the foreseeable future. Significant volatility in the stock markets, particularly with respect to Internet stocks, may increase the difficulty of raising additional capital. Although we believe that current cash and cash equivalents and cash that may be generated from operations will be sufficient to meet our anticipated cash needs through June 30, 2001, there can be no assurance to that effect.

THE MARKET PRICE OF OUR SECURITIES MAY BE VOLATILE, WHICH COULD RESULT IN SUBSTANTIAL LOSSES FOR INDIVIDUAL SECURITYHOLDERS.

The market price for our securities has been and is likely to continue to be highly volatile and subject to wide fluctuations in response to factors including the following, some of which are beyond our control:

- actual or anticipated variations in our quarterly operating results;

- announcements of technological innovations, increased cost of operations or new products or services by us or our competitors;

- changes in financial estimates by securities analysts;

- conditions or trends in the Internet and/or online commerce industries;

- changes in the economic performance and/or market valuations of other Internet, online commerce or retail companies;

- volatility in the stock markets, particularly with respect to Internet stocks, and decreases in the availability of capital for Internet-related businesses;

- announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital commitments;

- additions or departures of key personnel;

35

TR 001560

App. 0100

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0036



DX0075-0036

- transfer restrictions on our outstanding shares of common stock or sales of additional shares of common stock; and

- potential litigation.

From May 20, 1999 (the first day of public trading of our common stock), through August 11, 2000, the high and low sales prices for our common stock fluctuated between $86.00 and $3.94. On August 11, 2000, the closing price of our common stock was $4.25. In the past, following periods of volatility in the market price of their securities, many companies have been the subject of securities class action litigation. If we were sued in a securities class action, it could result in substantial costs and a diversion of management's attention and resources and would cause the prices of our common stock to fall.

ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

We are subject to market risk related to changes in foreign currency exchange rates and interest rates. We do not use derivative financial instruments.

FOREIGN CURRENCY RISK. We currently have wholly-owned subsidiaries with operations in the United Kingdom and Europe. All sales and expenses incurred by the foreign subsidiaries are denominated in the British pound and Euro, which are considered the functional currencies of the respective subsidiaries. As such, we are exposed to foreign currency risk which arises in part from funding denominated in British pounds and Euros provided to the foreign subsidiaries and from the translation of the foreign subsidiaries' financial results into U.S. dollars during consolidation. As exchange rates vary, our results from operations and profitability may be adversely impacted. As of June 30, 2000, the effect of the foreign currency exchange rate fluctuations has not been material.

INTEREST RATE RISK. We maintain a portfolio of highly liquid cash equivalents maturing in three months or less as of the date of purchase. Given the short-term nature of these investments, we believe we are not subject to significant interest rate risk with respect to these investments. Additionally, we are subject to interest rate risk related to the $150 million of convertible notes, combined with our notes payable and capital lease obligations. Our notes payable and capital lease obligations bear interest at fixed rates, and their carrying amount approximates fair value based on borrowing rates currently available to us. As such, we believe that market risk arising from our notes payable and capital lease obligations is not material. The convertible notes, issued in December 1999, are unsecured and are subordinated to our existing and future senior debt as defined in the indenture pursuant to which the convertible notes were issued. The principal amount of the convertible notes will be due on December 1, 2004 and will bear interest at an annual rate of 6.25%, payable twice a year, on June 1 and December 1, beginning June 1, 2000, until the principal amount of the convertible notes is fully repaid. The convertible notes may be converted into our common stock at the option of the holder at any time prior to December 1, 2004, unless the convertible notes have been previously redeemed or repurchased by us. The conversion rate, subject to adjustment in certain circumstances, is 13.5323 shares of our common stock for each $1,000 principal amount of convertible notes, which is equivalent to a conversion price of approximately $73.90 per share. As of June 30, 2000, the carrying value of the convertible notes was $150 million. As of June 30, 2000, the fair value of the convertible notes was $65.7 million based upon the closing market price as of that date. The difference between the carrying value and the fair value of the convertible notes as of June 30, 2000 is primarily due to declines in the price of our common stock and the favorable interest rate of the convertible notes as compared to current interest rates.

36

TR 001561

App. 0101



PART II--OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

See Note 4, Commitments and Contingencies, in Part I, Item 1, Consolidated Financial Statements.

ITEM 2. CHANGES IN SECURITIES AND USE OF PROCEEDS

On June 12, 2000, the Company issued 10,000 shares of Series D Convertible Preferred Stock, $10,000 stated value per share, and warrants to purchase 5,018,296 shares of common stock with a current warrant exercise price of $7.17375 per share. The preferred stock is convertible into shares of the Company's common stock in the manner described herein under "Note 3. Redeemable Convertible Preferred Stock" in the Notes to Consolidated Financial Statements set forth in Part I, Item 1 hereof. The securities were issued to HFTP Investment, L.L.C., Leonardo, L.P., Wingate Capital Ltd. and Fisher Capital Ltd. in exchange for aggregate consideration of $100.0 million, with a placement fee payable by the Company to Promethean Capital Group LLC of $2.0 million. The issuance of such securities was exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to Section 4(2) thereof.

ITEM 3. DEFAULTS UPON SENIOR SECURITIES

None.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

ITEM 5. OTHER INFORMATION

None.

37

TR 001562

App. 0102



ITEM 6. EXHIBITS AND REPORTS ON FORM 8-K

    (a) Exhibits

| | |
|---|---|
| 3.1 | Amended and Restated Bylaws |
| 3.2 | Certificate of Designations, Preferences and Rights relating to Series D Convertible Preferred Stock (incorporated herein by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 4.1 | Form of Warrant issued to holders of Series D Preferred Stock (incorporated herein by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.1 | Lease Agreement dated August 11, 1999 between The Pink and Schindler Company and BabyCenter, Inc. |
| 10.2 | Underlease dated September 29, 1999 between the Post Office and eToys UK Limited |
| 10.3 | Registration Rights Agreement, dated as of June 12, 2000, by and among the Company and certain investors (incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.4 | Securities Purchase Agreement, dated as of June 12, 2000, by and among the Company and certain investors (incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.5 | Lease agreement dated July 24, 2000 between Land Securities PLC and eToys UK Limited |
| 10.6 | Underlease dated July 26, 2000 between eToys UK Limited and Momentum Limited and Diamond Technology Partners Incorporated |
| 27.1 | Financial Data Schedule |

    (b) Reports on Form 8-K

    Current Report on Form 8-K dated June 12, 2000 pertaining to the Company's issuance of Series D Convertible Preferred Stock and related warrants.

    Current Reports on Form 8-K dated June 2, 2000 and June 23, 2000 for purposes of making certain information regarding the Company generally available in order to incorporate it by reference into other Company filings.

TR 001563

App. 0103


DX0075-0039

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, eToys
Inc. has duly caused this report to be signed on its behalf by the undersigned,
thereunto duly authorized.

ETOYS INC.

By:          /s/ STEVEN J. SCHOCH
    ------------------------------------------------
             Steven J. Schoch
        EXECUTIVE VICE PRESIDENT AND
           CHIEF FINANCIAL OFFICER

Dated:  August 14, 2000

39

TR 001564

App. 0104


DX0075-0040

EXHIBIT INDEX

EXHIBITS
--------

| | |
|---|---|
| 3.1 | Amended and Restated Bylaws |
| 3.2 | Certificate of Designations, Preferences and Rights relating to Series D Convertible Preferred Stock (incorporated herein by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 4.1 | Form of Warrant issued to holders of Series D Preferred Stock (incorporated herein by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.1 | Lease Agreement dated August 11, 1999 between The Fink and Schindler Company and BabyCenter, Inc. |
| 10.2 | Underlease dated September 29, 1999 between the Post Office and eToys UK Limited |
| 10.3 | Registration Rights Agreement, dated as of June 12, 2000, by and among the Company and certain investors (incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.4 | Securities Purchase Agreement, dated as of June 12, 2000, by and among the Company and certain investors (incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed June 13, 2000) |
| 10.5 | Lease agreement dated July 24, 2000 between Land Securities PLC and eToys UK Limited |
| 10.6 | Underlease dated July 26, 2000 between eToys UK Limited and Momentus Limited and Diamond Technology Partners Incorported |
| 27.1 | Financial Data Schedule |

40

TR 001565

App. 0105



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

## EX-3.1

EXHIBIT 3.1
10-Q Filed on 08/14/2000 - Period: 06/33/2000
File Number 000-25709



GSI

LIVEDGAR Information provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

TR 001566

App. 0106



EXHIBIT 3.1

RESTATED BYLAWS

OF

ETOYS INC.

(AS AMENDED AND RESTATED ON JUNE 8, 2000)

TR 001567

App. 0107

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0043



DX0075-0043

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| ARTICLE I – CORPORATE OFFICES | | 1 |
| 1.1 | Registered Office | 1 |
| 1.2 | Other Offices | 1 |
| | | 1 |
| ARTICLE II – MEETINGS OF STOCKHOLDERS | | 1 |
| 2.1 | Place of Meetings | 1 |
| 2.2 | Annual Meeting | 1 |
| 2.3 | Special Meeting | 3 |
| 2.4 | Notice of Stockholder's Meeting; Affidavit of Notice | 3 |
| 2.5 | Advance Notice of Stockholder Nominees | 4 |
| 2.6 | Quorum | 4 |
| 2.7 | Adjourned Meeting; Notice | 4 |
| 2.8 | Conduct of Business | 5 |
| 2.9 | Voting | 5 |
| 2.10 | Waiver of Notice | 5 |
| 2.11 | Record Date for Stockholder Notice; Voting | 6 |
| 2.12 | Proxies | 6 |
| | | 6 |
| ARTICLE III – DIRECTORS | | 6 |
| 3.1 | Powers | 6 |
| 3.2 | Number of Directors | 6 |
| 3.3 | Election, Qualification and Term of Office of Directors | 6 |
| 3.4 | Resignation and Vacancies | 7 |
| 3.5 | Place of Meetings; Meetings by Telephone | 8 |
| 3.6 | Regular Meetings | 8 |
| 3.7 | Special Meetings; Notice | 8 |
| 3.8 | Quorum | 8 |
| 3.9 | Waiver of Notice | 9 |
| 3.10 | Board Action by Written Consent without a Meeting | 9 |
| 3.11 | Fees and Compensation of Directors | 9 |
| 3.12 | Approval of Loans to Officers | 9 |
| 3.13 | Removal of Directors | 10 |
| 3.14 | Uncle and Chairman of the Board of Directors | 10 |
| | | 10 |
| ARTICLE IV – COMMITTEES | | 10 |
| 4.1 | Committees of Directors | 11 |
| 4.2 | Committee Minutes | 11 |
| 4.3 | Meetings and Action of Committees | 11 |
| | | 11 |
| ARTICLE V – OFFICERS | | 11 |
| 5.1 | Officers | 11 |
| 5.2 | Appointment of Officers | 11 |
| 5.3 | Subordinate Officers | 11 |
| 5.4 | Removal and Resignation of Officers | 12 |

i

TR 001568

App. 0108



PAGE

5.5     Vacancies in Offices                                         12
5.6     Chief Executive Officer                                      12
5.7     President                                                    12
5.8     Vice Presidents                                              12
5.9     Secretary                                                    13
5.10    Chief Financial Officer                                      13
5.11    Representation of Shares of Other Corporations               14
5.12    Authority and Duties of Officers                             14

ARTICLE VI - INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES,      14
    AND OTHER AGENTS
6.1     Indemnification of Directors and Officers                    14
6.2     Indemnification of Others                                    14
6.3     Payment of Expenses in Advance                               15
6.4     Indemnity Not Exclusive                                      15
6.5     Insurance                                                    15
6.6     Conflicts                                                    15

ARTICLE VII - RECORDS AND REPORTS                                    16
7.1     Maintenance and Inspection of Records                        16
7.2     Inspection by Directors                                      16
7.3     Annual Statement to Stockholders                             16

ARTICLE VIII - GENERAL MATTERS                                       17
8.1     Checks                                                       17
8.2     Execution of Corporate Contracts and Instruments            17
8.3     Stock Certificates; Partly Paid Shares                       17
8.4     Special Designation on Certificates                          18
8.5     Lost Certificates                                            18
8.6     Construction; Definitions                                    18
8.7     Dividends                                                    18
8.8     Fiscal Year                                                  19
8.9     Seal                                                         19
8.10    Transfer of Stock                                            19
8.11    Stock Transfer Agreements                                    19
8.12    Registered Stockholders                                      19

ARTICLE IX - AMENDMENTS                                              20

ii

TR 001569

App. 0109

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0045            *Page 45 of 171*            
DX0075-0045

RESTATED BYLAWS

OF

ETOYS INC.

ARTICLE I

CORPORATE OFFICES

1.1  REGISTERED OFFICE.

The address of the Corporation's registered office in the State of Delaware is 15 East North Street, Dover, County of Kent, Delaware 19901. The name of its registered agent at such address is Incorporating Services, Ltd.

1.2  OTHER OFFICES.

The Board of Directors may at any time establish other offices at any place or places where the Corporation is qualified to do business.

ARTICLE II

MEETINGS OF STOCKHOLDERS

2.1  PLACE OF MEETINGS.

Meetings of stockholders shall be held at any place, within or outside the State of Delaware, designated by the Board of Directors. In the absence of any such designation, stockholders' meetings shall be held at the registered office of the Corporation.

2.2  ANNUAL MEETING.

(a)  The annual meeting of stockholders shall be held each year on a date and at a time designated by the Board of Directors. At the meeting, directors shall be elected and any other proper business may be transacted.

(b)  Nominations of persons for election to the Board of Directors of the Corporation and the proposal of business to be transacted by the stockholders may be made at an annual meeting of stockholders (i) pursuant to the Corporation's notice with respect to such meeting, (ii) by or at the direction of the Board of Directors or (iii) by any stockholder of the Corporation who was a stockholder of record at the time of giving of the notice provided for in this Section 2.2, who is entitled to vote at the meeting and who has complied with the notice procedures set forth in this Section 2.2.

1

TR 001570

App. 0110



(c)   In addition to the requirements of Section 2.5, for nominations or other business to be properly brought before an annual meeting by a stockholder pursuant to clause (iii) of paragraph (b) of this Section 2.2, the stockholder must have given timely notice thereof in writing to the secretary of the Corporation and such business must be a proper matter for stockholder action under the General Corporation Law of Delaware. To be timely, a stockholder's notice shall be delivered to the secretary at the principal executive offices of the Corporation not less than 20 days nor more than 90 days prior to the first anniversary of the preceding year's annual meeting of stockholders; provided, however, that in the event that the date of the annual meeting is more than 30 days prior to or more than 60 days after such anniversary date, notice by the stockholder to be timely must be so delivered not earlier than the 90th day prior to such annual meeting and not later than the close of business on the later of the 20th day prior to such annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made. Such stockholder's notice shall set forth (i) as to each person whom the stockholder proposes to nominate for election or reelection as a director all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Regulation 14A under the Securities Exchange Act of 1934, as amended (the "Exchange Act") (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); (ii) as to any other business that the stockholder proposes to bring before the meeting, a brief description of such business, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder and the beneficial owner, if any, on whose behalf the proposal is made; and (iii) as to the stockholder giving the notice and the beneficial owner, if any, on whose behalf the nomination or proposal is made (A) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner and (B) the class and number of shares of the Corporation which are owned beneficially and of record by such stockholder and such beneficial owner.

(d)   Only such business shall be conducted at an annual meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.2. The chairman of the meeting shall determine whether a nomination or any business proposed to be transacted by the stockholders has been properly brought before the meeting and, if any proposed nomination or business has not been properly brought before the meeting, the chairman shall declare that such proposed business or nomination shall not be presented for stockholder action at the meeting.

(e)   For purposes of this Section 2.2, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or a comparable national news service.

(f)   Nothing in this Section 2.2 shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

2

TR 001571

App. 0111

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0047    Page 47 of 171


DX0075-0047

2.3  SPECIAL MEETING.

(a)  A special meeting of the stockholders may be called at any time by the Board of Directors, or by the chairman of the board, or by the president.

(b)  Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to such notice of meeting (i) by or at the direction of the Board of Directors or (ii) by any stockholder of the Corporation who is a stockholder of record at the time of giving of notice provided for in Section 2.5, who shall be entitled to vote at the meeting and who complies with the notice procedures set forth in Section 2.5.

2.4  NOTICE OF STOCKHOLDER'S MEETINGS; AFFIDAVIT OF NOTICE.

All notices of meetings of stockholders shall be in writing and shall be sent or otherwise given in accordance with this Section 2.4 of these Bylaws not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting (or such longer or shorter time as is required by Section 2.5 of these Bylaws, if applicable). The notice shall specify the place, date, and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

Written notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at his address as it appears on the records of the Corporation. An affidavit of the secretary or an assistant secretary or of the transfer agent of the Corporation that the notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

2.5  ADVANCE NOTICE OF STOCKHOLDER NOMINEES.

Only persons who are nominated in accordance with the procedures set forth in this Section 2.5 shall be eligible for election as directors. Nominations of persons for election to the Board of Directors of the Corporation may be made at a meeting of stockholders by or at the direction of the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in this Section 2.5. Such nominations, other than those made by or at the direction of the Board of Directors, shall be made pursuant to timely notice in writing to the secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than 60 days nor more than 90 days prior to the meeting; provided, however, that in the event that less than 60 days' notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made. Such stockholder's notice shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of such person, (ii) the principal occupation or employment of such person, (iii) the class and number of shares of the Corporation which are beneficially owned by

3

TR 001572

App. 0112

DX0075-0048

such person and (iv) any other information relating to such person that is required to be disclosed in solicitations of proxies for election of directors, or is otherwise required, in each case pursuant to Regulation 14A under the Exchange Act (including, without limitation, such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected); and (b) as to the stockholder giving the notice (i) the name and address, as they appear on the Corporation's books, of such stockholder and (ii) the class and number of shares of the Corporation which are beneficially owned by such stockholder. At the request of the Board of Directors any person nominated by the Board of Directors for election as a director shall furnish to the secretary of the Corporation that information required to be set forth in a stockholder's notice of nomination which pertains to the nominee. No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 2.5. The chairman of the meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the procedures prescribed by the Bylaws, and if he or she should so determine, he or she shall so declare to the meeting and the defective nomination shall be disregarded.

2.6   QUORUM.

The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the Certificate of Incorporation. If, however, such quorum is not present or represented at any meeting of the stockholders, then either (a) the chairman of the meeting or (b) the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

2.7   ADJOURNED MEETING; NOTICE.

When a meeting is adjourned to another time or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business that might have been transacted at the original meeting. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2.8   CONDUCT OF BUSINESS.

The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including the manner of voting and the conduct of business.

4

TR 001573

App. 0113



2.9  VOTING.

(a)  The stockholders entitled to vote at any meeting of stockholders shall be determined in accordance with the provisions of Section 2.11 of these Bylaws, subject to the provisions of Sections 217 and 218 of the General Corporation Law of Delaware (relating to voting rights of fiduciaries, pledgors and joint owners of stock and to voting trusts and other voting agreements).

(b)  Except as may be otherwise provided in the Certificate of Incorporation, each stockholder shall be entitled to one vote for each share of capital stock held by such stockholder.

2.10  WAIVER OF NOTICE.

Whenever notice is required to be given under any provision of the General Corporation Law of Delaware or of the Certificate of Incorporation or these Bylaws, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders need be specified in any written waiver of notice unless so required by the Certificate of Incorporation or these Bylaws.

2.11  RECORD DATE FOR STOCKHOLDER NOTICE; VOTING.

In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than 60 nor less than 10 days before the date of such meeting, nor more than 60 days prior to any other action. If the Board of Directors does not so fix a record date:

(a)  The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)  The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

5

TR 001574

App. 0114

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0050

*Page 50 of 171*



DX0075-0050

2.12 PROXIES.

Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by a written proxy, signed by the stockholder and filed with the secretary of the Corporation, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be deemed signed if the stockholder's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission or otherwise) by the stockholder or the stockholder's attorney-in-fact. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212(e) of the General Corporation Law of Delaware.

ARTICLE III

DIRECTORS

3.1 POWERS.

Subject to the provisions of the General Corporation Law of Delaware and any limitations in the Certificate of Incorporation or these Bylaws relating to action required to be approved by the stockholders or by the outstanding shares, the business and affairs of the Corporation shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors.

3.2 NUMBER OF DIRECTORS.

The number of directors constituting the entire Board of Directors shall be seven.

3.3 ELECTION, QUALIFICATION AND TERM OF OFFICE OF DIRECTORS.

Except as provided in Section 3.4 of these Bylaws, directors shall be elected at each annual meeting of stockholders to hold office until the next annual meeting. Directors need not be stockholders unless so required by the Certificate of Incorporation or these Bylaws, wherein other qualifications for directors may be prescribed. Each director, including a director elected to fill a vacancy, shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal.

Elections of directors need not be by written ballot.

3.4 RESIGNATION AND VACANCIES.

Any director may resign at any time upon written notice to the attention of the secretary of the Corporation. When one or more directors so resigns and the resignation is effective at a future date, a majority of the directors then in office, including those who have so resigned, shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective, and each director so chosen shall hold

6

TR 001575

App. 0115


DX0075-0051

office as provided in this section in the filling of other vacancies. A vacancy created by the removal of a director by the vote of the stockholders or by court order may be filled only by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute a majority of the quorum. Each director so elected shall hold office until the next annual meeting of the stockholders and until a successor has been elected and qualified.

Unless otherwise provided in the Certificate of Incorporation or these Bylaws:

(a)  Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

(b)  Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

If at any time, by reason of death or resignation or other cause, the Corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in accordance with the provisions of the Certificate of Incorporation or these Bylaws, or may apply to the Court of Chancery for a decree summarily ordering an election as provided in Section 211 of the General Corporation Law of Delaware.

If, at the time of filling any vacancy or any newly created directorship, the directors then in office constitute less than a majority of the whole Board of Directors (as constituted immediately prior to any such increase), then the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10% of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid, which election shall be governed by the provisions of Section 211 of the General Corporation Law of Delaware as far as applicable.

3.5  PLACE OF MEETINGS; MEETINGS BY TELEPHONE.

The Board of Directors of the Corporation may hold meetings, both regular and special, either within or outside the State of Delaware.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors, or any committee, by means of conference telephone or similar communications equipment by means of which all persons participating in

7

TR 001576

App. 0116



DX0075-0052

the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

3.6 REGULAR MEETINGS.

Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

3.7 SPECIAL MEETINGS; NOTICE.

Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the chairman of the board, the president, any vice president, the secretary or any two directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail or telegram, charges prepaid, addressed to each director at that director's address as it is shown on the records of the Corporation. If the notice is mailed, it shall be deposited in the United States mail at least four days before the time of the holding of the meeting. If the notice is delivered personally or by telephone or by telegram, it shall be delivered personally or by telephone or to the telegraph company at least 48 hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose or the place of the meeting, if the meeting is to be held at the principal executive office of the Corporation.

3.8 QUORUM.

At all meetings of the Board of Directors, a majority of the authorized number of directors shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors, except as may be otherwise specifically provided by statute or by the Certificate of Incorporation. If a quorum is not present at any meeting of the Board of Directors, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting.

3.9 WAIVER OF NOTICE.

Whenever notice is required to be given under any provision of the General Corporation Law of Delaware or of the Certificate of Incorporation or these Bylaws, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall

8

TR 001577

App. 0117

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0053

*Page 53 of 171*



DX0075-0053

constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the directors, or members of a committee of directors, need be specified in any written waiver of notice unless so required by the Certificate of Incorporation or these Bylaws.

### 3.10 BOARD ACTION BY WRITTEN CONSENT WITHOUT A MEETING.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee. Written consents representing actions taken by the board or committee may be executed by telex, telecopy or other facsimile transmission, and such facsimile shall be valid and binding to the same extent as if it were an original.

### 3.11 FEES AND COMPENSATION OF DIRECTORS.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. No such compensation shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

### 3.12 APPROVAL OF LOANS TO OFFICERS.

The Corporation may lend money to, or guarantee any obligation of, or otherwise assist any officer or other employee of the Corporation or of its subsidiary, including any officer or employee who is a director of the Corporation or its subsidiary, whenever, in the judgment of the directors, such loan, guaranty or assistance may reasonably be expected to benefit the Corporation. The loan, guaranty or other assistance may be with or without interest and may be unsecured, or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the Corporation. Nothing in this Section 3.12 contained shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the Corporation at common law or under any statute.

### 3.13 REMOVAL OF DIRECTORS.

Unless otherwise restricted by statute, by the Certificate of Incorporation or by these Bylaws, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors; provided, however, that if the stockholders of the Corporation are entitled to cumulative voting, if less than the entire Board of Directors is to be removed, no director may be removed without cause if the votes cast against his removal would be sufficient to elect him if then cumulatively voted at an election of the entire Board of Directors.

9

TR 001578

App. 0118



DX0075-0054

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of such director's term of office.

3.14 UNCLE AND CHAIRMAN OF THE BOARD OF DIRECTORS.

The Corporation may also have, at the discretion of the Board of Directors, an uncle and chairman of the Board of Directors who shall not be considered an officer of the Corporation.

ARTICLE IV

COMMITTEES

4.1  COMMITTEES OF DIRECTORS.

The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, with each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors or in the Bylaws of the Corporation, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; but no such committee shall have the power or authority to (a) amend the Certificate of Incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board of Directors as provided in Section 151(a) of the General Corporation Law of Delaware, fix the designations and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the Corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the Corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), (b) adopt an agreement of merger or consolidation under Sections 251 or 252 of the General Corporation Law of Delaware, (c) recommend to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, (d) recommend to the stockholders a dissolution of the Corporation or a revocation of a dissolution, or (e) amend the Bylaws of the Corporation; and, unless the board resolution establishing the committee, the Bylaws or the Certificate of Incorporation expressly so provide, no such committee shall have the power or authority to declare a dividend, to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law of Delaware.

10

TR 001579

App. 0119

Desc: 06-30-00 eToys, inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0055
Page 55 of 171

DX0075-0055

4.2  COMMITTEE MINUTES.

Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

4.3  MEETINGS AND ACTION OF COMMITTEES.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Section 3.5 (place of meetings and meetings by telephone), Section 3.6 (regular meetings), Section 3.7 (special meetings and notice), Section 3.8 (quorum), Section 3.9 (waiver of notice), and Section 3.10 (action without a meeting) of these Bylaws, with such changes in the context of such provisions as are necessary to substitute the committee and its members for the Board of Directors and its members; provided, however, that the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee, that special meetings of committees may also be called by resolution of the Board of Directors and that notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these Bylaws.

ARTICLE V

OFFICERS

5.1  OFFICERS.

The officers of the Corporation shall be a chief executive officer, a president, a secretary, and a chief financial officer. The Corporation may also have, at the discretion of the Board of Directors, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and any such other officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws. Any number of offices may be held by the same person.

5.2  APPOINTMENT OF OFFICERS.

The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Sections 5.3 or 5.5 of these Bylaws, shall be appointed by the Board of Directors, subject to the rights, if any, of an officer under any contract of employment.

5.3  SUBORDINATE OFFICERS.

The Board of Directors may appoint, or empower the chief executive officer or the president to appoint, such other officers and agents as the business of the Corporation may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board of Directors may from time to time determine.

11

TR 001580

App. 0120



5.4  REMOVAL AND RESIGNATION OF OFFICERS.

Subject to the rights, if any, of an officer under any contract of employment, any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board of Directors at any regular or special meeting of the Board of Directors or, except in the case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

Any officer may resign at any time by giving written notice to the attention of the secretary of the Corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

5.5  VACANCIES IN OFFICES.

Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

5.6  CHIEF EXECUTIVE OFFICER.

Subject to such supervisory powers, if any, as may be given by the Board of Directors to the chairman of the board, if any, the chief executive officer of the Corporation shall, subject to the control of the Board of Directors, have general supervision, direction, and control of the business and the officers of the Corporation. He or she shall preside at all meetings of the stockholders and, in the absence or nonexistence of a chairman of the board, at all meetings of the Board of Directors and shall have the general powers and duties of management usually vested in the office of chief executive officer of a corporation and shall have such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

5.7  PRESIDENT.

Subject to such supervisory powers, if any, as may be given by the Board of Directors to the chairman of the board (if any) or the chief executive officer, the president shall have general supervision, direction, and control of the business and other officers of the Corporation. He or she shall have the general powers and duties of management usually vested in the office of president of a corporation and such other powers and duties as may be prescribed by the Board of Directors or these Bylaws.

5.8  VICE PRESIDENTS.

In the absence or disability of the chief executive officer and president, the vice presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a

12

TR 001581

App. 0121



vice president designated by the Board
of Directors, shall perform all the duties of the president and when so acting
shall have all the powers of, and be subject to all the restrictions upon, the
president. The vice presidents shall have such other powers and perform such
other duties as from time to time may be prescribed for them respectively by the
Board of Directors, these Bylaws, the president or the chairman of the board.

    5.9  SECRETARY.

        The secretary shall keep or cause to be kept, at the principal
executive office of the Corporation or such other place as the Board of
Directors may direct, a book of minutes of all meetings and actions of
directors, committees of directors, and stockholders. The minutes shall show the
time and place of each meeting, the names of those present at directors'
meetings or committee meetings, the number of shares present or represented at
stockholders' meetings, and the proceedings thereof.

        The secretary shall keep, or cause to be kept, at the principal
executive office of the Corporation or at the office of the Corporation's
transfer agent or registrar, as determined by resolution of the Board of
Directors, a share register, or a duplicate share register, showing the names of
all stockholders and their addresses, the number and classes of shares held by
each, the number and date of certificates evidencing such shares, and the number
and date of cancellation of every certificate surrendered for cancellation.

        The secretary shall give, or cause to be given, notice of all meetings
of the stockholders and of the Board of Directors required to be given by law or
by these Bylaws. He or she shall keep the seal of the Corporation, if one be
adopted, in safe custody and shall have such other powers and perform such other
duties as may be prescribed by the Board of Directors or by these Bylaws.

    5.10 CHIEF FINANCIAL OFFICER.

        The chief financial officer shall keep and maintain, or cause to be
kept and maintained, adequate and correct books and records of accounts of the
properties and business transactions of the Corporation, including accounts of
its assets, liabilities, receipts, disbursements, gains, losses, capital
retained earnings, and shares. The books of account shall at all reasonable
times be open to inspection by any director.

        The chief financial officer shall deposit all moneys and other
valuables in the name and to the credit of the Corporation with such
depositories as may be designated by the Board of Directors. He or she shall
disburse the funds of the Corporation as may be ordered by the Board of
Directors, shall render to the president, the chief executive officer, or the
directors, upon request, an account of all his or her transactions as chief
financial officer and of the financial condition of the Corporation, and shall
have other powers and perform such other duties as may be prescribed by the
Board of Directors or the Bylaws.

<div align="center">13</div>

<div align="right">TR 001582

App. 0122</div>

| Desc: 06-30-00 eToys, Inc. Form 10-Q | | |
| First Page ID: DX0075-0001 | | |
| Current Page ID: DX0075-0058 | Page 58 of 171 | |



DX0075-0058

5.11 REPRESENTATION OF SHARES OF OTHER CORPORATIONS.

The chairman of the board, the chief executive officer, the president, any vice president, the chief financial officer, the secretary or assistant secretary of this Corporation, or any other person authorized by the Board of Directors or the chief executive officer or the president or a vice president, is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by the person having such authority.

5.12 AUTHORITY AND DUTIES OF OFFICERS.

In addition to the foregoing authority and duties, all officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board of Directors or the stockholders.

ARTICLE VI

INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS

6.1  INDEMNIFICATION OF DIRECTORS AND OFFICERS.

The Corporation shall, to the maximum extent and in the manner permitted by the General Corporation Law of Delaware, indemnify each of its directors and officers against expenses (including attorneys' fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by reason of the fact that such person is or was an agent of the Corporation. For purposes of this Section 6.1, a "director" or "officer" of the Corporation includes any person (a) who is or was a director or officer of the Corporation, (b) who is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, or (c) who was a director or officer of a Corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation.

6.2  INDEMNIFICATION OF OTHERS.

The Corporation shall have the power, to the maximum extent and in the manner permitted by the General Corporation Law of Delaware, to indemnify each of its employees and agents (other than directors and officers) against expenses (including attorneys' fees), judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceeding, arising by reason of the fact that such person is or was an agent of the Corporation. For purposes of this Section 6.2, an "employee" or "agent" of the Corporation (other than a director or officer) includes any person (a) who is or was an employee or agent of the Corporation, (b) who is or was serving at the request of the Corporation as an employee or agent

14

TR 001583

App. 0123



DX0075-0059

of another corporation, partnership, joint venture, trust or other enterprise, or (c) who was an employee or agent of a corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation.

6.3 PAYMENT OF EXPENSES IN ADVANCE.

Expenses incurred in defending any action or proceeding for which indemnification is required pursuant to Section 6.1 or for which indemnification is permitted pursuant to Section 6.2 following authorization thereof by the Board of Directors shall be paid by the Corporation in advance of the final disposition of such action or proceeding upon receipt of an undertaking by or on behalf of the indemnified party to repay such amount if it shall ultimately be determined that the indemnified party is not entitled to be indemnified as authorized in this Article VI.

6.4 INDEMNITY NOT EXCLUSIVE.

The indemnification provided by this Article VI shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any Bylaw, agreement, vote of shareholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office, to the extent that such additional rights to indemnification are authorized in the Certificate of Incorporation.

6.5 INSURANCE.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of the General Corporation Law of Delaware.

6.6 CONFLICTS.

No indemnification or advance shall be made under this Article VI, except where such indemnification or advance is mandated by law or the order, judgment or decree of any court of competent jurisdiction, in any circumstance where it appears:

(a) That it would be inconsistent with a provision of the Certificate of Incorporation, these Bylaws, a resolution of the stockholders or an agreement in effect at the time of the accrual of the alleged cause of the action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b) That it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

15

TR 001584

App. 0124


DX0075-0060

ARTICLE VII

RECORDS AND REPORTS

7.1  MAINTENANCE AND INSPECTION OF RECORDS.

The Corporation shall, either at its principal executive offices or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these Bylaws as amended to date, accounting books, and other records.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal place of business.

7.2  INSPECTION BY DIRECTORS.

Any director shall have the right to examine the Corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director. The Court of Chancery is hereby vested with the exclusive jurisdiction to determine whether a director is entitled to the inspection sought. The Court may summarily order the Corporation to permit the director to inspect any and all books and records, the stock ledger, and the stock list and to make copies or extracts therefrom. The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection, or award such other and further relief as the Court may deem just and proper.

7.3  ANNUAL STATEMENT TO STOCKHOLDERS.

The Board of Directors shall present at each annual meeting, and at any special meeting of the stockholders when called for by vote of the stockholders, a full and clear statement of the business and condition of the Corporation.

16

TR 001585

App. 0125



ARTICLE VIII

GENERAL MATTERS

8.1  CHECKS.

From time to time, the Board of Directors shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the Corporation, and only the persons so authorized shall sign or endorse those instruments.

8.2  EXECUTION OF CORPORATE CONTRACTS AND INSTRUMENTS.

The Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer or officers, or agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board of Directors or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

8.3  STOCK CERTIFICATES; PARTLY PAID SHARES.

The shares of the Corporation shall be represented by certificates, provided that the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board of Directors, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the Corporation by the chairman or vice-chairman of the Board of Directors, or the chief executive officer or the president or vice-president, and by the chief financial officer or an assistant treasurer, or the secretary or an assistant secretary of the Corporation representing the number of shares registered in certificate form. Any or all of the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue.

The Corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. Upon the face or back of each stock certificate issued to represent any such partly paid shares, upon the books and records of the Corporation in the case of uncertificated partly paid shares, the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated. Upon the declaration of any dividend on fully paid shares, the Corporation shall declare a dividend upon

17

TR 001586

App. 0126



partly paid shares of the same class, but only upon the basis of the percentage of the consideration actually paid thereon.

### 8.4  SPECIAL DESIGNATION ON CERTIFICATES.

If the Corporation is authorized to issue more than one class of stock or more than one series of any class, then the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise provided in Section 202 of the General Corporation Law of Delaware, in lieu of the foregoing requirements there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, the designations, the preferences, and the relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

### 8.5  LOST CERTIFICATES.

Except as provided in this Section 8.5, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and canceled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate previously issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or the owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

### 8.6  CONSTRUCTION; DEFINITIONS.

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Delaware General Corporation Law shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both a corporation and a natural person.

### 8.7  DIVIDENDS.

The directors of the Corporation, subject to any restrictions contained in (a) the General Corporation Law of Delaware or (b) the Certificate of Incorporation, may declare and pay dividends upon the shares of its capital stock. Dividends may be paid in cash, in property, or in shares of the Corporation's capital stock.

18

TR 001587

App. 0127

The directors of the Corporation may set apart out of any of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve. Such purposes shall include but not be limited to equalizing dividends, repairing or maintaining any property of the Corporation, and meeting contingencies.

8.8   FISCAL YEAR.

The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors and may be changed by the Board of Directors.

8.9   SEAL.

The Corporation may adopt a corporate seal, which may be altered at pleasure, and may use the same by causing it or a facsimile thereof, to be impressed or affixed or in any other manner reproduced.

8.10  TRANSFER OF STOCK.

Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction in its books.

8.11  STOCK TRANSFER AGREEMENTS.

The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law of Delaware.

8.12  REGISTERED STOCKHOLDERS.

The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner, shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

19

TR 001588

App. 0128


DX0075-0064

ARTICLE IX

AMENDMENTS

The Bylaws of the Corporation may be adopted, amended or repealed by the stockholders entitled to vote; provided, however, that the Corporation may, in its Certificate of Incorporation, confer the power to adopt, amend or repeal Bylaws upon the directors. The fact that such power has been so conferred upon the directors shall not divest the stockholders of the power, nor limit their power to adopt, amend or repeal Bylaws.

TR 001589

App. 0129



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

# EX–10.1

EXHIBIT 10.1
10–Q Filed on 08/14/2000 – Period: 06/30/2000
File Number 000–25709

GSI©



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

TR 001590

App. 0130



DX0075-0066

EXHIBIT 10.1

## LEASE AGREEMENT

### BASIC PROVISIONS ("BASIC PROVISIONS")

1.1    PARTIES:  This Lease ("LEASE"), dated for reference purposes only August 11, 1999, is made by and between The Pink and Schindler Company ("LESSOR") and Baby Center, Inc., a Delaware corporation ("LESSEE") (collectively the "PARTIES," or individually a "PARTY").

1.2    PREMISES:  That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as 552 Brannan Street, San Francisco, California, consisting of approximately 24,000 rentable square feet ("PREMISES").

1.3    TERM:  The initial term of this Lease shall be five (5) years ("ORIGINAL TERM") and shall expire five (5) years after the Commencement Date ("EXPIRATION DATE"). The Original Term shall commence (the "COMMENCEMENT DATE") on the date on which the Tenant Improvements described in Paragraph 49 to be constructed by Lessor ("LESSOR'S TENANT IMPROVEMENTS") shall have been substantially completed. "Substantial Completion" shall mean that (i) Lessor shall have completed the Lessor Tenant Improvements in all material respects in accordance with the Construction Documents (as defined in paragraph 49), (ii) there remains no incomplete or defective item of Lessor Tenant Improvements that would materially adversely affect Lessee's intended use of the Premises, (iii) Lessor has delivered possession of the applicable permits from appropriate governmental authorities required to be obtained by Lessor for the legal occupancy of the Premises and completion of Lessor's Tenant Improvements.

1.4    EARLY POSSESSION:  As provided in Section 3.2.

1.5    BASE RENT:  The Monthly rent for the Premises ("BASE RENT") shall be as follows:

During the Early Possession period (based upon a pro rated rental as described in Section 3.2, and during the initial 12 months of the Term:  Forty-Eight Thousand Dollars ($48,000);

During months 13-24:  Forty-Nine Thousand Nine Hundred Twenty Dollars ($49,920);

During months 25-36:  Fifty-One Thousand Nine Hundred Twenty Dollars ($51,920);

During months 37-48:  Fifty-Four Thousand Dollars ($54,000); and

During months 49-60:  Fifty-Six Thousand Dollars ($55,160);

Base rent shall be payable in advance on the first day of each month commencing on the Commencement Date.

1.6    BASE RENT PAID UPON EXECUTION:  Upon execution of this Lease, Lessee shall pay to Lessor the amount of Two Hundred Eighty-Eight Thousand Dollars ($288,000) as Base Rent for the first six (6) months of the Original Term.

1.7    SECURITY DEPOSIT:  There shall be no security deposit.

1.8    AGREED USE:  Lessee shall use the Premises for general industrial use with supporting offices for an internet-multimedia company, consistent with the use approval received from the San Francisco Planning Department. Lessor assumes no obligation or liability if any proposed use by Lessee is not in conformance with any such approval.  Lessee shall not have access to, or the use of, the roof of the Premises for any reason whatsoever and shall advise its employees and invitees upon the Premises of such restriction and shall take reasonable actions to prevent any such person from gaining access to and using said roof, excepting only access to the roof by service technicians who are providing maintenance services for the HVAC located upon the roof or are keeping the roof and roof drainage free of debris.

1.9    REAL ESTATE BROKERS:  The following real estate brokers (collectively, the "BROKERS") and brokerage relationships exist in this transaction:

Starboard Commercial Real Estate represents Lessor exclusively ("LESSOR'S BROKER"). KROK Properties represents Lessee exclusively ("LESSEE'S BROKER"). Upon execution and delivery of this Lease by both Parties and upon the taking of possession by Lessee of the Premises, Lessor shall pay to Lessor's Broker the fee agreed to in their separate written

1

TR 001591

App. 0131

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0067

Page 67 of 171



DX0075-0067

agreement. No brokerage fees shall be payable with respect to the Option Period (as described in paragraph 39) if Lessee shall exercise the Option to extend the Term of this Lease.

1.10    LETTER OF CREDIT. The obligations of the Lessee under this Lease during the Original Term shall be secured by a standby letter of credit (the "LETTER OF CREDIT") which shall permit drawings during the Original Term in the event of a Breach (as defined in Section 13.1 hereof) in an aggregate amount of Two Hundred Eighty-Eight Thousand Dollars ($288,000). The Letter of Credit shall be in form satisfactory to Lessor and shall be issued by a bank whose creditworthiness is satisfactory to Lessor. The Letter of Credit shall be delivered to Lessor concurrently with the execution of the Lease. If the Letter of Credit by its terms shall expire prior to the expiration of the Original Term, the Letter of Credit shall expressly provide that unless a substitute Letter of Credit is delivered to Lessor no later than 30 days prior to such stated expiration date, and notwithstanding that a Breach may not have occurred, Lessor may draw upon the Letter of Credit for the full amount drawable thereunder and hold such amounts as security for the obligations of Lessee hereunder during the Original Term.

**2.    PREMISES**

2.1    LETTING. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating rental, is an approximation which the Parties agree is reasonable and the rental based thereon is not subject to revision whether or not the actual size is more or less.

2.2    CONDITION. Lessor shall deliver the Premises broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("START DATE"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, if any, and all other such elements of the building, in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the surface and structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "BUILDING") shall be free of material defects. If a non-compliance with said warranty exists as of the Start Date or shall occur after the Start Date, Lessee shall provide written notice to Lessor setting forth with specificity the nature and extent of such non-compliance. Except as otherwise provided in this Lease, promptly after receipt of Lessee's notice, Lessor shall repair or replace same at Lessor's expense; provided, however, that if Lessor has not received any written notice from Lessee within (i) six (6) months after the Start Date, as to the HVAC systems, or (ii) ninety (90) days after the Start Date, as to the remaining systems and other elements of the Building, Lessor shall have no further obligations with respect thereto and correction of any such non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense, except for the roof, foundations, beams, columns, HVAC, exterior and bearing walls, the responsibility for which shall be determined in accordance with paragraph 7. Lessor's obligation with respect to any such non-compliance shall be limited to its obligation to repair or replace any defective elements and in no event shall Lessor be responsible for any other damages which may be suffered by Lessee as a direct or indirect result thereof, including without limitation, consequential, special, incidental or punitive damages.

2.3    COMPLIANCE. Lessor warrants that, to the best of its knowledge, the improvements on the Premises comply in all material respects with all applicable laws, covenants or restrictions of record, building codes, regulations and ordinances ("APPLICABLE REQUIREMENTS") in effect on the Commencement Date, including the Americans With Disabilities Act of 1990 and all Applicable Requirements relating to the seismic condition of the Premises. Said warranty does not apply to the use to which Lessee will put the Premises or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the zoning is appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessor does not give Lessee written notice of a non-compliance with the warranty within six (6) months following the Commencement Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed (as opposed to being in existence at the Commencement Date, which is addressed in Paragraph 6.2(e) below) so as to require during the term of this Lease the construction of an addition to or an alteration of the Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

2

TR 001592

App. 0132

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0068

DX0075-0068

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last two (2) years of this Lease and the cost thereof exceeds two (2) months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within ten (10) days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to two (2) months' Base Rent. If Lessee elects Termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least ninety (90) days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lease could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for such costs pursuant to the provisions of Paragraph 7.1(c); provided, however, that if such Capital Expenditure is required during the last two years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessee shall have the option to terminate this Lease upon ninety (90) days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within ten (10) days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon thirty (30) days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall be fully responsible for the cost thereof, and Lessee shall not have any right to terminate this Lease.

2.4     ACKNOWLEDGMENTS. Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security environmental aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use; (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises; and (c) neither Lessor, Lessor's agents, nor any Broker has made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (a) Broker has made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises; and (b) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

3.      TERM.

3.1     TERM. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.

3.2     EARLY POSSESSION. Lessee shall be granted access to the Premises prior to the Commencement Date to allow Lessee to construct such improvements to the Premises as shall be Lessee's responsibility and as shall have been approved by Lessor. Lessee shall take possession and occupy the second floor of the Premises following the substantial completion (as defined in Section 3.5) by Lessor of the Lessor Tenant Improvements for such floor. Upon such occupancy by Lessee (the date of such occupancy being the "EARLY POSSESSION DATE"), Lessee shall be obligated to pay Rent based upon portion of the Premises so occupied, multiplied by the applicable Base Rent specified in paragraph 1.5 until the Commencement Date specified in paragraph 1.3 above, at which time the entire applicable monthly Base Rent specified in paragraph 1.5 shall be payable. The making of any payment of all or a portion of this Lease shall be in effect during the Early Possession period. Any such early possession shall not affect the Expiration Date.

3.3     DELAY IN POSSESSION. Lessor agrees to use its best commercially reasonable efforts to (i) deliver possession of the second floor of the Premises by August 27, 1999 and (ii) deliver possession of the first floor of the Premises by September 3, 1999; provided, however, that such dates may be extended if Lessee is not able to obtain new electrical service from Pacific Gas & Electric Company. If, despite said efforts, Lessor is unable, despite its diligent efforts, to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure effect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of a

3



TR 001593

App. 0133

portion of the Premises as provided in paragraph 1.4. If possession of the entire Premises with Lessor's Tenant Improvements is not delivered by December 15, 1999 (the "OUTSIDE DELIVERY DATE"), Lessee may, at its option, by notice in writing within forty-five (45) days after the Outside Delivery Date, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder, except that Lessor shall promptly refund to Lessee all amounts previously rendered to Lessor pursuant to Paragraph 1.6 and shall return the Letter of Credit to Lessee (or as Lessee shall direct). If such written notice is not received by Lessor within said forty-five (45) day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession of the entire Premises is not tendered to Lessee by the Outside Delivery Date and Lessee does not terminate this Lease, as aforesaid, the Original Term shall commence from the date of delivery of possession of the entire Premises and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.

3.4      LESSEE COMPLIANCE. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Commencement Date, or any Early Possession Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Commencement Date, the Commencement Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.1      RENT.

4.1      RENT DEFINED. All monetary obligations of Lessee to Lessor under the terms of this Lease are deemed to be rent ("RENT").

4.2      PAYMENT. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. Rent for any period during the term hereof which is for less than one (1) full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.

5.      SECURITY DEPOSIT. None.

6.      USE.

6.1      USE. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto and permitted under the rules and regulations of the City of San Francisco, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs owners and/or occupants of, or causes damage to neighboring properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, or is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within five (5) business days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in use.

6.2      HAZARDOUS SUBSTANCES:

        (a) REPORTABLE USES REQUIRE CONSENT. The term "HAZARDOUS SUBSTANCE"

TR 001594

App. 0134



as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) regulated or monitored by any governmental authority, or (ii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "REPORTABLE USE" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice,

4

TR 001595

App. 0135

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0071

Page 71 of 171



DX0075-0071

registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements).

(b) DUTY TO INFORM LESSOR. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises as a result of the actions, or failure to act, of Lessee, its agents, employees, or invitees, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) LESSEE REMEDIATIONS. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) LESSEE INDEMNIFICATION. Lessee shall indemnify, defend, reimburse and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and reasonable attorneys' and reasonable consultants' fees arising out of or involving any Hazardous Substance released, emitted, used, stored, manufactured, transported or discharged upon the Premises by or for Lessee, its agents, employees, contractors or invitees or any other third party under Lessee's control (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. NO TERMINATION, CANCELLATION OR RELEASE AGREEMENT ENTERED INTO BY LESSOR AND LESSEE SHALL RELEASE LESSEE FROM ITS OBLIGATIONS UNDER THIS LEASE WITH RESPECT TO HAZARDOUS SUBSTANCES, UNLESS SPECIFICALLY SO AGREED BY LESSOR IN WRITING AT THE TIME OF SUCH AGREEMENT.

(e) LESSOR INDEMNIFICATION. Lessee shall have no responsibility for Lessor and its successors and assigns shall indemnify, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all damages, including the cost of remediation, arising out of or involving the existence any Hazardous Substances in, under, about or on the Premises prior to the Commencement Date or, with respect to Hazardous Substances, which are caused by the negligence or willful misconduct of Lessor, its agents or employees. Lessor's indemnification shall not be applicable to the extent that any Hazardous Substances was released, emitted, used, stored, manufactured, transported or discharged upon the Premises by or for Lessee, its agents, employees, contractors or invitees or any other third party under Lessee's control. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) INVESTIGATIONS AND REMEDIATIONS. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Commencement Date, unless such remediation measure is required as a result of Lessee's use (including alterations) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) LESSOR TERMINATION OPTION. If a Hazardous Substance Condition occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required

5

TR 001596

App. 0136


DX0075-0072

by the Applicable Requirements and this Lease shall continue in full force and effect. But subject to Lessor's rights under Paragraph 6.3(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds twelve (12) times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date sixty (60) days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within ten (10) days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to twelve (12) times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provided the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3     LESSEE'S COMPLIANCE WITH APPLICABLE REQUIREMENTS. Except as otherwise provided in this Lease, and subject to paragraph 2.3, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any Applicable fire insurance underwriter or rating bureau, which relate to the particular use or occupancy of the Premises by Lessee, without regard to whether said requirements are now in effect or become effective after the Commencement Date. Lessee shall, within ten (10) days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with an Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4     INSPECTION; COMPLIANCE. Lessor and Lessor's "Lender" (as defined in Paragraph 30 below) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, upon at least 24 hours prior notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements by Lessee, its agents, employees, or invitees, has occurred, or a contamination caused by Lessee, its agents, employees, or invitees is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority with respect to such violation or contamination or with respect to other obligations for which Lessee is responsible hereunder. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspections, so long as such inspection is reasonably related to the violation or contamination.

7.1     MAINTENANCE, REPAIRS, UTILITY INSTALLATIONS; TRADE FIXTURES AND ALTERATIONS.

7.1     LESSEE'S OBLIGATIONS.

(a) IN GENERAL. Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance with Covenants, Restrictions and Building Code), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage and Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations, and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities such as plumbing, heating, ventilating, air-conditioning, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior) ceilings, floors, windows, doors, skylights, landscaping, driveways, parking lots, fences, signs, sidewalks and parkways located in, on, or adjacent to the Premises. Lessee is also responsible for keeping the roof and roof drainage clean and free of debris. Lessor shall keep the surface and structural elements of the roof, foundations, beams, columns, exterior and bearing walls in good repair (see paragraph 7.2). Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition (including, e.g., graffiti removal) consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when necessary, the exterior repainting of the building.

6

TR 001597

App. 0137



(b) SERVICE CONTRACTS. Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements ("Basic Elements"), if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) clarifiers, and (vi) basic utility feed to the perimeter of the Building.

(c) REPLACEMENT. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if the Basic Elements described in Paragraph 7.1(b), or the plumbing and electrical systems serving the Premises, cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such Basic Elements or systems, then such Basic Elements or systems shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is the number of months of the useful life of such replacement as such useful life is specified pursuant to Federal income tax regulations or guidelines for depreciation thereof (including interest on the unamortized balance as is then commercially reasonable in the judgment of Lessor's accountants, but not to exceed six percent (6%) per annum), with Lessee reserving the right to prepay its obligation at any time.

7.2 LESSOR'S OBLIGATIONS. Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance with Covenants, Restrictions and Building Code), 7.1(c) (Replacements), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee, except for the surface and structural elements of the roof, foundations, beams, columns, exterior and bearing walls, the repair of which shall be the responsibility of Lessor upon receipt of written notice that such a repair is necessary. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    UTILITY INSTALLATIONS; TRADE FIXTURES; ALTERATIONS.

(a) DEFINITIONS; CONSENT REQUIRED. The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electrical distribution, security and fire protection systems and signs, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "TRADE FIXTURES" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "ALTERATIONS" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "LESSEE OWNED ALTERATIONS AND/OR UTILITY INSTALLATIONS" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a). Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent, which shall not be unreasonably withheld. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof does not exceed $15,000 for any particular work of improvement.

(b) CONSENT. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount equal to the greater of one month's Base Rent, or $75,000, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alteration or Utility Installation and/or upon Lessor's posting an additional Security Deposit with Lessor.

(c) INDEMNIFICATION. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialman's lien against the premises or any interest therein. Lessee shall give Lessor not less than ten (10) day's notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post

7

TR 001598

App. 0138



App. 5 (Part 3)

notices of non-responsibility. If Lessee shall contest the validity of any
such lien claim or demand, then Lessee shall, at its sole expense defend and
protect itself, Lessor and the Premises against the same and shall pay and
satisfy any such adverse judgment that may be rendered thereon before the
enforcement thereof. If Lessor shall require Lessee shall furnish a surety
bond in an amount equal to one and one-half times the amount of such
contested lien, claim or demand, indemnifying Lessor against liability for
the same. If Lessor elects to participate in any such action, Lessee shall
pay Lessor's attorneys' fees and costs.

7.4     OWNERSHIP; REMOVAL; SURRENDER; AND RESTORATION.

(a) OWNERSHIP. Subject to Lessor's right to require remove or
elect ownership as hereinafter provided, all Alterations and Utility
Installations made by Lessee shall be the property of Lessee, but considered
a part of the Premises. Lessor may, at any time, elect in writing to be the
owner of all or any specified part of the Lessee Owned Alterations and
Utility Installations. Unless otherwise instructed per Paragraph 7.4(b)
hereof, all Lessee Owned Alterations and Utility Installations shall, at the
expiration or termination of this Lease, become the property of Lessor and be
surrendered by Lessee with the Premises.

(b) REMOVAL. By delivery to Lessee of written notice from Lessor
not earlier than ninety (90) and not later than thirty (30) days prior to the
end of the term of this Lease, Lessor may require that any or all Lessee
Owned Alterations or Utility Installations be removed by the expiration or
termination of this Lease. Lessor may require the removal at any time of all
or any part of any Lessee Owned Alterations or Utility Installations made
without the required consent.

(c) SURRENDER/RESTORATION. Lessee shall surrender the Premises by
the Expiration Date or any earlier termination date, with all of the
improvements, parts and surfaces thereof broom clean and free of debris, and
in good operating order, condition and state of repair, ordinary wear and
tear excepted and excepting acts of God, casualties, condensation, Hazardous
Substances (other than those Hazardous Substances stored, used, or disposed
of by Lessee, its agents, employees, or invitees, in or about the Premises in
violation of Applicable Requirements or this Lease) and Alterations with
respect to which Lessor has not required the removal thereof as provided
herein). "Ordinary wear and tear" shall not include any damage or
deterioration that would have been prevented by good maintenance practice.
Lessee shall repair any damage occasioned by the installation, maintenance or
removal of Trade Fixtures, Lessee Owned Alterations and/or Utility
Installations, furnishings, and equipment as well as the removal of any
storage tank installed by or for Lessee, and the removal, replacement, or
remediation of any soil material or groundwater contaminated by Lessee. Trade
Fixtures shall remain the property of Lessee and shall be removed by Lessee.
The failure by Lessee to timely vacate the Premises pursuant to this
Paragraph 7.4(c) without the express written consent of Lessor shall
constitute a holdover under the provisions of Paragraph 26 below. Lessor
agrees that the improvements to be constructed pursuant to Paragraph 49 shall
not be required to be removed at the expiration or earlier termination of
this Lease.

8.      INSURANCE: INDEMNITY.

8.1     PAYMENT OF PREMIUM INCREASES.

(a) Lessee shall pay to Lessor any insurance cost increase
("INSURANCE COST INCREASE") occurring during the term of this Lease.
"Insurance Cost Increase" is defined as any increase in the actual cost of
the insurance required under Paragraph 8.2(b), 8.3(a) and 8.3(b), over and
above the annual "Base Premium" of $4,268.00. "Insurance Cost Increase" shall
include but not be limited to increases resulting from the nature of Lessee's
occupancy, any act or omission of Lessee, the reasonable requirements of the
holder or mortgage or deed of trust covering the Premises, increased
valuation of the Premises and/or a premium rate increase. The parties are
encouraged to fill in the Base Premium in the blank above, with a reasonable
premium for the Required Insurance based on the Agreed Use of the
Premises. If the parties fail to insert a dollar amount in the blank above,
then the Base Premium shall be the lowest annual premium reasonably
obtainable for the Required Insurance as of the commencement of the Original
Term for the Agreed Use of the Premises. In no event, however, shall Lessee
be responsible for any portion of the increase in the premium cost
attributable to liability insurance carried by Lessor under Paragraph 8.2(b)
in excess of $2,000,000 per occurrence.

(b) Lessee shall pay any such Insurance Cost Increase to Lessor
within thirty (30) days after receipt by Lessee of a copy of the premium
statement or other reasonable evidence of the amount due. If the insurance
policies maintained hereunder cover other property besides the Premises,
Lessor shall also deliver to Lessee a statement of the amount of such
Insurance Cost Increase attributable only to the Premises showing in
reasonable detail the manner in which such amount was computed. Premiums for
policy periods commencing prior to, or extending beyond the term of this
Lease, shall be prorated to correspond to the term of this Lease.

8

TR 001599

App. 0139



8.2    LIABILITY INSURANCE.

(a)  CARRIED BY LESSEE.  Lessee shall obtain and keep in force a
Commercial General Liability Policy of Insurance protecting Lessee and Lessor
against claims for bodily injury, personal injury and property damage based
upon or arising out of the ownership, use, occupancy or maintenance of the
Premises and all areas appurtenant thereto. Such insurance shall be on an
occurrence basis providing single limit coverage in an amount not less than
$2,000,000 per occurrence with an "ADDITIONAL INSURED-MANAGERS OR LESSORS OF
PREMISES ENDORSEMENT" and contain the "AMENDMENT OF THE POLLUTION EXCLUSION
ENDORSEMENT" for damage caused by heat, smoke or fumes from a hostile fire.
The policy shall not contain any intra-insured exclusions as between insured
persons or organizations, but shall include coverage for liability assumed
under this Lease as an "insured contract" for the performance of Lessee's
indemnity obligations under this Lease. The limits of said insurance shall
not, however, limit the liability of Lessee nor relieve Lessee of any
obligation hereunder. All insurance carried by Lessee shall be primary to and
not contributory with any similar insurance carried by Lessor, whose
insurance shall be considered excess insurance only.

(b)  CARRIED BY LESSOR.  Lessor shall maintain liability insurance as
described in Paragraph 8.3(a), in addition to, and not in lieu of, the
insurance required to be maintained by Lessee. Lessee shall not be named as
an additional insured therein.

8.3    PROPERTY INSURANCE - BUILDING, IMPROVEMENTS AND RENTAL VALUE.

(a)  BUILDING AND IMPROVEMENTS.  Lessor shall obtain and keep in
force a policy or policies in the name of Lessor, with loss payable to
Lessor, any ground lessor, and to any Lender(s) insuring loss or damage to
the Premises. The amount of such insurance shall be equal to the full
replacement cost of the Premises, as the same shall exist from time to time,
or the amount required by any Lenders, but in no event more than the
commercially reasonable and available insurable value thereof. Lessee Owned
Alterations and Utility Installations, Trade Fixtures, and Lessee's personal
property shall be insured by Lessee under Paragraph 8.4 rather than by
Lessor. Such policy or policies shall insure against all risks of direct
physical loss or damage (except the perils of flood and/or earthquake unless
required by a Lender or included in the Base Premium), including coverage for
debris removal and the enforcement of any Applicable Requirements requiring
the upgrading, demolition, reconstruction or replacement of any portion of
the Premises as the result of a covered loss. Said policy or policies shall
also contain an agreed valuation provision in lieu of any coinsurance
clause, waiver of subrogation, and inflation guard protection causing an
increase in the annual property insurance coverage amount by a factor of not
less than the adjusted U.S. Department of Labor Consumer Price Index for All
Urban Consumers for the city nearest to where the Premises are located.

(b)  RENTAL VALUE.  Lessor shall obtain and keep in force a policy or
policies in the name of Lessor, with loss payable to Lessor and any Lender,
insuring the loss of the full Rent for one (1) year. Said insurance shall
provide that in the event the Lease is terminated by reason of an insured
loss, the period of indemnity for such coverage shall be extended beyond the
date of the completion of repairs or replacement of the Premises, to provide
for one full year's loss of Rent from the date of any such loss. Said
insurance shall contain an agreed valuation provision in lieu of any
coinsurance clause, and the amount of coverage shall be adjusted annually to
reflect the projected Rent otherwise payable by Lessee, for the next twelve
(12) month period.

8.4    LESSEE'S PROPERTY/BUSINESS INTERRUPTION INSURANCE.

(a)  PROPERTY DAMAGE.  Lessee shall obtain and maintain insurance
coverage on all of Lessee's personal property, Trade Fixtures, and Lessee
Owned Alterations and Utility Installations. Such insurance shall be full
replacement cost coverage. The proceeds from any such insurance shall be used
by Lessee for the replacement of personal property, Trade Fixture's and
Lessee Owned Alterations and Utility Installations. Lessee shall provide
Lessor with certificates of insurance confirming that such insurance is in
force.

(b)  BUSINESS INTERRUPTION.  Intentionally Deleted.

(c)  NO REPRESENTATION OF ADEQUATE COVERAGE.  Lessor makes no
representation that the limits or forms of coverage of insurance specified
herein are adequate to cover Lessee's property, business operations or
obligations under this Lease.

8.5    INSURANCE POLICIES.  Insurance required herein shall be by companies
duly licensed or admitted to transact business in the state where the
Premises are located, and maintaining during the policy term a "General
Policyholders Rating" of at least B+, V, as set forth in the most current
issue of "Best's Insurance Guide", or such other rating as may be required by
a Lender.

9

TR 001600

App. 0140

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0076

*Page 76 of 171*


DX0075-0076

Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Commencement Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to reduction or material and adverse modification of coverage except after thirty (30) days prior written notice to Lessor. Lessee shall, at least thirty (30) days prior (to) the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either party Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6    WAIVER OF SUBROGATION. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein or actually insured against by either party. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7    INDEMNITY

(a)    Except for matters covered by Lessor's indemnity in subparagraph (b) below, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, employees, contractors and invitees, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, reasonable attorneys' and reasonable consultants' fees, expenses and /or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee, and/or liabilities arising from the negligence or willful misconduct by Lessee, and its agents, employees, contractors and invitees, Lessee's violation of Applicable Requirements not required or to be performed by Lessee, or a breach by Lessee of its obligations hereunder. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

(b)    Except for matters covered by Lessee's indemnity in subparagraph (a) above, Lessor shall indemnify, protect, defend and hold harmless Lessee and its agents, employees, contractors and invitees, from and against any and all claims, and/or damages, liens, judgments, penalties, reasonable attorneys' and reasonable consultants' fees, expenses and/or liabilities arising from the negligence or willful misconduct by Lessor, and its agents, employees, contractors and invitees, Lessor's violation of Applicable Requirements not required to be performed by Lessor, or a breach by Lessor of its obligations hereunder. If any action or proceeding is brought against Lessee by reason of any of the foregoing matters, Lessor shall upon notice defend the same at Lessor's expense by counsel reasonably satisfactory to Lessee and Lessee shall cooperate with Lessor in such defense. Lessee need not have first paid any such claim in order to be defended or indemnified.

8.8    EXEMPTION OF LESSOR FROM LIABILITY. Except to the extent directly caused by the negligence or willful misconduct by Lessor, and its agents, employees, contractors and invitees, Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building of which the Premises are a part, or from other sources or places. Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor. Notwithstanding Lessor's negligence, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

9.    DAMAGE OR DESTRUCTION

9.1    DEFINITIONS

(a)    "PREMISES PARTIAL DAMAGE" shall mean damage or destruction to the improvements on the Premises, other (than) Lessee Owned Alterations, Utility Installations and Trade Fixtures, which can reasonably be repaired in six (6) months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

10

TR 001601

App. 0141



(b) "PREMISES TOTAL DESTRUCTION" shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Trade Fixtures, Installations and Trade Fixtures, which cannot reasonably be repaired in six (6) months or less from the date of the damage or destruction. Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) "INSURED LOSS" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) "REPLACEMENT COST" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) "HAZARDOUS SUBSTANCE CONDITION" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

9.2    PARTIAL DAMAGE - INSURED LOSS. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage to their condition (to all material respects) immediately prior to the damage or destruction (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, Lessor shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within ten (10) days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said ten (10) day period, the party responsible for making the repairs shall complete them and restore in all material respects the Premises to its condition immediately prior to the damage or destruction as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within ten (10) days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect; or (ii) have this Lease terminate thirty (30) days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    PARTIAL DAMAGE - UNINSURED LOSS. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of a Lessee in which event Lessee shall make the repairs at Lessee's expense and, provided no Default exists, Lessor shall make all applicable insurance proceeds available to Lessee on a reasonable basis for that purpose), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective sixty (60) days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within ten (10) days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    TOTAL DESTRUCTION. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate as of the date of such destruction. If the damage or destruction was caused by the negligence or willful misconduct of Lessee, its agents, employees, contractors or invitees, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    DAMAGE NEAR END OF TERM. If at any time during the last six (6) months of this Lease there is damage for which the cost to repair exceeds one (1) month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective sixty (60) days following the date of occurrence of such damage by giving a written termination notice to Lessee within thirty (30) days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable

11

TR 001602

App. 0142



option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is thirty (30) days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    ABATEMENT OF RENT; LESSEE'S REMEDIES.

(a) ABATEMENT. In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessees use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) REMEDIES. If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within ninety (90) days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than sixty (60) days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within thirty (30) days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within said thirty (30) days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    TERMINATION-ADVANCE PAYMENTS. Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8    LESSEE'S TERMINATION RIGHT. Notwithstanding anything to the contrary contained herein, excepting any damage or destruction the repair of which is the responsibility of Lessee herein, Lessee shall have the option to terminate this Lease if any of the following shall occur, the exercise of such option being evidenced by delivery to Lessor of written notice of Lessee's election to terminate within thirty (30) days after Lessee receives from Lessor Lessor's estimate of the time needed to complete such restoration: (i) the Premises, with reasonable diligence, cannot be fully repaired by Lessor within one hundred eighty (180) days after the date of the damage or destruction; or (ii) Lessor commences the repairs but fails to complete them, in all material respects, within one hundred eighty (180) days after the date of the damage or destruction; or (iii) if the Premises are materially damaged by any peril within the last six (6) months of the Term.

9.9    WAIVE STATUTES. Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    REAL PROPERTY TAXES.

10.1    DEFINITION OF "REAL PROPERTY TAXES." As used herein, the term "REAL PROPERTY TAXES" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental law or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or

TR 001603

App. 0143



license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. The term "REAL PROPERTY TAXES" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises. Notwithstanding anything to the contrary contained

12

TR 001604

App. 0144

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0080



DX0075-0080

in this Lease, Lessee shall not be required to pay any portion of any tax or assessment (i) levied on Lessor's rental income, unless such tax or assessment is imposed in lieu of Real Property Taxes, (ii) imposed on land and improvements other than with respect to the Premises, or (iii) attributable to Lessor's net income, inheritance, gift, franchise, estate taxes. Upon the request of Lessor, Lessee will cooperate or join with Lessee in any application which is necessary to permit the payment of any assessment in installments.

10.2

(a) PAYMENT OF TAXES. Lessor shall pay the Real Property Taxes applicable to the Premises provided, however, that Lessee shall pay to Lessor the amount, if any, by which Real Property Taxes applicable to the Premises increase over the Real Property Taxes for the fiscal tax year ending June, 30, 1999 ("TAX INCREASE"). Subject to Paragraph 10.2(b), payment of any such Tax increase shall be made by Lessee to Lessor within thirty (30) days after receipt of Lessor's written statement setting forth the amount due and the computation thereof. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such taxes shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect.

(b) ADVANCE PAYMENT. In the event Lessee incurs a late charge on any Tax Increase payment, Lessor may, at Lessor's option, estimate the current Real Property Taxes, and require that the Tax increase be paid in advance to Lessor by Lessor, either: (i) in a lump sum amount equal to the amount due, at least twenty (20) days prior to the applicable delinquency dates; or (ii) monthly in advance with the payment of the Base Rent. If Lessor elects to require payment monthly in advance, the monthly payment shall be an amount equal to the amount of the estimated installment of the Tax increase divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable Tax increase is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable Tax increase. If the amount collected by Lessor is insufficient to pay the Tax increase then due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. All moneys paid to Lessor under this Paragraph may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a breach by Lessee in the performance of its obligations under this Lease, then any balance of funds paid to Lessor under the provisions of this Paragraph may at the option of Lessor, be treated as an additional Security Deposit.

(c) ADDITIONAL IMPROVEMENTS. Notwithstanding anything to the contrary in this Paragraph 10.2, Lessee shall pay to Lessor upon demand therefor the entirety of any increase in Real Property Taxes assessed by reason of alterations or Utility Installations placed upon the Premises by Lessee or at Lessor's request.

10.3    JOINT ASSESSMENT. If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Tax Increase for all of the land and improvements included within the tax parcel assessed, such proportion to be reasonably determined by Lessee from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available, but excluding any Tenant Improvements made by Lessor.

10.4    PERSONAL PROPERTY TAXES. Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause such property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within thirty (10) days after receipt of a written statement.

11.    UTILITIES. Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered.

12.    ASSIGNMENT AND SUBLETTING.

12.1    LESSOR'S CONSENT REQUIRED.

(a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "ASSIGN OR ASSIGNMENT") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent, such consent not to be unreasonably withheld. Lessor agrees to respond to Lessee's written request or consent to a subleasing or assignment within fifteen (15) business days after Lessee has delivered to Lessor the proposed sublease or assignment and current financial statements of the proposed transferee. If Lessor fails to respond to Lessee's written request for such consent, Lessor shall be deemed to have consented to the proposed sublessee or

13

TR 001605

App. 0145



assignee. if Lessor shall disapprove such proposed sublessee or assignee, Lessor shall inform Lessee of the reasons for such disapproval during said response period.

(b) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than twenty-five percent (25%) of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent, "NET WORTH OF LESSEE" shall mean the net worth of Lessee established under generally accepted accounting principles.

(c) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

12.2    TERMS AND CONDITIONS APPLICABLE TO ASSIGNMENT AND SUBLETTING.

(a) Regardless of Lessor's consent, any assignment or subletting shall not, unless evidenced by a written agreement signed by Lessor: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease; (ii) release Lessee of any obligations hereunder; or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment, or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Breach by Lessee, Lessor may proceed directly against Lessee, or anyone else responsible for the performance of Lessee's obligations under this Lease including any assignee or sublessee, and/or may draw upon the Letter of Credit, at the same time or in any order, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.

(f) Any assignee of, or sublessee under, this Lease shall by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) In the case of a subletting, one-half (1/2) of any sums or

TR 001606

App. 0146



economic consideration received by Lessee as a result of or in connection with the subletting shall be paid to Lessor upon receipt after first deducting (i) the rental due under this Lease, prorated to reflect only rental allocable to the sublet portion of the Premises, (ii) the cost of leasehold improvements made to the sublet portion of the Premises at Lessee's cost, amortized over the remaining term of this Lease at the time of such subletting, except for leasehold improvements made for the specific benefit of the sublessee, which shall be amortized over the term of the sublease, and (iii) the cost of any real estate commissions, reasonable attorney fees, or other third party professional services paid by Lessee in connection with the subletting. In the case of an assignment of this Lease, one-half (1/2) of any sums or economic consideration received by Lessee as a result of or in connection with the assignment shall be paid to Lessor upon receipt after first deducting the cost of any real estate commissions, reasonable attorney fees, or other third party professional services paid by Lessee in connection with the assignment. The consideration received by Lessee to be shared with Lessor shall exclude any consideration fairly

14

TR 001607

App. 0147



attributable to Lessee's furniture, fixtures (other than the Tenant Improvements) and equipment made available to the sublessee or the assignee, but in no event greater than the fair market value thereof to a third party purchaser who was not a sublessee or assignee.

(h) Without limiting other instances in which Lessor may reasonably withhold consent to an assignment or subletting, Lessor and Lessee acknowledge that it shall be reasonable for Lessor to withhold consent in the following instances:

(i) If at the time consent is requested or at any time consent is requested but prior to the granting of consent, but for the pendency of any grace or cure period under paragraph 11, a Default exists under this Lease;

(ii) If the proposed assignee or sublessee is a governmental agency;

(iii) If, in Lessor's reasonable judgment, use of the Premises by the proposed assignee or sublessee would entail alterations that would materially lessen the value of the leasehold improvements in the Premises (unless Lessee provides adequate security to ensure that the Premises will be restored to their prior condition as required herein), or would require substantially increased services by Lessor;

(iv) If Lessor reasonably determines that circumstances warrant a consideration of the financial worth of a proposed assignee or sublessee, and the financial worth, in Lessor's reasonable judgment, does not meet the credit standards required by Lessor;

(v) If, in Lessor's reasonable judgment, the character, reputation, or business of the proposed assignee or sublessee is not consistent with the quality required by Lessor.

12.3    ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO SUBLETTING. The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, and subject to the provisions of Paragraph 12.2 (p), Lessee may collect said Rent. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs and such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublease shall further assign or sublet all or any part of the Premises without Lessor's prior written consent, as specified above.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice. The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

(f) Notwithstanding anything to the contrary contained in this Lease, Lessee, without Lessor's prior written consent, may sublet the Premises or assign this Lease to: (i) a subsidiary, affiliate, franchise, division or corporation controlling, controlled by or under common control with Lessee; (ii) a successor corporation related to Lessee by merger, consolidation, non-bankruptcy reorganization; or (iii) a purchaser of substantially all of Lessee's assets by merger, stock

15

TR 001608

App. 0148


DX0075-0084

acquisition or otherwise (collectively, "PERMITTED TRANSFEREES"). For purposes of this Lease, a sale of Lessee's capital stock through any public exchange shall not be deemed an assignment, subletting or other transfer of this Lease or the Premises requiring Lessor's consent.

13.1    DEFAULT; BREACH; REMEDIES.

13.1    DEFAULT; BREACH. A "DEFAULT" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or rules under this Lease. A "BREACH" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period.

(a) The abandonment of the Premises, coupled with Lessee's failure to pay Rent when due; or the vacating of the Premises without providing a commercially reasonable level of security, and/or Security Deposit or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of three (3) business days following written notice to Lessee (other than for the payment of Rent, for which no notice from Lessor shall be required).

(c) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements if requested by Lessor, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) a Tenancy Statement, (v) a requested subordination, (vi) evidence concerning any guaranty, (vii) any document requested under Paragraph 42 (easements), or (viii) any other documentation or information which Lessor may reasonably require under the terms of this Lease, where any such failure continues for a period of ten (10) days following written notice to Lessee.

(d) A default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such default continues for a period of thirty (30) days after written notice; provided, however, that if the nature of Lessee's Default in such that more than thirty (30) days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(e) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "DEBTOR" as defined in 11 U.S.C. Section 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days; (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within sixty (60) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within sixty (60) days; provided, however, in the event that any provision of this subparagraph (e) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f) The discovery that any financial statement of Lessee given to Lessor was materially false.

(g) (i) The termination or withdrawal or purported termination or withdrawal of the Letter of Credit by the issuer thereof, or (ii) the refusal of the issuer of the Letter of Credit to honor any draw request by Lessor thereunder, or (iii) the failure at any time during the Original Term of Lease to cause the Letter of Credit to maintained in full force and effect as required by Section 1.10 hereof.

13.2    REMEDIES. If Lessee fails to perform any of its affirmative duties or obligations within the time provided herein and the passage of ten (10) days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds insurance policies, or governmental licenses, permits or approvals. The costs and expenses of any such performance by Lessee shall be due and payable by Lessee upon receipt of invoice therefor. If any check given to Lessor by Lessee shall not be honored by the bank upon which it is drawn, Lessor, at its option, may require all future payments

16

TR 001609

App. 0149



to be made by Lessee to be by cashier's check, in the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event, Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent (1%). Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue this Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term thereof or by reason of Lessee's occupancy of the Premises.

13.3    INDUCEMENT RECAPTURE. Intentionally Deleted.

13.4    LATE CHARGES. Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within five (5) days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to five percent (5%) of each such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    INTEREST. Any monetary payment due Lessor hereunder not received by Lessor, within three (3) days after the date when due as to scheduled payments (such as Base Rent) or within ten (10) days after the date when due as to non-scheduled payments, shall bear interest from the date when due plus the interest ("INTEREST") charged shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus 2%, but shall not exceed the maximum rate allowed by law. Interest is payable in addition any late charge provided for in Paragraph 13.4.

17



TR 001610

App. 0150

13.6    BREACH BY LESSOR.

(a) NOTICE OF BREACH. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than thirty (30) days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purposes, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion.

(b) PERFORMANCE BY LESSEE on Behalf of Lessor in the event that neither Lessor nor Lender cures said breach within thirty (30) days after receipt of said written notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent an amount equal to the greater of one month's Base Rent or the Security Deposit, and to pay an excess of such expense under protest, reserving Lessee's right to reimbursement from Lessor. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    CONDEMNATION. If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "CONDEMNATION"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than ten percent (10%) of any building portion of the premises, or more than twenty-five percent (25%) of the land area portion of the premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within ten (10) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    REPRESENTATIONS AND INDEMNITIES OF BROKER RELATIONSHIPS. Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    ESTOPPEL CERTIFICATES.

(a) Each Party (as "RESPONDING PARTY") shall within ten (10) business days after written notice from the other Party (the "REQUESTING PARTY") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "ESTOPPEL CERTIFICATE" form published by the American Industrial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such ten day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party; (ii) there are no uncured defaults in the Requesting Party's performance; and (iii) if Lessor is the Requesting Party, not more than one month's Rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

18

TR 001611

App. 0151



(c) Upon request by Lessor, Lessee shall deliver to Lessor and to any potential lender or purchaser designated by Lessor (but not more than two times in any twelve month period) such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements or the past three (3) years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    DEFINITION OF LESSOR. The term "LESSOR" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined. Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 6 above.

18.    SEVERABILITY. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.    DAYS. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.    LIMITATION ON LIABILITY. Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Premises, the rents from the Premises, and insurance proceeds relating to a casualty at the Premises (subject in all such cases to prior rights of any lenders to Lessor), and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.    TIME OF ESSENCE. Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.    NO PRIOR OR OTHER AGREEMENTS. This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.

23.    NOTICES.

23.1    NOTICE REQUIREMENTS. All notices required or permitted by this Lease shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2    DATE OF NOTICE. Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given forty-eight (48) hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given twenty-four (24) hours after delivery of the same to the Postal Service of courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt, provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

19

TR 001612

App. 0152


DX0075-0088

24.     WAIVERS. No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.     RECORDING. Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a short form Memorandum of this Lease for recording purposes. The Party requesting recordation shall be responsible for payment of any fees applicable thereto.

26.     NO RIGHT TO HOLDOVER. Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to one hundred fifty percent (150%) of the Base Rent applicable during the month immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     CUMULATIVE REMEDIES. No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     COVENANTS AND CONDITIONS; CONSTRUCTION OF AGREEMENT. All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Lease, whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it.

29.     BINDING EFFECT; CHOICE OF LAW. This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     SUBORDINATION; ATTORNMENT; NON-DISTURBANCE.

30.1    SUBORDINATION. This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as Lessors Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have the Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    ATTORNMENT. Subject to the non-disturbance provisions of Paragraph 30.3, Lessee agrees to attorn to a Lender or any other party who acquires ownership of the Premises by reason of a foreclosure of a Security Device, and that in the event of such foreclosure, such new owner shall not: (i) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (ii) be subject to any offsets or defenses which Lessee might have against any prior lessor; or (iii) be bound by prepayment of more than one (1) month's rent.

30.3    NON-DISTURBANCE. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "NON-DISTURBANCE AGREEMENT") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within sixty (60) days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said sixty (60) days, then Lessee may, at Lessee's option, directly contact Lessor's Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

20

TR 001613

App. 0153



30.4 SELF-EXECUTING. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessee or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    ATTORNEYS' FEES. If any Party or Broker brings an action or proceeding involving the Premises to enforce the terms hereof or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "PREVAILING PARTY" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach.

32.    LESSOR'S ACCESS; SHOWING PREMISES; REPAIRS. Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times upon at least 24 hours prior notice for the purpose of showing the same to prospective purchasers, lenders, or lessees, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary. All such activities shall be without abatement of rent or liability to Lessee. Lessor may at any time place on the Premises any ordinary "FOR SALE" signs and Lessor may during the last six (6) months of the term hereof place on the Premises any ordinary "FOR LEASE" signs. Lessee may at any time place on or about the Premises any ordinary "FOR SUBLEASE" sign.

33.    AUCTIONS. Lessee shall not conduct nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    SIGNS. Except for ordinary "For Sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements. Lessee, at its sole cost and expense, shall have the right to install signage on the exterior of the Premises, upon the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed, which sign shall be a permit table sign; provided that Lessee shall provide evidence that such signage shall conform to all Applicable Requirements and all required permits shall have been obtained.

35.    TERMINATION; MERGER. Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within ten (10) days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    CONSENTS. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and is reasonable detail within ten (10) business days following such request.

37.    INTENTIONALLY DELETED.

38.    QUIET POSSESSION. Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

21

TR 001614

App. 0154



39.    OPTION TO EXTEND ORIGINAL TERM.

39.1    Lessee shall have the option to extend the Original Term of this Lease (the "OPTION") for one (1) additional period of five (5) years (the "OPTION PERIOD") commencing on the Expiration Date upon the following terms and conditions:

(a)    That Lessee is not in Default under any of the terms, covenants, conditions or provisions of this Lease either at the time Lessee exercises the Option or at any time thereafter prior to the Expiration Date;

(b)    That Lessee shall have notified Lessor of Lessee's election to exercise such Option in the manner provided below; and

(c)    Lessee shall have provided to Lessor Lessee's audited financial statements for the Lessee's fiscal year most recently completed, along with unaudited financial statements for the interim periods thereafter, and Lessor shall have determined, in the sole and absolute discretion of Lessor, that Lessee's creditworthiness is satisfactory to Lessor.

(d)    The "OPTION PERIOD RENT" shall be equal to the greater of (i) the Rent paid by Lessee for the one year period prior to the Expiration Date, or (ii) the Fair Market Rental Value for the Premises for the Option Period as of the Expiration Date. "FAIR MARKET RENTAL VALUE" shall mean the prevailing market rental rate charged in an arms length transaction by a willing Lessor and a willing Lessee for substantially similar space, in substantially the same physical condition as the Premises in comparable buildings in the immediate area of the Premises.

(e)    If Lessee desires to exercise the Option, Lessee shall deliver to Lessor written notice of exercise not more than twelve (12), and not less than eight (8), months prior to the expiration of the Original Term. Within fifteen (15) days after receipt of such notice of exercise, Lessor shall notify Lessee of Lessor's determination of the Fair Market Rental Value for the Premises. Within ten (10) days of Lessee's receipt of Lessor's determination of Fair Market Rental Value, Lessee shall notify Lessor as to one of the following (i) Lessee's decision to confirm its exercise of the Option at Fair Market Rental Value as determined by Lessor; (ii) Lessee's decision to confirm its exercise of the Option, but that Lessee disagrees with Lessor's calculation of Fair Market Rental Value; or (iii) that Lessee waives and releases its Option. If Lessee does not respond during this ten (10) day notice period, Lessee will be deemed to have elected not to exercise its Option. If during the ten (10) day notice period, Lessee notifies Lessor that Lessee desires to exercise its Option, but Lessee disputes Lessor's calculation of Fair Market Rental Value, Lessee and Lessor shall have fifteen (15) days following receipt of Lessee's notice to agree as to the Fair Market Rental Value. If within the fifteen (15) day negotiation period Lessor and Lessee cannot so agree, then within ten (10) days after the expiration of the fifteen (15) day negotiation period, Lessor and Lessee each, at its own cost and by giving notice to the other party, shall appoint a real estate broker with at least ten (10) years' full-time commercial real estate leasing experience in San Francisco County to determine Fair Market Rental Value. If either Lessor or Lessee does not appoint a broker within ten (10) days after the other party has given notice of the name of its broker, the single broker appointed shall be the sole broker and shall set the Fair Market Rental Value. If the two (2) brokers are unable to agree within thirty (30) days after the second broker has been appointed, they shall attempt to select a third broker meeting the qualifications stated in this paragraph 39 within ten (10) days after the last day the two (2) brokers are given to set the Fair Market Rental Value. If they are unable to agree on the third broker, either Lessor or Lessee by giving ten (10) days' notice to the other party can apply to the then presidency of the real estate board of San Francisco County, or to the Presiding Judge of the Superior Court of San Francisco County, for the selection within fifteen (15) days thereafter of a third broker who meets the qualifications stated in this paragraph 39. Lessor and Lessee each shall bear one-half (1/2) of the cost of appointing the third broker and of paying the third broker's fee. Within thirty (30) days after the selection of a third broker, a majority of the brokers shall set the Fair Market Rental Value. If a majority of the brokers are unable to set the Fair Market Rental Value within the stipulated period of time, the three (3) estimates shall be added together and their total divided by three (3); and the resulting quotient shall be the Fair Market Rental Value. If, however, the low estimate and/or high estimate are more than ten percent (10%) lower and/or higher than the middle estimate, the low estimate and/or the high estimate shall be disregarded, the remaining two (2) estimates shall be added together and their total divided by two (2); and the resulting quotient shall be the Fair Market Rental Value. If both the low estimate and the high estimate are disregarded as stated in this paragraph 39, the middle estimate shall

22

TR 001615

App. 0155



be the Fair Market Rental Value. After the Fair Market Rental Value has been set, the brokers shall immediately notify Lessor and Lessee. The determination of the brokers as set forth above shall be binding on Lessor and Lessee.

39.2 The Option granted to Lessee in this Lease is personal to the original Lessee (except with respect to a permitted Transferee), and cannot be assigned or exercised by anyone other than said original Lessee (or such Permitted Transferee) and only while the original Lessee (or such Permitted Transferee) is in full possession of the Premises.

40.    MULTIPLE BUILDINGS. If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will observe all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and that Lessee will pay its fair share of common expenses incurred in connection therewith.

41.    SECURITY MEASURES. Lessee hereby acknowledges that the rental payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.    RESERVATIONS. Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary to, and cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee, or diminish Lessee's parking as provided in Paragraph 50. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.    PERFORMANCE UNDER PROTEST. If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum, and it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

44.    AUTHORITY. If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within thirty (30) days after request, deliver to the other party satisfactory evidence of such authority.

45.    CONFLICT. Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.    OFFER. Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to Lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.    AMENDMENTS. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.    MULTIPLE PARTIES. If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

49.    TENANT IMPROVEMENTS. Attached hereto as Exhibit 2 are the space plans and specifications (the "CONSTRUCTION DOCUMENTS") which describe the improvements to be constructed in the Premises (the "TENANT IMPROVEMENTS"). The Construction Documents specify the entire scope of the Tenant Improvements to be made by Lessor. Any changes to the Construction Documents may be made only in writing and with the approval of Lessor and Lessee. Lessor shall construct the Tenant Improvements in accordance with the Construction Documents and in accordance with all Applicable Requirements including without limitation the Americans With Disabilities Act of 1990, in a good and workmanlike manner, free of defects and using new materials and equipment of good quality. Within thirty (30) days after the Commencement Date, Lessee and Lessor shall conduct a joint "walk-through" of the Premises in order to determine and agree upon a written "punch list", setting

23

TR 001616

App. 0156



forth those items which Lessor and Lessee agree are defective items of construction. Lessor shall promptly cause such punch list items to be corrected. Lessee's acceptance of the Premises or agreement to a "punch list" shall not be deemed a waiver of Lessee's right to have defects in the Tenant Improvements or the Premises which are latent defects repaired at no cost to Lessee. Lessee shall provide notice to Lessor whenever any such latent defect becomes reasonably apparent and Lessor shall repair such latent defect as soon as practicable. Lessor shall cooperate with Lessee in the enforcement of any warranties available to Lessor which would reduce Lessee's maintenance obligations under this Lease.

50.     PARKING. During the Initial Term, Lessor shall make available to Lessee three (3) parking stalls at the prevailing market rate (which is currently $150 per month per stall) in the Freelon Street gated parking lot located behind 560 Brannan Street. Lessor does not provide any assurance that such parking will be provided to Lessee by Lessor following the Initial Term and Lessor has no obligation to provide same.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

THE FINK AND SCHINDLER COMPANY          BABY CENTER, INC.


By  /s/ GERHARD KONOPKA               By  /s/ MATTHEW GLICKMAN
----------------------------------   ----------------------------------
Name: GERHARD KONOPKA                Name: MATTHEW GLICKMAN
----------------------------------   ----------------------------------
Title: PRESIDENT                     Title: CEO
----------------------------------   ----------------------------------

24

TR 001617

App. 0157



EXHIBITS

Exhibit 1     Form of Letter of Credit

Exhibit 2     Construction Documents for Tenant Improvements

25

TR 001618

App. 0158



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

# EX–10.2

**EXHIBIT 10.2**
**10–Q Filed on 08/14/2000 – Period: 06/30/2000**
File Number 000–25709



GSI



TR 001619

**App. 0159**

EXHIBIT 10.2

DATED:  29th September, 1999

THE POST OFFICE

AND

eTOYS UK LIMITED

======================================

UNDERLEASE
of
Unit A Stirling Court
South Marston Industrial Estate
Stirling Road South Marston Swindon

======================================

Post Office
Legal Services
Impact House
2 Edridge Road
Croydon CR9 1PJ

Ref: C/11314/KJE/aly
4 August, 1999

TR 001620

App. 0160

[SEAL]

THIS UNDERLEASE is made the 29th day of September, One thousand nine hundred and ninety nine

B E T W E E N

(1)  THE POST OFFICE whose principal office is at 148 Old Street, London [ILLEGIBLE] EC1V 9HQ (hereinafter called "the Landlord") and

(2)  eTOYS UK LIMITED whose registered office is situate at St. Victoria Embankment London EC4Y ODX (Registered in England Number [ILLEGIBLE]) (hereinafter called "the Tenant")

N O W   T H I S   D E E D   W I T N E S S E T H  as follows

1  DEFINITIONS AND INTERPRETATION

In this Deed:

1.1  "The Term" means the period commencing on the Third day of August 1999 and expiring on the 27th day of September 2008

1.2  "the Rent" means the additional rents secondly and thirdly reserved by Clause 2 hereof Together With:

1.2.1  For the period commencing on the Rent Commencement Date and ending on the 28th day of September 2003 a rent of One Hundred and Twelve Thousand pounds (L112,000) per annum

1.2.2  Thereafter the yearly rent shall be the greater of the sum referred to in Clause 1.2.1 and such amount as may be agreed between the Landlord and the Superior Landlord as being the revised rent with effect from 29th September 2003 for the Premises under the terms of the Superior Lease

1.3  "the Rent Commencement Date" shall be the Fourth day of August, 1999

1.4  "the Premises" means the land and buildings at Unit A Stirling Court South Marston Industrial Estate Stirling Road South Marston Swindon as the same is more particularly described in Part I of the First

1

TR 001621

**App. 0161**

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0097



DX0075-0097

Schedule to the Superior Lease and shown edged red on the plan
numbered 2 attached thereto

1.5 "the permitted use of the premises" means use for storage and
distribution in accordance with Class B8 of the Schedule to
the Town & Country Planning (Use Classes) Order 1987 together
with ancillary offices Provided that references to the Order
herein shall not include or be deemed to include references to
any amendment re-enactment or replacement of the Order and
accordingly Clause 1.12.1 hereof shall not apply to these
references to the Order

1.6 "The Superior Lease" means the Lease dated 19th December 1988
as varied by the Deeds referred to in the Third Schedule of
this Underlease and all documents supplemental thereto

1.7 "Superior Landlord" means Clerical Medical Investment Group
Limited or such other persons for the time being entitled to
the reversion immediately expectant upon the determination of
the term granted by the Superior Lease

1.8 "the Landlord" includes where the context so admits the person
or persons for the time being entitled to the reversion
immediately expectant on the determination of the Term

1.9 "The Tenant" includes the Tenant and the successors in title
and assigns of the Tenant

1.10 "the Quarter Days" means the 25th day of March the 24th day of
June the 29th day of September and the 25th day of December
in each year

1.11 "Qualifying Assignee" means an assignee being:

1.11.1 a statutory or public body or statutory undertaker
a public or local authority a government
department or ministry or a nationalised industry
or

1.11.2 a limited company incorporated in England and
Wales with annual profits before tax in the three
complete trading years immediately preceding the
date of application for licence to

2

TR 001622

App. 0162

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0098



DX0075-0098

assign which in each year exceed an amount representing the Rent payable under this Underlease at the date of the application multiplied by three as evidenced by a set of properly audited accounts the latest set of which has been published not earlier than eleven months before the date of the application or

1.11.3 an organisation which is able to provide a surety as a party to any proposed alienation of these presents who fulfills one or more of the foregoing criteria

1.12 And in this Underlease unless there be something in the context inconsistent therewith:

1.12.1 Reference (whether general or specific) in this Underlease to any Act of Parliament or Bye-Law shall include every Act of Parliament or Bye-Law for the time being in force amending and modifying or replacing the same and all Orders Directions and Regulations already made or issues or hereafter to be made or issued thereunder

1.12.2 Words importing the masculine gender shall include the feminine gender and the neuter and vice versa and words importing the singular number only shall include the plural number and vice versa and words importing persons and all references to persons shall include companies corporations and firms and vice versa

1.12.3 If at any time two or more persons are included in the expression "the Tenant" then covenants entered into or implied herein by or on the part of the Tenant shall be deemed to be and shall be construed as covenants entered into by and binding on such persons jointly and severally

2    DEMISE

In consideration of the Rent and covenants hereinafter reserved and contained on the part of the Tenant to be paid performed and observed the Landlord

3

TR 001623

App. 0163

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0099

*Page 99 of 171*



DX0075-0099

HEREBY DEMISES unto the Tenant ALL THAT the Premises TOGETHER with the benefit of but subject to (as the case may be) the covenants (except the covenant as to payment of the rents reserved by the Superior Lease) exceptions reservations and provisos contained in the Superior Lease TO HOLD the same unto the Tenant for the Term YIELDING AND PAYING therefor clear of all deductions whatsoever yearly and proportionately for any part of a year [FIRST] from the Rent Commencement Date and thereafter until the end of the Term the yearly rents specified in subclauses 1.2.1 and 1.2.2 (inclusive) of Clause 1 hereof without any deduction by equal quarterly payments in advance on the Quarter Days the first payment for the period from the Rent Commencement Date to the next following Quarter Day to be paid on the Rent Commencement Date SECONDLY by way of additional rent and on demand the insurance costs and service charges which the Landlord shall from time to time be required to pay pursuant to the provisions of Clause 2(b) pages 8 and 9 of the Superior Lease and THIRDLY by way of additional rent interest on a daily basis on all rents or any other sums due under this Underlease which the Tenant shall fail to pay within seven days of the due date such interest to be calculated at the Prescribed Rate as defined by the Superior Lease from the date on which the same were due until the date of payment without deduction set off or counter-claim (except such as the Tenant may be required by law to deduct notwithstanding any stipulation to the contrary) and by means of a bankers standing order if so required by the Landlord

3        TENANT'S COVENANTS

The Tenant to the intent that the obligations hereby created shall continue throughout the Term hereby convenants with the Landlord as follows:

3.1    At all times during the Term to pay the Rent at the times and in the manner hereinbefore reserved

3.2    To observe and perform in favour of the Landlord the covenants on the part of the tenant (except the covenant as to payment of the rents

4

TR 001624

App. 0164

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0100

DX0075-0100

reserved by Clause 1 of the Third Schedule to the Superior
Lease) and the conditions and provisos contained in the
Superior Lease and in the documents referred to by the Third
Schedule of this Underlease in all respects as if the same
were set out herein in extenso with such modifications only as
may be contained in the Tenant's additional covenants set out
in the First Schedule hereto

3.3   To observe and perform the said additional covenants on the
Tenant's part contained in the First Schedule hereto

3.4   To indemnify and keep indemnified the Landlord against any
liability (save in respect of any default by the Landlord in
observing its covenants hereinafter contained) whatsoever
including costs and expenses in any way relating to the
Tenant's use and occupation of the Premises or any breach of
the Tenant's covenants herein contained

4       LANDLORD'S COVENANTS

The Landlord hereby covenants with the Tenant throughout the Term:

4.1   To perform and observe the covenant on its part contained in
the Superior Lease to pay the rents reserved by Clause 2
thereof and at all times to keep the Tenant indemnified
against any liability including costs and expenses in any way
relating to the same

4.2   That the Tenant paying the Rent hereby reserved and performing
and observing the covenants and stipulations herein contained
on the part of the Tenant to be performed and observed shall
peaceably hold and enjoy the Premises during the Term without
interruption or disturbance by the Landlord or any person
lawfully claiming under or in trust for the Landlord

4.3   Upon receiving notice from and at the expense of the Tenant to
take all reasonable steps to enforce the covenants on the part
of the Superior Landlord contained in the Superior Lease

5

TR 001625

App. 0165



DX0075-0101

4.4  To take all reasonable steps to obtain the consent of the Superior Landlord whenever the Tenant makes an application for any consent required hereunder where the consent of both the Landlord and the Superior Landlord is needed by virtue of this Underlease and the Superior Lease in those cases where the Landlord is willing to give its consent or where the Landlord's refusal to give such consent is held by the Court to be unreasonable

4.5  To notify the Tenant of any such notice served by the Superior Landlord instituting a review of the rent in accordance with the provisions of the Superior Lease and to keep the Tenant informed at all times of the progress and outcome of all negotiations in connection with such review.

5    PROVIDED ALWAYS AND IT IS HEREBY AGREED AND DECLARED:

5.1  That the provisos for re-entry reduction of rent in the event of damage by fire and other provisos and conditions contained in the Superior Lease shall apply to this Underlease as if they had been written in full herein.

5.2  Where the consent of the Landlord is required to any act . matter or thing under the terms of this Underlease the consent of the Superior Landlord shall also be required whenever requisite under the covenants and conditions of the Superior Lease

5.3  Whenever necessary or appropriate under the covenants and conditions of the Superior Lease or this Underlease where any matter is to be carried out to the satisfaction or approval of the Landlord it shall also be carried out to the satisfaction of the Superior Landlord

5.4  Where any issue question or matter arising out of or under or relating to the Superior Lease which affects or relates to the provisions of this Underlease is to be determined as therein provided it shall also be so

6

TR 001626

App. 0166



DX0075-0102

determined under this Underlease and the determination of any
such issue question or matter pursuant to the provisions of
the Superior Lease shall be binding on the Tenant as well as
the Landlord for the purposes both of the Superior Lease and
this Underlease

5.5    All sums payable by the Tenant hereunder which may be subject
to Value Added Tax shall be considered to be tax exclusive
sums and the Value Added Tax at the appropriate rate for the
time being shall be payable by the Tenant in addition thereto

5.6    Notwithstanding the provisions of Clause 1.5 the Landlord does
not thereby make or give to the Tenant any representation or
warranty that the said use or any other use of the Premises or
any part thereof is or will be or become or remain a permitted
use within the provisions of current planning legislation and
the Tenant shall not be entitled to any relief or compensation
whatsoever in respect thereof

5.7    A notice by one party ("the sender") to another ("the
recipient") is duly served if in writing and either delivered
to the recipient or sent by registered or recorded delivery
post addressed to the recipient at his address as stated in
this deed or as from time to time notified to the sender in
writing provided that any notice to the Landlord while the
reversionary interest is vested in the Post Office shall be
addressed to Post Office Property Holdings at Impact House   2
Edridge Road Croydon Surrey CR9 1PJ or as from time to time
notified in writing to the Tenant

5.8

5.8.1    If either party shall have served on it a notice of
wants of repairs or schedule of dilapidation or a
notice under Section 146 or 147 of the Law Of Property
Act 1925 ("the Notice") it shall supply the other with
a copy of the Notice

5.8.2    The parties will seek to agree what works detailed in
the Notice are to be carried out by the Tenant pursuant
to the covenants on

7

TR 001627

App. 0167

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0103


DX0075-0103

its part contained in this Lease and in the absence of agreement either party shall be entitled to refer the issue to an independent surveyor who shall act as an expert for determination (the provisions of the Second Schedule to the Superior Lease applying in respect of the appointment duties and fees of the surveyor)

5.8.3   The Tenant hereby covenants to carry out those works which fall within its obligations under this Lease as detailed in paragraph 4 of the First Schedule hereof necessary to comply with the Notice without undue delay

5.8.4   The Landlord hereby covenants to carry out those works which do not fall within the Tenant's obligations under this Lease necessary to comply with the Notice without undue delay

6        MISCELLANEOUS PROVISIONS

6.1   If the Tenant wishes to determine this Underlease on either the 1st day of February 2001 ("the First Break") or the 29th day of September 2004 ("the Second Break") and shall give to the Landlord not less than six months' prior notice in writing and in the case of the Second Break shall give to the Landlord not less than six months' prior notice in writing and provided that the Tenant shall up to the time of such determination pay the Rent AND REASONABLY PERFORM AND OBSERVE THE COVENANTS CONTAINED IN THIS UNDERLEASE then upon expiry of such notice the Term shall immediately cease and determine but without prejudice to the respective rights of either party in respect of any antecedent claim or breach of covenant

7        IT IS HEREBY CERTIFIED that there is no agreement for lease to which this Underlease gives effect

8

TR 001628

App. 0168



I N   W I T N E S S whereof the Landlord has caused its Common Seal to be hereunto affixed and the Tenant has duly executed this Deed which shall be deemed to be delivered the day and year first before written

FIRST SCHEDULE

TENANT'S ADDITIONAL COVENANTS

1

1.1 Not to assign underlet or part with or share possession or occupation of part only of the Premises and not to assign underlet or part with or share possession or occupation of the whole of the Premises except as may be permitted in accordance with the provisions of paragraphs 1.3 1.4 1.5 1.6 and 1.7 of this Schedule

1.2 Not to:

1.2.1 hold the whole or any part of the Premises on trust for another

1.2.2 charge or mortgage either the whole of any part or parts of the Premises

1.3 Not to assign the whole of the Premises without the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed) provided that the Landlord shall be entitled:

1.3.1 to withhold its consent in any of the circumstances specified for the purposes of Section 19(1A) of the Landlord and Tenant Act 1927 and set out in paragraph 1.5

1.3.2 to impose all or any of the conditions specified for the purposes of Section 19(1A) of the Landlord and Tenant Act of 1927 and set out in paragraph 1.6 as a condition of its consent

1.4 The proviso to paragraph 1.3 shall operate without prejudice to the right of the Landlord to withhold such consent on any other ground or grounds where such withholding of consent would be reasonable or to

9

TR 001629

App. 0169



impose any further condition or conditions upon the grant of consent where the imposition of such condition or conditions would be reasonable

1.5    The circumstances referred to in paragraph 1.3.1 are as follows:

    1.5.1    if any sums due are from the Tenant under this Underlease have not been paid at the date of the application for licence to assign

    1.5.2    if the proposed assignee is not resident in a jurisdiction where reciprocal enforcement of judgment exists

    1.5.3    if in the Landlord's reasonable opinion there are at the date of the application for the licence to assign any material outstanding breaches of any tenant covenant under this Lease or any personal covenants undertaken by the Tenant

    1.5.4    If the proposed assignee is not a Qualifying Assignee

1.6    The conditions referred to in paragraph 1.3.2 are as follows:

    1.6.1    the execution and delivery to the Landlord prior to the proposed assignment of a deed of guarantee (being an authorised guarantee agreement within Section 16 of the Landlord and Tenant (Covenants) Act 1995) in the form set out in the Second Schedule

    1.6.2    if the Landlord shall reasonably so require (or if the proposed assignee is a group company of the Tenant within the meaning of Section 42 of the Landlord and Tenant Act 1954) in the absolute discretion of the Landlord the execution and delivery by one or more third party guarantors reasonably acceptable to the Landlord of a deed of guarantee containing a covenant with the Landlord as a primary obligation in such terms as the Landlord may reasonably require prior to the completion of the purposed assignment

    1.6.3    the written Licence to Assign contains a condition that if at any time prior to the assignment the circumstances (or any of them)

10

TR 001630

App. 0170



specified in paragraph 1.5 arise the Landlord may
revoke the Licence by written notice to the Tenant

1.7

    1.7.1  Not to underlet the whole of the Premises without the
prior written consent of the Landlord (such consent not
to be unreasonably withheld or delayed) nor without
procuring that:

        1.7.1.1  prior to the grant of any underlease the
undertenant shall execute a deed containing
a direct covenant with the Landlord to perform
and observe the obligations of the undertenant
to be contained in the underlease and the
obligations of the Tenant under these presents
(other than the obligations to pay the rents
hereby reserved and except where inapplicable
to the premises underlet)

        1.7.1.2  any undertenant shall (if the Landlord shall so
reasonably require) provide a surety or
sureties reasonably acceptable to the Landlord
to guarantee the due performance by the
undertenant of its obligations in the
underlease

        1.7.1.3  each underlease shall be at a rent which shall:

            1.7.1.3.1  be not less than the open market
rental value (without taking or giving
a fine or premium or other valuable
consideration) reasonably obtainable
for the premises underlet at the time
such underlease is granted and not
less than the Rent then payable

            1.7.1.3.2  not to be commuted or be payable more
than one quarter in advance

        1.7.1.4  each underlease shall contain covenants by the
undertenant:

11

TR 001631

App. 0171



1.7.1.4.1 not to assign any part of the premises underlet as distinct from the whole

1.7.1.4.2 not to sub-underlet or charge the whole or any part of the premises underlet nor (save by way of an assignment of the whole thereof) part with the possession or share the occupation of the whole or any part of the premises underlet

1.7.1.4.3 not to assign any part of the premises underlet with obtaining the prior written consent of the Landlord (such consent not to be unreasonably withheld or delayed)

1.7.1.4.4 otherwise corresponding with the obligations of the Tenant under this Underlease (except the obligation to pay the rents hereby reserved and except where inapplicable to the premises underlet)

1.7.1.4.5 an Order of the Court be obtained under the provisions of Section 38(4) of the 1954 Act authorising the exclusion of Sections 24-28 of the Landlord and Tenant Act 1954 (as amended) in relation to such underlease and that a certified copy of such Order be supplied to the Landlord

1.7.2    Not without the prior written consent of the Landlord such consent not to be unreasonably withheld or delayed to vary or waive the terms nor accept any surrender of any underlease and to take all steps necessary to enforce such terms

PROVIDED ALWAYS that nothing herein contained shall preclude the Tenant from sharing occupation in accordance with the provisions of paragraph 28(g) of the Third Schedule to the Superior Lease

12

TR 001632

App. 0172



2    The Tenant shall upon request from time to time provide within one month all information which the Landlord may request under Section 40(1)(a) and (b) of the Landlord and Tenant Act 1954

3    The Tenant shall within 28 days of any assignment or underletting of or of any other devolution of the Lease or of any interest deriving from the Lease give notice thereof to the Landlord's Solicitor and produce for registration the original or a certified copy of the document effecting or evidencing such devolution and pay such reasonable registration fee as the Landlord's Solicitor may require being not less than L20 (plus VAT) plus any registration fee payable to the Superior Landlord pursuant to clause 29 of the Superior Lease

4    At all times during the Term to keep the Premises repaired and maintained in accordance with the provisions of the Superior Lease Provided That the Tenant shall not be obligated to keep or hand back the Premises in any better state of repair or decorative condition than that evidenced by the Schedule of Condition marked 'A' and signed on behalf of the parties hereto and for the avoidance of doubt the Tenant shall not be required to redecorate the exterior of the Premises in accordance with paragraph 6(a) of the Third Schedule to the Superior Lease in the year 2000

5    The obligations contained in clause 2 (2) and 12 respectively of the Licences for Alterations detailed in the Third Schedule shall not apply on the determination of the Term pursuant to clause 6.1 of this underlease

13

TR 001633

App. 0173

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0109
*Page 109 of 171*

DX0075-0109

SECOND SCHEDULE

THIS GUARANTEE AGREEMENT is made the                                    day of
            199[ ]

BETWEEN

(1)   [                                           ] (a company registered in England number
                    ) whose registered office is at
                            ("the Landlord")

(2)   [                                    ] (a company registered in England number
                        ) ("the Assignee")

W H E R E A S

(1)   LEASE

        By an Underlease ("the Lease") made the                          day of
                between [                              ] (1) and [
                        ] (2) [                                              ]
        ("the Original Tenant") the premises known as [
            ] ("the Premises") were demised from a term of
        [                                        ] years from the                    day
        of        ("the Term") subject to the payment of the rent[s] reserved by the
        observance and performance of the covenants on the Tenant's part and the
        conditions contained in the Lease


(2)   DEVOLUTION OF TITLE

        The reversion immediately expectant upon the determination of the Term
        [remains or is now] vested in the Landlord and the unexpired residue of
        the Term [remains or is now] vested in [the Original Tenant] or [        ]

14

TR 001634

App. 0174


DX0075-0110

(3)  AGREEMENT TO ENTER INTO GUARANTEE

The Assignor has agreed with the Landlord to enter into this guarantee agreement as a condition of the Landlord's consent permitting the assignment of the Lease to [                    ] ("the Assignee")

NOW THIS DEED WITNESSES as follows:

1.    In this Deed:

1.1   "the Landlord" includes the person in whom the reversion immediately expectant on the determination of the Term is for the time being vested

1.2   "the Lease" includes all or any deeds and documents supplemental to the lease whether or not expressed to be so

1.3   "the Term" includes any continuation or extension of the Term and any holding over whether by statute at common law or otherwise

1.4   "Commencement Date" means the date [of this deed or upon which the residue of the Term became vested in the Assignee referred to in recital (3) above]

1.5   if the Assignor is more than one person [its] obligations shall be the joint and several obligations of such persons

1.6   words importing one gender import any other gender works importing the singular import the plural and vice versa

2     THE ASSIGNOR'S COVENANTS

The Assignor covenants with the Landlord and without the need for any express assignment with all [its] successors in title such covenant to take effect from the Commencement Date that:

15

TR 001635

App. 0175



2.1  TO PAY AND PERFORM

The Assignee will punctually pay the rents and observe and perform the covenants and other terms of the Lease and if at any time the Assignee shall make any default in payment of the rents or in observing or performing any of the covenants or other terms of the Lease the Assignor will pay the rents and observe or perform the covenants or terms in respect of which the Assignee shall be in default and make good to the Landlord on demand and indemnify the Landlord against all losses damages costs and expenses arising or incurred by the Landlord as a result of such non-payment non-performance or non-observance notwithstanding:

2.1.1  any time or indulgence granted by the Landlord to the Assignee or any neglect or forbearance of the Landlord in enforcing the payment of the rents or the observance or performance of the covenants or other terms of the Lease or any refusal by the Landlord to accept rents tendered by or on behalf of the Assignee at a time when the Landlord was entitled (or would after the service of a notice under the Law of Property Act 1925 Section 146 have been entitled) to re-enter the Property

2.1.2  that the terms of the Lease may have been varied by agreement between the parties Provided that such variation is non prejudicial

2.1.3  that the Assignee shall have surrendered part of the Property in which event the liability of the Assignor under the Lease shall continue in respect of the part of the Property not so surrendered after making any necessary apportionments under the Law of Property Act 1925 Section 140 and

2.1.4  any other act or thing by which but for this provision the Assignor would have been released other than a variation of the terms of the Lease agreed between the parties that is prejudicial to the Assignor

16

TR 001636

App. 0176

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0112



DX0075-0112

2.2  TO TAKE A LEASE FOLLOWING DISCLAIMER

In the event of the Assignee

2.2.1 being a company:

    2.2.1.1 going into liquidation and the liquidator disclaiming the Lease or

    2.2.1.2 being dissolved and the Crown disclaiming the Lease or

    2.2.1.3 ceasing for any reason to be registered with the Registrar of Companies or

2.2.2 being an individual becoming bankrupt and the Trustee in bankruptcy disclaiming the Lease

then if the Landlord so requires the Assignor will accept a new underlease of the Premises for a term equal in duration to the residue remaining unexpired of the Term at the time of the grant of a new underlease to contain like tenant's and landlord's covenants respectively and the like provisions and conditions in all respects as are contained in the Lease and the rights and liabilities shall take effect as from the date of such disclaimer forfeiture or cessation (as the case may be) provided always that the Landlord within the period of six months after such disclaimer or exercise of the right of re-entry shall serve upon the Assignor notice in writing so to do and subject to the consent of any superior landlord to the grant of the new underlease being obtained prior to the grant thereof.

3    THE ASSIGNOR'S FURTHER COVENANTS

The Assignor further covenants with the Landlord to pay to the Landlord on demand and to indemnify the Landlord against all reasonable costs charges fees disbursements and expenses including those of professional advisers and agents and including in each case VAT incurred by the Landlord in connection with this guarantee agreement including without limitation those arising from

<center>17</center>

<center>TR 001637</center>

<center>App. 0177</center>

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0113
*Page 113 of 171*

DX0075-0113

the obtaining of the consent or approval of or information from any other person in connection with this guarantee agreement

4    CESSATION

This guarantee agreement ceases to have effect when the Assignee is released from the tenant covenants of the Lease by virtue of Section 5 of the Landlord and Tenant (Covenants) Act 1995 or with the consent of the Landlord

I N   W I T N E S S  whereof the parties hereto have executed this guarantee agreement as a deed the day and year first before written

EXECUTED as a Deed (but not          )
delivered until the date hereof      )
by affixing the Common Seal of       ·)
Landlord in the presence of:         )

EXECUTED as a Deed (but not          )
delivered until the date hereof      )
by affixing the Common Seal of       )
[Assignor] in the presence of:       )

18

TR 001638

App. 0178

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0114



DX0075-0114

# App. 5 (Part 4)

THIRD SCHEDULE
(ENCUMBRANCES)

| 19th December 1988 | Service Charge<br>Lease (Phase I) | Vickers Properties Limited (1)<br>Superior Landlord (2) |
| 6th July 1990 | Licence for Alterations | Superior Landlord (1)<br>Landlord (2) |
| January 1998 | Licence for Alterations | Superior Landlord (1)<br>Landlord (2) |

THE COMMON SEAL of THE          )
POST OFFICE affixed hereto      )
is authenticated by:            )
Stephen Charles Hill            )

the signature of a person       )
authorised by the Post Office   )
to act for that purpose         )

19

TR 001639

App. 0179

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0115
Page 115 of 171

DX0075-0115

# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

# EX–10.5

EXHIBIT 10.5
10–Q Filed on 08/14/2000 – Period: 06/30/2000
File Number 000–25709



GSI

© EDGAR® Information Provider Global Securities Information, Inc.
www.gsionline.com

TR 001640

App. 0180



DX0075-0116

EXHIBIT 10.5

THIS LEASE IS A NEW TENANCY FOR THE PURPOSES OF THE LANDLORD AND TENANT
(COVENANTS) ACT 1995

DATED        24 JULY 2000
-----------------------------------------------------

LAND SECURITIES PLC

-and-

eTOYS UNLIMITED

-----------------------------------------------------

LEASE

relating to
Premises known as
Sixth and Seventh Floors, St Albans House, Haymarket,
London SW1

-----------------------------------------------------

Nabarro Nathanson
Lacon House
Theobald's Road
London WCIX 8RW

Tel: 020 7524 6000

-----------------------------------------------------

TR 001641

App. 0181

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0117



DX0075-0117

CONTENTS

| CLAUSE | SUBJECT MATTER | PAGE |
| --- | --- | --- |
| 1. | DEFINITIONS........................................................1 | |
| 2. | INTERPRETATION.....................................................3 | |
| 3. | DEMISE, TERM AND RENT..............................................4 | |
| 4. | TENANT'S COVENANTS.................................................5 | |
| | To pay rents......................................................5 | |
| | To pay outgoings..................................................5 | |
| | Service Charge....................................................5 | |
| | Comply with Acts..................................................5 | |
| | Repair............................................................5 | |
| | Window Cleaning...................................................6 | |
| | Decoration........................................................6 | |
| | To permit the Landlord to repair in default......................6 | |
| | Alterations.......................................................6 | |
| | Signs and advertisements..........................................7 | |
| | Overloading.......................................................7 | |
| | User..............................................................7 | |
| | Restrictions on User..............................................7 | |
| | Alienation........................................................8 | |
| | Registration.....................................................10 | |
| | To permit viewing................................................10 | |
| | To inform the Landlord of notices...............................10 | |
| | Reimburse fees incurred by Landlord..............................10 | |
| | The Planning Acts................................................10 | |
| | Encroachment and easements.......................................11 | |
| | Indemnity........................................................11 | |
| | To pay charges...................................................11 | |
| | Interest on overdue payments.....................................11 | |
| | VAT..............................................................11 | |
| | Management: Common Parts.........................................11 | |
| | Superior Interests...............................................12 | |
| 5. | LANDLORD'S COVENANTS..............................................12 | |
| | Quiet enjoyment..................................................12 | |
| | To insure........................................................12 | |
| | To provide services..............................................12 | |

i

TR 001642

App. 0182



Signage...................................................12
Headlease................................................13

6             AGREEMENTS...............................................13
              Re-entry.................................................13
              Cesser of rent...........................................13
              No easements.............................................14
              Service of notices.......................................14
              Superior Landlord's and Mortgage's Consent...............14
              Tenant's option to determine.............................14
              Contracts (Rights of Third Parties) Act 1999.............14

THE FIRST SCHEDULE     PART I - Description of Demised Premises.................15
                       PART II - Easements and Rights Granted...................16
                       PART III - Easements and Rights Reserved................16

THE SECOND SCHEDULE    Rent Review...........................................18

THE THIRD SCHEDULE     Services and Service Charges...........................20
                       PART I - Administrative Provisions......................20
                       PART II - Landlords Obligations.........................20
                       PART III - Services....................................21

11

TR 001643

App. 0183

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0119

DX0075-0119

PARTICULARS

LANDLORD:                              Land Securities Plc

Registered Office:                    5 Strand, London WC2N 5AF

Company Number:                       551402

TENANT:                               eToys UK Limited

Registered Office:                    50 Victoria Embankment Blackfriars London
                                      ECAY ODY

Company Number:                       03726048

DEMISED PREMISES:                     Sixth and Seventh Floors, St Albans House

BUILDING:                             St. Albans House, Haymarket, London SW1

TERM COMMENCEMENT DATE:               25 December 1999

LENGTH OF TERM:                       Fifteen years

Tenant's Break clause:                25 December 2009

Expiration Date:                      24 December 2014

INITIAL RENT:                         Three hundred and ninety two thousand
                                      five hundred and eighty pounds (L392,580)
                                      (exclusive of VAT)

RENT COMMENCEMENT DATE:               24        2000

RENT REVIEW DATES:                    25 December 2004 and 25 December 2009

There is no agreement for lease to which this lease gives effect

TR 001644

App. 0184


DX0075-0120

THIS LEASE made the        day of        Two thousand

PARTIES

(1) The Landlord named in the Particulars (the "LANDLORD").

(2) The Tenant named in the Particulars (the "TENANT").

WITNESSES AS FOLLOWS:

1.  DEFINITIONS

In this Lease, unless the context requires otherwise:

"ACT"

means any Act of Parliament (including any consolidation, amendment or reenactment of it) and any subordinate legislation, regulation, or bye-law made under it;

"THE BUILDING"

means the Building and its curtilage (and each and every part of it) known as St. Albans House, Haymarket, London SW1 as registered at HM Land Registry under Title Number NGL 604865, with all Landlord's plant and machinery in it;

"THE COMMON PARTS"

means the structure, exterior, roof and foundations of the Building and all lavatories, fire escapes, pavements (if any), entrances, lobbies, passages, lifts, staircases, plant, equipment and other features and facilities (both functional and decorative) not demised exclusively to any tenant and either available for use by the Tenant in common with others and/or used by the Landlord in connection with the Services;

"CONDUCTING MEDIA"

means gutters, pipes, wires, cables, sewers, ducts, drains, mains, channels, conduits, flues and any other medium for the transmission of Supplies;

"THE DEMISED PREMISES"

means the premises (and each and every part of them) described in part 1 of the First Schedule;

1

TR 001645

App. 0185

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0121


DX0075-0121

"THE INSURED RISKS"

 means such of the risks of fire (including lightning),
explosion, storm, tempest, earthquake, flood, bursting or
overflowing of water tanks apparatus or pipes, impact and (in
peacetime) aircraft and any articles dropped from aircraft,
riot, civil commotion, and malicious damage for which cover at
the time the insurance is effected is generally available on
normal commercial terms, and such other risks against which the
Landlord from time to time reasonably insures;

"THIS LEASE"

 means this deed (whether it be a Lease or an Underlease) and
any licence deed or other document supplemental to it;

"THE PLANS"

 means the plans annexed to this Lease;

"QUARTER DAYS"

 means 25 March 24 June 29 September and 25 December in every
year and Quarter Day means any of them;

"THE SERVICES"

 means the works, services, facilities and charges listed in
part III of the Third Schedule;

"THE SERVICE CHARGE"

 means a sum representing a fair and proper proportion of the
costs (including provision towards the estimated cost of the
future renewal or replacement at the appropriate time of the
Landlord's plant and machinery and of the periodical cleaning
and future repair, renewal and redecoration of the Building)
incurred by the Landlord in providing the Services;

"SUPPLIES"

 means water, steam, gas, air, soil, electricity, telephone,
heating, telecommunications, data communications and other
like supplies;

"THE TERM"

 means the term of years granted by this Lease (including where
applicable any extension of such term under any Act or
otherwise);

"THE TERMINATION DATE"

 means the expiration date of the Term (however arising);

"VAT"

 means Value Added Tax or any similar tax from time to time
replacing it or performing a similar fiscal function;

2

TR 001646

App. 0186



>

[BLUEPRINT]

LAND SECURITIES
5 STRAND
LONDON
WC2N 5AF
0171 413 9000

DEMISE DETAILS
SIXTH FLOOR
57 - 60 HAYMARKET
LONDON
SW1
LEASE REF: 00000000

PROPERTY DETAILS
SIXTH FLOOR
ST. ALBANS HOUSE
57.- 60 HAYMARKET
LONDON SW1
4857-6

TR 001647

App. 0187



DX0075-0123

[BLUEPRINT]

LAND SECURITIES
5 STRAND
LONDON
WC2N 5AF
0171 413 9000

DEMISE DETAILS
SEVENTH FLOOR
57 - 60 HAYMARKET
LONDON
SW1
LEASE REF: 00000000

PROPERTY DETAILS
SEVENTH FLOOR
ST. ALBANS HOUSE
57 - 60 HAYMARKET
LONDON        SW1
4857-6

TR 001648

App. 0188



"VAT SUPPLY"
    has the meaning which "supply" has for the purpose of the Value
    Added Tax Act 1994.

2.    INTERPRETATION

In this Lease:

2.1    The clause headings shall not affect its construction.

2.2    Words respectively denoting the singular include the plural and vice
versa and one gender include each and all genders.

2.3    Obligations owed by or to more than one person are owed by or to them
jointly and severally.

2.4    "THE LANDLORD" includes the person entitled to the reversion expectant
on this Lease; and "THE TENANT" includes the successors in title and
persons deriving title under the original Tenant, and "THE LANDLORD'S
SURVEYOR" may be an employee of the Landlord or of an associated
company of the Landlord.

2.5    An obligation not to do or omit to do something includes an obligation
not to suffer or permit the doing or omission (as appropriate) of that
thing.

2.6    A reference to an act or omission of the Tenant includes reference to
an act or omission of any person having the Tenant's express or implied
authority.

2.7    Any sums payable by reference to a year or any other period shall be
payable proportionately for any fraction of a year or other period (as
appropriate). Apportionments of rents will be computed using the
method set out at paragraphs K2.6.4 - K2.6.6 of the Law Society's
Conveyancing Handbook 1999. If apportionment on that basis is
impossible, the method set out in paragraph K2.6.8 of the above
Handbook will be used.

2.8    All sums payable under this Lease must be paid at the discretion of
the Tenant by direct debit or in sterling through (or by cheque drawn
on) a clearing bank in the United Kingdom.

2.9    Reference to a fair proportion of a sum is reference to such fair and
reasonable proportion of that sum as determined by the Landlord's
surveyor acting reasonably and properly (whose decision except in case
of manifest error will be binding on the parties).

2.10    Rights of entry reserved to the Landlord (whether under clause 4 or
under part III of the First Schedule) may also be exercised by those
authorised by the Landlord (and with plant and equipment where
appropriate) but entry shall (save in emergency or in case of default
by the Tenant) only be exercised pursuant to 48 hours' prior notice;
and as little inconvenience and disturbance as reasonably practicable
shall be caused; and all damage caused to the Demised Premises shall
as soon as possible be made good.

3

TR 001649

App. 0189

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0125

DX0075-0125

3.    DEMISE, TERM AND RENT

3.1    The Landlord demises to the Tenant the Demised Premises TOGETHER with
the rights specified in part II of the First Schedule EXCEPT AND
RESERVING to the Landlord the Superior Landlord and those authorised
by it the rights specified in part III of the First Schedule TO HOLD
for a term of FIFTEEN YEARS (subject to determination as hereinafter
provided) commencing on the 25 day of December One thousand nine
hundred and ninety nine and expiring on the 24 day of December Two
thousand and fourteen.

3.2    The Tenant shall pay the following sums, which are reserved as rent:

3.2.1    FIRSTLY, during the first five years of the Term, yearly, the rent
of Three hundred and ninety two thousand five hundred and eighty
pounds (L392,580) and during the remainder of the Term the rent
determined in accordance with the provisions of the Second Schedule.
Such rent shall be payable by equal quarterly payments in advance
on the Quarter Days in every year without any deduction or set off.
The first payment shall be for the period commencing on (and to be
paid on) the 24 day of July Two thousand and ending on the day prior
to the Quarter Day next following that date PROVIDED THAT during the
period of twelve months from 24 July 2000 and expiring on 23 July 2001
the yearly rent shall be abated each quarter by the sum of Thirty
two thousand seven hundred and fifteen pounds (L32,715) and the
quarterly payments in advance shall be adjusted accordingly during
such period such that the quarterly rent for such period shall be
payable at the rate of Sixty five thousand four hundred and thirty
pounds (L65,430) (exclusive of VAT) AND PROVIDED FURTHER THAT during
the period 24 July 2001 and expiring on 23 July 2002 the yearly rent
shall be abated each quarter by the sum of Sixteen thousand three
hundred and fifty seven pounds and fifty pence (L16,357.50) and the
quarterly payments in advance shall be adjusted accordingly during
such period such that the quarterly rent for such period shall be
payable at the rate of Eighty one thousand seven hundred and eighty
seven pounds and fifty pence (L81,787.50) (exclusive of VAT);

3.2.2    SECONDLY a fair proportion of the sums paid by the Landlord in
insuring the Building under clause 5.2.1 and the whole of the sums
paid for insuring three years, rents firstly and thirdly reserved by
this Lease. Such rent shall be payable within 7 days of demand;

3.2.3    THIRDLY the sums due under clause 4.3, payable as specified in
part I of Third Schedule;

3.2.4    FOURTHLY, any sums due under clause 4.2.3;

3.2.5    FIFTHLY the sums due under clause 4.24 (so far as they relate to the
rents above reserved).

4

TR 001650

App. 0190

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0126



DX0075-0126

4.    TENANT'S COVENANTS

THE Tenant COVENANTS with the Landlord at all times during the Term:

4.1    TO PAY RENTS

To pay the rents reserved by this Lease immediately they become due without deduction or set off.

4.2    TO PAY OUTGOINGS

To pay all rates, taxes, duties, charges, assessments, impositions and outgoings ("levies") whatsoever whether parliamentary, local or otherwise charged upon the Demised Premises or upon their owner or occupier and a fair proportion of any levies on the Landlord in respect of the Building (except income tax on the rents reserved properly payable by the Landlord and any levy occasioned by any dealing with the reversion immediately expectant on this Lease).

4.3    SERVICE CHARGE

To pay the Service Charge, in accordance with part I of the Third Schedule provided always that in no circumstances shall the Tenant pay any Service Charge in relation to any lettable parts of the Building which are at any time underlet.

4.4    COMPLY WITH ACTS

To comply with all notices served by any public, local or statutory authority and with the requirements of any present or future Acts, regulation or directive (whether imposed on the owner or occupier) which affects the Demised Premises or their use Provided always that any such matter served or imposed on the owner as relates to the Demised Premises or their use shall be notified forthwith to the Tenant.

4.5    REPAIR

4.5.1    To keep the Demised Premises including without limitation all Landlord's plant and machinery in it in good and substantial repair and good working order and to keep any car parking spaces used by the Tenant clean tidy and free of obstruction or rubbish.

4.5.2    To replace by new articles of similar kind and quality any fixtures, fittings, plant, or equipment (other than Tenant or Trade fixtures and fittings) upon the Demised Premises which are in need of replacement.

4.5.3    Damage by any of the Insured Risks is excepted from the Tenant's obligation under sub-clauses 4.5.1 and 4.5.2 save to the extent that payment of the whole or part of the insurance moneys is refused in consequence of some act or default of or suffered by the Tenant.

4.5.4    As the Termination Date to yield up the Demised Premises (having removed all Tenant's and Trade fixtures and any partitions installed by the Tenant, reinstated any partitions or other fixtures shown on the Plan but removed by the Tenant during the Term, as the Landlord shall reasonably direct, and made good all damage caused in

5

TR 001651

App. 0191


DX0075-0127

such removal and reinstatement to the Landlord's reasonable satisfaction) in the state of repair and working order above referred to.

4.5.5   Promptly to notify the Landlord as soon as the Tenant becomes aware of any defect in the Demised Premises or defect or want of repair in the Building capable of giving rise to a duty under any Act or under this Lease on the Landlord.

4.6   WINDOW CLEANING

To clean all windows and their frames, both inside and outside, of the Demised Premises as often as reasonably necessary.

4.7   DECORATION

During the year Two thousand and eight, and in the year immediately before the Termination Date appropriately to decorate the Demised Premises in a proper and workmanlike manner, to the reasonable satisfaction of the Landlord, and in the case of works carried out in the year immediately before the Termination Date, to the approval of the Landlord as to colour and appearance (such approval not to be unreasonably withheld or delayed).

4.8   TO PERMIT THE LANDLORD IN REPAIR TO DEFAULT

To permit the Landlord (and in accordance with the provisions of clause 2.10) to enter and view the condition of the Demised Premises. If the Landlord serves on the Tenant or leaves on the Demised Premises notice in writing requiring that any repairs or other works or matters for which the Tenant is liable under the terms of this Lease be undertaken, and the Tenant does not within two months following such notice (or sooner if requisite) commence to comply with its requirements and thereafter diligently proceed with the same to the reasonable satisfaction of the Landlord and/or the Landlord's Surveyor the Landlord may enter the Demised Premises and do everything necessary to comply with such notice. All costs properly incurred by the Landlord in so doing shall be repaid by the Tenant as a debt within seven days of demand. Any such entry is without prejudice to the Landlord's rights under clause 6.1.

4.9   ALTERATIONS

4.9.1   Not to make any structural or external alteration or addition in or to the Demised Premises or cut into any structural part of the Building.

4.9.2   Not otherwise to alter the Demised Premises or to carry out alterations or additions to the Supplies without the prior written approval of and in accordance with drawings and specifications approved by the Landlord (such approvals not be to unreasonably withheld or delayed). No approvals shall be required for (but written notice shall be given to the Landlord of) the installation and removal of demountable partitioning provided that they do not interfere with the provision of the Services.

4.9.3   If a breach of sub-clause 4.9.1 or 4.9.2 occurs the Landlord may (without obligation) at the Tenant's expense remove or fill up (as the case may be) any unauthorised buildings, structures, alterations or additions.

6

TR 001652

App. 0192



4.9.4    The terms of any approval may require the Tenant to covenant in such form as the Landlord shall reasonably require in regard to the execution of any works to the Demised Premises and as the Landlord may absolutely require their reinstatement at the Termination Date.

4.10    SIGNS AND ADVERTISEMENTS

Not to display on or from the Demised Premises so as to be visible from the outside any sign, advertisement, lettering or notice of any kind except as previously approved by the Landlord subject always to the provisions of paragraphs 5 and 6 of Part II of the First Schedule.

4.11    OVERLOADING

Not to exceed the designed floor loading of the Building.

4.12    USER

Not to use the Demised Premises otherwise than as high class offices.

4.13    RESTRICTIONS ON USER

Not to:

4.13.1    use the address of the Demised Premises (whether for advertising purposes or otherwise) in a manner which the Landlord acting reasonably considers detrimental to the reputation of the Building;

4.13.2    install any window box or receptacle for flowers outside the Demised Premises;

4.13.3    cook or heat food on the Demised Premises other than by microwaving pre-cooked food;

4.13.4    do anything which may invalidate any insurance or render any additional premium payable for the insurance of the Demised Premises or the Building against any Insured Risk;

4.13.5    use the Demised Premises as a dwelling place or for sleeping, as a betting office or in connection with gaming, for the sale of intoxicants for consumption on or off the premises, for public entertainment, or for any sale by auction (which for the avoidance of doubt not prohibit the use of the Demised Premises for the purposes of the Tenant's business as an e-commerce company); or

4.13.6    use the Demised Premises for any illegal or immoral purpose or cause in the opinion of the Landlord any nuisance, damage or disturbance to the Landlord or the occupiers of the Building.

7

TR 001653

App. 0193



4.14    ALIENATION

4.14.1    In this sub-clause:

'PERMITTED PART'

shall mean the whole or a part of any floor of the Demised Premises (excluding the landings lifts toilets and services ducts) together with (in common with other occupiers) the right to use the entrances staircases lifts and landings for access thereto and egress therefrom and the right to use appropriate toilet accommodation so that a Permitted Part comprises a viable independent suite of offices.

'PERMISSIBLE UNDERLEASE'

means an underlease created by Deed, not created on payment of a fine or premium, and containing the Stipulated Covenants; and a reservation of and an underlessee's covenant to pay a rent not less than the open market rent (obtainable without making a fine or premium) for the Demised Premises or any Permitted Part; and provisions for rent review at the same times and in the same terms as in the Second Schedule of this Lease; and provisions for change of use, alienation and recovery of insurance premium and service charge no less onerous those in this Lease.

'PERMISSIBLE UNDERLESSEE'

means a person who has executed a Deed giving the Stipulated Covenants directly to the Landlord;

'STIPULATED COVENANTS'

means the Tenant's covenants and conditions in this Lease (except the Tenant's covenant to pay the rents reserved by this Lease) to the extent applicable to the premises to be underlet.

4.14.2    Not (save as herein expressly permitted) to assign, share, part with the possession or occupation of, charge or underlet any part of the Demised Premises.

4.14.3    Not to underlet the whole of the Demised Premises or a Permitted Part except to a Permissible Underlessee by a Permissible Underlease in accordance with the provisions of clause 4.14.5.

4.14.4    Not to part with, or share the possession or occupation of the Demised Premises except by virtue of an assignment or underlease authorised under this sub-clause 4.14.

4.14.5    Not without the prior consent in writing of the Landlord (such consent not to be unreasonably withheld or delayed subject in the case of an assignment to sub-clauses 4.14.6 - 4.14.9):

(a)    to assign the whole of the Demised Premises; or

(b)    to underlet (including in any derivative manner) the whole of the Demised Premises by a Permissible Underlease to a Permissible Underlessee; or

8

TR 001654

App. 0194

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0130



DX0075-0130

(c)   to charge or mortgage in any way the whole (except by a floating charge upon the Tenant's undertaking) of the Demised Premises.

(d)   to underlet a Permitted Part except by a Permissible Underlease for a term not exceeding two years and which shall exclude by Court Order Sections 24-28 (inclusive) of the Landlord and Tenant Act 1954 and not at any time during the term to grant or permit to be granted Permissible Underleases of Permitted Parts so that there are more than two occupiers of any floor of the Demised Premises at any one time provided that whilst this lease is vested in eToys UK Limited (but not otherwise) the Tenant may grant or permit to be granted Permissible Underleases of Permitted Parts for a term not exceeding two years so that there may be up to five occupiers of any floor of the Demised Premises at any one time.

4.14.6   A refusal of consent to assign will be reasonable if on the ground (whether or not with other grounds) that in the reasonable opinion of the Landlord the proposed assignee is unlikely to be able to meet its obligations under this Lease having regard to all relevant circumstances.

4.14.7   Sub-clause 4.14.5 shall be without prejudice to the right of the Landlord to refuse consent on any other ground or grounds where such refusal would be reasonable provided always that it shall not be reasonable for the Landlord to request more than one form of guarantee from the proposed assignee and to refuse consent on the grounds that the proposed assignee shall not provide more than one form of guarantee.

4.14.8   It will be reasonable for any consent to assign to be subject to a condition that the assigning Tenant execute as a deed and in a form reasonably required by the Landlord and deliver to the Landlord prior to the assignment in question an authorised guarantee agreement (as defined in and for the purposes of section 16 of the Landlord and Tenant (Covenants) Act 1995).

4.14.9   Sub-clause 4.14.8 shall be without prejudice to the right of the Landlord to impose further conditions upon a grant of consent where such imposition would be reasonable (subject at all times to the provisions of clause 4.14.7).

4.14.10  Not to waive any breach by any underlessee of any of the Stipulated Covenants, but on any such breach to take all reasonable steps to enforce the Stipulated Covenants by re-entry or otherwise.

4.14.11  The Tenant may (without prejudice to clause 4.14.4) without the necessity of obtaining any consent of the Landlord share occupation of the whole or any part or parts of the Demised Premises with a company that is a member of the same group as the Tenant (as defined by Section 42 of the Landlord and Tenant Act 1954) provided that:

(a)   The Landlord shall be notified of the commencement or termination of each such arrangement;

(b)   such arrangement shall cease forthwith upon any such company or companies ceasing to be a members of members of the same group as the tenant;

9

TR 001655

App. 0195

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0131    *Page 131 of 171*


DX0075-0131

(c)  no relationship of Landlord and Tenant is thereby created.

4.15    REGISTRATION

To produce two certified copies of every document evidencing any transmission of any interest (however remote) in the Demised Premises to the Landlord's Solicitors for registration within one month after the date of such document, and to pay to the Landlord's Solicitors a fee of Twenty Five Pounds plus Value Added Tax for each such registration together with any fee properly payable to any Superior Landlord.

4.16    TO PERMIT VIEWING

To permit prospective purchasers of the reversion or persons carrying out a valuation for insurance purposes (once in any year of the Term) with written authority from the Landlord or its agent at reasonable times in the day and upon reasonable prior notice to view the Demised Premises.

4.17    TO INFORM THE LANDLORD OF NOTICES

To give immediate notice to the Landlord upon becoming aware of any notice or claim affecting the Demised Premises.

4.18    REIMBURSE FEES INCURRED BY LANDLORD

To reimburse the Landlord on written demand all expenditure properly incurred in connection with:

4.18.1    any breach of any Tenant's covenant in this Lease, including the preparation and service of a notice under section 146 of the Law of Property Act 1925; and

4.18.2    the preparation and service of a Schedule of Dilapidations.

4.19    THE PLANNING ACTS

4.19.1    In this sub-clause:

"THE PLANNING ACTS"

means every Act for the time being in force relating to the use, development and occupation of land and buildings; and

"PLANNING PERMISSION"

means any permission, consent or approval given under the Planning Acts.

4.19.2    To comply with the requirements of the Planning Acts and of all Planning Permissions relating to or affecting the Demised Premises.

4.19.3    Not to apply for or implement any Planning Permission without (in each case) the prior written consent of the Landlord (such approval not to be unreasonably withheld or delayed where the Landlord has already consented to the alterations in accordance with this Lease and Planning Permission would be required for any such alterations).

10

TR 001656

App. 0196



4.20    ENCROACHMENT AND EASEMENTS

Not to obstruct any windows belonging to the Demised Premises or the Building nor to permit any encroachment or easement to be made or threatened against the Demised Premises.

4.21    INDEMNITY

To indemnify the Landlord from all losses, actions, claims, demands, costs, damages and expenses.

4.21.1    in respect of any personal injury or death or damage to any property or any infringement of any right or otherwise arising directly or indirectly in respect of the Demised Premises or their use; and

4.21.2    arising out of any breach of any obligation owed by the Tenant under this Lease.

4.22    TO PAY CHARGES

To pay the reasonable charges (including Solicitor's and Surveyor's charges) and disbursements properly incurred by the Landlord in connection with any application by the Tenant for consent under any provision of this Lease where such application is withdrawn or consent is granted or lawfully refused.

4.23    INTEREST ON OVERDUE PAYMENTS

To pay to the Landlord interest on all sums payable under this Lease not paid within 21 days following the due date (or if no date is specified from the date of demand) at the rate of three pounds per cent per annum above Lloyds TSB Bank Plc Base Lending Rate for the time being in force from the due date (or if no date is specified from the date of demand) until payment.

4.24    VAT

Any payment or other consideration to be provided to the Landlord pursuant to the provisions of this Lease is exclusive of VAT and the Tenant shall in addition pay:

4.24.1    VAT properly payable on any consideration in respect of a VAT Supply to the Tenant by the Landlord; and

4.24.2    a fair proportion of the VAT properly charged in respect of any VAT Supply to the Landlord in respect of the Demised Premises or the Building where such VAT is not recovered by the Landlord from HM Customs & Excise.

4.25    MANAGEMENT: COMMON PARTS

4.25.1    Not to transport heavy or bulky items through the Common Parts between 9.00 a.m. and 6.00 p.m. unless the consent of the Landlord (such consent not to be unreasonably withheld or delayed) has been obtained.

4.25.2    Not to damage or mark any surface of the Common Parts by using unsuitable trolleys, or otherwise, or overload any lift or raised floor (if any).

12

TR 001657

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0133
Page 133 of 171

DX0075-0133

4.25.3    Not to obstruct, deposit goods or rubbish upon, cause any nuisance or disturbance on, or endanger any person or vehicle using any of the Common Parts.

4.25.4    To comply with reasonable regulations notified by the Landlord to the Tenant as to the use of the Common Parts.

4.26    SUPERIOR INTERESTS

To comply with all tenant's covenants (except as to payment of rents or other sums) relating to the Demised Premises and contained or referred to in any lease to which this Lease is inferior and with all covenants affecting the freehold interest in the Demised Premises.

5.  . LANDLORD'S COVENANTS

THE Landlord COVENANTS with the Tenant as follows:

5.1    QUIET ENJOYMENT

That so long as the Tenant pays the rents reserved by and complies with the Tenant's covenants and conditions in this Lease, the Tenant shall peaceably hold and enjoy the Demised Premises during the Term without any lawful interruption by the Landlord or any person rightfully claiming under or in trust for it.

5.2    TO INSURE

5.2.1    To maintain a well established insurance office (to be notified to the Tenant) insurance of the Building against the Insured Risks in their full reinstatement value (including all professional fees and incidental expenses) and three years rents firstly and thirdly reserved by this Lease subject to such excesses, limitations and exclusions as the insurers may impose and shall have been notified in writing to the Tenant and otherwise on the usual terms of such insurance office.

5.2.2    If any part of the Building is destroyed or damaged by an Insurance Risk then unless payment of the insurance moneys is refused in whole or part because of the act or default of the Tenant and subject to obtaining all necessary planning and other consents, to expend all moneys received (other than in respect of loss of rent) from such insurance towards reinstating as quickly as reasonably practicable the Building following destruction or damage by an Insured Risk.

5.3    TO PROVIDE SERVICES

To supply the Services in accordance with Part II of the Third Schedule.

5.4    SIGNAGE

On request to display the name and business of the Tenant in the Landlord's house style on any signboards in the Common Parts.

12

TR 001658

App. 0198



5.5    HEADLEASE

To pay the rents reserved by the headlease under which the Landlord holds the Building and to observe and perform the Tenant's covenants under the headlease unless the obligation to do so falls upon the Tenant by virtue of this Lease.

6.    AGREEMENTS

IT IS AGREED that:

6.1    RE-ENTRY

6.1.1    If any event specified in sub-clause 6.1.2 occurs the Landlord may at any time afterwards re-enter the Demised Premises or any part of them in the name of the whole and this Lease will then immediately determine. In sub-clause 6.1.2 reference to "the 1986 Act" means the Insolvency Act 1986.

6.1.2    The events referred to in clause 6.1.1 are as follows:

(a) any rent reserved remaining unpaid for 21 days after becoming due and payable: and in the case of the rent first reserved this means whether formally demanded or not;

(b) the Tenant failing to comply with any obligation which it has undertaken or any condition to which it is bound under this Lease;

(c) the Tenant (if a company) entering into liquidation or passing a resolution for winding-up (otherwise than a voluntary winding-up of a solvent company for the purpose of amalgamation or reconstruction previously consented to by the Landlord such consent not to be unreasonably withheld or delayed) or being unable to pay its debts within the meaning of sections 122 and 123 of the 1986 Act or summoning a meeting of its creditors or any of them under Part I of the 1986 Act or allowing a petition for an Administration Order in respect of it to be filed in court or a receiver or an administrative receiver for it being appointed;

(d) the Tenant (if an individual) having a receiving order made against him or becoming bankrupt or entering into a composition with his creditors or being unable to pay or having no reasonable prospect of being able to pay his debts within the meaning of sections 267 and 268 of the 1896 Act or an interim order being made against him under Part VIII of the 1986 Act.

6.1.3    Neither the existence of the Landlord's right under sub-clause 6.1.1 above nor the consequences of any exercise of that right are to affect any other right or remedy available to the Landlord.

6.2    CESSER OF RENT

If the Demised Premises are destroyed or damaged by any Insured Risk so as to be unfit for occupation and use the insurance effected by the Landlord has not been vitiated or payment of the policy moneys refused in whole or in part because of any act or default of or suffered by the Tenant, then the rents first and third reserved, or a fair

13

TR 001659

App. 0199

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0135



DX0075-0135

proportion of those rents according to the nature and extent of the damage, shall cease to be payable until the Demised Premises shall again be fit for occupation and use or until the expiration of three years from the date the destruction or damage occurred (whichever period shall be the shorter).

6.3     NO EASEMENTS

The Tenant shall not be entitled to any rights whether of light and air or otherwise (save as expressly granted by this Lease) which would restrict the free user for building or otherwise of the Building or any adjoining or neighbouring premises. Section 62 Law of Property Act 1925 will not apply to this Lease.

6.4     SERVICE OF NOTICES

In addition to any other prescribed mode of service any notices shall be validly served if served in accordance with section 196 of the Law of Property Act 1925 as amended by the Recorded Delivery Service Act 1962 or, in the case of the Tenant, if left addressed to it on the Demised Premises or sent to it by post.

6.5     SUPERIOR LANDLORD'S AND MORTGAGEE'S CONSENT

The giving of any Landlord's consent or approval required under the terms of this Lease shall be conditional upon the consent or approval (where required) of any Superior Landlords or Mortgagees. The Landlord will apply for such consent or approval at the expense of the Tenant.

6.6     TENANT'S OPTION TO DETERMINE

The Tenant may determine this Lease by giving to the Landlord not less than twelve months' previous notice in writing to expire on the 25 December 2009. On the expiration of such notice and upon payment by the Tenant to the Landlord of a sum equivalent to six months rent firstly reserved by this Lease at such date and upon the Tenant giving vacant possession this Lease shall cease and determine, but without prejudice to any claim in respect of any prior breach.

6.7     CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

Unless it is expressly stated that the Contracts (Rights of Third Parties) Act 1999 is to apply nothing in this Lease will create rights in favour of any one other than the parties to this Lease.

IN WITNESS the parties have executed this Lease as a deed the day and year first before written.

14

TR 001660

App. 0200



THE FIRST SCHEDULE

PART I

Description of Demised Premises

1.  ALL THOSE Sixth and Seventh Floors of the Building shown for the purposes of identification only coloured pink on the Plans and more particularly described in paragraphs 2 and 3 below.

2.  There is included in this demise:

2.1     all internal surfacing materials and finishes on the walls, floors and ceilings of the Demised Premises and on the other structural parts of the Building within or bounding the Demised Premises; and

2.2     all doors (including those giving access to the Demised Premises from the Common Parts), windows and skylights (and in each case their frames and glazing) of the Demised Premises; and

2.3     all Landlord's plant, fixtures and fittings (save as specified in PARAGRAPH 3.4 below); and

2.4     one half severed vertically of any non-structural walls separating the Demised Premises from any adjoining premises; and

2.5     the entirety of any non-structural walls wholly within the Demised Premises or bounding the same (other than as specified in PARAGRAPH 2.4 above); and

2.6     all Conducting Media within and exclusively serving the Demised Premises (save as specified in PARAGRAPH 3.4 below);

2.7     the suspended ceiling, the raised floor (and the supports for each of these) and the airspace between each of these and the slab or other structural part respectively above and below them; and

2.8     window blinds (if any) and equipment for operating the same.

3.  There is excluded from this demise:

3.1     the whole of the airspace above the Demised Premises;

3.2     all loadbearing and exterior walls and the floors and ceilings of the Demised Premises (other than to the extent expressly included by virtue of PARAGRAPH 2 above);

3.3     all structural parts of the Building;

3.4     any conducting media serving the remainder of the Building.

15

TR 001661

App. 0201


DX0075-0137

PART II

Easements and Rights Granted

1.  The right of subjacent and lateral support for the Demised Premises from the remainder of the Building.

2.  The free passage of Supplies from and to the Demised Premises through Conducting Media at the Building.

3.  The right of access to and exit from the Demised Premises through the relevant Common Parts within the Building at all times.

4.  The right of use of lavatory accommodation where provided for common use in the Building.

5.  The right to display the Tenant's name upon the nameboards at both Haymarket and St Alban's Street reception areas at the Building.

6.  The right with the Landlord's consent (such consent not to be unreasonably withheld with regard to design and layout) to display the Tenant's name in the lobby areas outside each of the floors in the Building comprising the Demised Premises.

PART III

Easements and Rights Reserved

1.  SUPPORT

    The right to subjacent and lateral support for the remainder of the Building from the Demised Premises.

2.  RUNNING OF SERVICES

    The free passage of Supplies from and to the remainder of the Building through Conducting Media at any time within the Demised Premises.

3.  ENTRY IN RESPECT OF SERVICES ETC.

    The right to install, clean, maintain, alter, make connections to, replace or repair any Conducting Media within the Demised Premises but serving the Building and the right to enter the Demised Premises for those purposes.

4.  ENTRY FOR MANAGEMENT PURPOSES

    The right to enter on the Demised Premises to inspect, repair, alter, decorate or execute any other works upon the Building which would otherwise not be practicable to carry out, or to carry out any Services or for any other reasonable management purpose.

16

TR 001662

App. 0202



5.  ESCAPE

The right of emergency escape over any parts of the Demised Premises as are designated for such purpose.

6.  SUPERIOR INTERESTS

All exceptions and reservations out of any lease to which this Lease is inferior, or out of the freehold interest in the Demised Premises.

7.  COMMON PARTS: REDEVELOPMENT

Causing as little inconvenience interruption or nuisance to the Tenant as possible:

7.1    the right, in emergency or when works are being carried out to them, to close off or divert any of the Common Parts provided that such closing off or diversion is ceased as soon as reasonably possible;

7.2    the right to stop up or divert any Conducting Media or other Common Parts subject to a reasonable alternative being made available; and

7.3    The right to build upon, alter, add to or redevelop the Building or any adjoining or neighbouring premises as the Landlord considers fit, whether or not the access of light and air to the Demised Premises is interfered with.

17

TR 001663

App. 0203



THE SECOND SCHEDULE

Rent Review

1.  In this Schedule:

1.1     The rent review dates shall be the 25 December in the years 2004 and
        2009 and the expression "THE RELEVANT RENT REVIEW DATE" shall be
        construed accordingly.

1.2     The open market rent shall be the yearly rent for which the Demised
        Premises might reasonably expect to be let on the open market, with
        vacant possession, on the relevant rent review date, by a willing
        lessor to a willing lessee, without taking a fine or premium, for a
        term of 10 years commencing on the relevant rent review date, upon
        the supposition that the willing lessee shall have been given prior
        to (and that there shall have expired prior to) the relevant rent
        review date a sufficient rent free period for the purposes of the
        carrying out of lessee's fitting out works and on the assumption if
        not a fact that the Tenant has complied with its obligations under
        this Lease, that no work has been carried out to the Demised Premises
        which has reduced the rental value of the Demised Premises, if the
        whole or any part of the Demised Premises or the Building has been
        destroyed or damaged it has been reinstated and the Landlord shall
        have paid the contribution of L25 per square metre plus VAT towards
        the cost of providing and installing throughout the office areas of
        the seventh floor of the Demised Premises quality carpeting and the
        contribution of L70 per floor box towards the cost of the provision
        of floor boxes and tracking and distributed under floor power and
        floor grommets upon all the office areas of the Demised Premises and
        that at the relevant rent review date all the above exist and remain
        in good repair condition and working order and otherwise upon the
        terms and conditions (save as to the amount of rent payable but
        including provisions for rent review every five years and otherwise
        on terms similar to those contained in this Second Schedule)
        contained in this Lease, there being disregarded:

1.2.1   any effect on rent of the Tenant having been in occupation of
        the Demised Premises; and

1.2.2   any goodwill accruing to the Demised Premises because of the
        business of the Tenant;

1.2.3   any effect on rent of any improvement carried out by the Tenant
        otherwise than in pursuance of an obligation to the Landlord;
        and

1.2.4   any effect upon rent of any rental concession or abatement
        contained in this Lease.

2.      The rent payable under this Lease with effect from each rent review
        date shall be the higher of:

2.1     the rent reserved by this Lease immediately before the relevant
        rent review date (disregarding any cesser under CLAUSE 6.2); and

2.2     the open market rent on the relevant rent review date.

18

TR 001664

App. 0204



3.  The open market rent at the relevant rent review date shall be determined by agreement between the Landlord and the Tenant. Either party may require the other to commence and carry out negotiations as to the open market rent at any time after the date six months before the relevant rent review date.

4.  If the parties are unable to agree the open market rent it shall be determined by an expert who may be agreed upon in writing by the Landlord and the Tenant. Failing agreement, he shall be appointed upon the application of either party by the President (or next most senior available officer) of the Royal Institution of Chartered Surveyors.

5.  The expert's determination (which shall include payment of his costs) shall be final and binding on the parties.

6.  If on the relevant rent review date the open market rent has not be ascertained, the yearly rent reserved by this Lease immediately before the relevant rent review date shall continue to be payable until ascertainment. Immediately after ascertainment the difference (if any) between the amount actually so paid and the amount which would have been payable had it been ascertained before the relevant rent review date, together with interest on that difference calculated on a daily basis on each instalment from the date on which such instalment would have become payable to the date of payment, at Lloyds TSB Bank PLC base lending rate for the time being in force, shall be paid by the Tenant to the Landlord. If not so paid such sums shall be recoverable as rent in arrear.

7.  A deed recording the rent on review shall forthwith be entered into in such form as the Landlord shall reasonably require.

19

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0141          *Page 141 of 171*



DX0075-0141

THE THIRD SCHEDULE

Services and Service Charges

PART I

Administrative Provisions

1.   The accounting period shall be the year or other period ending on each
     Thirty first day of March or otherwise as stipulated by the Landlord.

2.   As soon as reasonably practicable after the end of each accounting period
     the Landlord will supply the Tenant with a statement (which save for any
     manifest error shall be binding on the parties) of the expenditure properly
     incurred by the Landlord in respect of the Services, and of the Service
     Charge payable for that accounting period.

3.   Pending the ascertainment of the Service Charge for each accounting period
     the Tenant shall pay, by equal quarterly payments on the four usual quarter
     days, a provisional sum by way of Service Charge of L57,000 per annum.

4.   When the actual Service Charge for each accounting period has been
     ascertained any surplus Service Charge due from or paid by the Tenant shall
     be added to or subtracted from (as the case may be) the next payment or
     payments to be made by the Tenant under PARAGRAPH 3, except that an amount
     owing at the Termination Date shall be paid or repaid as the case may be
     within three months of the Termination Date.

5.   The occurrence of the Termination Date shall not prejudice the Tenant's
     obligation to pay or the Landlord's entitlement to recover Service Charge
     upon demand made after the Termination Date where these have not been
     quantified prior to the Termination Date.

PART II

Landlord's Obligations

In accordance with the principles of good estate management the Landlord will
supply the Services in an efficient and economical manner. The Landlord (acting
reasonably and properly at all times):

1.   may employ agents, contractors or others as from time to time it thinks
     fit; and

2.   shall not be responsible for any temporary delay or stoppage in the supply
     of the Services due to any circumstances outside the Landlord's control,
     but shall take all reasonable steps to restore the supply as soon as
     practicable.

20

TR 001666

App. 0206



PART III

Services

1.    Repairing, renewing, rebuilding, replacing, decorating, cleaning, emptying, lighting and repainting the foundations roof structure and exterior of the Building and all Common Parts and Conducting Media used in common by the Tenant and others.

2.    Rates (if any) and other levies on and insurance of the Common Parts and/or on the Building generally and Property Owner's and Employer's Insurance on the Building; metered water supply to the Building, and power supply (metered or otherwise) to the Demised Premises.

3.    Providing, inspecting, maintaining (including by maintenance contracts), repairing, renewing, replacing, upgrading, insuring and operating all plant machinery, apparatus and vehicles used in providing the Services and all signage in the Common Parts.

4.    Provision, maintenance, renewal and replacement of all fire-fighting and fire detection equipment, fire alarm systems, security systems in the Building.

5.1    Heating the Building (except the Common Parts) during normal working hours during the months of October until April (inclusive) including heating the Demised Premises, to a temperature of 65DEG. F (provided the external temperature in the shade is at least 32DEG. F and the doors and windows of the Demised Premises are kept closed).

5.2    Heating the Common Parts when necessary.

5.3    Supplying comfort cooling to the Demised Premises during normal working hours.

5.4    Supplying warm and cold water to and otherwise equipping and supplying any toilet accommodation.

6.    Employment of all staff (including remuneration, incidental benefits and all associated costs and overheads) and contractors and professionals for the management and security of the Building and otherwise in connection with the Services.

7.    Providing accommodation for staff, plant and equipment and all outgoings on such accommodation.

8.    The execution of all works and the provision and maintenance of all facilities which are required under any Act to be carried out or provided at the Building generally.

9.    Any further services provided at any time by the Landlord for maintaining and securing the amenities of the Building.

10.    Any audit fee.

11.    Management charges meaning either:

11.1    the fees and expenses reasonably and properly charged by the Landlord's agents; or

21

TR 001667

App. 0207



11.2    if the work is carried out by the Landlord's own staff then 10% of the sum of:

11.2.1    the aggregate cost of all the above items, and

11.2.2    any irrecoverable VAT on that aggregate cost

<div style="margin-left:40%;">

( THE COMMON SEAL of
( LAND SECURITIES PLC
( was hereunto affected in the presence of:

Director    /S/ [ILLEGIBLE]

Director/Secretary    /S/ [ILLEGIBLE]

</div>

[SEAL]

22

TR 001668

App. 0208



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 664.8100

# EX-10.6

EXHIBIT 10.6
10-Q Filed on 08/14/2000 - Period: 06/30/2000
File Number 000-25709





LIVEDGAR Information provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

TR 001669

App. 0209



DX0075-0145

EXHIBIT 10.6

[LOGO]

----------------------------------------------------------------------

THIS LEASE IS A NEW TENANCY FOR THE PURPOSES OF
THE LANDLORD AND TENANT (COVENANTS) ACT 1995

Dated 26 July 2000

ETOYS UK LIMITED

and

MOMENTUS LIMITED

and

DIAMOND TECHNOLOGY PARTNERS INCORPORATED

UNDERLEASE

relating to Premise known as Sixth and Seventh Floors,
St Albans House, Haymarket, London SW1

[LETTERHEAD]

----------------------------------------------------------------------

TR 001670

App. 0210

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0146

*Page 146 of 171*



DX0075-0146

TABLE OF CONTENTS

| Contents | Page |
|---|---|

PARTICULARS...........................................................

1     Definitions...................................................... 1

2     Interpretation.................................................. 2

3     Demise, Term and Rent........................................... 3

3.1    Demise and Term................................................ 3

3.2    Rent.......................................................... 3

4     Tenant's Covenants.............................................. 4

4.1    To Pay Rent.................................................... 4

4.2    To Pay Outgoings............................................... 4

4.3    Comply with Acts............................................... 4

4.4    Repair........................................................ 4

4.5    Window Cleaning................................................ 5

4.6    To Permit the Landlord and/or The Superior Landlord to Repair in Default...................................................... 5

4.7    Alterations.................................................... 5

4.8    Signs and Advertisements....................................... 6

4.9    Overloading.................................................... 6

4.10   User.......................................................... 6

4.11   Restrictions on User........................................... 6

4.12   Alienation..................................................... 6

4.13   Registration................................................... 8

4.14   To Permit Viewing.............................................. 8

4.15   To Inform the Landlord of Notices.............................. 8

4.16   Reimburse Fees Incurred by Landlord............................ 8

-i-

TR 001671

App. 0211


DX0075-0147

4.17 The Planning Acts............................................... 8

4.18 Encroachment and Easements...................................... 9

4.19 Indemnity....................................................... 9

4.20 To Pay Charges.................................................. 9

4.21 Interest on Overdue Payments.................................... 9

4.22 VAT............................................................. 9

4.23 Management: Common Parts........................................ 9

4.24 Superior Interests............................................. 10

5    Landlord's Covenants........................................... 10

5.1  Quiet Enjoyment................................................ 10

5.2  Superior Lease................................................. 10

5.3  Superior Landlord's Covenants.................................. 10

6    Agreements..................................................... 10

6.1  Re-entry....................................................... 10

6.2  Cessor of Rent................................................. 11

6.3  No Easements................................................... 11

6.4  Service of Notices............................................. 11

6.5  Superior Landlord's Consent.................................... 11

6.6  Contracts (Rights of Third Parties) Act 1999................... 12

6.7  Exclusion of Landlord and Tenant Act 1954...................... 12

7    Guarantee...................................................... 12

8    Certification.................................................. 12

The First Schedule................................................. 13

PART I    Description of Demised Premises........................... 13

PART II   Easements and Rights Granted............................. 14

-ii-

TR 001672

App. 0212



PART III Easements and Rights Reserved.................................  14

The Second Schedule..................................................  16

-iii-

TR 001673

App. 0213

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0149
Page 149 of 171

DX0075-0149

PARTICULARS

| | |
|---|---|
| Landlord: | eToys UK Limited |
| Registered Office: | 50 Victoria Embankment, Blackfriars, London EC4Y ODX |
| Company Number: | 03726048 |
| Tenant: | Momentus Limited |
| Registered Office: | 21 St Thomas Street, Bristol BS1 6JS |
| Company Number: | 3312894 |
| Guarantor: | Diamond Technology Partners Incorporated (a company incorporated in Delaware) |
| Registered Office: | Prentice-Hall Corporation System, Inc. of 1013 Centre Road, City of Washington, County of New Castle, State of Delaware 19805 |
| Demised Premises: | Sixth and Seventh Floor, St Albans House |
| Building: | St Albans House, Haymarket, London SW1 |
| Term Commencement Date: | 26 July 2000 |
| Length of Term: | Two years and six months |
| Expiration Date: | 25 January 2003 |
| Initial Rent: | L453,987 (exclusive of VAT) |
| Rent Commencement Date: | 26 August 2000 |

TR 001674

App. 0214



This Lease is made the 26 July 2000 between:

(1) eTOYS UK LIMITED, company number 03726048, whose registered office is at
50 Victoria Embankment, Blackfriars, London EC4Y 0DX (the "Landlord"); and

(2) MOMENTUS LIMITED, company number 3312894, whose registered office is at
21 St Thomas Street, Bristol (the "Tenant"); and

(3) DIAMOND TECHNOLOGY PARTNERS INCORPORATED (a company registered in the
state of Delaware) whose registered office is at Prentice-Hall Corporation
System, Inc. of 1013 Centre Road, City of Wilmington, County of New Castle,
State of Delaware 19805 (the "Guarantor").

Witnesses as follows:

1    Definitions

In this Lease, unless the context requires otherwise:

"ACT" means any Act of Parliament (including any consolidation,
amendment or re-enactment of it) and any subordinate legislation,
regulation or bye-law made under it;

the "BUILDING" means the Building and its curtilage (and each and every
part of it) known as St Albans House, Haymarket, London SW1 as registered
at HM Land Registry under Title Number NGL 604885, with all Landlord's
Plant and machinery in it;

the "COMMON PARTS" means the structure, exterior, roof and foundations
of the Building and all lavatories, fire escapes, pavements (if any),
entrances, lobbies, passages, lifts, staircase, plant, equipment and other
features and facilities (both functional and decorative) not demised
exclusively to any tenant and either available for use by the Tenant in
common with others and/or used by the Landlord in connection with the
Services;

the "CONTRACTOR" means Jarvis Newman Limited;

"CONDUCTING MEDIA" means gutters, pipes, wires, cables, sewers, ducts,
drains, mains, channels, conduits, flues and any other medium for the
transmission of Supplies;

the "DEED OF COLLATERAL WARRANTY" means the deed of collateral
warranty dated 3 May 2000 provided to the Landlord by the Contractor;

the "DEMISED PREMISES" means the premises (and each and every part of
them) described in Part I of the First Schedule;

the "GUARANTOR" means the person so named in the Particulars and in the
case of an individual includes his personal representatives;

the "INSURED RISKS" means such of the risks of fire (including
lightning), explosion, storm, tempest, earthquake, flood, bursting or
overflowing of water tanks apparatus or pipes, impact and (in peacetime)
aircraft and any articles dropped from aircraft, riot, civil commotion and
malicious damage for which cover at the time the insurance is effected is
generally available on normal commercial terms, and such other risks
against which the Superior Landlord from time to time reasonably insures;

this "LEASE" means this deed (whether it be a Lease or an Underlease)
and any licence deed or other document supplemental to it;

the "PLANS" means the plans annexed to this Lease;

-1-

TR 001675

App. 0215



"QUARTER DAYS" means 25 March 24 June 29 September and 25 December in every year and Quarter Day means any of them;

the "SERVICES" means the works, services, facilities and charges listed in Part III of the Third Schedule of the Superior Lease;

the "SERVICE CHARGE" means the sum equal to the sum payable by the Landlord to the Superior Landlord in accordance with the terms of the Superior Lease;

"SUPERIOR LANDLORD" means Land Securities Plc whose registered office is at 5 Strand, London WC2N 5AF;

"SUPERIOR LEASE" means the lease dated 24 JULY 2000 made between (1) the Superior Landlord and (2) the Landlord;

"SUPPLIES" means water, steam, gas, air, soil, electricity, telephone, heating, telecommunications, data communications and other like supplies;

the "TERM" means the term granted by this Lease;

the "TERMINATION DATE" means the expiration date of the Term (however arising);

"VAT" means Value Added Tax or any similar tax from time to time replacing it or performing a similar fiscal function;

"VAT SUPPLY" has the meaning which 'supply' has for the purpose of the Value Added Tax Act 1934.

2    INTERPRETATION

In this Lease

2.1.1    The clause heading shall not affect the construction.

2.1.2    Words respectively denoting the singular include the plural and vice versa and one gender includes each and all genders.

2.1.3    Obligations owned by or to more than one person are owed by or to them jointly and severally.

2.1.4    The "Superior Landlord" includes the person entitled to the reversion expectant on the Superior Lease, the "Landlord" includes the person entitled to the reversion expectant on this Lease, and the "Tenant" includes the successors in title and persons deriving title under the original Tenant, and the "Landlord's surveyor" may be an employee of the Landlord or of an associated company of the Landlord.

2.1.5    An obligation not to do or omit to do something includes an obligation not to suffer or permit the doing or omission (as appropriate) of that thing.

2.1.6    A reference to an act or omission of the Tenant includes reference to an act or elimination of any person having the Tenant's express or implied authority.

2.1.7    Any sums payable by reference to a year or any other period shall be payable proportionately for any fraction of a year or other period (as appropriate). Apportionments of rent will be computed using the method set out at paragraphs K2.6.4-K2.6.6 of the Law Society's Conveyancing Handbook 1989. If apportionment on that basis is impossible, the method set out in paragraph K2.6.8 of the above Handbook will be used.

-2-

TR 001676



App. 0216

2.1.8    All sums payable under this Lease must be paid at the discretion of the Tenant by direct debit or in sterling through (or by cheque drawn on) a clearing bank in the United Kingdom.

2.1.9    Reference to a fair proportion of a sum is reference to such fair and reasonable proportion of that sum as determined by the Landlord's and/or Superior Landlord's surveyor acting reasonably and properly (whose decision except in case of manifest error will be binding on the parties).

2.1.10   Rights of entry revised to the Landlord and/or the Superior Landlord (whether under Clause 4 or under Part III of the First Schedule) may also be exercised by those authorised by the Landlord and/or the Superior Landlord and with plant and equipment where appropriate) but entry shall (save in emergency or in case of default by the Tenant) only be exercised pursuant to 48 hours' prior notice; and as little inconvenience and disturbance as reasonably practicable shall be caused; and all damage caused to the Demised Premises shall as soon as possible be made good.

3.    DEMISE, TERM AND MERIT

3.1   DEMISE AND TERM

The Landlord demises to the Tenant the Demised Premises together with the rights specified in Part II of the First Schedule except and receiving to the Landlord the Superior Landlord and those authorised by them the rights specified in Part III of the First Schedule to hold for a term at two years and six months (subject to determination as hereinafter provided) commencing on the 26 JULY 2000 and expiring on the 25 JANUARY 2003.

3.2   RENT

The Tenant shall pay the following sums, which are reserved as rent.

3.2.1    firstly, during the Term, yearly, the sum of L489,987. Such rent shall be payable by equal quarterly payments in advance on the Quarter Days in every year without any deduction or set off. The first payment shall be for the period commencing on (and to be paid on) the 26 JULY 2000 and ending on the day prior to the Quarter Day next following that date;

3.2.2    secondly, the amount properly paid by the Landlord to the Superior Landlord in accordance with Clause 3.2.2 of the Superior Lease. Such rent shall be payable within seven days of demand;

3.2.3    thirdly, the Service Charge together with the sum of L3 per square foot in connection with the use of IT and telephone cabling at the Demised Premises provided by the Landlord for the use of the Tenant all such sums payable by equal quarterly instalments in advance on the Quarter Days in every year without any deduction or set off in the same manner as set out in Part I of the Third Schedule of the Superior Lease PROVIDED ALWAYS that the service charge shall exclude

(i)    any costs or charges which the Landlord is properly entitled to claim from the Contractor pursuant to the Deed of Collateral Warranty; and

(ii)   any sum included in the service charge pursuant to the Superior Lease by way of provision towards the estimated cost of the future renewal or replacement at the appropriate time of the Superior Landlord's plant and machinery and future repair renewal and redecoration of the building;

-3-

TR 001677

App. 0217



3.2.4  fourthly, any sums due under Clause 4.20;

3.2.5  fifthly, the sums due under Clause 4.21 (so far as they relate to the rents above reserved);

3.2.6  sixthly, the sums due under Clause 4.22 (so far as they relate to the rents above reserved).

4    TENANT'S COVENANTS

The Tenant covenants with the Landlord at all times during the Term.

4.1  TO PAY RENT

To pay the rents reserved by this Lease immediately they become due without deduction or set off.

4.2  TO PAY OUTGOINGS

To pay all rates, taxes, duties, charges, assessments, impositions and outgoings ("levies") whatsoever whether parliamentary, local or otherwise charged upon the Demised Premises or upon their owner or occupier and a fair proportion of any levies on the Landlord in respect of the Building (except income tax on the rents reserved properly payable by the Landlord and/or the Superior Landlord and any levy occasioned by any dealing with the reversion immediately expectant on this Lease).

4.3  COMPLY WITH ACTS

To comply with all notices served by any public, local or statutory authority and with the requirements of any present or future Acts, regulation or directive (whether imposed on the owner or occupier) which affects the Demised Premises or their use provided always that any such matter served or imposed on the owner as relates to the Demised Premises or their use shall be notified forthwith to the Tenant.

4.4  REPAIR

4.4.1  To keep the Demised Premises including without limitation all Landlord's and/or Superior Landlord's plant and machinery in it in good and substantial repair and good working order PROVIDED ALWAYS that the Tenant shall not be required to yield up the Premises at the end of the Term in any better state or condition than as evidenced by the attached photographic schedule of condition.

4.4.2  To replace by new articles of similar kind and quality any fixtures, fittings, plant or equipment (other than Tenant or Trade fixtures and fittings) upon the Demised Premises which are in need of replacement.

4.4.3  Damage by any of the Insured Risks is excepted from the Tenant's obligation under sub-clauses 4.4.1 and 4.4.2 save to the extent that payment of the whole or part of the insurance moneys is refused in consequence of some act or default of or suffered by the Tenant.

4.4.4  At the Termination Date to yield up the Demised Premises in the state of repair and working order above referred to.

4.4.5  Promptly to notify the Landlord as soon as the Tenant becomes aware of any defect in the Demised Premises capable of giving rise to a duty under any Act or under this Lease on the Landlord and/or the Superior Landlord.

-4-

TR 001678

App. 0218



DX0075-0154

# App. 5 (Part 5)

4.5   WINDOW CLEANING

To clean the inside of all windows and their frames, of the Demised Premises as often as reasonably necessary.

4.6   TO PERMIT THE LANDLORD AND/OR THE SUPERIOR LANDLORD TO REPAIR IN DEFAULT

To permit the Landlord and/or the Superior Landlord (and in accordance with the provisions of Clause 2.10) to enter and view the condition of the Demised Premises. If the Landlord serves on the Tenant or leaves on the Demised Premises notice in writing requiring that any repairs or other works or matters for which the Tenant is liable under the terms of this Lease be undertaken, and the Tenant does not within two months following such notice (or sooner if requisite) commence to comply with the requirements and thereafter diligently proceed with the same to the reasonable satisfaction of the Landlord and/or the Landlord's Surveyor. the Landlord may enter the Demised Premises and do everything necessary to comply with such notice. All costs properly incurred by the Landlord in so doing shall be repaid by the Tenant as a debt within seven days of demand. Any such entry is without prejudice to the Landlord's rights under Clause 6.1.

4.7   ALTERATIONS

4.7.1   Not to make any structured or external alterations or additions in or to the Demised Premises or cut into any structural part of the Building.

4.7.2   Not otherwise to carry out any internal non-structural alterations or additions to the Demised Premises without the prior written approval of and in accordance with drawings and specifications approved by the Landlord (such approvals not to be unreasonably withheld or delayed) and by the Superior Landlord.

4.7.3   If a breach of sub-clause 4.7.1 occurs the Landlord may (without obligation) at the Tenant's expense remove or fill up (as the case may be) any unauthorised buildings, structures, alterations or additions.

4.7.4   The terms of any approval may require the Tenant to covenant in such form as the Landlord and/or the Superior Landlord shall reasonably require in regard to the execution of any works to the Demised Premises and as the Landlord may absolutely require their reinstatement at the Termination Date.

4.8   SIGNS AND ADVERTISEMENTS

Not to display on or from the Demised Premises so as to be visible from the outside any sign, advertisement, lettering or notice of any kind except as previously approved by the Landlord and/or the Superior Landlord.

4.9   OVERLOADING

Not to exceed the designed floor loading of the Building.

4.10  USER

Not to use the Demised Premises otherwise than as high class offices.

-5-

TR 001679

App. 0219



**4.11 RESTRICTIONS ON USER**

Not to:

4.11.1   use the address of the Demised Premises (whether for advertising purposes or otherwise) in a manner which the Landlord and/or the Superior Landlord acting reasonably considers detrimental to the reputation of the Building;

4.11.2   install any window box or receptacle for flowers outside the Demised Premises;

4.11.3   cook or heat food on the Demised Premises other than by microwaving pre-cooked food;

4.11.4   do anything which may invalidate any insurance or render any additional premium payable for the insurance of the Demised Premises or the Building against any Insured Risk;

4.11.5   use the Demised Premises as a dwelling place or for sleeping, as a betting office or in connection with gaming, for the sale of intoxicants for consumption on or off the premises, for public entertainment, or for any sale by auction (which for the avoidance of doubt does not prohibit the use of the Demised Premises for the purposes of the Tenant's business as an e-commerce company); or

4.11.6   use the Demised Premises for any illegal or immoral purpose or cause in the opinion of the Landlord and/or the Superior Landlord any nuisance, damage or disturbance to the Landlord or the occupiers of the Building.

**4.12 ALIENATION**

4.12.1   In this sub-clause:

"PERMITTED PART"

shall mean the whole or a part of any floor of the Demised Premises (excluding the landings, lifts, toilets and service ducts) together with (in common with other occupiers) the right to use the entrances staircases, lifts and landings for access thereto and egress therefrom and the right to use appropriate toilet accommodation so that a Permitted Part comprises a viable independent suite of offices.

"PERMISSIBLE UNDERLEASE"

means an underlease created by Deed, not created on payment of a fine or premium, and containing the Stipulated Covenants; and a reservation of and an underlessee's covenant to pay a rent not less than the open market rent (obtainable without taking a fine or premium) for the Demised Premises or any Permitted Part and provisions for change of use and alienation and recovery of Insurance Premium and Service Charge no less onerous than those in this Lease.

"PERMISSIBLE UNDERLESSEE"

means a person who has executed a Deed giving the Stipulated Covenants directly to the Landlord.

- 6 -

TR 001680

App. 0220



"STIPULATED COVENANTS"

means the Tenant's covenants and conditions in this Lease (except the Tenant's covenant to pay the rents reserved by this Lease) to the extent applicable to the premises to be underlet.

4.12.2  Not (save herein expressly permitted) to assign, share, part with the possession or occupation of, charge or underlet any part of the Demised Premises.

4.12.3  Not to underlet the whole of the Demised Premises or a Permitted Part except to a Permissible Underlessee by a Permissible Underlease in accordance with the provisions of clause 4.12.5.

4.12.4  Not to part with, or share the possession or occupation of the Demised Premises except by virtue of an assignment or underlease authorized under this sub-clause 4.12.

4.12.5  Not without the prior consent in writing of the Landlord (such consent not to be unreasonably withheld or delayed subject in the case of an assignment to sub-clauses 4.12. 6-12.9) and (where required under the terms of the Superior Lease) of the Superior Landlord:

  (a)   to assign the whole of the Demised Premises; or

  (b)   to underlet the whole of the Demised Premises by a Permissible Underlease (which shall exclude by Court Order Sections 24-28 (inclusive) of the Landlord and Tenant Act 1954) to a Permissible Underlessee; or

  (c)   to underlet a Permitted Part except by a Permissible Underlease (which shall exclude by Court Order Sections 24-28 (inclusive). of the Landlord and Tenant Act 1954) and not at any time during the term to grant or permit to be granted Permissible Underleases of Permitted Parts so that there are more than two occupiers of any floor of the Demised Premises at any one time.

4.12.6  A refusal of consent to assign will be reasonable if on the ground (whether or not with other grounds) that in the reasonable opinion of the Landlord the proposed assignee is unlikely to be able to meet its obligations under this Lease having regard to all relevant circumstances.

4.12.7  Sub-clause 4.12.6 shall be without prejudice to the right of the Landlord to refuse consent on any other ground or grounds where such refusal would be reasonable.

4.12.8  It will be reasonable for any consent to assign to be subject to a condition that the assigning Tenant execute as a deed and in a form reasonably required by the Landlord and deliver to the Landlord prior to the assignment in question an authorized guarantee agreement (as defined in and for the purposes of section 16 of the Landlord and Tenant (Covenants) Act 1995).

4.12.9  Sub-clause 4.12.8 shall be without prejudice to the right of the Landlord to impose further conditions upon a grant of consent where such condition and its imposition would be reasonable (subject at all times to the provisions of clause 4.12.7).

4.12.10 Not to waive any breach by any underlessee of any of the Stipulated Covenants, but on any such breach to take all reasonable steps to enforce the Stipulated Covenants by re-entry or otherwise.

- 7 -

TR 001681

App. 0221


DX0075-0157

4.12.11  The Tenant may (without prejudice to clause 4.12.4) without the necessity of obtaining the consent of the Landlord share occupation of the whole or any part or parts of the Demised Premises with a company that is a member of the same group as the Tenant (as defined by Section 42 of the Landlord and Tenant Act 1954) provided that:

   (a)  the Landlord shall be notified of the commencement and termination of each such arrangement;

   (b)  such arrangement shall cease forthwith upon any such company or companies ceasing to be a members of the same group as the Tenant; and

   (c)  no relationship of Landlord and Tenant is thereby created.

4.13  REGISTRATION

   To produce two certified copies of every document evidencing any transmission of any interest (however remote) in the Demised Premises to the Landlord's Solicitors for registration within one month after the date of such document, and to pay to the Landlord's Solicitors a fee of Twenty Five Pounds plus Value Added Tax for each such registration together with any fee properly payable to any Superior Landlord.

4.14  TO PERMIT VIEWING

   To permit prospective purchasers of the reversion or persons carrying out a valuation for insurance purposes (once in any year of the Term) with written authority from the Landlord and/or the Superior Landlord or their agents at reasonable times in the day and upon reasonable prior notice to view the Demised Premises.

4.15  TO INFORM THE LANDLORD OF NOTICES

   To give immediate notice to the Landlord upon becoming aware of any notice or claim effecting the Demised Premises.

4.16  REIMBURSE FEES INCURRED BY LANDLORD

   To reimburse the Landlord on written demand all expenditure properly incurred in connection with:

   4.16.1  any breach of any Tenant's covenant in this Lease including the preparation and service of a notice under Section 146 of the Law of Property Act 1925; and

   4.16.2  the preparation and service of a Schedule of Dilapidations.

4.17  THE PLANNING ACTS

   4.17.1  In this sub-clause:

      "Planning Acts" means every Act for the time being in force relating to the use, development and occupation of land and buildings; and

      "Planning Permission" means any permission, consent or approval given under the Planning Acts.

   4.17.2  To comply with the requirements of the Planning Acts and of all Planning Permissions relating to or affecting the Demised Premises.

   4.17.3  Not to apply for or implement any Planning Permission without (in each case) the prior written consent of the Landlord.

-8-

TR 001682

App. 0222



Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0158

DX0075-0158

4.18 ENCROACHMENT AND EASEMENTS

Not to obstruct any windows belonging to the Demised Premises or the Building nor to permit any encroachment or easement to be made or threatened against the Demised Premises.

4.19 INDEMNITY

To indemnify the Landlord and/or the Superior Landlord from all losses, actions, claims, demands, costs, damages and expenses:

4.19.1 In respect of any personal injury or death or damage to any property or any infringement of any right or otherwise arising directly or indirectly in respect of the Demised Premises or their use; and

4.19.2 arising out of any breach of any obligation owed by the Tenant under this Lease.

4.20 TO PAY CHARGES

To pay the reasonable charges (including Solicitor's and Surveyor's charges) and disbursements properly incurred by the Landlord and/or the Superior Landlord in connection with any application by the Tenant for consent under any provision of this Lease where such application is withdrawn or consent is granted or lawfully refused.

4.21 INTEREST ON OVERDUE PAYMENTS

To pay to the Landlord interest on all sums payable under this Lease not paid within 14 days following the due date (or if no date is specified from the date of demand) at the rate of L3.00 per cent. per annum above Lloyds TSB Bank Plc Base Lending Rate for the time being in force from the due date (or if no date is specified from the date of demand) until payment.

4.22 VAT

Any payment or other consideration to be provided to the Landlord pursuant to the provisions of this Lease is exclusive of VAT and the Tenant shall in addition pay:

4.22.1 VAT properly payable on any consideration in respect of a VAT Supply to the Tenant by the Landlord; and

4.22.2 a fair proportion of the VAT properly charged in respect of any VAT Supply to the Landlord in respect of the Demised Premises or the Building where such VAT is not recoverable by the Landlord from HM Customs & Excise.

4.23 MANAGEMENT: COMMON PARTS

4.23.1 Not to transport heavy or bulky items through the Common Parts between 8.00 am and 8.00 pm unless the consent of the Landlord and/or the Superior Landlord (such consent not to be unreasonably withheld or delayed) has been obtained.

4.23.2 Not to damage or mark any surface of the Common Parts by using unsuitable trolleys, or otherwise, or overload any lift or raised floor (if any).

4.23.3 Not to obstruct, deposit goods or rubbish upon, cause any nuisance or disturbance on, or endanger any person or vehicle using any of the Common Parts.

4.23.4 To comply with reasonable regulations notified by the Landlord and/or the Superior Landlord to the Tenant as to the use of the Common Parts.

-9-

TR 001683

App. 0223

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0159

Page 159 of 171


DX0075-0159

4.24  SUPERIOR INTERESTS

To comply with all tenants covenants (except as to payment of rents or other sums) relating to the Demised Premises and contained or referred to in the Superior Lease and any other lease to which this Lease is inferior and with all covenants affecting the freehold interest in the Demised Premises (for the avoidance of doubt in the case of any conflict between the Tenant's covenants in this Lease and the covenants in the Superior Lease and any other Lease to which this Lease is inferior this Lease shall prevail).

5    LANDLORD'S COVENANTS

The Landlord covenants with the Tenant as follows:

5.1  QUIET ENJOYMENT

That so long as the Tenant pays the rents reserved by and complies with the Tenant's covenants and conditions in this Lease, the Tenant shall peaceably hold and enjoy the Demised Premises during the Term without any lawful interruption by the Landlord or any person rightfully claiming under or in trust for it.

5.2  SUPERIOR LEASE

To pay the rents reserved by the Superior Lease and to observe and perform the Tenant's covenants under the Superior Lease unless the obligation to do so falls upon the Tenant by virtue of this Lease.

5.3  SUPERIOR LANDLORD'S COVENANTS

5.3.1  To use its reasonable endeavours to procure that the Superior Landlord complies with its covenants and obligations contained in the Superior Lease.

5.3.2  To use its reasonable endeavours but at the Tenant's cost to enforce any of the covenants and obligations on the part of the Superior Landlord in the Superior Lease.

6    AGREEMENTS

It is agreed that:

6.1  RE-ENTRY

6.1.1  If any event specified in sub-clause 6.1.2 occurs the Landlord may at any time afterwards re-enter the Demised Premises or any part of them in the name of the whole and this Lease will then immediately determine. In sub-clause 6.1.2 reference to the "1986 Act" means the Insolvency Act 1986.

6.1.2  The events referred to in Clause 6.1.1 are as follows:

(i)  any rent reserved remaining unpaid for 21 days after becoming due and payable; and in the case of the rent first reserved this means whether formally demanded or not;

(ii)  the Tenant or the Guarantor failing to comply with any obligation which it has undertaken or any condition to which it is bound under this Lease;

-10-

TR 001684

App. 0224


DX0075-0160

(iii)  the Tenant or the Guarantor (if a company) entering
into liquidation or passing a resolution for
winding-up (otherwise than a voluntary winding-up of a
solvent company for the purpose of amalgamation or
reconstruction previously consented to by the Landlord
such consent not to be unreasonably withheld or
delayed) or being unable to pay its debts within the
meaning of Sections 122 and 129 of the 1986 Act or
summoning a meeting of its creditors or any of them
under Part I of the 1986 Act or allowing a petition
for an Administration Order in respect of it to be filed
in court or a receiver or an administrative receiver
for it being appointed;

(iv)  the Tenant or the Guarantor (if an individual) having
a receiving order made against him or becoming bankrupt
or entering into a composition with his creditors or
being unable to pay or having no reasonable prospect of
being able to pay his debts within the meaning of
Sections 267 and 288 of the 1986 Act or an interim
order being made against him under Part VIII of the 1986
Act.

6.1.3  Neither the existence of the Landlord's right under
sub-clause 6.1.1 above nor the consequences of any exercise
of that right are to effect any other right or remedy available
to the Landlord.

6.2  CESSER OF RENT

If the Building is destroyed or damaged by any insured Risk so as to
render the Demised Premises unfit for occupation and use and the
insurance effected by the Superior Landlord has not been [ILLEGIBLE] or
payment of the policy moneys refused in whole or in part because
of any act or default of the Tenant, then the rents first and third
reserved, or a fair proportion of those rents according to the
nature and extent of the damage, shall cease to be payable until
the Demised Premises shall again be fit for occupation and use or
until the expiration of three years from the date the destruction or
damage occurred (whichever period shall be the shorter).

6.3  NO EASEMENTS

The Tenant shall not be entitled to any rights whether of light and air
or otherwise (save as expressly granted by this Lease) which would
restrict the free user for building or otherwise of this Building or
any adjoining or neighbouring premises. Section 62 Law of Property
Act 1925 will not apply to this Lease.

6.4  SERVICE OF NOTICES

In addition to any other prescribed mode of service any notices
shall be validly served if served in accordance with Section 196 of
the Law of Property Act 1925 as amended by the Recorded Delivery
Service Act 1962 or, in the case of the Tenant, if left addressed to
it on the Demised Premises or sent to it by post.

6.5  SUPERIOR LANDLORD'S CONSENT

The giving of any Landlord's consent or approval required under the
terms of this Lease shall be conditional upon the consent or approval
(where required) of any Superior Landlords. The Landlord will apply
for such consent or approval and the terms of Clause 5.3 shall apply
thereto.

-11-

TR 001685

App. 0225

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0161



DX0075-0161

6.6  CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

Unless it is expressly stated that the Contracts (Rights of Third Parties) Act 1999 is to apply nothing in this Lease will create rights in favour of any one other than the parties to this Lease.

6.7  EXCLUSION OF LANDLORD AND TENANT ACT 1954

Having been authorised so to do by an Order of the Mayor's and City of London Court made on 12 July 2000 the Parties hereto agree and declare that the provisions of Sections 24 to 28 of Part II of the Landlord and Tenant Act 1954 (as amended) shall be excluded in respect of the tenancy created by this Lease.

7.  GUARANTEE

The Guarantor covenants with the Landlord in the terms set out in the Second Schedule.

8.  CERTIFICATION

It is hereby certified that there is no Agreement for Lease to which this Lease gives effect.

In Witness the Parties have executed this Lease as a deed the day and year first before written.

-12-

TR 001686

App. 0226


DX0075-0162

THE FIRST SCHEDULE

PART I
DESCRIPTION OF DEMISED PREMISES

1       All that Sixth and Seventh Floors of the Building shown for the
        purposes of identification only edged pink on the Plans and more
        particularly described in paragraphs 2 and 3 below.

2       There is included in this demise:

2.1     all internal surfacing materials and finishes on the walls, floors
        and ceilings of the Demised Premises and on the other structural
        parts of the Building within or bounding the Demised Premises; and

2.2     all doors (including those giving access to the Demised Premises
        from the Common Parts), windows and skylights (and in each case
        their frames and glazing) of the Demised Premises; and

2.3     all Landlord's and/or Superior Landlord's plant, fixtures and
        fittings (save as specified in paragraph 3.4 below); and

2.4     one half severed vertically of any non-structural walls separating
        the Demised Premises from any adjoining premises; and

2.5     the entirety of any non-structural walls wholly within the Demised
        Premises or bounding the same (other than as specified in paragraph
        2.4 above); and

2.6     all Conducting Media within and exclusively serving the Demised
        Premises (save as specified in paragraph 3.4 below);

2.7     the suspended ceiling, the raised floor (and the supports for each
        of these) and the airspace between each of these and the slab or
        other structural part respectively above and below them; and

2.8     window blinds (if any) and equipment for operating the same;

3       There is excluded from this demise:

3.1     the whole of the airspace above the Demised Premises;

3.2     all loadbearing and exterior walls and the floors and ceilings of
        the Demised Premises (other than to the extent expressly included
        by virtue of paragraph 2 above);

3.3     all structural parts of the Building;

3.4     any conducting media serving the remainder of the Building.

-13-

TR 001687

App. 0227



[BLUEPRINT]

TR 001688

App. 0228

Desc: 06-30-00 eToys, Inc. Form 10-Q
First Page ID: DX0075-0001
Current Page ID: DX0075-0164



DX0075-0164

[BLUEPRINT]

TR 001689

App. 0229



PART II
EASEMENTS AND RIGHTS GRANTED

1   The right of subjacent and lateral support for the Demised Premises from the remainder of the Building.

2   The free passage of Supplies from and to the Demised Premises through Conducting Media at the Building.

3   The right of access to and exit from the Demised Premises through the relevant Common Parts within the Building at all times.

4   The right of use of lavatory accommodation where provided for common use in the Building.

5   The right to display the Tenant's name in size and manner previously approved by the Landlord (such approval not to be unreasonably withheld or delayed) and the Superior Landlord upon the nameboards at both Haymarket and St Alban's Street reception areas at the Building.

6   The right to display the Tenant's name in size and manner previously approved by the Landlord (such approval not to be unreasonably withheld or delayed) and the Superior Landlord in the lobby areas outside each of the floors in the Building comprising the Demised Premises.

PART III
EASEMENTS AND RIGHTS RESERVED

1   SUPPORT

The right to subjacent and lateral support for the remainder of the Building from the Demised Premises.

2   RUNNING OF SERVICES

The free passage of Supplies from and to the remainder of the Building through Conducting Media at any time within the Demised Premises.

3   ENTRY IN RESPECT OF SERVICES, ETC.

The right to install, clean, maintain, alter, make connections to, replace or repair any Conducting Media within the Demised Premises but serving the Building and the right to enter the Demised Premises for those purposes.

4   ENTRY FOR MANAGEMENT PURPOSES

The right to enter on the Demised Premises to inspect, repair, alter, decorate or execute any other works upon the Building which would otherwise not be practicable to carry out, or to carry out any Services or for any other reasonable management purpose.

-14-

TR 001690

App. 0230



5       ESCAPE

The right of emergency escape over any parts of the Demised Premises as
are designated for such purpose.

6       SUPERIOR INTERESTS

All exceptions and reservations out of the Superior Lease and any other
lease to which this Lease is inferior, or out of the freehold interest
in the Demised Premises.

7       COMMON PARTS: REDEVELOPMENT

Causing as little inconvenience, interruption or nuisance to the Tenant as
possible:

7.1     the right, in emergency or when works are being carried out to them, to
close off or divert any of the Common Parts provided that such closing
off or diversion is ceased as soon as reasonably possible;

7.2     the right to stop up or divert any Conducting Media or other Common
Parts subject to a reasonable alternative being made available; and

7.3     the right to build upon, alter, add to or redevelop the Retained Premises
and/or the Building or any adjoining or neighbouring premises as the
Landlord and/or the Superior Landlord considers fit, whether or not the
access of light and air to the Demised Premises is interfered with.

-15-

TR 001691

App. 0231



DX0075-0167

THE SECOND SCHEDULE

GUARANTEE

1    The Guarantor covenants with the Landlord as principal debtor that:

1.1    throughout the Term or until the Tenant is released from its covenants pursuant to the 1995 Act:

      1.1.1    the Tenant will pay the rents reserved by and perform its obligations contained in this Lease;

      1.1.2    the Guarantor will indemnify the Landlord on demand against all Costs arising from any default of the Tenant in paying the rents and performing its obligations under this Lease;

1.2    the Tenant (here meaning the Tenant so named in the Particulars) will perform its obligations under any authorised guarantee agreement that it gives with respect to the performance of any of the covenants and conditions in this Lease.

2    The liability of the Guarantor shall not be affected by:

2.1    any time given to the Tenant or any failure by the Landlord to enforce compliance with the Tenant's covenants and obligations;

2.2    the Landlord's refusal to accept rent at a time when it would or might have been entitled to re-enter the Premises;

2.3    any variation of the terms of this Lease;

2.4    any change in the constitution, structure or powers of the Guarantor the Tenant or the Landlord or the administration, liquidation or bankruptcy of the Tenant or Guarantor;

2.5    any act which is beyond the powers of the Tenant;

2.6    the surrender of part of the Premises;

2.7    the transfer of the reversion expectant on the Term;

2.8    any other act or thing by which (but for this provisions) the Guarantor would have been released.

3    Where two or more persons have guaranteed obligations of the Tenant the release of one or more of them shall not release the others.

4    The Guarantor shall not be entitled to participate in any security held by the Landlord in respect of the Tenant's obligations or stand in the Landlord's place in respect of such security.

5    If this Lease is disclaimed, and if the Landlord within 6 months of the disclaimer requires in writing, the Guarantor will enter into a new lease of the Premises at the cost of the Guarantor on the terms of this Lease other than Clause 7 and this Schedule (but as if this Lease had continued and so that any outstanding matters relating to rent review or otherwise shall be determined as between the Landlord and the Guarantor) for the residue of the Contractual Term from and with effect from the date of the disclaimer.

-16-

TR 001692

App. 0232



6    If this Lease is forfeited and if the Landlord within 6 months of the forfeiture requires in writing the Guarantor will (at the option of the Landlord);

6.1    enter into a new lease as in paragraph 5 above with effect from the date of the forfeiture; or

6.2    pay to the Landlord on demand an amount equal to the moneys which would otherwise have been payable under this Lease until the earlier of 6 months after the forfeiture and the date on which the Premises are fully relet.


EXECUTED as a DEED by                  )
MOMENTUS LIMITED                       )
                                       )
acting by:                             )
                                       )
/s/ [ILLEGIBLE]                        )
Director                               )


/s/ [ILLEGIBLE]
Director/Secretary


EXECUTED as a DEED by                  )
DIAMOND TECHNOLOGY PARTNERS            )
INCORPORATED                           )
                                       )
acting by:                             )

Chief Financial Officer
/s/ [ILLEGIBLE]
Assis. Secretary
/s/ [ILLEGIBLE]


-17-


TR 001693

App. 0233



# ETOYS INC

12200 W OLYMPIC BLVD
LOS ANGELES, CA 90064
310. 684.8100

# EX–27.1

EXHIBIT 27.1
10–Q Filed on 08/14/2000 – Period: 06/30/2000
File Number 000–25709





TR 001694

App. 0234



```
<ARTICLE> 5
<LEGEND>
THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM ETOYS INC.'S
FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2000 AND IS QUALIFIED IN ITS ENTIRETY
BY REFERENCE TO SUCH FINANCIAL STATEMENTS.
</LEGEND>
<MULTIPLIER> 1,000


<PERIOD-TYPE>                    3-MOS
<FISCAL-YEAR-END>                        MAR-31-2001
<PERIOD-START>                           APR-01-2000
<PERIOD-END>                             JUN-30-2000
<CASH>                                       162,145
<SECURITIES>                                       0
<RECEIVABLES>                                      0
<ALLOWANCES>                                       0
<INVENTORY>                                   52,500
<CURRENT-ASSETS>                             232,197
<PP&E>                                       102,671
<DEPRECIATION>                               (9,152)
<TOTAL-ASSETS>                               475,010
<CURRENT-LIABILITIES>                         49,254
<BONDS>                                      150,000
<PREFERRED-MANDATORY>                         74,075
<PREFERRED>                                        0
<COMMON>                                          12
<OTHER-SE>                                   189,119
<TOTAL-LIABILITY-AND-EQUITY>                 475,010
<SALES>                                       24,862
<TOTAL-REVENUES>                              24,862
<CGS>                                         19,415
<TOTAL-COSTS>                                 19,415
<OTHER-EXPENSES>                              61,228
<LOSS-PROVISION>                                   0
<INTEREST-EXPENSE>                             2,985
<INCOME-PRETAX>                             (56,957)
<INCOME-TAX>                                       0
<INCOME-CONTINUING>                         (56,957)
<DISCONTINUED>                                     0
<EXTRAORDINARY>                                    0
<CHANGES>                                          0
<NET-INCOME>                                (56,957)
<EPS-BASIC>                                   (0.49)
<EPS-DILUTED>                                 (0.49)
```

TR 001695

App. 0235



# App. 6

11/18/97 PRWIRE 10:15:00                                                    Page 1
11/18/97 PR Newswire 10:15:00
(Publication page references are not available for this document.)

PR Newswire
Copyright (c) 1997, PR Newswire

Tuesday, November 18, 1997

eToys Announces Multi-Million Dollar Agreement With America Online

Online Toy Retailer Strengthens Leading Position Through Advertising and

Marketing Agreement With Top Internet Online Service

SANTA MONICA, Calif., Nov. 18 /PRNewswire/ -- eToys, the premiere online toy store offering more than 1,000 children's toys, today announced a two- year, $3 million marketing agreement with America Online, Inc. (NYSE: AOL). Under the agreement, eToys (www.etoys.com) will become the exclusive toy retailer on the main screen of the AOL.com Shopping Channel, with additional promotion on AOL.com, the AOL Shopping Channel, the AOL NetFind search engine, and elsewhere on the AOL service.

The relationship will offer AOL users quick access to eToys' products and services, providing them with a convenient method for toy shopping. eToys, which launched Oct. 1 and attracted more than 250,000 visitors to its site in its first 45 days of availability, joins other top online retailers on the AOL.com and AOL Network Shopping Channels.

"We are extremely excited to enter into this relationship with America Online," said Toby Lenk, eToys' CEO. "This agreement further establishes our position as the leading online toy store and will enable eToys to directly reach consumers who are looking for a powerful shopping alternative this holiday season and throughout the year."

"With the rapid growth of the online retail industry, this agreement illustrates AOL's strength in driving traffic and business to our partners," said Bob Pittman, president and CEO, AOL Networks. "eToys' decision to team with us also demonstrates AOL's ability to bring the best values in cyberspace to Internet and online shoppers."

About eToys

Based in Santa Monica, Calif., eToys is the only online toy retailer to provide a comprehensive selection of nationally advertised and specialty toy brands. eToys' prices meet or beat those of land-based toy retailers. The company was founded in March 1997 by Lenk, formerly a corporate vice president in the strategic planning area of The Walt Disney Company; and by entrepreneur Bill Gross, founder of Knowledge Adventure, a leading children's software company, and chairman of idealab!, an Internet startup incubator.

/CONTACT: Susan Sheehan, Alexander Communications, 303-615-5070, ssheehan @alexander-pr.com, or Dave Haucke, Alexander Communications, 303-615-5070, dhaucke@alexander-pr.com/ 10:00 EST



Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



EXHIBIT 58
3
Lenk    12-18-03



App. 0236



11/18/97 PRWIRE 10:13:00
11/18/97 PR Newswire 10:13:00
Publication page references are not available for this document.)

PR Newswire
Copyright (c) 1997, PR Newswire

Tuesday, November 18, 1997

eToys Announces Multi-Million Dollar Agreement With America Online

Online Toy Retailer Strengthens Leading Position Through Advertising and

Marketing Agreement With Top Internet Online Service

SANTA MONICA, Calif., Nov. 18 /PRNewswire/ -- eToys, the premiere online toy store offering more than 1,900 children's toys, today announced a two-year, $3 million marketing agreement with America Online, Inc. (NYSE: AOL). Under the

"With the rapid growth of the online retail industry, this agreement illustrates AOL's strength in driving traffic and business to our partners," said Bob Pittman, president and CEO, AOL Networks. "eToys' decision to team with us also demonstrates AOL's ability to bring the best values in cyberspace to Internet and online shoppers."

Online," said Toby Lenk, eToys' CEO. "This agreement further establishes our position as the leading online toy store and will enable eToys to directly reach consumers who are looking for a powerful shopping alternative this

## About eToys

Based in Santa Monica, Calif., eToys is the only online toy retailer to provide a comprehensive selection of nationally advertised and specialty toy brands. eToys' prices meet or beat those of land-based toy retailers. The company was founded in March 1997 by Lenk, formerly a corporate vice president in the strategic planning area of The Walt Disney Company; and by entrepreneur Bill Gross, founder of Knowledge Adventure, a leading children's software company, and chairman of idealab!, an Internet startup incubator.



DEFENDANT'S
EXHIBIT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works



EXHIBIT

App. 0237



DX0001-0001-SS01

```
11/18/97 PRWIRE 10:15:00                                    Page 2
 11/18/97 PR Newswire 10:15:00
(Publication page references are not available for this document.)

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:      Joint Ventures (JVN)


Word Count: 332

11/18/97 PRWIRE 10:15:00

END OF DOCUMENT
```

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

App. 0238

**Desc:** eToys Announces Multi-Million Dollar Deal with America Online
**First Page ID:** DX0001-0001
**Current Page ID:** DX0001-0002                  *Page 2 of 2*



DX0001-0002

# App. 7

*Confidential*

### INTERACTIVE MARKETING AGREEMENT

This Interactive Marketing Agreement (the "Agreement"), dated as of October 1, 1997 (the "Effective Date"), is between America Online, Inc. ("AOL"), a Delaware corporation, with offices at 22000 AOL Way, Dulles, Virginia 20166, and eToys Inc. ("eToys"), a private corporation, with offices at 1640 5th Street, Suite 124, Santa Monica, CA 90401. AOL and eToys may be referred to individually as a "Party" and collectively as "Parties."

### INTRODUCTION

AOL and eToys each desires to enter into an interactive marketing relationship whereby AOL will promote an interactive site referred to (and further defined) herein as the Affiliated eToys Site. This relationship is further described below and is subject to the terms and conditions set forth in this Agreement. Defined terms used but not defined in the body of the Agreement will be as defined on Exhibit B attached hereto.

### TERMS

1.  **PROMOTION, DISTRIBUTION AND MARKETING.**

    1.1.  **AOL Promotion of Affiliated eToys Site.**

    AOL will provide eToys with the promotions for the Affiliated eToys Site described on Exhibit A (the "Promotions"). Screen shots indicating the current design for the applicable screens within the shopping channels on each of the AOL Service and AOL.com are attached hereto. Subject to eToys's reasonable approval, AOL will have the right to fulfill its promotional commitments with respect to any of the foregoing by providing eToys comparable promotional placements in alternative areas of the AOL Network. AOL reserves the right to redesign or modify the organization, structure, "look and feel," navigation and other elements of the AOL services at any time. In the event such modifications materially and adversely affect any specific Promotion, AOL will work with eToys to provide eToys, as its sole remedy, a comparable promotional placement. In the event that modifications materially and adversely affect the aggregate promotional value to be received hereunder by eToys (including, without limitation, the promotional value of the placements reflected through the attached screen shots) and AOL and eToys cannot reach agreement regarding substitute promotional placements reasonably satisfactory to eToys (notwithstanding both Parties' good faith efforts to reach agreement for a period of thirty days), then eToys will be entitled to terminate this Agreement with fifteen days prior written notice to AOL. In the event of such an early termination, eToys will be responsible for the pro-rata portion of the payments provided for herein. This pro-rata portion will represent the average of the percentages of value delivered with respect to each component of Promotions described on Exhibit A. For the impressions-based Promotions, the percentage of value will be determined with reference to the percentage of impressions which were delivered prior to the effectiveness of the termination. For the other Promotions, the percentage of value will be determined with reference to the percentage of days of the term of the agreement which precede the effectiveness of such termination.

    With respect to the Impressions targets specified on Exhibit A, AOL will not be obligated to provide in excess of any of such target amounts in any year. Any shortfall in Impressions at the end of a year will not be deemed a breach of the Agreement by AOL. In the event there is a shortfall in Impressions as of the end of either year during the Initial Term (a "Shortfall"), AOL will provide eToys with advertising placements in mutually 



1

AOL 00488

**App. 0239**



*Confidential*

agreed upon areas of the AOL Network which have a total value, based on rates comparable to those set forth in Exhibit A, equal to the value of the Shortfall (determined by multiplying the percentage of Impressions that were not delivered by the total, guaranteed payment provided for below) and which will be delivered during the first four months following the end of the year in question. Notwithstanding the foregoing: (i) in the event that the aggregate shortfall at the end of either year exceeds 20%, then eToys will be entitled to incremental Impressions (of comparable value) during the subsequent year equal to 150% of the excess shortfall; and (ii) in the event that the aggregate shortfall at the end of the first year exceeds 30%, then eToys will have the right to terminate this Agreement with written notice delivered to AOL by December 1, 1998 (or within five days of such later date as such first year shortfall shall be identified), with such termination to be effective as of December 31, 1998.

1.2.   **Content of Promotions.** The specific eToys Content (e.g., eToys's logo) to be contained within the Promotions will be determined by eToys, subject to AOL technical limitations and AOL's then-applicable policies relating to advertising and promotions. Except to the extent described herein, the specific form, placement, duration and nature of the Promotions will be as determined by AOL in its reasonable editorial discretion (consistent with the editorial composition of the applicable screens).

1.3.   **eToys Promotion of Affiliated eToys Site and AOL.** As set forth in fuller detail in Exhibit C, eToys will promote the availability of the Affiliated eToys Site through the AOL Network.

2.   **AFFILIATED ETOYS SITE.**

2.1.   **Content.** eToys will make available through the Affiliated eToys Site a substantial offering of Toys, and may also include other childrens products (the "Other Products"); provided that: (i) such Other Products will not be promoted through the Promotions; (ii) eToys will not devote a linked page of the Affiliated eToys Site (i.e., the page directly linked from a Promotion on the AOL Service or AOL.com) wholly or primarily to the promotion of any Other Products; (iii) the Affiliated eToys Site will remain principally focused on the promotion and sale of Toys. eToys will review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated eToys Site in accordance with the terms of this Agreement. eToys will ensure that the Affiliated eToys Site does not in any respect promote, advertise, market or distribute the products, services or content of any Interactive Service through the linked pages of the Affiliated eToys Site. The linked pages of the Affiliated eToys Site will not contain advertisements, promotions, links, sponsorships or other Content (i) relating to any Products other than Toys and Other Products or (ii) otherwise in conflict with AOL's standard advertising policies (except as expressly approved in writing by AOL).

2.2.   **Production Work.** eToys will be responsible for all production work associated with the Affiliated eToys Site, including all related costs and expenses.

2.3.   **Technology.** eToys shall take reasonable steps necessary to conform its promotion and sale of Products through the Affiliated eToys Site to the then-existing technologies identified by AOL which are optimized for the AOL Service. AOL reserves the right to review and test the Affiliated eToys Site from time to time to determine whether the site is compatible with AOL's then-available client and host software and the AOL Network.

2.4.   **Product Offering.** eToys will ensure that the Affiliated eToys Site includes all of the Products and other Content (including, without limitation, any features, offers, contests, functionality or technology) that are then made available by or on behalf of eToys through

2

AOL 00489

App. 0240



*Confidential*

the "General eToys Site" (i.e., the publicly available site at www.etoys.com to which an unregistered user would have access); provided, however, that (a) such inclusion will not be required where it is commercially or technically impractical to either Party (i.e., inclusion would cause either Party to incur substantial incremental costs); and (b) eToys will notify AOL of the material, specific changes in scope, nature and/or offerings required by such inclusion.

2.5.   **Pricing and Terms.** eToys will ensure that the prices (and any other required consideration) for Products in the Affiliated eToys Site do not exceed the prices for substantially similar Products offered by or on behalf of eToys through the General eToys Site.

2.6.   **Special Offers.** eToys will promote through the Affiliated eToys Site on a regular and consistent basis (at least four times per year) special offers exclusively available to AOL Members by eToys in its reasonable discretion (collectively, the "Special Offers"). eToys will provide AOL with reasonable prior notice of Special Offers so that AOL can market the availability of such Special Offers in the manner AOL deems appropriate in its editorial discretion, subject to the terms and conditions hereof. 

2.7.   **Operating Standards.** eToys will ensure that the Affiliated eToys Site complies with the operating standards set forth in Exhibit D.

2.8.   **Traffic Flow.** eToys will take reasonable efforts to ensure that AOL traffic is either kept within the Affiliated eToys Site or channeled back into the AOL Network (with the exception of advertising links sold and implemented pursuant to the Agreement). The Parties will work together on mutually acceptable links back to the AOL Service.

3.   **AOL EXCLUSIVITY OBLIGATIONS.** With respect to any eToys Competitor marketing online a comprehensive selection of products for children which are primarily Toys, on a retail basis (the "Exclusive Products"), eToys will be the exclusive third party marketer of Toys to which AOL sells an anchor tenant placement on the main screen of the shopping channel of AOL.com ("the Exclusive Area") during the Initial Term. The foregoing exclusivity will apply to each eToys Competitor (a) only to the extent the eToys Competitor is or remains a provider of the Exclusive Products or (b) if the eToys Competitor is not solely a provider of the Exclusive Products (i.e., it is also engaged in other activities), only to the marketing of the Exclusive Products by such eToys Competitor through promotions in the Exclusive Area. Notwithstanding anything to contrary in this Section 3, no provision of this Agreement will limit AOL's ability (on or off the AOL Network) to undertake activities or perform duties pursuant to existing arrangements with third parties.

4.   **PAYMENTS.**

4.1.   **Payments.** eToys will pay AOL an amount of Three Million Dollars (US$3,000,000), to be paid in: (i) thirteen monthly payments in arrears (net 30) of Fifty Nine Thousand Six Hundred and Fifteen Dollars and Thirty Eight Cents (US$59,615.38), beginning with a December 1, 1997 invoice to be paid by December 31, 1997: (ii) twelve monthly payments in arrears of Sixty Four Thousand Five Hundred and Eighty Three Dollars and Thirty Three Cents (US$64,583.33) (the "Fixed Year 2 Payment"), beginning with a January 1, 1999 invoice to be paid by January 31, 1999; and (iii) additional monthly payments for the remainder, with each monthly payment reflecting the value (based on the "cpm"s set forth in Exhibit A) of the impressions delivered during the prior month. In any month, beginning January of 1999, the aggregate payment to AOL will be no less than Eighty Five Thousand Dollars (US$85,000.00) (the "Minimum Payment"); provided that, in the event that the Minimum Payment exceeds the combination of the Fixed Year 2 Payment and the payment to be made pursuant to subsection (iii) above (the "Excess

*(handwritten: yr 1  774,999.94)*

*(handwritten: 774,999.96)*

*(handwritten: 1,020,000)*

3

AOL 00490

App. 0241




*Confidential*

Payment"), then such Excess Payment will be credited against future payments to be made pursuant to subsection (iii) in connection with subsequently delivered impressions. As indicated elsewhere herein, this Agreement supersedes eToys prior agreements with AOL related to advertising and placement in the AOL shopping channel (the "Prior Agreements"). In that regard, (i) eToys has no further payment obligations under the Prior Agreements (except with respect to invoices which have been received by eToys as of its execution of this Agreement) and (ii) any impressions delivered to eToys beginning as of the Effective Date will count towards the impressions commitments contained herein.

4.2.   Wired Payments; Late Payments.  All payments required under this Section 4 will be paid in immediately available, non-refundable funds either by way of check or as wired to AOL's account.  All amounts owed hereunder not paid when due and payable will bear interest from the date such amounts are due and payable at the rate of 10% per year.

5.   TERM; RENEWAL; TERMINATION.

5.1.   Term.  Unless earlier terminated as set forth herein, the initial term of this Agreement will be from the Effective Date through December 31, 1999 (the "Initial Term").

5.2.   Termination for Breach.  Except as expressly provided elsewhere in this Agreement, either Party may terminate this Agreement at any time in the event of a material breach of the Agreement by the other Party which remains uncured after thirty (30) days written notice thereof to the other Party (or such shorter period as may be specified elsewhere in this Agreement).  Notwithstanding the foregoing, in the event of a material breach of a provision that expressly requires action to be completed within an express period shorter than 30 days, either Party may terminate this Agreement if the breach remains uncured after written notice thereof to the other Party.

5.3.   Termination for Bankruptcy/Insolvency.  Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party (i) ceases to do business in the normal course, (ii) becomes or is declared insolvent or bankrupt, (iii) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) calendar days or (iv) makes an assignment for the benefit of creditors.

6.   STANDARD TERMS.  The Standard Online Commerce Terms & Conditions set forth on Exhibit E attached hereto and Standard Legal Terms & Conditions set forth on Exhibit F attached hereto are each hereby made a part of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

AMERICA ONLINE, INC.                    ETOYS INC.

By: _____            By: _____

Print Name: _____            Print Name: _____

Title: _____            Title: _____

4

AOL 00491

App. 0242



*Confidential*

## EXHIBIT A

### Placement/Promotion Plan

**AOL Service Shopping Channel (through December 31, 1999)($175,000 per year*)**
eToys will receive <u>two adjacent "tenant" slots</u> within the following department screens within the AOL Service Shopping Channel Toys Department.  Each tenant slot will include the following:

- One continuous (24/7) button with corporate brand or logo on the department front screen (consistent in size and nature with the other "tenant" buttons appearing on such screen)
- Rotation with other tenants in the department on a continuous (24/7) promotional banner on the department front screen
- Featured product with text promotion for one day per month minimum on the relevant department screen
- Rotation through the department screen in text-based programming promos along with other merchants and channel initiatives
- Rotation through the shopping channel search screen advertising banners along with all other anchors and tenants
- One keyword for trade name or trademark (subject to availability)
- Participation in the following programs at no additional charge (the "Program Areas"):
  - Electronic Order Blank Area
  - Bargain Basement
  - Quick Gifts
  - Event and/or theme areas (e.g., Christmas Shop)

**AOL.com Shopping Channel (Anchor Plus package) (through December 31, 1999)($600,000 per year*)**
eToys will receive: (i) one continuous (24/7) button "above the fold" with corporate brand or logo on the front screen of the AOL.com Shopping Channel (which will be one of nine buttons for anchor tenants on such screen); (ii) one "tenant" slot within the Toy department of such channel (including the same components as the tenant slots described above); and (iii) 6 million impressions (per year) in banner advertising through AOL.com areas.

**Additional Advertising (per year*) (through December 31, 1999, except as otherwise specified)**
- 2 million impressions ($35 cpm) to eToys advertising banners appearing on results pages from searches on AOL.com through AOLNetfind using the search terms Toy, Toys, Playskool, Hasbro, Barbie, Barbies, Brio, Playmobil, Lego, Mattel, Tikes (subject to any third party intellectual property rights in any such keywords).
- 4 million impressions to "run of service" banners appearing on AOL.com between 11/15 and 12/28
- 3 million impressions ($25 cpm) to banners appearing within the "Families" netChannel on AOL.com
- 4 million impressions ($30 cpm) to banners generated through AOL's ad server targeting AOL Members that are mothers with children ages 0-9 (using the information and ad serving technology available to AOL)
- One permanent button within the AOLNetFind portion of AOL.com in the "Shortcuts" portion of the "Home & Family" category of "TimeSavers," to which there will be at least 7 million impressions ($20 cpm)
- 4 million impressions ($35 cpm) to banners appearing in AOL Service "Families" Channel and other holiday areas

Should eToys wish to increase or decrease its impression levels within any of the impressions-based, additional advertising categories described above (the "Impressions-based Ads"), AOL will work in good faith with eToys to accommodate any such requests, subject to availability and provided that eToys will continue to be required to pay AOL the full amounts specified under this Agreement and eToys will not,

5

AOL 00492

App. 0243

*Confidential*

through any such adjustments, be entitled to value in excess of that allocable to the Impressions-based Ads (taking into account the relative values of the impressions involved in any such adjustments).

In delivering the impressions called for under the Impressions-based Ads, AOL will use all commercially reasonable efforts to deliver 35% of the annual impressions for the following categories during the fourth calendar quarter: AOL Netfind search terms, demographically targeted ads, AOL Netfind "Shortcuts," AOL.com "Families" channel and AOL Service "Families" Channel/holiday areas; provided that, in the event AOL believes that it will not be able to deliver the requisite impressions in any specific category, eToys will cooperate in good faith with AOL to designate comparable, substitute inventory for delivery of such impressions during such period. The Parties will use commercially reasonable efforts to spread the remaining impressions on a relatively even basis during the remaining three quarters of each year (or on such other basis as the Parties may reasonably agree); provided that, in the event that the impressions are not spread on that basis due to eToys role in the process, then AOL shall not be responsible for any penalties or timing restrictions with respect to shortfalls of impressions which may otherwise be called for hereunder.

*For purposes of these promotions, the first year shall be deemed to end December 31, 1998

6                                    **AOL 00493**

**App. 0244**

| Desc: Interactive Marketing Agreement Addendum |  |  |
| First Page ID: DX0002-0001 |  |  |
| Current Page ID: DX0002-0006 | *Page 6 of 17* | DX0002-0006 |



*Confidential*

## EXHIBIT B

### Definitions

The following definitions will apply to this Agreement:

**Additional eToys Channel.** Any third-party distribution channel (e.g., an Interactive Service) through which the Affiliated eToys Site is made available.

**Affiliated eToys Site.** The specific area to be promoted and distributed by AOL hereunder in which eToys can market and complete transactions regarding its Products.

**AOL.com.** AOL's primary Internet-based Interactive Site marketed under the "AOL.COM" brand, specifically excluding (a) the AOL Service, (b) any international versions of AOL.com, (c) "Driveway," "AOL Instant Messenger" or any similar product or service offered by or through such site or any other AOL Interactive Site, (d) "Digital Cities," "WorldPlay," "Entertainment Asylum," the "Hub," or any similar "sub-service" offered by or through such site or any other AOL Interactive Site and (e) any programming or content area offered by or through such site or any other AOL Interactive Site which is provided and operationally controlled by a third-party content provider and not by AOL (or any successor to or substitute for any of the foregoing properties in clauses (a) through (e)).

**AOL Look and Feel.** The elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with Interactive Sites within the AOL Service or AOL.com.

**AOL Member.** Any authorized user of the AOL Network, including any sub-accounts using the AOL Network under an authorized master account.

**AOL Network.** (i) The AOL Service and (ii) any other product or service owned, operated, distributed or authorized to be distributed by or through AOL or its Affiliates worldwide through which such party elects to offer the Licensed Content.

**AOL Service.** The U.S. version of the America Online® brand service, specifically excluding (a) AOL.com or any other AOL Interactive Site, (b) the international versions of the AOL Service (e.g., AOL Japan), (c) "Driveway," "NetFind," "AOL Instant Messenger" or any similar product or service offered by or through the U.S. version of the America Online® brand service, (d) "Digital Cities," "WorldPlay," "Entertainment Asylum," the "Hub," or any similar "sub-service" offered by or through the U.S. version of the America Online® brand service and (e) any programming or content area offered by or through the U.S. version of the America Online® brand service which is provided and operationally controlled by a third-party content provider and not by AOL (or any successor to or substitute for any of the foregoing properties in clauses (a) through (e)).

**Confidential Information.** Any information relating to or disclosed in the course of the Agreement, which is or should be reasonably understood to be confidential or proprietary to the disclosing Party, including, but not limited to, the material terms of this Agreement, information about AOL Members and eToys customers, technical processes and formulas, source codes, product designs, sales, cost and other unpublished financial information, product and business plans, projections, and marketing data. "Confidential Information" will not include information (a) already lawfully known to or independently developed by the receiving Party, (b) disclosed in published materials, (c) generally known to the public, or (d) lawfully obtained from any third party.

7

AOL 00494

App. 0245


DX0002-0007

*Confidential*

<u>Content</u>. Information, materials, features, Products, advertisements, promotions, links, pointers and software, including any modifications, upgrades, updates, enhancements and related documentation.

<u>eToys Competitors</u>. Third parties marketing online, now or in the future, a substantial selection of Toys to consumers on a retail basis (as the principal focus of their respective businesses), including, without limitation, ToysRUs, FAO Schwartz, Zany Brainy, Noodle Kidoodle, Red Rocket, Internet Baby, Holt Outlet and Toys.com, excluding the sites of any department store (or comparable aggregator of multiple product lines) in which the percentage of "SKUs" for Exclusive Products does not exceed 15%.

<u>Impression</u>. Any access by a user to the file representing the page containing the applicable Promotion.

<u>Interactive Service</u>. Any entity that offers online or Internet connectivity (or any successor form of connectivity), aggregates and/or distributes a broad selection of third-party interactive Content, or provides interactive navigational services (including, without limitation, any online service providers, Internet service providers, @Home or other broadband providers, search or directory providers, "push" product providers such as the Pointcast Network or providers of interactive environments such as Microsoft's "Active Desktop").

<u>Interactive Site</u>. Any interactive site or area (other than the Affiliated eToys Site) which is managed, maintained or owned by eToys or its agents, including, by way of example and without limitation, (i) an eToys site on the World Wide Web portion of the Internet or (ii) a channel or area delivered through a "push" product such as the Pointcast Network or interactive environment such as Microsoft's proposed "Active Desktop."

<u>Licensed Content</u>. All Content offered through the Affiliated eToys Site pursuant to this Agreement, including any modifications, upgrades, updates, enhancements, and related documentation.

<u>Product</u>. Any product, good or service which eToys offers, sells or licenses to AOL Members through (i) the Affiliated eToys Site (including through any Interactive Site linked thereto) or (ii) an "offline" means (e.g., toll-free number) for receiving orders related to specific offers within the Affiliated eToys Site requiring purchasers to reference a specific promotional identifier or tracking code, including, without limitation, products sold through surcharged downloads (to the extent expressly permitted hereunder).

<u>Toys</u>. Childrens toy products.

AOL 00495

App. 0246

*Confidential*

## EXHIBIT C

### eToys Cross-Promotion

<u>Online</u>

In each eToys Interactive Site, eToys will include:

- 
- A "Try AOL" feature where users can obtain promotional information about AOL products and services and, at AOL's option, download or order AOL's then-current version of client software for the AOL Service or software for any other AOL products or services (e.g., AOL's Instant Messenger service), which will appear continuously on the first page of the site[1]; and
- To the extent eToys offers or promotes any products or services similar to AOL's "component" products and services (e.g., Netfind or other search/directory service, NetMail or free/discount email service, Instant Messenger, yellow/white pages, classifieds, etc.), prominent offers or promotions related to such AOL-designated products or services.
- The foregoing obligations shall not apply to co-branded or private label branded version of an eToys Interactive Site associated with a competitor to AOL, provided that the promotions are available through sites representing at least 50% of the Impressions to eToys Interactive Sites.

<u>Offline</u>

In eToys' television, radio and print advertisements and in any publications, programs, features or other forms of media over which eToys exercises at least partial editorial control, eToys will make reasonable efforts to include on a periodic basis:

- Specific references or mentions (verbally where possible) of the Affiliated eToys Site's availability through America Online® in connection with any reference to any eToys Interactive Site; and
- The specific instances in which such references appear shall be as determined by eToys in its reasonable editorial discretion.

Subject to the requirements of Section 1 of Exhibit F, eToys will be entitled to issue a press release regarding this Agreement.

---

[1] AOL will pay eToys a standard bounty for each person who registers for the AOL Network using eToys' special identifier for this promotion and subsequently pays AOL monthly usage fees across at least three billing cycles for the use of the AOL Network (provided that, in the event that AOL and eToys are unable to mutually agree on such bounty, eToys will not be required to run the direct fulfillment promotions for which eToys would receive such bounty). Note that if this promotion is delivered through Microsoft's Active Desktop or any other "push" product (an "Operating System"), such feature will link users directly to AOL software within the Operating System or direct users without Internet access to an AOL application setup program within the Operating System (all subject to any standard policies of the Operating System).

9



AOL 00496

App. 0247

*Confidential*

### EXHIBIT D

### Operating Standards

**General.** The (i) pricing of Products, (ii) scope and selection of Products, (iii) quality of Products, (iv) customer service and fulfillment associated with the marketing and sale of Products and (v) ease of use of the Affiliated eToys Site will, in the aggregate, be reasonably competitive with that which is offered by any eToys Competitors.

**Hosting; Capacity.** eToys will provide all computer servers, routers, switches and associated hardware in an amount reasonably necessary to meet anticipated traffic demands, adequate power supply (including generator back-up) and HVAC, adequate insurance, adequate service contracts and all necessary equipment racks, floor space, network cabling, and power distribution to support the Affiliated eToys Site (collectively, "Hosting Infrastructure"). In the event eToys fails to satisfy this requirement AOL will have the right (in addition to any other remedies available to AOL hereunder) to regulate the promotions it provides to eToys hereunder to the extent necessary to minimize user delays until such time as eToys corrects its infrastructure deficiencies.

**Speed; Accessibility.** eToys will ensure that the performance and availability of the Affiliated eToys Site (a) is monitored on a continuous, 24/7 basis and (b) remains competitive in all material respects with the performance and availability of other similar sites based on similar form technology. eToys will use commercially reasonable efforts to ensure that: (a) the functionality and features within the Affiliated eToys Site are optimized for the AOL client software then in use by AOL Members; and (b) the Affiliated eToys Site is designed and populated in a manner that minimizes delays when AOL Members and AOL Users attempt to access such site.

**User Interface.** eToys will maintain a graphical user interface within the Affiliated eToys Site that is competitive in all material respects with interfaces of other similar sites based on similar form technology. AOL reserves the right to conduct focus group testing to assess eToys' competitiveness in this regard.

**Monitoring.** AOL Network Operations Center (NOC) will work with a eToys-designated technical contact in the event of any performance malfunction or other emergency related to the Affiliated eToys Site and will either assist or work in parallel with eToys' contact using eToys tools and procedures, as applicable. The Parties will develop a process to monitor performance and member behavior with respect to access, capacity, security and related issues both during normal operations and during special promotions/events.

**Telecommunications.** The Parties agree to explore encryption methodology to secure data communications between the Parties' data centers. The network between the Parties will be configured such that no single component failure will significantly impact AOL Users. The network will be sized such that no single line runs at more than 70% average utilization for a five minute peak in a daily period.

**Security Review.** eToys and AOL will work together to perform an initial security review of, and to perform tests of, the eToys system, network, and service security in order to evaluate the security risks and provide recommendations to eToys, including periodic follow-up reviews as reasonably required by eToys or AOL.

**Technical Performance.** eToys will perform the following technical obligations (and any reasonable updates thereto from time to time by AOL):

1. eToys will design the Affiliated eToys Site to support the Windows version of the Microsoft Internet Explorer 4.0 browser, and make commercially reasonable efforts to support all other AOL browsers listed at: http://webmaster.info.aol.com/BrowTable.html.

10

AOL 00497

App. 0248



*Confidential*

2.  eToys will configure the server from which it serves the site to examine the HTTP User-Agent field in order to identify the AOL Member-Agents listed at: http://webmaster.info.aol.com/Brow2Text.html (the "AOL Member-Agents").

3.  eToys will design its site to support HTTP 1.0 or later protocol as defined in RFC 1945 (available at http://ds.internic.net/rfc/rfc1945.text) and to adhere to AOL's parameters for refreshing cached information listed at http://webmaster.info.aol.com/CacheText.html.

eToys will provide continuous navigational ability for AOL Users to return to an agreed-upon point on the AOL Network (for which AOL will supply the proper address) from the Affiliated eToys Site.

AOL 00498

App. 0249



DX0002-0011

Confidential

## EXHIBIT E

### Standard Online Commerce Terms & Conditions

1. AOL Network Distribution. eToys will not authorize or permit any third party to distribute or promote the Affiliated eToys Site through the AOL Network absent AOL's prior written approval. AOL shall be entitled to require reasonable changes to the Content (including, without limitations features and functionality) within any linked pages of the Affiliated eToys Site to the extent AOL reasonably believes that such Content will adversely affect AOL's operation of the AOL Network.

2. Provision of Other Content. In the event that AOL notifies eToys that (i) as reasonably determined by AOL, any Content within the Affiliated eToys Site violates AOL's then-standard Terms of Service (as set forth on the America Online® brand service), the terms of this Agreement or any other standard, written AOL policy or (ii) AOL reasonably objects to the inclusion of any Content within the Affiliated eToys Site (other than any specific items of Content which may be expressly identified in this Agreement), then eToys shall take commercially reasonable steps to block access by AOL Members to such Content using eToys's then-available technology. In the event that eToys cannot, through its commercially reasonable efforts, block access by AOL Members to the Content in question, then eToys shall provide AOL prompt written notice of such fact. AOL may then, at its option, restrict access from the AOL Network to the Content in question using technology available to AOL. eToys will cooperate with AOL's reasonable requests to the extent AOL elects to implement any such access restrictions.

3. Contests. eToys will take all steps necessary to ensure that any contest, sweepstakes or similar promotion conducted or promoted through the Affiliated eToys Site (a "Contest") complies with all applicable federal, state and local laws and regulations.

4. Disclaimers. Upon AOL's request, eToys agrees to include within the Rainman Screens a product disclaimer (the specific form and substance to be mutually agreed upon by the Parties) indicating that transactions are solely between eToys and AOL Users purchasing products from eToys.

5. Ownership. eToys acknowledges and agrees that AOL will own all right, title and interest in and to the elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) (collectively, the "Look and Feel") which are generally associated with online areas contained within the AOL Network (the AOL

Look and Feel, as previously defined), subject to eToys' ownership rights in any eToys trademarks or copyrighted material within the Affiliated eToys Site. AOL acknowledges and agrees that eToys will own all right, title and interest in and to the Look and Feel which is generally associated with the Affiliated eToys Site, subject to AOL's ownership rights in any AOL trademarks or copyrighted material and the AOL Look and Feel.

6.

7. Management of the Affiliated eToys Site. eToys will manage, review, delete, edit, create, update and otherwise manage all Products available on or through the Affiliated eToys Site, in a timely and professional manner and in accordance with the terms of this Agreement. eToys will ensure that each Affiliated eToys Site is current, accurate and well-organized at all times. eToys warrants that the Affiliated eToys Site, including all Products and Contents available therein: (i) will not infringe on or violate any copyright, trademark, U.S. patent or any other third party right, including without limitation, any music performance or other music-related rights; and (ii) will not contain any Product which violates any applicable law or regulation, including those relating to contests, sweepstakes or similar promotions. AOL will have no obligations with respect to the Products available on or through the Affiliated eToys Site, including, but not limited to, any duty to review or monitor any such Products.

8. Duty to Inform. eToys will promptly inform AOL of any information related to the eToys Service or Affiliated eToys Site which could reasonably lead to a claim, demand, or liability of or against AOL and/or its affiliates by any third party.

9. Customer Service. It is the sole responsibility of eToys to provide customer service to persons or entities purchasing Products through the AOL Network ("Customers"). eToys will bear full responsibility for all customer service, including without limitation, order processing, billing, fulfillment, shipment, collection and other customer service associated with any Products offered, sold or licensed through the Affiliated eToys Site, and AOL will have no obligations whatsoever with respect thereto. eToys will receive all emails from Customers via a computer available to eToys' customer service staff and generally respond to such emails within one business day of receipt. eToys will receive all orders electronically and generally process all orders within one business day of receipt, provided Products ordered are not advance order

12                    AOL 00499

App. 0250



*Confidential*

items. eToys will ensure that all orders of Products are received, processed, fulfilled and delivered on a timely and professional basis. eToys will offer AOL Users who purchase Products through such Affiliated eToys Site a money back satisfaction guarantee. eToys will bear all responsibility for compliance with federal, state and local laws in the event that Products are out of stock or are no longer available at the time an order is received. eToys will also comply with the requirements of any federal, state or local consumer protection or disclosure law. Payment for Products will be collected by eToys directly from customers. eToys' order fulfillment operation will be subject to AOL's reasonable review.

10. <u>Production Work.</u> In the event that eToys requests AOL's production assistance in connection with any matter, eToys will work with AOL to develop a detailed production plan for the requested production assistance (the "Production Plan"). Following receipt of the final Production Plan, AOL will notify eToys of (i) AOL's availability to perform the requested production work, (ii) the proposed fee or fee structure for the requested production and maintenance work and (iii) the estimated development schedule for such work. To the extent the Parties reach agreement regarding implementation of agreed-upon Production Plan, such agreement will be reflected in a separate work order signed by the Parties. To the extent eToys elects to retain a third party provider to perform any such production work, work produced by such third party provider must generally conform to AOL's production Standards & Practices (a copy of which will be supplied by AOL to eToys upon request). The specific production resources which AOL allocates to any production work to be performed on behalf of eToys will be as determined by AOL in its sole discretion.

11. <u>Merchant Certification Program.</u> eToys will participate in any generally applicable "Certified Merchant" program operated by AOL or its authorized agents or contractors. Such program may require merchant participants on an ongoing basis to meet certain reasonable standards relating to provision of electronic commerce through the AOL Network and may also require the payment of certain reasonable certification fees to the applicable entity operating the program.

**AOL 00500**

**App. 0251**

Desc: Interactive Marketing Agreement Addendum
First Page ID: DX0002-0001
Current Page ID: DX0002-0013



DX0002-0013

Confidential

## EXHIBIT F

### Standard Legal Terms & Conditions

1. <u>Promotional Materials/Press Releases.</u> Each Party will submit to the other Party, for its prior written approval, which will not be unreasonably withheld or delayed, any marketing, advertising, press releases, and all other promotional materials related to the Affiliated eToys Site and/or referencing the other Party and/or its trade names, trademarks, and service marks (the "Materials"); provided, however, that either Party's use of screen shots of the Affiliated eToys Site for promotional purposes will not require the approval of the other Party so long as the AOL Network is clearly identified as the source of such screen shots. Each Party will solicit and reasonably consider the views of the other Party in designing and implementing such Materials. Once approved, the Materials may be used by a Party and its affiliates for the purpose of promoting the Affiliated eToys Site and the content contained therein and reused for such purpose until such approval is withdrawn with reasonable prior notice. In the event such approval is withdrawn, existing inventories of Materials may be depleted. Notwithstanding the foregoing, either Party may issue press releases and other disclosures as required by law or as reasonably advised by legal counsel without the consent of the other Party and in such event, prompt notice thereof will be provided to the other Party.

2. <u>License.</u> eToys hereby grants AOL a non-exclusive worldwide license to market, license, distribute, reproduce, display, perform, transmit and promote the Affiliated eToys Site and the Products contained therein (or any portion thereof) through such areas or features of the AOL Network as AOL deems appropriate. AOL Users will have the right to access and use the Affiliated eToys Site.

3. <u>Trademark License.</u> In designing and implementing the Materials and subject to the other provisions contained herein, eToys will be entitled to use the following trade names, trademarks, and service marks of AOL: the "America Online®" brand service, "AOL™" service/software and AOL's triangle logo; and AOL and its Affiliates will be entitled to use the trade names, trademarks, and service marks of eToys (collectively, together with the AOL marks listed above, the "Marks"); provided that each Party: (i) does not create a unitary composite mark involving a Mark of the other Party without the prior written approval of such other Party; and (ii) displays symbols and notices clearly and sufficiently indicating the trademark status and ownership of the other Party's Marks in accordance with applicable trademark law and practice.

4. <u>Ownership of Trademarks.</u> Each Party acknowledges the ownership of the other Party in the Marks of the other

Party and agrees that all use of the other Party's Marks will inure to the benefit, and be on behalf, of the other Party. Each Party acknowledges that its utilization of the other Party's Marks will not create in it, nor will it represent it has, any right, title, or interest in or to such Marks other than the licenses expressly granted herein. Each Party agrees not to do anything contesting or impairing the trademark rights of the other Party.

5. <u>Quality Standards.</u> Each Party agrees that the nature and quality of its products and services supplied in connection with the other Party's Marks will conform to quality standards set by the other Party. Each Party agrees to supply the other Party, upon request, with a reasonable number of samples of any Materials publicly disseminated by such Party which utilize the other Party's Marks. Each Party will comply with all applicable laws, regulations, and customs and obtain any required government approvals pertaining to use of the other Party's marks.

6. <u>Infringement Proceedings.</u> Each Party agrees to promptly notify the other Party of any unauthorized use of the other Party's Marks of which it has actual knowledge. Each Party will have the sole right and discretion to bring proceedings alleging infringement of its Marks or unfair competition related thereto; provided, however, that each Party agrees to provide the other Party with its reasonable cooperation and assistance with respect to any such infringement proceedings.

7. <u>Representations and Warranties.</u> Each Party represents and warrants to the other Party that: (i) such Party has the full corporate right, power and authority to enter into this Agreement and to perform the acts required of it hereunder; (ii) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (iii) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (iv) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof that are not expressly provided for in this Agreement.

8. <u>Confidentiality.</u> Each Party acknowledges that Confidential Information may be disclosed to the other Party during the course of this Agreement. Each Party agrees that it will take reasonable steps, at least substantially equivalent to the steps it takes to protect its own proprietary information, during the term of this Agreement, and for a

14

AOL 00501

App. 0252



*Confidential*

period of three years following expiration or termination of this Agreement, to prevent the duplication or disclosure of Confidential Information of the other Party, other than by or to its employees or agents who must have access to such Confidential Information to perform such Party's obligations hereunder, who will each agree to comply with this section. Notwithstanding the foregoing, either Party may issue a press release or other disclosure containing Confidential Information without the consent of the other Party, to the extent such disclosure is required by law, rule, regulation or government or court order. In such event, the disclosing Party will provide at least five (5) business days prior written notice of such proposed disclosure to the other Party. Further, in the event such disclosure is required of either Party under the laws, rules or regulations of the Securities and Exchange Commission or any other applicable governing body, such Party will (i) redact mutually agreed-upon portions of this Agreement to the fullest extent permitted under applicable laws, rules and regulations and (ii) submit a request to such governing body that such portions and other provisions of this Agreement receive confidential treatment under the laws, rules and regulations of the Securities and Exchange Commission or otherwise be held in the strictest confidence to the fullest extent permitted under the laws, , rules or regulations of any other applicable governing body.

9. <u>Limitation of Liability; Disclaimer; Indemnification.</u>

9.1. <u>Liability.</u>   UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, THE SALE OF PRODUCTS, THE USE OR INABILITY TO USE THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED eToys SITE, OR ARISING FROM ANY OTHER PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS ("COLLECTIVELY, "DISCLAIMED DAMAGES"); PROVIDED THAT EACH PARTY WILL REMAIN LIABLE TO THE OTHER PARTY TO THE EXTENT ANY DISCLAIMED DAMAGES ARE CLAIMED BY A THIRD PARTY AND ARE SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 9.3 OF THIS EXHIBIT F. EXCEPT AS PROVIDED IN SECTION 9.3 OF THIS EXHIBIT F, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR MORE THAN $1,000,000; PROVIDED THAT EACH PARTY WILL REMAIN LIABLE FOR THE AGGREGATE AMOUNT OF ANY PAYMENT OBLIGATIONS OWED TO THE OTHER PARTY PURSUANT TO SECTION 4 OF THE AGREEMENT.

9.2. <u>No Additional Warranties.</u>   EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY, AND EACH PARTY HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED eToys SITE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AOL SPECIFICALLY DISCLAIMS ANY WARRANTY REGARDING THE PROFITABILITY OF THE AFFILIATED ETOYS SITE.

9.3. <u>Indemnity.</u> Either Party will defend, indemnify, save and hold harmless the other Party and the officers, directors, agents, affiliates, distributors, franchisees and employees of the other Party from any and all third party claims, demands, liabilities, costs or expenses, including reasonable attorneys' fees ("Liabilities"), resulting from the indemnifying Party's material breach of any duty, representation, or warranty of this Agreement, except where Liabilities result from the gross negligence or knowing and willful misconduct of the other Party.

9.4. <u>Claims.</u> Each Party agrees to (i) promptly notify the other Party in writing of any indemnifiable claim and give the other Party the opportunity to defend or negotiate a settlement of any such claim at such other Party's expense, and (ii) cooperate fully with the other Party, at that other Party's expense, in defending or settling such claim. AOL reserves the right, at its own expense, to assume the exclusive defense and control of any matter otherwise subject to indemnification by eToys hereunder, and in such event, eToys will have no further obligation to provide indemnification for such matter hereunder.

9.5. <u>Acknowledgment.</u>   AOL and eToys each acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all risks (both known and unknown) associated with the transactions contemplated hereunder. The limitations and disclaimers related to warranties and liability contained in this Agreement are intended to limit the circumstances and extent of liability. The provisions of this Section 6 will be enforceable independent of and severable from any other enforceable or unenforceable provision of this Agreement.

10. <u>Solicitation of AOL Users.</u> During the term of this Agreement, and for the two-year period following the expiration or termination of this Agreement, neither eToys nor its agents will use the AOL Network to (i) solicit, or

15

AOL 00502

App. 0253



*Confidential*

participate in the solicitation of AOL Users when that solicitation is for the benefit of any entity (including eToys) which could reasonably be construed to be or become in competition with AOL or (ii) promote any services which could reasonably be construed to be in competition with AOL including, but not limited to, services available through the Internet. In addition, eToys may not send AOL Users e-mail communications promoting eToys' Products through the AOL Network without a "Prior Business Relationship." For purposes of this Agreement, a "Prior Business Relationship" will mean that the AOL User has either (i) engaged in a transaction with eToys through the AOL Network or (ii) voluntarily provided information to eToys through a contest, registration, or other communication, which included notice to the AOL User that the information provided by the AOL User could result in an e-mail being sent to that AOL User by eToys or its agents. A Prior Business Relationship does not exist by virtue of an AOL User's visit to an Affiliated eToys Site (absent the elements above). More generally, eToys will be subject to any standard policies regarding e-mail distribution through the AOL Network which AOL may implement.

**11. Collection of User Information.** eToys is prohibited from collecting AOL Member screennames from public or private areas of the AOL Network, except as specifically provided below. eToys will ensure that any survey, questionnaire or other means of collecting AOL Member screennames or AOL User email addresses, names, addresses or other identifying information ("User Information"), including, without limitation, requests directed to specific AOL Member screennames and automated methods of collecting screennames (an "Information Request") complies with (i) all applicable laws and regulations and (ii) any privacy policies which have been issued by AOL in writing during the Term (the "AOL Privacy Policies"). Each Information Request will clearly and conspicuously specify to the AOL Users at issue the purpose for which User Information collected through the Information Request will be used (the "Specified Purpose").

**12. Use of User Information.** eToys will restrict use of the User Information collected through an Information Request to the Specified Purpose. In no event will eToys (i) provide User Information to any third party (except to the extent specifically (a) permitted under the AOL Privacy Policies or (b) authorized by the members in question), (ii) rent, sell or barter User Information, (iii) identify, promote or otherwise disclose such User Information in a manner that identifies AOL Users as end-users of the AOL Service, AOL.com or the AOL Network or (iv) otherwise use any User Information in contravention of Section 10 above. Notwithstanding the foregoing, in the case of AOL Users who purchase Products from eToys, eToys will be entitled to use User Information from such AOL Users as part of eToys's aggregate list of

Customers; provided that eToys' use does not in any way identify, promote or otherwise disclose such User Information in a manner that identifies AOL Users as end-users of the AOL Service, AOL.com or the AOL Network. In addition, eToys will not use any User Information for any purpose (including any Specified Purpose) not directly related to the business purpose of the Affiliated eToys Site.

**13. Excuse.** Neither Party will be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence.

**14. Independent Contractors.** The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or partner of the other Party. Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind, the other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.

**15. Notice.** Any notice, approval, request, authorization, direction or other communication under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes on the delivery date if delivered by electronic mail on the AOL Network or (i) on the delivery date if delivered personally to the Party to whom the same is directed; (ii) one business day after deposit with a commercial overnight carrier, with written verification of receipt, or (iii) five business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available, to the person(s) specified below at the address of the Party set forth in the first paragraph of this Agreement.

**16. No Waiver.** The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect.

**17. Return of Information.** Upon the expiration or termination of this Agreement, each Party will, upon the written request of the other Party, return or destroy (at the option of the Party receiving the request) all confidential information, documents, manuals and other materials specified the other Party.

16

**AOL 00503**



**App. 0254**



*Confidential*

18. <u>Survival</u>.  Sections 9 through 12 of this Exhibit F, will survive the completion, expiration, termination or cancellation of this Agreement.

19. <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein. Neither Party will be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.

20. <u>Amendment</u>.  No change, amendment or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment, and in the case of AOL, by an executive of at least the same standing to the executive who signed the Agreement.

21. <u>Further Assurances</u>.  Each Party will take such action (including, but not limited to, the execution, acknowledgment and delivery of documents) as may reasonably be requested by any other Party for the implementation or continuing performance of this Agreement.

22. <u>Assignment</u>.  eToys will not assign this Agreement or any right, interest or benefit under this Agreement without the prior written consent of AOL. Subject to the foregoing, this Agreement will be fully binding upon, inure to the benefit of and be enforceable by the Parties hereto and their respective successors and assigns.

23. <u>Construction; Severability</u>.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement, (i) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law, and (ii) the remaining terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect.

24. <u>Remedies</u>.  Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity; provided that, in connection with any dispute hereunder, eToys will be not entitled to offset any amounts that it claims to be due and payable from AOL against amounts otherwise payable by eToys to AOL.

25. <u>Applicable Law; Jurisdiction</u>.  This Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the Commonwealth of Virginia except for its conflicts of laws principles. Each Party irrevocably consents to the exclusive jurisdiction of the courts of the Commonwealth of Virginia and the federal courts situated in the Commonwealth of Virginia, in connection with any action to enforce the provisions of this Agreement, to recover damages or other relief for breach or default under this Agreement, or otherwise arising under or by reason of this Agreement.

26. <u>Export Controls</u>.  Both Parties will adhere to all applicable laws, regulations and rules relating to the export of technical data and will not export or re-export any technical data, any products received from the other Party or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations and rules unless properly authorized.

27. <u>Headings</u>.  The captions and headings used in this Agreement are inserted for convenience only and will not affect the meaning or interpretation of this Agreement.

28. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same document.

AOL 00504

App. 0255



# App. 8

Subj:    **Fwd: AOL eToys Proposal**
 te:    5/12/99 10:14:56 AM Eastern Daylight Time
 om:    Pegfry
To: AWHorrigan, KMOsio
Sent on:    AOL 4.0 for Windows 95 sub 246

 File:  AOL Version 5-11.xls (78848 bytes)
DL Time (TCP/IP): < 1 minute

etoys response....we'll be reviewing this on the conf. call today.
peggy

───────────

Forward Verified: Mon May 17 11:41:28 1999
Subj:    **AOL eToys Proposal**
Date:    5/11/99 8:45:03 PM Eastern Daylight Time
From:    peter@etoys.com (Peter Brine)
To: Pegfry@aol.com, Davisnell@aol.com, YangBness@aol.com
CC: spaul@aol.com, phil@etoys.com

Dear Peggy and Neil,

We are looking forward to discussing our new deal tomorrow.  Enclosed
please find an Excel Workbook detailing our response to your proposal.  We
will discuss this in greater detail during our conference call.

Based on our analysis, your proposal would result in a $125 cost per order.
We have therefore revised the proposal to bring the cost per order to a
    re acceptable level.

In addition, our analysis of the shopping channel assumes 300 hours of
Welcome Screen per year, 200 of which should occur between January and
September.

The total dollar figure of our response is just over $12MM.  As we have
expressed on many occasions we have no problem doing a $20MM deal with AOL,
however, the value must be there.  To that end, tomorrow we will outline an
AOL/eToys co-branded Kids' Registry.  If executed properly, this registry
will provide significant value to the end user, drive new customers to
eToys and provide AOL with an exclusive offering to market to your users.

We are very excited about doing a big deal with AOL, both in terms of
dollar figures and AOL/eToys integration.  I am sure this will be the
beginning of very fruitful discussions.

-Peter

───────────

Peter Brine
Director of Online Marketing
eToys
    ə Internet's Largest Toystore"
 ,۱00 Ocean Park Blvd., Suite 300
Santa Monica, CA 90405
voice: (310) 664-8126
fax:  (310) 664-8101
peter@etoys.com





**CONFIDENTIAL**

AOL  01748

App. 0256

───────────────────────

**Desc:** E-mail To: AW Horrigan, KM Osio; From: Pegfry; re: FWD: AOL e-toys Proposal
**First Page ID:** DX0005-0001
**Current Page ID:** DX0005-0001    *Page 1 of 1*     DX0005-0001



DX0005-0001

AOL01748

Subj: Fwd: AOL eToys Proposal
To: 5/12/99 10:14:56 AM Eastern Daylight Time
From: Freghty
To: AWHoergen, KidCew
Sent on: AOL 4.0 for Windows 95 sub 248

File: AOL Version 6-11.exe (19642 bytes)
DL Time (TCP/IP): < 1 minute

eToys response... we'll be reviewing this on the conf. call today.

The total dollar figure of our response is just over $12MM. As we have expressed on many occasions we have no problem doing a $20MM deal with AOL, however, the value must be there. To that end, tomorrow we will outline an AOL/eToys co-branded Kids' Registry. If executed properly, this registry will provide significant value to the end user, drive new customers to eToys and provide AOL with an exclusive offering to market to your users.

We are very excited about doing a big deal with AOL, both in terms of dollar figures and AOL/eToys integration. I am sure this will be the beginning of very fruitful discussions.

Peter Brino
Director of Online Marketing
eToys
"Internet's Largest Toystore"
...00 Ocean Park Blvd., Suite 300
Santa Monica, CA 90405
voice: (310) 664-8126
fax: (310) 664-8191
peter@etoys.com

DEFENDANT'S
EXHIBIT
5

CONFIDENTIAL     AOL 01748

App. 0257

Desc: Snapshot Monday, Jun, 25, 2007 09:51 AM
First Page ID: DX0005-0001
Current Page ID: DX0005-0001-SS01          Page 1 of 1          DX0005-0001-SS01



# App. 9

*Confidential*
## INTERACTIVE MARKETING AGREEMENT

This Interactive Marketing Agreement (the "Agreement"), dated as of August 10, 1999 (the "Effective Date"), is between America Online, Inc. ("AOL"), a Delaware corporation, with offices at 22000 AOL Way, Dulles, Virginia 20166, and eToys Inc. ("Marketing Partner" or "MP"), a Delaware corporation, with offices at 3100 Ocean Park Boulevard, Suite 300, Santa Monica, California 90405. AOL and MP may be referred to individually as a "Party" and collectively as the "Parties."

### INTRODUCTION

AOL and MP each desires to enter into an interactive marketing relationship whereby AOL will promote and distribute an interactive site referred to (and further defined) herein as the Affiliated MP Site. This relationship is further described below and is subject to the terms and conditions set forth in this Agreement. Defined terms used but not defined in the body of the Agreement will be as defined on Exhibit B attached hereto.

### TERMS

1.     **PROMOTION, DISTRIBUTION AND MARKETING.**

1.1.     **AOL Promotion of Affiliated MP Site.** AOL will provide MP with the promotions for the Affiliated MP Site described on Exhibit A attached hereto and in Sections 1.2 and 1.3 below. Subject to MP's reasonable approval and to Section 1.4 hereof, AOL will have the right to fulfill its promotional commitments with respect to any of the foregoing by providing MP comparable promotional placements in appropriate alternative areas of the AOL Network taking into account the Relative Weighted Value (as defined below) of the Promotions and Impressions. In addition, except as otherwise provided in Section 1.4 hereof, if AOL is unable to deliver any particular Promotion, subject to MP's reasonable approval, AOL shall deliver a comparable promotional placement in lieu thereof taking into account the Relative Weighted Value of the Promotions and Impressions which will be MP's sole remedy for AOL's failure to deliver such Promotion (subject to referral to the Management Committee and the other procedures for conflict resolution set forth in Section 6). AOL reserves the right to redesign or modify the organization, structure, "look and feel," navigation and other elements of the AOL Network at any time. In the event such modifications materially and adversely affect any specific Promotion or the Promotions in the aggregate, subject to Section 1.4 hereof, AOL and MP will mutually agree upon a comparable promotional placement in lieu thereof taking into account the Relative Weighted Value of the Promotions and Impressions (such agreement not to be unreasonably withheld by either party), which will be MP's sole remedy for such modifications (subject to referral to the Management Committee and the other procedures for conflict resolution set forth in Section 6). As used herein, "Relative Weighted Value" of the Promotions and Impressions refers to the fact that, as acknowledged and agreed by the Parties hereto and as evidenced by Exhibit A hereto, the Impressions and Promotions described on Exhibit A hereto are not of equal value but rather, in order of descending relative value from the most to the least valuable, are categorized as follows: (a) Shopping (b) Level 1, (c) Level 2, (d) Level 3, (e) Level 4, and (f) Level 5 (Welcome Screen). Subject to Section 1.4 hereof, in any case arising under this Agreement that requires the Parties to value Promotions or Impressions that have been delivered, are required to be delivered or are required to be replaced with comparable promotional placements or any other comparable or similar valuation or circumstance, the Parties will take into account the Relative Weighted Value of the Promotions and Impressions. On each anniversary date of the Effective Date (or as soon thereafter as practicable), the

**Plaintiff's Exhibits**
Adv. Pro. No. 03-50003
**01**

CONFIDENTIAL
Draft 8/5/99

```
Deposition Exhibit PY-1
Deponent: C. Valle
Date: November 20, 2003
Reporter: Jane Grossman, CSR No. 5225
```

**AOL 00197**

App. 0258


PX0001-0001

Parties shall discuss in good faith the Relative Weighted Value assigned to the various categories of Promotions. In the event that the Parties are unable to agree on modifications to the Relative Weighted Value of the various categories of Promotions, the issue shall be referred to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.2.    Impressions Commitment. During the Term, AOL shall deliver at least one billion (1,000,000,000) Impressions to the Affiliated MP Site through the Promotions (the "Impressions Commitment"). AOL shall use commercially reasonable efforts to divide the Impressions Commitment among the three years of the Term in the manner set forth on Exhibit A hereto. In addition, AOL shall use commercially reasonable efforts to deliver at least 35% of the Impressions Commitment for any year during the three-month period ending December 20 of such year (the "Holiday Quarter"). Within 30 days following each anniversary of the Effective Date, AOL will deliver to MP a report indicating the number of Impressions delivered in the preceding year and whether there has occurred any shortfall in the required delivery of Impressions as set forth in Exhibit A during the preceding year in any particular area or component of the AOL Network. In the event that a shortfall has occurred in any year, subject to MP's reasonable approval and Section 1.4 hereof, AOL shall deliver comparable promotional placements taking into account the Relative Weighted Value of the Impressions during the first six months of the year following the year in which the shortfall occurred or such other time period as may be agreed to by MP. Notwithstanding the foregoing, subject to Section 1.4 hereof, in the event that (i) at the end of Year 1 AOL has delivered in the aggregate fewer Impressions than the Year 1 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 1 Penalty, (ii) at the end of Year 2 AOL has delivered in the aggregate fewer Impressions than the Year 2 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 2 Penalty, and (iii) at the end of Year 3 AOL has delivered in the aggregate fewer Impressions than the Year 3 Target, AOL shall deliver, in addition to any Impressions otherwise deliverable to MP hereunder, a number of Impressions equal to the Year 3 Penalty, in the case of each of (i), (ii) and (iii), such Impressions to be delivered within the first six months of the year following the year in which the shortfall occurred. In the event that a significant shortfall has occurred during the Holiday Quarter of any year (i.e. significantly less than 35% of the Impressions to be delivered in such year), MP may request that the Management Committee determine an appropriate remedy for MP. The foregoing shall be MP's sole remedies with respect to any shortfall in the delivery of Promotions and Impressions by AOL hereunder; provided, however, that nothing herein shall prohibit any Party from referring any dispute hereunder to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.3.    Additional Welcome Screen Promotions. In addition to the Impressions provided under Section 1.2, AOL shall deliver at least twenty-five million (25,000,000) Impressions to the Affiliated Site from the Promotions on the AOL Service Welcome Screen during each quarter of the Term that MP provides at least one mutually agreed upon AOL Special Offer (as described in Section 2.6) for promotion on the AOL Welcome Screen. In the event that at any time during the Term (i) AOL is unable or unwilling to deliver the Impressions required under this Section 1.3 and Level 5 of Exhibit A in a "graphic" format generally, and (ii) as a result of such inability or unwillingness, MP suffers at least a thirty-five percent (35%) decrease in the "click-through" rate of such Promotions by AOL Users, then the Parties shall discuss in good faith the number of Impressions to be delivered by AOL to MP in order to compensate MP for such decrease. In the event that the Parties are unable to agree on the appropriate number, the issue shall be referred to the

CONFIDENTIAL
Execution Copy

2

**AOL 00198**

App. 0259



Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.4.   Guarantee of Shopping Impressions. In the event of any shortfall in the delivery of Impressions required under "Shopping" on Exhibit A hereto, AOL agrees that it shall remedy each such shortfall by delivery of the required number of Impressions in the respective "Commerce" area in which such shortfall occurred. Notwithstanding the foregoing, the Parties agree that in the event of any shortfall in the delivery of Impressions in any department of the "Kids Commerce Center", AOL shall remedy each such shortfall by delivery of the required number of Impressions in the department in which such shortfall occurred.

1.5    Content of Promotions. The Promotions will link only to the Affiliated MP Site and will promote only the Promotable Products and Content and the Promotable Functions as defined on Exhibit D. The specific MP Content to be contained within the Promotions described in Exhibit A (the "Promo Content") will be determined by MP, subject to AOL's technical limitations, the terms of this Agreement and AOL's then-applicable policies relating to advertising and promotions (which policies shall be generally applicable to all marketing partners in relationships comparable to MP's relationship with AOL). MP will submit in advance to AOL for its review a quarterly online marketing plan with respect to the Promo Content to be included in the Promotions of the Affiliated MP Site on the AOL Network. The Parties will meet in person or by telephone at least monthly to review operations and performance hereunder, including a review of the Promo Content to ensure that it is designed to maximize performance. MP agrees to update the Promo Content when and as MP determines it to be necessary or desirable in MP's reasonable discretion. Except to the extent expressly described herein, the specific form, placement, duration and nature of the Promotions will be as determined by AOL in its reasonable editorial discretion (consistent with the editorial composition of the applicable screens).

1.6    MP Promotion of Affiliated MP Site and AOL. During the Term hereof, MP will promote the availability of the Affiliated MP Site through the AOL Network as set forth in Exhibit C hereof.

1.7    AOL's Promotion of MP as Premiere Children's Retailer. Promptly following the Effective Date, AOL and MP shall jointly issue a press release in a form mutually agreeable to the Parties announcing the effectiveness of this Agreement. Such press release will, among other things, identify MP as the "Premiere Retailer of Children's Products on the AOL Network, including toys, video games, videos, software, books, music and baby products."

1.8    Wish Lists.

1.8.1   Kids Only Holiday Wish List. During the Term, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the Kids Only Holiday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Holiday Wish List Section"). Beginning September 1, 2000, for the duration of the Term, MP shall be the exclusive provider of products promoted in the Music gift category of the Kids Only Holiday Wish List Section. MP agrees to (i) market and promote in the Kids Only Holiday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

1.8.2   Kids Only Birthday Wish List. During Year 1, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the

CONFIDENTIAL
Execution Copy

3

**AOL 00199**



| Desc: The Interactive Marketing Agreement (PX 1) | |
|---|---|
| First Page ID: PX0001-0001 | |
| Current Page ID: PX0001-0003 | Page 3 of 39 |



PX0001-0003



PX0001-0003

Management Committee and the other procedures for dispute resolution set forth in Section 6.

1.4    **Guarantee of Shopping Impressions.** In the event of any shortfall in the delivery of Impressions required under "Shopping" on Exhibit A herein, AOL agrees that it shall remedy each such shortfall by delivery of the required number of Impressions in the respective "Comments" area in which such shortfall occurred. Notwithstanding the foregoing, the Parties agree that in the event of any shortfall in the delivery of Impressions

1.5    **Content of Promotions.  The Promotions will link only to the Affiliated MP Site and will promote only the Promotable Products and Content and the Promotable Functions as defined on Exhibit D.  The specific MP Content to be contained within the Promotions**

relating to advertising and promotions (which policies shall be generally applicable to all marketing partners in relationships comparable to MP's relationship with AOL).  MP will submit in advance to AOL for its review a quarterly online marketing plan with respect to the Promo Content to be included in the Promotions of the Affiliated MP Site on the AOL Network.  The Parties will meet in person or by telephone at least monthly to review operations and performance hereunder, including a review of the Promo Content to ensure that it is designed to maximize performance.  MP agrees to update the Promo Content when and as MP determines it to be necessary or desirable in MP's reasonable discretion.  Except to the extent expressly described herein, the specific form, placement, duration and nature of the Promotions will be as determined by AOL in its reasonable editorial discretion (consistent with the editorial construction of this applicable screens).

1.6    **MP Promotion of Affiliated MP Site and AOL.** During the Term hereof, MP will promote the availability of the Affiliated MP Site through the AOL Network as set forth in Exhibit C hereof.

1.7    **AOL's Promotion of MP as Premiere Children's Retailer.** Promptly following the Effective Date, AOL and MP shall jointly issue a press release in a form mutually agreeable to the Parties announcing the effectiveness of this Agreement.  Such press release will, among other things, identify MP as the "Premiere Retailer of Children's Products on the AOL Network, including toys, video games, videos, software, books, music and baby products."

1.8    **Wish Lists.**

    1.8.1    Kids Only Holiday Wish List. During the Term, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the Kids Only Holiday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Holiday Wish List Section"). Beginning September 1, 2000, for the duration of the Term, MP shall be the exclusive provider of products promoted in the Music gift category of the Kids Only Holiday Wish List Section. MP agrees to (i) market and promote in the Kids Only Holiday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

    1.8.2    Kids Only Birthday Wish List. During Year 1, MP shall be the exclusive provider of products promoted in the Toys, Video and Video Games gift categories of the

CONFIDENTIAL
Executive Copy

3

AOL 00199

App. 0261



PX0001-0003-SS01

Kids Only Birthday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Birthday Wish List Section"). MP agrees to (i) market and promote in the Kids Only Birthday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

1.9     Toy Decision Guide. During the Term, MP shall receive the premier advertising anchor button on the AOL Service Toy Decision Guide (the "Decision Guide") main screen. In the event that MP contributes data and other content (e.g. product descriptions, product photographs) to the Decision Guide database and AOL, in its sole discretion elects to use such data and other content in the Decision Guide, MP shall receive a button on each page of the Decision Guide. MP shall receive a link on the "Results" page of the Decision Guide.

2.     **AFFILIATED MP SITE.**

2.1     Content. There shall be no limitation on the Content, products, services, community or functions that are or may be offered on the Affiliated MP Site except that, during each of Year 1, Year 2 and Year 3 of the Term, net sales of products on the Affiliated MP Site (after deducting charges for shipping, handling, gift wrapping, sales tax, coupons or other discounts, and product returns) shall be derived (i) at least fifty percent (50%) from, collectively, the sale of children's toys, hobbies, arts and crafts, video games and software, and (ii) at least seventy-five percent (75%) from or through a direct sales format. Unless AOL shall otherwise consent, the products, services, content, community and functions that may be advertised, marketed and promoted by MP through the Promotions and Impressions provided for hereunder shall be limited to (a) the Promotable Products and Content (as defined on Exhibit D hereto) and (b) with respect to up to 200,000,000 of the Impressions provided for hereunder, the Promotable Functions (as defined on Exhibit D hereto); provided, however, that (i) all promotions of Promotable Functions shall describe such Promotable Functions generically and shall not reference any branding of such Promotable Function (i.e. "find toy decision guides at keyword: eToys" would be permitted, but "come check out the eToys Toy Decision Guide" would not be permitted) and (ii) in the event that AOL desires to lessen the maximum number of promotions of Promotable Functions permitted hereunder, eToys will consider in good faith whether to lessen such number and will negotiate in good faith with AOL with respect thereto, and in the event the Parties are unable to agree on a lesser number, the matter shall be referred to the Management Committee for consideration, provided that nothing herein shall require that MP agree to lessen the number of promotions of Promotable Functions. MP will review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated MP Site in accordance with the terms of this Agreement. MP will ensure that the Affiliated MP Site does not in any respect promote, advertise, market or distribute the products, services or content of any other Interactive Service, except that MP may include on the Affiliated MP Site:

2.1.1     branding for another Interactive Service to the extent such branding (i) merely indicates MP's use of such Interactive Service's integrated technology, (ii) does not provide a link to any other Interactive Site, and (iii) is required under MP's written agreement with such Interactive Service. Notwithstanding the foregoing sentence, MP agrees that in the event that (x) MP proposes to purchase, license or otherwise acquire for use on the Affiliated MP Site any integrated technology not in use on the Affiliated MP Site as of the Effective Date or with respect to which MP has not entered into negotiation or discussion prior to the Effective Date (MP represents and warrants that it has not entered into negotiations or discussions regarding instant messaging, e-mail or chat technology), and (y) AOL

CONFIDENTIAL
Execution Copy

4

AOL 00200

App. 0262


PX0001-0004



PX0001-0004

Kids Only Birthday Wish List section of the AOL Kids Only Channel of the AOL Service (the "Kids Only Birthday Wish List Section"). MP agrees to (i) market and promote in the Kids Only Birthday Wish List Section only those products mutually selected by AOL and MP, and (ii) merchandise such products according to AOL's specifications.

1.3    Toy Decision Guide. During the Term, MP shall receive the premier advertising anchor

2.1    **Content.** There shall be no limitation on the Content, products, services, community or functions that are or may be offered on the Affiliated MP Site except that, during each of Year 1, Year 2 and Year 3 of the Term, net sales of products on the Affiliated MP Site (after deducting charges for shipping, handling, gift wrapping, sales tax, coupons or other discounts, and product returns) shall be derived (i) at least fifty percent (50%) from, collectively, the sale of children's toys, hobbies, arts and crafts, video games and software, and (ii) at least seventy-five percent (75%) from or through a direct sales format. Unless AOL shall otherwise consent, the products, services, content, community and functions that may be advertised, marketed and promoted by MP through the Promotions and Impressions provided for hereunder shall be limited to (a) the Promotable Products and Content (as defined on Exhibit D hereto) and (b) with respect to up to 200,000,000 of

to the Management Committee for consideration, provided that nothing herein shall require that MP agree to lessen the number of promotions of Promotable Functions. MP will review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated MP Site in accordance with the terms of this Agreement; MP will ensure that the Affiliated MP Site does not in any respect promote, advertise, market or distribute the products, services or content of any other Interactive Service, except that MP may include on the Affiliated MP Site:

2.1.1    branding for another Interactive Service to the extent such branding (i) merely indicates MP's use of such Interactive Service's integrated technology, (ii) does not provide a link to any other Interactive Site, and (iii) is required under MP's written agreement with such Interactive Service. Notwithstanding the foregoing sentence, MP agrees that in the event that (x) MP proposes to purchase, license or otherwise acquire for use on the Affiliated MP Site any integrated technology not in use on the Affiliated MP Site as of the Effective Date or with respect to which MP has not entered into negotiation or discussion prior to the Effective Date (MP represents and warrants that it has not entered into negotiations or discussions regarding instant messaging, e-mail or chat technology), and (y) AOL

CONFIDENTIAL
Executive Copy                                                     4

AOL 00200

App. 0263

Desc: Snapshot Monday, Jun, 25, 2007 11:28 AM
First Page ID: PX0001-0001
Current Page ID: PX0001-0004-SS01          *Page 4 of 39*          PX0001-0004-SS01

offers market competitive and relevant similar technology, MP shall notify AOL of its intention to purchase, license or otherwise acquire such new integrated technology and:

2.1.1.1  In the case of any instant messaging, e-mail or chat technology or, in each of Year 2 and Year 3, one other type of technology as specified in writing by AOL (a "Specified Technology"), MP shall conduct good faith negotiations exclusively with AOL for at least thirty (30) days regarding MP's possible purchase, license or other acquisition of such Specified Technology from AOL. During such time, AOL shall, if it so desires, make an offer to MP setting forth in reasonable detail the product specifications for such technology and the price and other terms on which it is willing to provide such technology to MP (the "AOL Technology Offer"). If MP rejects the AOL Technology Offer, then MP may not accept an offer for such Specified Technology unless MP determines, in the exercise of its good faith business judgment, that the product specifications, price and terms offered by such third party are, in the aggregate, materially more favorable to MP than the AOL Technology Offer; and

2.1.1.2  In the case of any other integrated technology, MP shall consider in good faith the possible purchase, license or other acquisition of such integrated technology from AOL.

Notwithstanding the foregoing, AOL agrees that other than with respect to any Specified Technology listed in Section 2.1.1.1., in the event MP creates or acquires in connection with the acquisition of another business enterprise (a "Business Acquisition") any integrated technology, MP shall be free to promote, advertise, market and distribute such integrated technology on the Affiliated MP Site, whether under the "eToys" name or any other name, without restriction or penalty under this Agreement; provided, that, unless otherwise required under an agreement to which MP becomes a party as a result of a Business Acquisition, nothing in this paragraph shall permit the establishment of a link to any Interactive Service.

2.1.2   screens which promote, advertise, market or distribute the products, services or content of another Interactive Service, if such screens are not accessible to any AOL Users while using the AOL Network unless such AOL Users have accessed such screens directly from such Interactive Service;

2.1.3   references to another Interactive Service made solely in connection with special charitable offers (e.g., Toys for Tots, March of Dimes) co-branded with such Interactive Service, provided that such references do not provide a link to the other Interactive Service. To the extent it has authority to do so, MP shall make reasonable efforts to include AOL as a co-sponsor of any such special charitable offer; and

2.1.4   a linked button for the online shopping mall branded "Shopper Connection" appearing below the fold on MP's home page, of no greater prominence than the largest button appearing at the bottom of the Affiliated MP Site; provided, however, that MP shall be permitted for two one-week periods during each year of the Term (but not more than one during any Holiday Quarter) to include on the Affiliated MP Site a more prominent above the fold promotion for "Shopper Connection" if required under MP's agreement with "Shopper Connection."

CONFIDENTIAL
Execution Copy

5

**AOL 00201**

**App. 0264**


PX0001-0005

2.1.5   with respect to any Interactive Service that advertises, markets or promotes itself or otherwise maintains a presence on the AOL Network (an "AOL Associated Interactive Service"), if MP desires to enter into a relationship pursuant to which the Affiliated MP Site will promote, advertise, market or distribute the products, services or content of such AOL Associated Interactive Service, upon MP's request, AOL will consider such request in good faith and may grant its permission for MP to enter into such relationship with such AOL Associated Interactive Service, if AOL reasonably determines that the granting of such permission would not be adverse to AOL's interests; provided, however, that nothing herein shall require that AOL grant such permission.

2.2   Production Work. Except as agreed to in writing by the Parties pursuant to the "Production Work" section of the Standard Online Commerce Terms & Conditions attached hereto as Exhibit F, MP will be responsible for all production work associated with the Affiliated MP Site, including all related costs and expenses.

2.3.   Technology. MP will take all commercially reasonable steps necessary to conform its promotion and sale of Products through the Affiliated MP Site to the then-existing technologies identified by AOL which are optimized for AOL. Notwithstanding the foregoing, the parties hereto agree that, unless MP otherwise consents, MP will not be required to incorporate or implement into or on the Affiliated MP Site any "quick checkout" tool that AOL may implement (including any modifications thereof) to facilitate purchase of products by AOL Users other than such a tool (including any modifications thereof) with specifications that substantially conform to those set forth on Exhibit I attached hereto and which is otherwise reasonably acceptable to MP. MP shall use commercially reasonable efforts to implement the "quick checkout" tool on the Affiliated MP Site prior to September 30, 1999, provided, however, that unless any such "quick checkout" tool has been fully implemented or incorporated on or into the Affiliated MP Site no later than September 30, 1999, MP shall be entitled to cease all efforts to implement such technology and not resume such efforts until January 2000. Once implemented into the Affiliated MP Site, subject to the following sentence, such tool may not be modified in any material manner or in any manner that requires a material modification of the Affiliated MP Site unless MP consents to such modification, which consent shall not be unreasonably withheld. Notwithstanding the foregoing sentence, (i) AOL shall be entitled to modify the "quick checkout" tool to make any necessary protocol changes (e.g., fix bugs, remedy security holes, etc.); provided that AOL shall use commercially reasonable efforts to make any new protocol compatible with the Affiliated MP Site as the Affiliated MP site is then configured, and (ii) in the event of such a modification, MP shall use commercially reasonable efforts to conform the Affiliated MP Site, if necessary, to operate with such modifications. AOL will be entitled to require reasonable changes to the Content (including, without limitation, the features or functionality) within any linked pages of the Affiliated MP Site to the extent such Content will adversely affect any material operational aspect of the AOL Network. AOL reserves the right to review and test the Affiliated MP Site from time to time to determine whether the site is compatible with AOL's then-available client and host software and the AOL Network. Notwithstanding any provision of this Agreement to the contrary, in the event that MP suffers a material decrease in sales on the Affiliated MP Site as a result of its implementation of "quick checkout" (and MP has established such causal relationship to AOL), then MP shall be permitted to discontinue its use of "quick checkout".

2.4.   Product Offering. Subject to the restrictions set forth in Section 2.1, MP will ensure that the Affiliated MP Site includes all of the Promotable Products and Content and Promotable Functions (including, without limitation, any features, offers, contests, functionality or technology) that are then made available by or on behalf of MP through

CONFIDENTIAL
Execution Copy

6

AOL 00202

App. 0265



PX0001-0006

any Additional MP Channel; provided, however, that such inclusion will not be required where it is commercially or technically impractical to either Party (i.e., inclusion would cause either Party to incur substantial incremental costs).

2.5.    Pricing and Terms.  Other than periodic special contests, sweepstakes, coupons, discounts, product enhancements, premiums, unique services, auctions, subscriptions or other advertising, marketing or promotional offers, campaigns or initiatives that are targeted at specific customers or groups of customers other than AOL Users ("Non-AOL Special Offers"), MP will ensure that: (i) the prices (and any other required consideration) for Products in the Affiliated MP Site do not generally exceed the prices for the Products or substantially similar Products offered by or on behalf of MP through any Additional MP Channel; and (ii) the terms and conditions related to Products in the Affiliated MP Site are not generally less favorable than the terms and conditions for the Products or substantially similar Products offered by or on behalf of MP through any Additional MP Channel.  Notwithstanding the foregoing, MP agrees that, in the event that in any of Year 1, Year 2 or Year 3, the Non-AOL Special Offers during such year are in the aggregate materially more valuable than the AOL Special Offers in the aggregate during such year, the Parties shall conduct good faith discussions to devise a means of providing AOL Users with additional AOL Special Offers to compensate for such discrepancy in aggregate value.  In the event that the Parties are unable to agree on an appropriate remedy, the matter shall be referred to the Management Committee and the other procedures for dispute resolution set forth in Section 6.

2.6.    Special Offers/Member Benefits. At least once per calendar quarter for not less than seven (7) consecutive days, MP shall promote through the Affiliated MP Site a special offer that is promoted specifically for AOL Users (the "AOL Special Offers").   The AOL Special Offer made available by MP shall provide a substantial member benefit to AOL Users, either by virtue of a meaningful price discount, product enhancement, unique service benefit or other special feature, or opportunity to purchase a new Product.  Such AOL Special Offer will be made exclusively to AOL Users, except that, with respect to such the opportunity to purchase a new Product, AOL acknowledges that MP is unable to provide such an opportunity on an exclusive basis, but MP will only advertise the availability of the new Product to AOL Users during the term of the AOL Special Offer, thereby increasing the likelihood that AOL Users will have the opportunity to purchase the new Product before other MP customers.    MP will provide AOL with reasonable prior notice of AOL Special Offers so that AOL can market the availability of such AOL Special Offers in the manner AOL deems appropriate in its editorial discretion. AOL Special Offers that are appropriate for promotion on the AOL Service Welcome Screen, as mutually agreed by the Parties (which agreement shall not be unreasonably withheld by either party), shall be promoted as set forth in Section 1.2.

2.7.    Operating Standards. MP will ensure that the Affiliated MP Site complies at all times with the standards set forth in Exhibit E.  To the extent site standards are not established in Exhibit E with respect to any aspect or portion of the Affiliated MP Site (or the Products or other Content contained therein), MP will provide such aspect or portion at a level of accuracy, quality, completeness, and timeliness which meets or exceeds prevailing standards in the toys industry.  In the event MP fails to comply with any standards set forth in Exhibit E, as of the seventh calendar day following such non-compliance, AOL will have the right (in addition to any other remedies available to AOL hereunder) to decrease the promotion it provides to MP until such time as MP corrects its non-compliance (and in such event, AOL will be relieved of the proportionate amount of any promotional commitment made to MP by AOL hereunder corresponding to such decrease in promotion) and any New Customer and Impressions threshold(s) set forth in Sections 4

AOL 00203

App. 0266


PX0001-0007



any Additional MP Channel; provided, however, that such inclusion will not be required where it is commercially or technically impractical to either Party (i.e., inclusion would cause either Party to incur substantial incremental costs).

part 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

2.8.   Advertising. Except for Non-material Advertisements, the Affiliated MP Site shall not

2.7.   **Operating Standards.** MP will ensure that the Affiliated MP Site complies at all times with the standards set forth in Exhibit E. To the extent site standards are not established in Exhibit E with respect to any aspect or portion of the Affiliated MP Site (or the Products or other Content contained therein), MP will provide such aspect or portion at a level of accuracy, quality, completeness, and timeliness which meets or exceeds prevailing standards in the toys industry. In the event MP fails to comply with any standards set forth in Exhibit E, as of the seventh calendar day following such non-compliance, AOL will have the right (in addition to any other remedies available to AOL hereunder) to decrease the promotion it provides to MP until such time as MP corrects its non-compliance (and in such event, AOL will be relieved of the proportionate amount of any promotional commitment made to MP by AOL hereunder corresponding to such decrease in promotion) and any New Customer and Impressions threshold(s) set forth in Sections 4

and 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

| | |
|---|---|
| July 15, 2000 | $1,500,000 |
| October 15, 2000 | $1,500,000 |
| January 15, 2001 | $1,500,000 |
| April 16, 2001 | $1,500,000 |
| July 15, 2001 | $1,500,000 |

CONFIDENTIAL
Execution Copy

AOL 00203

CONFIDENTIAL
Execution Copy

AOL 00204

App. 0267



and 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

2.8.  **Advertising**. Except for Non-material Advertisements, the Affiliated MP Site shall not advertise or promote any third party, without AOL's prior written consent. Any consent by AOL shall be conditioned upon the Parties agreeing in writing to a revenue splitting arrangement (with respect to revenues in excess of the thresholds in the following sentence) for such advertising.. For the purposes of this Section 2.8, "Non-material Advertisements" shall mean (i) in Year 1, advertisements valued in the aggregate at not more than two million dollars ($2,000,000), (ii) in Year 2, advertisements valued in the aggregate at not more than four million dollars ($4,000,000),and (iii) in Year 3, advertisements valued in the aggregate at not more than six million dollars ($6,000,000). The value of advertising shall be the total consideration (but not including in-kind, reciprocal advertising) received by MP for such advertising.

2.9.  **Traffic Flow**. The Parties will work together on implementing mutually acceptable links from the Affiliated MP Site back to the AOL Service. In the event that AOL points to the Affiliated MP Site or any other MP Interactive Site or otherwise delivers traffic to such site hereunder, MP will ensure that navigation back to the AOL Network from such site, whether through a particular pointer or link, the "back" button on an Internet browser, the closing of an active window, or any other return mechanism, shall not be interrupted by MP through the use of any intermediate screen or other device not specifically requested by the user, including without limitation through the use of any html popup window or any other similar device. Rather, such AOL traffic shall be pointed directly back to the AOL Network as designated by AOL.

3.  **AOL CDROM DISTRIBUTION.** During the 90 day period following the Effective Date, MP shall use commercially reasonable efforts to provide AOL with such information and data reasonably requested by AOL for determining the feasibility and likely success of a marketing test for AOL and CompuServe CD-ROM distribution; provided, however, that MP shall have no obligation to provide such information in the event that MP reasonably believes that such act would violate any policy of MP or be impracticable or competitively disadvantageous. Thereafter, the Parties shall discuss in good faith the feasibility of entering into a marketing arrangement, pursuant to which MP would distribute CD-ROMs on behalf of AOL in consideration of bounty payments by AOL to MP for new subscribers.

4.  **PAYMENTS**.

4.1  **Required Payments**. MP will pay AOL a non-refundable payment of Eighteen Million Dollars (US$18,000,000) payable on the dates and in the amounts as follows:

| Payment Due Date | Payment Amount |
|---|---|
| Effective Date | $1,500,000 |
| October 15, 1999 | $1,500,000 |
| January 15, 2000 | $1,500,000 |
| April 15, 2000 | $1,500,000 |
| July 15, 2000 | $1,500,000 |
| October 15, 2000 | $1,500,000 |
| January 15, 2001 | $1,500,000 |
| April 15, 2001 | $1,500,000 |
| July 15, 2001 | $1,500,000 |

CONFIDENTIAL                                      8
Execution Copy

AOL 00204

App. 0268





PX0001-0007

any Additional MP Channel; provided, however, that such inclusion will not be required where it is commercially or technically impractical to either Party (i.e., inclusion would cause either Party to incur substantial incremental costs).

PX0001-0008

and 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

2.8.    Advertising. Except for Non-material Advertisements, the Affiliated MP Site shall not

2.7.    Operating Standards. MP will ensure that the Affiliated MP Site complies at all times with the standards set forth in Exhibit E. To the extent site standards are not established in Exhibit E with respect to any aspect or portion of the Affiliated MP Site (or the Products or other Content contained therein), MP will provide such aspect or portion at a level of accuracy, quality, completeness, and timeliness which meets or exceeds prevailing standards in the toys industry. In the event MP fails to comply with any standards set forth in Exhibit E, as of the seventh calendar day following such non-compliance, AOL will have the right (in addition to any other remedies available to AOL hereunder) to decrease the promotion it provides to MP until such time as MP corrects its non-compliance (and in such event, AOL will be relieved of the proportionate amount of any promotional commitment made to MP by AOL hereunder corresponding to such decrease in promotion) and any New Customer and Impressions threshold(s) set forth in Sections 4

and 1.2, respectively, will each be adjusted on a pro rata basis to correspond to such decrease in promotion during the period of non-compliance.

| | |
|---|---|
| July 15, 2000 | $1,500,000 |
| October 15, 2000 | $1,500,000 |
| January 15, 2001 | $1,500,000 |
| April 16, 2001 | $1,500,000 |
| July 15, 2001 | $1,500,000 |

CONFIDENTIAL
Execution Copy

AOL 00303

CONFIDENTIAL
Execution Copy

AOL 00304

App. 0269



| October 15, 2001 | $1,500,000 |
| January 15, 2002 | $1,500,000 |
| April 15, 2002 | $1,500,000 |

4.2 <u>Bounty for New Customers</u>. In addition to the amounts payable under Section 4.1 above,

4.2.1    during the Initial Term, after MP has acquired One Million Eight Hundred Thousand (1,800,000) New Customers (the "New Customer Threshold") through the AOL Network, MP shall pay to AOL, within thirty (30) days of the end of each three month period ending March 31, June 30, September 30 or December 31 (each a "Quarter"), ten dollars ($10) for each additional New Customer acquired over the New Customer Threshold through the AOL Network thereafter during the Term; and

4.2.2    during the Continued Link Period, provided that AOL maintains the Continued Link and provided that the New Customer Threshold has been achieved during the time period consisting of the Initial Term and any portion of the Continued Link Period during which AOL has maintained the Continued Link, MP shall pay to AOL, within thirty (30) days of the end of each Quarter, ten dollars ($10) for each additional New Customer acquired over the New Customer Threshold through the AOL Network thereafter during the Term. For purposes of clarification, only one $10 fee shall be paid for each New Customer over the New Customer Threshold, and there shall be no duplication of the fees paid under Section 4.2.1 and 4.2.2.

4.3 <u>Late Payments; Wired Payments</u>. All amounts owed hereunder not paid when due and payable will bear interest from the date such amounts are due and payable at the prime rate in effect at such time as reported by The Chase Manhattan Bank, New York, New York. All payments required hereunder will be paid in immediately available, non-refundable U.S. funds wired to the "America Online" account, Account Number 323070752 at The Chase Manhattan Bank, 1 Chase Manhattan Plaza, New York, NY 10081 (ABA: 021000021).

4.4 <u>Auditing Rights</u>. MP will maintain complete, clear and accurate records in connection with the performance of this Agreement. For the sole purpose of ensuring compliance with this Agreement, AOL (or its representative) will have the right to conduct a reasonable and necessary inspection of portions of the books and records of MP which are relevant to MP's performance pursuant to this Agreement. Any such audit may be conducted after twenty (20) business days prior written notice to MP. AOL shall bear the expense of any audit conducted pursuant to this Section 4.4 unless such audit shows an error in AOL's favor amounting to a deficiency to AOL in excess of five percent (5%) of the actual amounts paid and/or payable to AOL hereunder, in which event MP shall bear the reasonable expenses of the audit. MP shall pay AOL the amount of any deficiency discovered by AOL within thirty (30) days after receipt of notice thereof from AOL.

4.5 <u>Taxes</u>. MP will collect and pay and indemnify and hold AOL harmless from, any sales, use, excise, import or export value added or similar tax or duty not based on AOL's income, including any penalties and interest, as well as any costs associated with the collection or withholding thereof, including attorneys' fees.

4.6 <u>Reports</u>.

4.6.1    <u>Sales Reports</u>. MP will provide AOL in an automated manner with a quarterly report setting forth summary aggregate sales information for the Affiliated MP Site

CONFIDENTIAL
Execution Copy

9

AOL 00205

App. 0270


PX0001-0009

("Sales Reports"). AOL will be entitled to use the Sales Reports in its business operations, subject to the terms of this Agreement. AOL acknowledges that such reports may contain Confidential Information as defined herein. Additionally, upon request, MP shall provide to AOL a certificate executed by an executive officer of MP certifying MP's compliance with the first sentence of Section 2.1 of this Agreement.

4.6.2    Usage Reports. AOL shall provide MP with standard usage information related to the Promotions (e.g. a schedule of the Impressions delivered by AOL at such time) which is similar in substance and form to the reports provided by AOL to other interactive marketing partners similar to MP. AOL acknowledges that such information is currently audited by an independent third party. In the event that at any time during the Term, such information is no longer audited by an independent third party, the Parties shall discuss in good faith the reporting obligations of AOL and shall modify such obligations as the Parties shall mutually agree. MP acknowledges that such information may be Confidential Information as defined herein. AOL shall also provide MP with the reports listed on Exhibit J.

4.6.3    Fraudulent Transactions.    To the extent permitted by applicable laws and any privacy policy followed by MP, MP will, at its reasonable discretion, provide AOL with a report of any order that has been finally determined to MP's satisfaction to be fraudulent, including the date, screenname or email address and amount associated with such order. All information provided to AOL pursuant to this Section 4.6.3 shall be considered Confidential Information. MP shall not be held liable for any losses suffered by AOL or any of its affiliates arising in whole or in part from any failure to provide the information required hereby.

5.    TERM; RENEWAL; TERMINATION.

5.1    Term. Unless earlier terminated as set forth herein, the initial term of this Agreement will be three (3) years from the Effective Date (the "Term").

5.2    Continued Links. For up to three (3) years after expiration of the Term (the "Continued Link Period"), AOL may, at its discretion, continue to promote one or more "pointers" or links from the AOL Network to an MP Interactive Site and continue to use MP's trade names, trade marks and service marks in connection therewith (collectively, a "Continued Link"). So long as AOL maintains a Continued Link, (a) MP shall pay AOL the bounty required pursuant to Section 4.2.2, and (b) Sections 4.4 and 4.5 along with the terms of Exhibit G hereto shall continue to apply with respect to the Continued Link and any transactions arising therefrom.

5.3    Termination for Breach. Except as expressly provided elsewhere in this Agreement, either Party may terminate this Agreement at any time in the event of a material breach of the Agreement by the other Party which remains uncured after thirty (30) days written notice thereof to the other Party (or such shorter period as may be specified elsewhere in this Agreement); provided that the cure period with respect to any scheduled payment will be fifteen (15) days from receipt of notice of nonpayment . Notwithstanding the foregoing, in the event of a material breach of a provision that expressly requires action to be completed within an express period shorter than 30 days, either Party may terminate this Agreement if the breach remains uncured after written notice thereof to the other Party and the expiration of such shorter cure period (if any).

CONFIDENTIAL
Execution Copy

10

AOL 00206

App. 0271



5.5    Termination on Change of Control.

5.5.1    In the event of a Change of Control of MP resulting in control of MP by an Interactive Service, AOL may terminate this Agreement by providing thirty (30) days prior written notice of such intent to terminate.

5.5.2    In the event of a Change of Control of AOL resulting in control of AOL by an MP Competitor, MP may terminate this Agreement by providing thirty (30) days prior written notice of such intent to terminate.

5.6    Termination for Bankruptcy/Insolvency. Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party (i) ceases to do business in the normal course, (ii) becomes or is declared insolvent or bankrupt, (iii) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) calendar days or (iv) makes an assignment for the benefit of creditors.

## 6.  MANAGEMENT COMMITTEE/ARBITRATION.

6.1 Management Committee. The Parties will act in good faith and use commercially reasonable efforts to promptly resolve any claim, dispute, controversy or disagreement (each a "Dispute") between the Parties or any of their respective subsidiaries, affiliates, successors and assigns under or related to this Agreement or any document executed pursuant to this Agreement or any of the transactions contemplated hereby. If the Parties cannot resolve the Dispute by such means within 10 days, the Dispute will be submitted to the Management Committee for resolution. For ten (10) days following submission of the Dispute to the Management Committee, the Management Committee will have the exclusive right to resolve such Dispute. If the Management Committee is unable to amicably resolve the Dispute during the ten-day period, then the Management Committee will consider in good faith the possibility of retaining a third party mediator to facilitate resolution of the Dispute. In the event the Management Committee elects not to retain a mediator, the dispute will be subject to the resolution mechanisms described below. "Management Committee" will mean a committee made up of a senior executive from each of the Parties for the purpose of resolving Disputes under this Section 6 and generally overseeing the relationship between the Parties contemplated by this Agreement. Neither Party will seek, nor will be entitled to seek, binding outside resolution of the Dispute unless and until the Parties have been unable amicably to resolve the Dispute as set forth in this Section 6 and then, only in compliance with the procedures set forth in this Section 6.

6.2 Arbitration. Except for Disputes relating to issues of proprietary rights, including but not limited to intellectual property and confidentiality, any Dispute not resolved by amicable resolution as set forth in Section 6.1 will be governed exclusively and finally by arbitration. Such arbitration will be conducted by the American Arbitration Association ("AAA") in Washington, D.C. and will be initiated and conducted in accordance with the Commercial Arbitration Rules ("Commercial Rules") of the AAA, including the AAA Supplementary Procedures for Large Complex Commercial Disputes ("Complex Procedures"), as such rules will be in effect on the date of delivery of a demand for arbitration ("Demand"), except to the extent that such rules are inconsistent with the provisions set forth herein. Notwithstanding the foregoing, the Parties may agree in good faith that the Complex Procedures will not apply in order to promote the efficient arbitration of Disputes where the nature of the Dispute, including without limitation the amount in controversy, does not justify the application of such procedures.

CONFIDENTIAL
Execution Copy

11

AOL 00207

App. 0272


PX0001-0011

6.3 <u>Selection of Arbitrators.</u> The arbitration panel will consist of three arbitrators. Each Party will name an arbitrator within ten (10) days after the delivery of the Demand. The two arbitrators named by the Parties may have prior relationships with the naming Party, which in a judicial setting would be considered a conflict of interest. The third arbitrator, selected by the first two, shall be a neutral participant, with no prior working relationship with either Party. If the two arbitrators are unable to select a third arbitrator within ten (10) days, a third neutral arbitrator will be appointed by the AAA from the panel of commercial arbitrators of any of the AAA Large and Complex Resolution Programs. If a vacancy in the arbitration panel occurs after the hearing have commenced, the remaining arbitrator or arbitrators may not continue with the hearing and determination of the controversy, unless the Parties agree otherwise.

6.4 <u>Governing Law.</u> The Federal Arbitration Act, 9 U.S.C. Secs. 1-16, and not state law, will govern the arbitrability of all Disputes. The arbitrators will allow such discovery as is appropriate to the purposes of arbitration in accomplishing a fair, speedy and cost-effective resolution of the Disputes. The arbitrators will reference the Federal Rules of Civil Procedure then in effect in setting the scope and timing of discovery. The Federal Rules of Evidence will apply in toto. The arbitrators may enter a default decision against any Party who fails to participate in the arbitration proceedings.

6.5 <u>Arbitration Awards.</u> The arbitrators will have the authority to award compensatory damages only. Any award by the arbitrators will be accompanied by a written opinion setting forth the findings of fact and conclusions of law relied upon in reaching the decision. The award rendered by the arbitrators will be final, binding and non-appealable, and judgment upon such award may be entered by any court of competent jurisdiction. The Parties agree that the existence, conduct and content of any arbitration will be kept confidential and no Party will disclose to any person any information about such arbitration, except as may be required by law, by any governmental authority, by the rules and regulations of any securities exchange on which either party's securities are listed or for financial reporting purposes in each Party's financial statements.

6.6 <u>Fees.</u> Each Party will pay the fees of its own attorneys, expenses of witnesses and all other expenses and costs in connection with the presentation of such Party's case (collectively, "Attorneys' Fees"). The remaining costs of the arbitration, including without limitation, fees of the arbitrators, costs of records or transcripts and administrative fees (collectively, "Arbitration Costs") will be borne equally by the Parties. Notwithstanding the foregoing, the arbitrators may modify the allocation of Arbitration Costs and award Attorneys' Fees in those cases where fairness dictates a different allocation of Arbitration Costs between the Parties and an award of Attorneys' Fees to the prevailing Party as determined by the arbitrators.

6.7 <u>Non Arbitratable Disputes.</u> Any Dispute that is not subject to final resolution by the Management Committee or to arbitration under this Section 6 or by law (collectively, "Non-Arbitration Claims") will be brought in a court of competent jurisdiction in Washington, D.C. Each Party irrevocably consents to the exclusive jurisdiction of the courts of Washington, D.C. and the federal courts situated therein over any and all Non-Arbitration Claims and any and all actions to enforce such claims or to recover damages or other relief in connection with such claims.

7. <u>STANDARD TERMS.</u> The Standard Online Commerce Terms & Conditions set forth on Exhibit F attached hereto, the Standard Legal Terms & Conditions set forth on Exhibit G attached hereto and the other exhibits and schedules attached hereto are each hereby made a part of this Agreement.

8. <u>NO INTERNATIONAL RIGHTS; NO BABYCENTER RIGHTS.</u> For purposes of clarification and notwithstanding anything to the contrary contained herein, AOL acknowledges and agrees that the provisions contained in this Agreement (a) relate only to the version or versions of interactive sites or

CONFIDENTIAL
Execution Copy

12

**AOL 00208**

App. 0273

Desc: The Interactive Marketing Agreement (PX 1)
First Page ID: PX0001-0001
Current Page ID: PX0001-0012


PX0001-0012

areas that are operated by MP within the United States and not to any version or versions of interactive sites or areas that are operated internationally by MP and (b) do not relate to the operations of, or interactive sites owned or operated by, MP's wholly owned subsidiary, BabyCenter, Inc., which has a separate agreement with AOL.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

AMERICA ONLINE, INC.                                 ETOYS INC.

By: _____               By: _____
Name   ERIC L. KELLER                            Name:   PHILIP POLISHUK
Title:   VICE PRESIDENT, Business Affairs          Title:   Vice-President Marketing

Date: August 10, 1999                            Date: August 10, 1999

CONFIDENTIAL                          13
Execution Copy

AOL 00209

App. 0274



EXHIBIT A

Placement/Promotion

Relative
Weighted Value
Switching
matrix:

| From / To | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | Shopping |
|-----------|---------|---------|---------|---------|---------|----------|
| Level 1 | 1:1 | 1:2 | 1:9 | 1:24 | N/A | N/A |
| Level 2 | 2:1 | 1:1 | 1:4 | 1:10 | N/A | N/A |
| Level 3 | 9:1 | 4:1 | 1:1 | 1:3 | N/A | N/A |
| Level 4 | 24:1 | 10:1 | 3:1 | 1:1 | N/A | N/A |
| Level 5 | N/A | N/A | N/A | N/A | N/A | N/A |
| Shopping | N/A | N/A | N/A | N/A | N/A | N/A |

CONFIDENTIAL
Execution Copy

14

**AOL 00210**

**App. 0275**


PX0001-0014

| Level 1 - 75,457,112 impressions | Year 1 | Year 2 | Year 3 | 3 Year Total |
|---|---|---|---|---|
| What to Expect Sponsorship Banners | 2,400,000 | 3,000,000 | 3,450,000 | 8,850,000 |
| Toys Decision Guide (Banner/Commerce Link,-10/99 Start) | 12,000,000 | 14,640,000 | 16,836,000 | 43,476,000 |
| Babies Registry | 2,640,000 | 3,036,000 | 3,491,140 | 9,167,140 |
| Babies Registry Promotional Open Banners | 500,000 | 610,000 | 701,500 | 1,811,500 |
| Babies Registry Banners | 264,000 | 322,080 | 370,392 | 956,472 |
| Birthday Club Banner | 625,000 | 1,525,000 | 1,753,750 | 3,903,750 |
| *4th Quarter Promotions* | | | | |
| Santa's Home Page Banners | 300,000 | 345,000 | 396,750 | 1,041,750 |
| Santa's Home Page Banners | 300,000 | 345,000 | 396,750 | 1,041,750 |
| Kid's Wish List | 1,500,000 | 1,725,000 | 1,983,750 | 5,208,750 |
| Level 1 Totals: | 20,529,000 | 25,548,080 | 29,380,032 | 75,457,112 |

| Level 2 - 74,762,925 impressions | | | | |
|---|---|---|---|---|
| Run of Channel Families | 1,000,000 | 1,150,000 | 1,322,500 | 3,472,500 |
| Run of Channel Games | 2,410,000 | 2,771,500 | 3,187,225 | 8,368,725 |
| *4th Quarter Promotions* | | | | |
| Tour of Toys Page Sponsorship | 500,000 | 575,000 | 661,250 | 1,736,250 |
| Slideshow Rotation of toys | 500,000 | 575,000 | 661,250 | 1,736,250 |
| *Write Santa Sponsorship* | | | | |
| Write Santa Page Sponsorship | 200,000 | 230,000 | 264,500 | 694,500 |
| 4TH Quarter Packages (3 Halloween/1 Thksgvng/1 Wntr Holiday/1 NewYr) | 300,000 | 345,000 | 396,750 | 1,041,750 |
| *AOL.com* | | | | |
| Hometown AOL - Run of Family Life - Member Pages | 500,000 | 575,000 | 661,250 | 1,736,250 |
| Search and Explore Games - Search Results | 200,000 | 230,000 | 264,500 | 694,500 |
| AOL.com Targeted Search - Toys (terms to be supplied) | 7,500,000 | 8,625,000 | 9,918,750 | 26,043,750 |
| *Netscape* | | | | |
| Babies Department Main Page Banner | 200,000 | 230,000 | 264,500 | 694,500 |
| Families ROS Banner | 720,000 | 828,000 | 952,200 | 2,500,200 |
| Netscape Search: Toys (terms to be supplied) | 7,500,000 | 8,625,000 | 9,918,750 | 26,043,750 |
| Level 2 Totals: | 21,530,000 | 24,759,500 | 28,473,425 | 74,762,925 |

| Level 3 - 66,508,050 impressions | | | | |
|---|---|---|---|---|
| Babies Department Main Page Text Link | 1,040,000 | 1,196,000 | 1,375,400 | 3,611,400 |
| Birthday Club Button | 625,000 | 1,525,000 | 1,753,750 | 3,903,750 |
| What to Expect Sponsorship Button | 2,400,000 | 3,000,000 | 3,450,000 | 8,850,000 |
| Families ROS Text Link | 6,240,000 | 7,176,000 | 8,252,400 | 21,668,400 |
| NSCP ROS Text Link | 8,200,000 | 9,430,000 | 10,844,500 | 28,474,500 |
| Level 3 Totals: | 18,505,000 | 22,327,000 | 25,676,050 | 66,508,050 |

| Level 4 – 224,087,718  Impressions | | | | |
|---|---|---|---|---|
| *AOL Network* | | | | |
| AOL Network ROS - 4th Quarter | 9,383,000 | 10,790,450 | 12,409,018 | 32,582,468 |
| 4TH Quarter Email Thanksgiving - 12/24 | 5,200,100 | 5,980,115 | 6,877,132 | 18,057,347 |

CONFIDENTIAL                    15
Execution Copy

AOL 00211

**App. 0276**


PX0001-0015

| | | | |
|---|---|---|---|
| AOL Network ROS | 28,149,000 | 32,371,350 | 37,227,053 | 97,747,403 |
| *AOL.com* | | | | |
| AOL.com Home Page | 2,100,000 | 2,415,000 | 2,777,250 | 7,292,250 |
| Netfind Home Page 4TH QUARTER | 700,000 | 805,000 | 925,750 | 2,430,750 |
| *Netscape* | | | | |
| NSCP Home Page Banner | 5,000,000 | 5,750,000 | 6,612,500 | 17,362,500 |
| NSCP ROS Banner | 14,000,000 | 16,100,000 | 18,515,000 | 48,615,000 |
| **Level 4 Totals:** | 64,532,100 | 74,211,915 | 85,343,703 | 224,087,718 |

| **Level 5 – 736,971,399  Impressions** | | | | |
|---|---|---|---|---|
| *AOL Service* | | | | |
| Welcome Screen | 97,040,000 | 111,596,000 | 128,335,400 | 336,971,400 |
| Welcome Screen - promotions | 100,000,000 | 100,000,000 | 100,000,000 | 300,000,000 |
| Log-off screen | 33,333,333 | 33,333,333 | 33,333,333 | 99,999,999 |
| **Level 5 Totals:** | 230,373,333 | 244,929,333 | 261,668,733 | 736,971,399 |

| **Shopping – 151,626,112 Impressions** | | | | |
|---|---|---|---|---|
| TOYS ANCHOR | 4,350,202 | 6,670,310 | 9,876,227 | 20,896,739 |
| EDUCATIONAL TOYS ANCHOR | 3,107,267 | 4,764,476 | 7,054,402 | 14,926,145 |
| KID & INFANT GEAR ANCHOR | | 6,670,308 | 9,876,225 | 16,546,533 |
| KID & INFANT GEAR GOLD | 3,728,745 | | | 3,728,745 |
| COLLECTIBLES ANCHOR | 4,350,201 | 6,670,308 | 9,876,225 | 20,896,734 |
| ELECTRONIC GAMES ANCHOR | 4,350,202 | 6,670,310 | 9,876,225 | 20,896,737 |
| BOOKS & MAGAZINES GOLD | 3,728,745 | 5,717,409 | 8,465,339 | 17,911,493 |
| MUSIC & VIDEO GOLD | 3,728,745 | 5,717,409 | 8,455,339 | 17,911,493 |
| SOFTWARE GOLD | 3,728,745 | 5,717,409 | 8,465,339 | 17,911,493 |
| **Shopping Total** | 31,072,852 | 48,597,939 | 71,955,321 | 151,626,112 |

| **Grand Total:** | 386,542,285 | 440,373,767 | 502,497,264 | 1,329,413,316 |
|---|---|---|---|---|

CONFIDENTIAL
Execution Copy

16

AOL 00212

App. 0277



EXHIBIT B

Definitions

The following definitions will apply to this Agreement:

**Additional MP Channel.** Any other distribution channel (e.g., an Interactive Service other than AOL) through which MP makes available an offering comparable in nature to the Affiliated MP Site within the United States.

**Affiliated MP Site.** The specific customized area or web site offered in the United States to be promoted and distributed by AOL hereunder accessible through MP's keyword or the Promotions through which MP can market and complete transactions regarding its Products.

**AOL Interactive Site.** Any Interactive Site which is managed, maintained, owned or controlled by AOL or its agents.

**AOL Look and Feel.** The elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with Interactive Sites within the AOL Service or AOL.com.

**AOL Member.** Any authorized user of the AOL Service, including any sub-accounts using the AOL Service under an authorized master account.

**AOL Network.** (i) The AOL Service, (ii) AOL.com, (iii) CompuServe, (iv) Netcenter, (v) any other product or service owned, operated, distributed or authorized to be distributed by or through AOL or its affiliates worldwide (and including those properties excluded from the definitions of the AOL Service or AOL.com), and (vi) any of the foregoing products and services authorized by AOL or its Affiliates to be distributed through a third party, including on a private label basis (including without limitation AOL's Custom Netcenter product).

**AOL Service.** The standard narrow-band U.S. version of the America Online® brand service, specifically excluding (a) AOL.com, Netcenter or any other AOL Interactive Site, (b) the international versions of an America Online service (e.g., AOL Japan), (c) the CompuServe® brand service and any other CompuServe products or services, (d) "Driveway," "ICQ™," "AOL NetFind™," "AOL Instant Messenger™," "Digital City," "NetMail™," "Electra", "Thrive", "Real Fans", "Love@AOL", "Entertainment Asylum," "AOL Hometown," "My News" or any similar independent product, service or property which may be offered by, through or with the U.S. version of the America Online® brand service, (e) any programming or Content area offered by or through the U.S. version of the America Online® brand service over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through the U.S. version of the America Online® brand service, (g) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (h) any other version of an America Online service which is materially different from the standard narrow-band U.S. version of the America Online brand service, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-

CONFIDENTIAL
Execution Copy

17

AOL 00213

App. 0278


PX0001-0017

branded version of the service or any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer.

**AOL User.** Any user of the AOL Service, AOL.com, CompuServe, Netcenter, or the AOL Network.

**AOL.com.** AOL's primary Internet-based Interactive Site marketed under the "AOL.COM™" brand, specifically excluding (a) the AOL Service, (b) Netcenter, (c) any international versions of such site, (d) "ICQ," "AOL NetFind™," "AOL Instant Messenger™," "NetMail™," "AOL Hometown," "My News" or any similar independent product or service offered by or through such site or any other AOL Interactive Site, (e) any programming or Content area offered by or through such site over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any programming or Content area offered by or through such site which was operated, maintained or controlled by the former AOL Studios division (e.g., Electra), (g) any yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through such site or any other AOL Interactive Site, (h) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (i) any other version of an America Online Interactive Site which is materially different from AOL's primary Internet-based Interactive Site marketed under the "AOL.COM™" brand, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-branded versions or any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer.

**Change of Control.** (a) The consummation of a reorganization, merger or consolidation or sale or other disposition of substantially all of the assets of a party or (b) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1933, as amended) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under such Act) of more than 50% of either (i) the then outstanding shares of common stock of such party; or (ii) the combined voting power of the then outstanding voting securities of such party entitled to vote generally in the election of directors.

**CompuServe.** The standard, narrow-band U.S. version of the CompuServe brand service, specifically excluding (a) any international versions of such service, (b) any web-based service including "compuserve.com", "cserve.com" and "cs.com", or any similar product or service offered by or through the U.S. version of the CompuServe brand service, (c) Content areas owned, maintained or controlled by CompuServe affiliates or any similar "sub-service," (d) any programming or Content area offered by or through the U.S. version of the CompuServe brand service over which CompuServe does not exercise complete or substantially complete operational control (e.g., third-party Content areas), (e) any yellow pages, white pages, classifieds or other search, directory or review services or Content and (f) any co-branded or private label branded version of the U.S. version of the CompuServe brand service, (g) any version of the U.S. version of the CompuServe brand service which offers Content, distribution, services and/or functionality materially different from the Content, distribution, services and/or functionality associated with the standard, narrow-band U.S. version of the CompuServe brand service, including, without limitation, any version of such service distributed through any platform or device other than a desktop personal computer and (h) any property, feature, product or service which CompuServe or its affiliates may acquire subsequent to the Effective Date.

**Confidential Information.** Any information relating to or disclosed in the course of the Agreement, which is or should be reasonably understood to be confidential or proprietary to the disclosing Party, including, but not limited to, the material terms of this Agreement, information about AOL Members, AOL Users, New Customers and MP customers, technical processes and formulas, source codes, product designs, sales, cost and other unpublished financial information, product and business plans, projections, and marketing data. "Confidential Information" will not include information (a) already lawfully known to or independently developed by the receiving Party, (b) disclosed in published materials, (c) generally known to the public, or (d) lawfully obtained from any third party.

CONFIDENTIAL                                    18
Execution Copy

AOL 00214

App. 0279



Content.  Text, images, video, audio (including, without limitation, music used in synchronism or timed relation with visual displays) and other data, Products, advertisements, promotions, URLs, links, pointers and software, including any modifications, upgrades, updates, enhancements and related documentation.

Impression.  Any access by a user to the applicable Promotion, as the same may be reasonably determined and measured by AOL in accordance with (a) its standard methodologies and protocols, (b) the methodologies and protocols used to determine and measure exposure for other parties in relationships with AOL that are comparable to the relationship established by this Agreement and (c) the methodologies and protocols that may be established from time to time by the Internet Advertising Bureau Standards.

Interactive Service.  An entity offering one or more of the following: (i) online or Internet connectivity services (e.g., an Internet service provider) (ii) an interactive site or service featuring a broad selection of aggregated third party interactive content (or navigation thereto) (e.g., an online service or search and directory service) and/or marketing a broad selection of products and/or services across numerous interactive commerce categories (e.g., an online mall or online department store offering numerous categories of products, such as books, music, electronics and videos); and/or (iii) communications software capable of serving as the principal means through which a user creates, sends and receives electronic mail or real time online messages.

Interactive Site. Any interactive site or area, including, by way of example and without limitation, (i) an MP site on the World Wide Web portion of the Internet or (ii) a channel or area delivered through a "push" product such as the Pointcast Network or interactive environment such as Microsoft's Active Desktop.

Keyword Search Terms.  (a) The Keyword™ online search terms made available on the AOL Network, combining AOL's Keyword™ online search modifier with a term or phrase specifically related to MP (and determined in accordance with the terms of this Agreement), and (b) the Go Word online search terms made available on CompuServe, combining CompuServe's Go Word online search modifier with a term or phrase specifically related to MP and determined in accordance with the terms of this Agreement).

Licensed Content. The names, marks, symbols, links and other designations associated with the Affiliated MP Site and such portion of the Content as may be approved by MP or its agents for use in connection herewith (e.g., offline or online promotional Content, Promotions, AOL "slideshows", etc.), including in each case, any modifications, upgrades, updates, enhancements, and related documentation.

MP Competitor. Any person or entity that is engaged, directly or indirectly, as a significant part of its business, in the manufacture, marketing, promotion and/or sale of children and baby products, including, without limitation, ToysRUs, Mattel, Hasbro, Amazon.com,, Wal-Mart, Target and The Walt Disney Company, and any person or entity controlling, controlled by or under common control with any of the foregoing.

MP Interactive Site. Any Interactive Site (other than the Affiliated MP Site) which is managed, maintained, owned or controlled by MP or its agents in the United States.

Netcenter.  Netscape Communications Corporation's primary Internet-based Interactive Site marketed under the "Netscape Netcenter™" brand, specifically excluding (a) the AOL Service, (b) AOL.com, (c) any international versions of such site, (d) "ICQ," "AOL Netfind™," "AOL Instant Messenger™," "NetMail™," "AOL Hometown," "My News," "Digital City™," or any similar independent product or service offered by or through such site or any other AOL Interactive Site, (e) any programming or Content area offered by or through such site over which AOL does not exercise complete operational control (including, without limitation, Content areas controlled by other parties and member-created Content areas), (f) any programming or Content area offered by or through the U.S. version of the America Online® brand service which was operated, maintained or controlled by the former AOL Studios division (e.g., Electra), (g) any

AOL 00215

App. 0280



yellow pages, white pages, classifieds or other search, directory or review services or Content offered by or through such site or any other AOL Interactive Site, (h) any property, feature, product or service which AOL or its affiliates may acquire subsequent to the Effective Date and (i) any other version of an AOL or Netscape Communications Corporation Interactive Site which is materially different from Netscape Communications Corporation's primary Internet-based Interactive Site marketed under the "Netscape Netcenter™" brand, by virtue of its branding, distribution, functionality, Content or services, including, without limitation, any co-branded versions and any version distributed through any broadband distribution platform or through any platform or device other than a desktop personal computer (e.g. Custom NetCenters built specifically for third parties).

New Customer. An MP customer who (a) prior to the Effective Date had not completed the purchase of any products (i.e., purchased, accepted delivery and paid in full) from the Affiliated MP Site or any other MP Interactive Site, as determined in good faith by MP based on its customer database existing as of the Effective Date, (b) on or after the Effective Date had not completed the purchase of any products (i.e., purchased, accepted delivery and paid in full) from the Affiliated MP Site or any other MP Interactive Site after arriving at the Affiliated MP Site or any other MP Interactive Site from a source other than a direct connection from an Impression or Keyword Search Term on the AOL Network, as determined in good faith by MP based on its customer database, and (c) on or after the Effective Date, enters the Affiliated MP Site directly from an Impression or Keyword Search Term on the AOL Network and for the first time selects and purchases a product from the Affiliated MP Site, accepts delivery of the product at the shipping destination, and remits payment in full to MP.

Product. Any product, good or service which MP (or others acting on its behalf or as distributors) offers, sells, provides, distributes or licenses to AOL Users directly or indirectly through (i) the Affiliated MP Site (including through any Interactive Site linked thereto), (ii) any MP Interactive Site (including through any Interactive Site linked thereto), (iii) any other electronic means directed at AOL Users (e.g., e-mail offers), or (iv) an "offline" means (e.g., toll-free number) for receiving orders related to specific offers within the Affiliated MP Site or any MP Interactive Site requiring purchasers to reference a specific promotional identifier or tracking code, including, without limitation, products sold through surcharged downloads (to the extent expressly permitted hereunder).

Promotions. The promotions described on Exhibit A and any comparable promotions delivered by AOL in accordance with Sections 1.1, 1.2 and 1.3, and any additional promotions of the Affiliated MP Site provided by AOL.

Run of Service Inventory. A collection of inventory made up of all areas of the relevant AOL property or service. If Advertiser has purchased Run of Service Inventory, AOL will place Advertiser's creative in different locations throughout the relevant property or service in accordance with AOL internal policies. Run of Service Impressions will be delivered reasonably evenly over a given time period. Advertiser may not control placement within a Run of Service Inventory purchase and AOL does not guarantee placement on any particular screen or group of screens (except that Run of Channel Inventory will be run only in the specified Channel).

Year 1. The period commencing on the Effective Date and ending on the first anniversary of the Effective Date.

Year 1 Penalty. An amount equal to (a) 1.5, multiplied by (b) (i) the Year 1 Target minus (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 1.

Year 1 Target. 221,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement).

CONFIDENTIAL
Execution Copy

20

AOL 00216

App. 0281



Year 2. The period commencing on the day after the first anniversary of the Effective Date and ending on the second anniversary of the Effective Date.

Year 2 Penalty. An amount equal to (a) 1.5, <u>multiplied</u> by (b) (i) the Year 2 Target <u>minus</u> (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 2 exclusive of any Impressions delivered in Year 2 for purposes of compensating for any Year 1 shortfall.

Year 2 Target. 279,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement)..

Year 3. The period commencing on the day after the second anniversary of the Effective Date and ending on the third anniversary of the Effective Date.

Year 3 Penalty. An amount equal to (a) 1.5, <u>multiplied</u> by (b) (i) the Year 3 Target <u>minus</u> (ii) the total number of Impressions delivered by AOL pursuant to this Agreement during Year 3 exclusive of any Impressions delivered in Year 3 for purposes of compensating for any Year 1 or 2 shortfall.

Year 3 Target. 326,000,000 Impressions (subject to adjustment based on the delivery of comparable promotions as permitted under this Agreement).

CONFIDENTIAL
Execution Copy

21

**AOL 00217**

**App. 0282**



EXHIBIT C

MP Cross-Promotion

Offline. In no less than sixty percent (60%) of all impressions in MP's television and print advertisements, MP will include specific references or mentions of the Affiliated MP Site's availability through AOL, subject to MP's reasonable editorial discretion and the "Keyword Guidelines" set forth on Exhibit H hereto in each instance. MP shall also work with AOL in good faith to explore opportunities for MP and AOL to jointly fund, produce and program joint AOL-MP television commercials.

Online. Within each MP Interactive Site, AOL shall have the right, at its option, to modify the AOL "Certified Merchant Guarantee" button to include the AOL logo, the words "America Online" or another AOL Mark, provided that such modification shall be subject to MP's reasonable approval of the creative content and shall not increase the size of such button from its current size.

CONFIDENTIAL
Execution Copy

22


AOL 00218

App. 0283



## EXHIBIT D

### Description of Products and Other Content

As used in this Agreement, the "Promotable Products and Content" shall consist of:

(a) the following children and baby products, services and content:

Toys
Games
Video Games
Videos (VHS and DVD)
Music (CDs Cassettes)
Software (other than downloadable software)
Baby Gear
Apparel (other than school uniforms)
Bedding and Linens
Books
Hobby Items
Arts and Crafts
Party Supplies
Artwork
Book Plates
School Supplies (other than school uniforms)
Sporting Goods
Magazines
Children and baby furniture

subject to the following limitations on music, books, videos, sporting goods and magazines:

Books – MP may not promote books (i) on the AOL Service, if MP derives at least ten percent (10%) of its revenue from the sale of books, or (ii) on AOL.com or Netcenter;

Videos – MP may not promote Videos (i) on the AOL Service (Entertainment Channel-Home Video Main, Families Channel-Weekend Activities Main, (ii) on CompuServe ("DVD" subscreen of the Sight & Sound and Arts & Entertainment Channels) or (iii) Netcenter;

Music – MP may not promote Music on (i) on the AOL Service (Music Channel, Shopping Channel (anchor tenancy limitation only), and Entertainment Channel Main Screen) (ii) on AOL.com (Homepage, Netfind, Entertainment Channel and Music Channel) or (iii) Netcenter;

Sporting Goods – MP may not promote Sporting Goods (including sports apparel) on (i) AOL Service (Sports Channel) or (ii) Netcenter; and

Magazines – MP may not promote Magazines on (i) AOL Service or (ii) Netcenter; and

(b) such other categories of children and baby products, services and content as MP shall request and AOL shall reasonably approve, such approval not to be unreasonably withheld; provided that, unless (i) the promotion thereof is limited or prohibited by any then-existing contractual obligation of AOL, or (ii) AOL reasonably believes, in the exercise of its good faith business judgment, that the promotion of such products, services or content would be disadvantageous (other than negligibly disadvantageous) to AOL notwithstanding the absence of any contractual prohibition or limitation, then AOL shall permit the addition of such new category. In the event that AOL does not approve a new category and AOL is not then subject to an exclusive agreement prohibiting such promotion or AOL is not marketing for its own account

CONFIDENTIAL
Execution Copy

23

**AOL 00219**

**App. 0284**


PX0001-0023



EXHIBIT D

Description of Products and Other Content

As used in this Agreement, the "Promotable Products and Content" shall consist of:

(a) the following children and baby products, services and content:

Toys
Games
Video Games
Videos (VHS and DVD)
Music (CDs Cassettes)
Software (other than downloadable software)
Baby Gear
Apparel (other than school uniforms)
Bedding and Linens
Books
Hobby Items
Arts and Crafts
Party Supplies
Artwork
Book Plates
School Supplies (other than school uniforms)
Sporting Goods
Magazines
Children and baby furniture

(i) the promotion thereof is limited or prohibited by any then-existing contractual obligation of AOL or (x) AOL reasonably believes, in the exercise of its good faith business judgment, that the promotion of such products, services or content would be disadvantageous (other than negligibly disadvantageous) to AOL notwithstanding the absence of any contractual prohibition or limitation, then AOL shall permit the addition of such new category. In the event that AOL does not approve a new category and AOL is not then subject to an exclusive agreement prohibiting such promotion or AOL is not marketing for its own account

CONFIDENTIAL                                     23
Execution Copy

AOL 00219

App. 0285

Desc: Snapshot Monday, Jun, 25, 2007 11:33 AM
First Page ID: PX0001-0001
Current Page ID: PX0001-0023-SS01        Page 23 of 39



PX0001-0023-SS01

a competitive product, then, at MP's request, the matter of such request shall be referred to the Management Committee and the other procedures for conflict resolution set forth in Section 6 to determine whether AOL has acted properly in denying such request.

As used in this Agreement, the "Promotable Functions" consist of

(a) the following functions:

Child "Savings" or "Allowance" accounts*
Auctions (but in no event person-to-person auctions)
Decision Guides

and (b) such other functions (excluding chat, e-mail and instant messaging) as MP shall request, and AOL shall approve, such approval not to be unreasonably withheld

* = shall no longer be a Promotable Function as of the ninetieth day after AOL launches a substantially similar functionality on the AOL Network.

CONFIDENTIAL
Execution Copy

24

**AOL 00220**

**App. 0286**

**Desc:** The Interactive Marketing Agreement (PX 1)
**First Page ID:** PX0001-0001
**Current Page ID:** PX0001-0024                    *Page 24 of 39*



EXHIBIT E

Operations

1.  General.  The Affiliated MP Site (including the Products and other Content contained therein) will rank among the top three (3) Interactive Sites operating principally in the toys industry on the World Wide Web in the following categories: (i) competitive pricing of Products; (ii) scope and selection of Products, (iii) customer service and fulfillment associated with the marketing and sale of Products and (iv) ease of use. As described elsewhere in this Agreement, MP is fully responsible for all aspects of hosting and administration of the Affiliated MP Site and must ensure that the site satisfies the specified access and performance requirements as outlined in this Exhibit E.

2.  Affiliated MP Site Infrastructure.  MP will be responsible for all communications, hosting and connectivity costs and expenses associated with the Affiliated MP Site. MP will provide all hardware, software, telecommunications lines and other infrastructure necessary to meet traffic demands on the Affiliated MP Site from the AOL Network. MP will design and implement the network between the AOL Service and the Affiliated MP Site such that (i) no single component failure will have a materially adverse impact on AOL Members seeking to reach the Affiliated MP Site from the AOL Network and (ii) no single line under material control by MP will run at more than 70% average utilization for a 5-minute peak in a daily period.  In the event that MP elects to create a custom version of the Affiliated MP Site in order to comply with the terms of this Agreement, MP will bear responsibility for all aspects of the implementation, management and cost of such customized site.

3.  Optimization; Speed.  MP will use commercially reasonable efforts to ensure that: (a) the functionality and features within the Affiliated MP Site are optimized for the client software then in use by AOL Members; and (b) the Affiliated MP Site is designed and populated in a manner that minimizes delays when AOL Members attempt to access such site.  At a minimum, MP will use commercially reasonable efforts to ensure that the Affiliated MP Site's data transfers initiate within fewer than fifteen (15) seconds on average. Prior to commercial launch of any material promotions described herein, MP will permit AOL to conduct performance and load testing of the Affiliated MP Site (in person or through remote communications), with such commercial launch not to commence until such time as AOL is reasonably satisfied with the results of any such testing.

4.  User Interface.  MP will maintain a graphical user interface within the Affiliated MP Site that is competitive in all material respects with interfaces of other similar sites based on similar form technology. AOL reserves the right to conduct focus group testing to assess compliance with respect to such competitiveness and with respect to MP's compliance with the preceding sentence.

5.  Technical Problems.  MP agrees to use commercially reasonable efforts to address material technical problems (over which MP exercises control) affecting use by AOL Members of the Affiliated MP Site (a "MP Technical Problem") promptly following notice thereof.  In the event that MP is unable to promptly resolve a MP Technical Problem following notice thereof from AOL (including, without limitation, infrastructure deficiencies producing user delays), AOL will have the right to regulate the promotions it provides to MP hereunder until such time as MP corrects the MP Technical Problem at issue, provided that such regulation of promotions will not reduce the total number of Impressions that AOL is required to deliver to MP hereunder.

6.  Monitoring.  MP will ensure that the performance and availability of the Affiliated MP Site is monitored on a continuous basis.  MP will provide AOL with contact information (including e-mail, phone, pager and fax information, as applicable, for both during and after business hours) for MP's principal business and technical representatives, for use in cases when issues or problems arise with respect to the Affiliated MP Site.

7.  Telecommunications.  Where applicable MP will utilize encryption methodology to secure data communications between the Parties' data centers.  The network between the Parties will be configured such that no single component failure will significantly impact AOL Users.  The network will be sized such that no single line over which the MP has material control runs at more than 70% average utilization for a 5-minute peak in a daily period.

8.  Security.  MP will utilize Internet standard encryption technologies (e.g., Secure Socket Layer – SSL) to provide a secure environment for conducting transactions and/or transferring private member information (e.g. credit card numbers, banking/financial information, and member address information) to and from the Affiliated MP Site.  MP will facilitate periodic reviews of the Affiliated MP Site by AOL in order to evaluate the security risks of such site. MP will promptly remedy any material security risks or breaches of security as may be identified in good faith by AOL's Operations Security team.

9.  Technical Performance.

i.    MP will design the Affiliated MP Site to support the AOL-client embedded versions of the Microsoft Internet Explorer 3.XX and 4.XX browsers (Windows and Macintosh)and the Netscape Browser 4.XX and make commercially reasonable efforts to support all other AOL browsers listed at: "http://webmaster.info.aol.com."

ii.    To the extent MP creates customized pages on the Affiliated MP Site for AOL Members, MP will develop and employ a methodology to detect AOL Members (e.g. examine the HTTP User-Agent field in order to identify the "AOL Member-Agents" listed at: "http://webmaster. info.aol.com)."

iii.    MP will periodically review the technical information made available by AOL at http://webmaster.info.aol.com.

iv.    MP will design its site to support HTTP 1.0 or later protocol as defined in RFC 1945 and to adhere to AOL's parameters for

CONFIDENTIAL
Execution Copy

25

**AOL 00221**

**App. 0287**

**Desc:** The Interactive Marketing Agreement (PX 1)
**First Page ID:** PX0001-0001
**Current Page ID:** PX0001-0025                    Page 25 of 39



PX0001-0025



PX0001-0025E

EXHIBIT E

Operations

1.  General.  The Affiliated MP Site (including the Products and other Content contained therein) will rank among the top three (3) Interactive Sites operating principally in the toys industry on the World Wide Web in the following categories:  (i) competitive pricing of Products; (ii) scope and selection of Products, (iii) customer service and fulfillment associated with the marketing and sale of Products and (iv) ease of use. As described elsewhere in this Agreement, MP is fully responsible for all aspects of hosting and administration of the Affiliated MP Site and must ensure that the site satisfies the specified access and performance requirements as outlined in this Exhibit E.

CONFIDENTIAL
Execution Copy                                      25

AOL 00221

App. 0288



refreshing or preventing the caching of information in AOL's proxy system as outlined in the document provided at the following URL: http://webmaster.info.aol.com. MP is responsible for the manipulation of these parameters in web-based objects so as to allow them to be cached or not cached as outlined in RFC 1945.

v.    Prior to releasing material, new functionality or features through the Affiliated MP Site ("New Functionality"), MP will test the New Functionality to confirm its compatibility with AOL Service client software . Should any new material, new functionality or features through the Affiliated MP Site be released without notification to AOL, AOL will not be responsible for any adverse member experience until such time that compatibility tests can be performed and the new material, functionality or features qualified for the AOL Service

10.  AOL Internet Services MP Support. AOL will provide MP with access to the standard online resources, standards and guidelines documentation, technical phone support, monitoring and after-hours assistance that AOL makes generally available to similarly situated web-based parties. AOL support will not, in any case, be involved with content creation on behalf of MP or support for any technologies, databases, software or other applications which are not supported by AOL or are related to any MP area other than the Affiliated MP Site. Support to be provided by AOL is contingent on MP providing to AOL demo account information (where applicable), a detailed description of the Affiliated MP Site's software, hardware and network architecture and access to the Affiliated MP Site for purposes of such performance and load testing as AOL elects to conduct.

**AOL 00222**

**App. 0289**





PX0001-0026

either preventing the caching of information in AOL's proxy system as outlined in this document provided at the following URL: http://webproxy.info.aol.com. MP is responsible for the manipulation of these parameters in well-based objects so as to allow them to be cached or not cached as desired in RFC 1945.

f.    Prior to enabling material, new functionality or features through the Affiliated MP Site ("New Functionality"), MP will test the New Functionality to confirm its compatibility with AOL Service client software. Should any new material, new functionality or features through the Affiliated MP Site be released without notification to AOL, AOL will not be responsible for any adverse member experience until such time that compatibility tests can be performed and the new material, functionality or features qualified for the AOL Service.

10.  **AOL Internet Services MP Support.** AOL will provide MP with access to the standard online resources, standards and guidelines documentation, technical phone support, monitoring and after-hours assistance that AOL makes generally available to similarly situated web-based parties. AOL support will not, in any case, be involved with content creation on behalf of MP or support for any technologies, databases, software or other applications which are not supported by AOL or are related to any MP area other than the Affiliated MP Site. Support to be provided by AOL is contingent on MP providing to AOL demo account information (where applicable), a detailed description of the Affiliated MP Site's software, hardware and network architecture and access to the Affiliated MP Site for purposes of such performance and load testing as AOL elects to conduct.

CONFIDENTIAL
Execution Copy

26

AOL 00222

App. 0290



PX0001-0026-SS01

## EXHIBIT F

### Standard Online Commerce Terms & Conditions

1.    AOL Network Distribution. MP will not authorize or permit any third party to distribute or promote the Products or any MP Interactive Site through the AOL Network absent AOL's prior written approval or as permitted hereunder. The Promotions and any other promotions or advertisements purchased from or provided by AOL will link only to the Affiliated MP Site, will be used by MP solely for its own benefit and will not be resold, traded, exchanged, bartered, brokered or otherwise offered to any third party.

2.    Provision of Other Content. In the event that AOL notifies MP that (i) as reasonably determined by AOL, any Content within the Affiliated MP Site violates AOL's then-standard Terms of Service (as set forth on the America Online® brand service at Keyword term "TOS"), for the AOL Service or any other AOL property through which the affiliated Site is promoted, the terms of this Agreement or any other standard, written AOL policy or (ii) AOL reasonably objects to the inclusion of any Content within the Affiliated MP Site (other than any specific items of Content which may be expressly identified in this Agreement), then AOL may, at its option, restrict access from the AOL Network to the Content in question using technology available to AOL. MP will cooperate with AOL's reasonable requests to the extent AOL elects to implement any such access restrictions.

3.    Contests. MP will take all steps necessary to ensure that any contest, sweepstakes or similar promotion conducted or promoted through the Affiliated MP Site (a "Contest") complies with all applicable federal, state and local laws and regulations.

4.    Navigation. Subject to the prior consent of MP, which consent may be withheld in MP's sole discretion, AOL will be entitled to establish navigational icons, links and pointers connecting the Affiliated MP Site (or portions thereof) with other content areas on or outside of the AOL Network. Additionally, in cases where an AOL User performs a search for MP through any search or navigational tool or mechanism that is accessible or available through the AOL Network (e.g., Promotions, Keyword Search Terms, or any other promotions or navigational tools), AOL shall have the right to direct such AOL User to the Affiliated MP Site, or any other MP Interactive Site determined by AOL in its reasonable discretion.

5.    Disclaimers. Upon AOL's request, MP agrees to include within the Affiliated MP Site a product disclaimer (the specific form and substance to be mutually agreed upon by the Parties) indicating that transactions are solely between MP and AOL Users purchasing Products from MP.

6.    Look and Feel. MP acknowledges and agrees that AOL will own all right, title and interest in and to the elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with online areas contained within the AOL Network, subject to MP's ownership rights in any MP trademarks or copyrighted material within the Affiliated MP Site, any MP

Interactive Site and the AOL Network. AOL acknowledges and agrees that MP will own all right, title and interest in and to the elements of graphics, design, organization, presentation, layout, user interface, navigation and stylistic convention (including the digital implementations thereof) which are generally associated with online areas contained within the Affiliated MP Site and any other MP Interactive Site, subject to AOL's ownership rights in any AOL trademarks or copyrighted material therein.

7.    Management of Sites. MP will manage, review, delete, edit, create, update and otherwise manage all Content available on or through the Affiliated MP Site, in a timely and professional manner and in accordance with the terms of this Agreement. MP will ensure that the Affiliated MP Site is current, accurate and well-organized at all times. MP warrants that the Products and other Licensed Content: (i) will not infringe on or violate any copyright, trademark, U.S. patent or any other third party right, including without limitation, any music performance or other music-related rights; (ii) will not violate AOL's then-applicable Terms of Service for the AOL Service and any other AOL property through which the Affiliated MP Site will be promoted or any other standard, written AOL policy; and (iii) will not violate any applicable law or regulation, including those relating to contests, sweepstakes or similar promotions. Additionally, MP represents and warrants that it owns or has a valid license to all rights to any Licensed Content used in AOL "slideshow" or other formats embodying elements such as graphics, animation and sound, free and clear of all encumbrances and without violating the rights of any other person or entity. MP also warrants that a reasonable basis exists for all Product performance or comparison claims appearing through the Affiliated MP Site. Except in connection with the press release contemplated by Section 1.6 hereof, MP shall not in any manner, including, without limitation in any Promotion, the Licensed Content or the Materials state or imply that AOL recommends or endorses MP or MP's Products (e.g., no statements that MP is an "official" or "preferred" provider of products or services for AOL). AOL will have no obligations with respect to the Products available on or through the Affiliated MP Site, including, but not limited to, any duty to review or monitor any such Products. AOL will manage, review, delete, edit, create, update and otherwise manage the AOL Network in a timely and professional manner and in accordance with the terms of this Agreement. AOL will ensure that the AOL Network is current, accurate and well-organized at all times. AOL warrants that the AOL Network: (i) will not infringe on or violate any copyright, trademark, U.S. patent or any other third party right, including without limitation, any music performance or other music-related rights; and (ii) will not violate any applicable law or regulation. Additionally, AOL represents and warrants that it owns or has a valid license to all rights to names, marks, symbols, designations or other intellectual or proprietary rights licensed by AOL to MP hereunder, free and clear of all encumbrances and without violating the rights of any other person or entity.

CONFIDENTIAL
Execution Copy

27

AOL 00223

App. 0291



3.   Duty to Inform.  MP will promptly inform AOL of any information related to the Affiliated MP Site which could reasonably lead to a claim, demand, or liability of or against AOL and/or its affiliates by any third party. AOL will promptly inform MP of any information related to the AOL Network which could reasonably lead to a claim, demand, or liability of or against MP and/or its affiliates by any third party.

9.   Customer Service.  It is the sole responsibility of MP to provide customer service to persons or entities purchasing Products through the AOL Network ("Customers"). MP will bear full responsibility for all customer service, including without limitation, order processing, billing, fulfillment, shipment, collection and other customer service associated with any Products offered, sold or licensed through the Affiliated MP Site, and AOL will have no obligations whatsoever with respect thereto. MP will receive all emails from Customers via a computer available to MP's customer service staff and generally respond to such emails within one business day of receipt. MP will receive all orders electronically and generally process all orders within one business day of receipt, provided Products ordered are not advance order items. MP will ensure that all orders of Products are received, processed, fulfilled and delivered on a timely and professional basis. MP will offer AOL Users who purchase Products through such Affiliated MP Site a money back satisfaction guarantee. MP will bear all responsibility for compliance with federal, state and local laws in the event that Products are out of stock or are no longer available at the time an order is received. MP will also comply with the requirements of any federal, state or local consumer protection or disclosure law. Payment for Products will be collected by MP directly from customers. MP's order fulfillment operation will be subject to AOL's reasonable review.

10.   Production Work.  In the event that MP requests AOL's production assistance in connection with (i) ongoing programming and maintenance related to the Affiliated MP Site, (ii) a redesign of or addition to the Affiliated MP Site (e.g., a change to an existing screen format or construction of a new custom form), (iii) production to modify work performed by a third party provider or (iv) any other type of production work, MP will work with AOL to develop a detailed production plan for the requested production assistance (the "Production Plan"). Following receipt of the final Production Plan, AOL will notify MP of (i) AOL's availability to perform the requested production work, (ii) the proposed fee or fee structure for the requested production and maintenance work and (iii) the estimated development schedule for such work. To the extent the Parties reach agreement regarding implementation of the agreed-upon Production Plan, such agreement will be reflected in a separate work order signed by the Parties. To the extent MP elects to retain a third party provider to perform any such production work, work produced by such third party provider must generally conform to AOL's standards & practices (as provided on the America Online brand service at Keyword term "styleguide"). The specific production resources which AOL allocates to any production work to be performed on behalf of MP will be as determined by AOL in its sole discretion. With respect to any routine production, maintenance or related services which AOL reasonably determines are necessary for AOL to perform in order to support the proper functioning and integration of the Affiliated MP Site ("Routine

Services"), MP will pay the then-standard fees charged by AOL for such Routine Services.

11.   Overhead Accounts.  To the extent AOL has granted MP any overhead accounts on the AOL Service, MP will be responsible for the actions taken under or through its overhead accounts, which actions are subject to AOL's applicable Terms of Service and for any surcharges, including, without limitation, all premium charges, transaction charges, and any applicable communication surcharges incurred by any overhead Account issued to MP, but MP will not be liable for charges incurred by any overhead account relating to any standard monthly usage fees and standard hourly charges, which charges AOL will bear. Upon the termination of this Agreement, all overhead accounts, related screen names and any associated usage credits or similar rights, will automatically terminate. AOL will have no liability for loss of any data or content related to the proper termination of any overhead account.

12.   Navigation Tools.  Any Keyword Search Terms to be directed to the Affiliated MP Site shall be (i) subject to availability for use by MP, and (ii) limited to the combination of the Keyword™ search modifier combined with a registered trademark of MP (e.g. "AOL keyword: XYZ Company Name"). AOL agrees that MP's Keyword Search Term shall initially be "eToys" and may be changed by MP at its discretion subject to compliance with the foregoing provision of this Agreement. AOL reserves the right to revoke at any time MP's use of any Keyword Search Terms which do not incorporate registered trademarks of MP. MP acknowledges that its utilization of a Keyword Search Term will not create in it, nor will it represent it has, any right, title or interest in or to such Keyword Search Term, other than the right, title and interest MP holds in MP's registered trademark independent of the Keyword Search Term. Without limiting the generality of the foregoing, MP will not: (a) attempt to register or otherwise obtain trademark or copyright protection in the Keyword Search Term; or (b) use the Keyword Search Term, except for the purposes expressly required or permitted under this Agreement. Upon the termination of this Agreement, MP's rights to any Keyword Search Terms and bookmarking will terminate.

13.   Merchant Certification Program.  MP will participate in any generally applicable "Certified Merchant" program operated by AOL or its authorized agents or contractors. Such program may require merchant participants on an ongoing basis to meet certain reasonable, generally applicable standards relating to provision of electronic commerce through the AOL Network (including, as a minimum, use of 40-bit SSL encryption and if requested by AOL, 128-bit encryption) and may also require the payment of certain reasonable certification fees to the applicable entity operating the program. Each Certified Merchant in good standing will be entitled to place on its affiliated Interactive Site an AOL designed and approved button promoting the merchant's status as an AOL Certified Merchant.

14.   Search Terms.  To the extent this Agreement sets forth any mechanism by which the Affiliated MP site will be promoted in connection with specified search terms within any AOL product or service, MP hereby represents and warrants that MP has all consents, authorizations, approvals, licenses, permits or other rights necessary

CONFIDENTIAL                                                       28
Execution Copy

AOL 00224



App. 0292

for MP to use such specified search terms. Notwithstanding the foregoing, AOL shall have the right to suspend the use of any search term if AOL has reason to believe continued use may subject AOL to liability or other adverse consequences. Subject to the Carriage Plan included on Exhibit A, AOL hereby acknowledges and agrees that the Affiliated MP Site will be promoted throughout the AOL Network with the search terms set forth on Exhibit K hereto.

15. <u>Kids and Teens Policy</u>. MP agrees that, at all times during the Term of this Agreement, MP and the Affiliated MP Site shall comply with all applicable laws pertaining to children and the use of the Internet, including all laws pertaining to children's privacy. In addition, MP acknowledges that it has reviewed AOL's current Kids and Teens Policy and agrees that, during the Term of this Agreement, it will consult and cooperate in good faith with AOL in an effort to provide a safe and secure environment for children on the Affiliated MP Site in keeping with the general intent and spirit of such policy. In the event that the Parties are unable to agree on MP's compliance with this Section 15, the matter shall be referred to the Management Committee and the other procedures for dispute resolution set forth in Section 6 of the Agreement.

CONFIDENTIAL
Execution Copy

29

AOL 00225

App. 0293



PX0001-0029

EXHIBIT G

Standard Legal Terms & Conditions

1.    Promotional Materials/Press Releases.   Each Party will submit to the other Party, for its prior written approval, which will not be unreasonably withheld or delayed, any marketing, advertising, or other promotional materials, excluding Press Releases, referencing the other Party and/or its trade names, trademarks, and service marks (the "Promotional Materials"); provided, however, that (a) either Party's use of screen shots of an Affiliated MP Site for promotional purposes will not require the approval of the other Party so long as America Online® is clearly identified as the source of such screen shots; (b) following the initial public announcement of the business relationship between the Parties in accordance with the approval and other requirements contained herein, either Party's subsequent factual reference to the existence of a business relationship between the Parties in Promotional Materials will not require the approval of the other Party and (c) to the extent MP is referencing only the "AOL Keyword" or "America Online Keyword", no prior submission or approval shall be required.  Each Party will solicit and reasonably consider the views of the other Party in designing and implementing such Promotional Materials.  Once approved, the Promotional Materials may be used by a Party and its affiliates for the purpose of promoting the Affiliated MP Site and the content contained therein and reused for such purpose until such approval is withdrawn with reasonable prior notice.  In the event such approval is withdrawn, existing inventories of Promotional Materials may be depleted.

2.    License.   MP hereby grants AOL a non-exclusive, non-transferable, non-sublicenseable, royalty-free  worldwide license to market, distribute, reproduce, display, perform, transmit and promote the Licensed Content (or any portion thereof) through such areas or features of the AOL Network as AOL deems appropriate for purposes of providing Impressions as required hereby, providing AOL Users with access to the Affiliated MP Site and otherwise complying with its obligations hereunder.  MP acknowledges and agrees that the foregoing license permits AOL to distribute portions of the Licensed Content in synchronism or timed relation with visual displays prepared by MP or AOL (e.g., as part of an AOL "slideshow").  In addition, AOL Users will have the right to access and use the Affiliated MP Site.

3.    Trademark License.   For purposes of designing and implementing the Materials and subject to the other provisions contained herein, AOL hereby grants MP a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to market, distribute, reproduce, display, perform, transmit, promote and use the following trade names, trademarks, and service marks of AOL:  the "America Online®" brand service, "AOL™" service/software and AOL's triangle logo and, in connection therewith, MP shall comply with the AOL styleguide available at Keyword: "style guide"; and AOL and its affiliates will be entitled to use the trade names, trademarks, and service marks of MP for

which MP holds all rights necessary for use in connection with this Agreement (collectively, together with the AOL marks listed above, the "Marks"); provided that each Party: (i) does not create a unitary composite mark involving a Mark of the other Party without the prior written approval of such other Party; and (ii) displays symbols and notices clearly and sufficiently indicating the trademark status and ownership of the other Party's Marks in accordance with applicable trademark law and practice.

4.    Ownership of Trademarks.   Each Party acknowledges the ownership right of the other Party in the Marks of the other Party and agrees that all use of the other Party's Marks will inure to the benefit, and be on behalf, of the other Party.  Each Party acknowledges that its utilization of the other Party's Marks will not create in it, nor will it represent it has, any right, title, or interest in or to such Marks other than the licenses expressly granted herein.  Each Party agrees not to do anything contesting or impairing the trademark rights of the other Party.

5.    Quality Standards.   Each Party agrees that the nature and quality of its products and services supplied in connection with the other Party's Marks will conform to quality standards set by the other Party.  Each Party agrees to supply the other Party, upon request, with a reasonable number of samples of any Materials publicly disseminated by such Party which utilize the other Party's Marks.  Each Party will comply with all applicable laws, regulations, and customs and obtain any required government approvals pertaining to use of the other Party's marks.

6.    Infringement Proceedings.   Each Party agrees to promptly notify the other Party of any unauthorized use of the other Party's Marks of which it has actual knowledge.  Each Party will have the sole right and discretion to bring proceedings alleging infringement of its Marks or unfair competition related thereto; provided, however, that each Party agrees to provide the other Party with its reasonable cooperation and assistance with respect to any such infringement proceedings.

7.    Representations and Warranties.   Each Party represents and warrants to the other Party that: (i) such Party has the full corporate right, power and authority to enter into this Agreement and to perform the acts required of it hereunder; (ii) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder, do not and will not violate any agreement to which such Party is a party or by which it is otherwise bound; (iii) when executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms; and (iv) such Party acknowledges that the other Party makes no representations, warranties or agreements related to the subject matter hereof that are not expressly provided for in this Agreement.  MP hereby represents and warrants that it possesses all



AOL 00226

App. 0294





EXHIBIT C

Standard Legal Terms & Conditions

2.    Trademark License. For purposes of designing and implementing the Materials and subject to the other provisions contained herein, AOL hereby grants MP a non-exclusive, non-transferable, non-sublicenseable, worldwide, royalty-free license to market, distribute, reproduce, display, perform, transmit, promote and use the following trade names, trademarks, and service marks of AOL: the "America Online®" brand service, "AOL™" service/software and AOL's triangle logo and, in connection therewith, MP shall comply with the AOL styleguide available at Keyword: "style guide"; and AOL and its affiliates will be entitled to use the trade names, trademarks, and service marks of MP for

AOL 00226

App. 0295


PX0001-0030-SS01

authorizations, approvals, consents, licenses, permits, certificates or other rights and permissions necessary to sell the Products.

8.     Confidentiality.  Each Party acknowledges that Confidential Information may be disclosed to the other Party during the course of this Agreement.  Each Party agrees that it will take reasonable steps, at least substantially equivalent to the steps it takes to protect its own proprietary information, during the term of this Agreement, and for a period of three years following expiration or termination of this Agreement, to prevent the duplication or disclosure of Confidential Information of the other Party, other than by or to its employees or agents who must have access to such Confidential Information to perform such Party's obligations hereunder, who will each agree to comply with this section. Each Party further agrees that it will only use the Confidential Information of the other Party for purposes of carrying out its obligations under this Agreement.  For purposes of this Agreement, all information (other than aggregated information) relating to impressions, click rates and conversion rates shall be deemed to be Confidential Information.  Furthermore, all information in AOL's possession gathered as a result of MP's implementation of AOL Quick Checkout shall be deemed Confidential Information and shall be subject to the provisions Exhibit I hereof. Notwithstanding the foregoing, either Party may issue a press release or other disclosure containing Confidential Information without the consent of the other Party, to the extent such disclosure is required by law, rule, regulation or government or court order.  In such event, the disclosing Party will provide at least ten (10) business days prior written notice of such proposed disclosure to the other Party.  Further, in the event such disclosure is required of either Party under the laws, rules or regulations of the Securities and Exchange Commission or any other applicable governing body, such Party will (i) redact mutually agreed-upon portions of this Agreement to the fullest extent permitted under applicable laws, rules and regulations and (ii) submit a request to such governing body that such portions and other provisions of this Agreement receive confidential treatment under the laws, rules and regulations of the Securities and Exchange Commission or otherwise be held in the strictest confidence to the fullest extent permitted under the laws, rules or regulations of any other applicable governing body.

9.     Limitation of Liability; Disclaimer. Indemnification.

9.1     Liability.  UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM BREACH OF THE AGREEMENT, THE USE OR INABILITY TO USE THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED MP SITE, OR ARISING FROM ANY OTHER PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS (COLLECTIVELY, "DISCLAIMED DAMAGES"); PROVIDED THAT EACH PARTY WILL REMAIN LIABLE TO THE OTHER PARTY TO THE EXTENT ANY

DISCLAIMED DAMAGES ARE CLAIMED BY A THIRD PARTY AND ARE SUBJECT TO INDEMNIFICATION PURSUANT TO SECTION 9.3.  EXCEPT AS PROVIDED IN SECTION 9.3, (i) LIABILITY ARISING UNDER THIS AGREEMENT WILL BE LIMITED TO DIRECT, OBJECTIVELY MEASURABLE DAMAGES, AND (II) THE MAXIMUM LIABILITY OF ONE PARTY TO THE OTHER PARTY FOR ANY CLAIMS ARISING IN CONNECTION WITH THIS AGREEMENT WILL NOT EXCEED THE AGGREGATE AMOUNT OF FIXED GUARANTEED PAYMENT OBLIGATIONS OWED BY MP HEREUNDER IN THE YEAR IN WHICH THE EVENT GIVING RISE TO LIABILITY OCCURS; PROVIDED THAT EACH PARTY WILL REMAIN LIABLE FOR THE AGGREGATE AMOUNT OF ANY PAYMENT OBLIGATIONS OWED TO THE OTHER PARTY PURSUANT TO THE AGREEMENT.

9.2     No Additional Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY, AND EACH PARTY HEREBY SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE AOL NETWORK, THE AOL SERVICE, AOL.COM OR THE AFFILIATED MP SITE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH OF AOL AND MP SPECIFICALLY DISCLAIMS ANY WARRANTY REGARDING THE PROFITABILITY OF THE AFFILIATED MP SITE.

9.3     Indemnity.  Either Party will defend, indemnify, save and hold harmless the other Party and the officers, directors, agents, affiliates, distributors, franchisees and employees of the other Party from any and all third party claims, demands, liabilities, costs or expenses, including reasonable attorneys' fees ("Liabilities"), resulting from the indemnifying Party's material breach of any duty, representation, or warranty of this Agreement.

9.4     Claims.  If a Party entitled to indemnification hereunder (the "Indemnified Party") becomes aware of any matter it believes is indemnifiable hereunder involving any claim, action, suit, investigation, arbitration or other proceeding against the Indemnified Party by any third party (each an "Action"), the Indemnified Party will give the other Party (the "Indemnifying Party") prompt written notice of such Action.  Such notice will (i) provide the basis on which indemnification is being asserted and (ii) be accompanied by copies of all relevant pleadings, demands, and other papers related to the Action and in the possession of the Indemnified Party.  The Indemnifying Party will have a period of ten (10) days after delivery of such notice to respond.  If the Indemnifying Party elects to defend the Action or does not respond within the requisite ten (10) day period, the Indemnifying Party will be obligated to defend the Action, at its own expense, and by counsel reasonably satisfactory to the Indemnified Party.  The Indemnified Party will cooperate, at the expense of the Indemnifying Party, with the Indemnifying Party and its counsel in the defense and the Indemnified Party will have the

AOL 00227

App. 0296



PX0001-0031

right to participate fully, at its own expense, in the defense of such Action. If the Indemnifying Party responds within the required ten (10) day period and elects not to defend such Action, the Indemnified Party will be free, without prejudice to any of the Indemnified Party's rights hereunder, to compromise or defend (and control the defense of) such Action. In such case, the Indemnifying Party will cooperate, at its own expense, with the Indemnified Party and its counsel in the defense against such Action and the Indemnifying Party will have the right to participate fully, at its own expense, in the defense of such Action. Any compromise or settlement of an Action will require the prior written consent of both Parties hereunder, such consent not to be unreasonably withheld or delayed.

10.   Acknowledgment.  AOL and MP each acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all risks (both known and unknown) associated with the transactions contemplated hereunder. The limitations and disclaimers related to warranties and liability contained in this Agreement are intended to limit the circumstances and extent of liability. The provisions of this Section 10 will be enforceable independent and severable from any other enforceable or unenforceable provision of this Agreement.

11.   Solicitation of AOL Users.  During the term of the Agreement and for a two year period thereafter, MP will not use the AOL Network (including, without limitation, the e-mail network contained therein) to solicit AOL Users on behalf of another Interactive Service. More generally, MP will not send unsolicited, commercial e-mail (i.e., "spam") or other online communications through or into AOL's products or services, absent a Prior Business Relationship. For purposes of this Agreement, a "Prior Business Relationship" will mean that the AOL User to whom commercial e-mail or other online communication is being sent has voluntarily either (i) engaged in a transaction with MP or with any third party that is acting on MP's behalf or (ii) provided information to MP or any third party that is acting on MP's behalf through a contest, registration, or other communication, which included clear notice to the AOL User that the information provided could result in commercial e-mail or other online communication being sent to that AOL User by MP or any third party acting on MP's behalf. Any commercial e-mail or other online communications to AOL Users which are otherwise permitted hereunder, will (a) include a prominent and easy means to "opt-out" of receiving any future commercial communications from MP, and (b) shall also be subject to AOL's then-standard restrictions on distribution of bulk e-mail (e.g., related to the time and manner in which such e-mail can be distributed through or into the AOL product or service in question).

12.   AOL User Communications.  To the extent that MP is permitted to communicate with AOL Users under Section 11 of this Exhibit G, in any such communications to AOL Users on or off the Affiliated MP Site (including, without limitation, e-mail solicitations), MP will not encourage AOL Users to take any action in violation of the terms of this Agreement. Additionally, with respect to such AOL User

communications, MP shall not encourage such AOL Users to access the Affiliated MP Site through any means other than the AOL Network.

13.   Collection and Use of User Information.  MP shall ensure that its collection, use and disclosure of information obtained from AOL Users under this Agreement ("User Information") complies with (i) all applicable laws and regulations and (ii) AOL's standard privacy policies, available on the AOL Service at the keyword term "Privacy" (or, in the case of the Affiliated MP Site, MP's standard privacy policies so long as such policies are prominently published on the site and provide adequate notice, disclosure and choice to users regarding MP's collection, use and disclosure of user information). MP will not disclose User Information collected hereunder to any third party in a manner that identifies AOL Users as end users of an AOL product or service or use Member Information collected under this Agreement to market another Interactive Service.

14.   Excuse.  Neither Party will be liable for, or be considered in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any causes or conditions which are beyond such Party's reasonable control and which such Party is unable to overcome by the exercise of reasonable diligence.

15.   Independent Contractors.  The Parties to this Agreement are independent contractors. Neither Party is an agent, representative or employee of the other Party. Neither Party will have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind, the other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.

16.   Notice.  Any notice, approval, request, authorization, direction or other communication under this Agreement will be given in writing and will be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered by electronic mail on the AOL Network (to screenname "AOLNotice@AOL.com" in the case of AOL) or by confirmed facsimile; (ii) on the delivery date if delivered personally to the Party to whom the same is directed; (iii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iv) five business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available. In the case of AOL, such notice will be provided to both the Senior Vice President for Business Affairs (fax no. 703-265-1206) and the Deputy General Counsel (fax no. 703-265-1105), each at the address of AOL set forth in the first paragraph of this Agreement. In the case of MP, except as otherwise specified herein, the notice address will be the address for MP set forth in the first paragraph of this Agreement, with the other relevant notice information, including the recipient for notice and, as applicable, such recipient's fax

CONFIDENTIAL
Execution Copy

32

AOL 00228

App. 0297



PX0001-0032

**13. Collection and Use of User Information.** MP shall ensure that its collection, use and disclosure of information obtained from AOL Users under this Agreement ("User Information") complies with (i) all applicable laws and regulations and (ii) AOL's standard privacy policies, available on the AOL Service at the keyword term "Privacy" (or, in the case of the Affiliated MP Site, MP's standard privacy policies so long as such policies are prominently published on the site and provide adequate notice, disclosure and choice to users regarding MP's collection, use and disclosure of user information). MP will not disclose User Information collected hereunder to any third party in a manner that identifies AOL Users as end users of an AOL product or service or use Member Information collected under this Agreement to market another Interactive Service.

CONFIDENTIAL
Executive Copy                    32                    AOL 00228

App. 0298

Desc: Snapshot Monday, Jun, 25, 2007 11:40 AM
First Page ID: PX0001-0001
Current Page ID: PX0001-0032-SS01



PX0001-0032-SS01

number or AOL e-mail address, to be as reasonably identified by AOL.

17. No Waiver. The failure of either Party to insist upon or enforce strict performance by the other Party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such Party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect.

18. Return of Information. Upon the expiration or termination of this Agreement, each Party will, upon the written request of the other Party, return or destroy (at the option of the Party receiving the request and provided such Party certifies in writing to such destruction) all confidential information, documents, manuals and other materials specified the other Party.

19. Survival. Sections 4.2.2 and 6 (and 4.4 and 4.5 if AOL elects to establish a Continued Link) of the body of the Agreement, Sections 8 through 30 of this Exhibit, any payment obligations accrued prior to termination or expiration, and any other terms which by their nature are designed to survive termination or expiration of this Agreement, will survive the completion, expiration, termination or cancellation of this Agreement.

20. Entire Agreement. This Agreement sets forth the entire agreement and supersedes any and all prior agreements of the Parties with respect to the transactions set forth herein, including, without limitation, the Interactive Marketing Agreement between the parties dated October 1, 1997, as amended. Neither Party will be bound by, and each Party specifically objects to, any term, condition or other provision which is different from or in addition to the provisions of this Agreement (whether or not it would materially alter this Agreement) and which is proffered by the other Party in any correspondence or other document, unless the Party to be bound thereby specifically agrees to such provision in writing.

21. Amendment. No change, amendment or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by the Party subject to enforcement of such amendment, and in the case of AOL, by an executive of at least the same standing to the executive who signed the Agreement.

22. Further Assurances. Each Party will take such action (including, but not limited to, the execution, acknowledgment and delivery of documents) as may reasonably be requested by any other Party for the implementation or continuing performance of this Agreement.

23. Assignment. MP will not assign this Agreement or any right, interest or benefit under this Agreement without the prior written consent of AOL, which consent shall not be unreasonably withheld. AOL will not assign this Agreement or any right, interest or benefit under this Agreement to any MP Competitor without the prior written consent of MP, which may be withheld in MP's sole discretion. Subject to the foregoing, this Agreement will be fully binding upon,

inure to the benefit of and be enforceable by the Parties hereto and their respective successors and assigns.

24. Construction; Severability. In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid by a court with jurisdiction over the Parties to this Agreement, (i) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable law, and (ii) the remaining terms, provisions, covenants and restrictions of this Agreement will remain in full force and effect.

25. Remedies. Except where otherwise specified, the rights and remedies granted to a Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies which the Party may possess at law or in equity; provided that, in connection with any dispute hereunder, MP will not be entitled to offset any amounts that it claims to be due and payable from AOL against amounts otherwise payable by MP to AOL.

26. Applicable Law. Except as otherwise expressly provided herein, this Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the Commonwealth of Virginia except for its conflicts of laws principles.

27. Export Controls. Both Parties will adhere to all applicable laws, regulations and rules relating to the export of technical data and will not export or re-export any technical data, any products received from the other Party or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations and rules unless properly authorized.

28. Headings. The captions and headings used in this Agreement are inserted for convenience only and will not affect the meaning or interpretation of this Agreement.

29. Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same document.

30. Press Releases. Each Party will submit to the other Party, for its prior written approval, which will not be unreasonably withheld or delayed, any press release or any other public statement ("Press Release") regarding the transactions contemplated hereunder. Notwithstanding the foregoing, either Party may issue Press Releases and other disclosures as required by law without the consent of the other Party and in such event, the disclosing Party will provide at least five (5) business days prior written notice of such disclosure. Any Party who fails to provide the other Party with prior notice in accordance with this Section 30 (the "Issuing Party"), shall, at the option of the other Party (the "Non-Issuing Party"), issue a retraction of such press release in a form reasonably acceptable to such other Party. Failure to issue a retraction in accordance with this Section 30 shall constitute a material breach of this Agreement. Notwithstanding the foregoing, nothing in this Section 30 shall limit the liability of the Issuing Party under this Agreement and the issuance of a retraction pursuant to this Section

CONFIDENTIAL
Execution Copy

33

**AOL 00229**

**App. 0299**



PX0001-0033

30 shall be in addition to any other damages and remedies to which
the Non-Issuing Party may be entitled.

CONFIDENTIAL
Execution Copy

34

AOL 00230

App. 0300



EXHIBIT H

Keyword Guidelines

AOL Keyword: eToys
- Capitalization – listing should appear in initial caps only.
  Note: When America Online is abbreviated to AOL – AOL must appear in all caps.
  K of Keyword must always be capitalized
- Subject to the terms in Exhibit C, in cases where MP displays its URL in a form other than as a part of its logo (e.g. 'www.eToys.com') MP will also display 'AOL Keyword: eToys' (the "Keyword Display") in the same style font and shall use commercially reasonable efforts to include the Keyword Display in a size no smaller than 67% of the size of the font used for the URL, but in no event shall such Keyword Display be in a size smaller than 50% of the size of the font used for the URL .
- AOL may opt out of Keyword promotions at its discretion.

BROADCAST/RADIO
"America Online Keyword" or "AOL Keyword" must be announced entirely.  Example voiceover would read:
  "Visit us at www.etoys.com or at AOL Keyword: eToys"

- AOL must approve all uses prior to usage if not consistent with the guidelines set forth herein.

CONFIDENTIAL                                    35
Execution Copy

AOL 00231

App. 0301

**Desc:** The Interactive Marketing Agreement (PX 1)
**First Page ID:** PX0001-0001
**Current Page ID:** PX0001-0035        *Page 35 of 39*


PX0001-0035

## Exhibit I

### Quick Checkout Provisions

The parties agree that MP's implementation of AOL Quick Checkout ("QC") shall conform to the following specifications and restrictions:

1.    MP will offer QC as an option only to AOL Users accessing MP's checkout process via a recognized IP address or browser detection technology. AOL shall provide or make available to MP (e.g., posted on the Web) a complete and updated list of IP addresses on a regular basis.

2.    In MP's implementation of QC on the Affiliated MP Site, (i) AOL Users signing up for QC for the first time or editing user information shall be required to view a minimum number of pages necessary to support data collection as compared to completing the same purchase using MP's normal checkout process, and (ii) AOL Users who are existing QC users shall be required to see no more than one additional webpage as compared to completing the same purchase using MP's normal checkout process. Furthermore, as the Parties shall mutually agree, the additional webpage shall be co-branded by AOL and MP, and conform to the "look and feel" of the Affiliated MP Site.

3.    AOL acknowledges and understands that MP requires purchasers on the Affiliated MP Site to create an account (combination of email address and password). MP acknowledges and understands that AOL is considering modifying the QC system to provide the ability for AOL Users to create, store, and retrieve MP-specific account information. To the extent that AOL modifies the QC system as such, AOL will make available to MP such system and such system will recall MP-specific account login information for future purchases on the Affiliated MP Site. AOL acknowledges that MP will not, and is not required to, implement QC until such modification is made. AOL acknowledges MP will not implement QC in the event that AOL includes in QC technology to track a customer's activity on the Affiliated MP Site and compile data as a result thereof. AOL shall notify MP in the event that QC contains any such technology.

4.    All financial data obtained by AOL as a result of the implementation of QC on the Affiliated MP Site, including, without limitation, the number of AOL Users signing up for QC on the Affiliated MP Site, the number of AOL Users completing a purchase on the Affiliated MP Site, the aggregate quantity and dollar value of items sold on the Affiliated MP Site, and any data related to the sale of individual items sold on the Affiliated MP Site, shall be deemed to be the sole property of MP and shall be treated as Confidential Information hereunder by AOL. To the extent AOL is ever deemed to acquire any ownership interest in such property, AOL agrees to take such steps, and execute such documents, as MP may reasonably request in order to transfer sole ownership thereof to MP. MP shall be entitled to audit AOL's procedures relating to the maintenance of the Confidential Information described herein.

5.    It is understood by MP that AOL may use the following information to include as a non-identifiable part of publicly reported aggregate data for all AOL users: 1) the total number of AOL Users completing a purchase on the Affiliated MP Site using QC, and 2) the total dollars spent by AOL Users completing a purchase on the Affiliated MP Site using QC. However, AOL shall not use any of the aforementioned data to publicly report on aggregate data for any subcategories such as toys, games, baby products, or children's products.

6.    Behavioral data (e.g. product purchase information, but excluding information in the "wallet" component of QC) gathered about individual AOL Users by AOL as a result of MP's implementation of QC on the Affiliated MP Site ("Individual Data") shall remain the sole property of MP and shall be treated as Confidential Information hereunder by AOL. Furthermore, AOL shall not use Individual Data to target any type of advertising or promotional messages to AOL Users, whether on behalf of AOL or a third party. At least once per year during the term of this Agreement, Individual Data held by AOL will be destroyed, the destruction of which will be certified by AOL to MP. MP shall be entitled to audit AOL's procedures relating to the maintenance of the Confidential Information described herein.

7.    Notwithstanding anything to the contrary contained in this Agreement, MP shall not provide to AOL, and AOL shall not receive or be entitled to receive, any data pertaining to particular products or SKUs

CONFIDENTIAL
Execution Copy

36

**AOL 00232**

**App. 0302**



PX0001-0036

purchased by individual customers; rather, only total purchase amounts and date for customers may be made available to AOL.

CONFIDENTIAL
Execution Copy

37

AOL 00233

App. 0303



Exhibit J

<u>Welcome Screen</u>* AOL shall provide on a monthly basis the number of Impressions, number of click throughs and click through rate per Promotion, broken down by day and time.

<u>Departments</u>* – AOL shall provide on a monthly basis the number of Impressions, number of click throughs and click through rate per placement, broken down by day and by brand (ie AOL, CIS, Netscape, AOL.com).

<u>Ad Banners</u> – MP shall have access to the AOL ASIS system.

<u>Text Links</u>* – AOL shall provide on a monthly basis the number of Impressions broken down by day.

*=All monthly reporting data will be sent by the 15th of the following month.

AOL shall not be required to continue to supply any category of information required under this Exhibit J in the event that such information is no longer at any time during the Term routinely compiled by AOL in the ordinary course of its business.

CONFIDENTIAL
Execution Copy

38

**AOL 00234**

App. 0304

**Desc:** The Interactive Marketing Agreement (PX 1)
**First Page ID:** PX0001-0001
**Current Page ID:** PX0001-0038     *Page 38 of 39*



## EXHIBIT K
### Search Terms

baby names
Baby shower
babycare
babynames
Babyshower
birth
birth
Birthday
Birthdays
Childcare
Console
Consoles
Doll
Dolls
e toys
etoys
etoys.com
Gifts
infant apparel
infant clothes
infant clothing
kids
nanny agencies
nursery
pregnancy
Stuffed
toy
toy store
toy stores
Toys
toys.com
toystores
Video
Video games
Videogames

www.etoys.com

barbie
Barbie Doll
barbies
beanie
beanie babies
beaniebabie
Beaniebabies
Beanies
beany
Blue
Blues Clues
Bluesclues
Brio
Disney
Disneyworld
Elmo
fisher price
Fisherprice
Furby
gerber
Hasbro
Hotwheels
Jawas
Jedi
Jedi Knights
Kenner
leggo
LEGO
Lego
legos
Light Saber
Matchbox
Mattel

Nick
Nickelodeon
Nintendo
Nintendo 64
Playmobil
Playstation
Playstation
Games
pokemon
pokemon cards
pokemon game
pokemon games
Pooh
Rogue Squadron
rugrat
Rugrats
Safety 1st
safety first
safetyfirst
Sesame
Sesame Street
Sesamestreet
Sony Playstation
SonyPlaystation
Star Wars
starwars
Teletubbie
Teletubbies
Teletubby
Tikes
Tyco
Winnie
Yoda

CONFIDENTIAL
Execution Copy

39

AOL 00235

App. 0305



# App. 10

Subj:    **RE: Follow Up**
Date:    7/27/99 9:44:19 AM Pacific Daylight Time
From:    peter@etoys.com (Peter Brine)
To: BurgerSH@aol.com
CC: phil@etoys.com, Pegfry@aol.com, MTelesco@aol.com, acorman@etoys.com (Alex Corman (E-mail))

Sue,

Per my conversation with Mary yesterday, we want to test everything. I don't mean this to sound arrogant or elusive, but it is the truth. The justification is outlined at the end of this email. I understand you need to share specifics with the shopping team, so I have attempted to list all the variables we may want to test over the coming weeks. This list is not exhaustive, I am sure we will come up with more ideas once we begin to see what works and what does not. However, this should be a good start.

In the short term, we want to test text links to "eToys General" items ($20 under $20, Picks of the month, Wish List, Birthday Reminders), text links to promotion specific items (Bookbags, and stationery for the Back to School promotion), other calls to action for the "Visit Now" button (Buy Now! Visit eToys! Come See! etc.), multiple featured product images, more text, more text links, borders, no borders, more buttons, and executions that will require more K size than the current 7k and 9k specs.

We are particularly interested in having the Toy Anchor and Commerce Center placements we sent you on Friday to go live. You asked us to revise our submission. We did. Your shopping team then changed the specs and rejected the submission because we had the "Visit Now!" button on it, something they accepted two days before for the Edutainment anchor. This link accounts for 30% of our visits and 30% of our sales from the Anchor placement. As you can understand, we are not excited about cutting the overall performance of these very important placements by 30% for any reason. We would like these placements to go live now so we can continue gathering data.

Longer term we will want to test pull down menus, search boxes, animation and rich media (like Enliven or Java banners) in this space. We know that these were banned in the first version of the specs, so we don't expect them right away, we do want the ability to readdress the issue if we find after testing the above items we still need to make the space work harder.

Bottom line is, no one knows what is going to work in this space. In the past we could have let this fact slide, the CPMs you were charging would net an OK cost per order as long as we kept our logo up and had a decent product to merchandize. Because of the current rate increase and traffic segregation, you have forced us to work five times harder to make the space drive a reasonable cost per order and thus make the whole AOL deal work.

We ran numbers comparing Friday-Monday this week (when were up with the Toy Anchor) to the same period last week and the results are startling. Total visits dropped 85%. Total sales dropped 80%. The fourth quarter is only weeks away and we cannot afford to face the Christmas season without knowing how to improve these numbers. If this does not demonstrate why we are so deeply concerned and why we need to find the formula to make these very expensive placements work very soon, nothing does.

-Peter



CONFIDENTIAL

AOL 00469

App. 0306

---


DX0010-0001



DX0010-0001

Subj: RE: Follow Up
Date: 7/27/99 9:44:19 AM Pacific Daylight Time
From: peter@etoys.com (Peter Ilene)
To: Bergo561@aol.com
CC: phil@etoys.com, Pegfry@aol.com, MTelesca@aol.com, acoman@etoys.com (Alex Corman (E-mail))

Sue,

Per my conversation with Mary yesterday, we want to test everything. I don't mean this to sound a parody or ubelieve, but it is the truth. The

**Per my conversation with Mary yesterday, we want to test everything.**

what works and what does not. However, we should be a good start.

In the short term, we want to post text links to "eToys General" items ($20 under $20, Picks of the month, Wish List, Birthday Reminders), text links to promotion specific items (Backbags, and stationery for the Back to School promotion), other calls to action for the "Visit Now" button (Buy Now! Visit eToys! Come See! etc.), multiple featured product images, more text, more text links, borders, no borders, more buttons, and executions that will require more K size than the current 7k and 9k specs.

We are particularly interested in having the Toy Anchor and Commerce Career placements we sent you on Friday to go live. You asked us to revise our submission. We did. Your shopping team then changed the space and rejected the submission because we had the "Visit Now" button on it, something they accepted two days before for the Entertainment anchor. This link accounts for 30% of our visits and 30% of our sales from the Anchor placement. As you can understand, we are not excited about cutting the overall performance of these very important placements by 30% for any reason. We would like these placements to go live now so we can continue gathering data.

Longer term we will want to test pull down menus, search boxes, animation and rich media (like Enliven or Java banners) in this space. We know that these were banned in the first version of the specs, so we don't expect them right away, we do want the ability to readdress the issue if we find after testing the above items we still need to make the space work harder.

Bottom line is, no one knows what is going to work in this space. In the past we could have let this ride, the CPMs you were charging would not an OK cost per order as long as we kept our logo up and had a decent product to merchandize. Because of the current rate laceisra and traffic segregation, you have forced us to work five times harder to make the space drive a reasonable cost per order and thus make the whole AOL deal work.

**Bottom line is, no one knows what is going to work in this space.**

We ran numbers comparing Friday-Monday this week (when were up with the Toy Anchor) to the same period last week and the results are startling. Total

-Peter

DEFENDANT'S EXHIBIT
10

Tuesday, July 27, 1999    America Online: Bergo561    Page 1

-----Original Message-----
From: BurgerSH@aol.com [mailto:BurgerSH@aol.com]
Sent: Monday, July 26, 1999 6:18 PM
To: peter@etoys.com
Cc: phil@etoys.com; Pegfry@aol.com; MTelesco@aol.com
Subject: Fwd: Follow Up


Peter,
  Beyond the fundamental, "you want to own the anchor and promotional
pixel/KB space," we need to know what you are trying to test within the
"different designs." From your submission the other day, it appears that
you
want to test logo, product pic, html links to product types/functionality.
Are other types of material/things you want to test?  Until we get a better
understanding of what you want to test, we will be unable to discuss with
shopping channel (who as you know is very busy launching other shopping
departments).  So, this means we won't have a call on Tuesday.
  Also, pls continue to work through Mary and I to resolve this issue, once
we better understand your issues, we can escalate to shopping channel
management more effectively than the individual shopping programmers.
  Thanks for your understanding and patience,
  Sue


———————— Headers ————————
Return-Path: <peter@etoys.com>
Received: from  aol.com (rly-zb03.mail.aol.com [172.31.41.3]) by air-zb01.mail.aol.com (v60.18) with ESMTP; Tue, 27 Jul 1999
12:44:19 -0400
Received: from  etoy2.etoys.com (mail.etoys.com [209.218.173.164]) by rly-zb03.mx.aol.com (v60.18) with ESMTP; Tue, 27 Jul
1999 12:44:05 -0400
Received: (qmail 18242 invoked from network); 27 Jul 1999 16:44:04 -0000
Received: from unknown (HELO laptopmaster) (209.218.173.163)
  by mail.etoys.com with SMTP; 27 Jul 1999 16:44:04 -0000
From: "Peter Brine" <peter@etoys.com>
To: <BurgerSH@aol.com>
Cc: <phil@etoys.com>, <Pegfry@aol.com>, <MTelesco@aol.com>,
    "Alex Corman (E-mail)" <acorman@etoys.com>
Subject: RE: Follow Up
Date: Tue, 27 Jul 1999 09:50:10 -0700
Message-ID: <000b01bed850$1847e220$ec03020a@office.etoys.com>
MIME-Version: 1.0
Content-Type: text/plain;
    charset="iso-8859-1"
Content-Transfer-Encoding: 7bit
X-Priority: 3 (Normal)
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook 8.5, Build 4.71.2173.0
Importance: Normal
X-MimeOLE: Produced By Microsoft MimeOLE V5.00.2615.200
In-Reply-To: <f537be32.24ce62d0@aol.com>

CONFIDENTIAL

AOL 00470

App. 0308

Desc: E-mail To: Sue Burger; From: Peter Brine; re: Follow up
First Page ID: DX0010-0001
Current Page ID: DX0010-0002                    Page 2 of 2


DX0010-0002

# App. 11

Subj:  **Fwd: eToys Named Top Overall Web Site of '99 Holiday Season...**
Date:  2/22/00 2:43:08 PM Eastern Standard Time
From:  MTelesco
To:  BurgerSH, Iannuccilli, MMINIGAN, CVALLESF
Sent on:    AOL 5.0 for Windows sub 4

 DEFENDANT'S EXHIBIT

FYI

Forward Verified: Tue Feb 22 15:34:42 2000
Subj:    eToys Named Top Overall Web Site of '99 Holiday Season...
Date:    2/22/00 8:18:18 AM Eastern Standard Time
From:    AOL News
Sent on:    Unknown (No Version)

## eToys Named Top Overall Web Site of '99 Holiday Season According to Report in Fortune Magazine

SANTA MONICA, Calif.--(BUSINESS WIRE)--Feb. 22, 2000--In a comprehensive and independent study of how Internet retailers performed during the recent holiday season, eToys Inc. (Nasdaq:ETYS) ranked No. 1 among the top 49 Web sites, according to Fortune magazine. The research was conducted by Resource Marketing Inc. of Columbus, Ohio, and was published in Fortune's Feb. 21 issue.

Resource Marketing described the research as "the industry's most rigorous and disciplined study to date." The company "stress-tested" each site on more than 80 separate measures, including site navigation, product presentation, customer service and shipping. The effort simulated more than 500 customer interactions and required that researchers spend a minimum of 20 hours on each site, nearly 200 times that of the average shopper.

eToys led all companies and particularly outpaced its principal competitors. The top six spots were held by Internet pure-plays. More information on this study can be found at www.resource.com.

eToys recently reported strong financial results for the holiday quarter. Net sales more than quadrupled to $107 million and cumulative customer accounts nearly tripled to 1.7 million. The company far surpassed its competition in sales of toys and videos during the holiday.

The complete rankings of the Resource Marketing's study, as published in Fortune, are as follows:

Complete Rankings:

| (Above Par, in descending order) | (Below Par, in descending order) |
|---|---|
| 1. eToys | 23. Violet |
| 2. garden.com | 24. Macys.com |
| 3. Cooking.com | 25. 1-800-FLOWERS.COM |
| 4. Fogdog Sports | 26. Outpost.com |
| 5. Amazon.com | 27. Sephora |
| 6. eve.com | 28. Barnesandnoble.com |
| 7. REI.com | 29. Furniture.com |
| 8. Land's End | 30. Reel.com |
| 9. L.L. Bean | 31. Living.com |

AOL 00753

**App. 0309**

Desc: E-mail To: Sue Burger, Iannuccilli, MMINIGAN, CVALLESSF; From: M Telesco; re: FWD: eToys Named Top Overall Web Site
First Page ID: DX0029-0001
Current Page ID: DX0029-0001              Page 1 of 2                              DX0029-0001


10. Banana Republic
11. boo.com
12. Gap
13. Bluefly
14. drugstore.com
15. 800.com
16. PlanetRx.com
17. NORDSTROMshoes.com
18. Hallmark.com
19. DrugEmporium.com
20. CDNOW
21. Brooks Brothers
22. RedEnvelope

32. Williams-Sonoma
33. Marthastewart.com
34. PC Flowers & Gifts
35. Indulge.com
36. Gloss.com
37. Sparks.com
38. Kbkids.com
39. Jcrew.com
40. Target.com
41. Crate & Barrel
42. Nike.com
43. Gifts.com
44. Buy.com

45. Toysrus.com

46. Disneystore.com

47. Cozone.com

48. Alloy

49. Wal-Mart

About eToys.com

    Based in Santa Monica, eToys Inc. (www.eToys.com;
www.eToys.co.uk; AOL Keyword eToys) is the premier Internet retailer
for children's products with an extensive selection of both nationally
advertised and specialty toys, software, books, videos, music, video
games, and baby-oriented products. By combining this extensive
selection, with helpful and fun ideas and award-winning customer
service, eToys offers consumers a unique one-stop source for
children's products. Through its wholly owned subsidiary, BabyCenter
Inc. (www.babycenter.com), eToys offers Webby award-winning content
and community, as well as an extensive selection of merchandise for
new and expectant parents.

    --30--JC/la* KR/la

CONTACT:

eToys Inc., Santa Monica

Jonathan Cutler, 310/664-8550

Announcement: America Online has added Reuters newswires to News Profiles. To add Reuters articles to your daily news delivery, go
to KW: News Profiles and click on "Modify Your News Profiles." Then click "Edit" and add Reuters from the list on the left.

To edit your profile, go to keyword NewsProfiles.
For all of today's news, go to keyword News.

AOL 00754

App. 0310

Desc: E-mail To: Sue Burger, Iannuccilli, MMINIGAN, CVALLESSF; From: M Telesco; re: FWD: eToys Named Top Overall Web Site o
First Page ID: DX0029-0001
Current Page ID: DX0029-0002    Page 2 of 2    DX0029-0002


# App. 12

Subj:   **eToys kickoff**
Date:   8/25/99 1:57:54 AM Eastern Daylight Time
From:  BurgerSH
To: MTelesco, CVALLESF, RLKarp, Patrickgates
To: KRodrig1, Greengg, raghu@netscape.com, JenLUliyot
To: kevin@netscape.com, jasonr@netscape.com
Sent on:   AOL 4.0 for Windows 95 sub 22

Thank you for your participation in the eToys kickoff meeting and/or contribution to meeting prep. This is a long email to explain a little about eToys as a partner to make sure we internally can move forward with the right understanding about them...

I know many of you may feel discouraged because eToys is so tough on us on so many things we're trying to do in shopping -- from shopping art specs, to tools implementation, etc. Taking the deal from $3MM/2 to $18MM/3 is a huge vote of confidence in AOL (they tell other portals how AOL "gets" commerce) -- but they are plainly nervous about their increased financial commitment. I view today's meeting as positive because I see a sincere desire to have success -- recognizing we each have our own objectives. I see eToys as partner with clearly defined key metrics; a recognized balance between ROI and branding; great merchandising, promotion, marketing ideas and enthusiasm -- backed up by the dedicated resources to deliver; a commitment to best of class experience in all aspects of commerce from product selection, to site design, transaction process, customer service; and so on.

Those at the meeting probably saw that eToys corp culture is very diligent and rigorous -- this neurosis is what has made them successful in commerce. They are tough like we are tough -- we both have high standards. Nothing will calm them like success -- so we need to get the new deal components launched and delivering sales.

To that end, I think it is my job and our job to help evangelize them to our way of thinking. I believe we need to build more senior relationships and address many of these issues at senior levels. We need to rise above the tactical stuff they're complaining about and address the deeper business issues. For example in the tools discussion, it would help if more AOL/NS senior tech folks also got involved and made connection with their senior tech folks, etc. My team will work to facilitate establishing these kinds of relationships -- but we'll need your help as well.

That's it for the pep talk for now. eToys has potential to be so great on AOL -- their success will be our success. I want to keep the momentum, we just have to carefully manage them. Thanks for hearing me out.
Sue



DEFENDANT'S EXHIBIT 19

CONFIDENTIAL

AOL 00444



App. 0311

| | |
|---|---|
| **Desc:** E-mail To: M Telesco, CVALLESF, RL Karp, Patrick | |
| **First Page ID:** DX0019-0001 | |
| **Current Page ID:** DX0019-0001 | Page 1 of 1 |


DX0019-0001



Subj: eToys kickoff
Date: 8/25/99 1:57:54 AM Eastern Daylight Time
From: BurgerSH
To: MTelesco, CVALLESF, RLKaip, Patrickgates
To: KKodrigh, Gteerup, raghu@netscape.com, JeriLUtyol
To: kevin@netscape.com, jason@netscape.com

Thank you for your participation in the eToys kickoff meeting and/or contribution to meeting prep. This is a long email to explain a little about eToys as a partner to make sure we internally can move forward with the right understanding about them...

I know many of you may feel discouraged because eToys is so tough on us on so many things we're trying to do in shopping -- from shopping art specs, to tools implementation, etc. Taking the deal from $3MM2 to $18MM3 is a huge vote of confidence in AOL (they tell other portals how AOL "gets" commerce) -- but they are plainly nervous about their increased financial commitment. I view today's meeting as positive because I see a sincere desire to have success -- recognizing we each have our own objectives. I see eToys as partner with clearly defined key metrics; a recognized balance between ROI and branding; great merchandising, promotion, marketing ideas and enthusiasm -- backed up by the dedicated resources to deliver; a commitment to best of class experience in all aspects of commerce from product selection, to site design, transaction process, customer service; and so on.

Those at the meeting probably saw that eToys corp culture is very diligent and rigorous -- this neurosis is what has made them successful in commerce. They are tough like we are tough -- we both have high standards. Nothing will calm them like success -- so we need to get the new deal components launched and delivering sales.

To that end, I think it is my job and our job to help evangelize them to our way of thinking. I believe we need to build more senior relationships and address many of thes e issues at senior levels. We need to rise above the tactical stuff they're complaining about and address the deeper business issues. For example in the tools discussion, it would help if more AOL/NS senior tech folks also got involved and made connection with their senior tech folks, etc. My team will work to facilitate establishing these kinds of relationships -- but we'll need your help as well.

That's it for the pep talk for now. eToys has potential to be so great on AOL -- their success will be our success. I want to keep the momentum, we just have to carefully manage them. Thanks for hearing me out.
Sue

DEFENDANT'S
EXHIBIT
19

CONFIDENTIAL

AOL 00444


DX0019-0001-SS01

# App. 13

DEFENDANT'S
EXHIBIT
27




**Internet**

**United States**     **e-Tailing**

**Market Outperformer**

November 10, 1999

# eToys Inc. (ETYS)

*Review of the Leading Kids
e-Tailer Quarterly Results*

**Analysts**

Anthony Noto
anthony.noto@gs.com
(New York) 1-212 357-1849

Coralie Tournier Witter, CFA
coralie.witter@gs.com
(New York) 1-212 855-0278

Michael K. Parekh
michael.parekh@gs.com
(New York) 1-212 902-8960

**Valuation (X)**

| Absolute | CY99 | CY00 |
|---|---|---|
| P/E | -43.3 | -44.7 |
| P/S | 60.1 | 27.8 |

**Stock Data**

| 52-Week Range | $86-$28 |
|---|---|

**Capitalization**

| Market Capitalization (mn) | $6,566 |
|---|---|
| Shares Outstanding (000s) | 119,374 |

**Price: $55.00**                     **GIN: 516**

- eToys reported second (September) fiscal quarter revenues that exceeded our estimates with sales of $13.3 million (up 2,008% year over year and 67% sequentially), 24% better than our $10.7 million estimate, and beat our EPS estimate by a penny with a loss of 27¢ per share.

- eToys has established itself as the leading e-Tailing Kids category killer with a proven concept and a solid management team. We believe they will continue to strengthen their leadership position and have strong growth prospects via their recent entry into the U.K. and additional category launches in FY 2000.

- The company accomplished several key initiatives and established several strategic alliances during the quarter, which we believe, positions them for an extremely successful Christmas season. Accordingly, we reiterate our market outperformer rating and our 12-18 month $80 price target.

---

Goldman Sachs Investment Research                     *Important disclosures appear on the back cover.*

Electronic Document Available via *Investment Research on GS Financial Workbench* ℠



**CONFIDENTIAL**          AOL 01707

App. 0313

Desc: Review of the Leading Kids E-tailer Quarterly Results
First Page ID: DX0027-0001
Current Page ID: DX0027-0001          *Page 1 of 20*          DX0027-0001


DX0027-0001



AOL01707

DEFENDANT'S
EXHIBIT
27

## Internet

**United States**     e-Tailing

---

**Market Outperformer**

November 10, 1999

# eToys Inc. (ETYS)

*Review of the Leading Kids
e-Tailer Quarterly Results*

Price: $55.00     GIN: 518

**Analysts**

Anthony Noto
anthony.noto@gs.com
(New York) 1-212 357-1849

Carolla Townler Wilher, CFA
carolla.wilher@gs.com
(New York) 1-212 855-3276

Michael K. Parekh
michael.parekh@gs.com
(New York) 1-212 902-4260

Valuation: (X)
| | CY99 | CY00 |
|---|---|---|
| P/E | -46.2 | nm |
| P/S | 62.2 | 37.5 |

**Stock Data**

52-Week Range     $86-$28

- eToys reported second (September) fiscal quarter revenues that exceeded our estimates with sales of $33.3 million (up 3.008% year over year and 87% sequentially), 24% better than our $16.7 million estimate, and beat our EPS estimate by a penny with a loss of 27¢ per share.

- eToys has established itself as the leading e-Tailing Kids category killer with a proven concept and a solid management team. We believe they will continue to strengthen their leadership position and have strong growth prospects via their recent entry into the U.K. and additional category launches in FY 2000.

- The company accomplished several key initiatives and established several strategic alliances during the quarter, which we believe, positions them for an extremely successful Christmas season. Accordingly, we reiterate our market outperformer rating and our 12-18 month $90 price target.

| Capitalization | |
|---|---|
| Market Capitalization (mn) | $6,568 |
| Shares Outstanding (000s) | 119,374 |

Goldman Sachs Investment Research
Electronic Document Available See Investment Research for GS Financial Workspace*     Important disclosures appear on the back cover.

EXHIBIT 58
6
Look 13-07-03

CONFIDENTIAL     AOL 01707

App. 0314


DX0027-0001-SS01

AOL01708

### Results and Forecasts

| Cal Year | Earnings Per Share | | Revenue | |
|---|---|---|---|---|
| | Amount | % Change | Amount | % Change |
| 1998A | ($0.19) | NA | $24.1 mn | 4,720.0 |
| 1999E | (1.09) | -473.7 | 109.2 | 353.1 |
| 2000E | (1.19) | -9.2 | 235.9 | 116.0 |

Source: Company reports and our estimates.

### Company Profile

eToys is the dominant kids segment e-Tailer, offering over 100,000 stock keeping units (SKUs) of more than 900 brands of toys (mass market and specialty), videos, software, music, baby products, and video games 24 hours a day, 7 days a week. The company delivers superior customer service by focusing on providing consumers with the key benefits of selection, convenience, and content through a vast assortment of products at competitive prices. eToys delivers these key benefits in a convenient shopping experience, via a user-friendly web-site interface and innovative merchandising techniques. Since it began selling online in October 1997, the company has sold products to over 611,000 customers (as of September 1999). eToys's management team comprises experienced, consumer-centric individuals, led by former Disney executive Toby Lenk.

### Price Chart



### Percent of Total Sales by Quarter



Source: Company reports and our estimates.

### Revenue, Gross Profit, Net Income Growth
($ millions)



*Net income excludes non-cash charges
Source: Company reports and our estimates.

### Stock Ratings

| | | | | | |
|---|---|---|---|---|---|
| RL = | Recommended List | LL = | Latin America Recommended List | TB = | Trading Buy |
| MO = | Market Outperformer | MP = | Market Performer | MU = | Market Underperformer |

Goldman Sachs Investment Research

CONFIDENTIAL

AOL 01708



App. 0315

## Summary and Investment Opinion

**Compelling Consumer Solution.** eToys provides consumers with an attractive alternative to the traditional brick and mortar retail experience through its increased convenience, service, selection, and content. Many customers find shopping at brick and mortar toy stores to be inconvenient and unattractive owing to issues with locations, store layout, limited selection, poor service, and the difficulties of shopping with children.

Through its broad selection of over 100,000 SKUs and 900 brands of both mass market and specialty toys, videos, music, software, books, baby products, and video games, eToys is revolutionizing the kids retail category market by delivering increased value to the consumer.

**First Good Mover.** We believe eToys is the leading kids category e-Tailer based on its superior brand awareness, leading market share of revenue, and online visitors per month. The company is achieving solid results through a "stress-tested" operating model, which during the 1998 holiday season generated sales of $23 million for the quarter ended December 1998 (eToys's third fiscal quarter, ended December 1998, accounted for 76% of its annual sales, and we expect the December 1999 quarter to account for 65% of 1999's revenues). eToys's top revenue performance among kids e-Tailers was supported by being the number-one online kids' retailer in December, attracting 3.4 million unique users or more than 2 times the next highest competitor. We are forecasting revenue of $81.9 million for the third (December 1999) fiscal quarter. Recent operational milestones that will help eToys succeed in the fourth calendar quarter include having opened its new distribution/fulfillment center in Utah, having converted its systems to Oracle/Unix, and having opened its new operational control center.

**Large Visible Market.** As the first kids e-Tailer to market, eToys is poised to capitalize on the enormous growth opportunity of online selling and the $75-billion U.S. kids target market. Online toy category sales are estimated to grow at a 129% compound annual growth rate (CAGR) to $555 million in 2002 (Jupiter Communications estimate for Toys only) from $20 million in 1998. eToys

currently operates in kid categories that account for $55 billion (toys, baby store, books, software, video, music; video games) of the $75-billion market and plans to expand into new categories representing an additional $20-billion untapped market opportunity (kids apparel, sporting goods, back-to-school, and party supplies).

**International Expansion.** eToys has a scalable/exportable market and plans to replicate eToys overseas. On October 18, 1999, eToys opened its U.K. store (www.etoys.co.uk), thereby entering the $125-billion European market and expanding its total market opportunity to $200 billion. The company's ability to clone its operating functions and systems into the European market has enabled it to enter its first international market in less than six months. We believe the U.K. will serve as a foothold for eToys to expand into other European countries at an accelerated pace in fiscal (March) 2000. Longer term, we believe the company will also look to enter the Asian market as Japan represents the second-largest stand-alone market. eToys will likely leverage joint venture opportunities to source and distribute product when complete ownership of its supply chain is not appropriate.

**Value Proposition – eToys Rises Above Other Kid e-Tailers.** While online toy shopping experiences offer an attractive alternative to shopping in stores, we believe eToys stands out from the pack through its broadest selection, unique in-depth content, sophisticated merchandising techniques, focus on the kids category (beyond toys) and early entry into international markets. eToys continues to improve the consumer experience on its easy-to-use web site. The company has developed the best online merchandising techniques, which we think will be a key differentiator among winners and losers. Key new marketing and merchandising initiatives include a strategic relationship with Rosie's (O'Donnell) Readers, the launch of a new TV campaign, Idea Center (thematic destination), and Hobby Shops.

**Depth of Consumer-Centric Management Team.** eToys's management team comprises experienced, consumer-centric individuals, who bring a breadth of experience working for some of the most well-known brand names, including Disney, Pepsi, L.L. Bean, and Procter and Gamble.

AOL 01709

**CONFIDENTIAL**



App. 0316

DX0027-0003

AOL01709



## Summary and Investment Opinion

Compelling Consumer Solution. eToys provides consumers with an attractive alternative to the traditional brick and mortar retail experience through its increased convenience, service, selection, and content. Many customers find shopping at brick and mortar toy stores to be inconvenient and unattractive owing to hours with locations, poor service, limited selection, and the difficulties of shopping with children.

Through its broad selection of over 100,000 SKUs and 900 brands of both mass market and specialty toys, videos, music, software, books, baby products, and video games, eToys is revolutionizing the kids retail category market by delivering increased value to the consumer.

First Good Mover. We believe eToys is the leading kids category e-Tailer based on its superior brand awareness, leading market share of revenue, and online visitors per month. The company is achieving solid results through a "move-to-scale" operating model, which during the 1998 holiday season generated sales of $23 million for the quarter ended December 1998 (eToys's third fiscal quarter, ended December 1998, accounted for 36% of its annual sales, and we expect the December 1999 quarter to account for 60% of 1999's revenues). eToys's key revenue performance among kids e-Tailers was supported by being the number-one online kids' retailer in December, attracting 3.4 million unique users or more than 2 times the next highest competitor. We are forecasting revenue of $81.9 million for the third (December 1999) fiscal quarter. Recent operational milestones that will help eToys succeed in the fourth calendar quarter include having opened its new distribution/fulfillment center in Utah, having converted its systems to Oracle/Unix, and having opened its new operational control center.

Large Visible Market. As the first kids e-Tailer to market, eToys is poised to capitalize on the enormous growth opportunity of online selling and the $75-billion U.S. kids target market. Online toy category sales are estimated to grow at a 22% compound annual growth rate (CAGR) to $555 million in 2002 (Jupiter Communications estimate for Toys only) from $36 million in 1998. eToys

currently operates in kid categories that account for $55 billion (toys, baby store, books, software, video, music, video games) of the $75-billion market and plans to expand into new categories representing an additional $20-billion untapped market opportunity (kids' apparel, sporting goods, back-to-school, and party supplies).

International Expansion. eToys has a scalable/exportable market and plans to replicate eToys overseas. On October 18, 1999, eToys opened its U.K. store (www.etoys.co.uk), thereby entering the $125-billion European market and expanding its total market opportunity to $200 billion. The company's ability to clone its operating functions and systems into the European market has enabled it to enter its first international market in less than six months. We believe the U.K. will serve as a foothold for eToys to expand into other European countries as

Goldman Sachs Investment Research

> **Value Proposition – eToys Rises Above Other Kid e-Tailers.** While online toy shopping experiences offer an attractive alternative to shopping in stores, we believe eToys stands out from the pack through its broadest selection, unique in-depth content, sophisticated merchandising techniques, focus on the kids category (beyond toys) and early entry into international markets. eToys continues to improve the consumer experience on its easy-to-use web site. The company has developed the best online merchandising techniques, which we think will be a key differentiator among winners and losers. Key new marketing and merchandising initiatives include a strategic relationship with Rosie's (O'Donnell) Readers, the launch of a new TV campaign, Idea Center (thematic destination), and Hobby Shops.

CONFIDENTIAL      AOL 01709

App. 0317



AOL01710

Internet • e-Tailing                                                                          United States

**Summary.** We believe eToys has established itself as a top-tier business-to-consumer e-Tailer with a proven concept and a solid management team that is poised to capture significant market share in the kids segment of online retailing. Our revenue and EPS estimates for eToys's fiscal (December) third quarter 1999 are $81.9 million and (50¢), respectively. Our fiscal 1999 and 2000 revenue and loss-per-share estimates are $126.8 million/$1.27 and $254.4 million/$1.23, respectively.

Accordingly, we view eToys as a leading core Internet franchise holding and the leading kids e-Retailing Category Killer. We reiterate our market outperformer rating with a 12-18 month price target of $80.

## Review of Second-Quarter 1999 Results

### Summary

eToys reported second fiscal quarter results that exceeded our estimate with sales of $13.3 million (up 2,008% year over year and 67% sequentially) and a loss per share of 27¢ compared with our projection of $10.7 million and a 28¢ loss per share, respectively. Owing to increased sales and marketing and product development spending in the third quarter, we decreased our EPS estimate to 50¢ loss per share from a 35¢ loss per share, and left our revenue estimate unchanged. We increased our 1999 revenue estimate to $126.8 million from $124.3 million, reflecting this quarter's outperformance, and reduced EPS to a $1.27 loss per share from a $1.12 loss per share. We believe eToys is best positioned for this holiday season and to capture the vast global opportunity.

eToys's sales growth was up 67% sequentially (and 33% sequentially excluding BabyCenter, which closed on November 1) from $8.0 million in the June 1999 quarter. Strong sales gains were attributed to the to 144,000 new customers, 42% repeat orders, and the addition of BabyCenter revenues. eToys's customer account base grew by 30% to 611,000 customer accounts from 467,000 customers at the end of the June 1999 quarter.

**Potential Near-Term Catalysts** – We expect eToys to continue to export its proven and scalable business to other international markets over the next several quarters, especially in the $125-billion European kids market. eToys announced it would begin shipping to Canada from the United States the first week of November. We believe eToys is well positioned to execute in its seasonally strongest quarter this December with solid technology, fulfillment, and infrastructure in place, as well as new and innovative merchandising and marketing initiatives kicking off in the third quarter.

We continue to view eToys as a core Internet holding as the leading kids e-Tailer with a visible $75 billion U.S. market opportunity (+ another $125 billion European market opportunity with its entry in the U.K. market), a proven operating model, early category dominance, and a consumer-centric management team. Accordingly, we reiterate our market outperformer rating on the shares and our 12-18 month $80 price target.

### Review of the Quarter

eToys's reported results for the second quarter ended September 30, 1999, that exceeded our estimates by 24% with sales of $13.3 million and a loss per share of 27¢ (excludes non-cash charges) compared with our projection of $10.7 million and a 28¢ loss per share, respectively.

Goldman Sachs Investment Research

**CONFIDENTIAL**

AOL 01710

App. 0318

Desc: Review of the Leading Kids E-tailer Quarterly Results
First Page ID: DX0027-0001
Current Page ID: DX0027-0004                    Page 4 of 20                    DX0027-0004



DX0027-0004



**Internet • e-Tailing**  **United States**

**Summary.** We believe eToys has established itself as a leading business-to-consumer e-Tailer with a...

Accordingly, we view eToys as a leading core Internet franchise holding and the leading kids e-Retailing Category Killer. We reiterate our market outperformer rating with a 12-18 month price target of $80.

### Review of Second-Quarter 1999 Results

**Summary**

eToys reported second fiscal quarter results that exceeded our estimate with sales of $13.3 million (up 2,008% year over year and 67% sequentially) and a loss per share of 27¢ compared with our projection of $10.7 million and a 28¢ loss per share, respectively. Owing to increased sales and marketing and product development spending in the third quarter, we decreased our EPS estimate to 50¢ loss per share from a 35¢ loss per share, and left our revenue estimate unchanged. We increased our 1999 revenue estimate to $136.8 million from $134.3 million, reflecting this quarter's outperformance, and reduced EPS to a $1.27 loss per share from a $1.12 loss per share. We believe eToys is best positioned for this holiday season and to capture the vast global opportunity.

eToys' sales growth was up 67% sequentially (and 33% sequentially excluding BabyCenter, which closed on November 1) from $8.0 million in the June 1999 quarter. Strong sales gains were attributed to the 144,000 new customers, 42% repeat orders, and the addition of BabyCenter revenues. eToys' customer account base grew by 30% to 441,000 customer accounts from 463,000 customers at the end of the June 1999 quarter.

**Potential Near-Term Catalysts** — We expect eToys to continue to expand its proven and scalable business to other international markets over the next several quarters, especially in the $125-billion European kids market. eToys announced it would begin shipping to Canada from the United States the first week of November. We believe eToys is well positioned to execute in its seasonally strongest quarter this December with solid technology, fulfillment, and infrastructure in place, as well as new and innovative merchandising and marketing initiatives kicking off in the third quarter.

We continue to view eToys as a core Internet holding as the leading kids e-Tailer with a visible $75 billion U.S. market opportunity (+ another $125 billion European market opportunity with its entry in the U.K. market), a proven operating model, early category dominance, and a consumer-centric management team. Accordingly, we reiterate our market outperformer rating on the shares and our 12-18 month $80 price target.

**Review of the Quarter**

eToys reported results for the second quarter ended September 30, 1999, that exceeded our estimate by 24% with sales of $13.3 million and a loss per share of 27¢ (excludes non-cash charges) compared with our projection of $10.7 million and a 28¢ loss per share, respectively.

2  Goldman Sachs Investment Research

**CONFIDENTIAL**



AOL 01710

App. 0319



AOL01711

United States                                                                    Internet • e-Tailing

**Table 1: eToys, Inc. Quarterly Income Statement Analysis, First Quarter 1999 – 1998 Results**
(in $ millions, except per share data)

|  | Jun-99 | Jun-98 | Yr-over-Yr Pct. Change |
|---|---|---|---|
| **Total Revenues** | $0.4 | $8.0 | 1993% |
| Cost of Revenues | 0.3 | 6.5 | 1979% |
| **Gross Profit** | $0.1 | 31.5 | 2056% |
| Sales and Marketing | $1.4 | $11.2 | 741% |
| Product Dev. | 0.4 | 4.5 | 1080% |
| G&A | 0.4 | 3.2 | 657% |
| **Operating Expenses** | $2.2 | $19.4 | 737% |
| Operating Income | (52.1) | (517.9) | 748% |
| Interest Income | $0.0 | $0.0 | 9180% |
| **Pretax profit** | (52.1) | (517.0) | 709% |
| Net Income (exc. non-cash charges) | (52.1) | (517.0) | 709% |
| **EPS (exc. non-cash charges)** | (50.03) | (50.17) | 405% |
| Average shares | 61.5 | 98.0 | 59% |
| Cheap stock | 0.0 | 2.5 | 8495% |
| Net Inc. (as reported) | (52.2) | (520.9) | 864% |
| EPS (as reported) | (50.04) | (50.21) | 508% |
| **Margin Analysis** |  |  |  |
| Gross Margin | 18.4% | 18.0% |  |
| Sales & Mktng as a % of Sales | 358.2% | 144.4% |  |
| Prod Dev as a % of Sales | 106.0% | 58.8% |  |
| Gen & Admin as a % of Sales | 106.7% | 38.7% |  |
| Operating Margin | -558.7% | -224.8% |  |
| Source: Company reports. |  |  |  |

eToys's sales growth was up 67% sequentially from $8.0 million in the June 1999 quarter. Strong sales gains were attributed to 144,000 new customers and 42% repeat customer orders. (eToys changed from reporting percent of revenues from repeat customers to percent of orders from repeat customers. To provide comparison with last quarter, 37% of revenues were from repeat customers in second

quarter versus 40% in the first quarter.) eToys's customer account base grew by 31% sequentially (including BabyCenter customers) · to 611,000 customer accounts from 467,000 customers at the end of the June 1999 quarter.

**Table 2: Key Metrics**

|  | Q1 99 | Q2 99 |
|---|---|---|
| Total Customers (000) | 467 | 611 |
| Average # of customers (000) | 416 | 539 |
| Repeat Cust. Leverage ($/customer) | $8 | $9 |
| Repeat Cust.Purchases ($ millions) | $3.20 | $4.90 |
| Repeat Revenue | 40% | 37% |
| Repeat Orders | NA | 42% |
| New Customers (000s) | 102 | 144 |
| Avg Initial Order Size ($/new cust) | $47 | $59 |
| 1st Cust Purchases ($ millions) | $4.80 | $8.40 |
| Total Revenues ($ Millions) | $8.0 | $13.3 |

Source: Company reports and Goldman Sachs research.

By our estimates, average initial order size increased to $59 per customer, while repeat customer leverage (as defined by repeat sales divided by average number of customers) was $9 per customer. Both of these metrics were higher than the previous quarter (ending June 1999) performance of $47 per customer and $8 per customer. We believe the comparison of these sequential metrics is less relevant than year ago comparison, but have provided them in the absence of year ago data.

**Table 3: Review of Actual Fiscal Second-Quarter Results vs Our Estimates**
($ millions, except per-share data)

|  | Sep-99E ESTIMATE | Sep-99A. ACTUAL | COMMENTS |
|---|---|---|---|
| Total Revenue | $10.70 | $13.30 | Up 67% seq, 2088% seq. 24% |
| Cost of Revenues | 8.7 | 10.8 | Better than estimate |
| Gross Margin | 19.00% | 19.20% | Better mix & shipping economics |
| Sales and Marketing | $22.10 | $20.00 | 150.4% of revenues |
| Product Dev | 10 | 12.2 | 91.6% of revenues |
| G&A | 4.3 | 4.3 | 32.3% of revenues |
| Operating Expenses | $36.30 | $36.50 | Lower as a % of revenues vs Sept-98 |
| ·Operating Margin | -319.50% | -255.10% |  |
| Net Income* | ($33.00) | ($32.10) |  |
| EPS* | ($0.28) | ($0.27) |  |
| Average shares | 119.2 | 119.4 |  |
| * excludes non-cash charges |  |  |  |

Source: Company reports and Goldman Sachs research.

Goldman Sachs Investment Research                                                3

**CONFIDENTIAL**



AOL  01711

App. 0320

AOL01712

Review of Key Financials

eToys posted both strong year-over-year revenue growth (2,088%) and sequential gains (37%) that were 24% better than our expectations. This is the first quarter that includes revenues from BabyCenter, which closed on July 1. The gross margin was 200 basis points (bp) better at 19.2% compared with 19.0% in June 1999, and better than the 18.4% gross margin in the year-ago quarter owing to a better mix of products and improved shipping economics. We expect the gross margin to remain in the 19% range. Operating expenses also improved compared with the year-ago-quarter as sales and marketing as a percent of sales decreased to 150.4% from 389.3%, product development as a percent of sales declined 91.6% versus 114.6% in the year-ago quarter, and general and administrative as a percent of sales fell to 32.3% from 109.2%, all of which reflect the increased operating leverage that comes with scale. Both the higher gross margin and increased expense leverage resulted in a net income loss for the quarter of $32.1 million, or 27¢ loss per share (excludes non-cash charges), which was slightly better than our estimated loss of $33.0 million, or a 28¢ loss per share.

Review of Initiatives Achieved
During the Second Fiscal Quarter

1.  Infrastructure, technology & customer service:

    ■  Began shipping from its new warehouse in Provo, Utah, outsourced from Fingerhut. eToys is also shipping from its existing warehouse in Commerce, California, and has the option to use other Fingerhut warehouses if the need arises;

    ■  Reinforced its customer service systems;

    ■  Created a new network operating center in Santa Monica to better monitor its web-site activity and performance;

    ●  Converted to an Oracle database to have better scalability and systems integrity in advance of the holiday spike. eToys's backup-redundant web site will be up in a few days to prevent site outages. eToys conducted significant stress tests above expected peak demand levels to ensure that it has a robust system for the holiday shopping season.

2.  Merchandising:

    ■  Launched "Idea Center" with thematic content and products (September), which is driving early solid results;

    ■  Launched "Hobby Shop" with over 3,000 items, which has also exceeded initial expectations and is, in our view, an example of the unique offerings that eToys provides compared with key online and onland competitors.

3.  Marketing:

    ■  Signed an expanded three-year, $18-million marketing agreement with AOL to be the premier retailer of children's toys, videos, and books across several AOL brands. This extension, in our view, will serve to reinforce eToys's leadership position given the association with the leading access provider.

    ■  Strategic initiative with Rosie's (O'Donnell) Readers program to improve children's literacy nationwide by driving kids' interest in books and supporting fund raising for Rosie's children's charitable foundation. The initiative includes a regular-featured segment on "The Rosie O'Donnell Show" and on the eToys web site. Each week, Rosie will make a book recommendation on her show for each of the four age categories. This partnership provides significant visibility for eToys's new children's books product category. This type of cause-related marketing effort also reinforces the emotional satisfaction in purchasing a product to improve a child life.

4.  International expansion:

    ■  Launched its first international store in the U.K. at www.etoys.co.uk in mid-October, exporting a proven, scalable business. We expect the U.K. to serve as a beachhead for expansion into the $125-billion European kids market.

New Initiatives Expected

eToys announced it would continue its international expansion beyond the U.K. and begin shipping to Canada the first week of November using its U.S.

4.

Goldman Sachs Investment Research

CONFIDENTIAL



App. 0321



DX0027-0006

AOL01712

Internet • e-Tailing                                                    United States

**Review of Key Financials**

eToys posted both strong year-over-year revenue growth (2,089%) and sequential gains (37%) that were 24% better than our expectations. This is the first quarter that includes revenues from BabyCenter, which closed on July 1. The gross margin was 200 basis points (bp) better at 19.2% compared with 19.0% in June 1999, and better than the 18.4% gross margin in the year-ago quarter owing to a better mix of products and improved shipping economics. We expect the gross margin to remain in the 19% range. Operating expenses also improved compared with the year-ago quarter as sales and marketing as a percent of sales decreased to 150.1% from 209.3%, product development as a percent of sales declined 91.6% versus 134.0% in the year-ago quarter, and general and administrative as a percent of sales fell to 32.5% from 369.2%, all of which reflect the increased operating leverage that comes with scale. Both the higher gross margin and increased expense leverage resulted in a net income loss for the quarter of $52.1 million, or 27¢ loss per share (excludes non-cash charges), which was slightly better than our estimated loss of $33.0 million, or a 28¢ loss per share.

**Review of Initiatives Achieved During the Second Fiscal Quarter**

1. Infrastructure, technology & customer service:

   • Began shipping from its new warehouse in Provo, Utah, announced from Fingerhut. eToys is also shipping from its existing warehouse in Commerce, California, and had the option to use other Fingerhut warehouses if the need arises;

   • Reinforced its customer service systems;

   • Created a new network operating center in Santa Monica to better monitor its web-site activity and performance;

   • Converted to its Oracle database to have better scalability and systems integrity in advance of the holiday spike. eToys's backup-redundant web site will be up in a few days to prevent site outages. eToys conducted significant stress tests above expected peak demand levels to ensure that it has a robust system for the holiday shopping season.

2. Merchandising:

3. **Marketing:**

   ■ Signed an expanded three-year, $18-million marketing agreement with AOL to be the premier retailer of children's toys, videos, and books across several AOL brands. This extension, in our view, will serve to reinforce eToys's leadership position given the association with the leading access provider.

   ■ Strategic initiative with Rosie's (O'Donnell) Readers program to improve children's literacy nationwide by driving kid's interest in books and supporting fund raising for Rosie's children's charitable foundation. The initiative includes a regular-featured segment on "The Rosie O'Donnell Show" and on the eToys web site. Each week, Rosie will make a book recommendation on her show for each of six four age categories. This partnership provides significant visibility for eToys's new children's books product category. This type of cause-related marketing effort also reinforces the emotional satisfaction in purchasing a product to improve a child life.

4. International expenditure

   ■ Launched its first international store in the U.K. in www.etoys.co.uk in mid-October, expanding a proven, scalable business. We expect the U.K. to serve as a beachhead for expansion into the $125-billion European kids market.

**New Initiatives Expected**

eToys announced it would continue its international expansion beyond the U.K. and begin shipping to Canada the first week of November using its U.S.

Goldman Sachs Investment Research

4.

CONFIDENTIAL


AOL 01712

Desc: Snapshot Monday, Jun, 25, 2007 10:45 AM
First Page ID: DX0027-0001
Current Page ID: DX0027-0006-SS01                Page 6 of 20                DX0027-0006-SS01

infrastructure. We expect eToys to continue to expand in Europe on the heels of its successful launch in the U.K. in addition to potentially entering Asia.

eToys is continuing to expand its fulfillment capabilities with a new warehouse in Danville, Virginia, which will serve the East Coast order demand (should be operational prior to Christmas 2000).

On the marketing side, eToys will be a retail partner in McDonald's LEGO Happy Meal promotion scheduled to launch October, 29, contributing five $100 gift certificates to the Happy Meal sweepstakes. The promotion provides great visibility to eToys ahead of the holidays via its logo displayed on all Happy Meal bags, tray liners and floor merchandise. This strategic partnership is an excellent example of how an online player can leverage the benefits of a brick and mortar location without making such an investment.

eToys launched a new advertising campaign in October (eToys. Where Great Ideas Come to You) with a marketing message focusing on the emotional appeal of shopping at eToys. We expect the company to extend this campaign into a new holiday-themed execution supported by a significant advertising budget.

On the merchandising side, eToys continues to innovate with new integrated content, community, and merchandising, which further separates its ability in these areas from the competition. eToys will launch an improved "shop by age" feature which will align all seven product categories appropriate for certain ages into integrated areas on the web site. Community feedback will be enhanced to separate out kids' feedback from adults' feedback. Additionally, eToys will use NetPerception's collaborative filtering technology to serve up recommendations based on items place by kids into their eToys wish list. We expect these merchandising improvements to roll out in the very near-term. In sum, eToys's ongoing marketing, operational, and merchandising improvements should position eToys to continue to be the category killer in the kids e-tailing segment in the United States and beyond.

## eToys Continues to Extend its Lead as the Leading Kids Merchant

While eToys clearly offers an attractive alternative to consumers over the traditional brick and mortar toy store experience through increased convenience, service selection, and content, it has also begun to demonstrate a superior ability to develop online merchandising. eToys is more than simply a toy store, and is instead a destination for kids with seven categories devoted exclusively to kids: toys, baby products, children's books, software, videos, video games and music. Through its superior merchandising techniques, eToys has become a place for kids and parents to go for inspiration and ideas.

eToys opened its virtual doors just two years ago with many helpful features such as toy recommendations (classics, bestsellers, favorites by age, toys from movies, picks of the month, popular characters, toybox essentials, gifts under $20) and value-added services such as birthday reminders, address books, wish lists, express checkouts, email confirmations, and online order status checks.

eToys has continued to stay ahead of the competition through new and innovating merchandising techniques, relevant strategic marketing partnerships, and promotions.

CONFIDENTIAL          AOL 01713



App. 0323



### Figure 1: eToys's Homepage Demonstrates Innovative Partnerships, Merchandising, and Promotions



**Search by keword, age, category, and price**

**Special recommendations:** bestsellers, award winners, under $20, special needs, classics, etc.

**Idea Center** stimulates the imagination and helps drive additional sales

**Kid Crazes area** keeps parents in touch with the latest hot toys

**As a Category Killer** focused exclusively on kids, eToys can provide unique items not found at brick and mortar stores or broadline retailers (on and offline)

← **Seven kids categories**

**10% off** promotion on Gift Registry items

**$10 off cross-** promotion with GapKids and babyGap

**Strategic relationship** with Rosie's (O'Donnell) Readers. Rosie makes children's book recommendations on her show each week

**Feature Shops are** thematic stores within a store

**New Lego McDonald's** Happy Meal promotions leverages land-based store without corresponding investment

Source: www.eToys.com and Goldman Sachs research.

### New Marketing Initiatives

eToys is successfully leveraging land-based brand names for cross-promotions to efficiently target its customer, Mom. Three of the most recent promotions are the McDonald's LEGO Happy Meal promotions, Rosie's Reader's promotion and the babyGap and GapKids cross-promotion.

Through the McDonald's promotion, eToys gains access to extensive brand promotion (eToys logo to be displayed through tray liners, floor merchandise and Happy Meal bags) at very little cost (five $100 gift certificates distributed to the Happy Meal

sweepstakes). This promotion illustrates how eToys can leverage other leading kid brand names.

Through its agreement with Rosie's (O'Donnell) Readers (see Figure 2), eToys is also leveraging a credible Mom spokesperson, Rosie O'Donnell, to efficiently reach its target customer. Each week on popular day-time talk show, *The Rosie O'Donnell Show*, Rosie will recommend children's books appropriate for different ages. This promotion provides eToys with significant visibility for its newer kids' books category at no cost to eToys.

**CONFIDENTIAL**

AOL  01714

App. 0324



United States                                                                          Internet • e-Talling

Figure 2: Rosie's Readers



Source: www.eToys.com.

Innovative Merchandising
Techniques Inspire Parents and Kids Alike

Feature Shops. eToys effectively merchandises products across categories in eight different features shops that function as smaller stores within a store: Discovery Toys boutique, school supplies, doll boutique, infant toy boutique, train station store, Star Wars store, and Summer Shop. The Feature Shops are a unique merchandise technique that help eToys's customers find great ideas (see Figure 3).

The most recent addition is the Discovery Toys boutique – eToys is the exclusive online seller for Discovery Toys which sells educational and developmental toys. Products are sold by age category as well as specific developmental benefit (thinking and learning, creativity, auditory, visual, tactile, fine motor, gross motor, social and emotional, and language). Through its own strong brand, eToys is able to partner with other well-regarded brands.

Figure 3: Feature Shops Function as Specialty Stores Within a Store



Source: www.eToys.com and Goldman Sachs research.

CONFIDENTIAL

AOL 01715



App. 0325

Internet • e-Tailing                                                                    United States

### Figure 4: Hobby Shop



Source: www.eToys.com and Goldman Sachs research.

Hobby Shop. eToys recently launched Hobby Shop, an innovative product center that appeals to kids (see Figure 4). eToys offers products, supplies, and instructions for building models, train sets, electric road racing, radio controls, model rockets, flying planes, and kites.

Idea Center. Idea Center is an example of another merchandising technique that makes eToys unique and is in keeping with the theme delivered in its current television advertisements (see Figure 6): "eToys. Where Great Ideas Come to You." eToys advertisements focus on the emotional connection that eToys can deliver with great ideas that kids and parents can do together.

The recent Hobby Shop and Idea Center initiatives leverage eToys's strong position as a kids category killer by presenting thematic product and gift ideas across all of its kids product categories and should enhance cross-selling opportunities.

eToys makes the shopping experience easier and more fun for kids and parents alike, and provides value-added services such as individual gift wrapping with "to-from" labels for multiple gifts within an order so that the right kid gets the right gift.

### Figure 5: Individual Gift Wrap and Labels



Source: www.eToys.com.

8                                                      Goldman Sachs Investment Research

CONFIDENTIAL          

App. 0326

Desc: Review of the Leading Kids E-tailer Quarterly Results
First Page ID: DX0027-0001
Current Page ID: DX0027-0010                    Page 10 of 20                    DX0027-0010

United States                                                                                    Internet • e-Tailing

**Figure 6: Idea Center Recommends Products That Inspire Kids' Imaginations**



Source: www.eToys.com and Goldman Sachs research.

Goldman Sachs Investment Research                                                                        9

CONFIDENTIAL



App. 0327

AOL01718

Internet • e-Tailing                                                    United States

## Review of the Recent European Expansion

In addition to extending its lead through innovative and effective merchandising techniques and marketing efforts, eToys is extending its lead by exporting its scalable model overseas with the recent expansion into the United Kingdom (in October) with toy, software, video, and PC/Video game sales via www.etoys.co.uk (see Figure 7). The grand opening reinforces our belief that eToys has a highly scalable/exportable model based on its ability to penetrate the European market in less than six months.

### Overview

eToys Has a Significant Opportunity in International Expansion based on the following: The market size for eToys current categories in Europe is large estimated at approximately $125 billion compared to the United States at $55 billion. The market is highly fragmented consisting of local retailers and no significant national player or e-retailer. Toy online selling provides significant advantages over the European toy retail shopping experience.

The deficiencies of the toy retail shopping experience in selection, and convenience are more pronounced in the European markets than the U.S. eToys proven ability to provide an improved value proposition to the consumer through increased selection, content, service/customization, and convenience should allow them to quickly establish a leading market position in new international markets.

Toy Retail Competition Limited in the United Kingdom. Toys "R" Us will be the leading

**Figure 7: www.eToys.co.uk – eToys Gains a Foothold into $125-Billion European Market**



Source: www.eToys.co.uk

10                                              Goldman Sachs Investment Research

CONFIDENTIAL

AOL 01718

App. 0328



competitor to eToys in the United Kingdom with approximately 60 retail locations and more than 800 products offered online via www.toysrus.co.uk. We do not believe that no other major competitor has established a meaningful presence online in the U.K.

**Management Team.** In our view eToys is well equipped to export its proven e-Tailing model to the European market. Ruben Rodriguez, formerly the head of Boston Consulting Group's International Consumer and Retail Group, is leading the international effort. Mr. Rodriguez's global experience makes him well suited to meet the challenges of International selling to include establishing local vendor relationship and operating functions. James Bidwell joined Mr. Rodriguez as the director of marketing for Europe in August 1999. As a U.K. national Mr. Bidwell's local market knowledge is critical in translating a Global strategy at the local level.

**Operations.** In the United Kingdom, the company is sourcing products both locally and globally, while fulfillment/distribution is executed by eToys from a local warehouse in Swindon, London. We believe in additional countries the company will likely leverage joint venture opportunities to source and distribute product when complete ownership of the its supply chain is not appropriate.

**Future Expansion Potential.** The company's ability to clone its operating functions and systems into the European Market has enabled it to enter its first international market in less than 6 months. We believe the U.K. will serve as a foothold for eToys to expand into other European countries at an accelerated pace in FY 2000. We believe the company will look to enter the Asian market as Japan represents the second largest stand-alone market and will likely have a new player in toy e-Tailing, eShopping Toys. eShopping Toys is a joint venture of Yahoo! Japan, Bandai, and SOFTBANK to sell toys online in Japan.

The company's plan to deploy a Global strategy executed at the local level in International markets should allow them to develop both the European and Asian markets simultaneously.

**Key Drivers of Adoption Rates**

Despite a large addressable market, adoption of e-Tailing in the European markets lags the United States. The U.K. is significantly ahead of many of the European markets in key considerations for e-Tailing adoption.

Considerations for adoption of e-Tailing in International markets consist of the following: PC penetration, Online Access, Credit Card Penetration, and local phone call costs.

**Table 4: Key Penetration Statistics in the United States vs. Europe, December 1998**

|  | US | Europe |
|---|---|---|
| % Online | 38 | 12 |
| PCs per 1000 | 580 | 352 |
| Cost per 20 Hrs | $35 | $48 |
| Disposable Income per capita | $21,900 | $14,800 |
| Credit Cards per 100 adults | 148 | 39 |
| Source: Forbes. | | |

Based on percentage internet penetration the U.K. is ranked fifth in Europe. But on an absolute basis the U.K. has the second largest number of online users at 5.3 million homes as of the end of 1998

**Table 5: Internet Penetration Levels Across Europe, 1998**

|  | 1998 |
|---|---|
| Finland | 31% |
| Sweden | 26% |
| Norway | 24% |
| Denmark | 21% |
| Netherlands | 18% |
| UK | 15% |
| Switzerland | 15% |
| Germany | 13% |
| Austria | 11% |
| Ireland | 8% |
| Belgium | 8% |
| France | 7% |
| Italy | 5% |
| Spain | 5% |
| Portugal | 5% |
| Greece | 3% |
|  |  |
| Europe | 11% |
| Source: International Data Corp. | |

Credit cards are the only form of currency in e-retailing and usage in foreign countries is not as

**CONFIDENTIAL**



App. 0329

AOL01720

Internet • e-Tailing                                                       United States

wide spread as compared to the U.S. The U.K. is ranked second in credit card penetration in Europe.

Unlike the United States local phone calls are not part of the fixed local usage charge. The U.K. rate is approximately a $0.01 above the average in Europe.

**Table 6: Credit Card Penetration Across Europe, 1994-1995**

| Country | Cards / 1000 inhabitants | |
|---|---|---|
| | 1994 | 1995 |
| Sweden | 1375 | 1535 |
| UK | 934 | 1012 |
| Belgium | 881 | 932 |
| Germany | 582 | 911 |
| Spain | 819 | 792 |
| Portugal | 684 | 720 |
| Finland | 620 | 625 |
| Denmark | 543 | 563 |
| Austria | 501 | 548 |
| France | 385 | 406 |
| Italy | 313 | 351 |
| Ireland | 273 | 341 |
| Greece | 103 | 136 |
| Netherlands | 82 | 97 |
| EU average | 580 | 657 |

Source: Eurostat.

**Table 8: Local Call Charge Rates**

| (US¢) Country | Peak Rate per Minute Local |
|---|---|
| Austria | 9.47 |
| Belgium | 7.96 |
| Ireland | 7.88 |
| U.K. (B.T.) | 5.55 |
| Spain | 4.80 |
| Denmark | 4.77 |
| Switzerland | 4.61 |
| France | 4.51 |
| Germany | 4.20 |
| Finland | 3.82 |
| Portugal | 3.29 |
| Netherlands | 3.17 |
| Norway | 3.10 |
| Italy | 2.28 |
| Sweden | 2.22 |
| Greece | 1.55 |
| Average | 4.57 |

Source: GS Telecom.

The United Kingdom is ranked second in Europe based on the absolute number of online users. The number of online users is expected to increase by a 40% CAGR from 1998 to 2002, totaling more than 90 million households

B2C commerce is estimated to reach $10.8 billion by 2002 in the U.K. and approximately $50 billion in Europe making this a very attractive opportunity for eToys.

**Table 7: Number of Home Users Online**

| Home Users (000) | 1998 | 2002 | CAGR 1998-2002 |
|---|---|---|---|
| Germany | 9,280 | 21,840 | 36 |
| UK | 7,840 | 15,870 | 31 |
| France | 3,670 | 15,740 | 66 |
| Italy | 2,850 | 7,970 | 48 |
| Sweden | 2,350 | 4,810 | 31 |
| Netherlands | 2,260 | 5,450 | 39 |
| Spain | 1,830 | 4,860 | 48 |
| Finland | 1,230 | 2,080 | 20 |
| Denmark | 950 | 1,760 | 28 |
| Switzerland | 960 | 2,300 | 39 |
| Norway | 870 | 1,550 | 27 |
| Austria | 880 | 2,150 | 42 |
| Belgium | 750 | 2,410 | 51 |
| Portugal | 380 | 1,120 | 50 |
| Ireland | 280 | 720 | 41 |
| Greece | 210 | 690 | 55 |
| Europe | 36,590 | 91,120 | 40 |

Source: International Data Corp.

**Table 9: B2C Commerce Revenue, 1997-2002**

| B2C Internet Commerce $ millions | 1998 | 2002 | CAGR 1998-2002 |
|---|---|---|---|
| Germany | 1863 | 15340 | 120 |
| UK | 1402 | 10810 | 115 |
| Netherlands | 339 | 2590 | 115 |
| Sweden | 285 | 2180 | 115 |
| France | 337 | 6870 | 197 |
| Italy | 229 | 2430 | 141 |
| Switzerland | 172 | 1490 | 124 |
| Finland | 136 | 940 | 104 |
| Austria | 153 | 1360 | 128 |
| Norway | 130 | 1010 | 116 |
| Denmark | 106 | 990 | 127 |
| Spain | 107 | 1150 | 145 |
| Belgium | 68 | 770 | 143 |
| Ireland | 39 | 380 | 133 |
| Portugal | 18 | 190 | 137 |
| Greece | 12 | 140 | 143 |
| TOTAL | 5396 | 48820 | 126 |

Source: International Data Corp.

12                                        Goldman Sachs Investment Research

CONFIDENTIAL          AOL 01720

App. 0330


DX0027-0014

## Financial Outlook

We maintain a very positive outlook for eToys's third fiscal quarter, which is by far its biggest quarter of the year (we expect it to account for 65% of 1999 revenues). Owing to increased sales and marketing and product development spending in the third quarter, we decreased our EPS estimate to a loss of 50¢ per share from a loss of 35¢ per share, and left our revenue estimate unchanged. We believe eToys's increased marketing spending (while modest on an absolute basis) is necessary and critical based on the increased competitive activity. The increased marketing effort should help to ensure that eToys can leverage its superior value proposition to strengthen its leadership position in Kids e-Tailing category. We raised our 1999 revenue estimate to $126.8 million from $124.3 million, reflecting this quarter's outperformance and revised our loss-per-share estimate to $1.27 from $1.12 (see Tables 10 and 11).

### Potential Near-Term Catalysts

We expect eToys to continue to export its proven and scalable business to other international markets over the next several quarters, especially in the $125-billion European kids market and potentially Asia. Additionally, eToys announced it would begin shipping to Canada from the United States the week of November 1. We also believe many of eToys's ongoing marketing initiatives and strategic partnerships will prove to drive results well after the Christmas season. Accordingly, we believe eToys is well positioned to execute in its seasonally strongest quarter this December with solid technology, fulfillment and infrastructure in place as well as new and innovative merchandising and marketing initiatives kicking off in the December quarter.

### Investment Opinion

We continue to view eToys as a core Internet holding as the leading kids e-Tailer with a visible $75 billion U.S. market opportunity (and an additional $125-billion European market opportunity with the U.K. expansion). In our view, the company's proven operating model, early category dominance, superior online merchandising, and content, world-class marketing, and consumer-centric management team will continue to strengthen its leadership position. Accordingly, we reiterate our

market outperformer rating on the shares and our $80 price target.

## Valuation

We believe the shares of eToys could trade at $80 a share over the next 12-18 months. We arrived at this price range based on discounted cash flow valuation (see Table 12). To value eToys, we estimated a 50%, three- to five-year revenue growth rate, with profitability by the third quarter of 2002. Over the longer term, we estimate that eToys could achieve an operating margin of 8%-10% with a 25%-30% gross margin and a 17%-20% SG&A-to-sales ratio.

CONFIDENTIAL

AOL  01721

App. 0331



AOL01722

Internet • e-Tailing                                                                United States

## Table 10: eToys, Quarterly Income Statement
($ millions, except per-share data; March fiscal year-end)

*Tabular financial data illegible in source scan.*

Source: Company reports and Goldman Sachs research.

CONFIDENTIAL



AOL 01722

App. 0332



DX0027-0016

AOL01723

United States                                                                    Internet • e-Tailing

## Table 11: eToys, Annual Income Statement
($ millions, except per-share data; March fiscal year-end)

Source: Company reports and Goldman Sachs research.

Goldman Sachs Investment Research

CONFIDENTIAL

AOL 01723

App. 0333




Internet • e-Tailing                                                                                             United States

### Table 12: eToys, Discounted Cash Flow Analysis
($ millions)

|  |  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | Projected Fiscal Year Ended | | | | | | |
|  | 1999 | 1999E | 2000E | 2001E | 2002E | 2003E | 2004E | 2005E | 2006E | 2007E | 2008E | 2009E |
| Revenue $ MM | 30 | 127 | 254 | 466 | 731 | 1,227 | 1,840 | 2,668 | 3,736 | 5,043 | 6,606 | 8,560 |
| % Growth |  |  | 101% | 83% | 70% | 58% | 50% | 45% | 40% | 35% | 31% | 30% |
| Theoretical EBIT | -23 | -146 | -147 | -46 | -67 | 25 | 147 | 267 | 374 | 504 | 604 | 648 |
| Theoretical Margin | -77% | -116% | -114.9% | -114.9% | -8.3% | 2.0% | 8.0% | 10.0% | 10.0% | 10.0% | 10.0% | 10.0% |
| Taxes | 0 | - | - | - | - | 9 | 56 | 101 | 142 | 192 | 250 | 338 |
| Tax Rate | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% | 39% |
| Net Income | (23.2) | (146.7) | (146.8) | (84.7) | (67.3) | 18.2 | 91.3 | 166.4 | 231.8 | 312.7 | 422.1 | 548.7 |
| Less Net Cap Ex. |  | 0 | 0 | 0 | 0 | (100) | 0 | 0 | (100) | 0 | 0 | 0 |
| Amortization |  | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NOL Add Back |  | 0 | 0 | 0 | 0 | 0 | 41 | 72 | 15 | 0 | 0 | 0 |
| Change in WC |  | (5.1) | (8.0) | (2.7) | (5.1) | (0.6) | (17.3) | (18.6) | (21.3) | (26.1) | (35.3) | (40.8) |
| Free Cash Flow |  | (161.8) | (154.9) | (87.4) | (72.4) | (76.3) | 120.0 | 220.8 | 125.2 | 286.5 | 386.8 | 507.9 |
| Terminal Value |  |  |  |  |  |  |  |  |  |  |  | 23,718 |
| Total Cash Flow |  | (152) | (155) | (87) | (72) | (76) | 120 | 221 | 125 | 287 | 387 | 24,226 |

| | Single Point Price Target |
|---|---|
| NPV of Free Cash Flow MM | $561 |
| NPV of Terminal Value MM | $3,977 |
| Total NPV MM | $4,538 |
| NPV per Share | $30 |
| | |
| Current Price | $ 36.00 |
| Implied Premium | 46% |

| Price Target Sensitivity - Based on Beta | | | |
|---|---|---|---|
| $149 | $99 | ($12) | ($39) |
| $6,492 | $4,360 | $3,698 | $3,162 |
| $6,641 | $4,917 | $3,684 | $3,153 |
| $56 | $41 | $31 | $26 |
| 2.9 | 3.3 | 4.9 | 4.8 |

Cost of Equity Assumptions
Risk Free Rate %   6.5
Beta   1.4
Equity Risk Premium %   3.5

Source: Company reports and Goldman Sachs research.

16                                                                      Goldman Sachs Investment Research

CONFIDENTIAL



AOL 01724

App. 0334

Desc: Review of the Leading Kids E-tailer Quarterly Results
First Page ID: DX0027-0001
Current Page ID: DX0027-0018                        Page 18 of 20                        DX0027-0018

AOL01725

**CONFIDENTIAL**

AOL 01725



App. 0335

| | |
|---|---|
| **Desc:** Review of the Leading Kids E-tailer Quarterly Results | |
| **First Page ID:** DX0027-0001 | |
| **Current Page ID:** DX0027-0019 | *Page 19 of 20* | DX0027-0019 |

AOL01726

### Goldman Sachs Global Research Centers

**New York**
Goldman, Sachs & Co.
One New York Plaza
New York, New York 10004
United States
Tel:   (1) 212-902-1000
Fax:  (1) 212-902-2145

**London**
Goldman Sachs International
Peterborough Court
133 Fleet Street
London, EC4A 2BB, England
Tel:   (44) 171-774-1000
Fax:  (44) 171-774-1146

**Hong Kong**
Goldman Sachs (Asia) L.L.C.
Asia Pacific Finance Tower
Citibank Plaza, 3 Garden Road
Central, Hong Kong
Tel:   (852) 2978-1000
Fax:  (852) 2978-0479

**Tokyo**
Goldman Sachs (Japan) Ltd.
ARK Mori Building
12-32, Akasaka 1-chome
Minato-ku, Tokyo 107, Japan
Tel:   (813-3589-7000
Fax:  (813-3587-9263

**Korea**
Goldman, Sachs & Co.
Dong Ah Life Insurance Building
33 Da-Dong, Chung-Ku
Seoul, South Korea
Tel:   (822) 3788-1000
Fax:  (822) 3788-1001

**Frankfurt**
Goldman, Sachs & Co. oHG
MesseTurm
60308 Frankfurt am Main
Germany
Tel:   (49) 69-7532-1000
Fax:  (49) 69-7532-2800

**Paris**
Goldman Sachs Paris Inc. et Cie
2, Rue de Thann
75017 Paris
France
Tel:   (33) 1-4212-1000
Fax:  (33) 1-4212-1499

**Singapore**
Goldman Sachs (Singapore) Pte.
50 Raffles Place
#29-01 Singapore Land Tower
Singapore 048623
Tel:   (65) 228-8100
Fax:  (65) 228-8474

Goldman, Sachs & Co. or an affiliate has managed or comanaged a public offering of eToys Inc. securities in the past several years. Goldman, Sachs & Co. or an affiliate makes an over-the-counter market in eToys Inc. common stock. Goldman, Sachs & Co. or an affiliate may deal as principal in any of the securities mentioned.

©1999 Goldman, Sachs & Co. All rights reserved.

This material is for your private information, and we are not soliciting any action based upon it. This report is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. Certain transactions, including those involving futures, options, and high yield securities, give rise to substantial risk and are not suitable for all investors. The material is based upon information that we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such. Opinions expressed are our current opinions as of the date appearing on this material only. While we endeavor to update on a reasonable basis the information discussed in this material, there may be regulatory, compliance, or other reasons that prevent us from doing so. We and our affiliates, officers, directors, and employees, including persons involved in the preparation or issuance of this material may, from time to time, have long or short positions in, and buy or sell, the securities, or derivatives (including options) thereof, of companies mentioned herein. No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without Goldman, Sachs & Co.'s prior written consent.

This material has been issued by Goldman, Sachs & Co. and/or one of its affiliates and has been approved by Goldman Sachs International, which is regulated by The Securities and Futures Authority, in connection with its distribution in the United Kingdom and by Goldman Sachs Canada in connection with its distribution in Canada. This material is distributed in Hong Kong by Goldman Sachs (Asia) L.L.C., in Japan by Goldman Sachs (Japan) Ltd., and in Singapore through Goldman Sachs (Singapore) Pte. This material is not for distribution in the United Kingdom to private customers, as that term is defined under the rules of The Securities and Futures Authority; and any investments, including any convertible bonds or derivatives, mentioned in this material will not be made available by us to any such private customer. Neither Goldman, Sachs & Co. nor its representative in Seoul, Korea, is licensed to engage in the securities business in the Republic of Korea. Goldman Sachs International and its non-U.S. affiliates may, to the extent permitted under applicable law, have acted upon or used this research, to the extent it relates to non-U.S. issuers, prior to or immediately following its publication. Foreign-currency-denominated securities are subject to fluctuations in exchange rates that could have an adverse effect on the value or price of, or income derived from, the investment. In addition, investors in securities such as ADRs, the values of which are influenced by foreign currencies, effectively assume currency risk.

Further information on any of the securities mentioned in this material may be obtained upon request, and for this purpose persons in Italy should contact Goldman Sachs S.I.M. S.p.A. in Milan, or at its London branch office at 133 Fleet Street, and persons in Hong Kong should contact Goldman Sachs (Asia) L.L.C. at 3 Garden Road. Unless governing law permits otherwise, you must contact a Goldman Sachs entity in your home jurisdiction if you want to use our services in effecting a transaction in the securities mentioned in this material.

CONFIDENTIAL



App. 0336

# App. 14

Source: News & Business > News > Wire Service Stories ⓘ
Terms: (further info! or contact pre/20 etoys) or (headline(etoys) or company(etoys) and contact or further information or subject(press release)) and date is 2/26/2001 (Edit Search)

☞Select for FOCUS™ or Delivery

☐

*Business Wire February 26, 2001, Monday*

Copyright 2001 Business Wire, Inc.
Business Wire

**February** 26, 2001, Monday



**DISTRIBUTION:** Business Editors

**LENGTH:** 554 words

**HEADLINE: eToys** Announces Plans for Bankruptcy Filing

**DATELINE:** LOS ANGELES, Feb. 26, 2001

**BODY:**
eToys Inc. (Nasdaq:ETYS) today announced that it plans to file for protection under federal bankruptcy law within approximately the next five to 10 days. The company said its decision was based on the results to date of its efforts to pursue strategic alternatives and its conclusion that, under any scenario, its outstanding liabilities, which totaled approximately $274.0 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction. Accordingly, the company has determined that it has no alternative other than to file for bankruptcy protection. The company also said that, in light of these facts, it has concluded that its outstanding equity securities, including both its common stock and its Series D preferred stock, have no value. The company strongly encouraged anyone considering an investment in these securities to consider its determination that they are worthless.

In addition, the company said it has received a notice from Nasdaq that it no longer meets the minimum net tangible assets requirement for The Nasdaq National Market. The company does not believe that it will be able to regain compliance with this requirement, and it has notified Nasdaq of this fact. Accordingly, the company anticipates that its common stock will be delisted from trading in the very near term, certainly sooner than the previously expected date of May 2, 2001.

The company reiterated that its cash, cash equivalents and cash that may be generated from operations will be sufficient to continue its operations only to March 31, 2001 at the latest and that it has provided job elimination notices to all of its employees, with termination dates extending up to April 6, 2001. The company anticipates that it will close the eToys.com Web site on or about March 8, 2001 and that, thereafter, the company will focus solely on the winding down of its business and the liquidation of its assets.

The company also announced that, following authorization of the bankruptcy filing, three of its directors, Tony Hung, Michael Moritz and Dan Nova, have resigned from the board effective today. The remaining directors consist of Edward C. Lenk, the Chairman of the Board and Chief Executive Officer of the company, and Peter Hart.

Forward-Looking Statements                                      AOL 00349

Statements made in this document that are forward-looking involve risks and uncertainties that could cause results to differ materially from those expressed. Such risks and uncertainties include, but are not limited to, the company's expectation that it will cease operations in the near term and that its

**Desc:** Press Releases re: eToys to File for Bankruptcy, Shut Down Site
**First Page ID:** DX0059-0001
**Current Page ID:** DX0059-0001                    *Page 1 of 4*                    DX0059-0001





Source: News & Business > News > Wire Service Stories ⓘ
Terms: (further info| or contact pra/20 etoys) or (headline(etoys) or company(etoys)) and contact or further information or subject(press release)| and date is 2/26/2001 (Edit Search)

☐ Select for FOCUS™ or Delivery
☐

Business Wire February 26, 2001, Monday

Copyright 2001 Business Wire, Inc.
Business Wire

DEFENDANT'S
EXHIBIT
29

February 26, 2001, Monday

DISTRIBUTION: Business Editors

## BODY:

eToys Inc. (Nasdaq:ETYS) today announced that it plans to file for protection under federal bankruptcy law within approximately the next five to 10 days. The company said its decision was based on the results to date of its efforts to pursue strategic alternatives and its conclusion that, under any scenario, its outstanding liabilities, which totaled approximately $274.0 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction. Accordingly, the company has determined that it has no alternative other than to file for bankruptcy protection. The company also said that, in light of these facts, it has concluded that its outstanding equity securities, including both its common stock and its Series D preferred stock, have no value. The company strongly encouraged anyone considering an investment in these securities to consider its determination that they are worthless.

The company reiterated that its cash, cash equivalents and cash that may be generated from operations will be sufficient to continue its operations only to March 31, 2001 at the latest and that it has provided job elimination notices to all of its employees, with termination dates extending up to April 6, 2001. The company anticipates that it will close the eToys.com Web site on or about March 8, 2001 and that, thereafter, the company will focus solely on the winding down of its business and the liquidation of its assets.

The company also announced that, following authorization of the bankruptcy filing, three of its directors, Tony Hung, Michael Moritz and Don Nova, have resigned from the board effective today. The remaining directors consist of Edward C. Lenk, the Chairman of the Board and Chief Executive Officer of the company, and Peter Hart.

Forward-Looking Statements                                    AOL 00349

Statements made in this document that are forward-looking involve risks and uncertainties that could cause results to differ materially from those expressed. Such risks and uncertainties include, but are not limited to, the company's expectation that it will cease operations in the near term and that its

http://www.lexis.com/research/retrieve? _m=009f4bdaad33bd47d874|ase427a2d2b&docnum=3&_f...  2/8/2005

Desc: Snapshot Monday, Jun, 25, 2007 08:18 PM
First Page ID: DX0059-0001
Current Page ID: DX0059-0001-SS01          Page 1 of 4           DX0059-0001-SS01

DX0059-0001



Source: News & Business > News > Wire Service Stories (i)
Terms: (further info) or contact pro/20 etoys) or (headline(etoys) or company(etoys) and contact or further information or
subject(press release) and date is 2/26/2001 (Edit Search)

☐ Select for FOCUS™ or Delivery

Business Wire February 26, 2001, Monday

**DEFENDANT'S EXHIBIT 59**

Copyright 2001 Business Wire, Inc.
Business Wire

February 26, 2001, Monday

**DISTRIBUTION:** Business Editors

**LENGTH:** 554 words

**HEADLINE:** eToys Announces Plans for Bankruptcy Filing

**DATELINE:** LOS ANGELES, Feb. 26, 2001

**BODY:**
eToys Inc. (Nasdaq:ETYS) today announced that it plans to file for protection under federal bankruptcy law within approximately the next five to 10 days. The company said its decision was based on the results to date of its efforts to pursue strategic alternatives and its conclusion that, under any scenario, its outstanding liabilities, which totaled approximately $274.0 million as of January 31, 2001, will substantially exceed the value of any proceeds or assets that may be received in a strategic transaction. Accordingly, the company has determined that it has no alternative other than to file for bankruptcy protection. The company also said that, in light of these facts, it has concluded that its outstanding equity securities, including both its common stock and its Series D preferred stock, have no value. The company strongly encouraged anyone considering an investment in these securities to consider its determination that they are worthless.

In addition, the company said it has received a notice from Nasdaq that it no longer meets the minimum net tangible assets requirement for The Nasdaq National Market. The company does not

The company reiterated that its cash, cash equivalents and cash that may be generated from operations will be sufficient to continue its operations only to March 31, 2001 at the latest and that it has provided job elimination notices to all of its employees, with termination dates extending up to April 6, 2001. The company anticipates that it will close the eToys.com Web site on or about March 8, 2001 and that, thereafter, the company will focus solely on the winding down of its business and the liquidation of its assets.

Officer of the company, and Peter Hart.

AOL 00349

Forward-Looking Statements

Statements made in this document that are forward-looking involve risks and uncertainties that could cause results to differ materially from those expressed. Such risks and uncertainties include, but are not limited to, the company's expectation that it will cease operations in the near term and that its

http://www.lexis.com/research/retrieve? m=009f1bdaad33bd47d8741aaa427a242J&docnum=3&_f... 2/8/2001

App. 0339

equity securities are worthless. Other risks are set forth in the company's Annual Report on Form 10-K for the fiscal year ended March 31, 2000, under the heading "Business -- Additional Factors That May Affect Results," in the company's quarterly reports on Form 10-Q for the quarters ended June 30, 2000, September 30, 2000 and December 31, 2000 and in the company's other filings with the Securities and Exchange Commission.  **CONTACT: eToys** Inc., Los Angeles
Ken Ross, 310/998-6993 (media)
kross@**etoys.com**
Gary Gerdemann, 310/998-6823 (media)
ggerd@etoys.com
Clem Teng, 310/998-6312 (investors)
cteng@etoys.com  URL: http://www.businesswire.com

**LOAD-DATE:** February 27, 2001

---

Source: News & Business > News > Wire Service Stories ⓘ
Terms: (further info! or contact pre/20 etoys) or (headline(etoys) or company(etoys) and contact or further information or subject(press release)) and date is 2/26/2001  (Edit Search)
View: Full
Date/Time: Saturday, February 8, 2003 - 3:15 PM EST

---

About LexisNexis | Terms and Conditions

---

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AOL 00350

App. 0340

Desc: Press Releases re: eToys to File for Bankruptcy, Shut Down Site
First Page ID: DX0059-0001
Current Page ID: DX0059-0002                    Page 2 of 4


DX0059-0002

Search - 7 Results - (further info! or contact pre/20 etoys) or (headline(etoys) or company(etoys) a...  Page 1 **of** 2

Source: News & Business > News > Wire Service Stories ⓘ
Terms: (further info! or contact pre/20 etoys) or (headline(etoys) or company(etoys) and contact or further information or subject(press release)) and date is 2/26/2001 (Edit Search)

↙Select for FOCUS™ or Delivery

☐

*Newsbytes February 26, 2001, Monday*

Copyright 2001 Post-Newsweek Business Information, Inc.
Newsbytes

**February** 26, 2001, Monday

**LENGTH:** 370 words

**HEADLINE: EToys** To File For Bankruptcy, Shut Down Site

**BYLINE:** Michael Bartlett; Newsbytes

**DATELINE:** LOS ANGELES, CALIFORNIA, U.S.A.

**BODY:**
  Troubled e-tailer Etoys Inc. [NASDAQ: ETYS] today  said the company plans to file for bankruptcy.

The dot-com toy stores said it expects it will file for bankruptcy  protection within the next five to 10 days. The company said its  outstanding liabilities, which totaled approximately $274 million as of  Jan. 31, will "substantially exceed" the value of any proceeds or assets  that may be received. Gary Gerdemann, Etoys' senior director of communications, said the  company has been unable to find a buyer for the business. He added the  current economic and business environment was not in its favor.

"Our sales for the last holiday season were 25 percent ahead of what we  did the year before, but they were still significantly less than what we  needed to continue operations," Gerdemann said. "With the economic  slowdown, there is a difficult retail environment for every retailer,  online and traditional. There is also a difficult investment environment  for new ventures or businesses like ours."

The company said the eToys.com Web site would be closed on or about  March 8. All employees have been given job elimination notices, with  termination dates extending up to April 6, Etoys said.

Etoys warned potential investors that its stock has "no value" and advised  people not to buy either its common or preferred shares. The company said  it has received notice from Nasdaq that it no longer meets the minimum  net tangible assets requirement to be listed on the exchange.

EToys said it does not believe the company will be able to comply with  the requirement, and has notified Nasdaq. The company said it expects to  be "delisted" soon, probably before the previously expected date, May 2.

Looking back at what had been one of the most recognizable names in  cyberspace, Gerdemann said, "I think everyone acknowledges we had the  best e-commerce site in the business, but that was not enough in this case."

More information on Etoys is available on the Web  at http://www.etoys.com .

Reported by Newsbytes.com, http://www.newsbytes.com .

AOL 00351

http://www.lexis.com/research/retrieve?  m=009f4bdaad33bd47d8741aae427a2d2d&docnum=6&_f...  2/8/200:

App. 0341


DX0059-0003

17:35 CST

(20010226/Press **Contact:** Gary Gerdemann, **Etoys,** 310-998-6823 /WIRES ONLINE, BUSINESS/DOTCOMMELT/PHOTO)

**TYPE:** NEWS

**LOAD-DATE:** February 27, 2001

Source: News & Business > News > Wire Service Stories ⓘ
Terms: (further info! or contact pre/20 etoys) or (headline(etoys) or company(etoys) and contact or further information or subject(press release)) and date is 2/26/2001 (Edit Search)
View: Full
Date/Time: Saturday, February 8, 2003 - 3:17 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

AOL 00352

App. 0342

Desc: Press Releases re: eToys to File for Bankruptcy, Shut Down Site
First Page ID: DX0059-0001
Current Page ID: DX0059-0004                     Page 4 of 4



DX0059-0004