IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EBC I, INC.  f/k/a ETOYS, INC., et al., | ) | Bankruptcy Case No. 01-706 |
| | ) | Adv. No. 03-50003(MFW) |
| Debtors. | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Appellant, | ) | Civil Action No. 08-100(JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Appellee. | ) | |

**APPELLANT'S REPLY BRIEF**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street, 18th Floor
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Appellant*
  *EBC I, Inc., f/k/a eToys, Inc.*

July 28, 2008

i.

## TABLE OF CONTENTS

Page

ARGUMENT ....................................................................................................................1

I.    THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL
      STANDARD. ...........................................................................................................1

II.   THE BANKRUPTCY COURT ERRED IN FINDING THE
      AGREEMENT WAS NON-ASSIGNABLE. ...........................................................6

      A.    The Agreement Was Not Executory. ...........................................................7

      B.    The Bankruptcy Court Erroneously Concluded That The
            Agreement Was Not Assignable. .................................................................8

      C.    The Record Contradicts The Bankruptcy Court's Finding
            Of "de minimis" Value. .............................................................................10

III.  THE TERMINATION WAS A TRANSFER OF PROPERTY. ...........................11

      A.    AOL Has Waived Any Challenge To The Bankruptcy
            Court's Opinion. ........................................................................................11

      B.    The Termination Of The Agreement Was A Transfer. ..............................12

IV.   ETOYS IS ENTITLED TO AN AWARD OF PREJUDGMENT
      INTEREST. ...........................................................................................................15

CONCLUSION .............................................................................................................17

ii.

## TABLE OF AUTHORITIES

Page(s)

CASES

*Baldi v. Lynch (In re McCook Metals, L.L.C.),*
   319 B.R. 570 (Bankr. N.D. Ill. 2005) ................................................................5

*Broyhill v. DeLuca (In re DeLuca),*
   194 B.R. 65 (Bankr. E.D. Va. 1996) ................................................................9

*Coast Cities Truck Sales, Inc. v. Navistar International Transportation Co.,*
   147 B.R. 674 (D.N.J. 1992) ................................................................ 13-14

*DuPont de-Bie v. Vredenburgh,*
   490 F.2d 1057 (4th Cir. 1974) ................................................................9

*Eder v. Queen City Grain Inc., et al.,*
   51 B.R. 722 (Bankr. S.D. Ohio 1985)................................................................12

*Epperson v. Epperson,*
   62 S.E. 344 (Va. 1908)................................................................9

*Erie Telecomms., Inc. v. City of Erie,*
   853 F.2d 1084 (3d Cir. 1988)................................................................11

*In re Bockes Brothers Farms, Inc.,*
   1994 WL 910792 (Bankr. N.D. Iowa 1994) ................................................................12

*In re Butler,*
   271 B.R. 867 (Bankr. C.D. Cal. 2002)................................................................15

*In re Catron,*
   158 B.R. 624 (Bankr. E.D. Va. 1992)................................................................9

*In re Columbia Gas Sys. Inc.,*
   50 F.3d 233 (3d Cir. 1995)................................................................7

*In re Combustion Engineering, Inc.,*
   391 F.3d 190 (3d Cir. 2005)................................................................4

*In re Gen. DataComm Indus., Inc.,*
   407 F.3d 616 (3d Cir. 2005)................................................................8

*In re GGM, P.C.,*
   165 F.3d 1026 (5th Cir. 1999) ................................................................11

iii.

*In re Headquarters Dodge, Inc.,*
  13 F.3d 674 (3d Cir. 1994)................................................................8

*In re Hechinger Invs. Co.,*
  489 F.3d 568 (3d Cir. 2007).............................................................16

*In re J.R. McConnell, Jr.,*
  934 F.2d 662 (5th Cir. 1991) .......................................................12, 14

*In re James E. Freeman,*
  956 F.2d 252 (11th Cir. 1992) ...........................................................11

*In re Jermoo's Inc.,*
  38 B.R. 197 (Bankr. W.D. Wis. 1984).................................................13

*In re John L. Indri,*
  126 B.R. 443 (Bankr. D.N.J. 1991) ....................................................12

*In re KZK Livestock, Inc.,*
  221 B.R. 471 (Bankr. C.D. Ill. 1998)...................................................4

*In re LiTenda Mortgage Corp.,*
  246 B.R. 185 (Bankr. D.N.J. 2000) ....................................................12

*In re Newlin,*
  370 B.R. 870 (Bankr. M.D. Ga. 2007).................................................8

*In re Robert J. Grady,*
  202 B.R. 120 (Bankr. N.D. Iowa 1996) ..............................................12

*In re Stephen S. Meredith CPA., P.C.,*
  367 B.R. 558 (E.D. Va. 2007)............................................................5

*In re Stone & Webster, Inc.,*
  2001 WL 849738 (Bankr. D. Del. July 26, 2001)...................................4

*In re TWA, Inc.,*
  145 F.3d 124 (3d Cir. 1998)............................................................11

*In re Veretto,*
  131 B.R. 732 (Bankr. D.N.M. 1991) .............................................12, 14

*In re Wills Motors, Inc.,*
  133 B.R. 303 (Bankr. S.D.N.Y. 1991)................................................10

*J. Maury Dove Co. v. New River Coal Co.,*
  143 S.E. 317 (Va. 1928)..................................................................9

iv.

*McFarland v. Leigh,*
   52 F.3d 1330 (5th Cir. 1995) ........................................................................16

*McGuire v Brown,*
   76 S.E. 295 (Va. 1912)..................................................................................9

*Mellon Bank N.A. v. Metro Communications Inc.,*
   945 F.2d 635 (3d Cir. 1991)...........................................................................2

*Metro Water and Coffee Servs., Inc. v. Rochester Community Baseball, Inc.,*
   157 B.R. 742 (Bankr. W.D.N.Y. 1993) ....................................................12, 14

*Pelty v. Worldnet Corp.,*
   280 B.R. 573 (Bankr. D. Del. 2002) ..............................................................16

*Pinto v. Philadelphia Fresh Food Terminal Corporation,*
   89 B.R. 486 (Bankr. E.D. Pa. 1988) .......................................................... 12-13

*Sommers v. Burton (In re Conard Corp.),*
   806 F.2d 610 (5th Cir. 1986) .........................................................................5

*Stone Street Capital, Inc. v. Granati,*
   270 B.R. 575 (Bankr. E.D. Va. 2001)..............................................................9

*Sullivan v. Willock (In re Wey),*
   854 F.2d 196 (7th Cir. 1988) ........................................................................14

*Union Bank v. Wolas,*
   502 U.S. 151 (1977).....................................................................................4

*Young v. Higbee Co.,*
   324 U.S. 594 (1945)....................................................................................4

## STATUTES

11 U.S.C. § 365............................................................................... 7-8, 15

11 U.S.C. § 548............................................................................... Passim

11 U.S.C. § 550............................................................................... 5-6

28 U.S.C. § 1961..............................................................................16

<u>ARGUMENT</u>

I.    THE BANKRUPTCY COURT APPLIED THE WRONG LEGAL
      STANDARD.

As discussed in eToys' Opening Brief, the Bankruptcy Court's conclusion that the advertising services transferred to AOL by reason of its termination of the Agreement had no value was the product of three separate errors by the Bankruptcy Court: (1) the Bankruptcy Court failed to apply the totality of the circumstances test mandated by Third Circuit law and instead looked solely at the value "to eToys"; (2) the Bankruptcy Court failed to value what it had twice expressly found was the property transferred – "the advertising services for which eToys had prepaid" – and instead valued the contract itself, and thereby ignored the actual circumstances; and (3) the Bankruptcy Court ignored undisputed evidence of the fair market value of those advertising services, including the AOL price lists then in effect for those advertising services. AOL never directly addresses any of these points.

On the first point, AOL concedes that the proper test for determining the value of the services transferred to AOL is the "totality of circumstances" test established by Third Circuit decisions (*See* AB 13 ("like any other question of valuation, a court should consider the totality of the circumstances, looking at any evidence that it considers relevant to ascertain the property's value")). AOL asserts that "the truth is this is precisely what the Bankruptcy Court did" (AB 2), but cites no specific part of the Bankruptcy Court's opinion supporting that assertion. The inability of AOL to point to any part of the opinion in which the Bankruptcy Court actually examined the totality of circumstances and determined the fair market value alone refutes AOL's argument. The actual finding of the Bankruptcy Court was that "the Agreement had no value to eToys" (Op. at 27), as AOL elsewhere acknowledges (AB 11, 12), and it is clear

2.

from the Court's Opinion that it did not apply the totality of circumstances test to determine the fair market value of the services transferred.

AOL's only attempt to defend the valuation approach of the Bankruptcy Court is to argue that the Bankruptcy Court in effect determined the value of the property transferred by determining "how much better off the eToys estate would have been had AOL not terminated the Agreement" (AB 14), citing *Mellon Bank N.A. v. Metro Communications Inc.*, 945 F.2d 635 (3d Cir. 1991) as did the Bankruptcy Court (Op. at 25). However, as discussed in eToy's opening brief and not addressed by AOL, that case involved the far different situation in which all of a debtor's assets had been secured to protect a loan, making an examination of the total impact on the debtor an appropriate way to determine if reasonably equivalent value had been received. In addition, subsequent Third Circuit cases require the Bankruptcy Court to examine the totality of circumstances, which include all of the factors bearing on value, and the Bankruptcy Court plainly did not follow that approach.

The second error of the Bankruptcy Court was that, even though in both its summary judgment opinion and in its final opinion the Bankruptcy Court held that the property transferred was the "advertising services for which eToys had pre-paid" (Op. at 21), the Bankruptcy Court purported to value the contract itself rather than those services, concluding that "the Agreement . . . had no value to eToys because eToys was no longer operating" (Op. at 27). As discussed in eToy's opening brief, the effect of valuing the Agreement to "eToys" was to ignore the actual circumstances because the effect of the termination was to end the Agreement, relieve AOL of any obligation to perform and free up for resale the advertising space previously reserved for eToys – in contrast, a transfer of the contract would have continued AOL's obligation to perform and would not have freed up space for sale to others. Because the

3.

Bankruptcy Court valued the contract to eToys rather than the advertising services it found were transferred, it could not have examined the totality of circumstances because it ignored the actual circumstances.  AOL does not even address this error of the Bankruptcy Court.

The third error of the Bankruptcy Court was its failure to consider the evidence of the fair market value of those advertising services, which the Bankruptcy Court apparently concluded was unnecessary since it was valuing the Agreement "to eToys".  It is undisputed that those advertising services had been valued at millions of dollars by AOL and eToys only three months earlier when they negotiated the amendment to the Agreement.  It is also undisputed that, as of the date of the termination, AOL had internal price lists for those advertising services reflecting substantial value.[1]  While AOL asserts that there was an "utter failure to present the Bankruptcy Court with any reliable or relevant evidence on the issue of valuation," (AB 16) it nowhere explains why its own price lists as of the termination date are not evidence of value.  AOL tries to dismiss eToys' argument as a "far-fetched theory of valuation" (AB 14, 15) or an "essentially incoherent" theory (AB 3) when, in fact, it simply requires the Court to look at facts showing the value of those advertising services, which the Bankruptcy Court found were transferred to AOL.  That was the approach of the Bankruptcy Court in its summary judgment opinion, when it held that eToys was entitled to recover the value as agreed upon by the parties, less the value of any services delivered prior to termination.

AOL's only attempt to deal with the actual evidence of the fair market value of the services is to argue that there was no evidence that AOL was actually able to resell the

---

[1]     eToys noted in its opening brief that the relevant facts were essentially undisputed, which AOL says is "manifestly incorrect" (AB 4).  However, AOL points to no contrary evidence as to the value of the advertising services which the Bankruptcy Court found were transferred to AOL, or to any relevant fact dispute.

4.

impressions (AB 15).  However, as the Bankruptcy Court found, "AOL had a finite amount of advertising space which it could sell on its system and the effect of the termination of the Amended Agreement with eToys was to free up advertising space which could be sold to other customers at potentially higher rates."  (App. at A12, FOF 95).  AOL does not dispute that its own system made it impossible to determine whether the specific advertising space reserved for eToys was later resold, and AOL's primary witnesses testified that such services probably were resold (App. at A174-176).  More importantly, while an actual resale by AOL would be evidence of the fair market value, a failure of AOL to resell those impressions does not mean that the services had no value.  AOL's own price list established the value, whether AOL used the advertising space itself or resold the space.

AOL also purports to rely on supposed policies of the Bankruptcy Court to support the Bankruptcy Court's decision (AB 1).   However, it offers no explanation as to how it would be consistent with those policies to allow AOL to keep millions of dollars it was paid for services it never delivered and was then able to sell to others, to the detriment of numerous creditors who actually provided services to eToys and were not paid.  To the contrary, allowing AOL to keep such payments would ignore that "historically one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another."  *Young v. Higbee Co.,* 324 U.S. 594, 597 (1945).  This policy not only exists in the Bankruptcy Code generally but also is the underlying principle animating the Bankruptcy Code's avoidance provisions. *See, e.g., Union Bank v. Wolas,* 502 U.S. 151, 160-61 (1977); *In re Combustion Engineering, Inc.,* 391 F.3d 190, 239-40 (3d Cir. 2005); *In re Stone & Webster, Inc.,* 2001 WL 849738, at *13 (Bankr. D. Del. July 26, 2001) (Exhibit A hereto); *In re KZK Livestock, Inc.,* 221 B.R. 471, 479 (Bankr. C.D. Ill. 1998).

5.

AOL's approach asks this Court to ignore the benefit AOL actually received when it extinguished the valuable interest in the advertising services and cannot be reconciled with either the express language or legislative purpose of Section 550 of the Bankruptcy Code, which establishes the basis for and measure of its liability for an avoided transfer.  Section 550(a)(1) authorizes recovery of the value of property from, among others, "the entity for whose benefit such transfer was made . . . ." 11 U.S.C. § 550(a)(1).  In such situations, courts consistently peg the value recoverable by the trustee, not to the subjective value to the debtor of the property transferred, but to the value of benefit received by the party for whose benefit the transfer was made.[2]

Section 550(e)(1) of the Bankruptcy Code also evidences Congress' intent that value of the benefit received be considered in determining the amount recoverable on an avoidable transfer.  Section 550(e)(1) grants

> [a] good faith transferee . . . a lien on the property recovered to
> secure the lesser of (A) the cost, to such transferee, of any

---

[2]    For instance, in *Sommers v. Burton (In re Conard Corp.),* 806 F.2d 610 (5th Cir. 1986), the debtor sold its assets to a third party in exchange for, as partial consideration, its agreement to assume the debtor's obligations under an unsecured note payable to the debtor's former owners, the result of which was to prefer the former owners over the debtor's other creditors.  On these facts, the Fifth Circuit affirmed the bankruptcy court's decision granting the trustee a recovery against the former owners equal to the amount of the stream of payments required to be made rather than the value to the debtor of the assets transferred to the third-party purchaser. *Id.* at 613.    Confronted with the defendants' arguments that the estates would be somehow unjustly enriched by such a result, the court pointedly responded:

> While it always seems "unfair" that creditors such as the Burtons must
> lose the benefit of a transaction they accomplished with the debtor just
> prior to bankruptcy, on a more general level, it is fairer to distribute the
> maximum amount of assets among all creditors in accordance with the
> distribution principles established in the Bankruptcy Code.

*Id.* at 612.  *See also In re Stephen S. Meredith CPA., P.C.,* 367 B.R. 558 (E.D. Va. 2007) (focusing on benefit received by beneficiary); *Baldi v. Lynch (In re McCook Metals, L.L.C.),* 319 B.R. 570, 593 (Bankr. N.D. Ill. 2005) (same).

> improvements made after the transfer *less the amount of any profit realized by or accruing to such transferee from such property*; and (B) any increase in the value of such property as a result of such improvement of the property transferred.

11 U.S.C. § 550(e)(1) (emphasis added).  Congress' clear judgment reflected in section 550 of the Bankruptcy Code is that a transferee – even when acting in good faith – should be held accountable for the benefit it received as a result of the transfer.  No reason exists why the result should be different here.

The Bankruptcy Court's conclusion that the advertising services transferred to AOL as a result of the termination of the Agreement had no value was incorrect.  The Bankruptcy Court failed to apply the totality of circumstances test, the Bankruptcy Court failed to value the specific advertising services which it found were transferred to AOL or to examine the actual facts relating to those services and the Bankruptcy Court ignored undisputed evidence of the value of those services, including AOL's own price list.  AOL's generalizations about the Bankruptcy Court's "careful analysis" (AB 14) and "careful decision" (AB 2) and its attempt to label the Bankruptcy Court's conclusion as a factual finding (AB 5) cannot mask these basic legal errors in the Bankruptcy Court's decisions.

AOL also does not dispute that, under the totality of circumstances test, the undisputed evidence showed that eToys had paid $4,462,500 for services it never received and which instead reverted to AOL.  eToys is entitled to a judgment in that amount.

## II.    THE BANKRUPTCY COURT ERRED IN FINDING THE AGREEMENT WAS NON-ASSIGNABLE.

Even if there were some legal basis for the Bankruptcy Court's approach of valuing the Agreement "to eToys", the Bankruptcy Court committed separate errors in applying that approach.  These errors led the Bankruptcy Court to conclude incorrectly that the Agreement was not assignable in a bankruptcy sale and as a result had no value.

A.    <u>The Agreement Was Not Executory.</u>

AOL argues that the Bankruptcy Court correctly found that the Agreement was executory (AB 17-18), and notes that an executory contract is a "contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." (AB 17 (quoting *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir. 1989)). However, AOL fails to distinguish between conditions to another party's performance and actual performance obligations owed to the other contracting party. Where, as here, "the remaining obligations in the contract are mere conditions, not duties, then the contract cannot be executory for purposes of § 365 because no material breach could occur" that would subject eToys to a claim for damages. *In re Columbia Gas Sys. Inc.,* 50 F.3d 233, 241 (3d Cir. 1995).

Each of the obligations of eToys under the Agreement upon which AOL relies in contending that the Agreement was executory are conditions to AOL's performance rather than the performance of some act on the part of eToys such as the provision of services, the payment of fees, or the delivery of a tangible item as in a contract of sale, the nonperformance of which would subject eToys to a claim for damages.[3] In this case, the performance owed to AOL by

_____

[3]    Indeed, many of the obligations upon which AOL relies for its contention that the Agreement remained executory depended not so much on the actions of eToys but on conditions beyond its direct control, such as the condition that eToys had to derive at least 50% of its net website sales from children's toys, hobbies, arts and crafts, video games and software and the condition that eToy's website had to remain ranked among the top three interactive websites in the toy industry. Whatever rights AOL may have had in the event that any of those conditions failed, the failure of those conditions would not have resulted in a claim for damages against eToys by AOL.

8.

eToys was payment of the fees for services *to be provided by AOL*, and there is no dispute that

eToys had fully pre-paid for those services.  Accordingly, the Agreement was not executory.[4]

B.    The Bankruptcy Court Erroneously Concluded That The
      Agreement Was Not Assignable.

AOL contends that the Bankruptcy Court correctly determined that the Agreement

was non-assignable under section 365(c)(1) of the Bankruptcy Code because the Agreement

constituted a personal services contract that could not be assigned under Virginia law.[5]

However, as set forth in eToy's Opening Brief (at 24 & n.11), the Virginia cases upon which the

Bankruptcy Court relied do not suggest that the type of commercial contract at issue here is a

"personal services" contract.  Rather, those cases involved situations where one party to a

contract reposed a special trust and confidence in an individual based on that individual's unique

---

[4]    AOL's reliance on *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616 (3d Cir. 2005) for
the proposition that the Court need look only to the contract language itself and not state
law to determine whether a contract is executory is misplaced. *Id.* at 623-24.  In that
case, the Court explicitly determined that the contract language itself defined certain
ongoing obligations as material.  Here, the Bankruptcy Court made no such determination
as to whether the conditions relied upon by AOL were material for purposes of
determining whether the Agreement was executory.  Moreover, in *In re DataComm*, the
ongoing obligations at issue in an employee benefits plan involved refraining from taking
certain actions or agreeing to take certain actions solely within that party's control, rather
than on the continuing condition of a business enterprise.  Those obligations included
agreeing not to compete, maintaining confidentiality, not instigating litigation, refraining
from negative publicity and agreeing to participate in litigation initiated by DataComm.
*Id.* at 623.  That is not the case here.

[5]    Relying on *In re Headquarters Dodge, Inc.*, 13 F.3d 674 (3d Cir. 1994), AOL argues that
the issue of whether the Agreement was one to which the exception to the free
assignability of executory contracts set forth in section 365(c)(1) of the Bankruptcy Code
applies is a pure question of fact that this Court cannot resolve in eToys' favor unless the
Bankruptcy Court's findings were clearly erroneous. (AB at 21).  AOL misreads this
opinion.   While the Bankruptcy Court's determinations concerning the underlying
circumstances of the contract are factual, whether section 365(c)(1) applies to the
Agreement to prevent its assignment is a "legal question," as the Third Circuit
recognized. *Id.* at 682.  *See also, e.g., In re Newlin*, 370 B.R. 870, 875 (Bankr. M.D. Ga.
2007) ("Whether § 365(c)(1) applies to prohibit the Trustee from assuming the
Partnership Agreement is a complex *question of law* involving the oftentimes 'tortuous
interaction between the Bankruptcy Code, state partnership law, and a general partnership
agreement . . . .'") (emphasis added).

attributes or skills, such as where the contract involved mutual obligations between family members or individuals in a unique business relationship. *See Epperson v. Epperson,* 62 S.E. 344 (Va. 1908); *McGuire v Brown,* 76 S.E. 295 (Va. 1912); *Broyhill v. DeLuca (In re DeLuca),* 194 B.R. 65 (Bankr. E.D. Va. 1996).

The additional cases upon which AOL relies to support the Bankruptcy Court's determination that the Agreement constituted a personal services contract are distinguishable for the same reason. The general rule under Virginia law is that contract rights are freely assignable, *see Stone Street Capital, Inc. v. Granati*, 270 B.R. 575, 581-82 (Bankr. E.D. Va. 2001). The contract at issue in *In re Catron*, 158 B.R. 624, 627 (Bankr. E.D. Va. 1992), involved a partnership interest and given the personal nature of the partnership, the Court concluded that the agreement governing the partnership was essentially a contract for personal services. *Id.* at 627. Similarly, the contract at issue in *DuPont de-Bie v. Vredenburgh*, 490 F.2d 1057, 1060 (4th Cir. 1974), involved the purported assignment of a separation agreement between a husband and wife, which is plainly personal in nature and depends on the unique attributes of the individuals involved.[6] *Id.* at 1059. To the extent that *J. Maury Dove Co. v. New River Coal Co.*, 143 S.E. 317 (Va. 1928), involved a commercial contract between two entities, that case is plainly distinguishable because it involved concerns over requiring a contracting party to investigate the credit of an assignee and thus, similarly involved a unique attribute. AOL has cited no cases extending the notion of a personal services contract under Virginia law to the type of arms-length negotiated, commercial contract present here.

---

[6] The court in *Vredenburgh* went on to hold that "[t]he fact that an assignor has obligations as well as rights under a bilateral contract, and that the obligations cannot be assigned does not prevent him from assigning his rights," as would have been the case here. *Vredenburgh*, 490 F.2d at 1060.

10.

Finally, even if the Agreement could be viewed as a personal services contract, it expressly provided that eToys could assign it. While AOL had to consent to any assignment, that consent could not be unreasonably withheld. (App. at A138). *See In re Wills Motors, Inc.,* 133 B.R. 303, 308 (Bankr. S.D.N.Y. 1991). Accordingly, the Bankruptcy Court erred in finding that the Agreement could not be assigned under Virginia law.

C.    The Record Contradicts The Bankruptcy Court's Finding Of "de minimis" Value.

AOL contends that the Bankruptcy Court correctly held that any value that eToys might have received from an assignment of the Agreement in a bankruptcy sale was *de minimus* under a totality of the circumstances test (AB 24). However, the Bankruptcy Court did not in fact apply that test in concluding that eToys would receive *de minimus* value. Rather, the Bankruptcy Court's conclusion was based on a hypothetical sale in liquidation instead of the actual circumstances of termination and consequent ability of AOL to resell the services.

The hypothetical liquidation valuation approach of the Bankruptcy Court incorrectly assumed a sale three months later in bankruptcy, rather than at the time the contract was actually terminated by AOL. Moreover, the Bankruptcy Court ignored the fact that, even in a sale in bankruptcy, the AOL contract was an important asset essential to the basic nature of eToys' business, an internet company, as well as the fact that potential buyers included AOL in order to free itself of performance obligations under the contract and to free up the advertising space for sale to others. AOL fails to address any of these points other than to argue as a legal matter that the liquidation premise was appropriate.

Given that the contract was assignable, the Bankruptcy Court should have examined the totality of circumstances to determine value, for the reasons previously discussed.

11.

III.    THE TERMINATION WAS A TRANSFER OF PROPERTY.

AOL contends that the judgment of the Bankruptcy Court may also be affirmed on the ground that the termination of the Agreement did not constitute a transfer for purposes of 11 U.S.C. § 548. (AB 26). The Bankruptcy Court held otherwise in both its summary judgment opinion and in the final opinion (App. at A24, CL 20). AOL's argument must be rejected for two reasons.

### A.    AOL Has Waived Any Challenge To The Bankruptcy Court's Opinion.

AOL did not file a cross-appeal on this or any other issue. Accordingly, AOL has waived any right to challenge the Bankruptcy Court's holding on summary judgment and subsequent holding in its Final Opinion and the Court need not address AOL's argument. *See In re GGM, P.C.*, 165 F.3d 1026, 1031-32 (5th Cir. 1999) (issues not included in statement of issues presented on appeal are waived); *In re James E. Freeman*, 956 F.2d 252, 255 (11th Cir. 1992) ("An issue that is not listed pursuant to [Rule 8006] and is not inferable from the issues that are listed is deemed waived and will not be considered on appeal."). *Accord In re TWA, Inc.*, 145 F.3d 124, 132 (3d Cir. 1998).[7]

---

[7]    Although AOL initially appealed from the Bankruptcy Court's Summary Judgment Opinion (D.I. 3 in C.A. No. 1:07-MC-00012-JJF), AOL never pursued that appeal and, in fact, withdrew its notice of appeal. (D.I. 5 in C.A. No. 1:07-MC-00012-JJF). AOL's reliance on *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1089 n.10 (3d Cir. 1988), for the proposition that this Court may affirm the Bankruptcy Court's Final Order on the separate ground that the termination of the Agreement did not constitute a fraudulent transfer is misplaced. *Erie* stands for nothing more than the unremarkable proposition that an appellate court may affirm a decision of a lower court on grounds not fully considered by that court where that court relied on a wrong ground or reason, but otherwise reached the correct result. *Id.* at 1088 (district court summarily rejected defense of contractual release without detailed analysis). Here, in contrast, AOL asks this Court to overrule the Bankruptcy Court on an issue specifically considered by the Bankruptcy Court and from which AOL did not appeal.

B.    The Termination Of The Agreement Was A Transfer.

Even assuming that the Court may consider AOL's argument, the determination of the Bankruptcy Court that the termination of the Agreement was a transfer of property under Section 548 was correct. Courts have consistently held that where the termination of a contract, although proper due to the debtor's breach, results in the loss of already existing rights under a contract, the termination constitutes a transfer under Section 548 and, where there was no equivalent value received, a fraudulent transfer.[8] The common principle of these cases is that the termination of a contract pursuant to its terms, even as a result of the debtor's breach, nonetheless constitutes a transfer where the debtor had existing equitable rights because it had partially performed by paying money, and lost those rights without receiving any consideration. This case fits squarely within the reasoning of those cases. eToys had performed its obligations by making payments -- indeed, unlike those cases, eToys had not just partially performed, but instead had paid in full for the services promised by AOL and had an existing right to such services. Thus, the termination plainly had the effect of transferring eToys' property rights under Section 548. That real and valuable property was transferred is made clear by the undisputed fact that AOL had a finite amount of impressions it could sell, and the termination of the Agreement freed up impressions which AOL could then sell to others.[9]

---

[8]    *See In re Bockes Brothers Farms, Inc.*, 1994 WL 910792, at *5 (Bankr. N.D. Iowa 1994) (Exhibit B hereto); *In re Robert J. Grady*, 202 B.R. 120, 124 (Bankr. N.D. Iowa 1996); *In re Veretto*, 131 B.R. 732, 737 (Bankr. D.N.M. 1991); *In re J.R. McConnell, Jr.*, 934 F.2d 662, 668 (5th Cir. 1991); *In re John L. Indri*, 126 B.R. 443, 446 (Bankr. D.N.J. 1991). *Accord, Pinto v. Philadelphia Fresh Food Terminal Corporation*, 89 B.R. 486, 496 (Bankr. E.D. Pa. 1988); *Eder v. Queen City Grain Inc., et al.*, 51 B.R. 722 (Bankr. S.D. Ohio 1985); *Metro Water and Coffee Servs., Inc. v. Rochester Community Baseball, Inc.*, 157 B.R. 742, 746 (Bankr. W.D.N.Y. 1993).

[9]    AOL relies on *In re LiTenda Mortgage Corp.*, 246 B.R. 185 (Bankr. D.N.J. 2000) for the proposition that the pre-petition termination of a contract pursuant to its terms does not constitute a transfer within the meaning of Section 548(a). (AB 27). AOL's reliance on
(Continued . . .)

13.

The fact that the Agreement allowed for termination by AOL in the event of insolvency does not preclude the application of Section 548. In each of the cases cited, termination of the agreement in issue was proper under its terms but the courts nonetheless found the loss of rights for which the debtor had paid to be a fraudulent transfer. As the court in *Pinto* noted, "[w]hether the transfer of the Debtor's interest in property was legal or not is irrelevant for the purposes of § 548." 89 B.R. at 497. Assuming AOL had the right to choose not to perform and to terminate the Agreement, it did not have the right simply to keep the amounts it had been paid to perform. As a matter of common sense, eToys held valuable rights to performance under the contract which it never received, and for which it had paid millions of dollars -- the loss of those rights without compensation is on its face a transfer.

However, the cases cited by AOL to argue that the termination of a contract cannot constitute a transfer under Section 548 as a matter of law (AB 26-27) do not support such a sweeping assertion and are readily distinguishable. Those cases involved situations in which the termination of the contract was based on material breaches by the debtor or are otherwise inapposite. *In re Jermoo's Inc.*, 38 B.R. 197, 204 (Bankr. W.D. Wis. 1984). In *Jermoo's*, checks for payments under a franchise agreement bounced, the debtor failed to cure within the required time, the debtor then breached an interim settlement agreement by failing to sell one of the service stations it owned and by failing to give additional security and, after notice of those defaults, the debtor still failed to cure. 38 B.R. at 198. And in *Coast Cities Truck Sales, Inc. v. Navistar International Transportation Co.*, 147 B.R. 674 (D.N.J. 1992), payments by check of

---

(. . . continued)
   that case is misplaced. In that case, a chapter 7 trustee was attempting to revive a mortgage services agreement. Here, in contrast, eToys is not attempting to revive the Agreement. Rather, eToys is seeking to recover monies that it pre-paid for services never delivered.

14.

the franchisee were "regularly returned . . . for insufficient funds," despite repeated warnings the debtor failed to cure any of the deficiencies, and the debtor continued to breach the agreement. 147 B.R. at 674-75. The courts simply held that, given the debtor's own breaches, any expected future benefits from performing the contract ceased because, having failed to perform its own obligations under the contract, the debtor had no right to continue the contract, and there was therefore nothing to transfer.[10]  Indeed, one of the cases relied on by AOL, *Metro Water and Coffee Servs., Inc. v. Rochester Comty. Baseball, Inc.*, 157 B.R. 742 (Bankr. W.D.N.Y. 1993), expressly held that a termination of an agreement was a transfer under Section 548:

> Given the definition and the underlying intent of Congress, the termination of the Concession Agreement must be found to constitute a transfer within the meaning of Sections 101(54) and 548 of the Bankruptcy Code.

157 B.R. at 745.[11]

AOL's assertion that its position "accords with the purpose of Section 548" (AB 27) is both unsupported and incorrect.  While AOL correctly notes that the purpose of the protection against fraudulent transfers "is to prevent creditors from being deprived of value transferred from the debtor for inadequate consideration at a time when the debtor is insolvent"

---

[10]    AOL also cites *Sullivan v. Willock (In re Wey)*, 854 F.2d 196, 199 (7th Cir. 1988) as holding that a contract termination is not an avoidable transfer.  As noted by the Fifth Circuit in a later decision, *Wey* is "unclear" and the court construed it as holding that the transfer was the down payment and not the contract termination.  *In re J.R. McConnell, Jr.*, 934 F.2d 662, 664 (5th Cir. 1991).  Other courts have also so construed it, or rejected it.  *See, e.g., In re Veretto*, 131 B.R. 732, 737 (Bankr. D.N.M. 1991) ("To the extent *Wey* and *McConnell* are in conflict, this court adopts the holding of *In re McConnell*, and holds that a forfeiture of an equity interest under a real estate contract constitutes a transfer.")

[11]    The court held that the transfer was not fraudulent under the circumstances because a termination "by reason of a Debtor's material defaults is, as a matter of law, not a transaction or transfer which is actually or constructively fraudulent. . . ." (157 B.R. at 746).  Unlike that case, there was no breach by eToys and eToys had fully performed its payment obligations.

15.

(AB 27), it fails to explain how it can possibly be consistent with that policy to allow AOL to keep payments for services that it never performed (and which it was then able to sell to others) instead of returning that money for payment to creditors who did perform services for which they were not paid.

AOL also relies on Section 365, which it reads broadly as prohibiting the revival of properly terminated executory contracts (AB 27). However, as discussed, this was not a wholly executory contract because eToys had, in fact, fully performed by making all of the payments it was obligated to make. More importantly, eToys does not seek to revive the contract, but only to recover what it paid for services never received and which AOL could then sell to others.[12]

Where, as here, the debtor has partially or fully performed and will, by reason of a termination of the agreement, lose the rights for which it paid, a transfer has occurred both as a matter of law and as a matter of common sense. Accordingly, the Bankruptcy Court's decision that the termination of the contract resulted in a transfer of property was correct.

IV.    ETOYS IS ENTITLED TO AN AWARD OF PREJUDGMENT
       INTEREST.

AOL contends that the Bankruptcy Court properly determined that eToys was not entitled to an award of pre-judgment interest "because the property transferred had no value and there is no evidence that AOL acted in bad faith in terminating the 1999 Agreement." (AB 28

---

[12]    In any event, the specific language of section 365 of the Bankruptcy Code undermines AOL's position. Section 365(c)(3) is the only provision of section 365 that prohibits assumption or assignment and that provision by its express terms only applies when "such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief." 11 U.S.C. § 365(c)(3). Application of this provision is properly limited to the specific circumstances it describes. *See, e.g., In re Butler,* 271 B.R. 867, 873-74 (Bankr. C.D. Cal. 2002) (distinguishing authority applying section 365(c)(3) because the lease at issue was one for residential real property).

16.

(quoting App. at A28, CL ¶42)). In other words, AOL contends that eToys is not entitled to an award of pre-judgment interest because the Bankruptcy Court ruled against eToys and did not award eToys damages on its claim.

Nevertheless, AOL does not dispute that where a Bankruptcy Court awards damages from a fraudulent conveyance, the law of the Third Circuit favors the award of pre-judgment interest "unless there is a sound reason not to do so." *In re Hechinger Invs. Co.*, 489 F.3d 568, 580 (3d Cir. 2007). An award of pre-judgment interest is consistent with the purpose of Section 548 "to make the estate whole." *McFarland v. Leigh*, 52 F.3d 1330, 1339-40 (5th Cir. 1995); *Pelty v. Worldnet Corp.*, 280 B.R. 573, 602-03 (Bankr. D. Del. 2002). AOL does not contend otherwise. Accordingly, the Court should award damages to eToys in the amount of $4,462,500 plus pre-judgment interest at the rate provided for in 28 U.S.C. § 1961.

17.

<u>CONCLUSION</u>

For all of the foregoing reasons and those stated in Appellant's Opening Brief, the Court should reverse the Final Order of the Bankruptcy Court and enter an Order awarding damages to eToys in the amount of $4,462,500, plus prejudgment interest.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Richard D. Allen (#469)
Gregory W. Werkheiser (#3553)
Thomas W. Briggs, Jr. (#4076)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*rallen@mnat.com*
*gwerkheiser@mnat.com*
*tbriggs@mnat.com*
   *Attorneys for Appellant*
   *EBC I, Inc., f/k/a eToys, Inc.*

July 28, 2008

2409850

<u>CERTIFICATE OF SERVICE</u>

I, Thomas W. Briggs, Jr., hereby certify that on July 28, 2008, I caused the

foregoing Appellant's Reply Brief to be electronically filed with the Clerk of the Court using

CM/ECF which will send notification of such filing(s) to the following:

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE  19899

I further certify that copies were caused to be served on July 28, 2008 upon the

following individuals in the manner indicated:

**BY HAND DELIVERY**

> Marc J. Phillips, Esquire
> Connolly, Bove, Lodge & Hutz
> The Nemours Building
> 1007 N. Orange Street
> Wilmington, DE  19899

**BY U.S. FIRST-CLASS MAIL**

> Craig T. Goldblatt, Esquire
> Wilmer Cutler Pickering Hale and Dorr LLP
> 1875 Pennsylvania Avenue, N.W.
> Washington, D.C.  20006

> Thomas W. Briggs, Jr. (#4076)
> *tbriggs@mnat.com*

2409850

**EXHIBIT A**



Not Reported in B.R.                                                                                          Page 1
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

HIn re Stone & Webster, Inc.
Bkrtcy.D.Del.,2001.
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.
In re: STONE & WEBSTER, INCORPORATED;
1430 Enclave Parkway Corporation; 245 Summer
Street Corporation; AEC International Projects, Inc.;
Associated Engineers & Consultants, Inc.; Auburn
VPS General Corporation; Auburn VPS Limited
Corporation; Belmont Constructors Company, Inc.;
Commercial Cold Storage, Inc.; DSS Engineers, Inc.;
Enclave Parkway Realty, Inc.; Fast Supply
Corporation; Gses Holding, LLC; International
Engineers and Constructors, Incorporated; Nordic
Holdings, Inc.; Nordic Investors, Inc.; Nordic Rail
Services, Inc.; Nordic Refrigerated Services, Inc.;
Nordic Refrigerated Services, Limited Partnership;
Nordic Transportation Services, Inc.; Polar
Transport, Inc.; Power Technologies, Inc.; Prescient
Technologies, Inc.; Projects Engineers, Incorporated;
Rockton Associates, Incorporated; Rockton
Technical Services Corporation; Sabal Corporation;
Sabal Real Estate Corporation; Saw Consulting
Services, Inc.; SC Wood, LLC; Selective
Technologies Corporation; Sleeper Street Realty
Corporation; Stone & Webster Abu Dhabi (United
Arab Emirates), Inc.; Stone & Webster Asia
Corporation; Stone & Webster Auburn Corporation;
Stone & Webster Bharat, Incorporated; Stone &
Webster Binghamton Corporation; Stone & Webster
Civil and Transportation Services, Inc., Stone &
Webster Construction Company, Inc.; Stone &
Webster Development Corporation; Stone & Webster
Dominican Republic, Incorporated; Stone & Webster
Engineers and Constructors, Inc.; Stone & Webster
Far East Technical Services Corp.; Stone & Webster
Indonesia Corporation; Stone & Webster Industrial
Technology Corporation; Stone & Webster Inter-
American Corporation; Stone & Webster
International Corporation; Stone & Webster
International Projects Corporation; Stone & Webster
Italia, Incorporated; Stone & Webster Korea
Corporation; Stone & Webster Kuwait, Incorporated;
Stone & Webster Overseas Development Corporation
F/K/A Stone & Webster Lithuania Corporation;
Stone & Webster Management Consultants, Inc.;
Stone & Webster Middle East Engineering Services
Corporation; Stone & Webster of Argentina
Corporation; Stone & Webster of Mexico
Engineering Corporation; Stone & Webster Oil
Company, Inc.; Stone & Webster Operating
Corporation; Stone & Webster Overseas Consultants,
Inc.; Stone & Webster Overseas Group, Inc.; Stone &
Webster Pacific Corporation; Stone & Webster
Power Engineering Corporation; Stone & Webster
Power Projects Corporation; Stone & Webster
Procurement Corporation; Stone & Webster Puerto
Rico, Incorporated; Stone & Webster Saudi Arabia,
Incorporated; Stone & Webster Taiwan Corporation;
Stone & Webster Technology Corporation; Stone &
Webster Wallingford Corporation; Stone & Webster
Worldwide Engineering Corporation; Swl
Corporation; Stone & Webster Engineering
Corporation; and Stone & Webster Michigan, Inc.,
Debtors.
**No. 00-2142, 00-2214.**

July 26, 2001.

Gregg M. Galardi, Esquire and Eric M. Davis,
Equire, Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware; Edward J. Meehan, Esquire,
and David E. Carney, Esquire, Skadden, Arps, Slate,
Meagher & Flom LLP, Washington, DC; counsel for
Debtors.
Michael B. Joseph, Esquire, and Theodore J.
Tacconelli, Esquire, Ferry & Joseph, PA,
Wilmington, Delaware; William J. Kayatta, Jr.,
Esquire, Pierce Atwood, Portland, Maine; counsel for
Maine Yankee Atomic Power Company.

MEMORANDUM OPINION REGARDING
CLAIMS OF MAINE YANKEE ATOMIC POWER
COMPANY

MCKELVIE, District J.
**\*1** This is a commercial dispute that arises in the
context of a bankruptcy action.

Stone & Webster Engineering Corporation is a
Massachusetts corporation with its principal place of
business in Boston, Massachusetts ("SWEC"). Stone
& Webster Incorporated is a Delaware corporation
with its principal place of business in Boston,
Massachusetts. Stone & Webster Engineers and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 2
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Constructors, Inc. is a Maryland Corporation with its principal place of business in Boston, Massachusetts. Stone & Webster Incorporated owns one hundred percent of the shares of Stone & Webster Engineers and Constructors, Inc. which in turn owns one hundred percent of the shares of SWEC. The court will refer to these three companies collectively as "the debtors."

Maine Yankee Atomic Power Company is a Maine corporation with its principal place of business in Wiscasset, Maine. Maine Yankee owns a nuclear power generating facility in Wiscasset, Maine.

Maine Yankee and SWEC entered into an agreement effective August 31, 1998 to decommission Maine Yankee's nuclear power plant in Wiscasset, Maine.

On May 4, 2000, Maine Yankee issued a notice to SWEC purporting to terminate the agreement based upon SWEC's insolvency and upon Maine Yankee's assertion that SWEC had not adequately performed under the contract.

On June 2, 2000, Stone & Webster Incorporated, and certain affiliates including Stone & Webster Engineers and Constructors, Inc. and SWEC filed voluntary petitions for bankruptcy relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330.

On August 23, 2000, Maine Yankee filed proofs of claim in the bankruptcy cases against SWEC and against Stone & Webster Incorporated and Stone & Webster Engineers and Constructors, Inc. as guarantors of SWEC's performance. On November 16, 2000, the debtors objected to Maine Yankee's claims arguing that the court should disallow the claims because Maine Yankee did not properly terminate the decommissioning agreement for either insolvency or failure to perform and, in any event, did not have a right to damages for terminating the agreement on account of SWEC's insolvency. Further, the debtors argue that the court should disallow the claims because Maine Yankee holds property owed to the debtors' estate. On December 18, 2000, Maine Yankee filed a response. On January 16, 2001, the debtors filed a brief in support of their objection. On January 17, 2001, Maine Yankee filed a response.

On February 6, 2001, the parties submitted a Pretrial Order on the threshold defenses to the Maine Yankee claims. On February 13, 2001, the court held a one-day non-jury trial to consider the threshold defenses raised by the debtors. At the hearing, SWEC called one witness, James Carroll, the president and chief restructuring officer of Stone & Webster, Incorporated as of January 31, 2001 and the vice president and controller of Stone & Webster, Incorporated from August 31, 1999 through January 30, 2001.

**\*2** This is the court's decision on those defenses.

I. *FACTUAL AND PROCEDURAL BACKGROUND*

The court takes the following facts from the testimony and evidence presented at the February 13, 2001 hearing.

Effective August 31, 1998, Maine Yankee and SWEC entered into an agreement titled "Agreement Between Maine Yankee Atomic Power Company and Stone & Webster Engineering Corporation for the Decommissioning of the Maine Yankee Plant."Pursuant to this decommissioning agreement, SWEC agreed to perform certain work related to the decommissioning of the Wiscasset nuclear power plant and the completion of a fuel storage installation. Stone & Webster Incorporated and Stone & Webster Engineers and Constructors, Inc. guaranteed SWEC's performance under the contract. The agreement targeted April 30, 2004 as the completion date for the project.

Because the interpretation of the decommissioning agreement is central to this dispute, the court will describe several pertinent contract provisions.

According to Carroll, under the decommissioning agreement, it was SWEC's exclusive duty to pay the subcontractors. Article 4 covers the terms of payment. Under Articles 4.2 and 4.4, SWEC was to provide monthly invoices for itself and the subcontractors based on earned value and for reimbursable charges incurred. Article 4.3 contemplates the provision of lien indemnities and lien waivers where appropriate.

Article 31.0 of the decommissioning agreement sets

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

out the procedures for providing lien waivers and the payment of subcontractors. The provision obligates SWEC to waive any rights to a mechanic's lien upon payment of services and requires that SWEC "obtain from any Subcontractor or material man which provides goods or services a written waiver of such Subcontractors' or material men's right to any such lien ...." For those Subcontractor's whose contract price was less than $1,000,000, SWEC could provide an indemnity in lieu of a waiver.

Article 11 of the decommissioning agreement provides the parties the ability to terminate for cause. Article 11 states in full:

11.0 *TERMINATION FOR CAUSE*

11.1 Maine Yankee shall have the right, upon written notice to Contractor, to terminate the Agreement without any further liability to Contractor over and above compensation for Work performed, in the event of the occurrence of any of the following:

11.1.1 insolvency of the Contractor,

11.1.2 the filing of a voluntary petition in bankruptcy by Contractor;

11.1.3 the filing of an involuntary petition to have Contractor declared bankrupt;

11.1.4 the appointment of a receiver or trustee for Contractor;

11.1.5 the execution by Contractor of an assignment for the benefit of creditors; provided, however, Contractor may make an assignment of accounts receivable to a lending institution in its normal course of business without prejudice or notice; or

11.1.6 the commencement of any legal proceeding against Contractor which substantially interferes with Contractor's ability to perform

*3 11.2 If Contractor fails to substantially perform under the Contract Documents or if Contractor materially breaches any of the terms of the Contract Documents, or should Maine Yankee receive a Confirmatory Action Letter or NRC order which causes the suspension of Work as a result of

Contractor's deficient activities, Maine Yankee shall have the right, without further liability to Contractor, upon giving contractor written notice and reasonable time to remedy such deficiency, to:

11.2.1 terminate the Agreement in whole or in part upon giving a second written notice to Contractor of such termination and the basis thereof, if Contractor has failed to initiate the remedy in a reasonable fashion within thirty (30) days of the first notice in the immediately preceding paragraph;

11.2.2 obtain performance of some or all of the Contractor's obligations under the Contract Documents from another contractor and recover reasonable excess cost resulting therefrom from the Contractor, and/or

11.2.3 exercise any action available at law or in equity to enforce remedies provided, including liquidated damages, for the Contractor's failure to perform as set forth in the Contract Documents.

11.3 A termination under this article shall be effective immediately upon receipt of any written notice as described in Article 11.1 or Article 11.2.1 by the Contractor. The Contractor shall immediately cease Work, commence demobilization of any affected forces and promptly remove from the Site materials and equipment belonging to Contractor which have not been fully paid for by Maine Yankee. If requested to do so by Maine Yankee, Contractor shall promptly transfer title and deliver to Maine Yankee such completed or partially completed and paid for Work and assign any Subcontracts rights as Contractor may have with any third parties for the Work. Contractor shall attempt to promptly settle, any liabilities and claims arising out of any resulting termination of subcontracts and orders at no cost to Maine Yankee.

11.4 If the unpaid Agreement funds, including any funds payable to Maine Yankee by reason of letter fo credit, performance bond or insurance coverage, fail to compensate Maine Yankee for the total direct damages and costs incurred by Maine Yankee to finish the Work, Contractor shall pay such difference to Maine Yankee within thirty (30) days following receipt of an undisputed invoice from Maine Yankee. This obligation for payment shall survive the termination of the Agreement or relevant portion

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Page 4

thereof.

11.5 In the event any termination under this Article 11 is subsequently determined to have been made without cause, such termination shall be deemed to Termination for Convenience under Article 12.1.

11.6 In the event that Maine Yankee fails to comply with its material obligations herein, including but not limited to: Maine Yankee's non payment of any invoice per Section 4.4., Maine Yankee's failure to provide reasonable evidence that fund are available for the next year as per Section 4.6, Maine Yankee's declaring bankruptcy or otherwise is determined to not have the capability of paying its bills in the ordinary course of business, and Maine Yankee's failure to comply with its insurance requirements and obligations per Section 24B; and after Contractor has given Maine Yankee written notice of its intention to terminate, and allowed Maine Yankee a reasonable time to remedy such default, not less than sixty (60) days for nonpayment, Contractor may terminate this Agreement for Maine Yankee's default and Contractor shall be entitled to be paid pursuant to Article 12 hereof.

*4 On November 18, 1999, Maine Yankee sent SWEC a letter giving formal notice of default under Article 11.2 for failure to perform under the decommissioning agreement. Maine Yankee identified a number of breaches: SWEC's failure to pay its subcontractors and suppliers for work previously performed; SWEC's failure to provide properly filled out lien waivers (according to Maine Yankee, the lien wavers erroneously represented that all of its subcontracts had been paid in full for the work); and the notice that one of SWEC's major subcontractors was considering suspending all work as a result of SWEC's failure to pay in a timely manner. Further, Maine Yankee requested information about the possibility that SWEC and its parent corporations may have been insolvent. Maine Yankee stated that SWEC "failed to substantially perform its obligations with respect to the performance of the Work and is in material breach of the terms of the [decommissioning agreement]" and demanded that SWEC take action to remedy the deficiencies in its performance. Maine Yankee withheld payment of SWEC's October invoice until SWEC provided evidence that it would cure the alleged breaches.

On November 30, 1999, in response to the November 18, 1999 letter, Maine Yankee and SWEC entered into Addendum No. 3 of the decommissioning agreement. By that agreement, SWEC agreed to provide corrected lien waivers and certified statements from certain suppliers for overdue amounts and to meet with representatives of Maine Yankee periodically. Further, SWEC had to provide lien waivers "from all subcontractors whose contract/order price on the date of the invoice was greater than $100,000 and from all other Suppliers whose contract/order price on the date of the invoice is greater than $250,000." In exchange, Maine Yankee agreed to make payment to SWEC no more than one business day after receipt of the revised lien waivers and certification. On December 1, 1999, Maine Yankee wire-transferred most of the money due under the November 4 and 5, 1999 invoices.

On February 7, 2000, Maine Yankee sent SWEC a letter containing the subject line: "RE: ISFSI Cask Material Procurement and Fabrication, SWS-MY-000309." According to Carroll, the IFISI cask is a containment area for spent fuel storage. Carroll testified that this letter dealt with the ownership and procurement of the cask. The letter details Maine Yankee's concerns about the cask and SWEC's failure to create and distribute a detailed project schedule as required by the decommissioning agreement.

On March 28, 2000, Maine Yankee sent a letter to SWEC detailing concerns about the lack of a schedule for Reactor Vessel Internals Segmentation ("RVIS") activities. The letter describes the need to integrate the RVIS activities into the main project schedule.

Despite these concerns, from October 1999 through March 2000, SWEC submitted invoices to Maine Yankee pursuant to the decommissioning agreement. Included with the invoices were the lien waiver forms signed by SWEC and certain subcontractors. Maine Yankee paid the amount due under these invoices.

*5 In the Pretrial Order the parties agreed that as of May 1, 2000, and at all times thereafter, SWEC was insolvent within the meaning of Article 11.1.1 of the decommissioning agreement and within the meaning of 11 U.S.C. § 101(32)(A).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

On May 1, 2000, Maine Yankee sent a letter to SWEC regarding Stone and Webster Incorporated and SWEC's financial situation. In the letter, Maine Yankee asserted that it had notified SWEC in the November 18, 1999 letter of potential breaches of the agreement and advised SWEC that Maine Yankee might terminate the decommissioning agreement because of SWEC's potential insolvency. Further, Maine Yankee stated: "This past weekend's press release and the news reports about Stone & Webster, Inc., demonstrate that, despite your attempts to improve your financial situation, SWEC remains insolvent ."Maine Yankee also informed SWEC that it "remains in default of the [decommissioning agreement] and its efforts to cure since the November 18 letter have not remedied the material breaches of contract."Although Maine Yankee did not terminate the contract, it explicitly reserved the right to do so. Lastly, Maine Yankee requested a meeting no later than May 4, 2001 to find a mutually agreeable method for completing the project.

On May 3, 2000, the parties met to discuss the future of SWEC's work at the nuclear power plant. According to Carroll, at that meeting, Maine Yankee led SWEC to believe that the parties would work together to find a way to complete the project.

On May 4, 2000, SWEC hand delivered two invoices to Maine Yankee dated May 3, 2000, purportedly covering work and charges for April 2000 (the "April 2000 invoices"). The total amount of these invoices is $6,328,314. These invoices were not accompanied by lien waivers from the subcontractors and SWEC admits that it had not paid the subcontractors for the work covered in those invoices.

Also on May 4, 2000, Maine Yankee sent SWEC an official notice of termination under Article 11 of the decommissioning agreement. According to that letter, Maine Yankee terminated the agreement because of SWEC's insolvency and SWEC's failure to cure the defaults identified in the November 18, 1999 and May 2, 2000 letter. (The court assumes that Maine Yankee meant the letter dated May 1, 2000.) Specifically, Maine Yankee stated that SWEC had not provided an acceptable project schedule, had not made adequate progress in completion of the work, had not obtained the necessary regulatory approvals, had not administered the work, failed to provide adequate assurances of its ability to complete

performance, and failed to pay its subcontractors and suppliers as required by the decommissioning agreement.

On May 9, 2000, Maine Yankee sent a letter to SWEC stating that it had received the April 2000 invoices, but noted that SWEC had not provided the necessary lien waivers. Thus, Maine Yankee stated, "the subject invoices do not comply with the contract requirements and would not, in any event, be considered appropriate for payment."

**\*6** On that same day, SWEC sent a letter to Maine Yankee regarding the May 4, 2000 termination notice. The letter laid out grounds under which SWEC would continue to provide services on the Maine Yankee project until June 30, 2000.

On May 10, 2000, the parties entered into the Interim Service Agreement. That agreement ran from May 4, 2000 to June 30, 2000 and laid out terms "to mitigate the damages and adverse consequences of an abrupt or inefficient demobilization at the Maine Yankee site as a result of [the May 4, 2000 termination notice] and other contested issues among the parties ...." In essence, the parties agreed to perform as they would have under the decommissioning agreement for the duration of the Interim Service Agreement with certain exceptions. SWEC agreed to continue work on a modified schedule approved by Maine Yankee and Maine Yankee agreed to pay charges and reimbursable costs directly to the subcontractors. Further, Maine Yankee agreed to pay $5,100,789.36 to subcontractors, suppliers, vendors, and consultants for goods services provided prior to May 1, 2000 and SWEC agreed to provide the appropriate lien waivers with respect to all work in the April 2000 invoices. Despite these modifications and concessions, the parties explicitly stated that they retained their rights under the decommissioning agreement.

On May 22, 2000, the parties amended the Interim Service Agreement for the first time. That amendment made minor modifications to the language of the agreement.

On June 1, 2000, Maine Yankee sent SWEC a letter stating that it had not received any third party lien waivers from SWEC with respect to the April 2000 invoices and requested that SWEC provide all of the appropriate lien waivers by June 8, 2000.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

On June 2, 2000, Stone & Webster Incorporated, and certain affiliates including Stone & Webster Engineers and Constructors, Inc. and SWEC filed voluntary petitions for bankruptcy relief.

On June 8, 2000, SWEC contends that it provided lien releases for the appropriate subcontractors according to the work performed during April 2000.

On June 27, 2000, the parties entered into a Second Amendment to the Interim Service Agreement. This amendment extended the term of the Interim Service Agreement until September 30, 2000 and made other modifications to the scope of work and procedures for payment.

On August 23, 2000, Maine Yankee filed a proof of claim in the amount of $78.2 million against SWEC. At the same time, Maine Yankee filed nearly identical proofs of claim against Stone & Webster, Incorporated and Stone & Webster Engineers and Constructors, Inc.

On November 16, 2000, the debtors filed an objection under 11 U.S .C. §§ 502(b)[FN1] and 502(d)[FN2] to the Maine Yankee's claims. According to the debtors, the court should disallow Maine Yankee's claims under § 502(b) because Maine Yankee did not properly terminate the decommissioning agreement either for insolvency or for failure to perform and Maine Yankee has no right to damages even if it properly terminated for insolvency. The debtors further argue that the court should disallow the claims under § 502(d) because Maine Yankee has not paid SWEC the amount owed under the April 2000 invoices.

FN1.Section 502(b) states in relevant part:

502. Allowance of claims or interests

...

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that-

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

11 U.S.C. § 502(b)(1).

FN2.Section 502(d) states in relevant part:

502. Allowance of claims or interests

...

(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d)

*7 On February 6, 2001, the parties submitted a Pretrial Order on the threshold defenses by the debtors to the Maine Yankee claims. On February 13, 2001, the court held a non-jury trial on the threshold defenses. At trial, the debtors put one witness, James Carroll, on the stand. Maine Yankee did not present any witnesses.

The parties dispute whether the court should disallow Maine Yankee's claims under §§ 502(b) and 502(d).

II. *DISCUSSION*

A. *Should the court disallow the claims under § 502(b)?*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Under § 502(b)(1), the court must not allow claims against a debtor that are unenforceable "under any agreement or applicable law." The debtors argue that Maine Yankee cannot demonstrate that it is entitled to damages under the decommissioning agreement for three reasons: 1) Article 11.1, which allows Maine Yankee to terminate the agreement if SWEC becomes insolvent, does not create a right to recover damages; 2) if Article 11.1 does give a right to recover damages, Maine Yankee did not properly terminate the agreement under that provision because Maine Yankee did not give SWEC an opportunity to cure its financial position; and 3) Maine Yankee failed to follow the procedures required to terminate the decommissioning agreement under Article 11.2, which allows Maine Yankee to terminate the agreement for failure to perform.

*1. Is Maine Yankee entitled to recover damages from SWEC if the sole basis for terminating was SWEC's insolvency?*

The debtors argue that even if Maine Yankee properly exercised its right to terminate the contract for insolvency, Maine Yankee does not have the right to pursue any remedies or damages for termination under that provision. According to the debtors, the difference in the terms of Article 11.1, termination for insolvency, and 11.2, termination for failure to perform, demonstrates that Maine Yankee did not bargain for the right to pursue damages under Article 11.1. The debtors point out that in contrast to the termination for insolvency provision, which only lists events that give Maine Yankee the right to terminate the agreement, the termination for failure to perform provision gives Maine Yankee both the right to terminate and the express right to pursue "any action available at law or in equity to enforce remedies provided."

Maine Yankee makes two arguments in opposition. First, Maine Yankee contends that the plain language of Article 11.4, the damages provision, specifies that SWEC "shall pay" Maine Yankee in the event that other funds fail to compensate for direct damages and costs incurred by Maine Yankee to finish the work. According to Maine Yankee this passage does not limit recovery to termination for failure to perform.

Second, Maine Yankee argues that the structure of

Article 11 makes clear that damages are available for termination for insolvency. According to Maine Yankee, 11.1 and 11.2 specify the conditions upon which Maine Yankee can terminate the agreement and 11.3 and 11.4 specify SWEC's obligations in the event of a termination. Moreover, Maine Yankee further contends that the termination for failure to perform section contains an additional provision for remedies because that passage covers causes for termination that might create harm to Maine Yankee above and beyond the costs of completion and for which Maine Yankee might seek a remedy short of termination.

**8** In light of the structure and plain language of the contract, the court finds that Maine Yankee can sue for damages under Article 11.4 for termination under Article 11.1 for insolvency. Article 11.1 limits Maine Yankee's liability to SWEC to the amount owed for work already performed. The failure to include information about recovery of damages in this portion of Article 11 does not indicate that Maine Yankee has waived its right to damages. Article 11.4 gives Maine Yankee the right to damages and costs in the event that a performance bond or insurance does not compensate Maine Yankee for completing the work in the event of termination.

*2. Did Maine Yankee properly terminate the decommissioning agreement under Article 11.1 for insolvency?*

According to the debtors, Maine Yankee did not provide SWEC an opportunity to cure its financial condition before terminating the agreement pursuant to Article 11.1. Specifically, the debtors argue that although Maine Yankee provided SWEC with a "formal Notice of Default" in the November 18, 1999 letter, Maine Yankee did not terminate the decommissioning agreement. Rather, although Maine Yankee reserved the right to terminate for insolvency, Maine Yankee merely advised that it expected SWEC to take steps to cure its default. SWEC contends that it alleviated Maine Yankee's concerns about its financial condition by signing Amendment 3 on November 30, 1999.

Further, the debtors contend that in the May 1, 2000 letter, Maine Yankee provided notice of concerns about the SWEC's financial situation, but did not terminate the agreement. The debtors state that Maine

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Yankee again demanded that SWEC cure its default, "including providing Maine Yankee with sufficient information to permit Maine Yankee to evaluate SWEC's financial condition."Carroll testified that as a result of the May 3, 2000 meeting, SWEC officials believed that the parties would work together to resolve the situation as they had in the past. Thus, SWEC contends that it was not properly on notice that Maine Yankee might terminate. Lastly, SWEC contends that the May 1, 2000 letter did not give it enough time to cure its financial position.

Maine Yankee contends that although it did not terminate the agreement after the November 18, 1999 and May 1, 2000 letter, it had the right to do so at a later date. That is, according to Maine Yankee, both of those letters constituted notice of an intent to terminate for insolvency and because SWEC did not cure its financial deficiencies, Maine Yankee was entitled to terminate the agreement at any time.

As a preliminary matter, the court notes the difference in the drafting of the provisions for termination for insolvency and termination for failure to perform. Although Article 11.2, termination for failure to perform, requires Maine Yankee to provide SWEC with "written notice and reasonable time to remedy such deficiency" prior to terminating, Article 11.1, termination for insolvency, merely requires "written notice" to terminate. One might conclude from this that the notice provision for Article 11.1 does not require adequate time to cure.

**\*9** Nonetheless, the court finds that both the November 18, 1999 and May 1, 2000 letters constituted adequate notice of an intent to terminate. Thereafter, Maine Yankee was within its contractual rights to terminate the agreement. Maine Yankee did not waive the right to terminate by entering into negotiations to continue the work. That is, SWEC cannot reasonably claim that Maine Yankee abandoned its notice of an intent to terminate because the parties discussed continuing the commercial relationship in a mutually beneficial manner. Moreover, Maine Yankee placed SWEC on notice as early as November 18, 1999 of concerns about SWEC's financial position. As Maine Yankee noted, SWEC had from November until May to improve its financial position. As is clear from the facts before the court, SWEC did not do so. Therefore, the court finds that Maine Yankee provided notice and time to cure prior to terminating the agreement for insolvency.

3. *Did Maine Yankee properly terminate the decommissioning agreement under for failure to perform under Article 11.2?*

In contrast to Article 11.1, termination for insolvency, Article 11.2 spells out the conditions precedent to proper termination for failure to perform. In order to terminate for failure to perform, Maine Yankee must give "written notice and reasonable time to remedy such deficiency" and give "a second written notice to [SWEC] of such termination and the basis thereof, if [SWEC] has failed to initiate the remedy in a reasonable fashion within thirty (30) days of the first notice."Thus, Maine Yankee could only terminate under this provision after giving SWEC notice of an intent to terminate and thirty days in which to cure the identified default.

According to SWEC, Maine Yankee did not follow these procedures in terminating the contract under Article 11.2. In the May 4, 2000 termination letter, Maine Yankee stated that it was ending the decommissioning agreement because of the following defaults:

(1) The insolvency of Stone & Webster under Section 11.1.1; and

(2) Stone & Webster's failure to cure all of the defaults identified in Maine Yankee's November 18, 1999 and May 2, 2000 letter; <sup>FN3</sup> and

> FN3. The court assumes that this is a reference to the letter dated May 1, 2000 from Maine Yankee to SWEC. The parties have not identified a May 2, 2000 letter.

(3) Stone & Webster's failure to perform its material obligations and its failure to cure its numerous material defaults in its obligations under the Contract Agreement, including, but not limited to, its failure to provide an acceptable Project Schedule under Section 11.9 of the Amended RFP, its failure to make adequate progress in completion of the Work, its failure to plan for and obtain the necessary regulatory approvals for the Work, its failure to properly and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Page 9

adequately administer the Work, its failure to provide adequate assurances of its ability to complete performance under the Contract Agreement, and its failure to pay its subcontractors and suppliers as required by the Contract Agreement.

SWEC contends that the first basis deals with termination under Article 11.1 and that the third basis raises reasons for termination for which Maine Yankee has never provided notice. Thus, according to SWEC, only the second basis remains as a proper rationale for termination under Article 11.2 for failure to perform.

**\*10** Maine Yankee takes a different view of its contractual requirements. Maine Yankee identifies four breaches of SWEC's duty under the decommissioning agreement under which it was entitled to terminate the pursuant to Article 11.2: 1) failure to pay subcontractors, 2) failure to provide a detailed project schedule, 3) failure to obtain Certificates of Compliance for the casks, and 4) a failure to provide adequate assurance of an ability to perform. Maine Yankee further contends that it provided written notice of these deficiencies in at least three letters-the November 18, 1999 letter, the February 7, 2000 letter, and the May 1, 2000 letter-and that SWEC failed to cure any of these defaults.

In the November 18, 1999 letter, Maine Yankee alleged three breaches of the decommissioning agreement: failure to pay its subcontractors, failure to provide proper lien waivers, and notice by one of SWEC's major subcontractors that it considered suspending work for SWEC's failure to pay in a timely manner. In the February 7, 2000 letter, Maine Yankee made clear that it was concerned about the lack of a proper project schedule. SWEC contends that this letter was inadequate as formal notice because Maine Yankee did not state that it was formal notice and that it differed in form from the November 18, 1999 formal notice. However, the contract does not require a particular form of notice. The February 7, 2000 letter made clear in several paragraphs of text that SWEC had not met its obligations under the contract. To the extent that the May 4, 2000 termination notice identified concerns first addressed in either the November 18, 1999 letter or the February 7, 2000 letter, the court finds that Maine Yankee provided adequate notice and time to cure prior to the termination letter.

Lastly, SWEC argues that Maine Yankee did not provide adequate time to cure concerns raised in the May 1, 2000 letter. According to SWEC, the contract requires Maine Yankee to give SWEC thirty days notice and opportunity to cure. Maine Yankee concedes that the May 4, 2000 termination did not meet this requirement, but contends that "a nonbreaching party does not have to comply with notice and cure provisions when to do so would be futile."The court finds that it need not settle this dispute because the May 1, 2000 letter did not raise new grounds for terminating the agreement. Rather, this letter repeated the concerns of the November 18, 1999 and the February 7, 2000 letters.

The court concludes that the November 18, 1999 and February 7, 2000 letters from Maine Yankee provided SWEC with notice of a number of potential defaults. This notice gave SWEC adequate time to cure these concerns. The court, however, cannot determine based on the evidence presented whether SWEC actually breached the contract such that Maine Yankee properly terminated the decommissioning agreement under Article 11.2.

4. *Conclusion as to claims under § 502(b)*

The court finds that Maine Yankee can bring a claim for damages under Article 11.4 for termination for insolvency pursuant to Article 11.1. Further, the court finds that Maine Yankee gave SWEC adequate notice of its intent to terminate the agreement for insolvency. Lastly, the court finds that pursuant to Article 11.2 Maine Yankee provided SWEC adequate notice and time to cure potential defaults in the November 18, 1999 and February 7, 2000 letter. Therefore, the court will not disallow the claims under § 502(b)(1).

B. *Should the court disallow claims under § 502(d)?*

**\*11** Under § 502(d), courts should "disallow claims of any entity from which property is recoverable under section 542 ... or that is a transferee of a transfer avoidable under section ... 547[or] 548 ... unless such entity or transferee has paid the amount, or turned over any such property ...."11 U.S.C. § 502(d). The bankruptcy code defines a transfer as "every mode ... of disposing of or parting with property or with *an interest in property*." 11 U.S.C. § 101(54) (emphasis added). The debtors argue that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Page 10

pursuant to this section of the bankruptcy code, the court should disallow Maine Yankee's claims because two transfers, the interim service agreement and the subcontractor payments, are avoidable under §§ 547 and 548. Further, the debtors argue that Maine Yankee holds property of the estate recoverable under § 542.

According to the debtors, upon generating the invoices for the April work, SWEC had a receivable in the amount of $6,328,314. Therefore, as of May 4, 2000, the day of the delivery of those invoices, SWEC had a right to payment of that amount. Those invoices represented $1,227,524.64 of work and charges from SWEC and $5,100,789.36 of work and charges from subcontractors from April 2000.

On the same day that SWEC delivered those invoices, Maine Yankee terminated the decommissioning agreement. Subsequently, on May 10, 2000, the parties entered into the Interim Service Agreement. Pursuant to the Interim Service Agreement, Maine Yankee directly paid $5,100,789.36 to the subcontractors. This payment bypassed the typical method of payment under the decommissioning agreement, whereby Maine Yankee would pay SWEC the total invoice amount and SWEC would pay the subcontractors.

SWEC contends that by paying the subcontractors $5,100,789.36 of the April 2000 invoices, Maine Yankee transferred part of SWEC's receivable, an interest in property, to the Subcontractor. According to SWEC, the Interim Service Agreement, which allowed for this direct payment to the subcontractors, and the subsequent payment constitute a preferential transfer under § 547 and a fraudulent transfer under § 548. In other words, SWEC gave away the right to collect the $5,100,789.36 in the Interim Service Agreement to the detriment of other creditors. SWEC further contends that by failing to pay the remainder to SWEC, $1,227,524.64, Maine Yankee is in possession of property owed to SWEC that is recoverable under §§ 542.

Maine Yankee argues that the court need not reach any of these bankruptcy defenses because Maine Yankee does not owe SWEC the amounts reflected on the May 3, 2000 invoices. That is, each of debtor's bankruptcy defenses require, as a preliminary matter, that Maine Yankee owe SWEC the approximately

$6.3 million. According to Maine Yankee, it does not owe SWEC because: 1) SWEC failed to submit valid lien waivers to support the April 2000 invoices, a condition precedent to Maine Yankee's obligation to pay; and 2) SWEC breached the decommissioning agreement and therefore had no accounts receivable. The first of these arguments is relevant to the approximately $5.1 million dollars owed to the subcontractors, the second of these arguments is relevant to the remainder owed to SWEC.

**\*12** The debtors concede that SWEC had not paid the subcontractors as of the date of the April 2000 invoices. Further, Carroll testified that SWEC would not have used the Maine Yankee payments to pay the subcontractors. Rather, SWEC would have used the funds for payroll and other operating expenses. Moreover, SWEC concedes that it had not attached the proper lien waivers to the April 2000 invoices. Nonetheless, SWEC contends that under the decommissioning agreement the April 2000 invoices constitute a contingent interest in property. That is, SWEC maintains that it was entitled to collect the total amount of the invoices and to correct its failure to provide lien waivers. SWEC claims its interest in the April 2000 invoices is contingent upon fulfilling its obligation to provide lien waivers. The parties dispute whether or not SWEC has or even could properly file all of the proper lien waivers under Article 4 of the decommissioning agreement and the addendum signed on November 30, 1999.

In considering this issue, the court notes that the lien waivers state (emphasis added):

Contractor herein represents that all bills of Contractor's Subcontractors who performed Work or furnished materials for the performance of said Subcontracts *have been paid* for their Work pursuant to the terms of said Subcontracts and covered by the above payment, and Contractor further agrees to indemnify and hold harmless Purchaser and Owner from any and all manner of actions, caus of action, suits, in law or in equity, which any such Subcontractor or supplier may bring ....

Despite this language, Carroll testified that SWEC's common practice was to collect the invoice charges and the lien waivers from the subcontractors prior to invoicing Maine Yankee or paying the Subcontractors. In light of this regular business

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

practice, SWEC argues that it need not have had an intent to pay the subcontractors to provide properly filled out lien waivers. In other words, SWEC argues that it regularly invoiced Maine Yankee without paying the subcontractors and should not be penalized for following the same practice with regard to the April 2000 invoices. The court finds, however, that the lien waivers require that SWEC have paid the subcontractors in order to be properly filed with Maine Yankee. Therefore, because SWEC had not paid and did not intend to pay the subcontractors, SWEC could not meet its contingent requirement to invoice Maine Yankee properly.

Further, the court notes that Maine Yankee may not have had an obligation to provide SWEC with the approximately $5.1 million, given that Maine Yankee terminated under Article 11.1 and knew that SWEC would not pay the subcontractors. That is, Maine Yankee bargained for the ability to terminate the decommissioning agreement in the event that SWEC was insolvent. The contract makes clear that upon such a termination, Maine Yankee had to pay SWEC for the work it performed, *see* Article 11.1, but the contract does not state whether or not Maine Yankee would owe SWEC for work performed by the subcontractors. It would be a hollow bargain for Maine Yankee to agree to pay SWEC for subcontractor work, if Maine Yankee knew that SWEC would not, in turn, pay the subcontractors.

**\*13** As for Maine Yankee's second argument, the court finds that, even if it properly terminated the agreement for failure to perform under Article 11.2 or for insolvency under Article 11.1, Maine Yankee would still owe SWEC for the work SWEC performed. To rule otherwise would unjustly enrich Maine Yankee.

With these preliminary determinations in mind, the court will discuss the applicability of the bankruptcy provisions.

1. *Are the transfers avoidable under § 547 or § 548?*

Under § 547, the court may force the recipient of an interest in property to return what he received to the bankruptcy estate. Courts force creditors to return funds received from the debtor, even if received as compensation for an honest debt, in order to fairly divide the assets of the bankrupt corporation among a number of worthy creditors. That is, Congress laid out in the context of the bankruptcy statute a policy goal of treating creditors in like situations equally. To effectuate that goal, Congress allows courts to undo transactions where a corporation, after becoming insolvent, pays some debts and not others. Section 547(b) allows trustees to avoid a transfer of an interest of the debtor if the transfer was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

...

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Congress enacted § 548 to meet similar policy goals. Section 548 prevents debtors from making transfers with the actual intent to hinder or delay creditors or from making transfers for less than reasonably equivalent value.[FN4] This prevents a debtor from giving away its property and thus reducing the estate and from incurring debts such that there are more creditors to share in the assets remaining in the company.

FN4. Section 548 states in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                              Page 12
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation ....

11 U.S.C. § 548(a)(1).

Because the court finds that SWEC did not intend to pay its subcontractors for the April 2000 invoices and Maine Yankee properly terminated the decommissioning agreement under Article 11.1, it follows that Maine Yankee did not owe SWEC the approximately $5.1 million. Therefore, the Interim Service Agreement did not constitute a transfer of a property interest from SWEC to Maine Yankee. Thus, SWEC cannot avail itself of either of these defenses.

2. *Does Maine Yankee hold property recoverable under § 542?*

According to SWEC, Maine Yankee only objected to that portion of the April 2000 invoices owed to the subcontractors. The balance, $1,227,524.64, is a mature debt, owed to SWEC. Under § 542(b),

**\*14** an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b). SWEC argues that under this provision, the court should bar Maine Yankee's claims because of Maine Yankee's outstanding debt.

Maine Yankee argues first that it does not owe SWEC any part of the $6.3 million. According to Maine Yankee, even if the court finds that it owes SWEC for all or a portion of the April 2000 invoices, the debt is not matured because it is the subject of a dispute. Lastly, even if the court finds a debt and there is no dispute about the amount owed, Maine Yankee contends that it has the right to set off that amount against SWEC's obligation under the contract. *See* 11 U.S.C. § 553.

"Section 553 incorporates and preserves in bankruptcy law the right of setoff available at common law." *Cohen v. Savings Bldg. & Loan Co.,* 896 F.2d 54, 57 (3d Cir.1990). "The right of setoff depends on the existence of mutual debts and claims between creditor and debtor" and allows parties that owe mutual debts to set one against the other and only pay the balance. *Id.*

At this stage of the proceeding, the court cannot determine whether the parties owe each other mutual debts, and will reserve decision on that issue. However, the court finds that to the extent that Maine Yankee owes SWEC for work done in April 2000, Maine Yankee may set off that amount against potential claims that it may have against SWEC for breach of the decommissioning agreement.

III. *CONCLUSION*

The court finds that Maine Yankee properly terminated the decommissioning agreement under for insolvency Article 11.1 and has a right to recovery under Article 11.4 for termination under that provision. The court, however, does not rule on the propriety of Maine Yankee's termination for failure to perform under Article 11.2. Nonetheless, the court will not disallow Maine Yankee's claims under 11 U.S.C. § § 502(b)(1).

Further, the court finds that SWEC did not intend to pay the subcontractors for the work performed during April 2000. Therefore, SWEC could not provide properly filled out lien waivers for those subcontractors. As such, SWEC did not provide adequate support for the April 2000 invoices and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)
**2001 WL 849738 (Bkrtcy.D.Del.)**

Page 13

Maine Yankee had no duty to pay SWEC approximately $5.1 million. Thus, the Interim Service Agreement, which gave Maine Yankee the right to pay the subcontractors directly, does not constitute a preferential or fraudulent transfer under the bankruptcy code.

Lastly, the court finds that to the extent that Maine Yankee owes SWEC for work SWEC performed before April 2000, Maine Yankee may set off that amount against claims for breaching the decommissioning agreement.

Bkrtcy.D.Del.,2001.
In re Stone & Webster, Inc.
Not Reported in B.R., 2001 WL 849738 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in B.R.                                                                                                  Page 1
Not Reported in B.R., 1994 WL 910792 (Bkrtcy.N.D.Iowa)
**1994 WL 910792 (Bkrtcy.N.D.Iowa)**

**H**In re Bockes Bros. Farms, Inc. v. Bockes Brothers
Farms, Inc.
Bkrtcy.N.D.Iowa,1994.
Only the Westlaw citation is currently available.
United States Bankruptcy Court, N.D. Iowa.
In re BOCKES BROTHERS FARMS, INC.,
Debtor(s).
Eileen L. HAGER, Plaintiff(s),
v.
BOCKES BROTHERS FARMS, INC. Defendant(s).
No. 93-6127KW, 93-60881KW.

Jan. 6, 1994.

*ORDER*

PAUL J. KILBURG, Bankruptcy Judge.
**\*1** This matter was tried on December 9, 1993 on
Eileen L. Hager's Petition for Recovery of Real
Property. Plaintiff was represented by Curtis Ward.
Defendant/Debtor Bockes Brothers Farms, Inc. was
represented by Dan Childers. Tom McCuskey
appeared on behalf of the Unsecured Creditor's
Committee. After the presentation of evidence, the
Court took the matter under advisement.

*FINDINGS OF FACT*

Plaintiff originally filed this action in state court.
After this Court granted Ms. Hager relief from the
automatic stay to continue her action, Debtor
removed the matter to federal district court. This
Court then ordered retention in bankruptcy court in
its Order filed September 7, 1993. The petition
asserts that Ms. Hager is entitled to possession of
certain real estate by virtue of forfeiture of a real
estate contract between her and Debtor. She seeks
immediate possession of the real estate and rental
value damages for Debtor's use of the property
subsequent to completion of the forfeiture on October
8, 1992.

The parties executed a real estate contract for the
subject property on December 29, 1988. Thereafter,
Debtor was late in making some of the semi-annual
payments. Debtor was in default on the final
installment payment due in 1992. It owed

approximately $5,000 of the original contract price of
$33,000. Ms. Hager directed attorney Kirby D.
Schmidt to prepare and serve a Notice of Forfeiture
which was served September 8, 1992. Debtor had
thirty days after service of the Notice to cure the
default pursuant to Iowa Code § 656.4. Debtor
tendered a personal check to Mr. Schmidt on October
6, 1992 which was forwarded to Ms. Hager at her
residence in Texas. Ms. Hager, Mr. Schmidt and
Debtor apparently all considered this check to be
payment in full under the contract until October 20
when Ms. Hager was informed that the check was
returned for insufficient funds. This payment cannot
be considered sufficient performance by Debtor to
cure its default as the check was eventually
dishonored.

On October 22, Ms. Hager directed Mr. Schmidt to
complete the forfeiture. Debtor asserts that it learned
that the check failed to clear on October 29. Debtor
immediately procured a certified check for $5,071.62,
the balance due under the contract, and tendered it to
Mr. Schmidt in Grundy Center who mailed it to Ms.
Hager. When Ms. Hager received the check, she
refused it and mailed it back to Mr. Schmidt to return
to Debtor. She then discharged attorney Schmidt and
retained Attorney Curtis Ward to continue with the
forfeiture proceedings. The Affidavit in Support of
Forfeiture was recorded in Grundy County on
November 20, 1992. Ms. Hager filed her petition to
recover the property in February, 1993. Debtor filed
its Chapter 11 petition in bankruptcy in May, 1993.

Ms. Hager asserts that she has the right to possession
of the property from the date the forfeiture was
completed under Iowa law (October 8, 1992). Debtor
argues that its certified check avoided the forfeiture.
It asserts that Mr. Schmidt accepted the check in lieu
of forfeiture as Ms. Hager's apparent agent.

**\*2** Debtor also argues that even if the forfeiture was
validly completed under the statute, it should be set
aside as inequitable. At trial, Debtor offered expert
testimony that the property now has a value of
$59,000. Ms. Hager argues that the "forced sale"
value of the property is actually lower than that.
Debtor states that it made significant improvements

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

to the property, remodeling the barn and house and removing obsolete buildings. Ms. Hager, however, considers those changes to have decreased the value of the property.

Finally, Debtor alleges that the contract forfeiture is avoidable as a fraudulent transfer under 11 U.S.C. § 548(a)(2). The forfeiture occurred within one year prior to commencement of the case. Debtor asserts that it was insolvent at the time and did not receive reasonably equivalent value from the transfer. Ms. Hager argues that the contract forfeiture does not constitute a "transfer" under § 548(a)(2).

*JURISDICTION*

The bankruptcy court has jurisdiction to enter final orders in core proceedings "arising under" Title 11. 28 U.S.C. §§ 157(a), 157(b), 1334(b). A non-exhaustive list of types of core proceedings is found at 28 U.S.C. § 157(b)(2)(A)-(O). The bankruptcy court also has jurisdiction over non-core "related" proceedings, but does not have authority to enter a final order in those matters without the parties' consent. 28 U.S.C. § 157(c); *In re Roberg*, No. L92-00776W,Adv. No. 92-6263LW, slip op. at 3 (Bankr.N.D.Iowa Apr. 16, 1993). A proceeding is "related to" a bankruptcy case if "the outcome could conceivably have any effect on the estate being administered in bankruptcy." *In re Titan Energy, Inc.*, 837 F.2d 325, 330 (8th Cir.1988). As noted in the September 7, 1993 Order, this Court has jurisdiction over Hager's eviction action as a related proceeding. However, Debtor's assertion that the forfeiture constitutes a fraudulent transfer is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), "proceedings to determine, avoid, or recover preferences." A thorough analysis of this issue has been made by the Eighth Circuit Court of Appeals in *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993).

For the reasons set out later in this opinion, this matter is treated as a core proceeding and the ruling entered here is a final order.

*CONCLUSIONS*

First, Debtor challenges the validity of the forfeiture proceedings. It claims that Mr. Schmidt's acceptance of the certified check, tendered outside the statutory 30-day period for cure under Iowa Code sec. 656.4,

constitutes a waiver of the right to forfeit by Ms. Hager's apparent agent. The law provides that if the conduct of a contract seller clearly indicates a waiver of the right to forfeit, no forfeiture occurs. *Gottschalk v. Simpson*, 422 N.W.2d 181, 184 (Iowa 1988). Ms. Hager asserts that Mr. Schmidt did not have the authority to accept the late payment on her behalf.

Iowa courts have adopted the doctrine of apparent authority as defined in the Restatement 2d of Agency, Sec. 27. Apparent authority exists when a third party reasonably believes through the principal's words or conduct that the principal consents to the agent's action on the principal's behalf. *Crane v. Iowa Dep't of Job Serv.*, 412 N.W.2d 194, 197 (Iowa App.1987). The principal is bound by the acts of the agent if the principal has led the public to reasonably believe the agent has the authority to act. *State v. Sellers*, 258 N.W.2d 292, 297 (Iowa 1977).

*3 If Debtor's theory is accepted, Ms. Hager waived the right to forfeit when Mr. Schmidt accepted Debtor's certified check on her behalf. Debtor made its initial attempt to cure by tendering a check to Mr. Schmidt, to which Ms. Hager made no objection. The evidence indicates that Debtor periodically made contract payments to Mr. Schmidt because he was more accessible in Grundy Center, Iowa, than Ms. Hager was in Texas. This history of failing to object to Mr. Schmidt's receipt of Debtor's rental payments provides some support for the conclusion that Mr. Schmidt was Ms. Hager's agent for that purpose.

Second, Debtor argues that, assuming the right to forfeit was not waived, the forfeiture should nevertheless be set aside on equitable grounds. Generally, forfeiture is completed by compliance with Chapter 656 and the passage of thirty days after service of notice. Iowa Code §§ 656.2, .4; *Gottschalk*, 422 N.W.2d at 184; *Lett v. Grummer*, 300 N.W.2d 147, 149 (Iowa 1981). However, it is also a general rule of construction that equity abhors a forfeiture. *Jamison v. Knosby*, 423 N.W.2d 2, 4 (Iowa 1988). "In adherence to that rule, forfeiture statutes are to be construed strictly against a forfeiture, with the burden to show full and strict compliance with the statutory procedures upon the party seeking forfeiture." *Id.* at 5.

Other legal principals establish that if the seller's conduct constitutes a waiver of the right to forfeit, no

forfeiture will be allowed. *Gottschalk,* 422 N.W.2d at 184. Forfeiture will be set aside where it appears that the seller is in default. *Skubal v. Meeker,* 279 N.W.2d 23, 26 (Iowa 1979). The maxim *"de minimus non curat lex "* was applied in *Lett,* 300 N.W.2d at 149. The buyer's default was failure to repair hog house windows on a farm valued at $300,000 which had a contract balance remaining of merely $16,000. *Id. Lett* set aside the forfeiture because the default was too minuscule. *Id.* Likewise, in *Brown v. Nevins,* 499 N.W.2d 736, 738 (Iowa App.1993), the Court set aside a forfeiture which was based on the buyer's failure to pay the $40 cost of serving notice where she had equity in property of approximately $18,000. However, a default trifling in amount can support a forfeiture if the default was flagrantly deliberate and opportunity was given to make payment. *Miller v. American Wonderlands, Inc.,* 275 N.W.2d 399, 402 (Iowa 1979).

The arguments made on these two issues are substantial. However, the Court declines to rule on whether the forfeiture was valid or whether it should be set aside for equitable reasons because it finds that Debtor's defense of fraudulent transfer is dispositive. Also, the first two issues raised are non-core whereas the dispositive issue is a core proceeding. Ruling on the dispositive core proceeding provides immediate finality.

Fraudulent transfer is defined in § 548(a) which states, in relevant part, as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

**\*4** (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548(a)(2). Fraudulent transfer, therefore, contains five elements: (1) an interest of the debtor in property; (2) voluntarily or involuntarily transferred; (3) within one year of filing bankruptcy; (4) where debtor received less than reasonably equivalent

value; and (5) debtor was insolvent at the time of the transfer or became insolvent as a result thereof. *In re Cormack,* No. L88-01506D,Adv. No. L88-0285D, slip op. at 5-6 (Bankr.N.D.Iowa Jul. 7, 1989). The burden of proof is on the party seeking to avoid a fraudulent transfer to establish each of the five elements by a preponderance of evidence. *Id.; In re Breuer,* 68 B.R. 48, 49 (Bankr.N.D.Iowa 1985).

This Court has previously ruled that forfeiture of a real estate contract can constitute a transfer under 11 U.S.C. § 548(a)(2). *In re Seifert,* No. 87-00614D,Adv. No. 87-0243D, slip op. at 6 (Bankr.N.D.Iowa Feb. 17, 1988). *Seifert* found that the debtor/contract buyer had an interest in property under state law as equitable owner under the real estate contract. *Seifert,* slip op. at 5; citing *In re Vacation Village Ltd. Partnership,* 49 B.R. 590, 592 (Bankr.N.D.Iowa 1984); *Fellmer v. Gruber,* 261 N.W.2d 173, 174 (Iowa 1978). "The question of whether the contract forfeiture effects a transfer within the meaning of § 548(a) is a question of federal law." *Seifert,* slip op. at 6; citing *In re Hulm,* 738 F.2d 323, 326 (8th Cir.), *cert. denied,*469 U.S. 990 (1984). *Hulm* held that judicial foreclosure of a mortgage constitutes a § 548(a) transfer. 738 F.2d at 327; *see also Cormack,* slip op. at 7, (following *Hulm* to find that mortgage foreclosure in Iowa constitutes a § 548(a) transfer). The Court in *Seifert* compared forfeiture of a real estate contract to foreclosure of a mortgage in concluding that the forfeiture also effects a transfer within the meaning of 548(a). *Seifert,* slip op. at 6.

*In re Zeman,* 60 B.R. 764 (Bankr.N.D.Iowa 1986), considered a fairly similar set of circumstances. Although a forfeiture did not occur, the debtors/contract buyers gave a quit claim deed back to the contract sellers, one of the debtor's parents. *Id. at 766.* The court held that this was a transfer of valuable contract rights held by the debtors as equitable owners of the property.

The only reported case cited or found by the Court considering the issue is *In re Veretto,* 131 B.R. 732 (Bankr.D.N.M.1991). The *Veretto* court held that the forfeiture of an equitable interest under a real estate contract constitutes a § 548(a) transfer. *Id.* at 737. The debtor has a property interest under the real estate contract which is transferred at the time forfeiture is completed under state law. *Id.* at 736,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 1994 WL 910792 (Bkrtcy.N.D.Iowa)
**1994 WL 910792 (Bkrtcy.N.D.Iowa)**

738. On a related issue, _In re McConnell, 934 F.2d 662, 664 (5th Cir.1991)_, held that the loss of earnest money under a real estate purchase contract upon default by the debtor/buyer constitutes a § 548(a) transfer.

*5 The Court concludes that, regardless of whether the contract forfeiture was valid or should be equitably set aside, the first two elements of a fraudulent transfer are satisfied as the forfeiture constitutes an involuntary transfer of Debtor's interest in property under the contract.

It is uncontested that the transfer occurred within one year of filing bankruptcy. There is no dispute that Debtor was insolvent in October 1992. Debtor offered testimony that in the fall of 1992 it held assets of $3.3 million and liabilities of $3.8 million. It filed its bankruptcy petition approximately seven months later. Based upon this largely uncontested evidence, the third and fifth elements of fraudulent transfer are satisfied by a preponderance of the evidence.

The final element is whether Debtor received less than reasonably equivalent value. The measure of the value Debtor received through the forfeiture must be viewed in terms of the contract balance due at the date of the transfer. _See Zeman, 60 B.R. at 766._ The forfeiture cancels Debtor's right to possession of the property and its duty to pay the remaining contract balance. The amount necessary to cure the contract default at the time of forfeiture was approximately $5,000. Debtor offered expert testimony that the property is worth $59,000. This evidence is unrebutted except by Ms. Hager's contention that the property should be valued at "forced sale" prices which would presumably be somewhat lower. Based on the record presented, the Court concludes that forgiveness of a $5,000 debt is not reasonably equivalent value for the loss of an interest in property worth in excess of $50,000. _See Zeman, 60 B.R. at 768_ (concluding that cancellation of contract balance of $307,000 is not reasonably equivalent value for property worth $328,000).

For all the reasons set out herein, it is the conclusion of this Court that Debtor has met its burden of proof on all elements of fraudulent transfer under § 548(a)(2). Fraudulent transfer constitutes a complete defense to Ms. Hager's related proceeding to recover

possession of the property. For the reasons previously discussed, this ruling is decided under § 548(a)(2), and it is therefore a final order in a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### _RULING_

WHEREFORE, for all the reasons set out herein, Eileen L. Hager's Petition for Recovery of Real Property is DENIED.

FURTHER, forfeiture of Debtor's rights under the real estate contract between the parties constitutes a fraudulent transfer under § 548(a)(2).

FURTHER, this fraudulent transfer is avoided under § 548.

FURTHER, the parties are returned to their respective positions as they existed prior to service of the Notice of Forfeiture.

FURTHER, judgment is entered for Debtor Bockes Brothers Farms, Inc. and against Plaintiff Eileen L. Hager.

SO ORDERED.

Bkrtcy.N.D.Iowa,1994.
In re Bockes Bros. Farms, Inc. v. Bockes Brothers Farms, Inc.
Not Reported in B.R., 1994 WL 910792 (Bkrtcy.N.D.Iowa)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.